12
WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter #91839
Matthew P. Bunting #306034
Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:　(559) 435-9800
Facsimile:　(559) 435-9868
E-mail:　rileywalter@w2lg.com

Chapter 9 Counsel

MCCORMICK BARSTOW, LLP
Timothy L. Thompson #133537
Mandy L. Jeffcoach #232313
Niki E. Cunningham #277976
7647 N. Fresno Street
Fresno, CA 93720
Telephone:　(559) 433-1300
Facsimile:　(559) 433-2300
E-mail:　mandy.jeffcoach@mccormickbarstow.com

District Counsel

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re<br><br>TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER,<br><br>Debtor.<br><br>Tax ID #:　94-6002897<br>Address:　869 N. Cherry Street<br>　　　　　　Tulare, CA 93274 | CASE NO.　17-13797<br><br>DC No.: WW-1<br><br>Chapter 9<br><br>Date:　October 12, 2017<br>Time:　10:30 a.m.<br>Place:　2500 Tulare Street<br>　　　　　Fresno, CA 93721<br>　　　　　Courtroom 13<br>Judge:　Honorable René Lastreto II |

**DECLARATION OF KEVIN B. NORTHCRAFT IN SUPPORT OF MOTION FOR AUTHORIZATION TO REJECT EXECUTORY CONTRACT (HEALTHCARE CONGLOMERATE ASSOCIATES, LLC)**

I, Kevin B. Northcraft, hereby declare and represent as follows:

1.　I am the elected chairman of the board of directors of Tulare Local

DECLARATION OF KEVIN B. NORTHCRAFT IN SUPPORT
OF MOTION FOR AUTHORIZATION TO REJECT
EXECUTORY CONTRACT (HEALTHCARE
CONGLOMERATE ASSOCIATES, LLC)

36894-00000 4742360.1
-1-

00158917-gaa-10.10.2017

Healthcare District ("District"), a California healthcare district covering a large part of Southwestern Tulare County. The District serves over 90,000 people. It is the only hospital in the District.

2. The District has been embroiled in political and financial controversies for many years and this has impeded the ability of the District to move forward in providing quality healthcare to the citizens of the District.

3. I am informed and believe that the controversies began in approximately 1994 when Dr. Pramood Kumar was appointed to the board to fill a vacancy. From and after that time, there have been significant controversies among the citizens and voters as to the proper management and control of the hospital. There have been deep divides within the community.

4. For many years the board was controlled by Dr. Kumar. During that time the District embarked upon an ill-fated decision to borrow money to construct a hospital tower.

5. The District borrowed $85 million in general obligation bonds and additional revenue bonds for the tower construction project but it was soon consumed by construction cost overruns, litigation and disputes over the proper use of bond proceeds. During this time, many citizens in the District began to express concern and dismay as to the management of the District's operations by the Kumar board.

6. A historical overview and timeline prepared by me, based on information which has been provided to me, of the various controversies, missteps and confrontations is as follows:

DECLARATION OF KEVIN B. NORTHCRAFT IN SUPPORT 36894-00000 4742360.1
OF MOTION FOR AUTHORIZATION TO REJECT -2-
EXECUTORY CONTRACT (HEALTHCARE
CONGLOMERATE ASSOCIATES, LLC)

00158917-gaa-10.10.2017

## Tulare Local Healthcare District, dba Tulare Regional Medical Center
## History/Timeline of Events Leading to Financial Crisis

I am informed and believe that the District is a public agency, formed in 1945 under the State of California Local Healthcare District Law. The geographic area covered by the District encompasses a very large area in the Southwestern part of Tulare County and includes the City of Tulare. The permanent resident population of the District is estimated to be approximately 90,000 persons. The District provides healthcare services primarily to individuals who reside on the local area. The District's hospital is the only hospital in the District.

The voters of the District elect the Board of Directors by districts.

The District is governed by a five-member Board of Directors. The current members of the Board are Kevin B. Northcraft, Mike Jamaica, Senovia Gutierrez, and Xavier Avila. There is one vacant seat. On October 4, 2017, the Board approved the hiring of HFS to act as the Board's advisor and head the District's crisis management team, which is headed by Sanford Haskins and Rick Gianello of HFS. The fact that the Board is elected by the public causes both problems and opportunities that are generally associated with local government entities. Its governing body and senior staff undergo much closer public scrutiny and must devote more time to public affairs than would be the case if it were a private entity. On the other hand, as a local public entity, local residents tend to be supportive of the District.

As of the signing of this Declaration, day-to-day operations of the hospital were under the control of HCCA under various agreements. There have been and continue to be major disputes between TRMC and HCCA, briefly discussed below.

I am informed and believe that like most rural hospitals in California, the District faces immense financial pressures.

There has also been intense community involvement and disagreement over a 15 year management contract with HCCA a prior Board entered into on May 29, 2014, discussed below.

The District's residents desire and require nearby emergency, urgent and acute care services. To provide these services, I am informed and believe that the District must actively participate in developing and maintaining a panel of primary care and specialty physicians within the District and maintain and upgrade its medical, obstetrics/gynecology, imaging, laboratory equipment, physical plants, and rural health clinics.

Under California law, hospitals are required to treat any person who presents at the emergency room without regard to the patient's ability to pay for services. The District accepts all patients regardless of their ability to pay. The District absorbs the costs of medical care for uninsured patients who account for a very large percentage of its volume.

A patient is classified as a charity patient by reference to certain established policies of the political district. Essentially, these policies define charity services as those services for which no payment is anticipated.

The District has been contending with significant disruptions in its governance over several years. Based on my information and belief, a chronology that explains this political unrest and which lead to management turnover is as follows:

- 1994 - Parmood Kumar is appointed to the board of directors of Tulare Local Healthcare District, dba Tulare Regional Medical Center ("TRMC").

- November 2005 - Tulare voters pass a bond measure to build a tower expansion at TRMC.

- 2005 – 2010 - TRMC tower planning expands and the cost of the project exceeds original projections while hospital revenue declines.

- May 2010 – TRMC tower construction finally breaks ground and Shawn Bolouki, CEO at the time, tries to speed up the construction project.

- January 2014 - TRMC board of directors, Parmod Kumar and Sherrie Bell, vote to hire Healthcare Conglomerate Associates ("HCCA") to run the hospital and Bolouki leaves as CEO. HCCA promises to finish tower expansion and get hospital on stable financial ground. In May 2014 the TRMC board signs a 15-year management agreement with HCCA.

- November 2015 - Due to low revenue vendor invoices continue to rack up including Cardinal Health, a large drug supplier, to whom the hospital incurred a debt of about $830,000 from Nov. 2015 to May 2016. TRMC later took out a loan to repay the company.

- Between 2014 and 2016 various vendors, suppliers and contractors file lawsuits claiming unpaid bills and services.

- March 2016 – HCCA extends a $200,000 line of credit from TRMC to the Southern Inyo Healthcare District which HCCA also manages. The line of credit was extended without TRMC board approval. In July 2016 this line of credit was extended to a $500,000 limit.

- 2016 - The State of California issues citations to HCCA and TRMC in patient deaths and surgical errors.

- September 1, 2016 – TRMC board approves taking out a $800,000 line of credit with no specific purpose at the time. Any use of these funds were to require further board approval. It was later revealed these funds were to be used to repay Cardinal Health.

- August 2016 - Voters vote down bond measure to secure financing to complete tower construction project and the hospital is forced to make significant layoffs.

- October 2016 – Dr. Benny Benzeevi of HCCA presents to the board that the hospital had reached 30 months of consecutive profits and states that the hospital has the ability to complete the tower expansion project but only two months later, in December 2016, the hospital's operating expenses become past due.

- November 2016 - Kevin Northcraft and Mike Jamaica are elected to TRMC board of directors.

DECLARATION OF KEVIN B. NORTHCRAFT IN SUPPORT OF MOTION FOR AUTHORIZATION TO REJECT EXECUTORY CONTRACT (HEALTHCARE CONGLOMERATE ASSOCIATES, LLC)

36894-00000 4742360.1

-5-

00158917-gaa-10.10.2017

- March 2017 – TRMC board votes to allow HCCA to seek and obtain a $79 million loan to complete the tower expansion.

- March 2017 – July 2017 certain vendors and suppliers continue to file suits for unpaid invoices.

- May 18, 2017 - HCCA donates $10,000 to a group working to prevent the recall of HCCA supporter and board member Dr. Parmod Kumar. Dr. Parmod Kumar was recalled by voters in July 2017. Senovia Gutierrez is voted in to replace Kumar on the board of directors.

- June 2017 – Board of directors vote to allow HCCA to again seek and obtain a $22 million loan to refinance certain debt and fund operations.

- July 2017 – Employee paychecks begin to bounce and some physicians claim to have gone without pay for months.

- July 27, 2017 – The majority of the Board vote to rescind any authority given to HCCA to seek any loans on behalf of TRMC. HCCA claims this vote is invalid and asserts Gutierrez is not recognized as a board member, despite her election.

- September 27, 2017 – Senovia Gutierrez is officially seated and recognized by TRMC board of directors.

- September 2017 - TRMC board issues and disputes with HCCA cause credit rating to downgrade.

- September 8, 2017 - HCCA issues a letter to TRMC claiming TRMC owes it $8 million including expenses and charges incurred in connection with "leased" employees. HCCA also claims TRMC is $526,066.86 past due in management fees.

- September 28, 2017 – HCCA is unable to make payroll and considers shutting down all operations due to mounting significant financial issues and lack of available funds.

- September 29, 2017 – TRMC board of directors unanimously vote to seek Chapter 9 bankruptcy protection.

- September 30, 2017 – Petition for relief under Chapter 9 is filed.

- October 5 and 9, 2017: HCCA informs TRMC it will lay off or suspend its employees working at the hospital as it is unable to pay them.

- October 9, 2017: TRMC authorizes counsel to file the necessary paperwork with the bankruptcy court to reject the HCCA contract.

Providing quality health services to District residents is the primary goal of the District and necessary to the community, in part, because of the relative rural location of the District. The residents need emergency room, inpatient, obstetric and other ancillary services. The critical nature of the need for health care services requires the Board to place a high priority on the continued financial viability of the District.

### District's Financial Problems

At the time the District's Board of Directors considered filing a Chapter 9 petition, the District was facing a liquidity crisis that threatened its continued operations and was concerned that preferential transfers were being made. The Board concluded that filing a Chapter 9 was the only available remedy to avoid continued litigation with and collection action by creditors, while, at the same time, allowing the District to protect its assets, preserve its business operations and continue providing uninterrupted healthcare services to its patients while it developed a comprehensive business plan. The task of restructuring the District is particularly complicated and time consuming because of the multitude of financial and contractual relationships inherent in the hospital enterprise. The decision to file Chapter 9 came only after the District attempted alternatives that would have avoided such a filing as the District was told by HCCA it was nearly out of cash and unable to meet payroll or purchase vital medical supplies.

I am informed and believe that in about May 2014 these various controversies reached a fevered pitch when the Kumar dominated board entered into a entered into a very unfavorable contract ("Contract") with Healthcare Conglomerate Associates, LLC ("HCCA"). A copy of these four integrated agreements are attached as Exhibits A1, A2, A3 and A4. By these contracts the Kumar dominated board sold out the District and gave all control over the District's operations and finances to HCCA. As a small example, members of the board were not even allowed to enter on the District's property without the consent of HCCA. The board was denied meaningful financial information. The Contract requires the District to pay HCCA a management fee of about $8 million per year. All of the District's money was turned over to HCCA. [I believe the District has an account but is swept every night by HCCA through the sweeping function, but we do not know where these accounts are and HCCA will not tell us.] After HCCA took control of the District's operations and finances, it insisted on pressing forward in a plan to obtain new borrowing to complete the hospital tower. The 2016 vote was overwhelmingly against the new bond issuance and the campaign pitted parts of the community against one another deepening the divide.

7. Shortly thereafter Dr. Kumar was recalled by the voters by a large margin and shortly thereafter Senovia Gutierrez was elected on June 27, 2017. Gutierrez was aligned with myself and Director Mike Jamaica in seeking to regain control over the District's finances and governance. However the election did not end the controversy or interference by HCCA in the District's governance. Upon her election Gutierrez (and the rest of the board) was told by HCCA and then District Counsel who reported <u>only to HCCA</u> and not to the board) that she had not been "properly seated" and during this time HCCA sought to borrow money against the District's assets based on a consent

previously given by the Kumar board, but knowing that if Gutierrez were to be seated the consent would be withdrawn and demands for accountability would be given to HCCA.

8. HCCA and its hand-picked counsel (paid from District funds but reporting only to HCCA) continued to thwart and deny Gutierrez her seat on the board until September 15, 2017 when the District Attorney of Tulare County filed a Petition for Alternative Writ of Mandate which thereafter forced HCCA to cease opposing election her and she was officially seated on September 27, 2017, after an unconscionable delay of sixty days. I am informed and believe that the delay in seating Ms. Gutierrez as a board member was because HCCA had the ulterior motive of attempting to find financing to pay themselves for services claimed to have been rendered. I understand that HCCA paid itself and its lawyers a substantial amount of money instead of using that money to keep the hospital operational.

9. Upon having a now functioning board of directors, the District turned its attention, again, to the one sided agreement that the Kumar board had entered into with HCCA on May 29, 2014. It should be noted that even before Director Gutierrez was seated on September 27, 2017, Director Jamaica and I had been insisting upon receiving current, meaningful financial information from HCCA. Among the things that we requested were: 1. Tell us where our District's money is deposited? 2. Where are the District's money swept to and who has signatory power? 3.Who do we owe, how much and what is the aging of these accounts payable? 4. What do we owe HCCA and what makes up those charges? 5. What is owed to the District on account of on account of our accounts receivable and what is the status of collections? 6. What is our cash position and what are our short-term needs?

DECLARATION OF KEVIN B. NORTHCRAFT IN SUPPORT 36894-00000 4742360.1
OF MOTION FOR AUTHORIZATION TO REJECT -9-
EXECUTORY CONTRACT (HEALTHCARE
CONGLOMERATE ASSOCIATES, LLC)

00158917-gaa-10.10.2017

10. Amazingly, to this day HCCA has refused to supply any of this vitally needed information to the elected representatives of the District. This has thwarted us in the administration and governance of the District and imperiled it financial survival.

11. At the present time the board of directors is completely in the dark in terms of what is going on in the hospital, including revenues, debts, patient counts, etc. No material financial information has been provided to us about the condition of the Hospital. In fact, it appears as if the Board has been deceived about the financial condition of the hospital as prior to the Board Meeting on September 27, 2017, HCCA was reporting the hospital's profits were increasing. However, at a public meeting held on September 27, 2017, which I attended, the CFO of HCCA publically stated and told the assembled crowd that the patient census had dropped to an ultra-low level, there was "no cash", accounts payable were at least $26 million and there was at least $25 million in uncollected charges.

12. In recent days, we have also learned through third parties that the District may owe its utility company $139,000 and is being threatened with a power shut off. I am also informed and believe that the District owes an important billing service no less than $2,000,000. It owes its preferred provider of supplies and equipment about $400,000. Physicians and medical groups have not been paid. The list goes on and on, but we do not know because HCCA will not tell us what we owe.

13. At the public board meeting held on September 27, 2017 the CEO of HCCA, Benny Benzeevi, M.D., publicly stated that the situation was so dire that the hospital had "only two options". Either accept a loan that HCCA had negotiated or close. However, Dr. Benzeevi did not inform us of the amount of the loan, the lender, the term of the loan, the collateral, or any other vitally needed details as to the supposed loan. He did not provide any terms or conditions as to the loan whatsoever.

14. I have over 30 years' experience in municipal governance including 10 years as City Manager of the City of Tulare from 1995 to 2005. It is my professional opinion, and based on long professional experience, that the Contract between HCCA and the District is very unconscionable, unfavorable, void as to public policy, burdensome, over expensive and improperly interferes with the legally required governance of the District. The District does not need nor want this Contract. It has alternatives that are much more favorable.

15. On September 28, 2017 the board was informed that only a few of the of the essential HCCA employees who operate the hospital were paid for their services, leaving a great number of nurses and other healthcare personnel unpaid. The lifeblood of a hospital are the dedicated healthcare professionals who give care and comfort to the patients. Nonpayment of employees threatened the survival of the hospital.

16. I am informed and believe that on September 29, 2017 HCCA's CFO assembled groups of employees and told them that if the District did not accept the loan HCCA had negotiated and described to the board, the hospital would be shut down. This CFO was <u>personally present</u> at the meeting held the night before and he knew Dr. Benzeevi had NOT made such a disclosure to the board. He lied and told the employees that HCCA had presented the loan details and that the board had refused to consider it when, in actuality, the board did not receive any information about the so-called loan.

17. From and after September 29, 2017 the District and HCCA reached out to each other, through counsel, and attempted to avoid a crisis. Proposals were exchanged and none were found to be mutually agreeable.

18. Finally, on October 6 at 6:12 PM, the District was informed that unless agreement was reached by 8 AM on October 7, 2017, HCCA would proceed to

terminate or suspend its employees.

19. Having been unable to reach an acceptable agreement for a turnover of District governance and operations, on October 9, 2017 the board met and discussed at length its available courses of action and reviewed, again, the Contract. The board (the undersigned, Avila and Jamaica) voted to instruct its counsel to seek rejection and termination of the Contract so the District can recover control over the District's assets, finances and operations and so the Board can fulfil its fiduciary and statutory duties. Ms. Gutierrez was not present as she was out of the country.

20. On October 4, 2017 the District made arrangements with its Crisis Manager, HFS, to assume control over hospital operations if HCCA is terminated/rejected and HFS made arrangements with a healthcare provider of significant size, located in Fresno, to provide emergency interim management of the District's healthcare facilities and provide emergency funding to keep the hospital open for an interim period of time. The terms are still being negotiated.

21. The District respectfully requests that the Court authorize the District to reject the HCCA contract.

I am over the age of 18 and if I were called as a witness in connection with this proceeding I would and could testify as is set out in this declaration. I so declare under penalty of perjury this blank day of October 10th, 2017 at Tulare, California.

_____
Kevin B. Northcraft