66

Diane C. Stanfield (State Bar No. 106366)
Leib M. Lerner (State Bar No. 227323)
**ALSTON & BIRD LLP**
333 South Hope Street, Sixteenth Floor
Los Angeles, CA  90071
Telephone:  (213) 576-1000
Facsimile:  (213) 576-1100
diane.stanfield@alston.com
leib.lerner@alston.com

Attorneys for Creditor and Moving Party
Navigant Cymetrix Corporation

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re | **Case No.:  17-13797** |
| | **DC No.: AB-1** |
| TULARE LOCAL HEALTHCARE DISTRICT, | **Chapter 9** |
| Debtor. | Date:   November 1, 2017<br>Time:  9:30 a.m.<br>Place:  2500 Tulare Street<br>        Fresno, CA 93721<br>        Courtroom 13<br>Judge:  Honorable René Lastreto II |

## EXHIBITS IN SUPPORT OF NAVIGANT CYMETRIX CORPORATION FOR RELIEF FROM THE AUTOMATIC STAY OR, ALTERNATIVELY, REQUIRING DEBTOR TO ASSUME OR REJECT EXECUTORY CONTRACT; REQUEST FOR ADEQUATE PROTECTION PAYMENTS AND PAYMENT OF ADMINISTRATIVE CLAIM

Navigant Cymetrix Corporation Submits the following exhibits in support of its Motion for Relief from the Automatic Stay or, Alternatively, Requiring Debtor to Assume or Reject Executory Contract; Request for Adequate Protection Payments and Payment of Administrative Claim:

| EXHIBIT NO./PAGE NO. | DESCRIPTION |
|---|---|
| **A**<br>**Page 3** | Master Services Agreement dated November 26, 2014 |
| **B**<br>**Page 25** | Statement of Work #1 dated November 26, 2014 |
| **C**<br>**Page 47** | First Amendment to Statement of Work #1 dated June 15, 2015 |
| **D**<br>**Page 50** | Second Amendment to Statement of Work #1 dated July 31, 2015 |
| **E**<br>**Page 55** | Third Amendment to Statement of Work #1 |
| **F**<br>**Page 59** | Letter dated August 7, 2017 re: Demand for Fees Due under Master Services Agreement and Statement of Work #1 |
| **G**<br>**Page 62** | Letter dated September 21, 2017 re: Non-Payment Status Letter |

DATED:  October 12, 2017          DIANE C. STANFIELD
                                  LEIB M. LERNER
                                  **ALSTON & BIRD LLP**


                                  /s/ Leib M. Lerner
                                          Leib M. Lerner

                                  Attorneys for Creditor Navigant Cymetrix Corporation

# EXHIBIT A

# MASTER SERVICES AGREEMENT

This Master Services Agreement (this "Agreement") is entered into on this 26th day of November 2014 by and between **Navigant Healthcare Cymetrix Corporation**, a Delaware corporation ("Cymetrix"), and **Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**, a California health care district ("Client"), with reference to the following facts and circumstances:

**WHEREAS,** Cymetrix provides a wide range of revenue cycle management and outsourcing solutions, including business office management, health information management, patient access management, process improvement consulting, accounts receivable management, medical diagnosis and procedure coding, entitlement advocacy and audit and reimbursement services to healthcare entities;

**WHEREAS,** Client is a healthcare provider that renders health care services to patients; and

**WHEREAS,** Client desires to utilize certain of the services provided by Cymetrix and Cymetrix desires to provide such services.

**NOW, THEREFORE,** for and in consideration of the foregoing, the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  <u>SERVICES</u>

This Agreement establishes a contractual framework pursuant to which Cymetrix may be engaged to perform services for Client hereunder (the "Services"), with the Services to be designated by one (1) or more Statements of Work (each, a "Statement of Work") substantially in the form and substance of <u>Exhibit 1</u> attached hereto and incorporated herein by this reference. Any Statement of Work issued in accordance with this Agreement will detail and define the specific Services to be provided by Cymetrix, Cymetrix responsibilities, Client responsibilities, compensation and payment terms, and term, renewal and termination provisions specific to such Services. Each Statement of Work must be in writing and signed by Client and Cymetrix prior to the provision of the Services set forth therein. A Statement of Work may only be amended in a written amendment executed by both parties. Unless otherwise agreed by the parties, all Statements of Work that are entered into under this Agreement shall be governed by the terms of this Agreement and are hereby made part of and incorporated into this Agreement. In the event of a conflict between this Agreement and a Statement of Work, the terms of this Agreement shall prevail over the conflicting terms in the Statement of Work, unless the Statement of Work expressly references the specific provision in this Agreement to be modified in which case such revision shall only apply to the work being performed under such Statement of Work. With the exception of any Statement of Work executed concurrently herewith, the parties may determine in their sole and respective discretion whether or not to offer or enter into any subsequent Statement(s) of Work.

2.     TERM AND TERMINATION

    2.1    Term. The term of this Agreement (the "Term") begins on the date written above and will continue for a period of five (5) years (the "Initial Term"), subject to an extension of this Agreement for a term as mutually agreed upon in writing between the parties (each, such extension, an "Extension Term") unless either party notifies the other in writing not less than ninety (90) days prior to the expiration of the Initial Term or then-current Extension Term of its intention to not extend the Term; provided, however, that notwithstanding the foregoing, this Agreement shall remain in effect beyond any such expiration date solely for the purpose of completing any Statement of Work then in effect (and not for the purpose of executing new Statements of Work), and thereafter shall automatically terminate upon the expiration of the last to expire of such Statement(s) of Work.

    2.2    Effect of Termination. Expiration or earlier termination of this Agreement is without prejudice to any other right or remedy of the parties. Termination of this Agreement for any cause does not release either party from any liability (a) which at the time of termination, has already accrued to the other party, (b) which may accrue in respect of any act or omission prior to termination, or (c) from any obligation which is expressly stated to survive termination. An individual Statement of Work may be cancelled or terminated independently of the rest of this Agreement.

3.     CYMETRIX REPRESENTATIONS AND WARRANTIES

    Cymetrix warrants that the Services do and will comply with applicable federal, state and local laws, rules and regulations, and that its work will conform to generally accepted industry standards for companies providing similar services in the United States. THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

    Client agrees that the Services do not include auditing any financial statements or performing any attest procedures under this Agreement. The Services are not designed, nor should they be relied upon, to disclose internal weaknesses in internal controls, financial statement errors, irregularities, illegal acts or disclosure deficiencies. Cymetrix is not a professional accounting or law firm and does not render accounting or legal advice.

    Except as otherwise set forth herein (including in any Statement(s) of Work, Schedule(s) or Exhibits hereto), Cymetrix makes no warranty, representation, or guarantee of any kind that the Services will identify compliance issues or fraud, generate any specific financial or other results, or result in any specific level of improvement in Client financial results or performance.

2

4.     CLIENT REPRESENTATIONS AND WARRANTIES

Client warrants the accuracy and completeness of any and all information provided to Cymetrix under the terms of this Agreement. Client acknowledges that Cymetrix will base and tailor the Services and its findings and actions, including recommendations, upon such information and that Cymetrix will have no liability for errors resulting from the failure of Client to provide Cymetrix with appropriate, accurate, and/or complete documentation and information. Notwithstanding any other provision of this Agreement, it shall be the responsibility of Client to independently and thoroughly review all recommendations made by Cymetrix prior to implementation and that all decisions in connection with the Services will be the final responsibility of Client.

5.     DISPUTE RESOLUTION

Any dispute, claim or controversy between the parties arising out of or related to this Agreement (the "Dispute"), except for claims by Cymetrix related to nonpayment, shall be resolved through the following procedure, which can be initiated by either party delivering written notice to the other party, pursuant to this Agreement, describing the party's claims and damages (the "Demand").

The parties shall first attempt to resolve the Dispute through good-faith consultation and negotiation between management representatives possessing full authority to resolve the matter for their respective organizations. Such representatives shall meet promptly, applying their best efforts to meet within two weeks (2) after delivery of the Demand. In the event the parties are unable to resolve the Dispute through good-faith negotiations, then the Dispute shall be resolved through binding arbitration in conformance with the Arbitration Rules and Procedures ("Rules") of the Judicial Arbitration and Mediation Service ("JAMS") (formerly Judicial Arbitration and Mediation Services) under the then-applicable JAMS Rules, including its optional appellate procedure if the parties so elect. Except for Disputes related to nonpayment, the parties hereby give up their right to have any such disputes or claims litigated in a court or by a jury.

6.     CONFIDENTIAL INFORMATION

Each of Cymetrix and Client shall employ reasonable efforts to prevent unauthorized use or disclosure of confidential information of the other, and each shall cooperate with the other by observing security procedures established by the other to protect information about such party's business or patients which such party treats as confidential. As necessary for performing the Services under this Agreement, Cymetrix may disclose to its subcontractors the confidential information of Client provided that such subcontractors agree to treat the confidential information in accordance with the terms of this Section 6. The parties respective obligations of confidentiality under this Agreement shall not apply to information (a) which is obtained from a third party without an obligation of confidentiality; (b) which is known to Cymetrix or Client before it is obtained from the other; (c) which is independently developed by Cymetrix or Client; (d) which is otherwise in the public domain; (e) which is required to be disclosed by law or court order; or (f) which is reasonably required to obtain payment hereunder and is compliant with applicable federal and state laws related to privacy and confidentiality of health information.

3

7.    HIPAA BUSINESS ASSOCIATE.

Without limiting the mutual confidentiality obligations provided elsewhere herein, each of Cymetrix and Client acknowledges that it is familiar with the Health Insurance Portability and Accountability Act of 1996 (as amended from time to time and together with the rules, regulations and interpretive opinions promulgated thereunder, "HIPAA"), and hereby represents to the other that it will comply with all provisions of HIPAA applicable to it, its business and the business relationship and transaction(s) contemplated hereby. Without limiting the generality of the foregoing, or in any way limiting any other provision hereof, the parties have determined that Cymetrix is a "Business Associate" (as defined in HIPAA), and as a part of this contractual relationship Cymetrix has entered into a Business Associate Agreement, which is attached hereto as Exhibit 2.

8.    LIMITATION OF LIABILITY

8.1    Notwithstanding any other provision in the Agreement, Cymetrix assumes no responsibility or liability for or as a result of any overpayment, loss, liability or other adverse consequence that results directly or indirectly from any inaccurate information, incorrectly coded material, incorrectly dated material, insufficient authorizations, faulty medical record documentation, incorrect or incomplete charge master, or any other type of false, fraudulent, misleading, incomplete or otherwise deficient statements or information furnished by Client to Cymetrix. Further, Client agrees to indemnify and hold harmless Cymetrix, its affiliates, and their respective owners, officers, directors, employees and agents for (a) any expenses, fees, penalties or costs of any kind, including reasonable attorneys' fees ("Costs"), associated with claims, demands, investigations and/or liabilities alleged or filed against Cymetrix whereby such claim, investigation or liability arose from Cymetrix reliance upon the information, medical record documentation, codes, data, third party data and other information provided to it by Client, a physician or a third party, after it has been confirmed by Client and (b) any Costs associated with claims, demands, investigations and/or liabilities alleged or filed against Cymetrix whereby such claim, investigation or liability arose from Client's negligence, willful misconduct, fraudulent or criminal act or omission.

8.2    Cymetrix agrees to indemnify and hold harmless Client, its officers, directors, employees and agents for any Costs associated with claims, demands, investigations and/or liabilities as finally determined by an arbiter (in accordance Seciton 5 above) or court of competent jurisdiction whereby such claim, investigation or liability arose from Cymetrix's gross negligence, willful misconduct, fraudulent or criminal act or omission.

8.3    Neither party shall be responsible for any loss-of-profit, indirect, incidental, special, punitive, or consequential damages, howsoever caused or incurred, by the other party or any other party, even if a party has been advised of the possibility of the same or even if the same were reasonably foreseeable.

8.4    Cymetrix liability to Client under any provision of this Agreement or any agreement entered into pursuant hereto, or any transaction contemplated by this Agreement or any such other agreement, shall be limited to the aggregate sum of Two Million Dollars

4

($2,000,000); provided, however, that, subject in all cases to the foregoing aggregate limitation, the maximum liability under and arising from any particular Statement of Work shall be limited to the amount having then actually been paid by Client to Cymetrix with respect to such particular Statement of Work.

9.     <u>INSURANCE REQUIREMENTS</u>

      Cymetrix shall provide, at its own expense, insurance with minimum amount of coverage as follows:

- Workers' Compensation by statute
- General Liability of an amount not less than $2,000,000 per claim/$3,000,000 aggregate
- Professional Errors & Omissions Liability insurance in an amount not less than $2,000,000 per claim/$3,000,000 aggregate

10.     <u>ACCESS TO BOOKS AND RECORDS</u>

      During the Term and for a period of four (4) years after the furnishing of the Services under this Agreement, upon written request by the Secretary of Health and Human Services (the "Secretary"), the United States Comptroller General (the "Comptroller"), or any of their duly authorized representatives, the parties will make available the contracts, books, documents and records necessary to verify the nature and extent of the costs of providing the Services under this Agreement. If either party carries out any of the duties of the Agreement through a subcontract with the value of Ten Thousand Dollars ($10,000) or more over a 12-month period with a related individual or organization, the party agrees to include in any such subcontract a clause permitting access by the Secretary, the Comptroller, and their representatives to the related subcontractor's books and records. This section is included pursuant to and is governed by requirements of 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh) and the regulations in 42 CFR 420-300-420.304.

11.     <u>INTERIM PERSONNEL/MANAGEMENT</u>

      11.1     <u>[Intentionally omitted]</u>

      11.2     <u>Safe Working Environment</u>. Client will provide the employees and other personnel of Cymetrix with a safe working environment when they are on the premises of the Client, including an environment that is free of unlawful discrimination or harassment.

      11.3     <u>Liability Insurance and Indemnity</u>. At Client's expense, Client will cover Cymetrix's personnel serving in a management role under Client'serrors and omissions liability insurance policies for claims whereby Cymetrix personnel serving in a management position acted at the the direction of Client management . Unless otherwise mutually agreed, each such policy shall provide coverage of at least $2 million per occurrence and $3 million annual aggregate from an insurer with an A.M Best rating of (A-) or better, shall have a self-insured retention of $1,000,000 or less, and shall waive any subrogation rights against Cymetrix, its interim personnel,

5

officers, directors, agents, employees and outside consultants, if any. Client will provide acceptable written proof of such coverage as soon as possible following the execution of this Agreement, and Cymetrix may suspend its performance of the Services if Client fails to comply with this requirement in a timely manner.

Client, at its expense, agree to indemnify, defend and hold harmless Cymetrix, personnel, officers, directors, agents, employees and outside consultants, if any (collectively, the "Cymetrix Parties"), with respect to any and all demands, claims or suits brought or threatened by any person or entity as a result of any alleged action or inaction pertaining to the provision of the Services of this Agreement, provided that Client will not be responsible for payment of indemnification amounts hereunder that are determined by a final judgment of a court of competent jurisdiction to have resulted from any Cymetrix Parties' bad faith, self-dealing, gross negligence or willful misconduct. These indemnification provisions shall survive the termination or expiration of the Agreement.

In connection with any claim for which a Cymetrix Indemnified Party seeks indemnification hereunder, the Cymetrix Indemnified Party: (a) shall give Client prompt written notice of the claim; provided, however, that failure to provide such notice shall not relieve Client from its liabilities or obligations hereunder, except solely to the extent of any material prejudice as a direct result of such failure; (b) shall cooperate with Client, at Client's sole cost and expense, in connection with the defense and settlement of the claim; and (c) shall permit Client to control the defense and settlement of the claim; provided, however, that Client may not settle the claim without the Cymetrix Indemnified Party's prior written consent (which shall not be unreasonably withheld or delayed) in the event such settlement materially adversely impacts a Cymetrix Indemnified Party's rights or obligations.

Cymetrix and Client agree that the services to be performed by Cymetrix's interim personnel are advisory and administrative in nature and that such personnel are not required or expected to make decisions or take action on behalf of Client, participate directly in patient care and clinical decisions. Nevertheless, Client agrees that if Cymetrix personnel, acting in good faith and within the scope of his or her professional training, renders professional assistance to Client's personnel or to patients, then such activities shall be considered to be services provided pursuant to this Agreement for purposes of Client's indemnification obligation discussed in the immediately preceding paragraph.

12.    MISCELLANEOUS PROVISIONS

12.1    Entire Agreement.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect hereto and there. Each party to this Agreement acknowledges that no representation, inducements, promises, or agreements, orally or otherwise, have been made by any party, or any one acting on behalf of any party, which is not included herein, and that no other agreement, statement, or promise not contained in this Agreement or referred to herein shall be valid or binding.

6

12.2   Notices.  All communications and notices hereunder shall be in writing and shall be sufficient in all respects if delivered personally, electronic mail, by registered or certified mail, postage prepaid, or by commercial overnight delivery service with confirmation, delivered to the respective parties at the following addresses or to such other address as may be given by a party to the other pursuant hereto.

| | |
|---|---|
| Cymetrix: | Navigant Healthcare Cymetrix Corporation<br>Attn: Michael Halberda<br>2875 Michelle Drive<br>Irvine, California  92606<br><br>Email: Michael.Halberda@Cymetrix.com |
| With a copy to: | Navigant Consulting, Inc.<br>Attn: Office of General Counsel<br>30 S. Wacker Drive, Suite 3550<br>Chicago, IL 60606 |
| Client: | Tulare Regional Medical Center<br>Attn:  Alan Germany, CFO<br>869 N. Cherry<br>Tulare, CA 93274<br>559.688.0821<br><br>Email: agermany@tulareregional.org |

Notice shall be deemed to have been given upon transmittal thereof as to communications that are personally delivered; confirmed to have been received if sent via electronic mail or by commercial overnight delivery; and as to communications made by United States mail, on the third (3rd) day after mailing.

12.3   Waiver and Amendment.  No provision of this Agreement may be waived unless in writing signed by both of the parties hereto, and waiver of any one provision hereof shall not be deemed to be a waiver of any other provision.  This Agreement or any part hereof, including each Statement of Work, may be amended or waived only by an instrument in writing properly executed by both parties hereto.  Services may be modified, adjusted or otherwise redirected as deemed appropriate by the parties, provided that all such changes shall be included as amendments.

12.4   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to the conflicts of laws principles thereof.

12.5   Assignment.  Neither party may assign this Agreement, and any attempted or purported assignment or any delegation of any party's duties or obligations arising under this

7

Agreement to any third party or entity shall be deemed to be null and void, and shall constitute a material breach by such party of its duties and obligations hereunder, without the prior written consent of the other party, which consent shall not be unreasonably withheld, denied, conditioned or delayed; provided, however, that either party may assign this Agreement and its rights and obligations hereunder, without such consent, to any person or entity into or with which such party is merged or reorganized, or to which all or a majority of such party's capital stock or assets are sold, or which otherwise succeeds to all or substantially all of the business of such party. This Agreement shall inure to the benefit of and be binding upon any successors of each party.

12.6   Severability.   Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

12.7   Captions.   The various heading and captions in this Agreement are for reference only and shall not be considered or referred to in resolving questions of interpretation of this Agreement.

12.8   Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

12.9   Judicial Interpretation.   Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that both parties have participated in the preparation of this Agreement.

12.10   Costs and Attorneys' Fees.   If access to any of the materials in Cymetrix possession relating to this Agreement is sought by a third party, or Cymetrix is requested or compelled to testify as a fact witness in any legal proceeding related to Cymetrix work performed under this Agreement or the Services, by subpoena, investigative demand, administrative request or otherwise, or Cymetrix is made a party to any litigation related to work performed or the Services, Cymetrix will promptly notify Client of such action, and either tender to Client its defense responding to such request and cooperate with Client concerning Cymetrix response thereto or retain counsel after notification to Client of Cymetrix' need to retain legal counsel for Cymetrix defense for which Client shall reimburse Cymetrix for all reasonable attorney's fees and costs of defense. In such event, Client will compensate Cymetrix at Cymetrix standard billing rates for fees and expenses, including reasonable attorneys' fees (internal and external), involved in responding to such action. In the event of an investigation, government inquiry, alleged claim or litigation ("Matter") regarding Services provided hereunder, Client shall indemnify Cymetrix, its affiliates, and their respective owners, officers, directors, employees and agents for any and all costs and liabilities (including defense costs and

8

reasonable attorneys' fees) associated with defense and hours spent responding to and Cymetrix cooperation with any Matter.

If any action, suit, arbitration or other proceeding is instituted to remedy, prevent or obtain relief from a default in the performance by any party to this Agreement of its obligations under this Agreement, the prevailing party shall recover all of such party's attorneys' fees incurred in each and every such action, suit, arbitration or other proceeding, including any and all appeals or petitions therefrom. As used in this section, attorneys' fees shall be deemed to mean the full and actual, reasonable costs of any legal services actually performed (by internal or external counsel) in connection with the matters involved calculated on the basis of the usual fee charged by the attorney performing such Services and shall not be limited to "reasonable attorneys' fees" as defined in any statute or rule of court.

12.11  Relationship of Parties.  Cymetrix is acting as Client's independent contractor pursuant to this Agreement. None of Cymetrix' personnel or agents shall be deemed employees of Client in connection with Services provided under this Agreement. Client shall in no way be responsible for taxes of any kind relating to the compensation earned by Cymetrix pursuant to this Agreement except as otherwise stipulated herein, nor shall Client have any responsibility for any fringe benefits, payroll taxes, workers' compensation insurance, or other employee-related obligations of Cymetrix for itself, its personnel or its agents. Nothing in this Agreement is intended to create, nor shall be construed to create, any partnership, joint venture, agency, employment or joint employment relationship between or among such parties and/or their respective employees.

12.12  Intellectual Property and Rights to Deliverables.  Upon full payment of all amounts due to Cymetrix in connection with this Agreement, all rights, title and interest in any deliverables provided to Client by Cymetrix will become the sole and exclusive property of Client for use in connection with the subject of the Agreement, except as set forth below. Cymetrix will retain sole and exclusive ownership of all rights, title and interest in its proprietary software tools and solutions, work papers, proprietary information, processes, methodologies and know-how, including such information as existed prior to the delivery of the Services and, to the extent such information is of general application, anything that Cymetrix may discover, create or develop during the term of this Agreement, all of the foregoing being considered the proprietary, confidential and trade secret information of Cymetrix ("Cymetrix Property"). To the extent reports or other documents delivered to Client contain Cymetrix Property; Cymetrix grants Client a non-exclusive, non-assignable, royalty-free license to use it in connection with the subject of this Agreement. Any Cymetrix report or other document ("Deliverable") prepared pursuant to this Agreement shall be only for Client's internal business purposes and for any specific purposes identified in a Statement of Work. Absent the prior written consent of Cymetrix, in no event shall Cymetrix name be mentioned nor shall Cymetrix Deliverables be disclosed, referenced, used in connection with any offering documents or shared with any third party, except (a) as required by law; (b) as required by any government or regulatory agency with supervisory authority over Client; and (c) as may be necessary to conduct Client's business, with Client's legal advisors and auditors. The foregoing disclosure of Cymetrix Deliverables includes without limitation a prohibition on Deliverables being disclosed, referenced, filed or

distributed in connection with the purchase or sale of securities, and in connection with any financing or business transaction.

12.13  Non-Solicitation.  Client agrees not to solicit for employment or independent contracting any person(s) employed or contracted by Cymetrix who provide Services on behalf of Cymetrix under this Agreement during the Term hereof and for a period of one (1) year thereafter, except as expressly approved in writing by Cymetrix. The foregoing shall not prohibit Client from offering employment to or employing (a) Cymetrix employees who seek employment with Client on their own initiative, (b) Cymetrix employees who respond to a general solicitation or advertisement that is not specifically directed to Cymetrix employees or (c) Cymetrix employees referred to Client by search firms, employment agencies or other similar entities provided that such entities have not been specifically instructed by Client to solicit Cymetrix employees.

12.14  Press Release.  The parties agree that, except as the law shall otherwise require or as is necessary to enforce this Agreement or defend a claim of breach of this Agreement, they shall keep the terms of this Agreement strictly confidential, and shall not disclose to any third party, either directly or indirectly, the terms of this Agreement.  The parties acknowledge, however, that Client is a California public entity and the substance of this Agreement, once final, may be subject to disclosure under the California Public Records Act.  If any party receives a subpoena, order or other demand for production of this Agreement, then that party shall promptly notify the other party to this Agreement in writing of the receipt of such a demand.  Either party may issue a press release disclosing the existence of this Agreement subject to prior approval of the content by the other party.  Such approval shall not be unreasonably withheld, denied, conditioned or delayed.

12.15  Force Majeure.  If any party to this Agreement is delayed in the performance of any of its obligations hereunder or is prevented from performing any such obligations due to causes or events beyond its control, including, without limitation, electronic virus attack or infiltration, acts of God, fire, flood, earthquake, strike or other labor problem, injunction or other legal restraint, present or future law, governmental order, rule or regulation, then such delay or nonperformance shall be excused and the time for performance thereof shall be extended to include the period of such delay or nonperformance.

12.16  Survival. The following provisions shall survive the termination or cancellation of this Agreement or a Statement of Work executed under this Agreement: 4, 5, 6, 8, 10 and 11.

*[Signatures on following page]*

10

IN WITNESS WHEREOF, the parties agree to the foregoing and have caused this Agreement to be executed by duly authorized individuals as of the date first written above.

**Navigant Healthcare Cymetrix Corporation**

By: _____

Print Name: _Jerry MacDonald_

Print Title: _Executive Director_

**Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**

By: _____

Print Name: Alan Germany

Print Title: Chief Financial Officer/Chief Operating Officer

11

**Exhibit 1**

**Statement of Work Template**

This Statement of Work #_____ (this "SOW #___") is entered into by and between **Navigant Healthcare Cymetrix Corporation,** a Delaware corporation ("Cymetrix"), and _____, a _____ ("Client"), as of this ____ day of _____ 201_ and made pursuant to that certain Master Services Agreement dated _____ by and between Cymetrix and Client, for the Services herein described.

**A. DEFINITION OF SERVICES**

    **[To be determined]**

**B. CYMETRIX RESPONSIBILITIES**

    **[To be determined]**

**C. CLIENT RESPONSIBILITIES**

    **[To be determined]**

**D. COMPENSATION (including reimbursable expense and invoice payment terms)**

    **[To be determined]**

**E. TERM AND TERMINATION**

    A. <u>Term</u>. Subject to extension or early termination as provided herein, the term of this Statement of Work #____ shall commence on _____ ___, 201__ ("Effective Date"), and shall continue in full force and effect until _____, 201__ (the "Initial Term").

    B. <u>Renewal</u>.

    C. <u>Early Termination</u>.

*[Signature block]*

Exhibit 2
Business Associate Agreement

[To be attached]

2

## BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Agreement") is entered into in connection with that certain existing arrangement (the "Arrangement") between **Tulare Local Health Care District dba Tulare Regional Medical Center,** ("Covered Entity") and **Navigant Healthcare Cymetrix Corporation,** ("Business Associate"), and is effective as of the final signature at the end of this Agreement, (the "Effective Date").

## RECITALS

1.      The Arrangement requires Business Associate to have access to and/or to collect or create Protected Health Information ("PHI") in order to carry out Business Associate's functions on behalf of Covered Entity.

2.      Covered Entity and Business Associate intend to protect the privacy and provide for the security of PHI disclosed to, collected by, or created by Business Associate pursuant to the Arrangement in compliance with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Act, Public Law 111-005 (the "HITECH Act"), regulations promulgated thereunder, and other applicable laws, in each case, as amended from time to time.

3.      As part of the Privacy Rule and the Security Rule (defined below), the Covered entity is required to enter into an agreement containing specific requirements with Business Associate prior to the disclosure of PHI which are contained in this Agreement.

In consideration of the mutual promises below and the exchange of information pursuant to this Agreement, the parties agree to the following:

A.      DEFINITIONS

Terms used, but not otherwise defined in this Agreement shall have the same meaning as those terms in the regulations promulgated under HIPAA (the "Privacy Rule" and the "Security Rule" at 45 CFR Parts 160 and 164) and in the HITECH Act (42 U.S.C. Section 17921 et seq.)

B.      OBLIGATION OF BUSINESS ASSOCIATE

1. Use of PHI. Business Associate shall not, and shall ensure that its directors, officers, employees, contractors, and agents, do not, use PHI except for the purpose of performing Business Associate's obligations under the Arrangement and as permitted under the Arrangement and this Agreement, or in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so used by the Covered Entity.  However, Business Associate may use PHI for Business Associate's proper management and administrative services, to carry out the legal responsibilities of Business Associate, or as required by law. Use of de-identified PHI is not permitted without the prior consent of Covered Entity.  As between Business Associate and Covered Entity, the Covered Entity is the owner of all PHI.

2. Disclosure of PHI. Business Associate shall not, and shall ensure that it's directors, officers, employees, contractors and agents do not, disclose PHI except for the purpose of performing Business Associate's obligations under the Arrangement and as permitted under the

T Bus Asso Agt HITECH.032510        I

Arrangement and this Agreement, or in any manner that would constitute a violation of the Privacy Rule or the HITECH Act if so disclosed by the Covered Entity. However, Business Associate may disclose PHI for Business Associate's proper management and administrative services, to carry out Business Associate's legal responsibilities, or as required by law. Disclosure of de-identified PHI is not permitted without the prior consent of Covered Entity. To the extent Business Associate discloses PHI to a third party as permitted in accordance with this Agreement, Business Associate must obtain, prior to making any such disclosure, (a) reasonable written assurances from such third party that such PHI will be held confidential as provided pursuant to this Agreement and only used or disclosed as required by law or for the lawful purposes for which it was disclosed to such third party, and (b) a written agreement from such third party to immediately notify Business Associate of any breaches of the confidentiality of the PHI, to the extent it has obtained knowledge of such breach. Notwithstanding the foregoing, Business Associate shall refer all requests for PHI pursuant to subpoena or any other discovery request or judicial or administrative order mandating disclosure to Covered Entity within two (2) business days of receipt. Covered Entity shall make all determinations regarding compliance with any such mandated disclosure.

3. <u>Prohibited Uses and Disclosures.</u> Business Associate shall not: (i) use or disclose PHI for fund-raising or marketing purposes; (ii) disclose PHI to a health plan for payment or health care operations purposes if the patient has requested this special restriction, and has paid out of pocket in full for the health care item or service to which the PHI solely relates; (iii) directly or indirectly receive remuneration in exchange for PHI, except with the prior written consent of Covered Entity and as permitted by the HITECH Act, however, this prohibition shall not apply to payment by Covered Entity to Business Associate for services provided pursuant to the Arrangement.

4. <u>Appropriate Safeguards.</u> Business Associate shall implement all appropriate safeguards to prevent the use or disclosure of PHI other than as permitted by the Arrangement or this Agreement, including, but not limited to administrative, physical and technical safeguards consistent with the requirements of the Security Rule that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI that it creates, receives, maintains or transmits on behalf of Covered Entity. Business Associate shall comply with the policies and procedures and documentation requirements of the Security Rule.

5. <u>Reporting of Improper Access, Use or Disclosures of PHI.</u> Business Associate shall report to Covered Entity any suspected or actual (i) access, use or disclosure of PHI not permitted by this Agreement or the Arrangement, (ii) breach of unsecured PHI (as those terms are defined in the HITECH Act), (iii) security breach, intrusion, (iv) use or disclosure in violation of any applicable federal or state laws or regulations (collectively, "Breach"), of which it becomes aware within three (3)) business days by telephone, with a detailed written notice via facsimile within five (5) business days after discovery. Such written notice shall include, to the extent possible, (a) the identity of each individual whose information has been, or is reasonably believed to have been, Breached, and the types of information that were involved (e.g., full name, social security number, date of birth, home address, account number, diagnosis, etc.); (b) a brief description of what happened, the date of the Breach, and the date of discovery; (c) steps that the individual should take to protect himself/herself from harm; and (d) a brief description of what is being done to investigate, mitigate harm, and prevent future Breaches. If additional information surrounding the Breach subsequently becomes available, it shall be promptly provided to Covered Entity. Business Associate shall take (i) prompt corrective action to cure

any such deficiencies and (ii) any action pertaining to such unauthorized use or disclosure as required by applicable federal and state laws and regulations.

6. Business Associate's Agents. Business Associate shall enter into a written agreement with any agent or subcontractor that will have access to PHI that is received from, or created or received by Business Associate on behalf of the Covered Entity pursuant to which such agent or subcontractor agrees to be bound by the same restrictions, terms and conditions that apply to Business Associate pursuant to this Agreement with respect to such PHI.

7. Access to PHI. Within five (5) business days of a request by the Covered Entity for access to PHI about an individual contained in a Designated Record Set, Business Associate shall make available to the Covered Entity such PHI for so long as such information is maintained in the Designated Record Set. If Business Associate maintains an Electronic Health Record (as that term is defined in the HITECH Act), Business Associate shall provide such information in electronic format to enable Covered Entity to fulfill its obligations under the HITECH Act. In the event any individual requests access to PHI directly from Business Associate, Business Associate shall within five (5) business days forward such request to the Covered Entity. Covered Entity shall make all determinations regarding granting or denying any such access requested by an individual.

8. Availability of PHI for Amendment. Within ten (10) days of receipt of a request from the Covered Entity for the amendment of an individual's PHI or a record regarding an individual contained in a Designated Record Set (for so long as the PHI is maintained in the Designated Record Set), Business Associate shall provide such information to the Covered Entity for amendment and incorporate any such amendments in the PHI as required by 45 C.F.R. § 164.526. In the event the individual's request for an amendment is delivered directly to Business Associate, Business Associate shall within five (5) business days forward such request to the Covered Entity. Covered Entity's shall make any determinations regarding granting or denying any such amendment requested.

9. Accounting of Disclosures. Business Associate agrees to implement a process that provides for an accounting of disclosures to be collected and maintained by Business Associate and its agents or subcontractors with such information as would be required for Covered Entity to respond to a request by an individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528 and with the HITECH Act, including but not limited to 42 U.S.C. Section 17935(c), as determined by Covered Entity.

10. Requests for Accounting of Disclosures. Within ten (10) days of notice by the Covered Entity of receipt of a request for an accounting of disclosures of PHI regarding an individual, Business Associate and its agents or subcontractors shall make available to the Covered Entity the information required for the Covered Entity to provide an accounting of disclosures to enable Covered Entity to fulfill its obligations under the Privacy Rule and the HITECH Act, as determined by Covered Entity. At a minimum, Business Associate shall provide the Covered Entity with the following information: (i) the date of the disclosure, (ii) the name of the entity or person who received the PHI, and if known, the address of such entity or person, (iii) a brief description of the PHI disclosed, and (iv) a brief statement of the purpose of such disclosure that reasonably informs the individual of the basis for the disclosure, o a copy of the individual's authorization, or a copy of the written request for disclosure, for the period of at least six (6) years prior to the date on which the accounting was requested. To the extent that

Business Associate maintains an electronic health record and is subject to this requirement, accounting of disclosures from an electronic health record for treatment, payment or health care operations purposes are required to be collected and maintained for only three (3) years prior to the request. In the event the request for an accounting is delivered directly to Business Associate or its agents or subcontractors, Business Associate shall within five (5) business days forward such request to the Covered Entity. It shall be the Covered Entity's responsibility to prepare and deliver any such accounting requested by an individual, subject to Business Associate's obligations set forth in this Section.

11. <u>Minimum Necessary.</u>  Business Associate and its agents or subcontractors shall request, use and disclose only the minimum necessary amount of PHI to accomplish the purpose of the request, use or disclosure. Business Associate understands and agrees that the definition of "minimum necessary" is in flux and shall keep itself informed of guidance issued by the Secretary with respect to what constitutes "minimum necessary."

12. <u>Mitigation.</u>  Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Agreement.

13. <u>Electronic Transactions.</u>  If Business Associate conducts any Standard Transaction for or on behalf of Covered Entity, Business Associate shall comply with the requirements under the Electronic Transaction Rule (as those terms are defined in the Security Rule).

14. <u>Availability of Books and Records.</u>  Business Associate hereby agrees to make its internal practices, books and records, including policies and procedures, relating to the use and disclosure of PHI available to Covered Entity and to the Secretary for purposes of determining Business Associate's compliance with the Privacy Rule. Notwithstanding the foregoing, no attorney-client, accountant-client, or other legal privilege shall be deemed waived by the parties by virtue of this section. Except to the extent prohibited by law, Business Associate agrees to notify Covered Entity of all requests for information served upon Business Associate by or on behalf of the Secretary. Business Associate shall provide to Covered Entity a copy of any PHI that Business Associate provides to the Secretary concurrently with providing such PHI to the Secretary.

15. <u>Breach Pattern or Practice by Covered Entity.</u>  Pursuant to the HITECH Act, if the Business Associate knows of a pattern of activity or practice of the Covered Entity related to the use or disclosure of PHI that constitutes a material breach or violation of the Covered Entity's obligations under the Arrangement or this Agreement, the Business Associate must take reasonable steps to cure the breach or end the violation. If the steps are unsuccessful, the Business Associate must terminate the Arrangement if feasible, or if termination is not feasible, report the problem to the Secretary. Business Associate shall provide written notice to Covered Entity of any pattern of activity or practice of the Covered Entity that Business Associate believes constitutes a material breach or violation of the Covered Entity's obligations under the Arrangement or this Agreement with regard to the use or disclosure of PHI within five (5) business days of discovery and shall meet with Covered Entity to discuss and attempt to cure the breach or end the violation.

16.    <u>Audits, Inspection and Enforcement.</u>  Within ten (10) days of a written request by Covered Entity, Business Associate and its agents or subcontractors shall allow Covered Entity

to conduct a reasonable inspection of the facilities, systems, books, records, agreements, policies and procedures relating to the use or disclosure of PHI pursuant to this Agreement for the purpose of determining whether Business Associate has complied with this Agreement. The fact that Covered Entity inspects, or fails to inspect, or has the right to inspect, Business Associate's facilities, systems, books, records, agreements, policies and procedures does not relieve Business Associate of its responsibility to comply with this Agreement, nor does Covered Entity's (i) failure to detect or (ii) detection, but failure to notify Business Associate or require Business Associate's remediation of any unsatisfactory practices, constitute acceptance of such practice or a waiver of Covered Entity's enforcement rights under the Arrangement or this Agreement. Business Associate shall notify Covered Entity within ten (10) days of learning that Business Associate has become the subject of an audit, compliance review or complaint investigation by the Office for Civil Rights.

17. <u>State Privacy Laws.</u> Business Associate shall comply with state privacy laws to the extent that such state privacy laws are not preempted by HIPAA or the HITECH Act. Without limiting the generality of the foregoing, all of Business Associate's uses and disclosures of PHI shall be consistent with the California Confidentiality of Medical Information Act ("CMIA").

18. <u>Insurance.</u> Business Associate shall obtain and maintain appropriate professional and general liability insurance coverage, in the amounts of $100,000 per occurrence and $300,000 in the aggregate. Business Associate shall, where possible, name Covered Entity as an additional insured on this policy. Business Associate shall give Covered Entity thirty (30) days' prior written notice of any change or termination of such insurance policy.

C.   TERMINATION OF AGREEMENT WITH BUSINESS ASSOCIATE

1. <u>Material Breach.</u> Any other provision of the Arrangement notwithstanding, the Arrangement may be immediately terminated by the Covered Entity. Alternatively, at its sole discretion, Covered Entity may provide Business Associate with notice of the breach and afford Business Associate an opportunity to cure the breach to the satisfaction of Covered Entity within five (5) business days. If the breach is not cured within such five (5) business day period, Covered Entity may immediately terminate the Arrangement. However, in the event that termination of the Arrangement is not feasible in the Covered Entity's sole discretion, Business Associate hereby acknowledges that the Covered Entity shall have the right to report the breach to the Secretary. In addition, Covered Entity retains the right to seek injunction and other legal and equitable rights and remedies available under the law as necessary to prevent unauthorized use and disclosure of PHI.

2. <u>Judicial or Administrative Proceedings.</u> Covered Entity may terminate the Arrangement, effective immediately, if (i) Business Associate is named as a defendant in a criminal proceeding for a violation of HIPAA, the HITECH Act, the HIPAA Regulations or other security or privacy laws or (ii) a findings of stipulation that the Business Associate has violated any standard or requirement of HIPAA, the HITECH Act, the HIPAA Regulations or other security or privacy laws is made in any administrative or civil proceeding in which the Business Associate has been joined.

3. <u>Effect of Termination.</u> Upon termination of the Arrangement, Business Associate shall, at the option of Covered Entity, either return or destroy all PHI which Business Associate or its agents or subcontractor still maintains in any form. Business Associate shall not retain any

copies of such PHI. In the event that Covered Entity determines that return or destruction is not feasible, the terms and provisions of this Agreement shall survive termination of the Arrangement and such PHI shall be used and disclosed solely for such purpose or purposes that prevented the return or destruction of such PHI. If Covered Entity elects destruction of the PHI, Business Associate shall certify in writing to Covered Entity that such PHI has been destroyed.

D.     GENERAL PROVISIONS
1. <u>Indemnification.</u> Subject to the terms of the Underlying Arrangement that gave rise to the claim, Business Associate agrees to indemnify, defend, and hold harmless Covered Entity, its directors, officers, employees, contractors and agents, against, and in respect of, any and all claims, losses, expenses, costs, damages, obligations, penalties, and liabilities which Covered Entity may incur by reason of Business Associate's breach of or failure to perform any of its obligations pursuant to this Agreement. Further, Business Associate agrees to indemnify, defend, and hold harmless Covered Entity, its directors, officers, employees, contractors and agents, against all costs and expenses, including but not limited to, reasonable legal expenses, which are incurred by or on behalf of Business Associate in connection with the defense of such claims. Any damages resulting from Business Associate's breach of its obligations pursuant to this Agreement shall be expressly excluded from any limitations of liability set forth in the Arrangement.

2. <u>Disclaimer.</u> Covered Entity makes no warranty or representation that compliance by Business Associate with this Agreement, HIPAA, the HITECH Act, or the HIPAA Regulations will be adequate or satisfactory for Business Associate's own purposes. Business Associate is solely responsible for all decisions made by Business Associate regarding the safeguarding of PHI.

3. <u>Certification.</u> To the extent that Covered Entity determines that such examination is necessary to comply with Covered Entity's legal obligations pursuant to HIPAA relating to certification of its security practices, Covered Entity or its authorized agents or contractors may, at Covered Entity's expense, examine Business Associate's facilities, systems, procedures and records as may be necessary to certify to Covered Entity the extent to which Business Associate's security safeguards comply with HIPAA, the HITECH Act, the HIPAA Regulations, or this Agreement.

4. <u>Amendment to Comply with Law.</u> This Agreement shall be subject to the requirements of HIPAA and the HITECH Act, as amended, and any regulations promulgated thereunder, and any provisions required pursuant to those laws and regulations shall apply to Covered Entity and Business Associate regardless of whether the provision is set forth herein. The parties agree to take such action as is necessary to implement the standards and requirements of HIPAA, the Privacy Rule, the Security Rule and the HITECH Act, including but not limited to the amendment of this Agreement. Covered Entity may terminate the Arrangement upon thirty (30) days' written notice in the event (i) Business Associate does not promptly enter into negotiations to amend this Agreement when requested by Covered Entity pursuant to this section or (ii) Business Associate does not enter into an amendment to this Agreement that Covered Entity, in its sole discretion, deems sufficient to satisfy the standards and requirements of applicable laws.

5. <u>Assistance in Litigation or Administrative Proceedings.</u> Business Associate shall make itself, and any subcontractors, employees or agents assisting Business Associate in the performance of its obligations under the Arrangement or this Agreement, available to Covered Entity, at no cost to Covered Entity, to testify as witnesses, or otherwise, in the event of litigation or administrative proceedings being commenced against Covered Entity, its directors, officers or employees based upon a claimed violation of HIPAA, the HITECH Act, the Privacy Rule, the Security Rule, or other laws relating to security and privacy, except where Business Associate or its subcontractor, employee or agent is named adverse party.

6. <u>No Third-Party Beneficiaries.</u> Nothing express or implied in the Arrangement or this Agreement is intended to confer, nor shall anything herein confer, upon any person other than Covered Entity, Business Associate and their respective successors or assigns, any rights, remedies, obligations or liabilities whatsoever.

7. <u>Effect on Arrangement.</u> Except as specifically required to implement the purposes of this Agreement, or the extent inconsistent with this Agreement, all other terms of the Arrangement shall remain in force and effect.

8. <u>Interpretation.</u> The provisions of this Agreement shall prevail over any provision in the Arrangement that may conflict or appear inconsistent with any provision in this Agreement. This Agreement and the Arrangement shall be interpreted as broadly as necessary to implement and comply with HIPAA, the HITECH Act, the Privacy Rule and the Security Rule. The parties agree that any ambiguity in this Agreement shall be resolved in favor of a meaning that complies and is consistent with HIPAA, the HITECH Act, the Privacy Rule, and the Security Rule.

9. <u>Survival</u>. The provisions of this Agreement shall survive the termination or expiration of the Arrangement.

10. <u>Notices.</u> With the exception of notices required under Section B.5, any notice required or permitted to be given hereunder shall be in writing sent either by personal delivery, overnight delivery, or United States registered or certified mail, return receipt requested, all of which shall be properly addressed, with postage or delivery charges prepaid, to the parties, as follows:

> To Business Associate:    Navigant Consulting, Inc.
> Attention: Legal Department
> 30 South Wacker Drive, #3550
> Chicago, IL 60606

> To Covered Entity:    Tulare Regional Medical Center
> 869 N. Cherry Street
> Tulare, CA 93274
> Attn: Chief Executive Officer

Notices sent by personal delivery shall be deemed given upon actual receipt. Notices sent by overnight delivery shall be deemed given on the next business day. Notices sent via United States registered or certified mail shall be deemed given five (5) business days from mailing.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement:

**COVERED ENTITY:**
**Tulare Regional Medical Center**

By: _____

Its: _____

Date: _____

**BUSINESS ASSOCIATE:**
**Navigant Healthcare Cymetrix Corporation**

By: _____

Its: _Executive Director_

Date: _10/18/2019_

# EXHIBIT B

# STATEMENT OF WORK #1

This Statement of Work #1 (this "SOW #1") is entered into by and between **Navigant Healthcare Cymetrix Corporation**, a Delaware corporation ("Cymetrix"), and **Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**, a California health care district ("Client"), as of this 26th day of November, 2014, pursuant to that certain Master Services Agreement dated November 26, 2014 (the "MSA"), by and between Cymetrix and Client, for the services herein described.

## 1. DEFINITION OF SERVICES / CYMETRIX RESPONSIBILITIES

1.1 <u>Facilities</u>.  During the Term (as hereinafter defined), Cymetrix shall provide revenue cycle services and solutions as provided herein for the following client facility (the "Client Facility"):

(a)  Tulare Regional Medical Center.

1.2 <u>Patient Access Services</u>.  Throughout the Term, Cymetrix shall assume responsibility to staff, manage and provide functional oversight of the Client Facility's patient access services department and associated business operations and functions.  Cymetrix will leverage its own internal proprietary tools as it deems appropriate to efficiently deliver the services described herein.  Cymetrix shall provide revenue cycle management and staffing for the Client Facility's patient access services department in the areas described herein.

(a) Cymetrix shall manage the standard and customary functions of Client's Patient Access Services Department listed below:

    i.  Patient scheduling;

    ii.  Patient pre-registration;

    iii.  Insurance verification;

    iv.  Registration and admitting ;

    v.  Financial counseling;

    vi.  Financial clearance (authorizations / pre-certifications);

    vii.  Vendor management; and

    viii.  Eligibility/entitlement services.

(b) Cymetrix will leverage its own internal proprietary tools or, as applicable and pursuant to Section 1.4(e), reimburse Client for the patient access services as specified as "Cymetrix Responsibilities" on Schedule 1, attached hereto and incorporated herein by this reference ("Schedule 1").

1.3 <u>Patient Financial Services</u>.  Throughout the Term, Cymetrix shall assume responsibility to staff, manage and provide functional oversight of the Client Facility's patient financial services department and associated business operations and functions.  Cymetrix will leverage its own internal proprietary tools as it deems appropriate to efficiently deliver the services described herein.  Cymetrix shall provide revenue cycle management and staffing for the Client Facility's patient financial services department in the areas described herein.

(a) Patient Financial Services Department functions:

    i. Claims editing (which in certain cases shall be limited to the parsing and queuing of claims back to various hospital departments for review and correction), transmission, and submission to payors, either directly or through a Client designated clearinghouse;

    ii. Follow-up and collection for both government and commercial payor accounts, including, but not limited to, rebilling, performing automated healthcare claims status request/response processing and online website scripting;

    iii. Follow-up and collection for self-pay accounts, including submitting paper statements;

    iv. Denial management services with regard to both technical and clinical denials, healthcare claims payment and remittance advice ("835") processing, manual denial processing from paper remits, and appeal processing (with Client making coding and clinical personnel available to Cymetrix to assist with medical necessity determinations and to support the clinical denial management process);

    v. To the extent not automatically completed through Client's lockbox, appropriate services regarding posting of payments, including, but not limited to, processing of patient payments and payer remittances (either electronic remittances or paper remittances), and performing 835 processing;

    vi. Payment review and variance identification, including, but not limited to, submitting bulk appeals of overpayments and under-payments;

    vii. Credits and refund processing;

    viii. Handling of inbound patient calls relating to patient accounting matters;

    ix. Vendor management;

2

x.  Medicare payment reporting and preparation of bad debt logs for Client's final review, approval and submission; and

xi.  Management of recovery audit contractors ("RAC") business office functions, limited to the following:

- Participation in any RAC Committees;
- Creation and documentation of non-clinical RAC appeal letters for Client review, approval and submission;
- Data management and documentation of Cymetrix RAC activities in Client's RAC management system; and
- Re-billing support.

(b)  Cymetrix will leverage its own internal proprietary tools or, as applicable and pursuant to Section 1.4(e), reimburse Client for the patient financial services technologies specified as "Cymetrix Responsibilities" on Schedule 1.

1.4  ΝGeneral.

(a)  Cymetrix shall provide Client standard management reporting package and regular meeting schedule(s) to be finalized during implementation and mutually agreed to between the parties.

(b)  The services performed by Cymetrix under hereunder shall be limited to the revenue cycle activities applicable to the technical component of fees for services provided by Client.

(c)  Cymetrix employees and contractors will adhere to Client's policies, procedures and processes provided in writing to Cymetrix.

(d)  If any Cymetrix personnel performing services hereunder fails to perform properly or conducts himself or herself in an inappropriate manner when onsite at a Client Facility or otherwise in dealing with Client's affiliates' or any Client Facility's personnel, Client may provide Cymetrix with notice thereof.  Upon receipt of such notice, and upon otherwise becoming aware of any such failures to perform or inappropriate conduct, Cymetrix shall promptly investigate the matter and shall promptly either: (i) take such action as is reasonable and appropriate to address the issue or (ii) if necessary or requested by Client, promptly remove the identified person from performing work hereunder and replace the removed person with a properly qualified, trained, and skilled individual.  Examples of inappropriate conduct include failure to follow Client's relevant policies as required hereunder, conduct that could be construed as harassment of another person, and engaging in an act of fraud, dishonesty, other violations of law or regulations, and breach of trust in connection with performance hereunder, and any other failures to comply with Client's Code of Conduct.

(e)  Cymetrix shall reimburse Client on a monthly basis for expenses (excluding depreciation expense, expenses related to the purchase of assets, legal fees/costs and

3

other administrative professional fee expenses whether allocated or direct) incurred by Client during the Term for the reasonable and customary operating costs, consistent with prior practice, of the revenue cycle cost centers listed below; provided, however, that Cymetrix shall only be responsible for the reimbursement of such expenses that were (i) incurred by Client within ninety (90) days prior to submission to Cymetrix of a claim for reimbursement, and (ii) subsequently paid by Client, and in the event of any such nonpayment, Cymetrix shall be entitled to repayment of, or a credit for, such non-paid amounts.

<u>Revenue Cycle Cost Centers:</u>

18530      Patient Accounting
18560      Admitting

(f) In order to control Client's revenue cycle costs, the parties hereto acknowledge and agree that Cymetrix may (i) contract directly with Client's existing revenue cycle vendors, (ii) provide services using Cymetrix selected vendors, and/or (iii) in-source the services being provided by any such vendor(s). Cymetrix may cease to provide such services, if such services are deemed by both of Cymetrix and Client to provide insufficient benefit to Client, within the terms and conditions of any existing contracts.



4



(i)

(j) Upon expiration or termination of this SOW #1, upon request of Client, Cymetrix will collaborate with Client to ensure the efficient and systematic transition of the revenue cycle functions to Client. This shall include a comprehensive plan that addresses required communications and any necessary transitions in staffing and management, technology systems and any Cymetrix partner services.

## 2. CLIENT RESPONSIBILITIES

2.1 Client shall cooperate with Cymetrix in a commercially reasonable manner in order to permit Cymetrix to perform its duties hereunder.

2.2 Client shall provide Cymetrix remote access to all computer systems, technologies, support system, and databases required to support the revenue cycle in order for Cymetrix to perform its services hereunder.

2.3 Client shall provide data to Cymetrix as specified and within the timing provided in Schedule 5 attached hereto and incorporated herein by this reference. ███████████ ██████████████████████████████████████████████████████████████████ ████████████████ Further, Client acknowledges and agrees that Client's failure to provide such data on or before December 1, 2014 may cause the initiation of services to be extended beyond the Effective Date (as defined in section 4.1). In the event of a Client caused delay, the Effective Date shall be defined as the Effective Date plus the number of days it takes for Client to deliver the required data beyond December 1, 2014.

2.4 Client shall provide access to all work areas related to the performance of services hereunder.

2.5 Client shall provide, at its own expense, computers (for positions based at Client's facility), telephones, general office equipment, office supplies and workspace (including utilities) necessary to support the activities of all personnel working at Client's facility during the Term and related to the performance of services hereunder.

5

2.6 Client shall maintain responsibility for all expenses not otherwise identified as Cymetrix responsibilities as stated herein which are traditionally allocated to Client's revenue cycle departments.

2.7 Client shall provide coding and clinical resources to assist with medical necessity determinations and to support and complete clinical denials and RAC review/appeals that require clinical intervention or in which claims are denied or payment is reduced for medical necessity issues.

2.8 Client shall provide the following revenue cycle technologies/systems:

    (a) Client's or the Client Facility's patient accounting system;

    (b) Client's or the Client Facility's patient access systems;

    (c) Client's or the Client Facility's health information management system(s);

    (d) Client's or the Client Facility's scheduling system;

    (e) Client's or the Client Facility's merchant card processing systems (or "point of service" ("POS") systems);

    (f) Client's or the Client Facility's lockbox;

    (g) Client's or the Client Facility's contract management and expected reimbursement system;

    (h) Client's or the Client Facility's scanning/document imaging systems;

    (i) Client's or Client Facility's RAC compliance tool; and

    (j) Client's or the Client Facility's charge description master file system.

2.9 Client shall retain responsibility for all revenue cycle processes not otherwise identified as Cymetrix Responsibilities herein and in Schedule 1 including, but not limited to, the following:

    (a) Market analysis/strategy;

    (b) Pricing, pricing analysis and pricing strategy;

    (c) Health Information Management department processes;

    (d) Coding;

    (e) Clinical documentation;

(f) RAC processing, except for Cymetrix' responsibilities provided in Section 1.3(a)(xii) hereof;

(g) Clinical department charge capture;

(h) Accurate and timely charge entry;

(i) Revenue Cycle Integrity Department processes, including but not limited to, charge description master file maintenance and any audits thereof, charge auditing and clinical appeals;

(j) Managed care contract negotiations;

(k) Initial claim generation in Client's or the Client Facility's patient accounting system, including population of all claim data that are required to submit claims that comply with all applicable policies and requirements to federal and commercial payers;

(l) Case Management/ Utilization Review; and

(m) Cancer Registry.

2.10 Client shall provide access to the systems specified in Section 2.8 hereof ("Client Systems") at or better than the service levels specified below. In the event of any non-insignificant failure to meet such services levels, (i) Cymetrix shall be relieved during the pendency of such failure (and for such additional period of time as may be reasonable and/or necessary to resume normal productivity) of any obligation to provide any service, product, information, result, document or other deliverable otherwise required hereunder to the extent that the inability to so deliver or provide such item(s) is the result of such Client Systems failure, and (ii) the parties shall review the cause(s) and effect(s) of such failure and collaborate in good faith to agree and act upon, without limitation, (a) adjustments of or modifications to the Client Systems to be made by Client at Client's sole cost and expense, (b) the impact of such adjustments or modifications on Cymetrix' performance and delivery obligations hereunder, and (c) any necessary or appropriate adjustments to the compensation payable to Cymetrix hereunder. Any such amendments and/or modifications must be evidenced by a written amendment to this SOW #1.

(a) <u>System Access</u>. Client shall maintain a 99%+ availability of Client Systems during standard work hours of 7 am to 8 pm ET.

(b) <u>Security Access</u>. Client shall provide Client System access credentials to Cymetrix employees within 3 business days of Cymetrix' request for such credentials to Client.

2.11 Client represents and warrants to Cymetrix that Client maintains a corporate compliance plan, which compliance plan is in accordance with applicable federal and State guidelines, standards and interpretations, including without limitation, a compliance officer, the guidelines and standards issued by the federal Office of Inspector General of

the Department of Health and Human Services through the date first written above. Client covenants and agrees that it shall maintain such compliance plan in accordance with any and all further guidelines, standards and interpretations issued by any federal or State agency, court or other governmental entity during the Term.

2.12 During the Term, Client shall make its best efforts to provide Cymetrix employees performing services at Client premises the same or similar employee conveniences made available to Client employees, such as discounted employee parking, meal programs/discounts at Client's cafeteria, and employee events as applicable. Notwithstanding, this provision shall not include Client employee benefit plans or similar benefits that Client provides to its direct employees.

2.13 During the Term, Client shall provide to Cymetrix its monthly financial statements no later than the 15th day from the last calendar day of the reporting month with detail sufficient to allow Cymetrix to validate the performance and compensation calculations specified herein and to assess Client's financial condition in relation to Cymetrix' outstanding receivables due pursuant to this SOW #1.

2.14 Within thirty (30) days from the initiation of services hereunder or such other time period as mutually agreed upon by the parties, Client shall either (i) provide to Cymetrix copies of the policies listed below or (ii) collaborate with Cymetrix to create such policies. During the Term, Client shall be responsible to provide any updates of such policies to Cymetrix.

(a) Point of service collection policy;

(b) Charity Care policy;

(c) Self pay collection policy, including payment plan guidelines and bad debt collection guidelines; and

(d) Bad Debt Policy.

## 3. COMPENSATION

3.1 ▮▮ __Fee__. For the services performed hereunder, Client shall pay ▮▮▮▮▮▮▮▮▮▮▮▮



3.2

3.3



9



3.4 <u>Invoicing Timing</u>.  Cymetrix will provide to Client at the end of each billing period, a detailed invoice of all amounts due to Cymetrix.  Cymetrix will submit invoices to Client monthly.

10

3.5 <u>Payment Terms</u>.   Client shall pay all invoices in within thirty (30) days of receipt. Undisputed invoiced amounts not paid within sixty (60) days of receipt may bear interest, at Cymetrix' option, at the lesser of (i) twelve percent (12%) per annum, or (ii) the maximum rate permitted by applicable law.  Client agrees that such interest charges are reasonable and agrees to pay all such fees.

3.6 <u>Material Change</u>. Either party to this Agreement may request an adjustment to ████ ████████████████████████ structure, methodology or calculation in the event that a Material Change occurs or is reasonably expected to occur.  In such case, Client and Cymetrix agree to negotiate in good faith to determine appropriate modifications to the compensation methodologies hereunder.  For purposes of this Agreement, "Material Change" shall mean an event or transaction or series or sequence of events or transactions relating to Client's business that causes or may cause a significant variation to Client's normal business operations, including, but not limited to, the following: (i) alterations to, or relocations of, the, Client facilities that materially affect Client operations or Cymetrix' ability to perform Services as described herein, (ii) mergers, acquisitions, or divestitures of a material nature involving Client, (iii) substantive changes in government programs that alter reimbursement rates or patient volumes, (iv) material changes in payer mix, payer contracts, or average net revenue per patient account, (v) any material changes in Client's financial reporting, policies or procedures or (vi) any other material changes in Client's clinical or business operations.

3.7 <u>Taxes</u>.   The parties hereto further acknowledge that Cymetrix' pricing hereunder does not contemplate of include any provision for the payment of any excise taxes that are or may be assessed in the future.  Cymetrix shall promptly notify Client if in the future it becomes aware of any specific change in circumstances which would cause or result in an excise tax on any of its services provided under the terms and conditions of this Agreement.  Client shall be responsible to pay any such taxes.

## 4.   TERM AND TERMINATION

4.1 <u>Term</u>.  Subject to extension or early termination as provided herein, the term of this SOW #1 (including any Extension Term(s) pursuant to Section 4.2 below, the "Term") shall commence on December 11, 2014, (the "Effective Date") and shall continue in full force and effect for sixty (60) months (the "Initial Term").

4.2 <u>Renewal</u>.  Thereafter, and subject to termination as provided herein, this SOW #1 shall automatically renew for successive two-year periods (each an "Extension Term"), unless either party gives notice to the other of its intention not to renew not less than and one hundred eighty (180) days prior to the completion of the Initial Term or then current Extension Term, as appropriate.

4.3 <u>Early Termination</u>.  In addition to any rights of termination that either party may have at law or equity, this SOW #1 may be terminated during the Initial Term or any Extension Term as follows; provided, however, that no such termination shall reduce either party's right to seek and obtain damages, and provided further that nothing herein shall be deemed to waive the right by either party to seek specific performance:

(a) By either party in the event of the other party committing a material breach of any of the terms of this SOW #1 and failing to remedy such breach within a period of sixty (60) days after receipt of written notice drawing attention to the material breach with reasonable specificity;

(b) By either party "for cause", effective immediately and without opportunity to cure. As used herein, the term "for cause" shall include: (i) any willful misconduct, dishonesty, or fraud, (ii) the felony conviction of any officer of a party in the performance of such party's duties hereunder, or (iii) the adjudication of a party as bankrupt or insolvent, or the institution of voluntary or involuntary proceedings against a party seeking relief, reorganization or arrangement under any laws relating to insolvency, or assignment for the benefit of creditors, or the appointment of a receiver, liquidator or trustee of such party's property or assets, or the liquidation, dissolution or winding up of a party or its business;

(c) By either party if it reasonably and in good faith determines that it or the other party will be unable to cure an act or event of nonperformance resulting from a Force Majeure Event (as defined in Section 12.15 of this Agreement) within sixty (60) days following the commencement of a Force Majeure Event, effective upon not less than sixty (60) days prior written notice to the other party;

(d) By Client, after the initial twelve (12) months from the Effective Date hereof, following written notice of alleged breach given to Cymetrix in the event that Cymetrix commits a Performance Breach and fails to remedy such Performance Breach within either of the two (2) full calendar months immediately following the month in which such notice is received. For the purposes hereof, a Performance Breach shall be deemed to have occurred if Cymetrix' performance fails to meet the Minimum Performance Level ("MPL") specified in Schedule 4, for each Key Performance Indicator, for three (3) consecutive calendar months determined as of the end of each such month, and notice of any alleged breach shall be given, if at all, not later than the last day of the month following the month in which the breach is alleged to have occurred, and cure of any such alleged Performance Breach by Cymetrix may be effected by causing at least one (1) MPL to be in compliance within one of the herein specified monthly cure periods. In the event of a Performance Breach that Cymetrix fails to remedy as provided herein, Client may, during the forty-five (45) days following such failure, elect to terminate this SOW #1 upon sixty (60) days' written notice to Cymetrix;

(e) By Client, effective immediately and without opportunity to cure, upon Cymetrix' final and non-appealable exclusion from the Medicare, Medicaid, or other Federal healthcare program; or

(f) By Cymetrix in the event Client fails to make any payment when due and thereafter fails to cure such default within forty-five (45) days of receipt of written notice thereof.

*[Signatures on following page]*

12

IN WITNESS WHEREOF, the parties agree to the foregoing and have caused this SOW #1 to be executed by duly authorized individuals as of the first date written above.

**Navigant Healthcare Cymetrix Corporation**

By: _____

Print Name: _JEFFREY MacDonald_
Print Title: _EXECUTIVE DIRECTOR_

**Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**

By: _____  11/26/2014

Print Name: Alan Germany
Print Title:  Chief Financial Officer/Chief Operating Officer

13

**SCHEDULE 1**
**TECHNOLOGIES**

| Rev. Cycle Area | Major Processes | Sub-Processes | Not Included In Cymetrix Solution | Included In Cymetrix Solution |
|---|---|---|---|---|
| Revenue Cycle Management | Executive Reporting Package | Portal access via web-based devices | | X |
| Patient Access | Scheduling | On-line scheduling / Work queues | X | |
| Patient Access | Pre-Registration & Registration | Pre-registration work queues | X | |
| Patient Access | Pre-Registration & Registration | On-line pre-registration (patient portal) | X | |
| Patient Access | Pre-Registration & Registration | Patient Self-Service Registration (excludes hardware) | X | |
| Patient Access | Pre-Registration & Registration | Treatment Authorization | X | |
| Patient Access | Pre-Registration & Registration | Order Management | X | |
| Patient Access | Pre-Registration & Registration | Medical Necessity Screening | X | |
| Patient Access | Pre-Registration & Registration | Demographic / Address Verification | X | |
| Patient Access | Pre-Registration & Registration | ABN checker | X | |
| Patient Access | Pre-Registration & Registration | Data quality assurance | X | |
| Patient Access | Pre-Registration & Registration | Imaging / Patient Folder | X | |
| Patient Access | Pre-Registration & Registration | Email notifications to patients of appointment | X | |
| Patient Access | Insurance Verification | On-line insurance Verification (270/271) | | X |
| Patient Access | Insurance Verification | On-line Treatment Authorization (270/271) | | X |
| Patient Access | Financial Clearance | Ability / propensity to pay scoring (Eligibility Only) | X | |
| Patient Access | Financial Clearance | Charity scoring (Eligibility Only) | X | |
| Patient Access | Financial Clearance | Patient liability estimator | X | |
| Patient Access | Point-of-Service (POS) Collections | On-line POS collections (Hospital staff) | X | |
| Patient Access | Point-of-Service (POS) Collections | On-line POS collections (Patient portal) | X | |
| Patient Access | Point-of-Service (POS) Collections | Payment Processing | X | |
| Patient Access | Entitlement / Eligibility | Entitlement / Eligibility work queues | | X |
| Patient Access | Entitlement / Eligibility | Entitlement Screening | | X |
| Patient Access | Other | Physician credentials/ NPI #'s | X | |
| Patient Access | Other | Reporting | | X |
| Patient Access | Other | Patient Financing -- Facilitate Only | X | |
| Patient Financial Services | Billing Management | Billing Claim Editing | | X |
| Patient Financial Services | Billing Management | Claim Submission / Clearinghouse (837) | | X |
| Patient Financial Services | Payer Contract Management | Expected Reimbursement Calculation | X | |
| Patient Financial Services | Cash Posting | 835 Conversion from paper remit to electronic record | X | |
| Patient Financial Services | Cash Posting | Payment Posting | | X |
| Patient Financial Services | Cash Posting | Lockbox | X | |
| Patient Financial Services | Cash Posting | ERA Processing | | X |
| Patient Financial Services | Cash Posting | Medicare Payment Reporting | | X |
| Patient Financial Services | Denial Management | Denial Processing (Automated - 835) | | X |
| Patient Financial Services | Denial Management | Denial Processing (Manual) | | X |
| Patient Financial Services | Denial Management | Appeal Processing | | X |
| Patient Financial Services | Payment Variance | Payment Review - Automated movement of $'s | | X |
| Patient Financial Services | Payment Variance | Identification of Over / Under Payments | | X |
| Patient Financial Services | Payment Variance | Bulk Appeals of Over / Under Payments | | X |
| Patient Financial Services | Account Resolution / Follow-up | Claim Status - Automated (276/277) | | X |
| Patient Financial Services | Account Resolution / Follow-up | Claim Status - On-Line (Website Scripting) | | X |
| Patient Financial Services | Account Resolution / Follow-up | Bulk Claim Submission | | X |
| Patient Financial Services | Account Resolution / Follow-up | Ability / propensity to pay scoring | | X |
| Patient Financial Services | Account Resolution / Follow-up | Charity scoring | | X |
| Patient Financial Services | Account Resolution / Follow-up | Automated Follow-up Workflow / Work Queue | | X |
| Patient Financial Services | Account Resolution / Follow-up | Payment Plans | | X |
| Patient Financial Services | Account Resolution / Follow-up | DDE (Medicare) Access | | X |
| Patient Financial Services | Account Resolution / Follow-up | Medicare Payment Floor (Future Payment) Reporting | | X |
| Patient Financial Services | Account Resolution / Follow-up | Outbound Dialer | | X |
| Patient Financial Services | Account Resolution / Follow-up | Call Recording | | X |

| | | | | |
|---|---|---|---|---|
| Patient Financial Services | Account Resolution / Follow-up | Integrated Voice Response (IVR) | | X |
| Patient Financial Services | Account Resolution / Follow-up | Patterning | | X |
| Patient Financial Services | Account Resolution / Follow-up | Call Blasting | | X |
| Patient Financial Services | Support Services | Patient Statements | | X |
| Patient Financial Services | Support Services | Customer Service / Complaint Logs | | X |
| Patient Financial Services | Support Services | On-line Bill Presentment / On-line Patient Statements | | X |
| Patient Financial Services | Managed Care Auditing | Bulk Appeals of Over / Under Payments | | X |
| Patient Financial Services | Other | RAC Business Office Functions | | X |
| Patient Financial Services | Other | Medicare Bad Debt Logs | | X |
| Patient Financial Services | Other | International Collections | X | |
| Patient Financial Services | Other | Dashboard & Reporting | | X |

2

## SCHEDULE 2
## KPI
## DEFINITIONS AND BASELINE PERFORMANCE LEVEL





2

SCHEDULE 3





2



## SCHEDULE 5
## DATA EXTRACTS

[Provided as a separate document]

# EXHIBIT  C

Exhibit C- Page 047

## FIRST AMENDMENT TO
## STATEMENT OF WORK #1

This First Amendment to Statement of Work #1 (this "First Amendment") ") is entered into as of this 15th day of June, 2015 between **Navigant Healthcare Cymetrix Corporation**, a Delaware corporation ("Cymetrix"), and **Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**, a California health care district ("Client") (each referred to as "Party" or collectively referred to as the "Parties), pursuant to a Master Services Agreement executed between the Parties dated as of November 26, 2014 (the "MSA").

**WHEREAS**, Client and Company are parties to the certain Statement of Work #1 dated as of November 26, 2014 (the "Agreement"); and

**WHEREAS**, Client and Cymetrix now desire to amend certain provisions of the Agreement in order to, among other things, modify the scope of services and compensation provisions thereof.

**NOW, THEREFORE**, for and in consideration of the foregoing, the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**Section 1.**    Defined Terms.  Capitalized terms used but not defined herein shall have the meanings given to such terms in the MSA or the Agreement, as applicable.

**Section 2.**    Amendments.   The following amendment shall effective as of June 1, 2015:

    A. Section 3.1 of the Agreement shall be amended to include the following as the last paragraph of the section:



**Section 3.**    General.   Except as amended and modified hereby, all terms and conditions of the Agreement and the MSA shall remain in full force and effect. In the event and to the extent of any conflict between the terms of this First Amendment and those of the Agreement or the MSA, the terms of this First Amendment shall prevail and control. This First Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.

*[Signatures on following page]*

Exhibit C- Page 048

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the date first above written.

**Navigant Healthcare Cymetrix Corporation**

By: _____

    Name:      Jeffrey MacDonald
    Title:       Executive Director

**Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**

By: _____  6/15/15

    Name:      Alan Germany
    Title:       Chief Financial Officer

Exhibit C- Page 049

# EXHIBIT D

### SECOND AMENDMENT TO
### STATEMENT OF WORK #1

This Second Amendment to Statement of Work #1 (this "Second Amendment") ") is entered into as of this _31st_ day of July, 2015 between **Navigant Healthcare Cymetrix Corporation**, a Delaware corporation ("Cymetrix"), and **Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**, a California health care district ("Client") (each referred to as "Party" or collectively referred to as the "Parties), pursuant to a Master Services Agreement executed between the Parties dated as of November 26, 2014 (the "MSA").

**WHEREAS**, Client and Company are parties to the certain Statement of Work #1 dated as of November 26, 2014 as amended by that certain First Amendment to Statement of Work #1 dated as of June 15, 2015 (the "Agreement"); and

**WHEREAS**, Client and Cymetrix now desire to amend certain provisions of the Agreement in order to, among other things, modify the compensation provisions thereof.

**NOW, THEREFORE**, for and in consideration of the foregoing, the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**Section 1.**    Defined Terms. Capitalized terms used but not defined herein shall have the meanings given to such terms in the MSA or the Agreement, as applicable.

**Section 2.**    Amendments. The following amendments shall effective as of May 1, 2015:





**Section 3.** <u>General.</u> Except as amended and modified hereby, all terms and conditions of the Agreement and the MSA shall remain in full force and effect. In the event and to the extent of any conflict between the terms of this Second Amendment and those of the Agreement or the MSA, the terms of this Second Amendment shall prevail and control. This Second Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.

*[Signatures on following page]*

3

IN WITNESS WHEREOF, the parties have executed this Second Amendment as of the date first above written.

**Navigant Healthcare Cymetrix Corporation**

By: _____

Name:      Jeffrey MacDonald
Title:      Executive Director

**Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**

By: _____

Name:      Alan Germany
Title:      Chief Financial Officer

4

# EXHIBIT E

## THIRD AMENDMENT TO
## STATEMENT OF WORK #1

This Third Amendment to Statement of Work #1 (this "Third Amendment") ") is entered into as of this _____ day of December, 2015 between **Navigant Healthcare Cymetrix Corporation**, a Delaware corporation ("Cymetrix"), and **Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**, a California health care district ("Client") (each referred to as "Party" or collectively referred to as the "Parties"), pursuant to a Master Services Agreement executed between the Parties dated as of November 26, 2014 (the "MSA").

**WHEREAS**, Client and Company are parties to the certain Statement of Work #1 dated as of November 26, 2014 as amended by that certain First Amendment to Statement of Work #1 dated as of June 15, 2015 and that certain Second Amendment to Statement of Work #1 dated as of July 31, 2015 (as amended, the "Agreement"); and

**WHEREAS**, Client and Cymetrix now desire to amend certain provisions of the Agreement in order to, among other things, modify the compensation provisions thereof.

**NOW, THEREFORE**, for and in consideration of the foregoing, the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**Section 1.**     Defined Terms.  Capitalized terms used but not defined herein shall have the meanings given to such terms in the MSA or the Agreement, as applicable.

**Section 2.**     Amendments.  The following amendments shall effective as of December 1, 2015:

A. In addition to scope of services defined in Section 1 of the Agreement, Cymetrix shall provide Client the following accounts receivable conversion support services ("Conversion Support Services"):

1. Support the development of the Cerner IT Revenue Cycle business requirements for building and testing solution;
2. Support the development and document best practice model design and implementation plan;
3. Support development of test scripts;
4. Assist in defining test cases and associated requirements per each;
5. Support import of test cases into Client's Cerner testing catalogue;
6. Assist in integrating existing test cases into the applicable test scripts;
7. Assist in linking test cases to the applicable work flow within Client's Cerner system;
8. Provide high level training and certification for revenue cycle operations staff; and
9. Perform testing, using the following steps:
   o  Execute the test condition;
   o  Check the output against the expected results;

- o Evaluate and document any unexpected results utilizing the testing incidents database;
- o Complete required corrections and re-test;
- o Validate final testing components (conditions, input, and expected results) are accurate, complete and documented in such a way to make them repeatable and reusable;
- o Review and obtain acknowledgment and agreement of system test results from Client where appropriate (i.e. new functionality); and
- o Assist in meetings and provide high level advisory role for Charge Description Master.

B. The Conversion Support Services hereunder are limited to consulting on the development and configuration of Client's Cerner system. Client acknowledges that the Conversion Support Services are advisory in nature and Client retains responsibility for the final configuration and the system operation.

C. 

**Section 3.**    <u>General</u>.    Except as amended and modified hereby, all terms and conditions of the Agreement and the MSA shall remain in full force and effect. In the event and to the extent of any conflict between the terms of this Third Amendment and those of the Agreement or the MSA, the terms of this Third Amendment shall prevail and control. This Third Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which when taken together shall constitute one and the same instrument.

*[Signatures on following page]*

2

IN WITNESS WHEREOF, the parties have executed this Third Amendment as of the date first above written.

**Navigant Healthcare Cymetrix Corporation**

By: _____

     Name:     Jeffrey MacDonald
     Title:      Executive Director

**Tulare Local Healthcare District,**
**d/b/a Tulare Regional Medical Center**

By: _____

     Name:     Alan Germany
     Title:      Chief Financial Officer

3

# EXHIBIT F



2701 Highpoint Oaks Drive
Suite 124
Lewisville, Texas 75067

August 7, 2017

<u>Sent Via Electronic Email</u>

Tulare Regional Medical Center
Attn: Alan Germany, CFO
869 N. Cherry
Tulare, CA 93274
agermany@tulareregional.org

RE: Demand for Fees Due under Master Services Agreement and Statement of Work #1

Mr. Germany:

Please be advised that Navigant Cymetrix Corporation ("Navigant") is seeking collection of fees due and outstanding under that certain Master Services Agreement and Statement of Work #1 entered into between Navigant and Tulare Regional Medical Center ("TRMC"), effective November 26, 2014 (the "Agreement"). Pursuant to the Agreement: (i) TRMC is responsible for paying Navigant's fees; and (ii) payment is expected within thirty (30) days of receipt of Navigant's monthly invoices.

The outstanding invoices under the Agreement (the "Invoices") are:

| Invoice Number | Invoice Dates | Month of Service | Invoice Amount |
|---|---|---|---|
| 510116 | 11/22/2016 | August 2016 | $209,541.77 |
| 505042 | 9/30/2016 | August 2016 | $12,019.03 |
| 510788 | 11/29/2016 | September 2016 | $18,218.63 |
| 507994 | 10/25/2016 | August 2016 | $4,755.18 |
| 507995 | 10/25/2016 | September 2016 | $27,494.95 |
| 508982 | 11/7/2016 | October 2016 | $20,219.20 |
| 513224 | 12/28/2016 | September 2016 | $201,296.64 |
| 515500 | 1/25/2017 | October 2016 | $164,391.23 |
| 0400001022 | 5/31/2017 | April 2017 | $155,032.22 |
| 0400000460 | 2/17/2017 | November 2016 | $59,406.84 |
| 0400000492 | 2/23/2017 | December 2016 | $106,210.16 |
| 0400000693 | 3/31/2017 | January 2017 | $105,672.25 |
| 0400000842 | 4/26/2017 | February 2017 | $117,863.55 |
| 0400000985 | 5/19/2017 | March 2017 | $253,099.82 |
| 0400001163 | 6/23/2017 | April 2017 | $113,794.28 |
| 0400001269 | 7/13/2017 | May 2017 | $169,521.60 |
| **Total Amount Owed** | | | **$1,738,537.35** |

As a result of TRMC's failure to pay the Invoices in a timely manner, TRMC is in default of its obligations under the terms and conditions of the Agreement. Pursuant to Section 4.3(f) of Statement of Work #1, Navigant is hereby giving TRMC notice of its intent to terminate the Agreement if such default is not cured by TRMC within forty-five (45) days of receipt of this notice. In addition, Navigant shall enforce all of its available rights and remedies in accordance with applicable law including, but not limited to fees, costs and expenses incurred by Navigant, related to the collection thereof and the enforcement of its rights under the Agreement.

This is an attempt to collect a debt; any information obtained can and will be used for that purpose.

Sincerely,

Jeffrey Nieman
COO & Managing Director

Enclosure

cc: Benny Benzeevi, MD, FACEP (via electronic mail)
     Megan Marshall, Assistant General Counsel (via electronic mail)
     Jim Mapes, Managing Director (via electronic mail)

Please send payment to:

### Remittance Instructions via Check

**Regular Mail**
Navigant
4511 Paysphere Circle
Chicago IL 60674
United States

**Fedex/Courier**
Navigant
4511 Paysphere Circle
Chicago IL 60674
United States

### Electronic Payment Info

**Wire Instructions**
Account Name: Navigant
Account Number: 5800151127
Bank of America
135 S. Lasalle Street
Chicago IL 60603
United States
ABA# 026009593
SWIFT: BOFAUS3N

**ACH Instructions**
Account Name: Navigant
Account Number: 5800151127
Bank of America
135 S. Lasalle Street
Chicago IL 60603
United States
ABA# 071000039

# EXHIBIT G



2701 Highpoint Oaks Drive
Suite 124
Lewisville, Texas 75067

September 21, 2017

<u>Sent Via Electronic Email</u>

Tulare Regional Medical Center
Attn: Alan Germany, CFO
869 N. Cherry
Tulare, CA 93274
agermany@tulareregional.org

RE: Non-Payment Status Letter

Mr. Germany:

As a follow up to our meeting on September 11, 2017 regarding the outstanding amounts due and owing, Navigant Cymetrix has not yet received payment for any past due amounts, most of which were listed in the August 7, 2017 letter sent to you (the "Letter"). Pursuant to section 4.3(f) of SOW #1 to the services agreement, and as further detailed in the Letter, Tulare has forty-five (45) days to cure a breach for non-payment after receiving notice from Navigant Cymetrix, which is due to expire on October 5, 2017. During our meeting with you on September 11, 2017, you shared that Tulare was seeking financing so that it may pay the amounts due and owing Navigant Cymetrix. Although Navigant is appreciative of your efforts, I explained to you that Navigant Cymetrix could no longer provide services without payment. Further, if outstanding amounts were not paid in accordance with the terms set forth in the Letter, Navigant Cymetrix would be left with no choice but to suspend services and remove all personnel from your facility until your past due account is current.

Please be advised that if your account is not made current for all outstanding invoiced amounts by midnight on October 5, 2017, Navigant Cymetrix will suspend performance of its services to Tulare effective October 9, 2017.

As a reminder, section 12.13 of the services agreement prohibits Tulare from soliciting Navigant Cymetrix employees during the term of the services agreement and for a twelve (12) month period thereafter.

Navigant Cymetrix reserves its right to enforce all available rights and remedies in accordance with applicable law, including but not limited to termination rights and the collection of fees, costs and expenses incurred by Navigant Cymetrix related to the collection thereof and the enforcement of its rights under the services agreement.

I hope that Tulare can resolve this matter quickly and that Navigant Cymetrix can continue to provide services without interruption.

9/22

Sincerely,



James Mapes
Managing Director
Navigant Cymetrix Corporation

Enclosure

cc: Benny Benzeevi, MD, FACEP (via electronic mail)
    Megan Marshall, Assistant General Counsel (via electronic mail)



2701 Highpoint Oaks Drive
Suite 124
Lewisville, Texas 75067

August 7, 2017

<u>Sent Via Electronic Email</u>

Tulare Regional Medical Center
Attn:  Alan Germany, CFO
869 N. Cherry
Tulare, CA 93274
agermany@tulareregional.org

RE:  Demand for Fees Due under Master Services Agreement and Statement of Work #1

Mr. Germany:

Please be advised that Navigant Cymetrix Corporation ("Navigant") is seeking collection of fees due and outstanding under that certain Master Services Agreement and Statement of Work #1 entered into between Navigant and Tulare Regional Medical Center ("TRMC"), effective November 26, 2014 (the "Agreement"). Pursuant to the Agreement: (i) TRMC is responsible for paying Navigant's fees; and (ii) payment is expected within thirty (30) days of receipt of Navigant's monthly invoices.

The outstanding invoices under the Agreement (the "Invoices") are:

| Invoice Number | Invoice Dates | Month of Service | Invoice Amount |
|---|---|---|---|
| 510116 | 11/22/2016 | August 2016 | $209,541.77 |
| 505042 | 9/30/2016 | August 2016 | $12,019.03 |
| 510788 | 11/29/2016 | September 2016 | $18,218.63 |
| 507994 | 10/25/2016 | August 2016 | $4,755.18 |
| 507995 | 10/25/2016 | September 2016 | $27,494.95 |
| 508982 | 11/7/2016 | October 2016 | $20,219.20 |
| 513224 | 12/28/2016 | September 2016 | $201,296.64 |
| 515500 | 1/25/2017 | October 2016 | $164,391.23 |
| 0400001022 | 5/31/2017 | April 2017 | $155,032.22 |
| 0400000460 | 2/17/2017 | November 2016 | $59,406.84 |
| 0400000492 | 2/23/2017 | December 2016 | $106,210.16 |
| 0400000693 | 3/31/2017 | January 2017 | $105,672.25 |
| 0400000842 | 4/26/2017 | February 2017 | $117,863.55 |
| 0400000985 | 5/19/2017 | March 2017 | $253,099.82 |
| 0400001163 | 6/23/2017 | April 2017 | $113,794.28 |
| 0400001269 | 7/13/2017 | May 2017 | $169,521.60 |
| **Total Amount Owed** | | | **$1,738,537.35** |



As a result of TRMC's failure to pay the Invoices in a timely manner, TRMC is in default of its obligations under the terms and conditions of the Agreement. Pursuant to Section 4.3(f) of Statement of Work #1, Navigant is hereby giving TRMC notice of its intent to terminate the Agreement if such default is not cured by TRMC within forty-five (45) days of receipt of this notice. In addition, Navigant shall enforce all of its available rights and remedies in accordance with applicable law including, but not limited to fees, costs and expenses incurred by Navigant, related to the collection thereof and the enforcement of its rights under the Agreement.

This is an attempt to collect a debt; any information obtained can and will be used for that purpose.

Sincerely,

Jeffrey Nieman
COO & Managing Director

Enclosure

cc: Benny Benzeevi, MD, FACEP (via electronic mail)
    Megan Marshall, Assistant General Counsel (via electronic mail)
    Jim Mapes, Managing Director (via electronic mail)

Please send payment to:

### Remittance Instructions via Check

| **Regular Mail** | **Fedex/Courier** |
| --- | --- |
| Navigant | Navigant |
| 4511 Paysphere Circle | 4511 Paysphere Circle |
| Chicago IL 60674 | Chicago IL 60674 |
| United States | United States |

### Electronic Payment Info

| **Wire Instructions** | **ACH Instructions** |
| --- | --- |
| Account Name: Navigant | Account Name: Navigant |
| Account Number: 5800151127 | Account Number: 5800151127 |
| Bank of America | Bank of America |
| 135 S. Lasalle Street | 135 S. Lasalle Street |
| Chicago IL 60603 | Chicago IL 60603 |
| United States | United States |
| ABA# 026009593 | ABA# 071000039 |
| SWIFT: BOFAUS3N | |

9/22