**26**

MARC A. LEVINSON, CSB NO. 57613
CYNTHIA J. LARSEN, CSB NO. 123994
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497
Telephone: (916) 329-4910
Email: malevinson@orrick.com
          clarsen@orrick.com

HAGOP T. BEDOYAN, CSB NO. 131285
LISA HOLDER, CSB NO. 217752
**Klein, DeNatale, Goldner,**
  **Cooper, Rosenlieb & Kimball LLP**
5260 N. Palm Avenue, Suite 201
Fresno, California 93704
Telephone: (559) 438-4374
Facsimile: (559) 432-1847
E-mail: hbedoyan@kleinlaw.com
          lholder@kleinlaw.com

Attorneys for Healthcare Conglomerate Associates, LLC

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| In re:<br>TULARE LOCAL HEALTHCARE<br>DISTRICT dba TULARE REGIONAL<br>MEDICAL CENTER,<br>　　　　　　　　　Debtor. | Case No.: 17-13797-9-B<br><br>Chapter 9<br><br>DC No.: 　　WW-1<br><br>**HEALTHCARE CONGLOMERATE**<br>**ASSOCIATES, LLC'S OPPOSITION TO**<br>**MOTION FOR AUTHORIZATION TO**<br>**REJECT EXECUTORY CONTRACT**<br><br>Date: 　　October 19, 2017<br>Time: 　　2:00 p.m.<br>Place: 　　2500 Tulare Street<br>　　　　　　Fresno, CA 93721<br>Judge: 　Hon. René Lastreto II |

OHSUSA:767482769.21

**TABLE OF CONTENTS**

Page

I.   INTRODUCTION .................................................................................................. 1

II.  BACKGROUND .................................................................................................. 2

     A.   The Parties ................................................................................................ 2

     B.   The Challenged Contracts ........................................................................ 2

     C.   The Financial Distress of the District Prior to the MSA ......................... 3

     D.   The Engagement of HCCA and the Resulting Turnaround of the District ............ 5

     E.   The Dissident Attacks on HCCA and the MSA ....................................... 8

          1.   Actions of Kevin Northcraft ............................................................ 9

          2.   Actions of Michael Jamaica and Senovia Gutierrez ...................... 10

          3.   Actions of CHA .............................................................................. 10

     F.   Damages Resulting From the Ongoing Attacks ..................................... 11

     G.   The District's Refusal to Consider Financing Opportunities and the Rush to File for Bankruptcy ...................................................................... 13

III. ANALYSIS ........................................................................................................ 16

     A.   Standard For Rejection of Executory Contracts .................................... 16

          1.   The Motion Lacks Evidentiary Support, and it and the Supporting Declarations are False in Material Respects ............................ 17

          2.   The District has Not Met Its Burden of Proof in Establishing that Rejection Would Benefit the Unsecured Creditors or Result in a Successful Reorganization ............................................................ 19

     B.   The District's Decision to Reject the MSA is Manifestly Unreasonable and is Not Based Upon the Debtor's Sound Business Judgment ................ 20

     C.   The District's Decision to Reject the MSA Was Driven by its Bad Faith ............ 21

IV.  CONCLUSION .................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Chi-Feng Huang*,
　23 B.R. 798 ................................................................................................................16

*In re Hertz*,
　536 B.R. 434 (Bankr. C.D. Cal 2015) ......................................................................16

*Lubrizol Ents., Inc. v. Richmond Metal Finishers, Inc.*,
　756 F.2d 1043 (4th Cir. 1985)..................................................................................16

*In re Nickels Midway Pier, LLC*,
　341 B.R. 486 (Bankr. D.N.J. 2006) ..........................................................................16

*In re Pomona Valley Med. Group, Inc.*,
　476 F.3d 665 (9th Cir. 2007)....................................................................................16

*In re Prestige Motorcar Gallery, Inc.*,
　456 B.R. 541 (Bankr. N.D. Fla. 2011) .....................................................................16

**Statutes**

11 U.S.C. § 365(a) ...........................................................................................................16

Bankruptcy Code, chapter 9.................................................................................... *passim*

Bankruptcy Code § 109(c) ...............................................................................................21

Bankruptcy Code § 921(c) ...............................................................................................21

Bankruptcy Code § 923 ....................................................................................................21

California Health and Safety Code § 32000 *et seq.* .....................................................2, 3

MSA, Section 2(a)-(b)........................................................................................................3

MSA, Section 3 ..................................................................................................................3

MSA, Section 3(b)(iii) ...............................................................................................3, 18

MSA Section 10(b) ..........................................................................................................20

MSA Section 10(c)(i) .......................................................................................................18

MSA Section 10(e)(i) .......................................................................................................18

- ii -

**Other Authorities**

Senate Bill 1953 ................................................................................................................4, 5, 6, 7

HEALTHCARE CONGLOMERATE ASSOCIATES, LLC'S OPPOSITION
TO MOTION FOR AUTHORIZATION TO REJECT EXECUTORY CONTRACT

OHSUSA:767482769.21

I.     **INTRODUCTION**

Healthcare Conglomerate Associates, LLC ("HCCA") respectfully submits this opposition ("Opposition") to the motion to reject several related agreements including the Management Services Agreement ("MSA") ("Motion") filed by the Debtor Tulare Local Healthcare District dba Tulare Regional Medical Center ("District").  Notwithstanding the hurdles in opposing a contract rejection motion, HCCA submits that the Motion is unfounded, and urges its denial for the following reasons:  1) it is not supported by admissible evidence; and 2) the decisions of the District's board of directors ("Board") to file the Motion and to declare a fiscal emergency were imprudent, capricious and are the product of bad faith.

This Opposition describes the challenged agreements and the well-considered and legitimate reasons that led to the District and HCCA to contract as they did in 2014.  Next, it discusses HCCA's performance under the terms of the MSA and the positive results HCCA achieved for the District.  The Opposition then documents the ugly politics and the deliberate verbal assaults and baseless disparagement of HCCA and its founder, Dr. Benny Benzeevi, that resulted in a change in the membership and direction of the Board.  Finally, it describes the Board's rush to falsely declare a fiscal emergency on six hours' notice and to file this case fewer than 24 hours thereafter.  When the District did so, it lacked its own source of funding in hand to operate the District and, at the same time, intentionally ignored a bona fide source for such financing proffered to the District by HCCA.

Indeed, the District refused HCCA's request to present to the Board the financing opportunities it procured which would have obviated any need for this case.  As a result of its own reckless conduct, the Board heard only a presentation blaming HCCA and Doctor Benzeevi for all the District's problems.  The Board cared only to advance the politically charged environment it had fostered over a two year period to terminate the District's relationship with HCCA.  In so doing, it ignored all of HCCA's efforts to get the District on sound footing and instead rushed to file for bankruptcy.

Fueled by its own political animus toward HCCA and Doctor Benzeevi, the District filed

OHSUSA:767482769.21

1   the Motion a mere 10 days after the petition date.  The rush to judgment is shown by the absence

2   of any pleading demonstrating why the District is eligible for chapter 9 relief or of a proposed

3   notice to creditors which would provide notice and opportunity to be heard and set a time frame

4   for any objections to eligibility or other considered positions.

5          The declarations submitted by the District consist primarily of inadmissible hearsay and

6   impermissible legal argument.  Where there is an effort to state facts, more often than not they are

7   lacking veracity.  HCCA's focus here is on the uncontested facts, supported by those with

8   personal knowledge, and the application of the law to those facts.  We hope to establish that the

9   Court should deny the Motion and that justice is best and only served if the MSA and related

10  agreements are left undisturbed.

11  **II.**    **BACKGROUND**

12         **A.  The Parties**

13         HCCA is a California Limited Liability Company with its principal place of business in

14  Los Angeles.  Its managing member is Dr. Yorai (Benny) Benzeevi, a board-certified Emergency

15  Medicine Specialist.  *See* Declaration of Benny Benzeevi, M.D. ("Benzeevi Decl.") ¶ 1.  The

16  District is a local healthcare district in Tulare, organized under section 32000 *et seq*. of the

17  California Health and Safety Code.  The District's bylaws provide that its Board be comprised of

18  five elected directors.  *Id.* at ¶ 2, Ex. 1.

19         **B.  The Challenged Contracts**

20         On January 10, 2014, HCCA began managing the District on an interim basis and on

21  May 29, 2014, HCCA and the District entered into the MSA which is currently in effect.  *Id.* at

22  ¶ 2, Ex. 2.  Both the interim agreement and the long term agreement were approved by a 5-0 vote

23  of the  Board. The District has moved to reject its four interrelated and phased contracts with

24  HCCA:  (1) the MSA; the Interim Joint Operating Agreement ("IJOA"); the Joint Operating

25  Agreement ("JOA"); and the Operating Agreement ("OA").  The MSA governs the current

26  relationship of the District and HCCA.[1]

---

27  [1] The JOA provides for a joint venture arrangement between the District and HCCA to become effective upon the
    settlement of the revenue bonds.  The IJOA addresses the interim period prior to the effective date of the JOA.  The
28  OA gives HCCA an option to purchase or lease District assets under specified circumstances.  *Id.* at ¶ 2.

OHSUSA:767482769.21

1    Under the MSA, the District appointed the HCCA as manager of the District for an initial

2  15 year term, with a renewal period of 10 years unless either party declined renewal.  In the MSA,

3  the District acknowledged that the long-term nature of the MSA and its limited termination

4  provisions were a substantial inducement to HCCA in agreeing to contract with the District.  *Id.*,

5  MSA, Section 2(a)-(b).  Given the truncated tenures of multiple prior managers with which the

6  District found fault, HCCA was unwilling to make the long-term investment in the District

7  required under the MSA without the assurance of a long-term arrangement.  *Id.* at ¶ 3, Ex. 2.

8    The MSA granted HCCA the exclusive right and responsibility to manage the Hospital,

9  clinics and other facilities of the District, "includ[ing] but not limited to financial and operating

10  systems management, preparation of proposed annual budgets, purchasing, contracting support

11  and relationship management, expansion of the Hospital and the Clinics and Other Facilities or

12  the Service offered, preparation and implementation of staffing plans, recruiting of personnel, and

13  supervision of the day-to-day operation of the Hospital, and the Clinics and other facilities."  *Id.*

14  at ¶ 4, Ex. 2, MSA, Section 3.

15    The MSA recognizes rights and various obligations of the District.  In particular, the

16  District is contractually required to "furnish [HCCA] with sufficient funds to timely pay the

17  expenses relating to the District's operations, including both operating and non-operating

18  expenses" of the hospital.  *Id.* at ¶5, Ex. 2, MSA, Section 3(b)(iii).  HCCA may, but is not

19  required to, advance funds to the District to fund operational costs.  If HCCA advances funds, the

20  MSA provides it with contractual means to secure repayment.  *Id.*

21      **C.  The Financial Distress of the District Prior to the MSA**

22    The District suffered severe financial and managerial difficulties in the years leading up to

23  the engagement of HCCA as the manager of the District.  Over the seven-year period prior to

24  2014, the District employed six different Chief Executive Officers and at least a half dozen Chief

25  Financial Officers.  During that time, the District suffered severe and progressively worsening

26  financial losses, namely, over $4 million in the immediately preceding six months; over $8

27  million in the immediately preceding fiscal year; over $16 million in the prior three fiscal years;

28

OHSUSA:767482769.21

and a combined loss of just under $5 million in the preceding ten-year period.  The Hospital's operating margin over the preceding ten years averaged a negative 0.72.  *Id.* at ¶ 6.

The foregoing dismal history of the District and its years of prior mismanagement is deeply rooted in disharmony within the Tulare medical community.  When the MSA was signed, Dr. Benzeevi had this understanding of the conflict within the medical community. There was a powerful physician group which sought to control the Hospital and its finances which would permit its members to operate the Hospital as if it were an extension of their private practices. They were hamstrung by a Corporate Integrity Agreement that limited their reach within the Hospital, and were further inflamed by HCCA's management, which focused on the larger interests of the Hospital rather than the financial interests of these physicians.  They turned against HCCA after a government inspection which forced the then Board (which they saw as pro-HCCA) to disaffiliate with them.

In response, these physicians supported the formation of the so-called Citizens for Hospital Accountability ('CHA') group, and they began a steady pattern of referring their patients to other hospitals in an attempt to starve the hospital and oust HCCA.  The District desperately needed financing to complete a scandal-rocked tower then under construction, and HCCA presented a bond offering, known as Measure I, for public vote to complete the tower and provide funding for the District.  These physicians actively opposed Measure I as a means of denying the District the much needed funding even though not completing the tower kept the Hospital from meeting state seismic requirements.  The measure failed and then these doctors backed their own CHA candidates for the Board.  These candidates became the new majority, which in turn has continued the attacks on HCCA and Dr. Benzeevi.

The need for Measure I arose prior to HCCA's arrival.  In 1994, following the "Northridge Earthquake," Senate Bill 1953 mandated that California hospitals be rebuilt to meet more stringent seismic guidelines. The then new Board sought voter approval in 2005 for an $85 million General Obligation bond offering to bring the existing uncompleted structure into compliance.  The cost of the new tower at inception in 2007 was estimated at $120 million, and a

- 4 -

OHSUSA:767482769.21

seismic bond offering was contemplated by the District to make up the difference. The Hospital project had been a financial and legal disaster. The funds raised by the District from the sale of bonds much earlier were substantially exhausted by 2014; the tower was unoccupied and only two thirds complete.[2] The tower project was mired in multiple lawsuits and unpaid claims with no prospects of funding its completion. Today, the Hospital remains out of compliance with Senate Bill 1953. *Id.* at ¶ 8. As a result of the de facto boycott of the District by the ousted doctor group, the volume of inpatients at the Hospital was materially reduced by nearly 40% of the prior volume and the volume of obstetrical deliveries was reduced by some two thirds. *Id.* at ¶ 8, Ex. 3.

The financial condition of the District was so bad for the fiscal years ending 2012 and 2013, that its outside independent auditors refused to issue a "clean opinion" and instead imposed a "going concern" condition to their audit report opinion. *Id.* at ¶ 9, Ex. 4. Such an opinion meant that the auditors had grave concern about their client's ability to avoid liquidation over the next 12 months. *Id.*

When HCCA assumed its management role in 2014, the financial deterioration of the District left it with less than a month's cash for its operations. *Id.* at ¶ 10. In addition, the District was operating under and subject to the five-year Corporate Integrity Agreement it had been required to enter into with the Federal Office of Inspector General to redress a history of its physician contracting practices. *Id.*

**D. The Engagement of HCCA and the Resulting Turnaround of the District**

In 2013, the District solicited and received bids from diverse parties, including HCCA, to take over the management of all of the District's operations, including the Hospital. In December 2013, the Board unanimously selected HCCA from among the bidders, and entered into an interim agreement in January 2014, pending completion of the parties' negotiations of a long term agreement, which was finalized in May 2014. By the time that HCCA was selected, the Board had been searching for an affiliation partner for a year. The Board members expressed to Dr.

---

[2] Prior to HCCA's commencement of management of the Hospital in January 2014, 90% of the bond proceeds had been exhausted and construction of the tower halted far short of completion. *Id.* at ¶ 8.

Benzeevi that they believed the District's long-term historical problems were due to poor governance and interference by the Board in operations. *Id.* at ¶ 11.

One of the issues that HCCA was called upon to address as manager was the failure of the physician leadership of the District to comply with peer review and other requirements for federal funding. In or about January 2016, the Federal Centers for Medicare and Medicaid Services (CMS) performed a survey of the Hospital's performance in past years and found a history of gross negligence by the physician leadership at the Hospital and threatened to exclude the Hospital from federal funding. *Id.* at ¶ 12. The Hospital receives approximately 80% of its funding from governmental sources, so such a step by CMS would have caused the immediate closure of the Hospital. *Id.*

Because of the non-compliance of the previous physician leadership and the imminent threat to the Hospital's ability to qualify for federal funding, the Board disaffiliated itself from its then existing medical staff and instead associated itself and the District with a new medical staff organization. After this successful restructuring and under the new leadership of the new medical staff, all doctors who previously worked at the Hospital retained their clinical privileges. Of note, both CMS and the California Department of Public Health found that the District's plan of correction – the disaffiliation with the prior medical staff and affiliation with the new medical staff –properly addressed and corrected the problem and the plan of correction was accepted in its entirety.[3] *Id.* at ¶ 13.

HCCA now employs for the District approximately 525 nurses, other trained medical professionals and support staff. *Id.* at ¶ 14. Prior to HCCA's arrival, pay had been frozen for years at the District prior to the MSA. *Id.* To date, HCCA has given two across-the-board pay raises as well as over 170 additional individual pay increases. *Id.*

In the three-plus years under HCCA management, the Hospital has had several dozen

---

[3] In the fall of 2016, the Hospital, under HCCA management, received a quality award from the California Secretary of Health and Human Services for meeting or exceeding the healthy people 2020 goal for low-risk, first-birth Cesarean deliveries. *Id.* at ¶ 15, Ex. 5. Other recognitions include a 2016 CALNOC Performance Excellence Award relating to the prevention of Hospital acquired infections – MRSA total facility. *Id.* at ¶ 15, Ex. 6. In addition, the Hospital achieved "Baby Friendly" status under a World Health Organization program recognizing optimal baby care. *Id.* at ¶ 15.

OHSUSA:767482769.21

months of positive net margins as confirmed by annual audits. In the first six months HCCA was on board, the Hospital had a $1.3 million net margin (compared to approximately $4 million in losses in the six months immediately prior to HCCA's arrival), and in the first full fiscal year under HCCA, the Hospital recognized a net margin exceeding $7 million. Similarly, that first full fiscal year under HCCA saw a 10% operating margin. On October 26, 2016, Doctor Benzeevi made a PowerPoint presentation to the Board summarizing the Hospital's tumultuous history prior to HCCA, and its financial condition and success since HCCA was engaged under the MSA. *Id.* at ¶ 16, Ex. 7. The positive turnaround was recognized by bond rating services and reflected in their ratings. Fitch Ratings, a leading national credit rating firm, upgraded the District's revenue bond ratings, and updated its outlook for the District from "negative" to "positive" and noted in its August 28, 2014 ratings report the dramatic change "over the last few months" (referring to the period since HCCA's arrival):

> SIGNS OF TURNAROUND: The Stable Outlook reflects the dramatic turnaround in operating and financial performance since Fitch's last review in February 2014….Fitch believes the positive trend over the last few months indicates performance improvement plans taking hold and signal recovery. *Id.* at ¶ 16, Ex. 8.

Fitch's positive outlook continued in its report dated August 27, 2015. Fitch reported that the District's financial condition "reflects sustained evidence of operational and financial turnaround and stabilization." *Id.* at ¶ 17, Ex. 9. It also stated that "[u]nder HCCA's leadership, operating and financial performance improved dramatically over the last 18 months." *Id.*

On August 23, 2016, Fitch again reported positive results for the District and stated clearly its view of the reason for the success: "[The District] has sustained the trend of strong operating performance since Fitch's last rating review in August 2015. Ongoing work by the management team in place since January 2014 has brought a financial turnaround, and double digit operating EBITDA margins are expected to continue." *Id.* at ¶ 18, Ex. 10.

Similarly, on October 25, 2016, the national bond rating firm Moody's Investors Service upgraded the District's outlook rating from negative to stable. *Id.* at ¶ 19, Ex. 11. Moody's emphasized the "improved operating performance beginning in fiscal 2014, driven by a new

management team" – namely, HCCA.  Moody's explained in more detail, stating:

> Beginning in fiscal 2014, a new management team affiliated with Healthcare Conglomerate Associates (HCCA) has generated significantly improved financial performance, growing revenues and reducing unnecessary costs. Operating revenues in fiscal 2015, for example, increased by close to 16.8%, resulting in a good 10.5% operating margin and marking the district's first positive operating margin since fiscal 2011. Previously, due largely to significant declines in patient volume and capital project costs, the district had three consecutive years of negative operating margins from fiscal 2012 through fiscal 2014. *Id.*

Moody's also opined that the positive outlook for the District would continue due to HCCA's management:

> The district's new financial management team [HCCA] has succeeded in reversing the district's past trend of weak operating performance, with the district's liquidity and operating margins demonstrating notable improvement. We believe that the current management team will remain in place over the intermediate term, maintaining a trend of stable financial operations. *Id.*

Under HCCA's management, the Hospital has shown a profit and the District has enjoyed a far better than average net margin and financial stability it had not experienced in over a decade. In 2015 alone, the Hospital's financial returns were three times the national average for hospitals and were greater than at any time in the prior 12 years.  The market value of the Hospital increased by approximately $32 million since HCCA became its manager.  *Id.* at ¶ 20, Ex. 12.

Kevin B. Northcraft, new Board Chair, argues that since HCCA became manager, the District has suffered only disruption and turmoil.  *See* Declaration of Kevin B. Northcraft (the "Northcraft Decl.") 4:16-17.  As demonstrated by the foregoing financial summary, his mere speculation without any foundation is simply wrong, but consistent with his disparagement campaign.  Moreover, in 2014, a year after HCCA came on board, two Board members that had supported the HCCA agreements ran for re-election unopposed.  Benzeevi Decl. ¶ 21.

It is true that in the last *two years* there has been disruption and turmoil, all of which has been caused by Northcraft and his allies (who have been financed by others) to sow hate and engage in name-calling directed to HCCA and Dr. Benzeevi.  It is to those efforts we now turn and discuss.

**E.     The Dissident Attacks on HCCA and the MSA**

OHSUSA:767482769.21

The attack by the so called CHA and its dissident physician sponsors was just the beginning of an attempt to harm the District, particularly financially. *Id.* at ¶¶ 8, 22, Ex. 3. As discussed above, the defeat of Measure I cost the District greatly from which it has not recovered. The bankruptcy filing is the capstone to those efforts. The true function of the bankruptcy is to dislodge HCCA rather than to benefit the District. This opposition group has mastered social media, including its own website and Facebook, to attack its perceived enemies through falsehood, innuendo and name-calling. *Id.* at ¶ 22. Since the defeat of Measure I, CHA turned its focus to replacing three Board members with CHA's hand-picked candidates, who now control the Board. *Id.* at ¶ 28, Ex. 20.

The recently seated Board members, along with CHA and others, continue with their deceptive smear campaign against HCCA and Dr. Benzeevi. They engage in threats and intimidation designed to set aside the MSA and cut off funding for the District, which have hampered the District from paying its obligations under the MSA. *Id.* at ¶ 23. They have stated they want to "throw out the current HCCA contract based on [undefined] illegal overreach." *Id.* at ¶ 23, Ex. 13. For example, on July 30, 2016, Kevin Northcraft stated that, if elected to the Board, he intended to "renegotiate or throw out the current HCCA contract" and to "do it 'the Tulare way'—not the Southern California divisive, secretive, and machine politics way." *Id.* The open threats by the new Board and its continued disparagement of the Hospital, HCCA, and the MSA have poisoned the environment within which the Hospital must function to the detriment of the District and community. *Id.* They have also caused irreparable harm to the Hospital, the District's residents who utilize the Hospital, the Hospital staff and their families, and HCCA.[4] Instances of such deception and bad faith conduct include the following actions by current Board members and CHA.

### 1. Actions of Kevin Northcraft

Northcraft has reposted and published on social media a CHA post alleging that the MSA

---

[4] Calls have also been made to the office of Congressman Nunes, ostensibly from Doctor Benzeevi's wife, but which he had no part in making. *Id.* at ¶ 23. Furthermore, threatening calls have been received at the Hospital, with messages left for Doctor Benzeevi, such as "I wanted to give you a heads up, the Federal Attorney General is coming." *Id.*

"brought our hospital to its current financial ruin, and thus, explains clearly how HCCA and Dr. Kumar are solely responsible for the substandard care offered at our hospital today…." *Id.* at ¶ 24, Ex. 14. During his election campaign, Northcraft made clear his desire to "amend or cancel," or in other words, "renegotiate or throw out the current HCCA contract." *Id.* at ¶ 23, Exs. 13, 18. He later did just that by turning a blind eye to much needed financing, as discussed below.

Northcraft posted on his Facebook page on July 28, 2017, "Dr. Benzeevi, how long did you have to study to bring a hospital to the brink of bankruptcy, **fleece your employees** and citizen's [sic] of the hospital district, and give such bad care you've frightened away most of the doctors in the area and an entire community…." *Id.* at ¶ 25, Ex. 28 (emphasis added). The defamation and character assassination extends to the reckless smear by Northcraft directed to existing counsel for HCCA. On or about September 11, 2017, he publicly and falsely stated: "I haven't received a phone call, text, email, in-person, anything from HCCA," "except their attorney, arguing that democracy doesn't exist for our district." *Id.* at ¶ 25, Ex. 16. No such statement was made by any counsel to HCCA.

And the falsehoods run deeper than that. Except for a meeting held at Dr. Benzeevi's insistence in November of 2016 after Messrs. Northcraft and Jamaica were elected to the Board, there has been no effort by Northcraft, or by the other newly-elected directors to meet with HCCA or its representatives to learn about the status of the Hospital or its operations. Benzeevi Decl. ¶ 26, Ex. 17. As shown by this outreach by Dr. Benzeevi, the Northcraft statement of September 2017 that he has had no contact from HCCA is outright false. And, as discussed further below, his testimonial claim of ignorance prior to late September 2017 of the District's financial condition is also utterly false.

### 2.  Actions of Michael Jamaica and Senovia Gutierrez

Now Board member Michael Jamaica has also stated his intention to have the MSA "amend[ed] or cancel[ed]." *Id.* at ¶ 27, Ex. 18. And new Board member Senovia Gutierrez has stated through social media that the District needs to "get rid of HCCA." *Id.* at ¶ 27, Ex. 19.

### 3.  Actions of CHA

CHA has published several posts on Facebook, including the following:

- That the MSA "brought our hospital to its current financial ruin, and thus, explains clearly how HCCA and Dr. Kumar are solely responsible for the substandard care offered at our hospital today…." Actions of Citizens for Hospital Accountability Group. *Id.* at ¶ 28, Ex. 20.
- Accusing HCCA of about to "replicate shady tactics" falsely and allegedly engaged in elsewhere by Doctor Benzeevi's brother. *Id.*
- Calling HCCA's leadership "fraudulent." *Id.*
- Referring to a "loan[f]raud." *Id.*
- Referring to "Doctor Benzeevi's out-and-out lies." *Id.*
- Stating, "This theft and graft must come to an end." *Id.*

### F.  Damages Resulting From the Ongoing Attacks

Leading up to the bankruptcy filing, the District has attempted to financially harm HCCA in ways large and small.  For example, the new Board has refused to accept a tender of defense (at carrier expense) of several lawsuits filed against the replaced Board.  There is no gain for the District in doing this; but the harm to HCCA is palpable.  And the District is harming the Hospital by diverting HCCA efforts to funds to litigation instead of the protection of patients and employees.  *See* Declaration of Marshall B. Grossman ("Grossman Decl.") ¶¶ 4-7.  The toxic body politic and cheap shots by the new District Board have taken their toll where it counts, to the financial detriment of HCCA and the District itself.

With respect to HCCA, it (and in some cases the District) has been sued in purported taxpayer lawsuits (organized by CHA) filed during the August to October 2017 time period. With respect to this litigation Marshall Grossman, co-counsel to HCCA, had a number of conversations with Marty Lockwood, the head of claims for third party Insurer, Beta Risk Management Authority ("Beta").  Beta's counsel, Mr. Carlo Coppo of Nossaman, informed him that tenders of defense are to be made to the District and if the tender is accepted then the Beta will provide the defense.  *See id.* at ¶ 2.  The only condition to doing so, according to these lawyers, is that HCCA and the District agree that there is no right to defense or indemnity if it is

OHSUSA:767482769.21

1  found that the member (here HCCA) acted with fraud, corruption or actual malice then there is no

2  coverage.  *Id.*   Additionally, the MSA calls for the District to provide such a defense to

3  HCCA,and such has been the practice since HCCA has been on board.

4  HCCA has agreed to this condition and communicated it to counsel for the District, Tim

5  Thompson.  *Id.* at ¶ 3. The District has yet to accept the tender or agreement with the condition as

6  set by Beta, to which HCCA has already agreed.  *Id.* at ¶ 4.  On at least four occasions, Thompson

7  or lawyers in his firm have been asked to accept the tender but as of this date they have refused to

8  do so or provide any reason other than it is still under consideration.  *Id.* at ¶ 5.

9        HCCA has incurred some $20,000 in legal fees and costs in the defense of these lawsuits.

10  These are funds which would otherwise be available to HCCA for other purposes.  *Id.* at ¶ 6.

11  Although the amount is relatively modest at this stage, the conduct of the hostile Board members

12  is consistent with their practice acting to harm HCCA and of not missing an opportunity to deny

13  HCCA funds so much needed at this point in time.  *Id.* at ¶ 7.

14        Unfortunately, the heavy damages to HCCA which it has suffered at the hands of the

15  District, have been far greater in amount and with adverse consequence to the District as well.

16  Within a week after the District's bankruptcy filing on September 30, 2017, Fitch downgraded the

17  Issuer Default Rating from CC to D as a direct consequence of the chapter 9 petition.  Benzeevi

18  Decl. ¶ 30, Ex. 21.  Fitch also downgraded the rating on the District's existing revenue bonds

19  from CC to C, stating default appears inevitable "absent timely third-party intervention to support

20  operations and debt service payments."  *Id.*  Similarly, Moody's Investors Service downgraded

21  the rating for the District on October 5, 2017, and maintained a negative outlook, while noting the

22  "nonexistent cash liquidity" and "dysfunctional board relations."  *Id.* at ¶ 30, Ex. 22.

23        Previously, because of the negative and destructive attacks on HCCA and self-inflicted

24  financial damage to the District about which the Board professes to care so much, the history of

25  favorable Fitch and Moody ratings for the District had turned negative.  On August 9, 2017, Fitch

26  downgraded its rating on revenue bonds and the District's Issuer Default Rating from BB- to B.

27  *Id.* at ¶ 31, Ex. 23.  Fitch further downgraded its rating on September 6, 2017 from B to CC

28

1   "indicating probable default risk." *Id.* at ¶ 31, Ex. 24. The Fitch report notes the "downgrade to

2   'CC' represent very high levels of credit risk, reflecting TRMC's continued delays in executing

3   external liquidity agreements to bolster working capital and heightened political instability at the

4   TRMC board level." *Id.* Fitch maintained the Rating Watch Negative (RWN) based on its

5   concern "over the breakdown of communication between the TRMC board and hospital

6   management that places risk on hospital operations and execution of credit agreements." *Id.*

7          Notwithstanding the chaos and tumult brought upon the District by its own new Board

8   over the past year or more, including its failure to honor its contractual obligations to pay for the

9   running of the Hospital (including payments for money due to HCCA and to the Hospital

10  employees), HCCA has provided millions of dollars the District did not pay as provided for in the

11  MSA.[5] *Id.* at ¶ 33, Ex. 25. The District remains in default under the terms of the MSA.[6]

### G. The District's Refusal to Consider Financing Opportunities and the Rush to File for Bankruptcy

14         At the Board's September 27, 2017 open session meeting, Dr. Benzeevi and HCCA Chief

15  Operating Officer Alan Germany appeared and discussed the dire cash flow issue facing the

16  Hospital, and distributed the financial statements ("Financials") for the fourth quarter of 2017.

17  Benzeevi Decl. at ¶ 34, Ex. 26. The balance sheet portion of the Financials showed $2,088,851 of

18  cash and $29,236,839 of current liabilities as of end of the quarter, June 30, 2017. *Id.* The

19  Financials were previously distributed at the meeting of the Board's Finance Committee on July

20  25, 2017. *Id.* at ¶ 34. Such financials have been publically available since shortly after that

21  meeting. The balance sheet forwarded by HCCA to the Board in April 2017 for the quarter

22  ending March 31, 2017, showed cash of $3,622,318, current liabilities of $3,682,258 and

---

[5] Suggestions made to the public and potentially in these proceedings that HCCA has been stealing the Hospital's funds are patently false. HCCA has not even been paid its management fee since August, despite having control of the bank accounts, HCCA has taken a measured response with vendors by making vendor payments to critical services and ensured a fluid state of operations. Northcraft's gratuitous smear that HCCA has an "ulterior motive," "to find financing to pay themselves for services claimed to have been rendered" is inadmissible argument and utterly false. Northcraft Decl. at 9:10-12. There is no ulterior motive other than for HCCA and vendors to receive what they are owed and for the Hospital funding to remain uninterrupted. Benzeevi Decl. ¶ 33.

[6] On September 8, 2017, HCCA provided the District with a Notice of Material Breach, and on September 19, 2017, with a Notice of District Default. Declaration of Marc A. Levinson ("Levinson Decl.") ¶¶ 2-3, Exs. A-B. HCCA filed suit pursuant to the terms of MSA in Los Angeles County Superior Court (Case Number BC676133) for declaratory relief and breach of contract.

1   accounts payable of $15,957,708.  *Id.*at ¶ 34, Ex. 27.  The two financial statement packages

2   described above also were contemporaneously posted on the HCCA website.  *Id.* at ¶ 34.

3         At its September 27 meeting, Dr. Benzeevi told the Board that the Hospital was out of

4   cash at present, and that HCCA had identified lenders with an interest in providing cash infusions

5   to the District to bridge the lack of liquidity crisis and enable the Hospital to remain operational.

6   *Id.* at ¶ 35.  He also suggested that a special meeting be called immediately to discuss the

7   potential funding sources and opportunities he had identified.  *Id.*

8         Dr. Benzeevi followed up the following evening by writing the Board requesting that,

9   pursuant to sections 1.b. or 1.c of the District bylaws, the Board conduct a special or

10  emergency meeting on Sunday, October 1, or on Monday, October 2, at which time he would

11  present the loan options to the Board.  *Id.* at ¶ 36, Ex. 28.

12        By email sent at 12:11 p.m. the next day, September 29, the Board's counsel, Tim

13  Thompson, rejected the request for as special or emergency meeting.  Levinson Decl. ¶ 4, Ex. C.

14  In addition to rejecting the request that the Board be presented with loan options on October 1 or

15  2, the Thompson letter served notice on HCCA of a 6:30 p.m. emergency meeting later that day.

16  It attached an agenda which included consideration of whether to declare a fiscal emergency and

17  to authorize the filing of a chapter 9 petition.  *Id.*  Within two hours of receiving notice of the

18  putative emergency meeting, Grossman emailed Thompson protesting the short notice and asking

19  that the meeting be continued two days until Monday because Yom Kippur was to begin at

20  sundown that evening.  *Id.* at ¶ 5, Ex. D.  The email further explained that Yom Kippur was the

21  holiest of days to people of the Jewish faith (which include Dr. Benzeevi, Levinson and

22  Grossman) and that therefore none could attend the meeting.  *Id.*  The email also stated Grossman

23  believed that Germany, HCCA's CFO, was not in California, and could not attend either.  *Id.*

24  Thompson denied the request 30 minutes later, offering to permit Germany to participate

25  telephonically.  *Id.*  At the Board meeting, unencumbered by any HCCA representative or

26  attorney, Thompson stated in a derisive manner that Dr. Benzeevi was "on holiday," prompting

27  laughter from the attendees.  *See*, video of September 29, 2017 emergency board meeting at 42:10

28

HEALTHCARE CONGLOMERATE ASSOCIATES, LLC'S OPPOSITION
TO MOTION FOR AUTHORIZATION TO REJECT EXECUTORY CONTRACT

OHSUSA:767482769.21

1    minutes remaining, www.ourvalleyvoice.com/2017/09/30/tulare-regional-medical-center-to-

2    undergo-chapter-9-bankruptcy.  The District filed a barebones chapter 9 petition the next day,

3    Yom Kippur.  Docket No. 1. Yet again, Northcraft has not been honest with the Court.  Even

4    though he was fully aware of Dr. Benzeevi's ongoing efforts to provide the Board with third party

5    interest in providing financing for the District, and without any sense of irony, his testimony is

6    that  "[t]he decision to file Chapter 9 came only after the District attempted alternatives that

7    would have avoided such a filing."  Northcraft Decl. 7:25-28.

8            Even in the face of the bankruptcy filing, on October 4, Levinson forwarded to Riley

9    Walter, the District's bankruptcy counsel, the documentation and information concerning two

10   proposed loans that Dr. Benzeevi had sought to discuss with the Board just days earlier.

11   Levinson Decl. ¶ 6, Ex. E.    The filing of this chapter 9 case and of the Motion were not in good

12   faith, were driven by a determined agenda to terminate the MSA, disseminated by code words and

13   conduct by the newly-seated Board members and by the supporting shadow of the CHA group

14   and its followers – consisting of the doctors ousted by the state.  In short, the game plan of the

15   Board and its advisors has been calculated to paint the picture of a financially distressed District

16   with no means of gaining financial stability other than bankruptcy.  The Board has made false

17   charges that HCCA has breached the MSA without identifying any breaches.  *See* Paragraph 8 of

18   the Motion.  Because there are none, the Board has created the false narrative that the District has

19   received "nothing" from HCCA to help it understand the District's business or financial

20   condition.  On the one prior occasion the District made the same baseless claim, the Superior

21   Court denied its demand for documents.  Grossman Decl. ¶ 8.    In fact, the Board has been

22   furnished with over three years of financial statements, as well as other financial data[7].  Levinson

23   Decl. ¶¶ 7-12, Exs. F-K.

24           Unfortunately, the campaign against HCCA and Dr. Benzeevi was laced with obscene

25   personal attacks on him and his family as well as having his religious beliefs ridiculed and worse.

26   
27   
28   

---

[7] HCCA's primary goal throughout this entire process has been to ensure patient safety and to keeping the Hospital open.  Due to the District's hasty decision to seek chapter 9 relief, HCCA has been left to deal with the impact on Hospital operations without any cooperation from the District.  HCCA is committed to continuing to provide documents to all who are entitled to have them but must place patient safety first and foremost and provide payments to its approximately 525 hospital employees.

- 15 -

1  The unabashed intention of the false facts campaign that began long before the petition date was

2  to drive or scare Dr. Benzeevi and HCCA out of the community and to terminate the MSA.  At

3  the same time, the District owes HCCA in excess of $7 million for direct advances HCCA made

4  on behalf of the District even though it was under no obligation to do so.

5        An atmosphere has been fictitiously created in which the non-breaching party is the evil

6  doer and the breaching party is a victim without recourse other than Chapter 9.   The atmosphere

7  was fueled by a not so subtle reference to Dr. Benzeevi's Jewish faith, including an appalling

8  cartoon throwback to the Nazi era showing a grotesque male with distorted facial features

9  surrounded by huge amounts of money while sitting on top of helpless others.  Benzeevi Decl. ¶

10  28, Ex. 20.

11  **III.    ANALYSIS**

12        **A.  Standard For Rejection of Executory Contracts**

13        A chapter 9 debtor, like a trustee, "subject to the court's approval, may assume or reject

14  any executory contract or unexpired lease." 11 U.S.C. § 365(a).  "Section 365(a) gives debtors

15  wide latitude in deciding whether to assume or reject a contract ...." *In re Pomona Valley Med.*

16  *Group, Inc.*, 476 F.3d 665, 672 (9th Cir. 2007).  "[I]n evaluating the rejection [or assumption]

17  decision, the bankruptcy court should presume that the debtor-in-possession acted prudently, on

18  an informed basis, in good faith, and in the honest belief that the action taken was in the best

19  interests of the bankruptcy estate." *Id.*

20        Notwithstanding this presumption, rejection of a contract is not free from judicial

21  examination.  This is a textbook case where that oversight proves to be of great importance.  A

22  request for authority to reject an unexpired lease should be denied if the debtor's decision to reject

23  "is so manifestly unreasonable that it could not be based on sound business judgment, but only on

24  bad faith, or whim or caprice." *Id.* (quoting *Lubrizol Ents., Inc. v. Richmond Metal Finishers,*

25  *Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985)).  This standard is commonly referred to the

26  "Deferential Business Judgment" rule.  *In re Hertz*, 536 B.R. 434, 442 (Bankr. C.D. Cal 2015).

27        Another consideration guiding courts in deciding whether a debtor has properly exercised

28

1   its business judgment is "whether rejection would benefit the general unsecured creditors." *Id.* at

2   442 (quoting *In re Chi-Feng Huang*, 23 B.R. 798, 801). Rejection should not be allowed where

3   the primary beneficiaries are the debtors, not the creditors. *Ibid.* "[T]he threshold requirement

4   and burden of the [debtor] is to produce credible evidence that [the] decision to assume or reject

5   would benefit the estate or result in a successful reorganization." *In re Prestige Motorcar*

6   *Gallery, Inc.*, 456 B.R. 541 (Bankr. N.D. Fla. 2011) (quoting *Pomona*, 476 F.3d at 670). Once

7   the Debtor meets its burden of showing that its rejection of an executory contract will benefit the

8   estate, the non-debtor party bears the burden of proving that the debtor's decision derives from

9   bad faith, whim, or caprice. *In re Nickels Midway Pier, LLC*, 341 B.R. 486, 493 (Bankr. D.N.J.

10  2006).

11
12
### 1.  The Motion Lacks Evidentiary Support, and it and the Supporting Declarations are False in Material Respects

13          Quite obviously, the Court should insist on and only consider admissible evidence in

14  passing judgment on this Motion. Here, as demonstrated in the following discussion, the

15  Northcraft declaration is inadmissible in material respects. Regrettably, as shown above and

16  further discussed below, it is also either false or laced with half-truths throughout. Moreover,

17  much of it is legal argument. This misconduct and failure to comply with basic principles where

18  testimony is proffered by declaration, add impetus for a decision denying the Motion.[8]

19          In the virtually evidence-free Declaration of Riley Walter, the District argues that HCCA

20  has threatened to terminate or suspend all employees of the hospital which "will imperil health

21  and safety of patients and results in a cessation of hospital operations." Declaration of Riley

22  Walter (the "Walter Decl.") 2:8-11. The truth is that it is only HCCA that is protecting the

23  patients and the Hospital operations by advancing the funds to do so even in the face of the

24  District's failure to pay for such expenses as required by the MSA. HCCA has provided those

25  funds out of its own pocket for well over a year, even though it had no obligation to do so and

26  now has the absolute legal right to decline to continue to do so when the responsible party, here

27  _____

28  [8] Concurrently with its opposition, HCCA has filed extensive evidentiary objections and motions to strike specific portions of the Northcraft and Gianello declarations.

- 17 -

1   the District, disparages HCCA at every turn, even as the District continues to breach the MSA.

2   No patients have been compromised, and that will not change under HCCA's watch.  Moreover,

3   as discussed above, the District's irrational conduct includes refusing to discuss or consider the

4   multimillion dollar financing opportunity for the District procured by HCCA.  Benzeevi Decl. ¶¶

5   35-37, Ex. 28; Levinson Decl. ¶ 4, Ex. C.

6          The Motion is a disjointed summary of arguments not grounded in fact and devoid of

7   evidentiary support.  One example is the claim that the MSA is "oppressive … unconscionable

8   and unlawful" and other pejorative labels.  Motion at 2:23-27.  As demonstrated above, HCCA

9   was awarded the MSA and related agreements in the context of competitive meetings with a

10  number of companies vying for the contract. The contract was heavily negotiated by the parties

11  over the course of five months, and each party was represented by well-regarded and respected

12  counsel.  At the time, the District wanted major control to pass to HCCA and that is what the

13  MSA provides.  The fact that Northcraft believes that he could have negotiated a more favorable

14  agreement is of no legal consequence. *See* Northcraft Decl. 3:1-6.

15         It is suggested that "[s]ince execution of the contract," each of the parties claims the other

16  is in breach of the contract. *Id.* at 3:7-9.  This is not true.  The rupture in the relationship started

17  with the recent smearing of HCCA to defeat a proposed bond sale and to win election to the

18  Board and not earlier.  The breaches by the District are legion. *See* Levinson Decl. ¶ 3, Ex. B.

19  There has never been a District claim of HCCA breach of the MSA.[9]  There is a claim by District

20  counsel that HCCA has been slow to produce a burdensome amount of documents and data.  The

21  record is clear that, even as it has been under relentless attack in the political realm as shown

22  below, HCCA has made ongoing major document productions to counsel for the District.

23  Moreover, the Superior Court recently denied a District motion to compel production of

24  documents.  Grossman Decl., ¶ 8.

25  _____

26  [9] Pursuant to Section 10(c)(i) of the MSA, if the District claims HCCA is in material breach of the MSA, the District
    must provide written notice of such breach to HCCA with at least 60 days to cure.  Pursuant to Section 10(e)(i) of the
27  MSA, "[i]n the event either party to this Agreement deems the other party to be in default of its obligations
    hereunder, then said party shall be required to provide notice of the alleged default to the other party, which notice
    shall contain a detailed description of the alleged default."  The District has not provided HCCA with a notice under
28  either section of the MSA.

HEALTHCARE CONGLOMERATE ASSOCIATES, LLC'S OPPOSITION
TO MOTION FOR AUTHORIZATION TO REJECT EXECUTORY CONTRACT

The Motion at paragraph 8 makes much of HCCA's inability to fund payroll. The MSA obligates the District to "furnish [HCCA] with sufficient funds to timely pay the expenses relating to the Operations" which it has failed to do so to the tune of over $7 million. *See* Benzeevi Decl., ¶ 5, Ex. 2, MSA, Section 3(b)(iii). Northcraft also claims that "[a]t the present time the board of directors is completely in the dark in terms of what is going on in the hospital, including revenues, debts, patient counts, etc. No material financial information has been provided to us about the condition of the Hospital." Northcraft Decl. at 10:4-7. Again, not true. As noted earlier in the Opposition, financial information regarding the Hospital has been presented at various Board and/or Finance Committee meetings, and much is available on the District's website. Separately, HCCA's counsel provided counsel for the Board with the following financial information on September 12, 2017, and September 26-28, 2017:

- January – December 2015 monthly financials, including balance sheets, statement of revenues, long-term debt service coverage ratio computation and continuing disclosure reports

- January – September 2016 monthly financials, including balance sheets, statement of revenues, long-term debt service coverage ratio computation and continuing disclosure reports

- Financials for October – December 2016, which were reported on a quarterly, rather than monthly basis

- Financials from first and second quarters of 2017, including statement of revenue and expenses through June 30, 2017, previously distributed at the July 25, 2017 Board Finance Committee meeting

- July 25, 2017 Finance Committee meeting agenda

- July 25, 2017 Finance Committee meeting report

- Proposed fiscal year 2018 budget

- Documents related to two loan proposals negotiated by HCCA.

Levinson Decl. ¶¶ 6-12, Exs. E-K.

In addition, Walter was provided with a complete list of creditors with names, addresses and amounts, along with a list of the District's bank accounts and available balances prior to the October 12, 2017 initial hearing on the Motion ("Initial Hearing").

The next day, HCCA provided Walter with a detailed accounts receivable reports along with aging histories. As agreed and as ordered at the Initial Hearing, HCCA will provide further documents to the District no later than the October 19 continued hearing on the Motion.

**2. The District has Not Met Its Burden of Proof in Establishing that Rejection Would Benefit the Unsecured Creditors or Result in a Successful Reorganization**

The District has offered no admissible evidence that establishes that rejection of the MSA would benefit the unsecured creditors in this case or lead to a successful adjustment of the District's debt. The District has not provided any proof of who will manage the Hospital if the MSA were to be rejected. Any references to HFS assuming control over hospital operations if HCCA is terminated are inadmissible hearsay (Northcraft Decl. 12:11-13). Moreover, any claim that HFS constitutes a solution for the District is contradicted by the statements made in the Gianello declaration, in which the declarant specifically states that HFS "[has] no intentions as serving as the long term manager of the Debtor. "Gianello Decl. 2:10-11.

With regard to obtaining financing, the District once again offers no suggestion, let alone admissible evidence, as to the availability of financing for the District other than the hearsay and unsupported Northcraft statements that admit that the "terms are still being negotiated." Northcraft Decl., 12:12-16.

All of the 525 plus employees at the Hospital are HCCA employees. The District offers no clue as to how it will staff the Hospital if the MSA is rejected. Finally, rejection of the MSA will result in its breach and will give rise to a claim for damages in excess of $15,000,000, including a termination fee which will add several million dollars to the pool of general unsecured claims and dilute any distribution to the general unsecured creditors. Benzeevi Decl. ¶ 2, Ex. 2, MSA Section 10(b). Without the benefit of HCCA's operational knowledge of the Hospital, no firm commitment for a replacement hospital manager, the potential loss of some, many or most of

1  the approximately 525 HCCA employees and an uncertain future with regard to the District's

2  future financing abilities, simply keeping the Hospital open, let alone confirming a successful

3  plan for the adjustment of the District's debts, with be difficult if not impossible.

**B.  The District's Decision to Reject the MSA is Manifestly Unreasonable and is Not Based Upon the Debtor's *Sound* Business Judgment**

6         Chapter 9 enables an insolvent municipality to restructure its debts.  It does not create

7  revenue.  Yet the "emergency" bankruptcy authorization resolution that the Board passed during a

8  meeting conducted on six hours' notice was grounded on its lack of cash and impliedly the lack of

9  any ability to obtain cash to continue in operations.  There were no pending foreclosures and no

10 creditors were threating to exercise self-help.  Nevertheless, this case was filed on a Saturday,

11 fewer than 24 hours after the Board meeting was concluded.  Not surprisingly, the Hospital

12 remains unable to pay its operating costs as they came due.  All members of the Hospital staff are

13 employed by HCCA, and have been paid by HCCA to the extent that District funds are available.

14 The MSA does not require HCCA to advance such funds.  The Motion seeks to replace HCCA

15 without any guarantee of a source of funds to keep the Hospital open.  Without the ability to staff

16 the Hospital, it will close, which only would benefit other hospitals in the area.  A legitimate area

17 of inquiry here is whether any of them have helped finance the campaign against HCCA or Dr.

18 Benzeevi; an expensive campaign presumably not financed by any of the newly-elected Board

19 members. Rejecting the MSA will make the survival of the Hospital problematic, all to the

20 detriment of the Debtor, its creditors and the community.

**C.  The District's Decision to Reject the MSA Was Driven by its Bad Faith**

22         The "emergency" cited by the Debtor for the chapter 9 filing was self-inflicted. As

23 discussed above, HCCA attempted to provide the District with financing proposals to remedy the

24 District's illiquidity, and that might have averted bankruptcy.  There is no guarantee, of course,

25 that the loans would have been the ultimate solution, but it was bad faith not to hear and seriously

26 consider them.  Rather, the District, determined to destroy the MSA via rejection under a new

27 Board, arbitrarily, capriciously and whimsically elected to ignore HCCA's financing

28

OHSUSA:767482769.21

1    opportunities and instead filed chapter 9 with no demonstrated ability to fund operations with or

2    without HCCA.

3          The District has not filed a pleading, let alone a pleading supported by any evidence, that

4    would enable the Court to determine whether the District is eligible for chapter 9 relief (as

5    required by Bankruptcy Code §§ 109(c) and 921(c)).  Due to the publication requirements of

6    Bankruptcy Code § 923, this Court will be unable to conduct a hearing on HCCA's impending

7    objection to the District's eligibility pleadings – assuming that they will be filed someday – until

8    December, if then.  But the Debtor has filed one set of pleadings in an attempt to reject the MSA

9    on much shortened notice.  This, months before the Court determines whether the District is

10   entitled to any bankruptcy relief.  HCCA submits that the Motion, like the so-called emergency

11   chapter 9 filing, is in bad faith.

12   **IV.    <u>CONCLUSION</u>**

13       In light of the foregoing, HCCA requests that the Motion be denied.

14

15   Date: October 17, 2017                          ORRICK, HERRINGTON & SUTCLIFFE LLP
                                                     and
16                                                   KLEIN, DENATALE, GOLDNER, COOPER,
                                                     ROSENLIEB & KIMBALL LLP
17

18                                                   BY: _____ */s/ Marc A. Levinson*
                                                     MARC A. LEVINSON
19                                                   Attorneys for Healthcare Conglomerate
                                                     Associates, LLC
20

21

22

23

24

25

26

27

28

- 22 -