**15**

MARC A. LEVINSON (STATE BAR NO. 57613)
malevinson@orrick.com
CYNTHIA J. LARSEN (STATE BAR NO. 123994)
clarsen@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall
Suite 3000
Sacramento, CA 95814-4497
Telephone:   +1 916 447 9200
Facsimile:   +1 916 329 4900

HAGOP T. BEDOYAN, CSB NO. 131285
LISA HOLDER, CSB NO. 217752
**Klein, DeNatale, Goldner,
   Cooper, Rosenlieb & Kimball LLP**
5260 N. Palm Avenue, Suite 201
Fresno, California 93704
Telephone: (559) 438-4374
Facsimile: (559) 432-1847
E-mail: hbedoyan@kleinlaw.com
          lholder@kleinlaw.com

Attorneys for Healthcare Conglomerate Associates, LLC

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| In re:<br>TULARE LOCAL HEALTHCARE DISTRICT dba TULARE REGIONAL MEDICAL CENTER,<br><br>           Debtor. | Case No. 17-13797-9-B<br>Chapter 9<br><br>DC No.:   WW-1<br><br>**DECLARATION OF YORAI (BENNY) BENZEEVI, M.D. IN SUPPORT OF HEALTHCARE CONGLOMERATE ASSOCIATES, LLC'S OPPOSITION TO MOTION FOR AUTHORIZATION TO REJECT EXECUTORY CONTRACT**<br><br>Date:     October 19, 2017<br>Time:    2:00 p.m.<br>Place:    2500 Tulare Street<br>              Fresno, CA 93721<br>              Judge:  Hon. René Lastreto II |

DECLARATION OF YORAI (BENNY) BENZEEVI, M.D.
17-13797-9-B

I, Yorai (Benny) Benzeevi, M.D., declare:

1. I am the Managing Member of Healthcare Conglomerate Associates, LLC ("HCCA"). HCCA is a California Limited Liability Company with its principal place of business in Los Angeles and is the Manager of debtor Tulare Local Healthcare District dba Tulare Regional Medical Center ("District" or "TRMC"). I have overall responsibility for the management of HCCA. Prior to HCCA serving as Manager to the District, I served as Director of the Emergency Department at TRMC from 2007 until January 2014. I received my medical degree at the University of California, Davis and I am board certified by the American Board of Emergency Medicine and I hold the status of Fellow of the American College of Emergency Medicine. Based on the foregoing positions, I have extensive knowledge of the District and its governance and operations, HCCA's contracts and the performance thereunder, and the relationship between the District and HCCA. I make this declaration in support of HCCA's opposition to the debtor's Motion to Reject Executory Contract (Healthcare Conglomerate Associates, LLC).

2. The District is a local healthcare district in Tulare, organized under section 32000 et seq. of the California Health and Safety Code. The District's bylaws, a true and correct copy of which are attached hereto as **Ex. 1**, provide that its Board be comprised of five elected directors. On January 10, 2014, HCCA began managing the District on an interim basis and on May 29, 2014, HCCA and the District entered into the Management Services Agreement ("MSA"), which is currently in effect. A true and correct copy of the MSA is attached hereto as **Ex. 2**. Both the interim agreement and the MSA were approved by a 5-0 vote of the District Board. The District has moved to reject its four interrelated and phased contracts with HCCA: the MSA; the Interim Joint Operating Agreement ("IJOA"); the Joint Operating Agreement ("JOA") and the Operating Agreement ("OA"). The MSA governs the current relationship of the District and HCCA. The JOA provides for a joint venture arrangement between the District and HCCA to become effective upon the settlement of the revenue bonds. The IJOA addresses the interim period prior to the effective date of the JOA. The OA gives HCCA an option to purchase or lease District property under specified circumstances.

3. Under the MSA, the District appointed HCCA as manager of the District for an initial 15 year term, with a renewal period of 10 years unless either party declined renewal. In the MSA, the District acknowledged that the long-term nature of the MSA and its limited termination provisions were a substantial inducement to HCCA in agreeing to contract with the District. **Ex. 2**, MSA, Section 2(a)-(b). Given the truncated tenures of multiple prior managers with which the District found fault, HCCA's management was unwilling to make the long-term investment in the District required under the HCCA without such a long-term contract.

4. The MSA granted HCCA the exclusive right and responsibility to manage the Hospital, clinics and other facilities of the District, "includ[ing] but not limited to financial and operating systems management, preparation of proposed annual budgets, purchasing, contracting support and relationship management, expansion of the Hospital and the Clinics and Other Facilities or the Service offered, preparation and implementation of staffing plans, recruiting of personnel, and supervision of the day-to-day operation of the Hospital, and the Clinics and other facilities." **Ex. 2**, MSA, Section 3.

5. The District is contractually required to "furnish [HCCA] with sufficient funds to timely pay the expenses relating to the District's Operations, including both operating and non-operating expenses" of the Hospital. **Ex. 2**, MSA, Section 3(b)(iii). HCCA may, but is not required to, advance funds to the District to fund operational costs. If HCCA advances funds, the MSA provides it with contractual means to secure repayment.

6. In my roles with the District, described above, I became aware that the District suffered severe financial, managerial, and governance difficulties in the years leading up to the engagement of HCCA as the manager of the District. Over the seven-year period prior to 2014, the District employed six different Chief Executive Officers and at least a half dozen Chief Financial Officers. During that time, the District suffered severe and progressively worsening financial losses, namely, over $4 million in the immediately preceding six months; over $8 million in the immediately preceding fiscal year; over $16 million in the prior three fiscal years; and a combined loss of just under $5 million in the preceding ten-year period. The Hospital's operating margin over the preceding ten years averaged a negative 0.72.

7. I know from my work at TRMC since 2007 that the dismal history of the District and its years of failure are deeply rooted in disharmony within the Tulare medical community. When the MSA was signed, I had personal knowledge of the fact that there was a powerful physician group which sought to control of the Hospital and its finances which, if achieved, would permit them to operate the Hospital as if it were an extension of their private practices. They were hamstrung by a Corporate Integrity Agreement with the Federal Office of Inspector General to correct and address inappropriate physician contracting practices. The Corporate Integrity Agreement limited the reach of those physicians within the Hospital. They were angered by the selection of HCCA as manager because of HCCA's focus on the larger interests of the Hospital rather than those physician's financial interests. After HCCA began managing the District, this group of physicians turned even more completely against HCCA after a government inspection which forced the then Board (which they saw as pro-HCCA) to disaffiliate with them. In response they supported the formation of the so-called Citizens for Hospital Accountability ("CHA") group. They then began a steady pattern of referring their patients to other hospitals and an attempt to oust HCCA. The District desperately needed financing to complete a scandal-rocked tower then under construction and HCCA presented a bond offering for public vote to complete the tower and provide funding for the District. These physicians actively opposed Measure I as a means of denying the District of the much needed funding even though no other credible source of funding was available and not completing the tower would have meant the Hospital would be unable to meet the state's earthquake compliance requirements required for it to remain viable The measure failed and then these doctors backed their own CHA-selected Candidates for the Board. When these candidates were elected, they became the Board majority, which in turn has continued the attacks on HCCA and me.

8. The need for Measure I arose long prior to HCCA's arrival. In 1994, following the "Northridge Earthquake," Senate Bill 1953 mandated that California hospitals be rebuilt to meet more stringent seismic guidelines. The then new Board sought and obtained voter approval in 2005 for an $85 million General Obligation bond offering to bring the existing uncompleted Hospital structure into compliance. The cost of the new tower at inception in 2007 was estimated

at $120 million and the plan as described in the initial bond documents in 2007 called for a second bond offering at a later date to make up the difference. This Hospital project became a financial and legal disaster. The funds raised by the District from the sale of bonds much earlier were substantially exhausted by 2014 (over 90%); the Hospital tower was unoccupied and only two thirds complete and the Hospital project was mired in multiple lawsuits and unpaid claims with no prospects of funding its completion. Today, the Hospital remains out of compliance with Senate Bill 1953. In addition, as a result of the de facto boycott of the District by the ousted doctor group the volume of inpatients at the Hospital was materially reduced by nearly 40% of the prior volume and the volume of obstetrical deliveries was reduced by some two thirds. A true and correct copy of a chart prepared by HCCA from District records showing reduced patient volumes of the dissident physicians is attached hereto as **Ex. 3**.

9. Thus, before HCCA's arrival, the financial condition of the District was so bad for the fiscal years ending 2012 and 2013, that its outside independent auditors refused to issue a "clean opinion" and instead imposed a "going concern" condition to their audit report opinion. A true and correct copy of the foregoing Audit Report is attached hereto as **Ex. 4**. Such an opinion meant that the auditors had grave concern about their client's ability to avoid liquidation over the next 12 months.

10. When HCCA assumed its management role in 2014, the financial deterioration of the District left it with less than a month's cash for its operations. In addition, the District was operating under, and subject to, the five-year Corporate Integrity Agreement it had been required to enter into with the Federal Office of Inspector General to redress a history of its physician contracting practices.

11. In 2013, the District solicited and received bids from diverse parties, including HCCA, to take over the management of all of the District's operations, including the Hospital. In December 2013, the Board unanimously selected HCCA from among the bidders, and entered into an interim agreement in January 2014, pending completion of the parties' negotiations of a long term MSA, which was finalized in May 2014. As stated above, both agreements were approved by a 5-0 vote of the Board. When HCCA was selected, the Board had been searching

1  for an affiliation partner for a year. The Board members expressed to me that they believed the
2  District's long-term historical problems were due to poor governance and interference by the
3  Board in operations.

4       12.    One of the issues that HCCA was called upon to address as manager was the
5  failure of the physician leadership of the District to comply with peer review, physician
6  credentialing, and other requirements for federal funding. In January 2016, the Federal Centers
7  for Medicare and Medicaid Services (CMS) performed a survey of the Hospital's performance in
8  past years and found a history of gross negligence by the physician leadership at the Hospital and
9  threatened to exclude the Hospital from federal funding. The Hospital receives approximately
10 80% of its funding from governmental sources, so such a step by CMS would have caused the
11 immediate closure of the Hospital.

12      13.    Because of the non-compliance of the existing physician leadership and the
13 imminent threat to the Hospital's ability to qualify for federal funding, the District Board
14 disaffiliated itself from the then existing medical staff in 2016 and instead associated itself and
15 the District with a new medical staff. After this successful restructuring and under the new
16 leadership of the medical staff, all doctors who previously worked at the Hospital retained their
17 clinical privileges. Of note, both CMS and the California Department of Public Health found that
18 the District's plan of correction – the disaffiliation with the prior medical staff and affiliation with
19 the new medical staff –properly addressed and corrected the problem and the plan of correction
20 was accepted in its entirety.

21      14.    HCCA now employs for the District approximately 525 nurses, trained medical
22 professionals and support staff. To date HCCA has given two across-the-board pay raises as well
23 as dozens of additional individual pay increases. When HCCA arrived in 2014, pay had been
24 frozen for years at the District.

25      15.    In the fall of 2016, the Hospital, under HCCA management, received a quality
26 award from the California Secretary of Health and Human Services for meeting or exceeding the
27 healthy people 2020 goal for low-risk, first-birth Cesarean deliveries. A true and correct copy of
28 this award is attached hereto as **Ex. 5**. Other recognitions include a 2016 CALNOC Performance

1　Excellence Award relating to the prevention of Hospital acquired infections – MRSA total
2　facility, a true and correct copy of which is attached hereto as **Ex. 6**. In addition, the Hospital
3　achieved a "Baby Friendly" status, a World Health Organization program that recognizes
4　hospitals that offer an optimal level of care for infant feeding and mother-baby bonding.

5　　　　16.　In the three-plus years under HCCA management, the Hospital has had several
6　dozen months of consecutive positive net margins as confirmed by annual audits. In the first six
7　months HCCA was on board, the Hospital had a $1.3 million net margin compared with $4
8　million in losses in the six months prior to HCCA's arrival, and in the first full fiscal year under
9　HCCA, the Hospital recognized a net margin exceeding $7 million. Similarly, the first full fiscal
10　year under HCCA saw a 10% operating margin. On October 26, 2016, I made a PowerPoint
11　presentation to the Board summarizing the Hospital's tumultuous history prior to HCCA and its
12　financial condition and success since HCCA was engaged under the MSA, a true and correct copy
13　of which is attached as **Ex. 7** hereto. The positive turnaround was recognized by bond rating
14　services and reflected in their ratings. Fitch Ratings, a leading national credit rating firm,
15　upgraded the District's revenue bond ratings, and updated its outlook for the District from
16　"negative" to "positive" and stated in its August 28, 2014 ratings report:

> SIGNS OF TURNAROUND: The Stable Outlook reflects the dramatic turnaround in operating and financial performance since Fitch's last review in February 2014….Fitch believes the positive trend over the last few months indicates performance improvement plans taking hold and signal recovery.

20　A true and correct copy of the August 28, 2014 Fitch Ratings Press Release is attached hereto as
21　**Ex. 8**.

22　　　　17.　Fitch's positive outlook is continued in its report dated August 27, 2015. Fitch
23　reported that the District's financial condition "reflects sustained evidence of operational and
24　financial turnaround and stabilization." It also stated that "[u]nder HCCA's leadership, operating
25　and financial performance improved dramatically over the last 18 months." A true and correct
26　copy of the August 27, 2015 Fitch Ratings Press Release is attached hereto as **Ex. 9**.

27　　　　18.　On August 23, 2016, Fitch again reported positive results for the District and
28　stated clearly its view of the reason for the success: "[The District] has sustained the trend of

1  strong operating performance since Fitch's last rating review in August 2015.  Ongoing work by

2  the management team in place since January 2014 has brought a financial turnaround, and double

3  digit operating EBITDA margins are expected to continue."  A true and correct copy of the

4  August 23, 2016 Fitch Ratings Press Release is attached hereto as **Ex. 10**.

5        19.     Similarly, on October 25, 2016, the national bond rating firm Moody's Investors

6  Service upgraded the District's outlook rating from negative to stable.  Moody's emphasized the

7  "improved operating performance beginning in fiscal 2014, driven by a new management team" –

8  namely, HCCA.  Moody's explained in more detail, stating:

> Beginning in fiscal 2014, a new management team affiliated with Healthcare Conglomerate Associates (HCCA) has generated significantly improved financial performance, growing revenues and reducing unnecessary costs. Operating revenues in fiscal 2015, for example, increased by close to 16.8%, resulting in a good 10.5% operating margin and marking the district's first positive operating margin since fiscal 2011. Previously, due largely to significant declines in patient volume and capital project costs, the district had three consecutive years of negative operating margins from fiscal 2012 through fiscal 2014.

A true and correct copy of Moody's October 25, 2016 Press Release is attached hereto as **Ex. 11**.

Moody's also opined that the positive outlook for the District would continue, due to HCCA's management:

> The district's new financial management team [HCCA] has succeeded in reversing the district's past trend of weak operating performance, with the district's liquidity and operating margins demonstrating notable improvement. We believe that the current management team will remain in place over the intermediate term, maintaining a trend of stable financial operations.

21  *Id.*

22        20.     Under HCCA's management, the Hospital has shown a profit and the District has

23  enjoyed a far better than average net margin and financial stability it had not experienced in over

24  a decade.  In 2015 alone, the Hospital's financial returns were three times the national average for

25  hospitals and were greater than at any time in the prior 12 years.  The market value of the District

26  increased by approximately $32 million since HCCA became its manager, according to the 2016

27  fiscal year audit.  A true and correct copy of Table 2, page 6, of the foregoing audit report is

28  attached hereto as **Ex. 12**.

21. Kevin B. Northcraft, new Board Chair, argues in his declaration that since HCCA became manager, the District has suffered only disruption and turmoil. Declaration of Kevin Northcraft in Support of Motion for Authorization to Reject Executory Contract (Healthcare Conglomerate Associates, LLC), ¶¶ 6-7. As demonstrated by the foregoing financial summary, Mr. Northcraft's mere speculation without any foundation is simply wrong. Moreover, contrary to Mr. Northcraft's claim of disruption, in 2014, a year after HCCA came on board, two Board members that had supported the HCCA agreements ran for re-election unopposed.

22. The attack by the so-called CHA and its dissident physician sponsors was just the beginning of their attempt to harm the District, especially financially. This opposition group has mastered social media including its own website and Facebook, to attack its perceived enemies through falsehood, innuendo and name-calling. After the defeat of Measure I, CHA turned its focus to replacing three Board members with CHA's selected candidates, Kevin Northcrarft, Michael Jamaica, and Senovia Gutierrez, who now control the Board.

23. The recently seated Board members, along with CHA and others, have continued their deceptive smear campaign against HCCA and me. They have stated they want to "throw out the current HCCA contract based on [undefined] illegal overreach." *See* Visalia Times Delta, 6/30/2016, "What Measure I Supporters Need To Know," a true and correct copy which is attached hereto as **Ex. 13**. For example, on July 30, 2016, Mr. Northcraft and the CHA group are quoted as saying that if elected to the Board, they intend to "renegotiate or throw out the current HCCA contract" and to "do it 'the Tulare way'—not the Southern California divisive, secretive, and machine politics way." *Id*. The open threats by CHA, and the new Board members to "throw out" the HCCA contract and their continued disparagement of the Hospital, HCCA, and the MSA have poisoned the environment within which the Hospital must function to the detriment of the District and community. By way of illustration, calls have been made to the Office of the Congressman Nunes by someone impersonating my wife. Threatening calls also have been received at the Hospital making the false claim that "the Federal Attorney General is coming."

24. Instances of such deception and bad faith conduct include the following actions by current Board members and CHA. New Board Chair, Kevin Northcraft, has reposted and

1  published on social media a CHA post alleging that the MSA "brought our hospital to its current
2  financial ruin, and thus, explains clearly how HCCA and Dr. Kumar are solely responsible for the
3  substandard care offered at our hospital today…." A true and correct copy of the foregoing post
4  is attached hereto as **Ex. 14**. During his election campaign, Northcraft made clear his desire to
5  "amend or cancel," or in other words, "renegotiate or throw out the current HCCA contract."
6  **Ex. 13**. He later did just that by turning a blind eye to much needed financing, as discussed
7  below.

25. Northcraft posted on his Facebook page on July 28, 2017, "Dr. Benzeevi, how long did you have to study to bring a hospital to the brink of bankruptcy, fleece your employees and citizen's [sic] of the hospital district, and give such bad care you've frightened away most of the doctors in the area and an entire community…." A true and correct copy of the foregoing July 28, 2017 Facebook post is attached hereto as **Ex. 15**. The defamation extends to the reckless smear by Mr. Northcraft directed to existing counsel to HCCA. On or about September 11, 2017, he publicly and falsely stated: "I haven't received a phone call, text, email, in-person, anything from HCCA," "except their attorney, arguing that democracy doesn't exist for our district." **Ex. 16**. To my knowledge, no such statement was ever made by any counsel to HCCA.

26. When Mr. Northcraft and Mr. Jamaica were first elected to the Board, I insisted on a meeting with them to bring them up to date on all the current issues presently facing our hospital as well as hear from them suggestions for best strategies to enhance and improve our services to the community. A true and correct copy of the foregoing November 11, 2016 exchange is attached hereto as **Ex. 17**. Other than that meeting, none of the three new Board members have ever met with HCCA or even requested to do so.

27. New Board member Michael Jamaica has also stated his intention to have the MSA "amend[ed] or cancel[ed]." **Ex. 18**. New Board member Senovia Gutierrez has stated through social media that the District needs to "get rid of HCCA." A true and correct copy of Ms. Gutierrez's May 20, 2017 Facebook post is attached hereto as **Ex. 19**.

28. CHA has published several posts on Facebook, true and correct copies of which are attached as **Ex. 20**. They include the following:

1    •    That the MSA "brought our hospital to its current financial ruin, and thus, explains clearly how HCCA and Dr. Kumar are solely responsible for the substandard care offered at our hospital today…." Actions of Citizens for Hospital Accountability Group.

   •    Accusing HCCA of about to "replicate shady tactics" falsely and allegedly engaged in elsewhere by Doctor Benzeevi's brother. This particular post included a not so subtle reference to my Jewish faith, including an appalling cartoon throwback to the Nazi era showing a grotesque male with distorted facial features surrounded by huge amounts of money while sitting on top of helpless others.

   •    Calling HCCA's leadership "fraudulent."

   •    Referring to a "loan[f]raud."

   •    Referring to "Doctor Benzeevi's out-and-out lies."

   •    Stating, "This theft and graft must come to an end."

29. Leading up to the bankruptcy filing, the District has attempted to financially harm HCCA in ways large and small. For example, the new Board has refused to accept a tender of defense (at carrier expense) of several lawsuits filed against the replaced board. There is no gain for the District in doing this; but the harm to HCCA is palpable. The Board's actions also harm the Hospital by diverting efforts to litigation instead of the protection of patients and employees.

30. The bad faith and defamatory conduct by the CHA and new District Board have taken their toll. Within a week after the District's bankruptcy filing on September 30, 2017, Fitch downgraded the Issuer Default Rating from CC to D as a direct consequence of the chapter 9 petition. Fitch also downgraded the rating on the District's existing revenue bonds from CC to C, stating default appears inevitable "absent timely third-party intervention to support operations and debt service payments." Similarly, Moody's Investors Service downgraded the rating for the District on October 5, 2017, and maintained a negative outlook, while noting the "nonexistent cash liquidity" and "dysfunctional board relations." A true and correct copy of the Fitch Press Release dated 10/6/2017 is attached hereto as **Ex. 21**. A true and correct copy of Moody's Report dated 10/5/2017 is attached hereto as **Ex. 22**.

31. Even before the chapter 9 filing, in recent weeks, the history of favorable Fitch and

1　Moody ratings for the District has turned negative.  On August 9, 2017, Fitch downgraded its

2　rating on revenue bonds and the District's Issuer Default Rating from BB- to B.  Fitch further

3　downgraded its rating on September 6, 2017 from B to CC "indicating probable default risk."

4　The Fitch report notes the "downgrade to 'CC' represent very high levels of credit risk, reflecting

5　TRMC's continued delays in executing external liquidity agreements to bolster working capital

6　and heightened political instability at the TRMC board level."  Fitch maintained the Rating Watch

7　Negative (RWN) based on its concern "over the breakdown of communication between the

8　TRMC board and hospital management that places risk on hospital operations and execution of

9　credit agreements."  A true and correct copy of the August 9, 2017 Fitch Downgrade Report is

10　attached hereto as **Ex. 23**.  A true and correct copy of the September 6, 2017 Fitch Downgrade

11　Report is attached hereto as **Ex. 24**.

12　　　　33.　Notwithstanding the chaos and tumult brought upon the District by its own new

13　Board over the past year including its failure to honor its contractual obligations to pay for the

14　running of the Hospital (including payments for money due to HCCA and to the Hospital

15　employees), HCCA has advanced millions of dollars to fund District operations notwithstanding

16　that funding Hospital operations is clearly the District's, and not HCCA's obligation under the

17　MSA.  HCCA was under no contractual obligation whatsoever to advance such funds and, in

18　acknowledgment of its responsibilities to repay such advances, the District issued promissory

19　notes in HCCA's favor.  Millions of dollars remained outstanding and unpaid under such

20　promissory notes.  In addition, HCCA has not been paid its contractual management fee since

21　August.  Thus, the District remains in default under the terms of the MSA.

22　　　　33.　The following listing sets forth the dates of the Requests for Funds by HCCA to

23　satisfy the District's obligations under the MSA, as well as the amounts requested pursuant to

24　Section 3(b)(iii) of the MSA.  When these requests were not honored as required by the MSA, the

25　District issued promissory notes for funds advanced by HCCA for ongoing District operations.

26　HCCA does not have an ulterior motive other than for HCCA and vendors to receive what they

27　are owed and for the Hospital funding to remain uninterrupted.

28　　　　•　On 12/21/2016, HCCA submitted a Request for Funds in the amount of

1　　$1,064,729.80.

2　　　　•　　On 12/28/2016, HCCA submitted a Request for Funds in the amount of
3　　$179,355.34.

4　　　　•　　On 12/29/2016, HCCA submitted a Request for Funds in the amount of
5　　$27,502.46.

6　　　　•　　On 12/30/2016, HCCA submitted a Request for Funds in the amount of
7　　$900,000.00 and $281,393.44.

8　　　　•　　On 3/31/2017, HCCA submitted a Request for Funds in the amount of
9　　$1,800,000.00.

10　　　　•　　On 4/10/2017, HCCA submitted a Request for Funds in the amount of
11　　$1,112,229.77.

12　　　　•　　On 5/8/2017, HCCA submitted a Request for Funds in the amount of
13　　$1,105,835.33.

14　　　　•　　On 5/23/2017, HCCA submitted a Request for Funds in the amount of
15　　$422,045.25.

16　　　　•　　On 6/6/2017, HCCA submitted a Request for Funds in the amount of
17　　$1,134,399.70.

18　　　　•　　On 7/21/2017, HCCA submitted a Request for Funds in the amount of
19　　$250,000.00.

20　　　　•　　On 7/31/2017, HCCA submitted a Request for Funds in the amount of
21　　$1,500,401.01.

22　　　　For purposes of illustration, true and correct copies of the 12/21/2016 Request for Funds
23　　and corresponding Promissory Note are attached hereto as **Ex. 25**.

24　　　　34.　　At the Board's September 27, 2017, open session meeting, I and HCCA Chief
25　　Operations Officer Alan Germany appeared and discussed in open session the dire cash flow
26　　issue facing the District. We distributed the financial statements ("Financials") for the fourth
27　　quarter of 2017. The balance sheet portion of the Financials showed $2,088,851 of cash and
28　　$29,236,839 of current liabilities as of end of the quarter, June 30, 2017. A true and correct copy

1  of the Fourth Quarter 2017 Financials is attached hereto as **Ex. 26**.  The Financials were
2  previously distributed at the meeting of the Board's Finance Committee on July 25, 2017.  The
3  balance sheet forwarded by HCCA to the Board in April 2017 for the quarter ending March 31,
4  2017, a true and correct copy of which is attached hereto as **Ex. 27**, showed cash of $3,622,318,
5  current liabilities of $3,682,258 and accounts payable of $15,957,708.  The two financial
6  statement packages described above also were contemporaneously posted on the HCCA website.

7        35.     At its September 27 meeting, I told the Board that the District was out of cash at
8  present, and that HCCA had identified lenders with an interest in providing cash infusions to the
9  District to bridge the lack of liquidity crisis and enable the Hospital to remain operational.  I also
10 suggested that a special meeting be called immediately to discuss the potential funding sources
11 and opportunities I had identified.

12       36.     I followed up the following evening, September 28, 2014, by writing the Board
13 requesting that, pursuant to sections 1.b. or 1.c of the District bylaws, the Board conduct a special
14 or an emergency meeting on Sunday, October 1, or on Monday, October 2, at which time he
15 would present the loan options to the Board.  A true and correct copy of my September 28, 2014
16 letter to the Board is attached hereto as **Ex. 28**.

17       37.     At 12:11 p.m. the next day, September 29, the Board's counsel, Tim Thompson,
18 rejected my request for a special or emergency meeting.  In addition to rejecting the request that
19 HCCA be permitted to present the Board with loan options on October 1 or 2, the Thompson
20 letter served notice on HCCA notice of a 6:30 p.m. emergency meeting later that day.  It attached
21 an agenda which included consideration of whether to declare a fiscal emergency and to authorize
22 the filing of a chapter 9 petition.  I could not attend due to observance of Yom Kippur.
23 Mr. Germany could not attend on a few hours' notice because he was traveling.  I later learned
24 that the District had voted to file a chapter 9 bankruptcy.

1  I declare under penalty of perjury under the laws of the State of California that the
2  foregoing is true and correct to the best of my knowledge.
3  Executed this 17th day of October, 2017 in  Los Angeles , California.

_____
Yorai (Benny) Benzeevi, M.D.