3

MARC A. LEVINSON, CSB NO. 57613
CYNTHIA J. LARSEN, CSB NO. 123994
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
400 Capitol Mall, Suite 3000
Sacramento, California 95814-4497
Telephone: (916) 329-4910
Email: malevinson@orrick.com
       clarsen@orrick.com

HAGOP T. BEDOYAN, CSB NO. 131285
LISA HOLDER, CSB NO. 217752
**Klein, DeNatale, Goldner,**
   **Cooper, Rosenlieb & Kimball LLP**
5260 N. Palm Avenue, Suite 201
Fresno, California 93704
Telephone: (559) 438-4374
Facsimile:  (559) 432-1847
E-mail: hbedoyan@kleinlaw.com
        lholder@kleinlaw.com

Attorneys for Healthcare Conglomerate Associates, LLC

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| In re:<br>TULARE LOCAL HEALTHCARE<br>DISTRICT dba TULARE REGIONAL<br>MEDICAL CENTER,<br>　　　　　　　Debtor. | Case No.: 17-13797-9-B<br><br>Chapter 9<br><br>DC No.:　　　WW-1<br><br>**EXHIBITS 1-29 TO THE DECLARATION OF YORAI (BENNY) BENZEEVI IN OPPOSITION TO DEBTOR'S MOTION TO REJECT EXECUTORY CONTRACT (HEALTHCARE CONGLOMERATE ASSOCIATES, INC.)**<br><br>Date:　　October 19, 2017<br>Time:　　2:00 p.m.<br>Place:　　2500 Tulare Street<br>　　　　　Fresno, CA 93721<br>Judge:　Hon. René Lastreto II |

# INDEX OF EXHIBITS TO DECLARATION OF YORAI (BENNY) BENZEEVI

| Exhibit | Page Number | Document |
|---|---|---|
| 1 | 4 | District Bylaws |
| 2 | 34 | Management Services Agreement |
| 3 | 190 | Chart Showing Reduced Patient Volumes of Dissident Physicians |
| 4 | 192 | 2013 Audit Report |
| 5 | 222 | 2016 California Secretary of Health and Human Services Award |
| 6 | 224 | 2016 CLANOC Performance Excellence Award |
| 7 | 226 | October 26, 2016 PowerPoint Presentation |
| 8 | 253 | August 28, 2014 Fitch Ratings Press Release |
| 9 | 258 | August 27, 2015 Fitch Ratings Press Release |
| 10 | 264 | August 23, 2016 Fitch Ratings Press Release |
| 11 | 268 | October 25, 2016 Moody's Press Release |
| 12 | 276 | Table 2, Page 6, of 2016 Fiscal Year Audit |
| 13 | 278 | Visalia Times Delta, 6/30/2016, "What Measure I Supporters Need To Know" |
| 14 | 281 | July 30, 2017 Kevin Northcraft Facebook Post reposting Citizens for Hospital Accountability Post |
| 15 | 283 | July 28, 2017 Kevin Northcraft Facebook Post |

| 16 | 285 | Our Valley Voice, 9/11/2017, "Tulare Hospital In Arrears, HCCA Claims Breach of Contract" |
| 17 | 294 | November 11, 2016 Email Exchange Between HCCA and Kevin Northcraft |
| 18 | 297 | Visalia Times Delta, 10/22-23/2016, "Let's Take Back Our Public Hospital" Election Mailer |
| 19 | 299 | May 30, 2017 Senovia Gutierrez Facebook Post |
| 20 | 302 | February 25, 2017 Kevin Northcraft Facebook Post reposting Citizens for Hospital Accountability Post; March 23, 2017 Citizens for Hospital Accountability Facebook Post; May 20, 2017 Citizens for Hospital Accountability Facebook Post; June 20, 2017 Citizens for Hospital Accountability Post with comments; August 2, 2017 Citizens for Hospital Accountability Post |
| 21 | 309 | October 6, 2017 Fitch Ratings Press Release |
| 22 | 318 | October 5, 2017 Moody's Report |
| 23 | 324 | August 9, 2017 Fitch Downgrade Report |
| 24 | 330 | September 6, 2017 Fitch Downgrade Report |
| 25 | 339 | Exemplary Request for Funds and Promissory Notes from December 2016 |
| 26 | 345 | District Fourth Quarter 2017 Financials |
| 27 | 350 | Balance Sheet for Quarter Ending in March 31, 2017 |
| 28 | 355 | Benny Benzeevi September 28, 2014 Letter to District Board |
| 29 | 362 | Citizens for Hospital Accountability Facebook Comment regarding Recall of Dr. Kumar |

# EXHIBIT 1



869 N. Cherry St. • Tulare • CA • 93274
559.688.0821 • www.TulareRegional.org

# TULARE LOCAL HEALTHCARE DISTRICT

# BYLAWS

## Adopted:  May 22, 2013

# TABLE OF CONTENTS

**ARTICLE I-NAME, AUTHORITY, PURPOSE AND LOCATION** ......................1-3

    Section 1 – Name.........................................................................................1
    Section 2 – Authority ................................................................................1
    Section 3 – Mission, Vision & Values ..................................................... 1, 2
    Section 4 – Description ............................................................................2
    Section 5 – Location .................................................................................2
    Section 6 – Components and Services .................................................... 3

**ARTICLE II-MEETINGS, ORDER OF BUSINESS** ...........................................3-5

    Section 1 – Meetings............................................................................3, 4
    Section 2 – Order of Business..............................................................4-5

**ARTICLE III-BOARD OF DIRECTORS** ...........................................................5-8

    Section 1 – Directors ................................................................................5
    Section 2 – Powers ...............................................................................5-6
    Section 3 – Duties ....................................................................................6
    Section 4 – Election and Vacancies .....................................................6-7
    Section 5 – Term; Removal......................................................................7
    Section 6 – Compensation ...................................................................7-8

**ARTICLE IV-OFFICERS**...............................................................................8-11
    Section 1 – Officers .................................................................................8
    Section 2 – President ...........................................................................8-9
    Section 3 – Vice President .......................................................................9
    Section 4 – Secretary ..........................................................................9-10
    Section 5 – Treasurer............................................................................10

**ARTICLE V-COMMITTEES** ......................................................................10-15

    Section 1 – General Provisions ..........................................................10-11
    Section 2 – Standing Committees ......................................................11-13
    Section 3 – AD HOC or Special Committees ..........................................13
    Section 4 – Hospital Committees ......................................................14-15

**ARTICLE VI-CHIEF EXECUTIVE OFFICER** ...............................................15-17

    Section 1 – General Provisions ..............................................................15
    Section 2 – Authorities and Duties .....................................................16-17

Exhibit 1, Page 6

**ARTICLE VII-MEDICAL STAFF** ................................................................18-22

    Section 1 – General Provisions .........................................................18-20
    Section 2 – Medical Staff (Active, Courtesy, Consulting & Professional) ........20
    Section 3 – Temporary Medical Staff Privileges....................................20-21
    Section 4 – Honorary Medical Staff.........................................................21
    Section 5 – Quality of Care/Patient Safety and Performance Improvement
           Program .........................................................................21-22

**ARTICLE VIII-NONDISCRIMINATION POLICY** ..................................................22

**ARTICLE IX-SEVERABILITY** ............................................................................22

**ARTICLE X-CONFLICTS OF INTEREST** .......................................................22-23

    Section 1 – Conflicts of Interest.......................................................22-23
    Section 2 – Permissible Interests ...........................................................23
    Section 3 – Duty To Disclose ................................................................23

**ARTICLE XI-INDEMNIFICATION** ..................................................................24-25

    Section 1 – Actions Other Than By The District .......................................24
    Section 2 – Actions By The District ....................................................24-25
    Section 3 – Authorization of Indemnification…… .....................................25

**ARTICLE XII-AMENDMENTS** ......................................................................25-26

    Section 1 – Amendment By Majority .......................................................25
    Section 2 – Action to Amend .................................................................26

Exhibit 1, Page 7

# ARTICLE I

## NAME, AUTHORITY, PURPOSE AND LOCATION

**Section 1.** **NAME**

The name of this District is "Tulare Local Health Care District," and is doing business as "Tulare Regional Medical Center," referred to herein as the "District."

**Section 2.** **AUTHORITY**

a. The District is a local health care district organized November 27, 1945, under the provisions of Division 23 of the California Health and Safety Code, otherwise known and referred to herein as "The Local Health Care District Law."

Under the terms of the Local Health Care District Law, as amended from time to time, the District has established and owns and operates Tulare Regional Medical Center (the "Hospital") and other facilities and services as set forth in Section 6 of this Article.

b. These bylaws, and any amendments hereto, shall collectively be known as the "District Bylaws."

c. In the event of any conflict between the District Bylaws and The Local Health Care District Law (California Health and Safety Code sections 32000 – 32492), the California Health and Safety Code shall prevail.

**Section 3.** **MISSION, VISION & VALUES**

a. Mission
To provide safe, efficient, technologically advanced healthcare with respect for the diversity of our region.

b. Vision
To be the leader and preferred healthcare organization in the region.

c. Values
**Quality**: To provide high-quality care, based on the best practices and in collaboration with Medical Staff that exceeds patient expectations.

1

**Customer Service**: To provide compassionate, courteous, respectful and dignified care, maintaining confidentiality and sensitivity to every individual.

**Compliance/Ethics**: To comply with regulatory requirements based on the highest ethical standards.

**Finance/Efficiency**: To conduct operations according to best practices in order to achieve financial goals.

**People**: To be the organization of choice for high-quality, culturally diverse employees and Medical Staff.

**Growth**: To expand access and availability of healthcare while growing services based on regional need.

**Community**: To partner with our communities to address local and regional healthcare needs and concerns.

**Section 4.**   **DESCRIPTION**

The geographic area served by the District includes the City of Tulare, California, and the surrounding southwestern areas of Tulare County, including but not limited the communities of Angiola, Alpaugh, Earlimart, Pixley, Plainview, Tipton, Waukena, and Woodville.

**Section 5.**   **LOCATION**

   a.   The principal office for the transaction of business of the District is fixed and located at 869 Cherry Street, Tulare, California 93274 (the "Offices").

   b.   Other offices and locations for the transaction of business of the District may be established by the Board of Directors within the boundaries of the District.

**Section 6.**   **COMPONENTS AND SERVICES**

   a. The District is a public agency.  Facilities and services owned and operated by the District pursuant to the powers granted it under the Local Health Care District Law include, but are not limited to the following health care and non-health care components and services, which may be amended by the Board

of Directors from time to time in the exercise of its discretionary authority.

i.     HEALTH CARE COMPONENTS AND SERVICES

    a. Tulare Local Health Care District Hospital dba Tulare Regional Medical Center;
    b. Tulare Home Care;
    c. Mineral King Toxicology Laboratory;
    d. Family X-Ray;
    e. Evolutions Fitness & Wellness Center; and
    f. Rural Health/FQHC Clinics.

ii.    NON-HEALTH CARE COMPONENTS AND SERVICES

    a. Ownership of real property available for lease, rental or sale.

## ARTICLE II

## MEETINGS, ORDER OF BUSINESS

**Section 1.**   **MEETINGS**

a.    The regular meetings of the Board of Directors of the District shall be held on the fourth Wednesday of each month, at such time as the Board of Directors may establish at the Offices, or such other location as the Board of Directors may from time to time establish.

b.    Special meetings of the Board of Directors of the District may be held in conformance with The Local Health Care District Law and the Ralph M. Brown Act. Special meetings may be called by three (3) members of the Board of Directors and notice of the holding of a special meeting shall be mailed, hand-delivered, electronically transmitted, or sent by facsimile or other generally acceptable means, to each member of the Board of Directors at least twenty-four (24) hours before the special meeting. Notice of each special meeting shall be posted at the designated area for posting Board of Director meeting agendas at least twenty-four (24) hours prior to the special meeting.

3

c.    Emergency meetings of the Board of Directors of the District may be held when prompt action is necessary due to actual or threatened disruption of public facilities in conformance with The Local Health Care District Law and the Ralph M. Brown Act. For purposes of this section, "emergency situation" means any of the following, as determined by a majority of the members of the Board of Directors: (i) work stoppage or other activity which severely impairs public health, safety or both; (ii) crippling disaster which severely impairs public health, safety, or both.

d.    All meeting sessions of the Board of Directors of the District, whether regular or special, shall be conducted in accordance with The Local Health Care District Law (Health and Safety Code sections 32000, et seq.) and the Ralph M. Brown Act, California Government Code Sections 54950, et seq. ("the Brown Act").

e.    The agenda for any regular meeting of the Board of Directors for the District shall be posted in a clearly visible and publicly accessible site for the District, including the District's website, no less than seventy-two (72) hours prior to the regular meeting. The agenda shall contain a description of each item to be transacted. Items not appearing on the agenda shall not be transacted, except in compliance with the applicable provision(s) of California Government Code Sections 54950, et seq.

**Section 2.**    **ORDER OF BUSINESS**

a.    A majority of the members of the Board of Directors shall constitute a quorum for the transaction of business.

b.    The Secretary of the Board of Directors shall cause to be kept at the principal office of the Board of Directors a book of minutes of all meetings of the Board of Directors showing the time and place, whether regular, special or emergency, and, if special or emergency, how authorized, the notice given, a list of persons who were notified or were attempted to be notified, the name of the directors present, and a statement of the vote of the directors on all motions and resolutions.

c.    The Board of Directors shall act only by motion and/or resolution and all votes, motions and/or resolutions shall be entered upon the minutes.

4

d.   Decisions of the Board of Directors of the District establishing general rules, requirements and/or procedures affecting the Board of Directors shall be by resolution. All other decisions of the Board of Directors, unless otherwise controlled by statute, shall be by motion, which shall become effective upon the affirmative vote by the majority of the directors present upon entry in the minutes, or as otherwise provided.

### ARTICLE III

### BOARD OF DIRECTORS

**Section 1.   DIRECTORS**

a. The District shall be governed by a Board of Directors (the "Board") consisting of five (5) elected or appointed persons who are registered voters residing in their specific electoral zone of the District, as identified and modified by resolution of the Board.

b. As of the November 2012 election, each member of the Board of Directors shall be elected by the electors of each of the zones. No person shall be eligible to hold the office as a member of the Board of Directors unless he or she has been a full time resident of the zone from which he or she is elected for 30 days immediately preceding the date of the election.

**Section 2.   POWERS**

a.   The Board of Directors shall have all of the powers given to it by The Local Health Care District Law.

b.   From time to time the Board of Directors may pass resolutions regarding specific policy issues, as well as pass resolutions which establish policy for the operation of the District and any of its facilities.

c.   The Board of Directors shall determine the policies and procedures and shall have control of and be responsible for the overall operations and affairs of the District and its facilities, according to the best interests of the communities served by the District.

5

d. The Board of Directors shall have the power to review and approve capital expenditures for the benefit of the District or any facilities owned and/or operated by the District.

e. The Board of Directors shall have the sole power to engage, employ, assign, supervise and discharge legal representation of the District, including the District's General Counsel. For the purpose of any such engagement, employment, assignment, supervision and discharge, the General Counsel shall be considered an "officer" of the District, reporting to and advising the Board of Directors.

f. The Board of Directors shall have the power to direct the operations of the District to ensure compliance with all applicable health care laws within the State of California and the United States, including but not limited to statutes, regulations and rules applicable to health care districts and related entities.

**Section 3.** **DUTIES**

a. Members of the Board shall govern the District in accordance with the best interests of the public health and make and enforce all rules, regulations, and bylaws necessary for the administration, government, protection and maintenance of the District, under their management, and property belonging thereto.

b. Members of the Board shall perform the duties and responsibilities required by The Local Health Care District Law, other public agencies laws applicable to the District, and applicable state and federal laws and regulations.

c. Members of the Board shall have the ultimate moral, legal, and regulatory responsibility for the quality of services provided by all individuals who perform their duties in the District's facilities.

**Section 4.** **ELECTION AND VACANCIES**

a. The Board of Directors shall be elected as provided in The Local Health Care District Law.

b. Members of the Board of Directors of the District shall serve a term of four (4) years.

6

c.     A vacancy in the office of the Board of Directors shall be filled by the remaining members of the Board of Directors by appointment, as provided in California Government Code section 1780. Additionally, any such vacancies shall be filled by election by the remaining members of the Board of Directors after a thirty (30) day public notice has been made and interested parties have been interviewed by the remaining members. Any person appointed to fill such vacancy shall hold office for the unexpired term or the next regular election in accordance with law.

d.     The election of the members of the Board of Directors of the District shall be held on the first Tuesday after the first Monday in November in each even-numbered year, at which time a successor shall be chosen to each Director whose term shall expire when the successor takes office pursuant to Section 10554 of the Elections Code (Health & Saf. Cod. § 32100.5). The election shall be consolidated with the Statewide General Election pursuant to California Election Code Section 10400, et seq. The elected members shall take office at noon on the first Friday in December following the general election. Prior to taking office, each elected member shall take the official oath. (California Elections Code §§ 10553 and 10554.)

## Section 5.   TERM; REMOVAL

a.     A member of the Board of Directors of the District may be removed only by recall vote, as set forth in California Elections Code Section 2700.

b.     Notwithstanding any other provision of law or of the District Bylaws, the term of any member of the Board of Directors may, at the discretion of the remaining members of the Board, be deemed expired if he or she is absent from three (3) consecutive meetings, or from three (3) of any five (5) consecutive meetings of the Board of Directors and the Board of Directors, by resolution, declares the term of that member expired and that a vacancy exists on the Board of Directors.

## Section 6.   COMPENSATION

a.     Members of the Board shall serve without compensation, except:

i.      Each Director shall be allowed and paid actual and
        necessary traveling and incidental expenses incurred
        in the performance of official business of the District in
        accordance with policies and procedures as may be
        established by the Board.

## ARTICLE IV

### OFFICERS

**Section 1.**   **OFFICERS**

The officers of the District shall be members of the Board of
Directors and elected by the Board members.  The officers of the
District shall include a President, Vice-President, Secretary and
Treasurer.  The President, Vice-President, Secretary and Treasurer
and such other officers as may be designated by the Board of
Directors shall be elected by the Board of Directors at the first
regular meeting  following an even numbered election year, and as
further described herein Article III, Sec. 4 of the Bylaws.

Each elected officer shall serve a term of two (2) years, or until their
successor is elected.  An officer may resign at any time or be
removed by a majority vote of the Board of Directors of the District
then in office at any regular or special meeting of the Board of
Directors.  Reasons for action of removal shall be given in writing to
each Board member, no later than ten (10) days prior to any action
being taken.

In the event of a resignation or removal of an officer, the Board of
Directors shall elect a successor to serve for the balance of the
removed officer's unexpired term.

**Section 2.**   **PRESIDENT**

The Board of Directors of the District shall elect one of its members
to act as President and, if at any time the President shall be unable
to act, the Vice-President shall take the President's place and
perform their duties.  The duties and responsibilities of the
President (or Acting Officer) are as provided:

a.      Shall preside over all meetings of the Board of Directors of
        the District.

8

b.  Shall, in conjunction with the District's CEO and the District's legal counsel, be responsible for the placement of all items on Board meeting agendas.

c.  Shall sign, as President, such contracts, conveyances and other instruments in writing as the Board of Directors shall authorize or direct the President to sign.

d.  Shall be responsible for coordination and liaison with District legal counsel, auditors and consultants.

e.  Designate members of the Board to undertake special responsibilities and to report to the Board on those activities.

f.  Appoint members of Standing and Ad Hoc committees.

g.  Represent the Board at official functions when necessary, serve as spokesperson for the Board regarding Board actions, and keep the Board informed of such occasions.

h.  Shall perform such other duties as pertain to the office, as prescribed by the Board of Directors.

## Section 3. VICE PRESIDENT

In the absence or inability of the President to serve, the Vice-President shall perform the duties of the President, and shall perform other duties as pertain to the office as are prescribed by the Board.

## Section 4. SECRETARY

a.  The Secretary shall act as Secretary of both the District and the Board of Directors.

b.  The Secretary shall be responsible for seeing that records of all actions, proceedings, and minutes of meetings of the Board of Directors are properly kept and maintained in the office of the Board of Directors.

c.  The Secretary shall be responsible for seeing that all ordinances and resolutions of the Board of Directors pertaining to policy and government of the District and its facilities are properly recorded and are maintained in the office of the Board of Directors.

9

d.    The Secretary shall serve, or cause to be served, all notices required either by law or the District Bylaws and, in the event of their absence, inability, refusal or neglect to do so, such notices shall be served by any person thereunto directed by the President or Board of Directors.

e.    The Secretary shall be responsible for seeing that the seal of the District is in safekeeping in the office of the Board of Directors and shall use it under the direction of the Board of Directors.

f.    The Secretary shall perform such other duties as pertain to the office and as are prescribed by the Board of Directors of the District.

**Section 5.** TREASURER

a.    The Treasurer shall have the responsibility for the safekeeping and dispersal of funds in the treasury of the District, in accordance with the provisions of The Local Health Care District Law and in accordance with such resolutions, procedures and directions as the Board of Directors may adopt.

b.    The Board of Directors may designate, by motion, resolution or by proper procedure, any other person or persons who shall have authority to sign checks drawn on the appropriate accounts of the District, and to execute in the name of the District all contracts and conveyances and other instruments in writing.

c.    The Treasurer shall perform such other duties as pertain to their office and as are prescribed by the Board of Directors.

**ARTICLE V**

**COMMITTEES**

**Section 1.** **GENERAL PROVISIONS**

a.    Board members shall be appointed to committees of the Board by the President, subject to the approval of the Board, at the first regular meeting of the Board each calendar year.

10

b.      The President of the Board may appoint, with concurrence of the Board of Directors, any special committees needed to perform special tasks and functions for the District.

c.      Committees of the Board shall be Standing or Ad Hoc.

d.      All committees, whether Hospital committees or committees established by the Board, shall be advisory to the Board unless otherwise specified by the Board.  The purpose and progress of committees shall be reviewed by the Board on an annual basis, at the December regular meeting of the Board.

e.      The President shall appoint no more than two (2) members of the Board of Directors to participate in any given committee.  Appointed Board members shall be assisted by District staff and consultants of the District.

f.      Each committee shall report its activities to the Board of Directors on a periodic basis.

### Section 2.  STANDING COMMITTEES

a.      Finance and Audit Committee.  This committee shall be responsible for performing the following functions:

   i.      To oversee the financial management and budget of the District, in consultation with an independent auditor selected by the Board.

   ii.      Review and recommend to the Board policies and procedures in the areas of finance, fiscal controls, investments and insurance programs.

   iii.      Recommend to the Board a change in auditors at least every five years, oversee the selection process and make a recommendation to the Board for selection of an appropriate auditor.

   iv.      Review the completed audit of the District's books and accounts when received and report the committee's recommendation concerning the audit to the Board.

   v.      The Finance Committee will review and forward to the full Board the following reports:

11

      a. Profit & Loss and Budget Report
      b. Semi-Annual Investment Report
      c. Annual Budget Report

vi.     Perform other duties as assigned by the Board.

b.     <u>Compliance Committee</u>. This committee shall be responsible for overseeing implementation, execution, and effectiveness of the compliance program in ensuring compliance with applicable statutes, regulations, and other Federal health care program requirements.

The compliance committee shall include two (2) Board members, Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, general counsel, Compliance Officer, and other personnel from relevant functional departments as the committee deems necessary. The Compliance Officer shall have direct access to the Board of Directors, and all members of the Compliance committee; including being present during any meeting of the Board. The Compliance Officer shall make regular reports to the Board of Directors and other District management concerning Compliance program implementation and execution. Responsibilities:

i.     Development and distribution of written compliance policies and procedures, including standards of conduct;

ii.     Development and implementation of regular, effective education and training programs for all affected employees in applicable District facilities and services;

iii.     Development of a system to receive allegations of improper/ illegal/ non-compliant activities, which system promotes open lines of communication, protects the anonymity of complainants and protects whistleblowers from retaliation;

iv.     Development of a system to respond to allegations of improper/ illegal/ non-compliant activities;

v.     Investigation and remediation of identified systemic problems and enforcement of appropriate disciplinary action against employees who have violated internal

12

compliance policies, applicable statutes, regulations or Federal health care program requirements including policies addressing the non-employment or retention of sanctioned individuals; and

vi.    Development and implementation of auditing or other evaluation techniques to monitor compliance and assist in the reduction of identified problem areas.

c.    <u>Building/Planning/Facilities Committee</u>.  This committee shall be responsible for the following:

i.    Oversee the proper use of all District properties;

ii.    Oversee the compliance of all agreements related to District assets, including issues of fair market value to protect against gifts of public funds;

iii.    Set lease/rental rates and ensure lessee/tenant compliance with lease/rental agreements;

iv.    Recommend to the Board any action the committee deems necessary or advisable to ensure protection of the District's interests under any lease/rental agreement;

v.    Work with lessees/tenants to resolve issues;

vi.    Work with District architect on master planning and construction project(s) to develop the entire District campus, including the District's east campus.

**<u>Section 3.</u>**    **AD HOC OR SPECIAL COMMITTEES**

Ad Hoc or Special committees (such as legislative, community based planning, governance, strategic planning, Bond Oversight) may be established by the President with the approval of the Board of Directors for such special tasks as circumstances warrant.  It shall be the duty of the President to appoint the chairperson and members of each Ad Hoc or Special committee.  The Ad Hoc or Special committee shall limit its activities to the accomplishments of the task for which it is appointed and shall not have power to act, except as is specifically conferred by action of the Board.  Upon completion of the task for which appointed, such Ad Hoc or Special committee shall stand discharged.

13

**Section 4.** **HOSPITAL COMMITTEES**

a. <u>Existing Hospital Committees</u>. The President shall appoint no more than two (2) Board members to serve as Board liaisons on the following established and existing Hospital committees: Joint Conference Committee, Physician Recruitment Committee; and/or those Hospital committees which may be established from time to time.

b. <u>Joint Conference Committee</u>. The President of the Board and a member of the Board appointed by President shall participate, along with the Chief Executive Officer, in the Joint Conference Committee, which is a committee of the Medical Staff of the District. This committee shall serve as a systematic mechanism for communication between members of the Board, the Administration, and members of the Medical Staff of the District. Specifically, issues which relate to utilization, credentialing, the Peer Review process, and quality of patient care shall be regularly addressed. These meetings shall be held on a routine basis, and at a minimum of twice a year. The proceedings and records of this committee are protected by Section 1157 of the Evidence Code.

c. <u>Performance Improvement Committee</u>. This committee's primary purpose is to provide oversight of the District's performance improvement activities, and to establish a consistent, systematic approach to improving organization wide improvement. A summary of Performance Improvement activities is to be submitted to the Board on periodic basis, but not less than semi-annually.

d. <u>Credentialing Committee</u>. This committee's primary purpose is for the Chair and the Vice Chair of the Board to work with the CEO and Chief of Medical Staff regarding the credentialing process of the District. In collaboration with the Medical Staff, the Credentialing Committee will submit recommendations made by Credentialing Committee to the Board for recommendation, approval and/or rejection of the credentialing of the Medical Staff.

e. <u>Grievance Committee</u>. The Board of Directors delegates responsibility for the grievance process, as required by the Medicare Conditions of Participation, to the Hospital. A Grievance Committee shall be responsible for

14

developing/amending policies and procedures for the handling
of patient grievances in accordance with legal requirements.

## ARTICLE VI

### CHIEF EXECUTIVE OFFICER

**Section 1.** **GENERAL PROVISIONS**

a.  The Board shall appoint and may enter into a contract of
employment with a competent experienced Administrator
who shall serve as the Chief Executive Officer (CEO) and
manager of the District, as provided and in compliance with
The Local Health Care Law and Ralph M. Brown Act.

b.  The Board shall be solely responsible for appointment or
dismissal of CEO.

c.  The CEO shall have the ultimate operational authority and
shall be responsible for the day-to-day administration and
management of the District in all its services, activities and
departments, and Medical Staff relations, subject only to
such policies adopted and/or issued by the Board of
Directors of the District.

d.  The CEO shall act as the "duly authorized representative" of
the Board of Directors in all matters the Board has not
otherwise formally designated to another.

e.  In the absence of the CEO, a Vice President designated by
the CEO shall assume the responsibilities of this position.
The Board Chair, in consultation with the Board, retains final
authority to name the person to act during the long term
absence or incapacity of the CEO.

f.  On a periodic basis, but at a minimum annually, the Board
shall meet in Executive session to monitor the performance
of the CEO. The conclusions and recommendations from
this performance evaluation will be directly communicated to
the CEO.

15

**Section 2.** **AUTHORITIES AND DUTIES**

The authorities and duties of the CEO, as required and as authorized by the Board shall be:

(1)     To prepare and submit to the Board of Directors for approval a plan or organization of the personnel and others concerned with the operation of District facilities, services, activities and departments, including but not limited to Tulare Regional Medical Center, and all of its related programs and services.

(2)     To prepare an annual budget of the expected receipts and expenditures.

(3)     To conserve physical and financial assets of the District.

(4)     To select, employ, assign, supervise, and discharge all employees.

(5)     Establish and maintain information and support systems.

(6)     To ensure physical properties are kept in good repair and operating condition.

(7)     To supervise all business affairs, financial transactions, collections of accounts, purchase and insurance of supplies, and to ensure all funds are collected and expended to the best possible advantage.

(8)     To submit to the Board of Directors a Capital Expenditure Report on a quarterly basis, as to how the capital expenditures in the previous quarter have been spent.   A Capital Expenditures Budget is approved on an annual basis by the Board.  The quarterly Capital Expenditure Reports are presented to inform the Board as to how the resources of the annual Capital Expenditure Budget are being managed.  .

(9)     To submit to the Board of Directors other expenditures exceeding the sum of Twenty Five Thousand Dollars ($25,000.00).

16

(10) To advise and cooperate with the Medical Staff of Tulare Regional Medical Center and to secure like cooperation directed toward and in the interest of rendering quality professional services to all patients.

(11) To prepare and submit regularly to the Board of Directors periodic reports showing the professional services performed, the financial activities of the District and such other reports as may be required by the Board of Directors.

(12) To attend meetings of the Board of Directors and its committees.

(13) To perform any other duties assigned or delegated by the Board and/or necessary to serve the best interest of the District.

(14) To serve as the liaison officer and channel of communications for all official communications between the Board of Directors or any of its committees and the Medical Staff.

(15) To be responsible for, have control of, and authority for decisions concerning the operation of District facilities, services and divisions and their related personnel, including but not limited to Tulare Regional Medical Center and its affiliated programs and services.

(16) To report to the Board at regular and special meetings all significant times of business of Tulare Regional Medical Center and make recommendations concerning the disposition thereof.

(17) To ensure that the District complies with applicable laws, regulations and standards.

(18) To promote awareness of the District, good will in the community, and philanthropic support.

17

# ARTICLE VII

## MEDICAL STAFF

**Section 1.** **GENERAL PROVISIONS**

a. The Board of Directors shall appoint the Medical Staff composed of licensed physicians, dentists, podiatrists, allied health or clinical psychologists duly licensed by the State of California, as described in the Health and Safety Code of the State of California, sec. 32128. The Board of Directors, upon consideration of the recommendations of the Medical Staff coming from the Medical Executive Committee, through the Credentialing Committee, affirms or denies appointment and privileges to the Medical Staff of Tulare Regional Medical Center. The Board shall reappoint members to the Medical Staff every two (2) years, as set forth in the Medical Staff Bylaws. The Board requires that an organized Medical Staff is established within the District and that the Medical Staff submits their Bylaws, Rules and Regulations and any changes thereto, to the Board of Directors for approval.

b. All applications for appointment to the Medical Staff shall be in writing, shall be addressed to and submitted to Administration, the Medical Staff and to the Board of Directors for final approval.

c. In no case shall the Board take action on an application, refuse to renew an appointment, or cancel an appointment previously made without conference with the Medical Staff or its duly authorized representative. Final responsibility for appointment, modification, rejection or cancellation of any appointment shall rest with the Board of Directors. The standards for appointment and reappointment of the Medical Staff shall be as provided by the standards of the regulatory and accrediting agencies.

d. The Medical Staff shall be self-governing with respect to the business of the Medical Staff, and as provided in Section 2282.5 of Business & Professions Code.

e. The Medical Staff shall initiate, formulate, adopt and recommend to the Board of Directors, Medical Staff Policies and Procedures, Bylaws, Rules and Regulations, and amendments thereto which shall be effective when approved

18

by the Board of Directors. The Medical Staff shall exercise this responsibility and authority in good faith and in a reasonable, timely, and responsible manner, reflecting the interests of providing patient care in a manner consistent with the generally recognized level of quality and efficiency, and maintaining a harmony of purpose and effort with the Board of Directors. The Medical Staff and the Board of Directors shall maintain a collaborative relationship to ensure proper and timely adoption and/or amendment of Medical Staff Policies and Procedures, Bylaws, Rules and Regulations.

f.    The Board of Directors holds the Medical Staff accountable and responsible for the development, adoption, and annual review of its own Medical Staff Bylaws, Rules and Regulations that are consistent with the District's policies, applicable codes, and/or other regulatory requirements. Neither the Medical Staff nor the Board of Directors may make unilateral amendments to the Medical Staff Bylaws or the Medical Staff Rules and Regulations.

g.    The Medical Staff is responsible for establishing the mechanism for the selection of Medical Staff Officers, Medical Staff Department Chairpersons, and Medical Staff Committee Chairpersons, with the mechanism included in the Medical Staff Bylaws and Rules.

h.    The Medical Staff shall meet in accordance with the requirements of Accrediting Agencies as they deem necessary to review and analyze their clinical work within the District. The Medical Staff and Management are to review and revise all departmental policies and procedures as often as needed, and comply with any and all regulatory agency requirements.

i.    In the event of a discrepancy between Medical Staff Bylaws, Medical Staff Rules and/or the District's Bylaws, the District Bylaws shall, to the extent permitted by law, prevail.

j.    The District shall retain the ability to make effective business decisions that are necessary for the efficient and high quality operation of its facilities.

k.    The Board of Directors shall adopt Appointment and Corrective Action Procedures for the Medical Staff setting forth the procedures governing: (1) appointments and re-

19

appointments to the Medical Staff; (2) delineation of clinical privileges; (3) assignments to staff categories; and (4) procedures relating to corrective actions involving applicants and medical staff appointees.

l.  The Board of Directors shall adopt a Fair Hearing Procedure for the Medical Staff setting forth: (1) the hearing rights which will be afforded to applicants and appointees to the Medical Staff in the event of a reduction, restriction, suspension, revocation, denial or failure to renew staff appointment or clinical privileges, or a recommendation for any of the foregoing; (2) the circumstances under which such hearing rights will be made available; (3) the manner in which such hearing will be conducted; and (4) the method of selecting members of the Hearing and Appellate Review Committees.

m.  The District CEO, as an Ex-Officio member of the Medical Executive Committee, shall have the right to attend all General, Executive and other committee meetings of the Medical Staff and shall be given notice of such meetings.

n.  Members of the Medical Staff are eligible to run in public election for membership on the Board of Directors in the same manner as any other member of the public.

**Section 2.**  **MEDICAL STAFF (ACTIVE, COURTESY, CONSULTING, & PROVISIONAL)**

a.  General qualifications and membership on the Medical Staff of the District shall be extended only to practitioners who are professionally competent and continuously meet the qualifications, standards, and requirements as set forth in the Medical Staff Bylaws and Rules. Medical Staff membership (except Honorary Medical Staff) shall be limited to practitioners who are currently licensed or qualified to practice medicine, dentistry, podiatry or oral surgery in California.

**Section 3.**  **TEMPORARY MEDICAL STAFF PRIVILEGES**

Temporary privileges may be granted by the CEO (or designee), on the recommendation of the Chief of Staff or the chief of the appropriate service, or either's designee. All persons requesting or receiving temporary privileges shall be bound by the Medical Staff Bylaws and Rules, as well as the

20

Board of Directors Bylaws. Temporary privileges shall automatically terminate at the end of 120 consecutive days, but may be terminated earlier. A determination to grant temporary privileges shall not be binding or conclusive with respect to an applicant's pending request for appointment to the Medical Staff.

**Section 4.**  **HONORARY MEDICAL STAFF**

Members of the Honorary Medical Staff shall be appointed by the Board of Directors from among former members of the Medical Staff who have retired from active practice, or other members of the medical profession who, in the opinion of the Board of Directors, are of such professional eminence as to merit this honor. Such members shall not vote on the business of the Medical Staff but may attend meetings, educational programs, and may be accorded the privileges of the floor.

**Section 5.**  **QUALITY OF CARE/PATIENT SAFETY AND PERFORMANCE IMPROVEMENT PROGRAM**

a.   The Board of Directors shall assure that there is an efficient, effective, comprehensive and integrated solution focused Quality of Care/Patient Safety and Performance Improvement Program.

b.   The Board of Directors delegates the authority and responsibility for carrying out the Quality of Care/Patient Safety and Performance Improvement Program to the Active Medical Staff and CEO, who, in turn, shall demonstrate to the Board the effectiveness of such program for quality assurance. The Medical Staff Bylaws shall include a standing Performance Improvement Committee. Membership of the Performance Improvement Committee shall include an equal number of active Medical Staff and appropriate District staff.

c.   The Medical Staff and District staff will implement and report on the activities and mechanisms for monitoring and evaluating the quality of patient care, for identifying and resolving patient care problems, and for identifying opportunities to improve patient care within the District.

d.   The quality assurance mechanisms within any of the District's facilities shall provide for monitoring of patient care processes to assure that patients with the same health

21

conditions are receiving the same level of care within the District.

## ARTICLE VIII

### NONDISCRIMINATION POLICY

The District, including its members of the Board of Directors, officers, employees and agents, shall not engage in discrimination on the basis of actual or perceived age, ancestry, religious creed, race, color, national origin, sex, religion, physical or mental disability, medical condition, political beliefs, sexual orientation, and/or marital or family status.

## ARTICLE IX

### SEVERABILITY

If any article, subsection, paragraph, sentence, clause or phrase of the District Bylaws is for any reason held to be in conflict with the provisions of The Local Health Care District Law or any other law, statute, rule or regulation, such conflict shall not affect the validity of the remaining portion of the District Bylaws.

## ARTICLE X

### CONFLICTS OF INTEREST

**Section 1.**   **CONFLICTS OF INTEREST**

Pursuant to Section 1090 of the Government Code, members of the Board and officers of the District shall not be financially interested in any contract made by them in their official capacity, or by the District or anybody or board of which they are members.  Members of the Board or officers of the District shall not be purchasers at any sale or vendors at any purchase made by them in their official capacity.

The Administration Policy Manual of Tulare Regional Medical Center and the Board of Directors Policy Manual has a written Conflict of Interest Policy which requires the completion and filing of a Conflict of Interest Statement disclosing financial interests that

22

may be materially affected by official actions and provides that designated staff members must disqualify themselves from acting in their official capacity when necessary in order to avoid a conflict of interest. The requirements of this policy are additional to the provisions of Government Code Section 87100 and other laws pertaining to conflict of interest; and nothing herein is intended to modify or abridge the provisions of the policies of Tulare Regional Medical Center which apply to:

A.    Members of the Board of Directors
B.    The executive staff of the District;
C.    All management personnel of any District
      Health care facility.

Each member of the Board of Directors and specified executives must file an annual Conflict of Interest Statement as required by California Code.

The Board shall assess the adequacy of its conflict-of-interest/confidentiality policies and procedures at least every three (3) years.

**Section 2.    PERMISSIBLE INTERESTS**

The Board of Directors may approve a proposed transaction in which a member of the Board or officer of the District has only a remote interest, as defined by Government Code sections 1091 through 1091.5, or other interest allowed by law, upon the disclosure of such interest pursuant to the requirements of Government Code section 1091, the Local Health Care District Law, or other applicable laws.

**Section 3.    DUTY TO DISCLOSE**

Members of the Board of Directors and officers of the District shall disclose any potential conflict to the Board of Directors prior to entering into any transaction entered by the District, and prior to participation in any related meetings, negotiations, discussions or other matters related to the transaction. Members of the Board of Directors and officers of the District shall abstain from participating in meetings, negotiations, discussions or other matters relating to a transaction in which the Board Member or officer of the District has a conflict of interest.

23

# ARTICLE XI

## INDEMNIFICATION

**Section 1.** **ACTIONS OTHER THAN BY THE DISTRICT**

The District shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the District) by reason of the fact that he or she is or was a director, officer, employee or agent of the Hospital District, or is or was serving at the request of the District as a director, officer, employee or agent of another corporation, partnership, join venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding if he or she acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the District, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The District shall indemnify any person, only as to that person's actions acting within the scope of his or her employment and/or authority as a director, officer or agent of the Hospital District. Willful acts outside the scope of any person's employment and/or authority of his/her position shall be investigated as to whether indemnification will be provided on a case by case basis. The termination of any action, suit or proceeding any judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Hospital District, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful. Indemnification shall not be considered when any action, after a good faith investigation has transpired, has been deemed as unlawful.

**Section 2.** **ACTION BY THE DISTRICT**

The District shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the District to procure a judgment in its favor by reason of the fact that he or she is or was a director officer, employee or agent of the District, or is or was serving at the request of the District as a director, officer, employee

24

or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection with the defense or settlement of such action or suit if he acted within the scope of his authority and in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the District and except that no indemnification shall be made in respect of any claim issue or matter as to which such person shall have been adjudged to be liable to the District, unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

**Section 3.**   **AUTHORIZATION OF INDEMNIFICATION**

Any indemnification under Sections (a) and (b) above shall be made by the District only as authorized in the specific case upon a determination that indemnification of the director, officer employee or agent is proper in the circumstances because he or she has met the applicable standard of conduct set forth therein.  Such determination shall be made:  (a) by the Board of Directors by a majority vote of a quorum consisting of members who were not parties to such action, suit or proceeding; or (b) if such quorum is not obtainable, or, even if obtainable a quorum of disinterested members so directs, by independent legal counsel in a written opinion; or (c) by the sole member.

**ARTICLE XII**

**AMENDMENTS**

**Section 1.**   **AMENDMENT BY MAJORITY**

The District Bylaws may be amended by affirmative vote of majority of the total members of the Board of Directors at any Regular or Special meeting of the Board of Directors, provided a full statement of such proposed amendment shall have been sent to each member of the Board of Directors not less than seven (7) days prior to the meeting.

25

**Section 2.** **ACTION TO AMEND**

Affirmative action may be taken to amend the District Bylaws by unanimous vote of the entire membership of the Board of Directors at any Regular or Special meeting of the Board of Directors in which event the provision for seven (7) days notice shall not apply.

_____

President, Board of Directors

_____

Secretary, Board of Directors

Adopted by the Board of Directors on May 22, 2013

26

# EXHIBIT 2

# Management Services Agreement

## between

## HealthCare Conglomerate Associates, LLC

## and

## Tulare Regional Medical Center

MAY 29, 2014

i

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement ("**Agreement**") is made and entered into effective as of ___/\\A-4___  -C, 2014 ("**Effective Date**"), by and between HealthCare Conglomerate Associates, LLC, a California limited liability company ("**Manager**"), and Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center (the "**District**"). This Agreement supersedes that certain Management Services Agreement dated as of January 10, 2014 between Manager and the District.

## R E C I T A L S:

WHEREAS, the District owns and operates an acute care hospital at 869 North Cherry Street in Tulare, California (the "**Hospital**") together with the Clinics and Other Facilities;

WHEREAS, the parties have determined that Manager's provision of services in accordance with the terms of this Agreement will further the ability of the District (1) to provide for efficient delivery of health care services; (2) serve the best interests of the communities served by the District; and (3) enhance the ability of the parties to effectively and efficiently provide health care for the communities served by the District;

WHEREAS, the parties intend that this arrangement will allow them to achieve a number of mutually beneficial objectives, including the following: (1) further the development of a community-based integrated health care system; (2) enhance the quality of health care services available to residents of the communities served by the District; (3) respond to the health care needs and cost concerns of community residents by allowing evaluation of existing services and addition of new services, as deemed appropriate by Manager; (4) achieve efficiencies through coordination, consolidation, or reorganization, as appropriate, of certain identified health care services; and (5) improve the capacity of the parties and their affiliates to recruit and retain physicians necessary to serve the health care needs of the community, develop linkages with other providers and payers, and expand the geographical service area of the District;

WHEREAS, Manager has heretofore expended considerable effort and resources, including, but not limited to, financial resources and independent consultants, to review and analyze information regarding the Hospital provided by the District; and

WHEREAS, the District desires to engage Manager, and Manager desires to be engaged, to manage the operations of the District upon the terms set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the premises and the mutual undertakings and representations herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to become legally bound, hereby agree as follows:

## AGREEMENT

1.  **Definitions**.

All capitalized terms not defined elsewhere in this Agreement shall have the following meanings, unless a different meaning clearly appears from the context:

(a)  "Acquisition Proposal" shall have the meaning set forth in Section 9(b)(ii).

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(b)　"Affiliate" means any other firm, partnership, association, corporation, joint venture or public body, directly or indirectly controlling or controlled by, or under direct or indirect common control with, the District or Manager. The term "control," when used with respect to a particular Person, means the possession, directly or indirectly, of the power to direct or cause the direction of management in the policies of such Person whether through the ownership of voting stock, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(c)　"Annual Budget" shall have the meaning set forth in Section 4(f)(i)."Bond Indenture" means that certain Indenture of Trust dated as of November 1, 2007 between the District and U.S. National Bank Association, as trustee.

(e)　"Bonds" shall have the meaning set forth in Section 9(a)(i).

(f)　"Buildings" means those buildings and other structures in which the Operations, now or hereafter are conducted, together with such other buildings and structures now or hereafter owned, leased or otherwise operated by the District that Manager elects, in its sole and absolute discretion, to operate hereunder, by notice to the District from time to time.

(g)　"Chief Executive Officer" shall have the meaning set forth in Section 4(a)(i)

(h)　"CIA" shall have the meaning set forth in Section 5(a).

(i)　"Claims" shall have the meaning set forth in Section 4(v)(x)(4).

(j)　"Clinics and Other Facilities" means those facilities and businesses identified on **Exhibit A** to this Agreement, together with such other facilities and clinics owned, leased or otherwise operated by the District that Manager elects, in its sole and absolute discretion, to manage hereunder, by notice to the District from time to time.

(k)　"CMS" means the Centers for Medicare and Medicaid Services.

(l)　"Collections" shall have the meaning set forth in Section 4(g)(i).

(m)　"Compliance Plan" shall have the meaning set forth in Section 5(a).

(n)　"Consultants" shall have the meaning set forth in Section 4(b)(xii).

(o)　"Contract Document" shall have the meaning set forth in Section 4(v)(ii).

(p)　"Controlling Person" means any Person, who acting alone or with others, has the ability to directly or indirectly influence, direct, or cause the direction of the management, expenditure of money, or policies of a Person submitting an Acquisition Proposal, including any shareholder owning, directly or indirectly, legally or beneficially, more than 5% of the equity of such Person submitting an Acquisition Proposal, a management company or similar service provider (together with a Person who is a Controlling Person of such management company or other business entity) and any other individual who, because of a relationship of any nature with the Person submitting an Acquisition Proposal or its owners, or managers, is in a position of actual control or authority with respect to the Person submitting an Acquisition Proposal, without regard to whether the individual is formally named as an owner, manager, director, officer, provider, consultant, contractor, or employee of the Person submitting an Acquisition Proposal.

2

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(q)     "CPI" shall have the meaning set forth in Section 6(b)(i).

(r)     "CPI Increase" shall have the meaning set forth in Section 6(b)(ii)(1).

(s)     "Depository" shall have the meaning set forth in Section 4(g)(i).

(t)     "Depository Account" shall have the meaning set forth in Section 4(g)(i).

(u)     "District Default" shall have the meaning set forth in Section 10(a).

(v)     "Emergent Expenses" shall have the meaning set forth in Section 4(f)(ii).

(w)     "Employee Lease Payment" shall have the meaning set forth in Section 4(b)(viii).

(x)     "GAAP" means United States generally accepted accounting principles and practices as in effect from time-to-time as applied by Manager.

(y)     "Governing Body" shall have the meaning set forth in Section 3(a).

(z)     "Governmental Authority" means any federal, State or local judicial, executive or legislative body or governmental municipality, department, commission board, agency or authority, including government contractors for federal health programs, and including without limitation, the State of California – Health and Human Services Agency Office of Statewide Health Planning and Development.

(aa)    "Governmental Depository Account" means a Depository Account established for the sole purpose of receiving checks, wire transfers and other forms of electronic payments governed under the Social Security Act (42 U.S.C. §§ 1395 et seq.), including payments under Medicare, Medicaid and TRICARE/CHAMPUS, and payments administered or regulated by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services (collectively "**Governmental Health Payers**").

(bb)    "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated pursuant thereto.

(cc)    "Hospital" shall have the meaning set forth in the Recitals.

(dd)    "Hospital Law" means California Health and Safety Code §32000 et seq.

(ee)    "Ineligible Person" shall have the meaning set forth in Section 5(f).

(ff)    "Interim Operating Agreement" shall have the meaning set forth in Section 9(a)(i).

(gg)    "Jeopardy Event" shall have the meaning set forth in Section 10(d)(ii).

(hh)    "Law" means any constitutional provision, statute, ordinance, or other law, rule, regulation, interpretation, judgment, decree, or order of any Governmental Authority or any settlement agreement or compliance agreement with any Governmental Authority, including Hospital Law, as the foregoing may be revised, replaced or amended from time to time.

3

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(ii)     "Leased Employees" shall have the meaning set forth in Section 4(b)(ii).

(jj)     "Long Term Operating Agreement" shall have the meaning set forth in Section 9(a)(ii).

(kk)    "Manager" has the meaning set forth in the Preamble.

(ll)     "Manager Default" shall have the meaning set forth in Section 10(c).

(mm)   "Manager Parties" shall have the meaning set forth in Section 3(e)(i).

(nn)    "Master Account" shall have the meaning set forth in Section 4(g)(iii).

(oo)    "Medical Staff" shall have the meaning set forth in Section 3(e)(i).

(pp)    "Medical Staff Recommendations" shall have the meaning set forth in Section 3(e)(i).

(qq)    "Net Adjusted Management Fee" shall have the meaning set forth in Section 6(b)(ii)(2).

(rr)     "OIG" means the Office of Inspector General of the Department of Health and Human Services.

(ss)    "Operating Contracts" shall have the meaning set forth in Section 4(n)(ii).

(tt)     "Operating Period" shall have the meaning set forth in Section 2(a).

(uu)    "Operations" means the healthcare and other operations and programs which are conducted at the Hospital and the Clinics and Other Facilities, as the same may be modified by Manager from time to time during the Operating Period.

(vv)    "Person" means an association, a corporation, a limited liability company, an individual, a partnership (general or limited), a trust, a hospital district organized under the Hospital Law, or any other entity or organization, including a Governmental Authority.

(ww)   "PHI" shall have the meaning set forth in Section 4(s)(iv).

(xx)    "Pre-existing Claims" shall have the meaning set forth in Section 4(v)(x)(5).

(yy)    "Project" shall have the meaning set forth in Section 4(v)(i).

(zz)    "State" means the State of California.

(aaa)   "Statement" shall have the meaning set forth in Section 4(b)(viii).

(bbb)   "Suspended" shall have the meaning set forth in Section 9(b).

(ccc)   "Termination Fee" shall have the meaning set forth in Section 10(b)(i).

4

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

2. **Operating Period**

    (a)    Initial Operating Period. The initial term of this Agreement shall commence on the Effective Date and end on the date fifteen (15) years thereafter (as such initial term may be renewed pursuant to Section 2(b), the "Operating Period").

    (b)    Extension of Operating Period. Upon completion of the initial Operating Period or of any subsequent renewal Operating Period, this Agreement shall automatically renew for an additional 10-year period unless either party shall send a written notice of intent not to renew the Agreement to the other party not less than twelve (12) months prior to the end of the initial Operating Period or then current renewal Operating Period, as applicable. Each renewal Operating Period shall be on the same terms and conditions set forth herein. Notwithstanding the foregoing, nothing herein is intended to permit the Operating Period to exceed such time period as is permissible under any tax-exempt bond financing requirements under applicable Law, with respect to bonds issued by the District on or prior to the date hereof, or hereafter issued with the concurrence of Manager. In the event the Operating Period exceeds any permissible time period, then the Operating Period shall be conformed to the maximum time period permitted under applicable Law.

    (c)    Irrevocability of Agreement. The District acknowledges and agrees that Manager is entering into this Agreement in reliance on the long term nature of this Agreement, and further acknowledges that the rights, duties, powers and authority of each of the parties hereto, are intended to be non-terminable throughout the Operating Period, except in accordance with the express provisions of this Agreement. The District acknowledges that neither party will achieve the benefits intended to be achieved if the District has any continuing right or power to terminate this Agreement, or the relationship hereby created, except in accordance with the express provisions of this Agreement. Accordingly, the District, as a substantial inducement to Manager to enter into this Agreement and provide its proprietary systems and knowledge, hereby irrevocably waives and relinquishes any right, power or authority existing at law or in equity to terminate this Agreement, except in strict accordance with the express provisions of this Agreement. The parties further hereby acknowledge that any breach of this Section will cause irreparable and permanent damage to Manager, not compensable by money damages.

3. **General Responsibilities of the Parties.**

    (a)    Appointment. The District hereby engages and appoints Manager, and Manager hereby accepts such engagement, to exclusively provide day-to-day management services to and for the District with respect to the Hospital and the Clinics and Other Facilities. Anything herein to the contrary notwithstanding, Manager's authority hereunder shall be limited as described in Section 3(b), and Manager shall otherwise perform its services hereunder in accordance with Section 5. Manager's duties shall include but are not limited to financial and operating system management, preparation of proposed annual budgets, purchasing, contracting support and relationship management, expansion of the Hospital and the Clinics and Other Facilities or the services offered, preparation and implementation of staffing plans, recruitment of personnel, and supervision of the day-to-day operations of the Hospital and the Clinics and Other Facilities. Manager shall perform its services hereunder in accordance with the District Bylaws, the policies lawfully adopted by the Board of Directors of the District (the "**Governing Body**") and applicable Law. It is understood and agreed that to the extent that (i) Hospital Law is in conflict with any of the District's Bylaws, then Hospital Law shall control or (ii) the District's Bylaws or policies conflict with the terms hereof, the terms hereof shall control.

5

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(b)     General Control of the District.

(i)     Manager expressly acknowledges and agrees that the District exercises, and at all times during the Operating Period, shall exercise the ultimate control and direction of the Operations. Subject to the provisions of Section 3(a), Manager shall operate within the reasonable parameters, policies and procedures adopted by the Governing Body and communicated to Manager by the District, (and provided that such parameters, policies and procedures do not, in Manager's reasonable judgment, jeopardize the quality of patient care provided at the Hospital and the Clinics and Other Facilities, or require Manager or the District to engage in any illegal or unethical acts, or breach any express provision of this Agreement or any other agreement of the parties). Notwithstanding the ultimate control to be exercised by the Governing Body, Manager shall comply with its obligations under this Agreement, provided that the District shall not interfere with its ability to do so.

(ii)     Notwithstanding anything to the contrary herein, any change in the licensure type, payment model chosen by the Hospital, classification or operations of the Hospital other than as a Medicare participating acute care hospital that is paid through the Medicare Prospective Payment System (Social Security Act §1886(d)), shall be subject to the prior written approval of the Governing Body and Manager.

(iii)     The District shall timely furnish Manager with sufficient funds to timely pay the expenses relating to the Operations, including funding of both operating expenses and non-operating expenses. Subject to the more expedient funding requirements set forth in Section 4(b)(viii), if funds in the Master Account are insufficient, Manager shall notify the District of the need for funds by submitting Manager's fund request to the District and the District shall supply the requested funds within three (3) days of Manager's notice to the District of the need for same, provided that for unanticipated Emergent Expenses, Manager shall have the right to provide a shorter notice period. Manager shall not be obliged to fund the District expenses hereunder or provide funds to accommodate shortfalls in revenue, however, Manager may, in its sole and absolute discretion, advance funds as provided in Section 4(j)(i)(1). Manager shall not be in default hereunder if Manager's failure to comply with the terms of this Agreement is due to the lack of adequate funds provided by the District.

(iv)     The District shall assure that its funds are used to support the Hospital and the Clinics and Other Facilities and to provide charitable care therein and are not diverted to other uses.

(c)     Cooperation and Responsiveness.

(i)     The District and its Governing Body shall fully and timely cooperate in good faith with Manager and shall be responsive and available to Manager during the Operating Period in order that Manager can carry out its duties and obligations hereunder.

(ii)     In any instance in which the District (or the Governing Body) has an obligation to provide input or decide an issue, or provide (or withhold) its approval or consent under the terms of this Agreement, the District (or the Governing Body) shall do so in accordance with the provisions of Section 11(o). Unless a specific period of time is set forth herein for a particular act, a reasonable period of time for the District to provide input or decide an issue, or provide (or withhold) its approval or consent shall generally be within five (5) to seven (7) calendar days.

6

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(iii)　In addition to its obligation to provide funds, the District will timely provide Manager with the necessary equipment, information and other resources to enable Manager to fully and timely perform its services hereunder.

(iv)　Manager shall provide up to five (5) hours of consultation to the District on a monthly basis regarding the Operations and the services provided hereunder. If requested to do so, Manager will provide additional consulting services for the District. Such services and the charge therefor will be determined by Manager and the cost thereof shall be billed to the District pursuant to Manager's then current terms and conditions, and the District shall pay such amount within thirty (30) days of invoicing.

(d)　Relationship.

(i)　Except as specifically authorized hereunder, the District shall not interfere, directly or indirectly, with Manager's decisions or the daily Operations, and shall not interfere with Manager's ability to perform its obligations hereunder. The District representatives shall not access the Hospital and the Clinics and Other Facilities, except upon prior arrangement with Manager, except in the event of emergency. Except upon request of Manager, individual members of the District's Governing Body, shall not issue directions to Manager, except following and in accordance with the formal actions of the District's Governing Body. The District shall not access data systems utilized in connection with the Operations, unless specifically authorized by Manager in each instance.

(ii)　The District representatives' communications, formal and informal, regarding Manager and the Operations with Persons associated or affiliated with the Operations or Manager, shall be conducted exclusively with Persons designated by Manager's Chief Executive Officer.

(iii)　Neither the District nor its Governing Body shall (nor cause or encourage others to) disclose confidential or negative information regarding, or take any action or omit to take any action that is materially detrimental to the reputation of (anything which might tend to bring a party into public disrepute, hatred, contempt, scorn, scandal, or ridicule, or which might tend to reflect unfavorably on or otherwise degrade such party), Manager or any of the other Manager Parties, or make any statements, verbally, in writing or otherwise, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of Manager, or of the other Manager Parties, to anyone other than Manager's Chief Executive Officer. Notwithstanding the foregoing, negative information may be discussed within official the District Governing Body meetings and in connection with its internal operations, provided that if such information is used in a non-confidential forum, the District shall use reasonable efforts to verify the veracity and objectivity of such information prior to disclosing same in a non-confidential forum. However, nothing herein shall prevent the District or any member of its Governing Body from testifying truthfully in a legal proceeding or governmental administrative proceeding. the District acknowledges and agrees that this prohibition extends to statements, written or verbal, made to anyone, including but not limited to, the news media, bondholders, industry analysts, competitors, strategic partners, vendors, employees (past and present), and clients.

(iv)　The parties acknowledge that: (1) this Section is a material provision of this Agreement; (2) any breach of this Section shall be a material breach of this Agreement, and (3) a breach of this Section would cause irreparable harm.

7

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(e)    <u>Medical and Professional Matters</u>.

(i)    All medical and professional matters relating to the care and treatment of patients requiring professional medical judgment shall remain the responsibility of the District medical director(s) and medical staff of the Hospital (the "**Medical Staff**"), provided, however, that Manager, in accordance with <u>Cal. Admin.Code</u> Regs., tit. 22, § 70701 and § 70703(b) and 42 C.F.R. § 482.12(a) and § 482.22, shall be obliged to (i) recommend written bylaws for adoption by the District in accordance with legal requirements and the District's community responsibility regarding the appointment and reappointment of members of the Medical Staff, which bylaws may or may not be consistent with the current bylaws in order to provide the most efficient, highest quality care practicable given the Hospital's size, location and resources, and (ii) provide recommendations to the District regarding Governing Body approval of Medical Staff by-laws (collectively "**Medical Staff Recommendations**"). It being the goal of the parties to establish and implement a medical staff development plan (the "**Medical Staff Development Plan**") that will lead to the establishment of a medical staff which is configured to (a) provide high quality care through a patient centered approach (b) be accountable for the care delivered and the efficiency of that care. The Medical Staff Development Plan shall be consistent with the provisions of 42 C.F.R. pt. 425, without regard to whether the District is a recognized accountable care organization.  The parties recognize that changes established pursuant to the Medical Staff Development Plan implementation may result in a smaller more accountable Medical Staff being appointed.   The District shall be deemed to have accepted Manager's Medical Staff Recommendations unless the District's Governing Body (i) within thirty (30) days of written notice of such Medical Staff Recommendation with good cause (which shall be specifically set forth in writing) specifically votes to disapprove the Medical Staff Recommendation and (ii) such vote is by a 4/5ths majority vote of the Governing Body, after Manager has been provided a reasonable opportunity to explain and/or justify the Medical Staff Recommendation before the members of the Governing Body.  The Medical Staff shall be organized and shall function in compliance with applicable Law and other licensure, certification, and accreditation standards as they may be amended from time-to-time.  Subject to the foregoing, final decision-making authority relating to all matters of medical, professional, and ethical affairs, are and shall be the exclusive responsibility of the District.   Manager and its Affiliates, and their respective officers, directors, managers, members, employees, agents, contractors and representatives (collectively, "**Manager Parties**") expressly do not, by this Agreement, undertake to perform or provide any physician or medical services to patients.  Except as provided with respect to Medical Staff Recommendations, all matters requiring or involving professional medical judgments or medical issues shall remain the responsibility of the District and its Medical Staff.  Manager and Manager Parties shall not be responsible in any manner for the acts, omissions or conduct of any member of the Medical Staff, or other credentialed health care providers or practitioners.  Neither Manager nor Manager Parties shall be liable to any patient or other Person for damages arising out of or resulting from any medical treatment, or act or omission by, or dishonesty or misconduct of, any servant or employee of the Hospital and the Clinics and Other Facilities, any physician or other credentialed health care provider providing physician or medical services at the Hospital or the Clinics and Other Facilities, or any agent of the Hospital and the Clinics and Other Facilities (other than for the direct acts of agents of Manager and Manager Parties, which shall not include any physicians, health care professionals or the District employees). However, Manager and Medical Staff shall consult with each other regarding such matters where consultation is feasible and in the best interest of the patients of the District.

(ii)    Subject to <u>Subsection 3(e)(i)</u>, Manager shall provide such oversight and support as Manager, in its sole and absolute discretion, deems appropriate for the Medical

8

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

Staff's administrative affairs, including monitoring the performance of professional services by the Medical Staff and other licensed personnel.

(iii)     Subject to the Medical Staff Recommendations, the District retains control and authority over all appointments to the District's Medical Staff, the granting of clinical privileges at the District to the extent required by applicable Law and applicable accreditation standards, and any actions taken with respect to Medical Staff members, including appeals of actions.  Actions taken by the District pursuant to this Subsection shall be consistent with the Medical Staff Development Plan.  Notwithstanding the foregoing, the Chief Executive Officer or his or her designee may grant an individual temporary clinical privileges for a period not to exceed the greater of (i) one hundred twenty (120) days or (ii) such period as is allowed under applicable Law, all in accordance with accreditation agency requirements and the District's Bylaws.

(f)     Standards of Performance.  The District acknowledges that while Manager shall expend its commercially reasonable efforts in performing its obligations under this Agreement, Manager does not guarantee any particular results, notwithstanding projections which may be made by Manager.  Manager's projections and forward looking statements are based on estimates and expectations, and reasonably available competitive, financial, economic and other data, and as a result are inherently uncertain.  Actual results could differ materially from those anticipated as a result of a variety of factors.  Manager shall use its commercially reasonable judgment in providing the services required under this Agreement.  The parties acknowledge that implementation of the District's charitable care purposes may not permit the maximization of the District's profits.  Manager shall, for and on behalf of the District, use commercially reasonable efforts to make recommendations and take actions required hereunder to assist the District to comply in all material respects with any material Law respecting the Hospital and the Clinics and Other Facilities.  The District covenants that it will, in good faith, consider all of Manager's recommendations regarding the Operations, and will support and implement, through policies and/or other appropriate actions of the Governing Body, the recommendations it deems reasonably appropriate.  The District is a California Health Care District organized and operating under the Hospital Law with, inter alia, a charitable mission, and it has under the Hospital Law certain responsibilities and obligations, including, but not limited to, obligations to provide charity care and indigent care.  At all times, Manager, in managing the District, shall follow the charity and indigent care policies and obligations of the District (provided that the Hospital and the Clinics and Other Facilities' financial obligations in that regard shall not be materially changed unless such change is required by applicable Law) and shall assist the District in meeting all of the District's required obligations under Hospital Law, the District will promptly notify Manager of any changes to any policy, procedure, or the District Bylaw which may impact Manager's rights or obligations under this Agreement, including but not limited to, those affecting the Hospital and the Clinics and Other Facilities' charity care obligations.

4.     **Duties of Manager.**

(a)     Hospital Chief Executive Officer.

(i)     Manager shall provide a Chief Executive Officer ("**Chief Executive Officer**") to provide the routine, day-to-day administrative and management services for the Hospital and the Clinics and Other Facilities, as set forth herein.  Such Chief Executive Officer shall carry out the usual and customary duties of such positions within the health care industry.  The Chief Executive Officer shall be an employee of Manager, as provided in Section 4(b). Notwithstanding anything to the contrary in this Agreement, the Chief Executive Officer's authority shall be at least as extensive as the authority the District delegated to the District's former chief

9

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

executive officer (as of the end of 2013), together with such additional authority as is provided in the District's Bylaws. However, it is specifically agreed that the restriction on the authority of the Chief Executive Officer set forth in <u>Section 2(q)</u> of the District's Bylaws (regarding submittal of certain expenditures over $100,000 to the Governing Body) shall not be a limitation on the authority of the Chief Executive Officer. Any duties and/or responsibilities beyond the foregoing will be discussed and agreed upon by Manager and the Governing Body and will be provided by Manager pursuant to the terms of a separate written agreement in exchange for fair market value compensation, and in compliance with applicable Law.

(ii)     The Chief Executive Officer shall: (i) serve as the District's authorized representative to the public, as well as to Governmental Authorities or voluntary organizations; (ii) report regularly to the Governing Body on the performance of the Hospital; (iii) assist the District with the development of strategies and action plans enabling the District to respond to the health care needs of individuals residing in communities served by the District; and (iv) direct the District in expanding its community relations program.

(b)     <u>Personnel</u>.

(i)     As soon as reasonably practicable, as determined by Manager, following the Effective Date, Manager shall be and become the exclusive employer / contractor of the personnel of the Hospital and the Clinics and Other Facilities required for the day-to-day Operations, except for those employees who must be employed by the District in order to comply with applicable Law (e.g., 42 C.F.R. § 482.28). Manager shall provide advance notice to the District of the date or dates upon which Manager shall elect to become the employer of the personnel of the Hospital and the Clinics and Other Facilities, as provided herein. Such employee transition may be made in one or more stages, as determined by Manager.

(ii)     Upon Manager's becoming the employer of the employees associated with the Hospital and the Clinics and other Facilities, Manager shall lease the employees associated with the Hospital and the Clinics and Other Facilities (the "**Leased Employees**") to the District during the Operating Period, on the terms set forth in this <u>Section 4</u>. Prior to Manager's becoming the employer of such employees the District shall be the employer of the employees and shall be responsible for paying such employees in accordance with its regular payroll practices.

(iii)     The Leased Employees shall be employees of Manager for purposes of Manager's benefit programs or plans now existing or hereafter created, including compensation and payment and withholding of federal, state and local income, social security, unemployment, Medicare, other payroll and employment taxes, Section 125 plans, Section 403(b) annuities, workers' compensation and health insurance. Manager is solely responsible for the administration of employee benefits, benefit plans and programs for the Leased Employees. All expenses and charges incurred in connection with the Leased Employees shall be reimbursed to Manager by the District.

(iv)     Manager pays compensation to its employees for certain holidays and vacations. Any paid holidays and vacation occurring during the Operating Period hereof shall be billed to the District at the same rates as if the employee was working.

(v)     Manager reserves the right of direction and control over the Leased Employees, including a right to terminate Manager's employment relationship with a Leased Employee in Manager's sole and absolute discretion. Manager shall recruit, employ, train,

10

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

promote, direct and terminate the employment of Leased Employees, as needed for the Operations, and shall provide oversight and consultation regarding performance standards, personnel policies, and employee benefits.

(vi)     Manager shall be responsible for the development and implementation of policies and practices, in conformity with the terms of this Agreement, relating to personnel management services only, including without limitation, enrolling, recruiting, interviewing, selecting, training, evaluating, replacing, supervising, disciplining, reassigning and terminating Leased Employees.

(vii)     While performing services for the District, the Leased Employees will be subject to all work rules and performance standards applicable to Manager's employees and contractors, including disciplinary standards.

(viii)     Manager shall have the right to draw from the Master Account, or if such amount is not sufficient, the District shall pay to Manager the estimated amount of the Employee Lease Payment for each payroll cycle payment date within two (2) days of a request from Manager for such funds. Within ten (10) days after the close of each month, Manager shall deliver to the District a statement of the actual Employee Lease Payment(s) for the prior month (the "**Statement**"). At the District's written request, Manager shall provide the District reasonable supporting detail underlying the calculations of the Employee Lease Payment(s). If the Statement discloses that actual Employee Lease Payments were less than the estimated Employee Lease Payments for the applicable prior month, then Manager shall refund the excess to the District or redeposit such amount in the Master Account, as Manager shall determine appropriate. If the Statement discloses that actual Employee Lease Payments were more than the estimated Employee Lease Payments for the applicable prior month, then Manager shall be paid the shortfall by the District within one (1) business day or shall withdraw such amount from the Master Account, as Manager shall determine appropriate. If the District fails to timely advance funds for the Employee Lease Payment, Manager shall have the right, in its sole and absolute discretion, but not the obligation, to advance such funds, as provided in Section 4(j)(i)(1).

(ix)     The payment for the applicable period, with respect to each Leased Employee (the "**Employee Lease Payment**"), shall be an amount equal to 130% of the compensation (including, without limitation, wages, salary, compensation, employee benefits, insurance, workers' compensation coverage, unemployment compensation coverage, taxes, withholdings, contributions, commissions, bonuses and travel and business expenses), retirement, workers' compensation premiums and benefit amounts payable with respect to a Leased Employee, and taxes thereon.

(x)     Manager shall confer with the District in determining the general range of the number and qualifications of employees required for the efficient and effective operation of Hospital and the Clinics and Other Facilities and in establishing and revising in-service training programs, and job descriptions, all in order to accomplish the goals and objectives of Hospital and the Clinics and Other Facilities. However, Manager shall have the ultimate authority to hire, fire and set the terms of employment for all such employees. To discourage nepotism and conflicts of interest, the District and its representatives agree that they shall not request or require that Manager: (i) hire or fire any specific employee or amend the terms of any specific employee's employment, (ii) dictate the specific number of employees in a category of employment or (iii) select, reject or promote a Leased Employee or contractor (or it's' personnel) based on the individual's political affiliation or beliefs or as a reward for political services or as a form of political

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

patronage, directly or indirectly. Likewise, the District shall not refer potential employees or contractors to Manager for hiring or engagement.

(xi)     During the Operating Period and for a period of two (2) years thereafter, the District and its Affiliates shall not, directly or indirectly, solicit for employment any Leased Employee.

(xii)    Manager may hire or retain any consultants, accountants, attorneys or other professional personnel (collectively, "**Consultants**") which Manager, in its sole and absolute discretion, determines is necessary or appropriate to assist Manager in carrying out its duties and responsibilities under this Agreement.  The expense of any Consultants so retained shall be an expense of the District, but Manager shall not retain any such Consultants without the approval of the Governing Body, if the cost of such services shall exceed $100,000 in any calendar year for such services, unless otherwise set forth in the approved Annual Budget.

(xiii)   Manager, during the transition of Leased Employees from the District hereunder, shall not implement any employee layoffs that could implicate the Worker Adjustment and Retraining Notification Act of 1988, as amended, 29 U.S.C. §§ 2101, et seq., and any similar state and local applicable Law, without providing any required notices.  Notwithstanding anything in this Agreement to the contrary, Manager is not obligated to hire any specific District employee but may interview any or all such District employees.  Manager may, but shall not be obligated to, make offers of employment to such employees of the District as are identified by Manager in its discretion.  It is understood and agreed that (A) Manager's extension of offers of employment shall not constitute any commitment, contract or understanding (expressed or implied) of any obligation on the part of Manager to an employment relationship of any fixed term or duration or upon any terms or conditions other than those that Manager may establish pursuant to individual offers of employment, and (B) employment offered by Manager is "at will" and may be terminated by Manager or by an employee at any time for any reason (subject to any written commitments to the contrary made by Manager or an employee).  Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Manager to terminate, reassign, promote or demote any of the Leased Employees or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such employees.

(c)     Patient Safety Quality and Performance Measurement.  Manager shall assist in the implementation of the Hospital and the Clinics and Other Facilities' patient safety, quality, and performance measurement program.  Manager shall provide oversight and facilitate the Hospital and the Clinics and Other Facilities' patient safety, quality, regulatory readiness, infection control/prevention, and service excellence performance metrics.  Manager activities shall include:

(i)     Coordination, data collection/analysis and recommendation/ facilitation of evidence-based practices to address the following:

(1)     Clinical program measures, hospital-acquired conditions, and other priority patient populations;

(2)     Patient and staff safety, including the reduction of preventable adverse events;

(3)     Infection control and prevention services to include electronic surveillance, tracking and transmission of required data;

12

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(4) Regulatory and accreditation readiness and compliance tracking;

(5) Evidence-based policy and procedure development; and

(6) Patient satisfaction and loyalty.

(ii) Manager will also recommend strategies to enhance the Hospital's patient safety and quality department infrastructures, assist the Hospital and the Clinics and Other Facilities in implementation of evidence-based order sets, and disseminate best practices. The District shall be responsible for all expenses associated with surveys, licensure, permits, and accreditation.

(iii) Manager shall use reasonable efforts, on a consultative basis, to guide or direct the District in maximizing its total performance score under the Federal government's value-based purchasing programs, including but not limited to the clinical process of core measures, the patient experience of care dimensions; and in connection with the Consumer Assessment of Health Care Providers and Systems surveys.

(d) <u>Standard Forms</u>. Manager shall recommend standard formats for all charts, invoices, and other forms used in the Operations. Manager shall make reasonable efforts to ensure that such standard forms remain current as to applicable Law, as well as industry standards.

(e) <u>Revenue Cycle Management</u>. Manager shall provide advice, direction, and reasonable assistance to the District and assist it in overseeing its revenue cycle management for the Hospital and the Clinics and Other Facilities. Services provided by Manager include making recommendations regarding Hospital and the Clinics and Other Facilities':

(i) Charge master or similar schedule of charges;

(ii) Adjustment coding;

(iii) Patient / client billing and collections; and

(iv) Coding and billing compliance audits.

All direct, out-of-pocket fees, expenses and charges incurred in connection with actual revenue cycle management shall be the District expenses.

(f) <u>Annual Budget</u>.

(i) Manager shall be responsible for preparation, presentation, monitoring, and reporting of the annual operating and capital budgets (collectively, the "**Annual Budget**"). Each proposed Annual Budget shall set forth an estimate of operating revenues and expenses (including capital expenses) for the next fiscal year, together with an explanation of anticipated changes in utilization, charges to patients and clients, payroll rates and positions, non-wage cost increases, and all other factors differing significantly from the then-current year. Manager shall be responsible for the oversight and review of the Annual Budgets, with final recommendations presented to the Governing Body for approval. Each Annual Budget will be created and implemented to coincide with the District's fiscal year, which is July 1st through June

13

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

30th of the following year. Once approved, Manager shall thereafter establish a plan necessary to implement such Annual Budget.

(ii)      Subject to the limitations set forth in Section 3(f), Manager shall take commercially reasonable efforts to oversee the management of the Hospital and the Clinics and Other Facilities so that the actual revenues, costs, and expenses of the operation and maintenance of the Hospital and the Clinics and Other Facilities shall be consistent with the approved Annual Budget. Inclusion of any item within the Annual Budget shall constitute all necessary approval of the Governing Body for Manager to take such act to effectuate the budgeted item. Notwithstanding anything to the contrary herein, Manager shall have the right, in its sole and absolute discretion, to make any expenditures necessary on an emergent basis to avoid or mitigate damage to the Hospital and the Clinics and Other Facilities, obtain equipment repairs or to avoid or mitigate injury or potential injury to Persons or property or that are necessary on an emergent basis to comply with any Law or to cure or prevent any violation of any Law, whether or not provided for or within the amounts provided for in the approved Annual Budget for the applicable year (collectively, the "**Emergent Expenses**"). Manager shall use its reasonable efforts to give the District advance notice of any such Emergent Expenses, and in any event, shall give notice as soon as reasonably practicable after such expenditures, but in no event later than fifteen (15) days.

(g)      Bank Accounts.

(i)      The District shall maintain the Gross Revenue Fund (as defined in the Section 5.01 of the Bond Indenture) bank accounts (the "**Depository Accounts**") at one or more financial institutions (the "**Depository**") pursuant to the requirements of the Bonds. The District shall cause all amounts received by or on behalf of the District in connection with the operation, maintenance, or ownership of the Hospital and the Clinics and Other Facilities (the "**Collections**") to be deposited in the Depository Accounts, including a Governmental Depository Account. Amounts received from Governmental Health Payers shall, unless otherwise required by the Bonds, be deposited into a separate Governmental Depository Account. Funds in the Governmental Depository Account shall be transferred, on a daily basis to a Depository Account (other than the Governmental Depository Account), in a manner consistent with the Bond Indenture. In the event that payments on the Bonds are delinquent or the Bonds are in default, or the Bond trustee shall have otherwise taken control of the Depository Accounts or amounts to be deposited therein, the District shall use its best efforts to cause the trustee to disburse amounts in the Gross Revenue Fund for the payment of current or past due expenses of the District and hereby authorizes Manager to make such requests directly to the Bond trustee on behalf of the District.

(1)      Except to the extent inconsistent with the Bond Indenture, the District shall enter into an agreement with each Depository to cause the Depository to receive such payments and deposit them into Governmental Depository Account in the name of the District, and sweep the proceeds of such account on a daily basis, into the Depository or Master Account as designated by Manager, in conformity with the terms of the Bond Indenture.

(2)      The foregoing instructions of the District with respect to the Government Depository Account shall be revocable, at the sole instruction of the District, to the extent required by applicable Law; provided, however, that if the District revokes such instructions, it shall be in material default of this Agreement and Manager shall, in addition to all other rights hereunder, be entitled to seek an order or judgment from a court of proper jurisdiction for specific performance to sweep the Governmental Depository Account pursuant to this Agreement.

14

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(ii)     Manager, acting in the District's name and as agent of the District, as provided in Section 4(h) shall make or direct to be made timely deposits, in the Depository Accounts or the Master Account, as hereafter defined, of all Collections which Manager receives, subject to the Bond Indenture requirements.

(iii)     The District shall provide disposition instructions to the Depository to transfer, at the end of each business day during the Operating Period, subject to the terms of the Bond Indenture, all amounts in the Depository Account (other than amounts required for payment of the Bonds) into a bank account controlled by Manager (the "**Master Account**"). Except for the transfers to the Master Account and Bond payments, the District shall not remove, disburse, transfer, use, pledge, hypothecate, grant a lien on or security interest in, or otherwise encumber any funds in the Depository Accounts or Master Account.

(iv)     The District shall execute such documents as any Depository or Manager may reasonably require, including without limitation, a limited power of attorney, to permit the Depository to receive the Collections, endorse any checks, drafts, notes, money orders, cash, insurance payments, and other instruments relating to such Collections, deposit the Collections into the Depository Account, and to transfer the Collections (less amounts precluded from transfer under the Bond Indenture) each day from the Depository Account into the Master Account. The District shall be responsible for all fees, costs and expenses incurred in connection with maintaining the Depository Account, including all fees, costs and expenses of a lockbox which may be deemed desirable and appropriate by Manager; provided, however if and to the extent permitted by applicable Law and the Bonds, at the request of Manager, the Collections or any part thereof, shall be deposited directly into the Master Account.

(v)     Manager is hereby authorized to make payment from the Master Account or other accounts of the District, including the Depository Account, to itself and its Affiliates of any amounts due to it or any of them by the District under this Agreement or otherwise, including, without limitation, the Management Fee, and the reimbursement of expenses and advances, and the District acknowledges that any amounts due to Manager or any of its Affiliates under this Agreement, including without limitation, any Management Fee, shall be of at least as senior a priority as, and shall not be subordinate to the payment of, any amount due to any other creditor of Company, unless otherwise agreed to in writing by Manager and paid as provided in Section 6(f).

(vi)     Manager shall have no liability or responsibility for any loss resulting from the insolvency, malfeasance or non-feasance of any Depository with respect to the District bank accounts.

(vii)     Manager shall have the right to make disbursements from the Master Account, the Depository Account and other the District bank accounts, on behalf of the District in such amounts and at such times as the same are required to operate the Hospital and the Clinics and Other Facilities, as provided in Section 4(i) and to pay the expenses and debts incurred in connection therewith. If the District fails to timely advance funds for to pay expenses, Manager shall have the right, in its sole and absolute discretion, but not the obligation, to advance such funds, as provided in Section 4(i)(i)(1).

(h)     Charges and Collections of Accounts.

(i)     Manager shall assist the District in billing and collecting for all fees payable with respect to all services, equipment, devices and supplies provided to patients and

15

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

clients at the Hospital and the Clinics and Other Facilities, including the enforcement of the rights of the Hospital and the Clinics and Other Facilities and/or the District as creditor under any contract or in connection with the rendering of any service in accordance with the District's charity care policies. All out-of-pocket costs and expenses relating to the billing and collection services, including without limitation, any fees or expenses payable to collection agencies, shall be for the account of the District.

    (ii)  The District shall direct all third party payors to provide Manager with copies of all remittance advices in electronic format or in such other format as shall be agreeable to Manager.

    (iii)  The District hereby irrevocably appoints Manager during the Operating Period as its true and lawful attorney-in-fact to take the following actions for and on behalf of and in the name of the District and agrees to execute the Limited Power of Attorney, attached hereto as **Exhibit D** and any other instrument reasonably requested by Manager to evidence such appointment to:

      (1)  Bill patients and third party payors (including reimbursement or indemnification from insurance companies and plans, and other third party payors or fiscal intermediaries) in the name and provider number(s) of the District;

      (2)  Collect in the name of the District from patients, insurance companies and all other third party payors (other than from Governmental Health Payers), all charges resulting from the provision of items and services rendered to patients of the Hospital and the Clinics and Other Facilities, and to collect capitated payments and all other charges, fees or salaries resulting from or related to the Operations, including but not limited to any and all incentive funds and funds from shared risk and bonus pools under any risk sharing arrangements wherein the District is the provider of medical services, in whole or in part;

      (3)  Take possession of and endorse in the name of the District all cash, notes, checks, money orders, insurance payments, and any other instruments received as payment of accounts receivable for deposit into the Depository Account or Master Account or other account, as applicable;

      (4)  Deposit all such Collections directly into the Depository Account or the Master Account, other than with respect to Governmental Health Payer receivables;

      (5)  Deposit Governmental Health Payer receivables into the Governmental Depository Account;

      (6)  Make withdrawals from the Depository Account and other the District accounts for such purposes as are consistent with the provisions of this Agreement and the Bond Indenture;

      (7)  Place accounts for collection, settle and compromise claims, and institute legal action for the recovery of accounts; and

      (8)  Execute all instruments or documents necessary or appropriate in connection with the above.

16

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(iv)     With respect to Government Health Payer patients and clients, Manager shall bill the Governmental Health Payers for same in the name of and on behalf of the District.

(v)     At the District's expense, Manager shall be entitled to obtain the assistance of one or more billing and/or collection agencies to bill and/or collect sums due to the District, in accordance with the District's charity care policies and applicable Law, including, without limitation, Section 9007 of the Patient Protection and Affordable Care Act.

(vi)     Manager, on behalf of the District, may, in its name or in the name of the District, but in any event at the expense of the District, appeal or contest any action taken by any Governmental Authority against the District and/or the Operations, including, without limitation any overpayment claims, or contest by legal proceedings the validity of any Law adverse to the District and/or the Operations; provided, however, that if Manager pursues any such appeal or contest, or asserts any such legal proceeding, the District shall adequately secure and protect Manager from all loss, cost, damage or expense by bond or other means satisfactory to Manager if any action taken by any Governmental Authority against the District and/or the Operations related to such action could result in a loss, cost, damage, or expense to Manager.

(i)     Payment of Expenses.

(i)     Manager shall provide oversight of the District's funds in connection with the timely payment of the District's liabilities and other obligations.  Manager shall review the payables of the District and shall cause payment thereof to be made from the Depository Account, the Master Account and / or from funds otherwise provided by the District.  If the District fails to timely advance funds for such expenses, Manager shall have the right, in its sole discretion, but not the obligation, to advance such funds, as provided in Section 4(j)(i)(1).

(ii)     The District hereby grants to Manager, to the extent permitted by applicable Law, throughout the Operating Period, an exclusive special power of attorney and appoints Manager, to the extent permitted by applicable Law, the District's exclusive true and lawful agent and attorney-in-fact, and Manager hereby accepts such special power of attorney and appointment, to: (i) sign checks, drafts, bank notes or other instruments on behalf of the District, (ii) make withdrawals from the Depository Account, the Master Account or other the District accounts for payments specified in this Agreement and (iii) designate, remove, and change such signatories on such accounts as Manager deems necessary or appropriate from time to time.

(iii)     Upon request of Manager, the District shall execute and deliver to any applicable financial institution such additional documents or instruments as Manager may reasonably request to evidence or effect the special power of attorney granted to Manager by the District pursuant to this Section. The special power of attorney granted herein is coupled with an interest and shall be irrevocable except with Manager's written consent.

(iv)     It is specifically agreed and understood, however, that Manager's obligations under this Section 4 are subject to availability of the District funds to make such payments. Nothing contained herein shall obligate Manager to make any such payments from its own funds or resources or to advance any monies whatsoever to the District.  If the District fails to timely advance funds, Manager shall have the right, in its sole and absolute discretion, but not the obligation, to advance such funds, as provided in Section 4(j)(i)(1).  Notwithstanding the foregoing, no advance of funds hereunder shall cure the District's default resulting from a failure to timely provide funds as required hereunder.  Manager shall not be liable either primarily or as guarantor

17

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

for debts of the Hospital or the Clinics and Other Facilities, or the District under the terms of this Agreement. The District shall be responsible for payment of all legal fees and collection fees incurred by Manager if the District fails to pay its invoices timely.

(j)     Pledge of Credit.

(i)     Manager shall not engage in any financial lending, financing or banking actions that result in liens, mortgages, lines of credit, security interest or financial obligations in the name of the District, without the prior written consent of the Governing Body. Prior to requesting consent for approval, Manager shall provide a detailed proposal to the Governing Body describing the amount of required funding, the purpose of the financing, the strategic plan to generate sufficient revenue to repay such financing and all other alternatives evaluated to obtain sufficient funding.

(1)     Notwithstanding anything in this Agreement to the contrary, in the event the District fails to timely advance funds as required hereunder and/or meet any of its payment obligations under this Agreement, Manager shall have the right, but not the obligation, in its sole and absolute discretion, to advance funds or agree to undertake to advance funds to any Person, as a loan to the District to meet the shortfall caused by the District's failure. Such advance of funds by Manager, however, shall not cure any default of the District as a result of its failure to timely provide funds. All sums advanced by Manager pursuant to such agreements or undertakings shall be for the District's account. The District shall pay Manager interest on all advanced funds at the rate set forth in Section 6(e) and the principal upon demand by Manager. Any advance made shall be evidenced by a promissory note issued by the District in an amount equal to the amount advanced.

(2)     To the extent Manager advances funds, this Agreement constitutes a security agreement pursuant to which the District provides Manager with a lien on all of the District's assets, to the extent allowed by Law, and Manager shall have the right to file a Uniform Commercial Code financing statement with respect to such obligation without the signature of the District.

(3)     Manager shall have the right to execute the above described promissory note on behalf of the District, to the extent permitted by Law. The District hereby irrevocably appoints Manager as its attorney-in-fact coupled with an interest with full power to prepare and execute any documents, instruments and agreements, including, but not limited to, any note evidencing the advance or loan and any Uniform Commercial Code financing statements, continuation statements and other security instruments as may be appropriate to perfect and continue its security interest in favor of Manager.

(ii)     Except as provided in Section 4(j)(i), Manager shall not, under any circumstance, in the name of, or on behalf of, the District borrow any money or execute any promissory note, bill of exchange or other obligation, or dispose of any asset of the District not in the ordinary course of business, without the consent of the Governing Body; and only to the extent allowed by all applicable Law.

(k)     Information Technology. Manager shall provide oversight of the information technology activities associated with the Hospital and the Clinics and Other Facilities. Manager shall be responsible for oversight of the selection, negotiation, installation, and implementation of the information technology systems and structures at the Hospital and the Clinics and Other Facilities consistent with the Annual Budget. Manager shall seek approval from the Governing

18

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

Body of any new systems and/or termination of any existing agreements, which approval shall not be unreasonably withheld. The District shall be responsible for the direct expense of all hardware and software for the information technology activities of the Hospital and the Clinics and Other Facilities. The District shall be responsible for the cost of maintenance and support of all such hardware and software, as well as the training of Manager and the District employees, physicians and other applicable personnel on systems and software provided, however, that Manager shall not incur any expense in excess of $100,000 unless set forth in the approved Annual Budget or otherwise approved by the Governing Body. For avoidance of doubt, Manager shall not perform the information technology maintenance for the District under the terms of this Agreement. Rather, any such additional services if provided, will be provided by Manager pursuant to the terms of a separate written agreement in exchange for fair market value compensation, and in compliance with applicable Law.

        (l)     Internal Audit. Manager shall provide oversight of the District's routine audits of internal procedures and systems, including auditing of billing, information systems, payroll, and other areas as identified and shall perform such internal audits as Manager, in its reasonable discretion, deems necessary for the purposes of providing its services hereunder. External audits, if requested by and performed for the District, shall be the responsibility of the District. All direct, out-of-pocket fees, expenses and charges incurred in connection with such external and internal audits shall be a the District expense. All internal and/or external audit expenses in excess of $100,000 shall be approved by the Governing Body, unless such expenses are set forth in the approved Annual Budget.

        (m)    Managed Care Contracting. Manager shall provide recommendations regarding managed care contracts and rates, and assist the District in the negotiation and consummation of such contracts, and monitoring of contract effectiveness and compliance.

        (n)    Operating Contracts.

        (i)     Manager shall assist the District in negotiating and securing all third party Operating Contracts necessary or desirable for the proper and efficient management and operation of the Hospital and the Clinics and Other Facilities.

        (ii)    Notwithstanding Section 4(j), Manager may enter into, or modify, supplement, amend, discharge, or terminate, or grant waivers or releases of obligations under such contracts, leases, licenses, instruments, and other agreements ("**Operating Contracts**") in the name of and at the expense of the District, as may be deemed necessary or advisable by Manager for the furnishing of all professional, consulting, and staffing services, concessions, drugs, supplies, utilities, equipment, property maintenance, insurance and other products, goods, and services as may be necessary or appropriate from time to time for the maintenance and operation of the Hospital and the Clinics and Other Facilities, or as may otherwise be necessary or appropriate to carry out Manager's obligations under this Agreement. Subject to the terms hereof, Manager is hereby expressly authorized, as the District's agent, to execute and deliver any of such Operating Contracts in the name of and on behalf of the District, and presentation of a copy of this Agreement shall constitute conclusive evidence of such agency; provided, however, that, Manager is also authorized to enter into and maintain in its own name any national and regional contracts in which the District may participate, as well as such other contracts for the District which, in the judgment of Manager, are advisable to be entered into in Manager's name. Upon Manager's request, the District shall execute such agreements, contracts, leases. Instruments, documents and other Agreements as Manager shall determine are desirable to facilitate the operation and management of the Hospital and the Clinics and Other Facilities. With respect to all cost and

19

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

expenses associated with Operating Contracts in Manager's name, the District shall reimburse Manager for all such costs and expenses and / or pay such costs and expenses directly, at Manager's discretion. Manager is expressly authorized to contract, in the name and on behalf of the District, for the provision by Manager or its Affiliates of any services to be provided with respect to the Operations.

(iii)    In the event of a termination of this Agreement which results in no further relationship between the District and Manager, Manager shall cause any contracts, including Operating Contracts, it has entered into in its own name to manage and operate the Hospital and the Clinics and Other Facilities pursuant to this Agreement for the benefit of the District to be assigned to the District and the District shall assume the obligations under all such agreements and shall indemnify Manager from and against any liability thereunder.

(iv)    All such Operating Contracts in excess of $1,000,000 shall be approved by the Governing Body, such consent not to be unreasonably delayed or denied, unless the items or services that are the subject of the Contract have been approved previously in the Annual Budget.

(v)    The expense of such third party contracts shall be a direct expense of the District. Manager shall not be obliged to pay for any the District purchases from its own funds nor shall Manager be obliged to guarantee, directly or indirectly, any debts of the Hospital or the District under the terms of any purchasing arrangement. If the District fails to timely pay amounts due under such arrangements, Manager shall have the right, in its sole discretion, but not the obligation, to advance the funds necessary to satisfy such obligations, as provided in Section 4(i)(i)(1).

(o)    Insurance. Manager shall consult with the District as to the type of insurance or self-insurance, amount of coverage thereunder, deductibles and/or self-insured retentions therefor, premiums therefor, and issuers thereof to be carried with respect to the Hospital and the Clinics and Other Facilities and the Operations. Approval of any change to the types or limits of insurance coverage for the District shall be made by the Governing Body. Manager shall use its commercially reasonable efforts to cause such insurance to be placed and kept in effect at all times; provided, however, the District shall, solely at its own expense, obtain and maintain in full force and effect throughout the Operating Period the following policies of insurance or self-insurance coverage:

(i)    Comprehensive general liability insurance, including personal injury and property damage liability insurance naming the District and Manager as insureds.

(ii)    Property and casualty insurance, including coverage for all Buildings and their contents, including boiler insurance naming the District and Manager as insureds.

(iii)    If deemed necessary by the District or Manager, comprehensive automobile liability insurance naming the District and Manager as insureds.

(iv)    Worker's compensation and employer's liability insurance and other similar insurance naming the District and Manager as insureds for the District's and Manager's employees.

(v)    Professional liability insurance covering all Operations and, to the extent available, directors and officers insurance, naming the District and Manager (and Manager's

20

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

executive employees) as named insureds. The professional liability insurance shall afford minimum protection (which may be effectuated through primary and/or excess coverage) of not less than $1,000,000.00 combined single limit for damage in any one occurrence and not less than $3,000,000.00 aggregate for all occurrences. The insurer must be licensed by the California Department of Insurance and have a general policyholders rating of not less than A-X or better by Best's Key Rating Guide and with a claims paying ability rating from S&P of at least AA or an equivalent rating from another rating agency acceptable to Manager. Manager may require that the District obtain from the insurer a statement as to good standing with the California Department of Insurance.

(vi) Commercial umbrella or excess liability coverage and, to the extent available, regulatory insurance coverage, covering all Operations, naming the District and Manager as named insureds. The commercial Umbrella and Excessive Liability Insurance shall afford minimum protection (which may be effectuated through primary and/or excess coverage) of not less than $1,000,000.00 combined single limit for damage in any one occurrence and not less than $3,000,000.00 aggregate for all occurrences, insuring Manager and the District and their respective employees and representatives in connection with Operations. The insurer must be licensed by the California Department of Insurance and have a general policyholders rating of not less than A-X or better by Best's Key Rating Guide and with a claims paying ability rating from S&P of at least AA or an equivalent rating from another rating agency acceptable to Manager. Manager may require that the District obtain from the insurer a statement as to good standing with the California Department of Insurance.

(p) <u>Insurance Specifications</u>. The foregoing insurance shall meet the following specifications:

(i) All such policies of insurance shall be in such amounts as are deemed necessary by the District and Manager (but in no event less than the amounts set forth above) and shall contain a waiver of rights of subrogation clause against Manager and the District, to the maximum extent permitted under applicable Laws. The parties and their respective Affiliates shall not assert against the others, and each does hereby waive with respect to the others, any claims for any losses, damages, liabilities or expenses (including attorneys' fees) incurred or sustained by any of them on account of damage or injury to Persons or property arising out of the ownership, operation and/or maintenance of the Hospital and the Clinics and Other Facilities, to the extent that the same would be covered and paid by the insurance required to be carried hereunder. The District shall present such policies of insurance to Manager for review, upon request by Manager.

(ii) The District shall cause Manager, and any Person affiliated with Manger, that Manager so directs, to be named as additional insureds on the liability insurance coverage described above and on any fidelity bond (if any). It is the intention of the parties that the insurance and bonds (if any) maintained by the District with respect to the Operations shall protect both the District and Manager and will be primary insurance for both parties for any and all losses covered thereby.

(iii) Certificates of insurance for the above coverages and a copy of the bond (if any) and accompanying endorsement naming Manager and/or Manager's employees (specifying his/her position), as applicable, shall be provided to Manager within thirty (30) days of the Effective Date and thereafter within thirty (30) days (i) of policy or bond (if any) renewal or replacement and (ii) of a request by Manager. All such policies shall provide that the subject policy may not be canceled, modified or reduced (including, without limitation, any amendment that would

21

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

reduce the scope or limit coverage or remove any endorsement to such policy or cause the same to no longer be in full force and effect) except upon not less than thirty (30) days prior written notice to Manager. Originals of each renewal policy or certificates therefore from the insurers evidencing the existence thereof shall be provided to Manager at least thirty (30) days prior to, but not later than, the expiration or termination dates of the applicable policy. In addition, the District shall notify Manager in writing of any reduction or cancellation, increase of deductible or material modification of any term or condition of any of insurance coverage required herein within twenty-four (24) hours of receipt.

        (iv)      Manager reserves the right to procure, at the District's cost, any or all of the foregoing required insurance coverage, if the District fails or refuses to do so, or if Manager in its sole discretion determines that Manager's procuring of such insurance is most efficient and/or in the financial benefit of Manager and/or the District. Manager is not required to act under this Section 4(p) and shall not be liable for its failure to effect or maintain recommended insurance upon the District's failure to do so.

        (v)      Manager may obtain similar coverages for its benefit by taking out policies with such insurance companies as may be selected by Manager. Notwithstanding anything herein to the contrary, any insurance obtained by Manager hereunder may, at Manager's election, cover only Manager's interest. All direct, out-of-pocket fees, expenses and charges incurred in connection with obtaining such insurance shall be the District expenses, even if the insurance protects only Manager's interests.

        (vi)      If, during the Operating Period, the District is covered by general liability, professional liability, or other liability insurance on a "claims made" basis, then at least ten (10) days before the termination of this Agreement, the District shall procure and maintain, at the District's sole cost and expense, an extended reporting endorsement or "tail" insurance coverage for a period of at least four (4) years after the termination date of this Agreement, with coverage limits and deductible amounts equivalent to those required hereunder on the date immediately preceding the termination of this Agreement for such coverage for general, professional and other liability claims reported after the termination of this Agreement but concerning services provided during the Operating Period or the term of the claims made policy. The District shall provide Manager with a certificate evidencing such coverage no later than ten (10) days before the termination of this Agreement. The District shall be named as the primary insured party on each policy of tail insurance and Manager shall be named as an additional insured. This Section will survive the termination or expiration of the Agreement.

        (vii)      To the extent any insurance is placed through a self-insurance program or captive insurance program, the District shall assure that such insurance shall comply with all applicable Law, if such self-insurance or captive program is domiciled outside the United States, and the District shall assure that such coverage shall be, as appropriate, reinsured by reinsurers acceptable to Manager, in Manager's sole and absolute discretion.

      (q)      Purchasing.

        (i)      Manager shall be responsible for the oversight and management of the District's purchasing systems and procedures for the Operations at the supervisory / management level, including but not limited to oversight of:

            (1)      Capital purchasing;

22

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

    (2) Researching and negotiating equipment based on Hospital and the Clinics and Other Facilities' needs, specifications, and the Annual Budget;

    (3) Reviewing oversight of inventory par levels (monthly audits); and/or

    (4) Department purchasing structures and systems.

    (ii) The District shall be responsible for the direct expense of all purchases and for all purchasing expenses, including but not limited to utilities, concessions, drugs, equipment, supplies, furniture or furnishings, inventory items, linens, machinery, medicines, and services.

    (iii) In furtherance of the foregoing, all capital and other expenditures made shall be subject to the purchasing and procurement policies and procedures of the District, its Bylaws, and applicable Law.

  (r) <u>Marketing and Communications</u>.

    (i) Manager shall provide consultation, advice and oversight related to marketing, advertising, and promotional issues, as well as marketing strategies and policies, as it deems necessary in its sole and absolute discretion.

    (ii) Manager shall:

    (1) Provide direction and advice regarding the marketing program for the Hospital and the Clinics and Other Facilities which shall be reasonably designed to inform and educate health care professionals and the general public served by the District of the existence of one or more of the services offered by the District.

    (2) Cause, to the extent required by applicable Law, including Internal Revenue Code §501(r), a community needs health assessment to be prepared identifying the health and welfare needs of the residents who reside in the communities served by the District, and propose an implementation strategy to meet the outstanding community health needs identified in the assessment.

    (3) Cause to be prepared and distributed such descriptive booklets, brochures or pamphlets as Manager determines are necessary, in its sole and absolute discretion, to inform health care professionals and members of the public of the nature and requirements of State and Federal reimbursement programs for patients and how the same relate to the services offered at the District.

    (iii) All direct, out-of-pocket fees, expenses and charges incurred in connection with marketing, advertising, and promotional activities shall be at the sole cost and expense of the District.

  (s) <u>Medical Records</u>.

    (i) Manager shall be responsible for the oversight of the District's medical records activities at director and executive levels, including development of department strategies and systems and planning.

23

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(ii)     During and following the expiration of the Operating Period, all records of the District shall remain the property of the District.

(iii)     All patient medical records shall be treated as confidential so as to comply with all applicable Laws regarding the confidentiality of patient records, including, without limitation, the privacy standards promulgated under HIPAA.

(iv)     Manager shall be a "Business Associate" of the District, as that term is defined in the regulations implementing HIPAA, and Manager's use of "Protected Health Information," as that term is defined in the regulations implementing HIPAA ("PHI"). Manager shall execute and comply with the Business Associate Agreement previously executed by the parties.

(v)     Manager shall notify the District of any data breach that may occur at the Hospital and the Clinics and Other Facilities, promptly after Manager becomes aware of same.

(t)     Additional Reports.  Manager agrees to prepare, cause to be prepared or otherwise make available reports regarding the Operations as follows:

(i)     Within forty-five (45) days after the end of each fiscal quarter, Manager shall make available to the District the following information:

(1)     Relevant utilization statistics for the District for the prior quarter, including but not limited to patient volume and payor mix; and

(2)     Financial statements and budget analysis for the District for the prior quarter, as provided in Section 7(c).

(ii)     Manager shall provide to the Governing Body, on at least thirty (30) calendar days' notice, or sooner if necessary, to implement such required action, a description of any needed or discontinued services, refinancing proposals, expansion plans or material changes in operating procedures.  The proposal shall explain the reasons for the proposed activity.

(u)     Agency.  Subject to (i) approval of the Governing Body for acts outside of the ordinary course of the Hospital and the Clinics and Other Facilities' businesses, and (ii) the terms hereof, Manager shall have the right to act as the agent of the District and/or the Hospital and the Clinics and Other Facilities in the procuring of licenses, permits and other approvals, the payment and collection of accounts and in all other activities necessary or appropriate or useful to Manager in the carrying out of its duties as specified herein.

(v)     Construction Project Advice.

(i)     Manager shall provide the District with advice and recommendations regarding the current Hospital construction project (involving the construction of a new tower commonly referred to as the Tower No. 1 Expansion Project (the "**Project**")) and will assist the District in its coordination of the Project.  Any Consultants engaged by Manager in this regard shall be compensated as provided in Section 4(b)(xii).  Manager shall not be a contractor on the Project and shall not have control over, charge of or responsibility for, the means, methods, techniques, sequences, procedures, or for the safety precautions and programs related to such Project. Manager shall not have control over or be responsible for the District's architects or contractors or their agents, nor shall Manager be deemed to be responsible for the construction of the Project, directly or indirectly or the funding of such Project.

24

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(ii)     Manager shall provide consultation and advice, and shall assist the District in the District's efforts to discharge all of the field operations requirements and responsibilities of the District as the owner of the Project as required under the construction contracts between the District and its contractors (the "**Contract Documents**") and to cause the District's contractors to perform the work required to construct the Project in accordance with the Contract Documents.  In this regard, Manager shall provide recommendations to the District to assist in its evaluation of the status of the on-going construction associated with the Project. Manager shall provide on-site administration of the Contract Documents in cooperation with the Project architect. Manager shall provide assistance, including administrative, management and related services, to coordinate scheduled activities and responsibilities of the contractors, and Manager shall schedule and conduct meetings to discuss such matters as procedures, progress, coordination, and scheduling of the Project work.

(iii)     Manager shall endeavor to obtain satisfactory performance from the District's contractors, but shall have no liability for any failure of performance by any of such contractors.  Manager shall have no liability for any design defect or other matter which is the responsibility of the Project architect.  Manager shall recommend courses of action to the District when requirements of the Contract Documents are not being fulfilled.  Manager shall report to the District any defects or deficiencies in the work of any contractor or their agents or employees, or any other Person performing construction on or providing materials or equipment to the Project of which Manager obtains actual knowledge.  Notwithstanding the foregoing, Manager shall have no obligation to investigate or take active steps to determine the existence of any such defects or deficiencies, nor shall Manager be liable, for any failure to timely communicate any such defect or deficiency to the District.  Manager may recommend the rejection of any deficient or defective work to the District, if such work does not conform to the Contract Documents; however, the failure of Manager to recommend rejection of any such work shall not constitute Manager's approval or acceptance of the work.

(iv)     Manager shall review requests for changes in the construction contracts, assist in negotiating contractors' proposals, and provide recommendations to the Project architect and the District in connection therewith.

(v)     Manager shall monitor and evaluate actual costs for the construction work, and estimates for uncompleted work, and shall advise the District as to variances between actual and budgeted or estimated costs. Manager shall notify the District if there are any apparent inconsistencies or inaccuracies in the information presented by the District's contractors. Manager shall also report the contractors' cost control information to the District.

(vi)     Manager shall assist the District in developing and implementing procedures for the review and processing of applications for payment from the contractors for progress and final payments.

(vii)     Manager shall record the progress of the Project.  On a monthly basis or otherwise as requested by the District, Manager shall submit written or oral progress reports to the District and attend monthly Governing Body meetings requested by the District.

(viii)     Manager shall not have control over, charge of, or responsibility for the construction means, methods, techniques, sequences or procedures, or for safety precautions or programs in connection with the work of any contractors.

25

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(ix)     Manager shall make recommendations if it determines that Consultants are reasonably required for the Project, and shall assist the District in selecting and engaging such Consultants.  Manager shall supervise and coordinate Project Consultants.

(x)     Limitations.

(1)     Manager has no authority to execute any Contract Documents or otherwise bind the District to any transactions with respect to the Project construction.  Manager shall not provide any legal services or architectural services with respect to the Project. The District agrees that although Manager will make recommendations, Manager shall not take any action in connection with the implementation of such recommendations without the District's prior approval.

(2)     The District will at all times maintain a meaningful and substantial involvement in all phases of the Project, and hereby accepts responsibility for the results of the Project.   Manager's recommendations concerning terms of the Construction Contracts shall be subject to review and approval of the District and the District's attorneys or other advisers.

(3)     The District acknowledges that Manager does not guarantee any particular results, notwithstanding projections which may be made by Manager.  Manager's projections and forward looking statements are based on estimates and expectations, and reasonably available data from contractors, architects and others, and as a result are inherently uncertain.  Actual results could differ materially from those anticipated as a result of a variety of factors.

(4)     Neither Manager nor Manager Parties shall be liable to the District for any claims, demands, costs, expenses, liabilities or obligations of any nature relating to the Project, ("**Claims**"), except to the extent resulting from the willful misconduct of Manager or Manager Parties.  Manager and Manager Parties may be liable to the District for general and direct damages, but in no event shall Manager or any Manager Parties be liable to the District for any consequential damages, including loss of use, special, indirect or incidental damages.  Manager and Manager Parties may be liable for punitive or exemplary damages to the extent resulting from their willful misconduct.

(5)     The District shall defend, indemnify and hold Manager and Manager Parties free and harmless from and against all Claims (including reasonable attorney's fees), except to the extent resulting from the willful misconduct of Manager or Manager Parties.  It is understood and agreed that, Manager and Manager Parties shall have no liability whatsoever for any actions or failure to act which arose prior to January 10, 2014, including Claims which relate in any way to construction activities which occurred prior to that date ("**Pre-existing Claims**").  In the event that any Claims are made against Manager or any Manager Party which may include Pre-existing Claims, then the indemnification and defense obligations of the District shall apply, even if they also involve Claims which are not Pre-existing Claims. However, in the event of a determination by a court or arbitrator that any Claims for which indemnification was provided by the District were not in fact Pre-Existing Claims and were not Claims for which indemnification is otherwise required hereunder, then Manager shall be liable to reimburse the District for any reasonable costs or expenses incurred by the District in connection with the defense or indemnification.

26

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(6)     In circumstances where any limitation on damages or indemnification provision hereunder is unenforceable or unavailable for any reason, the District shall contribute to any Claims, relating to the Services provided hereunder by Manager, in such proportion proportional to the relative fault of the parties bears to all other conduct giving rise to such Claim.

(7)     Neither Manager nor any Manager Parties, or any of their respective Affiliates, shall have any liability hereunder to the District, and the District agrees it will not bring any action against any such Persons, except to the extent caused by the willful misconduct of such Persons. Without limiting the foregoing, such Affiliates are intended third-party beneficiaries of these terms and may in their own right enforce such terms.

(8)     The provisions of Section 4(v)(x)(4)-(7) shall survive the expiration or termination of this Agreement.

5.     Legal Compliance.

(a)     Compliance Plan. Manager has received a copy of the District's Compliance Policies and Procedures, including the Code of Conduct and the Physician Referral, Stark Law, and Anti-Kickback policies and procedures together with a copy of the District's Corporate Integrity Agreement with the HHS Office of Inspector General dated July 20, 2009 (the "**CIA**"). Manager shall abide by these policies and procedures and applicable Law. Any recommendations and/or revisions of such policies made by Manager must be approved by the Governing Body. Manager will be given prompt written notice of any changes made to the foregoing. Manager may develop and recommend changes to the District's existing Compliance Plan (the "**Compliance Plan**") for implementation during the Operating Period. Any such recommendations and/or revisions to the Compliance Plan must be approved by the Governing Body. Manager shall use its commercially reasonable efforts to support the Compliance Plan. All costs of developing, implementing and maintaining the Compliance Plan shall be borne by the District.

(b)     Government Regulations. On behalf of the District, Manager shall, subject to the limitations set forth herein, use its reasonable commercial efforts to help assure that: (1) the District continuously complies with all material applicable Laws, including without limitation, Hospital Law, State and Federal False Claims Act, Civil Monetary Penalty Law, State and Federal Anti-Kickback statutes, State and Federal self-referral prohibitions and applicable Medicare conditions of coverage and/or participation and (2) the District retains and maintains in good standing all necessary accreditations, licenses, permits, approvals and authorizations required for the ongoing operation of the Hospital and the Clinics and Other Facilities.

(c)     Accreditation Compliance. Manager shall, subject to the limitations set forth herein, take all steps necessary to assist the District to continue meeting the applicable accreditation agency's accreditation standards, as they exist or may be changed from time-to-time, and as may be applicable to the Hospital and the Clinics and Other Facilities' then current accreditation(s). Manager shall have the right to select and/or change the applicable accreditation agency for the Hospital, and if applicable, the Clinics and Other Facilities, in its sole and absolute discretion.

(d)     Licensure. Manager shall not act in a manner which adversely affects the licensure of the District by the State as a Medicare participating acute care hospital (or any other Medicare reimbursement designation as may be agreed to by the parties). Within thirty (30) days of receipt by the District or Manager of any final report or written assessment concerning the

27

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

licensure of the District by the State as an acute care hospital or the accreditation of the District, Manager shall furnish a copy of such report to the District.

(e) HIPAA Compliance. Manager shall comply with the applicable provisions of the Administrative Simplification and Privacy Rules of the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations promulgated pursuant thereto, and any related or applicable privacy Law regarding medical information and protected health information.

(f) Ineligible Persons - Disclosure Obligation. Manager shall use reasonable commercial efforts to monitor that none of Manager's or the District's employees employed at the Hospital and the Clinics and Other Facilities have been sanctioned, debarred or suspended or otherwise deemed ineligible to participate in Medicare, Medicaid or other Federal health care programs, and procurement, or non-procurement programs (collectively, an "**Ineligible Person**"). Manager represents to the District that Manager is not an Ineligible Person nor has any pending proceedings or received notice of any action or proceeding to exclude, debar, suspend, or otherwise declare Manager ineligible under any federally funded health program. Manager shall notify the District within three (3) business days after becoming aware of any fact or circumstance that would make Manager an Ineligible Person.

(g) Access to Records. Manager shall, in accordance with Section 1395x(v)(1) of Title 42 United States Code until the expiration of four (4) years, or longer as may be required by applicable Law, after the termination of this Agreement, make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of this Agreement and such books, documents and records as are necessary to verify the nature and extent of the costs of the services provided by Manager under this Agreement. Manager further agrees that in the event Manager carries out any duties under this Agreement through a subcontract with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve-month period with a related organization, such agreement shall contain a clause to the effect that until expiration of four (4) years, or longer as may be required by Law, after the furnishing of such services pursuant to such subcontract, the related organization shall make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of such contract and such books, documents and records of such organizations as are necessary to verify the nature and extent of such costs. This Section is included pursuant to and is governed by the requirements of federal Law. No attorney-client, accountant-client, or other legal privilege will be deemed to have been waived by the parties or any of the parties' representatives by virtue of this Agreement.

(h) No Obligation to Refer Patients. Nothing contained in this Agreement shall require (directly or indirectly, explicitly or implicitly) either Manager or its Affiliates or the District or its Affiliates, to refer any patients to one another or to use the Hospital or the Clinics or Other Facilities as a precondition to receiving the benefits set forth herein.

6. **Management Fee**.

(a) Management Fee. As Manager's fee for the performance of the management services under this Agreement, Manager shall receive monthly (in advance on the first day of each month) a fee (the "**Management Fee**") in the amount of Two Hundred Twenty Five Thousand Dollars ($225,000). Effective as of each January 1st, commencing January 1, 2015, the Management Fee shall be increased as provided in Section 6(b).

28

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(b)    <u>CPI Adjustment</u>.

(i)    "**<u>CPI</u>**" means the monthly index of the U.S. City Average Consumer Price Index for Urban Wage Earners and Clerical Workers – Medical Care Services (1982-84 equals 100) published by the United States Department of Labor, Bureau of Labor Statistics or any successor agency that shall issue such index. In the event that the CPI is discontinued for any reason, the parties shall use such other index, or comparable statistics, on the cost of medical care services in the United States, as shall be computed and published by any agency of the United States or, if no such index is published by any agency of the United States, by a responsible financial periodical of recognized authority.

(ii)    Beginning on January 1, 2015, and every year thereafter, the Management Fee shall each be adjusted for inflation as follows:

(1)    The then existing Management Fee shall be multiplied by the greater of (i) the CPI percentage increase using the latest published data since the last adjustment or (ii) five percent (5%) ("**<u>CPI Increase</u>**");

(2)    The then existing Management Fee shall then be added to the CPI Increase ("**<u>Net Adjusted Management Fee</u>**"); and

(3)    The Net Adjusted Management Fee will then be multiplied by 1.01 to determine the Management Fee for the next ensuing calendar year.

(4)    For example, the latest published CPI in January 2015 (e.g. November 2014) will be compared to the CPI for November 2013 (assuming that was the latest available published data) and the 2014 Management Fee will be multiplied by the percentage difference. Assuming a three percent increase, the Management Fee of $225,000 would be increased by $6,750 for a new monthly Net Adjusted Management Fee of $231,750. That amount would then be multiplied by 1.01 resulting in a new monthly Management Fee of $234,067.50.

(c)    <u>Expenses</u>.    In addition to the Management Fee, Manager shall be reimbursed monthly by the District for (i) expenses expressly made reimbursable hereunder together with (ii) other usual, customary, and commercially reasonable out-of-pocket expenses incurred on behalf of the District, in accordance with the approved Annual Budget, or with approval from the Governing Body, if such fees are in excess of the amount in the approved Annual Budget. Manager shall not be reimbursed for any indirect or overhead expenses of Manager or its Affiliates.

(d)    <u>Operating Expenses</u>. Except as otherwise provided in this Agreement, all of the costs and expenses of maintaining and operating the Hospital and the Clinics and Other Facilities shall be the sole cost and expense of the District, and shall not be expenses of Manager. Expenses shall include, without limitation:

(i)    any operating or non-operating expense incurred in the provision of services to the District (unless specifically excluded hereunder); and

(ii)    The cost of any employee or Consultant that provides services at or in connection with the Hospital or the Clinics or Other Facilities for improved clinic performance, such as management, billing and collections, business office consultation, accounting and legal services, including salaries, benefits, other compensation, travel costs, and other expenses, but only when such services are coordinated by Manager.

29

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(e) <u>Late Payments</u>.    If payment of amounts due hereunder, including Management Fees, Employee Lease Payments and reimbursement of other amounts, are not made on the due date, then interest shall accrue on any unpaid amounts for each day beyond the due date at a rate equal to the lesser of: (a) one percent (1.0%) per month or (b) the maximum non-usurious interest rate allowable by Law.

(f) <u>Senior Indebtedness Status</u>. The obligations of the District under this Agreement rank and shall rank at least senior in priority of payment to all other unsecured debt of the District.  Fund transfers and other payments received by the District shall be directed, regardless of the payment purpose indicated in the payment document, according to the following priority ranking: (1) payment of the Bonds; (2) payment of the Management Fee and other amounts due hereunder and (3) all other debts of the District.

(i) <u>Setoff</u>.    Notwithstanding any provision of this Agreement to the contrary, Manager shall have the right from time to time to setoff any amounts owed by the District to Manager against any amounts owed by Manager to the District and/or from any funds of the District over which Manager has a power of attorney or right of disbursement, whether pursuant to this Agreement or otherwise.

7.    **Books and Records**.

(a) <u>Maintenance of Books and Records</u>.    Manager shall supervise the maintenance of the books of account covering the operation of the District.  Such books of account shall be maintained on an accrual basis in accordance with GAAP.

(b) <u>Accounting</u>.  Manager shall be responsible for the oversight of Hospital and the Clinics and Other Facilities' accounting functions.

(c) <u>Reports and Financial Statements</u>.  Manager shall from time to time deliver to the Governing Body, from the District's data, the reports and financial statements reasonably requested by the Governing Body, as well as any other reports or financial statements required by the terms of this Agreement.  Oversight shall include consultation with respect to Hospital and the Clinics and Other Facilities:

(i)    General ledger / financial accounting;

(ii)    Accounts payable;

(iii)    Payroll;

(iv)    Facilitation of Hospital and the Clinics and Other Facilities annual audit; fees paid to independent accountants, however, shall be the responsibility of the District;

(v)    Cost reporting.   Year-end information required for preparation of Medicare and MediCal cost reports shall be available to the District, and at the District's direction, to its accountants, prior to one hundred twenty (120) days into the year following the year for which they are prepared; and

(vi)    Monthly bank reconciliation.

30

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(d)     <u>Financial Statements</u>.

        (i)     Monthly financial statements, including income statements, balance sheets, statement of cash flows. Such statements shall generally be available to the District by the 20th day of the month following the applicable period.

        (ii)     Quarterly financial statements including unaudited financial statements reflecting the operations of the District for such quarter. Such statements shall generally be available to the District by the 45th day following the end of each applicable quarter. Quarterly statements shall also include Manager's usual and customary statistical and performance measures.

        (iii)     Annual financial statements, including an unaudited balance sheet of the District dated as of the end of the fiscal year and a related statement of income or loss for the District for such fiscal year. Year-end income statements, shall be available to the District, and at the District's direction, to its accountants, prior to ninety (90) days into the year following the year for which they are prepared.

(e)     <u>Audit</u>.

        (i)     If the District so elects, such financial statements will be certified in the customary manner by an independent certified public accountant approved by the District. The expense of any such independent accountants shall be borne by the District.

        (ii)     Manager shall respond, in writing, to any and all recommendations made by the District's independent auditors, which response shall either acknowledge that an audit proposal or recommendation has been implemented or, if not, the reasons why not.

(f)     <u>Financial Reporting Expenses</u>.   Fees paid to independent firms and professionals in connection with the foregoing together with the direct, out-of-pocket fees, expenses and charges incurred in connection with the preparation of such shall be the District expenses.

(g)     <u>Inspection of Records</u>. Authorized agents of the District shall have the right at all reasonable times during usual business hours, at the District's expense, to audit, examine and make copies of or extracts from the books of account of the District maintained by Manager. Such right may be exercised through any agent, independent public accountant or employee of the District designated by the District.

(h)     <u>Confidentiality</u>.   The parties agree that: (a) neither party will disclose any secrets or confidential technology, proprietary information, or trade secrets of the other party without the prior written consent of the transmitting party, except (i) to the receiving party's agents, advisors, auditors and representatives; or (ii) as may be necessary by reason of legal, accounting or regulatory requirements beyond the reasonable control of the recipient party; and (b) should this Agreement expire or terminate, neither party will take or retain any papers, records, files, computer programs and software, other documents or copies thereof, or other confidential information of any kind belonging to the other party, except for copies of same as may be reasonably necessary to defend any anticipated litigation or respond to claims or pursuant to ordinary data backup or storage processes.

31

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

8.     **Indemnification and Liabilities**.

(a)     District Indemnity Obligation.  Manager does not hereby assume any of the obligations, liabilities or debts of the District or the Hospital or the Clinics and Other Facilities, except as otherwise expressly provided herein, and shall not, by virtue of its performance hereunder, assume or become liable for any of such obligations, debts or liabilities.  The District hereby agrees to indemnify, defend and hold Manager harmless from and against any and all claims, actions, liabilities, losses, costs and expenses of any nature whatsoever, including reasonable attorneys' fees and other costs of investigating and defending any such claim or action, asserted against Manager on account of any of the obligations, liabilities or debts of the District or the Hospital or the Clinics and Other Facilities, except for demands arising from Manager's willful misconduct.  The District further hereby agrees to defend, hold harmless and indemnify Manager and Manager Parties from and against any and all claims, actions, liabilities, losses, costs and expenses of any kind imposed on account of or arising out of actions taken by Manager or Manager Parties in what Manager or any such Person reasonably believed to be within the scope of their responsibilities under this Agreement, except for acts of willful misconduct.  However, in no event shall Manager or any Manager Parties be liable to the District for any loss of use, goodwill, revenues or profits, or any consequential, special, indirect or incidental loss, damage or expense, or for punitive or exemplary damages, except for punitive or exemplary damages to the extent resulting from the willful misconduct of Manager or Manager Parties. This Section shall survive the expiration or termination of this Agreement.  The foregoing indemnification is an addition to and not in limitation of the indemnification provisions as they relate to agents of the District (it being agreed that Manager is an agent of the District for that purpose), as set forth in the District's Bylaws, and any other indemnification provisions set forth in this Agreement.

(b)     Manager Not Liable for District Liabilities.  The District is and shall be fully liable and legally accountable at all times to all patients and Governmental Authorities for all patient care and funds and all other aspects of the operation and maintenance of the Hospital and the Clinics and Other Facilities.  Manager shall have absolutely no obligation or duty to act for or on behalf of the District with respect to any matter which is not directly related to Manager's obligation to provide the administrative and management services described herein to the Hospital and the Clinics and Other Facilities, as and to the extent provided herein.  Manager shall not be or become liable for any of the existing or future obligations, liabilities, or debts of the District, or for any of the obligations of the Hospital and the Clinics and Other Facilities. This Section shall survive the expiration or termination of this Agreement.

(c)     Manager Not Liable for Condition of Buildings or Equipment. Notwithstanding anything contained herein to the contrary, in no event shall Manager be liable for any damages arising from, incident to, or in connection with, the physical condition (including the environmental condition) of the Buildings or other structures owned or leased by the District, or the land upon which such Buildings or other structures are situated, or any of the equipment located thereon, and any such damages as may arise shall be the sole responsibility of the District, as a the District expense, except to the extent that Manager engages in willful misconduct in carrying out its responsibilities hereunder, in which event Manager's liability shall be limited to amounts not covered by applicable insurance policies.  In connection with the foregoing, the District shall, with the assistance of Manager, comply with any and all applicable fire and safety codes.  This Section shall survive the expiration or termination of this Agreement.

(d)     Manager Not Liable for Acts or Omissions of the District's Agents.  Manager shall not be responsible for the acts or omissions of any of the District's managers, officers, directors, Governing Body, agents, employees, contractors, subcontractors or any other Persons

32

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

performing any work or rendering any services in connection with the operation, management, ownership or other use of the Hospital and the Clinics and Other Facilities, or any Consultants or other Persons engaged with respect thereto. This Section shall survive the expiration or termination of this Agreement.

(e) <u>Manager Not Liable for Consultants' Fees and Other Financial Obligations</u>. The District, and not Manager, shall be responsible for all fees and other compensation charged by Consultants and other Persons engaged by the District (or by Manager on behalf of the District in accordance with the terms hereof) to provide services related to the Hospital and the Clinics and Other Facilities. Manager shall be responsible for reviewing such fees, and the District shall timely provide Manager with copies of all bills, invoices, and other information relating to such fees.

(f) <u>Release</u>. Because of the unique services to be provided by Manager hereunder, neither Manager nor any Manager Parties shall be liable to the District for any damages or loss of any kind including, without limitation: (i) direct damages; (ii) consequential damages; (iii) loss of profits; (iv) business interruption; (v) damage to property or death or injury to Persons from any cause whatsoever including, without limitation, professional liability or malpractice, acts of vandalism, loss of trade secrets or other confidential information; or (vi) damage, loss, or injury caused by a defect in the structure of the Hospital and the Clinics and Other Facilities, power failure, fire, strikes, shortage of supplies, or any cause whatsoever in or about the Hospital and the Clinics and Other Facilities or any part thereof, unless such claims, losses, costs, damages or expenses are the result of the willful misconduct of Manager or Manager Parties. This Section shall survive the expiration or termination of this Agreement.

(g) <u>Manager Indemnity Obligation</u>. Manager shall indemnify, defend and hold the District harmless from and against any and all claims, actions, liabilities, losses, costs and expenses of any nature whatsoever, including reasonable attorneys' fees and other costs of investigating and defending any such claim or action, imposed on the District including its officers, directors, partners, employees and agents on account of or arising out of any breach of the terms hereof by Manager, and resulting from the willful misconduct of Manager or any Manager Parties. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT (INCLUDING ANY INDEMNIFICATION OBLIGATIONS), IN NO EVENT SHALL MANAGER BE LIABLE (WHETHER IN AN ACTION IN NEGLIGENCE, CONTRACT OR TORT OR BASED ON A WARRANTY OR OTHERWISE) FOR (I) FAILURE TO REALIZE SAVINGS OR LOSS OF PROFITS, REVENUE, OR ANY OTHER INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, AND (II) DIRECT AND OTHER DAMAGES IN EXCESS OF THE AMOUNT OF MANAGEMENT FEES EARNED BY MANAGER UNDER THIS AGREEMENT DURING THE THREE (3) MONTHS PRIOR TO THE DATE OF THE APPLICABLE CLAIM FOR DAMAGES, IN EACH CASE, EVEN IF MANAGER HAS BEEN ADVISED OF POSSIBILITY OF SUCH DAMAGES.

9. <u>**Joint Venture**</u>.

(a) <u>Covenant to Enter Into Joint Operating Agreement</u>.

(i) Attached hereto as Exhibit B is the Interim Joint Operating Agreement (the "**Interim Operating Agreement**") that the parties have executed and shall become effective, upon written notice from Manager, following: (i) Manager's or the District's receipt of consent thereto from the District's Bond trustee under the general obligation bonds and revenue bonds issued by the District prior to the date hereof, or hereafter issued with the concurrence of Manager (collectively, the "**Bonds**"); (ii) any required notices to the Attorney General regarding the transaction, if any, have been provided, including any that may be required pursuant to <u>Cal. Code</u>

33

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

Regs., tit. 11, § 999.40; and (iii) any required approvals from the Attorney General with respect to the charitable care assumption by Manager thereunder have been received, if any. The District shall fully cooperate with Manager's efforts to obtain the consent of such Bond trustee and the Attorney General, and the District shall promptly make such requests and take such actions as Manager shall request to obtain the Bond trustee's and Attorney General's consent(s). Efforts to procure such consent shall be commenced promptly after the Effective Date.

(ii)     Attached hereto as **Exhibit C** is the form of Joint Operating Agreement (the "**Long Term Operating Agreement**") that the parties have executed and shall become effective, upon written notice from Manager to the District after: (i) all Bonds which require compliance with Rev. Proc. 97-13 (or any successor regulatory requirement thereto containing similar limitations), have been repaid or otherwise defeased or the Internal Revenue Code limitations and conditions to the proposed transaction set forth in the Long Term Operating Agreement have been waived; (ii) any required notices to the Attorney General regarding the transaction, if any, have been provided, including any that may be required pursuant to Cal. Code Regs., tit. 11, § 999.40; and (iii) any required approvals from the Attorney General with respect to the charitable care assumption by Manager thereunder have been received, if any. The parties may enter into the Long Term Operating Agreement, whether the conditions described herein occur prior to or following entry into the Interim Operating Agreement. The District shall use its reasonable commercial efforts to repay or defease the Bonds as soon as reasonably practicable following the Effective Date. The District shall fully cooperate with Manager's efforts to obtain the consent of the Attorney General, and the District shall promptly make such requests and take such actions as Manager shall request to obtain the Attorney General's consent.

(iii)     The District agrees that Manager shall have the right to determine and direct the strategy and process by which the District and Manager effectuate the Interim Operating Agreement and the Long Term Operating Agreement (collectively, the "**Operating Agreements**"). Manager shall have the right to take the lead in all meetings and communications with the Bond trustee(s) and / or any other party whose consent is required to effectuate the Operating Agreements, including by determining the appropriate timing of any such meeting or communications (including the timing of the submission of any filing with, or the response to any request by, any consent party or any action to be taken pursuant to this Section).

(iv)     The District shall: (a) promptly give all notices which either party deems necessary, proper or advisable to the Bond trustee(s) and other applicable third parties which may be necessary or deemed desirable by Manager in connection with effectuating the Operating Agreements and the consummation of the transactions contemplated thereby; (b) use its best efforts to obtain all Bond trustee and other approvals, consents, permits, authorizations, and orders necessary, proper or deemed desirable by Manager in connection with effectuating the Operating Agreements and the consummation of the transactions contemplated thereby; (c) Permit Manager to review in advance, and consult with Manager on, any proposed filing, submission or communication (whether verbal or written) by the District or its Affiliates, and (d) give Manager the opportunity to attend and participate at any meeting with the Bond trustee(s) or any other party's representatives that are necessary, proper or advisable to effectuate the Operating Agreements. The District and its accountants, and attorneys shall cooperate fully with Manager in the preparation of any statements or applications made by Manager to the Bond trustee(s) and other applicable parties whose consent is required to effectuate the Operating Agreements and the transactions contemplated thereby and to furnish Manager with all information concerning the District necessary or deemed desirable by Manager for inclusion in such statements and applications, including, without limitation, all requisite financial statements and schedules.

34

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(v)     Between the date hereof and the effective dates of the Operating Agreements, the District shall promptly notify Manager of (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Operating Agreements becoming effective, (ii) any notice or communication from the Bond trustee(s) or any other party form whom consent is required, and (iii) any action or proceeding commenced or, to the knowledge of the District, threatened against Manager and/or the District which relates to the consummation of the transactions proposed under the Operating Agreements.

(b)     Stand-by Management Services.

(i)     Upon the Effective Date of an Operating Agreement (as defined in the Operating Agreements), Manager's and the District's obligations hereunder shall be treated as suspended ("**Suspended**") with neither party effectively having any obligation beyond those they would have had if the Agreement had been terminated or expired. When the District and Manager enter into either the Interim Operating Agreement and/or the Long Term Operating Agreement, the parties shall wind-up of their obligations hereunder as if this Agreement had been terminated. Following the Effective Date of an Operating Agreement (as defined in the Operating Agreements), during the remainder of the Operating Period hereunder, the District shall pay Manager an amount equal to One Hundred Dollars ($100) per year, for each year in which this Agreement is Suspended, on each annual anniversary of the Effective Date under the applicable Operating Agreement, in consideration of Manager's agreement to serve as a stand-by manager for the District for the Operating Period hereunder.

(ii)     As stand-by manager, Manager shall provide the management services described herein upon the terms set forth herein in the event that: (a) the term of the applicable Operating Agreement terminated or declared by a court of competent jurisdiction to be invalid or unenforceable and (b) such termination of the Operating Agreement was not due to: (i) Manager's default under the applicable Operating Agreement; (ii) any event which resulted in the payment of a Termination Fee, as defined in the applicable Operating Agreement; or (iii) the Long Term Operating Agreement becoming effective.  Manager shall commence providing the management services under the terms of this Agreement immediately following the termination of the applicable Operating Agreement and shall have all rights hereunder, including the right to renew the Operating Period.

(iii)     If Manager provides stand-by services hereunder, the Management Fee shall be adjusted pursuant to Section 6(b) as if the Agreement had not been Suspended and CPI Adjustments had continued to be made following the Effective Date of the applicable Operating Agreement.

10.     **Default**.

(a)     District Default.  The following occurrences shall each be deemed an event of default by the District ("**District Default**"), unless waived in writing by Manager:

(i)     Material breach of any representation, warranty, or covenant of the District contained within this Agreement, after giving written notice to the District, and the District's subsequent failure to cure the breach (if such breach is capable of being cured) within sixty (60) days (or ten (10) days in the event of a monetary breach or thirty (30) days in the event of a breach of any provision requiring the District to: (i) provide the Manager with a consent or approval or (ii) execute an agreement or document hereunder); provided, however, that if the cure cannot reasonably be effectuated within the applicable cure period, a longer period shall be allowed not to

35

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

exceed ninety (90) days, if the District has commenced to cure such breach in good faith or has otherwise provided adequate protection or security to protect Manager's interest hereunder (which security shall be sufficient in Manager's sole and absolute discretion) within the applicable cure period, and the District is proceeding with due diligence to effect a cure.

(ii)     The occurrence of any of the following: (a) the filing by the District of a voluntary petition in bankruptcy or for reorganization under the Bankruptcy Code, or (b) the filing of a petition for the appointment of a receiver for all or any of the property of the District, or (c) the taking of any voluntary or involuntary steps to dissolve or suspend the powers of the District (unless such steps to dissolve or suspend are removed) within thirty (30) days, or (d) the consent by the District to an order for relief under the Bankruptcy Code or the failure to vacate such an order for relief within sixty (60) days from and after the date of entry thereof, or (e) the entry of any order, judgment or decree, by any court of competent jurisdiction, on the application of any creditor of the District or any other Person, adjudicating the District as a bankrupt, or to be insolvent, or approving a petition seeking reorganization or the appointment of a receiver, trustee or liquidator of all or a substantial part of the District's assets, if such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days.  In the event that the District becomes a debtor under the Bankruptcy Code, the District agrees, to the extent permitted under applicable Law: (a) not to reject this Agreement; (b) to designate Manager as a vendor supplier that is critical to the District's business and obtain a critical vendor order that (x) waives or releases any preference liability; and (y) provides administrative priority or other preferred status, acceptable to Manager, with respect to Manager's pre-petition claims.

(iii)     If Manager, at any time and in good faith, shall deem itself insecure and for the purposes of this Agreement, Manager shall be entitled to deem itself insecure when some event occurs, fails to occur or is threatened or some objective condition exists or is threatened which significantly impairs the prospects that any of the obligations of the District hereunder will be paid when due, or which significantly affects the financial or business condition of the District.  If Manager deems itself insecure, it shall have no obligation to continue performing hereunder more than thirty (30) days from and after it notifies the District that it has deemed itself insecure, unless the District provides Manager with an unconditional, irrevocable letter of credit (the "**Letter of Credit**") from a U.S. banking institution acceptable to Manager, insured by a federal insurance agency ("**Issuer**"). The Letter of Credit shall (i) meet the requirements of the "Uniform Customs and Practice for Documentary Credits," ICC No. 500 (1993 Edition), (ii) name Manager as beneficiary, (iii) be in an amount equal to the lesser of (A) the Termination Fee or (B) such lesser amount as may be specified by Manager, in its sole and absolute discretion, (iv) be payable in full or partial draws against Manager's sight draft, (v) include an "evergreen" provision which provides that the Letter of Credit shall be renewed automatically on an annual basis following its issuance, unless the Issuer delivers thirty (30) days prior written notice of cancellation to Manager, (vi) have an initial expiration date no earlier than one year from the date of issue, and (vii) otherwise be in form and substance satisfactory to Manager.  In the event the Letter of Credit is ever not renewed when required hereunder, Manager shall have the right, immediately upon receipt of the notice of cancellation described above, to draw upon the Letter of Credit and hold the proceeds thereof as a cash security deposit.  Provided that the District is not then in default of any of its obligations hereunder and no act, omission, fact, circumstance, condition or event that with the giving of notice or the passage of time or both would constitute a default hereunder exists, Manager shall return the Letter of Credit to the District within forty-five (45) days after the expiration or termination of this Agreement.  If the Letter of Credit is not timely provided, then Manager shall have the right to immediately terminate this Agreement (with no right on the part of the District to cure same) and receive the Termination Fee.

36

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

    (b)    <u>Liquidated Damages</u>.

        (i)    Each of the parties acknowledges that it would be extremely difficult and impracticable, if not impossible, for Manager to ascertain with any degree of certainty the amount of damages that would be suffered by Manager in the event of the occurrence of a the District Default. In the event this Agreement is terminated as a result of any the District Default, or for any other reason other than a termination by Manager under <u>Section 10(d)(i)</u>, or a Manager Default, the District shall pay a fee (the "<u>**Termination Fee**</u>"), which fee is not a penalty, but rather is liquidated damages in accordance with California Civil Code Section 1671, which the parties have negotiated in good faith and have agreed is a reasonable fee under the circumstances. The Termination Fee shall be paid within five (5) days after the effective date of the termination of this Agreement.

        (ii)    The Termination Fee shall be an amount equal to Seventy Thousand Dollars ($70,000) per month first increased by CPI, as provided below, and then multiplied by the remaining number of months in the Term (not to exceed 120 months) at the time of the termination, discounted to its present value using the discount rate of the Federal Reserve Bank of San Francisco at the time of termination plus one percent (1%).

        (1)    "CPI" means the monthly index of the U.S. City Average Consumer Price Index for Urban Wage Earners and Clerical Workers – Medical Care Services (1982-84 equals 100) published by the United States Department of Labor, Bureau of Labor Statistics or any successor agency that shall issue such index. In the event that the CPI is discontinued for any reason, the parties shall use such other index, or comparable statistics, on the cost of medical care services in the United States, as shall be computed and published by any agency of the United States or, if no such index is published by any agency of the United States, by a responsible financial periodical of recognized authority.

        (2)    Inflation Adjustment. The Termination Fee shall be adjusted for inflation by multiplying the above stated Termination Fee by the CPI percentage increase between January 1, 2015 and the date the Termination Fee is payable, using the latest published data since the last adjustment.

        (iii)    Notwithstanding the foregoing, nothing herein is intended to permit the Termination Fee to exceed such amount as is permissible under any tax-exempt financing requirements under applicable Law, with respect to the Bonds. In the event the Termination Fee exceeds any permissible limit upon such fees, then the Termination Fee shall be reduced to the maximum termination or similar fee permitted under such Law, however denominated, and the District shall enter into any agreements necessary to minimize any reduction to the Termination Fee.

        (iv)    If the District fails to pay the Termination Fee when due, then the Termination Fee, or any unpaid portion thereof, shall bear interest from the date such payment was required to be made until the date of payment at the interest rate set forth in Section 6(e).

        (v)    If upon termination of this Agreement, the District contends that the Termination Fee is not due and owing and Manager contends that same is due and owing, the District shall be obliged to deposit, within three (3) days, the amount of the Termination Fee into an Escrow account with a national bank with not less than $50,000,000,000 in assets. The funds shall be released to the applicable party upon the sooner to occur of: (a) mutual instructions of Manager and the District; (b) final non-appealable order of a court directing the release of the funds

- 37

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

to a party; or (c) to the District if Manager has not contested, in a judicial proceeding, that the funds are owed to it within twenty four (24) months of the termination.

(vi)     This Section shall survive the expiration or termination of this Agreement.

(c)     Manager Default. The following occurrences shall each be deemed an event of default by Manager ("**Manager Default**"), unless waived in writing by the District:

(i)     Material breach of any material covenant of Manager contained within this Agreement, after giving written notice to Manager, and Manager's subsequent failure to cure the breach within sixty (60) days; provided, however, that if the cure cannot reasonably be effectuated within such sixty (60) day period, a longer period shall be allowed, if Manager has commenced to cure such breach or has otherwise provided adequate protection or security to protect the District 's interest hereunder, and Manager is proceeding to effect a cure.     In determining whether a breach has occurred, the District shall exercise its reasonable discretion in good faith and shall use its best efforts to assist Manager in effectuating a cure.

(ii)     The occurrence of any of the following: (a) the filing by Manager of a voluntary petition in bankruptcy or for reorganization under the Bankruptcy Code, or (b) the filing of a petition for the appointment of a receiver for all or any substantial portion of the property of Manager, or (c) the taking of any voluntary or involuntary steps to dissolve or suspend the powers of Manager (unless such steps to dissolve or suspend are removed) within sixty (60) days, or (d) the consent by Manager to an order for relief under the Bankruptcy Code or the failure to vacate such an order for relief within sixty (60) days from and after the date of entry thereof, or (e) the entry of any order, judgment or decree, by any court of competent jurisdiction, on the application of any creditor of Manager or any other Person, adjudicating Manager as a bankrupt, or to be insolvent, or approving a petition seeking reorganization or the appointment of a receiver, trustee or liquidator of all or a substantial part of Manager's assets, if such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days.

(d)     Early Termination Events.

(i)     Notwithstanding anything herein to the contrary, during the initial thirty-six (36) months of the Operating Period, Manager shall have the option to terminate this Agreement before its expiration, upon at least six (6) months' written notice to the District.

(ii)     In the event either party should be determined by a Governmental Authority to be in violation of any Law, by virtue of this arrangement or this arrangement is otherwise deemed illegal by a Court of competent jurisdiction in a final non-appealable determination ("**Jeopardy Events**"), the parties shall use best efforts to negotiate an amendment to this Agreement to remove or negate the Jeopardy Event. If they are unable to do so within six (6) months, either party may terminate this Agreement by written notice to the other, provided that upon such termination the District shall be obliged to pay the Termination Fee as provided in Section 10(b).  Until any such written notice of termination is received, Manager may elect to exercise its rights under Section 9, without regard to whether the preconditions regarding the Bond indebtedness has been satisfied.

38

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(e)     Procedure.

(i)     In the event either party to this Agreement deems the other party to be in default of its obligations hereunder, then said party shall be required to provide notice of the alleged default to the other party, which notice shall contain a detailed description of the alleged default.

(ii)    If the claim of default is disputed by the party receiving such notice, within ten (10) business days thereafter the party receiving the notice shall give notice to the charging party that the party receiving such notice disputes that the factual matters alleged constitute a default under this Agreement.  If the parties cannot resolve such dispute within ten (10) business days thereafter (commencing on the date that the charging party receives notice of the dispute) the parties shall submit such matter to binding arbitration in Los Angeles County, California, in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules and Procedure for Arbitration, and applying the Law of the State.  Any determination by the arbitrator shall be final and binding upon the parties, and judgment thereon may be entered in any court having jurisdiction thereof.  The costs of arbitration shall be borne equally by the parties. During the pendency of any such arbitration and until final judgment thereon has been entered, this Agreement shall not be terminated as a result of the alleged default which is in dispute.

(f)     Termination.

(i)     In the event of a party's failure to cure a default within the time allowed herein for curing such default, the non-defaulting party may immediately terminate this Agreement by notice to the defaulting party and none of the parties shall have any further obligations under this Agreement, except those obligations that by their terms or nature extend beyond the date of expiration or termination, provided, that the non-defaulting party shall have all rights and remedies available hereunder and at Law as a result of the default.  It is understood that in the event of any monetary default by the District which is not cured within the specified ten (10) day period (including the failure to deposit sufficient funds to enable Manager to pay the Hospital and the Clinics and Other Facilities' expenses) Manager may immediately terminate this Agreement by written notice to the District and may cease rendering any services hereunder to the District, all without any further liability to the District (without regard to whether Manager has advanced any funds pursuant to Section 4(j)(i)(1).

(ii)    The parties may mutually agree at any time to terminate this Agreement.

(iii)   This Agreement shall automatically terminate if:

(1)     An Operating Agreement, after its Effective Date, has been terminated and the Manager is not obliged to provide the stand-by management services described in Section 9(b);

(2)     The Operating Period hereunder has expired; or

(3)     A substantial portion of the Hospital and the Clinics and Other Facilities are destroyed or subject to condemnation such that the Operations are, in the sole and absolute discretion of Manager, materially impaired.

39

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(iv)    In the event of termination of this Agreement, Manager shall remove itself as a signatory on the District's accounts and turn over to the District within ten (10) business days following the expiration or termination of this Agreement all business records of the District pertaining to the District. All medical records shall be maintained by the District and shall remain the property of the District.

11.    **Miscellaneous**.

(a)    <u>Complete Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the management of the Hospital and the Clinics and Other Facilities, and supersedes any and all prior agreements, either oral or written, between the parties with respect thereto, including the Management Services Agreement described in the first paragraph of this Agreement.

(b)    <u>Recordation.</u> At the request of either party and at the expense of the requesting party, the parties shall execute a short form memorandum of this Agreement which identifies this Agreement, the parties, the Operating Period, the legal description of the real property upon which the Hospital and the Clinics and Other Facilities are located, and such other matters as the parties may agree. Such memorandum shall be recorded in the Office of the County Recorder of Tulare County, California, at the expense of the requesting party.

(c)    <u>Binding Agreement</u>. This Agreement and the rights and obligations of the parties hereunder are binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Except as provided in this Section, neither party shall have the right to assign its rights or delegate its duties hereunder unless it first obtains the written consent of the other party hereto. Manager may, in its sole and absolute discretion, assign this Agreement, without the District's consent, to any Affiliate of Manager, or to any other Person which is owned and controlled by Manager or the Controlling Persons of Manager, or in connection with a Manager consolidation or sale by Manager to any Person of all or substantially all of Manager's assets or ownership interests. Nothing herein prevents Manager from subcontracting with third parties to perform any of the services required of Manager hereunder. Any assignment in violation of this Section shall be null and void.

(d)    <u>Governing Law</u>. This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in accordance with, the Law of the State. The parties agree that the exclusive jurisdiction and venue of all actions claims, or other legal proceedings arising in any manner pursuant to this Agreement, shall be vested in the Superior Court of the County of Los Angeles in the State and in no other. Notwithstanding any other provisions contained in any other document executed simultaneously herewith, each party, for itself, and all successor, assigns, heirs, executors, or future parties at interest agree and accept the jurisdiction of these courts and waive any defense of personal jurisdiction, forum non conveniens, venue or similar defenses and irrevocably agree to be bound by any judgment rendered in the aforementioned Court; exclusive of any and all other Federal or State courts.

(e)    <u>Headings</u>. The section and subsection headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Agreement.

(f)    <u>Notices.</u> Except as otherwise expressly permitted herein, all notices required or permitted to be given hereunder shall be in writing (whether or not written notice is specified herein) and shall be personally delivered, or mailed by United States mail, postage

40

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

prepaid, registered or certified, return receipt requested, or sent by a nationally recognized overnight delivery service, or sent by electronic transmission system. Unless such information is changed by written notice given by the affected party, any such notices shall be sent to the following addresses:

> If to Manager:
> HealthCare Conglomerate Associates
> Attention: Benny Benzeevi, M.D.
> 810 North Cherry Street
> Tulare, CA 93274
> Email: Benny@Healthcca.com
>
> With a copy to:
> Bruce R. Greene, Esq.
> Baker Hostetler LLP
> 11601 Wilshire Blvd., Suite 1400
> Los Angeles, CA 90025
> Email: brgreene@bakerlaw.com
>
> If to the District:
> Tulare Regional Medical Center
> Attention: Chair of the Board
> 869 North Cherry Street
> Tulare, CA 93274
> Email: sbell@tulareregional.org
>
> With a copy to:
> Dooley, Herr, Pedersen & Berglund Bailey
> Attention: Kris Pedersen
> 100 Willow Plaza, Suite 300
> Visalia, CA 93291
> Email: kpedersen@dhlaw.net

All notices sent by personal delivery shall be effective and deemed served upon receipt thereof. All notices sent by mail shall be effective and deemed served three (3) calendar days after being deposited in the United States mail. All notices sent by overnight delivery service shall be effective and deemed served when delivered by such overnight delivery service. All notices sent by electronic transmission system shall be effective and deemed served on the day of transmission, if on a business day and during business hours (9am until 5pm, PT) or otherwise on the next business day thereafter.

(g)     Survival of Representations. All of the representations, and warranties, and those covenants and agreements contained in this Agreement which are stated to survive termination or expiration of this Agreement, shall survive the expiration or the termination, for any reason, of this Agreement. No performance or execution of this Agreement, in whole or in part, by any party hereto, no course of dealing between the parties hereto or any delay or failure on the party of any party in exercising any rights hereunder or at Law or in equity, and no investigation by any party hereto, shall operate as a waiver of rights of such party, except to the extent expressly waived in writing by such party.

41

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(h)     Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Signatures transmitted by facsimile or e-mail or other digital means shall be accepted as original signatures.

(i)     Severability.

(i)     Each and every provision of this Agreement is severable, and the invalidity of one or more of such provisions shall not, in any way, affect the validity of this Agreement or any other provisions hereof.  If any clause or provision of this Agreement is illegal, invalid or unenforceable, then and in that event, it is the intention of the parties hereto that the remainder of this Agreement shall not be affected thereby, and it is also the intention of the parties to this Agreement that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Agreement a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(ii)     The parties hereby have made all reasonable efforts to ensure this Agreement represents and memorializes the complete and final agreement between the parties hereto, and that it complies with all applicable Law.  In the event there is a change in Law, or the interpretations thereof, whether by statute, regulation, agency or judicial decision, or otherwise, that has any material effect on any term of this Agreement, or in the event that a party's reputable counsel (being legal counsel with at least ten (10) years' experience in Hospital Law) determines that any term of this Agreement poses a material risk of violating any Law, then the applicable term(s) of this Agreement shall be subject to renegotiation and either party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other party, to remedy such condition.  In the interim, the parties shall perform their obligations hereunder in full compliance with applicable Law.   The parties expressly recognize that upon request for renegotiation, each party has a duty and obligation to the other only to renegotiate the affected term(s) in good faith and, further, the parties expressly agree that their consent to proposals submitted by the other party during renegotiation efforts shall not be unreasonably withheld or delayed.  The parties further expressly recognize that in any such renegotiation, the relative economics to each of the parties shall be preserved.  Should the parties be unable to renegotiate the term or terms so affected so as to bring it/them into compliance with Law or the interpretation thereof within sixty (60) days of the date on which written notice of a desired renegotiation is given, then either party shall be entitled, after the expiration of said sixty (60) day period, to terminate this Agreement upon sixty (60) days' written notice to the other party, provided that such party has received an opinion of reputable legal counsel, which legal counsel and opinion are reasonably acceptable to the other party, that it is more likely than not that this Agreement violates applicable Law.  If this Agreement is terminated pursuant to Section 11(i)(ii), Manager shall be entitled to receive payment of the Termination Fee.

(j)     Cumulative Rights and Remedies.  Any right, power or remedy provided under this Agreement or any party hereto shall be cumulative and in addition to any other right, power or remedy provided under this Agreement or existing in Law or in equity, including, without limitation, the remedies of injunctive relief and specific performance.

(k)     Modification and Waiver.

(i)     This Agreement may only be amended by a writing signed by both parties.

42

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(ii)     No failure by any party to insist upon strict compliance with any term of this Agreement, to exercise any option, enforce any right, or seek any remedy upon any default of any other party shall affect, or constitute a waiver of, the first party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default; nor shall any custom or practice of the parties at variance with any provision of this Agreement affect or constitute a waiver of, any party's right to demand strict compliance with all provisions of this Agreement.

(l)     Attorneys' Fees.  If any action at law or in equity (or any arbitration proceeding required hereunder) is brought to enforce any of the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs in addition to any other relief, as determined by the applicable court or arbitrator.  The foregoing includes reasonable attorney's fees in connection with any bankruptcy proceeding (including relief from stay litigation), and in connection with any appeals.

(m)     Independent Contractor Status.  Notwithstanding any provision contained herein to the contrary, Manager and the District each understand and agree that the parties hereto intend to act and perform as independent contractors.  Therefore, the District is not an employee or partner of Manager.  Nothing in this Agreement shall be construed as placing the District in a relationship of employer-employee or partners with Manager.  The parties shall not have the right to make any promises, warranties or representations, or to assume or create any obligations, on behalf of the other party except as otherwise expressly provided herein or as otherwise agreed.  The District and Manager agree to be solely and entirely responsible for their respective acts and for the acts of any of their respective employees and agents, except as otherwise expressly provided herein.

(n)     Ambiguities and Uncertainties.  This Agreement and any ambiguities or uncertainties herein, or the documents referenced herein, shall be equally and fairly interpreted and construed without reference to the identity of the party or parties preparing this Agreement or any of the documents referred to herein, on the express understanding and agreement that the parties participated equally in the negotiation of the Agreement and the documents referred to herein, or have had equal opportunity to do so.  Accordingly, the parties hereby waive the benefit of California Civil Code Section 1654 and any successor or amended statute providing that in cases of uncertainty, language or a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

(o)     Consents, Approvals and Discretion.  Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by any party or any party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld, conditioned or delayed and such discretion shall be reasonably exercised, except as otherwise provided herein.  If no response to a consent or request from Manager to the District for approval is provided to Manager within ten (10) days from the receipt by the District of the request, then the consent or approval of the District shall be deemed to have been given.

(p)     Expiration of Time Periods.  In the event that any date specified herein is, or that any period specified herein expires on, a Saturday, a Sunday, or a State or federal holiday, then such date or the expiration date of such period, as the case may be, will be extended to the next succeeding business day.  A business day is a day on which banks are required to be open for business in Los Angeles, California.  All references in this Agreement to "days" are to calendar days, unless business days are so indicated.

43

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(q)     <u>Force Majeure</u>. Except with respect to payment obligations, neither party shall be liable nor deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, machinery or supplies, vandalism, strikes or other work interruptions beyond the reasonable control of either party. However, both parties shall make good faith efforts to perform under this Agreement in the event of any such circumstances.

(r)     <u>No Third-Party Beneficiaries</u>. The rights, privileges, benefits, and obligations arising under or created by this Agreement are intended to apply to and shall only apply to the parties and to no other Persons, except as otherwise set forth herein.

(s)     <u>Consequential Damages</u>. Except as expressly provided herein to the contrary, neither party shall be liable under this Agreement for consequential damages, incidental damages, indirect damages, or special damages or for loss of profit, loss of business opportunity or loss of income. Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge and agree that the terms and provisions of this <u>Section 11(s)</u> shall not limit, alter, modify, impair, or otherwise affect any of the remedies of Manager set forth in this Agreement, including the right to be paid the Termination Fee.

(t)     <u>Limitation of Liability</u>. Notwithstanding any provision in this Agreement to the contrary, under no circumstances shall Manager or any Manager Party have any personal liability for any failure to perform any obligations arising out of or in connection with this Agreement or for any breach of the terms or conditions of this Agreement (whether written or implied). No personal judgment shall lie against Manager or any Manager Party and any judgments so rendered shall not give rise to any right of execution or levy against any of their assets. Any judgments rendered against Manager shall be satisfied solely out of the assets of Manager. The foregoing provisions are not intended to relieve Manager from the performance of any of Manager's obligations under this Agreement, but only to limit the personal liability of Manager and Manager Parties in case of recovery of a judgment against any of them.

(u)     <u>Additional Assurances</u>. The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of a party, the other party or parties shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement.

(v)     <u>Expenses</u>. District shall bear any costs and expenses incurred by it in connection with the negotiation of the transactions contemplated herein and shall reimburse Manager for its actual out-of-pocket expenses incurred in connection with formulating, identifying, and developing transaction structures and strategies, financial and operational due diligence, preparation of definitive transaction agreements and ancillary documents, oversight of the legal process, and coordination and oversight of transaction implementation strategy related to the transactions contemplated herein, provided that such amount shall not exceed One Hundred Eighty Thousand Dollars ($180,000). Manager shall bear any other costs and expenses incurred by it in connection with the negotiation of the transactions contemplated herein.

[Signatures on next page]

44

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates



## EXHIBIT A

### LIST OF FACILITIES

Evolutions Fitness & Wellness
1425 E. Prosperity Avenue
Tulare CA

Family X-Ray Center
880 E. Merritt Ave
Tulare, CA  93274

Hillman Healthcare Center - 1062 South K Street Tulare, CA. 93274

Kingsburg Healthcare Center - 1200 Smith Street  Kingsburg, CA. 93631

Lindsay Healthcare Center - 845 N Sequoia Ave Lindsay, CA. 93247

West Street Healthcare Center - 325 N West Street  Tulare, CA. 93274

Woodville Healthcare Center - 16796 Ave 168  Woodville, CA. 93257

Allied Services Center
    Tulare Regional Medical Center Clinical Laboratory
    Allied Services Building
    869 N. Cherry
    Tulare, CA  93274

    Tulare Regional Laboratory - Alternate Collection Site
    799 Cherry Street
    Tulare, CA  93274

    Mineral King Toxicology Laboratory
    880 E. Merritt, Suite 107
    Tulare, CA  93274

Retail Pharmacy
    Tulare District Hospital Pharmacy
    869 N Cherry St
    Tulare, CA 93274

Together with such other facilities and clinics as are owned, leased or otherwise operated by District that Manager elects to operate hereunder, by notice to District from time to time.

Exhibit A

603545537.7

**EXHIBIT B**

INTERIM JOINT OPERATING AGREEMENT


[Attached]

# Interim Joint Operating Agreement

## between

## HealthCare Conglomerate Associates, LLC

## and

## Tulare Regional Medical Center

MAY 29, 2014

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

## INTERIM JOINT OPERATING AGREEMENT

This INTERIM JOINT OPERATING AGREEMENT ("**Agreement**") is made and entered into on ___May___ 29, 2014 to be effective upon the termination of the MSA, as defined below, ("**Effective Date**"), by and between HealthCare Conglomerate Associates, LLC, a California limited liability company ("**HCCA**"), and Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center ("**District**").

### R E C I T A L S:

WHEREAS, the District is the owner of the real property identified on **Exhibit A** hereto together with the Buildings thereon, and certain equipment, supplies and fixtures associated therewith on which it operates an acute care hospital facility, known as Tulare Regional Medical Center, located in Tulare, California (the "**Hospital**");

WHEREAS, the District is the owner or tenant of certain other real property, including, without limitation, the Buildings thereon, and the Clinics and Other Facilities, together with certain equipment, supplies and fixtures associated therewith;

WHEREAS, the parties, have previously entered into that certain Management Services Agreement, of even date herewith (the "**MSA**") which sets forth the terms and conditions pursuant to which HCCA provides certain management services to the District, and which contemplates the execution of this Agreement.

WHEREAS, the District has determined that it is in the best interests of the residents of the District that the operation of the Hospital and the Clinics and Other Facilities be delegated to HCCA, and that such delegation will best serve the interest of the District;

WHEREAS, HCCA and the District wish to enter into this Agreement for the purpose of forming an interim joint venture for the operation of the Hospital and the Clinics and Other Facilities in order to assure consistent high quality health care services are provided efficiently and to reduce the District's financial risk in providing those services;

WHEREAS, the District believes that this Agreement is necessary for the provision of adequate health services to the communities served by the District and that this arrangement constitutes a new method of providing adequate health care to the communities served by the District, as contemplated by California Health and Safety Code § 32126.5.

WHEREAS, the parties acknowledge that in today's healthcare environment, HCCA will need the flexibility to respond appropriately in conducting the Operations;

WHEREAS, the District shall act as an advocate for the community in its relations with HCCA; and

WHEREAS, under the Laws of the State, including, without limitation, California Health and Safety Code § 32121(o) and § 32126.5, the District and HCCA each is authorized to enter into and perform this joint venture arrangement and each has been duly authorized to do so by resolutions adopted by the Governing Body and by the manager of HCCA.

NOW, THEREFORE, for and in consideration of the premises and the mutual undertakings and representations herein contained and for other good and valuable consideration, the receipt and

1

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

sufficiency of which are hereby acknowledged, the parties hereto, intending to become legally bound, hereby agree as follows:

## AGREEMENT

1. **Definitions.**

All capitalized terms not defined elsewhere in this Agreement shall have the following meanings, unless a different meaning clearly appears from the context:

(a)    "Affiliate" means any other firm, partnership, association, corporation, joint venture or public body, directly or indirectly controlling or controlled by, or under direct or indirect common control with, the District or HCCA.  The term "control," when used with respect to a particular Person, means the possession, directly or indirectly, of the power to direct or cause the direction of management in the policies of such Person whether through the ownership of voting stock, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(b)    "Annual Budget" shall have the meaning set forth in Section 4(i)(i).

(c)    "Assumed Contracts" means those contracts which HCCA elects or has previously elected, in its sole and absolute discretion, to assume, pursuant to the provisions of Section 3(a)(x).

(d)    "Bonds" means the $15,700,000 Refunding Revenue Bonds, series 2007, the $8,595,000 General Obligation Bonds (2005 Election), Series B-1, 2009 and the $61,405,000 General Obligation Bonds (2005 Election), Series B-2, 2009 or any other bonds hereafter issued by the District with the consent of HCCA.

(e)    "Buildings" means those buildings and other structures in which the Operations now or hereafter are conducted, together with such other buildings and structures now or hereafter owned, leased or otherwise operated by the District that HCCA elects, in its sole and absolute discretion, to operate hereunder, by notice to the District from time to time.

(f)    "CIA" shall have the meaning set forth in Section 18(a).

(g)    "Claims" shall have the meaning set forth in Section 2(f)(x)(iv).

(h)    "Clinics and Other Facilities" means those facilities and businesses identified on Exhibit B to this Agreement, together with such other facilities and clinics owned, leased or otherwise operated by District that HCCA elects, in its sole and absolute discretion, to operate hereunder, by notice to District from time to time.

(i)    "Compliance Plan" shall have the meaning set forth in Section 18(a).

(j)    "Consultants" shall have the meaning set forth in Section 4(j).

(k)    "Contracts" means all service, supply, maintenance, and utility agreements, all leases, and all other contracts, agreements, arrangements, and obligations relating to the Operations, whether oral or written, all of which are described in Exhibit C to this Agreement.  True, correct, and complete copies of all of the written Contracts (including all

2

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

amendments thereto), in existence on the Effective Date, will be delivered to HCCA and detailed descriptions of all of the oral Contracts, in existence on the Effective Date, will also be delivered to HCCA.

(l)     "CPI" shall have the meaning set forth in Section 6(e)(ii)(1).

(m)    "CPI Increase" shall have the meaning set forth in Section 6(e)(ii)(1).

(n)     "District Default" shall have the meaning set forth in Section 6(d).

(o)     "District Service Area" means the geographic boundaries of the District established under applicable Law, as currently in effect and as hereafter amended.

(p)     "Emergent Expenses" shall have the meaning set forth in Section 4(i)(ii).

(q)     "GAAP" means United States generally accepted accounting principles and practices as in effect from time-to-time, as applied by HCCA.

(r)     "Governing Body" means the Board of Directors of the District.

(s)     "Governmental Authority" means any federal, State or local judicial, executive or legislative body or governmental municipality, department, commission board, agency or authority including government contractors for federal health programs, and including without limitation, the State of California – Health and Human Services Agency Office of Statewide Health Planning and Development.

(t)     "HCCA Default" shall have the meaning set forth in Section 6(f).

(u)     "HCCA Parties" means HCCA and its Affiliates, and their respective officers, directors, managers, employees, agents, contractors and representatives.

(v)     "HCCA Property" means any machinery, inventory, equipment, fixtures, hardware and software, or other personal property (tangible and intangible) associated with Operations that HCCA has constructed, installed or otherwise acquired, at its expense.

(w)     "Hospital" shall have the meaning set forth in the Recitals of this Agreement.

(x)     "Hospital Law" means California Health and Safety Code §32000 et seq.

(y)     "Ineligible Person" shall have the meaning set forth in Section 18(d).

(z)     "Jeopardy Events" shall have the meaning set forth in Section 6(g)(ii).

(aa)    "Law" means any constitutional provision, statute, ordinance, or other law, rule, regulation, interpretation, judgment, decree or order of any Governmental Authority or any settlement agreement or compliance agreement with any Governmental Authority, including Hospital Law.

(bb)    "Major Decisions" has the meaning set forth in Section 2(d).

(cc)    "Medical Staff" shall have the meaning set forth in Section 4(d)(i).

3

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(dd) "OIG" shall mean the Office of Inspector General of the Department of Health and Human Services.

(ee) "Operating Expenses" means all costs and expenses paid or incurred in connection with the Operations, determined in accordance with sound accounting and management practices, including without limitation, utilities, insurance, taxes, supplies, cost of Permits, salaries and other compensation due to employees or payable to third party consultants (including legal and accounting expenses) contractors, maintenance and repair of the Hospital or the Clinics and Other Facilities, including janitorial, security, elevator, painting, plumbing, electrical, carpentry, window washing, signage, landscaping, parking lot maintenance and waste disposal, including disposal of bio hazardous medical waste generated in Operations in accordance with applicable Law.

(ff) "Operations" means the healthcare and other operations and programs which are conducted at the Hospital and the Clinics and Other Facilities, as the same may be modified by HCCA from time to time during the Term.

(gg) "Permits" means all permits, licenses, registrations, orders, consents, certificates, accreditations, authorizations, waivers and approvals of any Governmental Authority.

(hh) "Person" means an association, a corporation, a limited liability company, an individual, a partnership (general or limited), a trust, a hospital district organized under the Hospital Law, or any other entity or organization, including a Governmental Authority.

(ii) "Preexisting Claims" shall have the meaning set forth in Section 2(f)(x)(r).

(jj) "Project" shall have the meaning set forth in Section 2(f)(i).

(kk) "State" means the State of California.

(ll) "Substantial Part of the Hospital or the Clinics and Other Facilities" means the portion of such facilities, as HCCA, in its sole and absolute discretion, shall determine which would prevent or materially interfere with the use of any of the Hospital or the Clinics and Other Facilities for the purposes set forth herein.

(mm) "Term" has the meaning set forth in Section 6.

(nn) "Termination Fee" shall have the meaning set forth in Section 6(e)(i).

2. **General Responsibilities of the Parties.**

(a) Appointment. The District hereby appoints HCCA and HCCA hereby accepts such appointment from the District, subject at all times to the terms and provisions herein, as the sole and exclusive agent to operate the Hospital and the Clinics and Other Facilities and to provide the day-to-day and strategic management of the foregoing. HCCA shall have the general responsibility and authority to implement all aspects of the Operations in accordance with HCCA's policies and procedures, in such manner as HCCA shall determine in its sole and absolute discretion, subject to Section 2(d). The parties intend that HCCA will operate and retain full control over the Hospital and the Clinics and Other Facilities and shall make all decisions and is hereby authorized to take any action of any kind and to do anything

4

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

and everything it deems necessary, in its sole and absolute discretion, in connection with the Operations, except as provided in <u>Subsection 2(d)(i)(3)</u>.  Nothing in this Agreement shall be construed to create any fiduciary duty owed by either party to the other party or any of their respective Affiliates.

  (b) <u>Ownership of Assets</u>.  The District will continue to retain ownership of the real and personal property (including the intangible property) of the Hospital and the Clinics and Other Facilities but subject to HCCA's right and authority to make use of such property for the purposes of this Agreement, as set forth in <u>Section 3(a)</u>.  This Agreement is not intended to: (i) be a lease, does not create any landlord/tenant relationship between the District and HCCA, and is not intended to convey or constitute an estate or interest in the real property of District or (ii) result in the transfer of the District's facilities from District ownership, as prohibited under California Health and Safety Code §32121(r).  It is intended that this Agreement shall constitute a license.

  (c) <u>Representations of the District</u>.  The District represents to HCCA as follows:

   (i) The execution and delivery of this Agreement by the District and the consummation by the District of the transactions contemplated hereby do not nor will they, after the giving of notice, or the lapse of time, or otherwise (i) violate any judgment, order, injunction, decree, regulation or ruling of any court or authority actually known to the District, or (ii) conflict with, result in a breach of, or constitute a default under any Bond, note or other evidence of indebtedness, any mortgage, or other material Contract or instrument to which the District is a party or by which the District is bound.

   (ii) Except for applicable consents described herein, no approval, consent or authorization of, filing or registration with or giving of notice to, any Governmental Authority or any other Person, including any Bond trustee, is required for the execution, delivery or performance of this Agreement or the consummation of the transactions contemplated hereby.

  (d) <u>Certain Rights and Obligations of the District</u>.

   (i) During the term hereof, the District shall do or cause all things to be done reasonably necessary to preserve, renew and keep in full force and effect its legal existence under the Law of the State.  In addition, the District shall participate in the following matters ("**Major Decisions**"):

    (1) Changes to the charity care policy of the Hospital that would result in a material change to the overall number of eligible participants in the charity care programs;

    (2) Changes in clinical or operational policies and procedures for District programs which would significantly and materially limit the scope of services provided at the Hospital;

    (3) In addition, while the District and HCCA believe that, as a result of the delegation of management duties hereunder, the Governing Body is not required to: (i) make and enforce all rules, regulations and bylaws necessary for the administration, government, protection and maintenance of the Hospital and the Clinics and Other Facilities and

5

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

the property belonging thereto or (ii) prescribe the terms upon which patients may be admitted thereto, as referenced in California Health and Safety Code § 32125(a). Notwithstanding the foregoing, in the event that it is determined that the Governing Body must continue to directly fulfill the duties set forth under California Health and Safety Code § 32125(a), then the Governing Body shall have the right, in consultation with HCCA, to: (i) make and enforce all rules, regulations and bylaws necessary for the administration, government, protection and maintenance of health care facilities under their management and all property belonging thereto; (ii) prescribe the terms upon which patients may be admitted to the Hospital; and (iii) establish and maintain minimum standards of operation, as prescribed under Division 23, Chapter 2, Article 2 of the California Health and Safety Code. In the event that the parties disagree as to the applicability of California Health and Safety Code § 32125(a), the District shall be required to bring a declaratory judgment action in a court in the venue set forth in Section 23(f) to determine the applicability of California Health and Safety Code § 32125(a) and the scope of the required management rights to be vested in the District hereunder; and

In connection with the participation by the District in Major Decisions, the parties shall use their good faith efforts to resolve any disagreements by consensus. HCCA shall give consideration to the views, positions and recommendations of the District. However, final decisions shall be made by HCCA, in its sole and absolute discretion, except as provided in Subsection 2(d)(i)(3). For the avoidance of doubt, the decision-making authority of the District with respect to the virtual joint venture formed hereunder is intended to be limited and advisory in nature, except as provided in Subsection 2(d)(i)(3). Except as otherwise expressly required by applicable Law (including as provided in Subsection 2(d)(i)(3)), the District shall not have any rights to vote or decide any matters related to the Operations or otherwise; and

(4)     Matters pertaining to the Project (as defined herein) as described more fully in Section 2(f).

(e)     Liaisons.  Each party shall appoint one senior executive who possesses a general understanding of the issues related to the joint venture collaboration contemplated by this Agreement to act as its respective liaison for this relationship.  The liaisons as of the date hereof shall be:

District: Chairman

HCCA: It's Manager

A party may replace its respective liaison at any time upon notice to the other party.  Any liaison may designate a substitute to temporarily perform the functions of that liaison.  Each liaison shall be charged with creating and maintaining a collaborative relationship.  Each liaison will also be responsible for:

(i)     coordinating the relevant functional representatives of the parties, in developing and executing strategies and plans hereunder;

(ii)     providing a single point of communication both internally within the respective party's organizations and together regarding key strategy and plan issues; and

(iii)     identifying and raising cross-party and/or cross-function disputes to the party's respective senior leadership team in a timely manner.

6

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

Upon the reasonable request of either party's liaison, and with reasonable notice, each party's liaison, as well as appropriate additional personnel involved in the performance of this Agreement, shall meet at a location mutually agreed to by the parties to discuss issues related to this Agreement.

(f)     Construction Project Advice.

(i)     HCCA shall provide the District with advice and recommendations regarding the current Hospital construction project (involving the construction of a new tower commonly referred to as the Tower No. 1 Expansion Project (the "**Project**")) and will assist the District in its coordination of the Project. HCCA shall not be a contractor on the Project and shall not have control over, charge of or responsibility for, the means, methods techniques, sequences, procedures, or for the safety precautions and programs related to such Project. HCCA shall not have control over or be responsible for the District's architects or contractors or their agents, nor shall HCCA be deemed to be responsible for the construction of the Project, directly or indirectly or the funding of such Project.

(ii)     HCCA shall provide consultation and advice, and shall assist the District in the District's efforts to discharge all of the field operations requirements and responsibilities of the District as the owner of the Project as required under the construction contracts between the District and its contractors (the "**Contract Documents**") and to cause the District's contractors to perform the work required to construct the Project in accordance with the Contract Documents. In this regard, HCCA shall provide recommendations to the District to assist in its evaluation of the status of the on-going construction associated with the Project; HCCA shall provide on-site administration of the Contract Documents in cooperation with the Project architect. HCCA shall provide assistance, including administrative, management and related services, to coordinate scheduled activities and responsibilities of the contractors, and HCCA shall schedule and conduct meetings to discuss such matters as procedures, progress, coordination, and scheduling of the Project work.

(iii)     HCCA shall endeavor to obtain satisfactory performance from the District's contractors, but shall have no liability for any failure of performance by any of such contractors. HCCA shall have no liability for any design defect or other matter which is the responsibility of the Project architect. HCCA shall recommend courses of action to the District when requirements of the Contract Documents are not being fulfilled. HCCA shall report to the District any defects or deficiencies in the work of any contractor or their agents or employees, or any other Person performing construction on or providing materials or equipment to the Project of which HCCA obtains actual knowledge. Notwithstanding the foregoing, HCCA shall have no obligation to investigate or take active steps to determine the existence of any such defects or deficiencies, nor shall HCCA be liable, for any failure to timely communicate any such defect or deficiency to the District. HCCA may recommend the rejection of any deficient or defective work to the District, if such work does not conform to the Contract Documents; however, the failure of HCCA to recommend rejection of any such work shall not constitute HCCA's approval or acceptance of the work.

(iv)     HCCA shall review requests for changes in the construction contracts, assist in negotiating contractors' proposals, and provide recommendations to the Project architect and the District in connection therewith.

(v)     HCCA shall monitor and evaluate actual costs for the construction work, and estimates for uncompleted work, and shall advise the District as to variances between

7

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

actual and budgeted or estimated costs. HCCA shall notify the District if there are any apparent inconsistencies or inaccuracies in the information presented by the District's contractors. HCCA shall also report the contractors' cost control information to the District.

(vi)    HCCA shall assist the District in developing and implementing procedures for the review and processing of applications for payment from the contractors for progress and final payments.

(vii)    HCCA shall record the progress of the Project.  On a monthly basis or otherwise as requested by the District, HCCA shall submit written or oral progress reports to the District and attend monthly Governing Body meetings requested by the District.

(viii)    HCCA shall not have control over, charge of, or responsibility for the construction means, methods, techniques, sequences or procedures, or for safety precautions or programs in connection with the work of any contractors.

(ix)    Project Consultants.   HCCA shall make recommendations if it determines that consultants are reasonably required for the Project, and shall assist the District in selecting and engaging such Consultants.  HCCA shall supervise and coordinate Project Consultants.

(x)    Limitations.

(1)    HCCA has no authority to execute any Contract Documents or otherwise bind the District to any transactions with respect to the Project. HCCA shall not provide any legal services or architectural services with respect to the Project. The District agrees that although HCCA will make recommendations, HCCA shall not take any action in connection with the implementation of such recommendations without the District's prior approval.

(2)    The District will at all times maintain a meaningful and substantial involvement in all phases of the Project, and hereby accepts responsibility for the results of the Project.  HCCA's recommendations concerning the terms of the Construction Contracts shall be subject to review and approval of the District and the District's attorneys or other advisers.

(3)    The District acknowledges that HCCA does not guarantee any particular results, notwithstanding projections which may be made by HCCA.  HCCA's projections and forward looking statements are based on estimates and expectations, and reasonably available data from contractors, architects and others, and as a result are inherently uncertain.  Actual results could differ materially from those anticipated as a result of a variety of factors.

(4)    Neither HCCA nor HCCA Parties shall be liable to the District for any claims, demands, costs, expenses, liabilities or obligations of any nature relating to the Project, ("**Claims**"), except to the extent resulting from the willful misconduct of HCCA or HCCA Parties.  HCCA and HCCA Parties may be liable to the District for general and direct damages, but in no event shall HCCA or any HCCA Parties be liable to the District for any consequential damages, including loss of use, special, indirect or incidental damages.  HCCA and HCCA Parties may be liable for punitive or exemplary damages to the extent resulting from their willful misconduct.

8

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(5)     The District shall defend, indemnify and hold HCCA and HCCA Parties free and harmless from and against all Claims (including reasonable attorney's fees), except to the extent resulting from the willful misconduct of HCCA or HCCA Parties.  It is understood and agreed that, HCCA and HCCA Parties shall have no liability whatsoever for any actions or failure to act which arose prior to the Effective Date, including Claims which relate in any way to construction activities which occurred prior to that date ("**Pre-existing Claims**").  In the event that any Claims are made against HCCA or any HCCA Party which may include Pre-existing Claims, then the indemnification and defense obligations of the District shall apply, even if they also involve Claims which are not Pre-existing Claims. However, in the event of a determination by a court or arbitrator that any Claims for which indemnification was provided by the District were not in fact Pre-Existing Claims and were not Claims for which indemnification is otherwise required hereunder, then HCCA shall be liable to reimburse the District for any reasonable costs or expenses incurred by the District in connection with the defense or indemnification.

(6)     In circumstances where any limitation on damages or indemnification provision hereunder is unenforceable or unavailable for any reason, the District shall contribute to any Claims, relating to the Services provided hereunder by HCCA, in such proportion proportional to the relative fault of the parties bears to all other conduct giving rise to such Claim.

(7)     Neither HCCA nor any HCCA Parties, or any of their respective Affiliates, shall have any liability hereunder to the District, and the District agrees it will not bring any action against any such Persons, except to the extent caused by the willful misconduct of such Persons.  Without limiting the foregoing, such Affiliates are intended third-party beneficiaries of these terms and may in their own right enforce such terms.

(8)     The provisions of Section 2(f)(x)(4)-(7) shall survive the expiration or termination of this Agreement.

(g)     Funds.  If HCCA shall determine that sufficient funds are not available from the Operations and amounts deposited with HCCA as provided in Section 2(h), the District shall furnish HCCA with timely and sufficient funds to timely pay the Operating Expenses, both operating and non-operating expenses.  HCCA will notify the District by submitting a fund request to the District and the District will supply the requested funds within three (3) calendar days of HCCA's notification of the District of the need for same, provided that for unanticipated Emergent Expenses, HCCA shall have the right to provide a shorter notice period.  HCCA shall not be obliged to fund Operating Expenses or other expenses hereunder or provide funds to accommodate shortfalls in revenue, except where an expense is specifically and expressly allocated to HCCA herein.  Notwithstanding the foregoing, HCCA, may, in its sole and absolute discretion, advance funds as provided in Section 2(g)(i). HCCA shall not be in default hereunder if HCCA's failure to comply with the terms of this Agreement is due to the lack of adequate funds provided by the District.

(i)     Notwithstanding anything in this Agreement to the contrary, in the event the District fails to timely advance funds as required hereunder and/or meet any of its payment obligations under this Agreement, HCCA shall have the right, but not the obligation, in its sole and absolute discretion, to advance funds or agree to undertake to advance funds to any Person, as a loan to the District to meet the shortfall caused by the District's failure.  All sums advanced by HCCA pursuant to such agreements or undertakings shall be for the District's account.  The District shall pay HCCA interest on all advanced funds at the rate set

9

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

forth in Section 19(d) and the principal, upon demand by HCCA. Any advance made shall be evidenced by a promissory note issued by the District in an amount equal to the amount advanced.

(ii)     To the extent HCCA advances funds, this Agreement constitutes a security agreement pursuant to which the District provides HCCA with a lien on all of the District's Assets (as defined herein), to the extent allowed by Law, and HCCA shall have the right to file a Uniform Commercial Code financing statement with respect to such obligation without the signature of the District.

(iii)    HCCA shall have the right to execute the above described promissory note on behalf of the District, to the extent permitted by Law. The District hereby irrevocably appoints HCCA as its attorney-in-fact coupled with an interest with full power to prepare and execute any documents, instruments and agreements, including, but not limited to, any note evidencing the advance or loan and any Uniform Commercial Code financing statements, continuation statements and other security instruments as may be appropriate to perfect and continue its security interest in favor of HCCA.

(h)     Charitable Care and Operational Support Fund.

(i)     The District recognizes that the continued operation of the Hospital and Clinics and Other Facilities in accordance with the District's historical role as the primary provider of healthcare for the indigent and uninsured populations of Tulare County, California, precludes operation of the Hospital and Clinics and Other Facilities for the provision of high quality healthcare without support from sources other than patient revenues, especially in light of increasing indigent and charity populations and adverse reimbursement changes. The District has determined that in light of the increasing healthcare costs it is in the best interest of the District to subsidize the cost of providing healthcare services for the indigent and uninsured populations of Tulare County, California and surrounding areas through the arrangement set forth herein and that the provision of sufficient funds for such care is essential.

(ii)     Except for funds required to be held by the District to support principal and interest on the Bonds and such other amounts as may be required to satisfy covenants under the Bonds, that all funds derived from the District's regular annual tax and assessments shall be conveyed by the District to HCCA, on not less than a monthly basis, to be held by HCCA (the "**Charitable Care and Operational Support Fund**") to use to pay expenses incurred in connection with the operation and maintenance of the Hospital and the Clinics and Other Facilities in accordance with the provisions hereof, including the cost of providing charitable care, as provided herein. Notwithstanding the foregoing, the balance contained in the Charitable Care and Operational Support Fund shall not exceed the sum of ten percent (10%) of the estimated annual expenditures related to the Hospital and the Clinics and Other Facilities, if disbursements would otherwise require a written order of the District's President and Secretary, as provided under applicable Law.

(iii)    Upon termination of this Agreement, any amounts remaining in the Charitable Care and Operational Support Fund shall be: (i) transferred to the Subsidy Fund established under the Long Term Operating Agreement, if the parties hereto enter into such agreement or (ii) returned to the District by HCCA.

(iv)    The District shall use its reasonable commercial efforts to (i) obtain the consent of any Bond trustees required to effectuate and fund the foregoing Charitable

10

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

Care and Operational Support Fund arrangement as soon as reasonably practicable and (ii) reasonably minimize the amount of funds required to be held by the District to support principal and interest on the Bonds and such other amounts as may be required to satisfy covenants under the Bonds.

(v)  HCCA shall provide the District with a quarterly statement of the charitable care provided, including such care provided with funds from the Charitable Care and Operational Support Fund.

(vi)  HCCA shall have, to the fullest extent allowed by Law, the right to withdraw funds from the Charitable Care and Operational Support Fund, as it deems necessary or advantageous, for the operation of the Hospital and Clinics and Other Facilities and the provision of healthcare services, including amounts for capital expenditures.

(vii)  The District shall assure that its funds are used to support the Hospital and the Clinics and Other Facilities and to provide charitable care therein and are not diverted to other uses.

(i)  Cooperation and Responsiveness.

(i)  The District and its Governing Body shall fully and timely cooperate with HCCA and shall be responsive and available to HCCA during the Term in order that HCCA can carry out its duties and obligations hereunder.

(ii)  In any instance in which the District (or the Governing Body) has an obligation to provide input or decide an issue, or provide (or withhold) its approval or consent under the terms of this Agreement, the District (or the Governing Body) shall do so in accordance with Section 23(r).  Unless a specific period of time is set forth for a particular act, a reasonable period of time for the District to provide input or decide an issue, or provide (or withhold) its approval or consent shall generally be within five (5) to seven (7) days.

(iii)  In addition to the obligation to provide funds to HCCA, the District will timely provide HCCA with the necessary equipment and other resources to enable HCCA to fully and timely perform its services hereunder.

(j)  Relationship.

(i)  Except as specifically authorized hereunder, the District shall not interfere, directly or indirectly, with HCCA's decisions or the daily Operations, and shall not interfere with HCCA's ability to perform its obligations hereunder.  The District representatives shall not access the Hospital and the Clinics and Other Facilities, except: (i) upon prior arrangement with HCCA, (ii) in the event of emergency; or (iii) as may be required pursuant to Subsection 2(d)(i)(3).  Except upon request of HCCA, individual members of the District's Governing Body, shall not issue directions to HCCA, except following and in accordance with the formal actions of the District's Governing Body.

(ii)  The District representatives' communications, formal and informal, regarding HCCA and the Operations with Persons associated or affiliated with the Operations or HCCA, shall be conducted exclusively with Persons designated by HCCA's manager or chief executive officer.

11

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(iii)     Neither the District nor its representatives shall (nor cause or encourage others to) disclose confidential or negative information regarding, or take any action or omit to take any action that is materially detrimental to the reputation of (anything which might tend to bring a party into public disrepute, hatred, contempt, scorn, scandal, or ridicule, or which might tend to reflect unfavorably on or otherwise degrade such party), HCCA or any of the other HCCA Parties, or make any statements, verbally, in writing or otherwise, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of HCCA, or of the other HCCA Parties, to anyone other than HCCA's manager or chief executive officer. Notwithstanding the foregoing, negative information may be discussed within official District Governing Body meetings and in connection with its internal operations, provided that if such information is used in a non-confidential forum, the District shall use reasonable efforts to verify the veracity and objectivity of such information prior to disclosing same in a non-confidential forum.  However, nothing herein shall prevent the District or any of its representatives from testifying truthfully in a legal proceeding or governmental administrative proceeding.  The District acknowledges and agrees that this prohibition extends to statements, written or verbal, made to anyone, including but not limited to, the news media, bondholders, industry analysts, competitors, strategic partners, vendors, employees (past and present), and clients.

(iv)     The parties acknowledge that: (1) this Section is a material provision of this Agreement; (2) any breach of this Section shall be a material breach of this Agreement, and (3) a breach of this Section would cause irreparable harm.

(k)     Standards of Performance.  The District acknowledges that while HCCA shall expend its commercially reasonable efforts in performing its obligations under this Agreement, HCCA does not guarantee any particular results, notwithstanding projections which may be made by HCCA.  HCCA's projections and forward looking statements are based on estimates and expectations, and reasonably available competitive, financial, economic and other data, and as a result are inherently uncertain.  Actual results could differ materially from those anticipated as a result of a variety of factors.  HCCA shall use its commercially reasonable judgment in directing the Operations.  The parties acknowledge that implementation of the District's charitable care purposes may not permit the maximization of the District's profits.  The District is a California Health Care District organized and operating under the Hospital Law with, inter. alia., a charitable mission, and it has under the Hospital Law certain responsibilities and obligations, including, but not limited to, obligations to provide charity care and indigent care.  At all times, HCCA, shall, as required by Law, follow the charity and indigent care policies and obligations of the District (provided that the Hospital and the Clinics and Other Facilities' financial obligations in that regard shall not be materially changed unless such change is required by applicable Law) and shall assist the District in meeting all of the District's required obligations under the Hospital Law. The District will promptly notify HCCA of any changes to any policy, procedure, or the District Bylaw which may impact the Hospital and the Clinics and Other Facilities' charity care obligations.

3.     **Virtual Joint Venture Economic Participation.**

(a)     District Contribution.  On the Effective Date, the District shall convey to HCCA (or cause to be conveyed) to the virtual joint venture the exclusive right to use, during the Term, all of its assets (whether real or personal property, or tangible or intangible property), constituting and associated with the Hospital and the Clinics and Other Facilities, together with all other assets of the District as HCCA shall designate, provided that the foregoing shall not constitute a grant to HCCA of a proprietary or ownership interest in any of such assets. In

12

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

furtherance of the foregoing, on the Effective Date, the District shall convey to HCCA (or cause to be conveyed) the exclusive right to use the following assets:

(i)     all inventory and supplies, including, but not limited to, office, foodstuffs, medical, disposables, linens, prescription medications and pharmaceutical inventories and supplies and other inventories and supplies of every kind and nature used in connection with the Operations;

(ii)    all policies and procedures manuals, operating manuals, training materials, marketing, sales and promotional materials, intellectual property including, but not limited to, all patents, trademarks, service marks, copyrights (whether or not registered) and registrations and applications therefore, trade names, trade secrets, confidential know-how and similar proprietary information, and/or computer software owned by the District;

(iii)   all administrative records, financial books and records, employee records, including, but not limited to, all books, records, files, computer software, data or databases, correspondence, memoranda, notes and other documents or papers and other evidence thereof relating to the Operations;

(iv)    all patient medical records, medical staff records and medical/administrative libraries;

(v)     copies of all other books and records of or relating to the Operations;

(vi)    all Permits (including, but not limited to, any Life Safety Code or similar waivers, variances and any certificates of need), relating to the Operations;

(vii)   goodwill;

(viii)  all vehicles used in the Operations;

(ix)    the District's rights and interests in and to its provider number and provider and reimbursement agreement under the Medicaid/Medicare programs, managed care contracts, insurance contracts and any other third party payor programs, but only to the extent that the same are assignable to HCCA to use during the Term, but only to the extent that HCCA accepts such right to use such arrangements;

(x)     all of the District's rights and interests in all Contracts set forth on Exhibit D to this Agreement (the "Assumed Contracts").  Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to assign any Contract or any claim, right or benefit arising thereunder or resulting therefrom, if a consent has not been obtained or if an attempted assignment thereof would be ineffective. If any such consent has not been obtained as of the Effective Date, or if an attempted assignment of any such Contract would be ineffective, (a) the District shall so advise HCCA and (b) the District shall reasonably cooperate with HCCA to obtain such consent, and absent obtaining such consent, in making commercially reasonable arrangements designed to provide to HCCA the benefits under such Contracts, including enforcement for the benefit of HCCA of any and all rights of the District against a third party arising out of any breach or cancellation by such third party or otherwise.  Fees, expenses and payments under all Assumed Contracts shall be pro-

13

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

rated as of the Effective Date. Expenses under the Assumed Contracts shall be paid as provided in Section 19(c).

(b)    Satisfaction of Bond Obligations. At its sole cost and expense, the District shall do all things necessary, desirable, and appropriate to pay or, otherwise satisfy the indebtedness related to the Hospital and the Clinics and Other Facilities, including the indebtedness related to the Project construction. Notwithstanding the foregoing, HCCA shall provide oversight of the District's funds and shall assist the District in making timely payments of its liabilities, including the Bonds and other obligations. It is specifically agreed and understood, however, that HCCA's obligations under this subsection are to assist in transmitting payments, subject to availability of District funds to make such payments. Nothing contained herein shall obligate HCCA to make any such payments from its own funds or resources or to advance any monies whatsoever to the District. However, HCCA shall have the right to pay such amounts, in its discretion, from the Charitable Care and Operational Support Fund. Further, HCCA shall not be liable either primarily or as guarantor for debts of the District as a result of HCCA's services hereunder.

(c)    HCCA Contribution. HCCA may, in its sole and absolute discretion, but shall not be required to, contribute working capital to the joint venture created hereunder, as same may be needed for the Operations, from time to time, and management resources to the joint venture created hereunder and provide all of the operational and strategic planning for the joint venture created hereunder.

(d)    Economic Distribution. During the Term, the District shall receive the net income resulting from the Operations in accordance with the following:

(i)    The annual net operating income from the Hospital and the Clinics and Other Facilities (calculated in accordance with GAAP) shall be determined for each fiscal year on a combined basis, and then allocated to the District after subtracting HCCA's fees set forth herein, including all expense reimbursement and the Operating Fee described in Section 19.

(ii)    If any losses are incurred in the operation of the Hospital and the Clinics and Other Facilities, such losses shall be the sole responsibility of the District.

(iii)    Distributions of allocated net income to the District shall be made when funds are reasonably available to do so, after considering the capital and operating needs of the Hospital and the Clinics and Other Facilities, including reasonable reserves determined in the sole and absolute discretion of HCCA.

(iv)    "True-up" payments shall be made between the parties, as may be necessary to reflect the proper allocation of income.

(e)    Proration of Expenses and Revenues. All expenses and revenues shall be prorated between the District and the virtual joint venture with HCCA acting as the joint venture's agent, as of the Effective Date. All prorations shall be made on the basis of actual days elapsed in the relevant accounting, billing or revenue period and shall be based on the most recent information available. "True-up" payments shall be made between the parties, as may be necessary to reflect the actual amount of any expense or revenue previously allocated between the parties based upon incomplete or inaccurate information or an estimate. The

14

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

parties shall each make such records available for inspection by the other party as are reasonable to demonstrate the accuracy of any prorations and adjustments.

4. **HCCA'S Operational Covenants**.

(a) Licensure. During the Term, HCCA shall: (i) maintain, in its name, in full force and effect, all necessary Permits required by applicable Law for the Operations; (ii) the Hospital and the Clinics and Other Facilities which are engaged in the Operations will be certified to participate in the Medicare program under Title XVIII of the Social Security Act and the Medi-Cal program, California's Medicaid program; (iii) HCCA will provide to the District copies of any Permits related to the Operations upon request; and (iv) HCCA will promptly notify the District of any change, relinquishment, revocation or suspension of, or the imposition of any material restriction to, any Permits.

(b) Mission, Vision, Values and Policies. HCCA will conduct the Operations in compliance with HCCA's mission, vision, values and ethical policies and will operate under HCCA's clinical and administrative policies, systems, and procedures and standards, as they may be amended, except as may otherwise be required by Subsection 2(d)(i)(3). The District enters into this Agreement with HCCA after having determined that HCCA's mission, vision, values, and ethical policies are consistent with the mission and purposes of the District to provide access to high quality health services to the public in the District Service Area and access to specialized services to District residents.

(c) Decision-making. HCCA may make all decisions regarding the Operations, in its sole and absolute discretion, recognizing that HCCA requires the flexibility, in its sole and absolute discretion, to determine how to deliver high quality healthcare services while maintaining financially sustainable Operations, except as provided in Subsection 2(d)(i)(3).

(d) Medical Staff.

(i) A separate medical staff (the "**Medical Staff**") will be maintained at the Hospital with credentialing services provided by HCCA. HCCA shall adopt Medical Staff Bylaws for the Operations effective on the Effective Date, and shall credential, appoint and grant Medical Staff privileges and membership status to physicians and other health care professionals, as is appropriate for the Hospital and the Clinics and Other Facilities in HCCA's sole and absolute discretion, except as provided in Subsection 2(d)(i)(3). HCCA shall be the governing body that approves the Medical Staff Bylaws, rules and regulations. Nothing herein restricts HCCA's ability to amend the Medical Staff Bylaws as it deems necessary and appropriate in its sole and absolute discretion, except as provided in Subsection 2(d)(i)(3).

(ii) The District shall provide HCCA with a confidential written disclosure containing a brief description of all adverse actions taken against Medical Staff members or applicants in the past three (3) years that are not disclosed in the minutes of the meetings of the Medical Executive Committee of the Medical Staff.

(e) Management and Governance. HCCA shall set strategic direction and provide strategic and operational planning for the Operations. HCCA shall have overall governance authority and responsibility for the Hospital and the Clinics and Other Facilities, except as provided in Subsection 2(d)(i)(3). HCCA will establish and select members of a community board to provide advice regarding the Operations, in its sole and absolute discretion. A majority of the members of the community board shall reside in the District and the initial

15

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

search committee for members of this community board shall include up to two (2) Persons selected by the District.

(f) Programs. The District shall have the right to: (i) reasonably request information regarding HCCA's performance hereunder, as may be required to satisfy its obligations under applicable Law and the Bonds, (ii) exercise taxing authority sufficient to satisfy debt obligations associated with the Hospital and the Clinics and Other Facilities; (iii) participate in Major Decisions, as provided in Subsection 2(d)(i), (iv) dispose of surplus District assets (as defined herein) not used by HCCA under this Agreement, and (v) otherwise perform its statutory functions.

(g) Charity Care. HCCA will apply to the Operations the charity care policies established by HCCA (subject to the District's rights under Subsection 2(d)(i)(1) and (3)), which shall, subject to the financial performance of the Hospital and the Clinics and Other Facilities, generally be consistent with the existing charitable policies of the Hospital, a copy of which is set forth in Exhibit E to this Agreement.

(h) Records. On the Effective Date, the District will provide HCCA with all patient, medical staff, personnel, and other records of the District necessary for Operations including, without limitation, medical records, billing records, equipment records, operating manuals, employment records and financial data related to Operations and the Hospital and the Clinics and Other Facilities, and HCCA agrees to maintain such records during the Term pursuant to HCCA's policies and procedures. HCCA will provide reasonable access to such records to the District and its agents for preparation of cost reports and other post-closing filing, preparation of the District financial statements relating to the period prior to the Effective Date, defense of investigations and claims, and other reasonable purposes. HCCA will be deemed to have custody but not ownership of such records.

(i) Annual Budget.

(i) HCCA shall be responsible for preparation, presentation, monitoring, and reporting of the annual operating and capital budgets (collectively, the "Annual Budget"), except as may otherwise be required by Subsection 2(d)(i)(3). Each proposed Annual Budget shall set forth an estimate of operating revenues and expenses for the next fiscal year, together with an explanation of anticipated changes in utilization, charges to patients and clients, payroll rates and positions, non-wage cost increases, and all other factors differing significantly from the then-current year. HCCA shall be responsible for the oversight and review of the Annual Budgets, except as may otherwise be required by Subsection 2(d)(i)(3). The Annual Budget will be created and implemented to coincide with District's fiscal year, which is July 1st through June 30th of the following year.

(ii) Subject to the limitations set forth in Section 2(g), HCCA shall make commercially reasonable efforts to oversee the management of the Hospital and the Clinics and Other Facilities so that the actual revenues, costs, and expenses of the operation and maintenance of the Hospital and the Clinics and Other Facilities shall be consistent with the Annual Budget. Inclusion of any item within the Annual Budget shall constitute all necessary approval for HCCA to effectuate the budgeted item. Notwithstanding anything to the contrary herein, HCCA shall have the right, in its sole and absolute discretion, to make any expenditures necessary on an emergent basis to avoid or mitigate damage to the Hospital and the Clinics and Other Facilities, obtain equipment repairs or to avoid or mitigate injury or potential injury to Persons or property or that are necessary on an emergent basis to comply with any Law or to

16

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

cure or prevent any violation of any Law, whether or not provided for or within the amounts provided for in the Annual Budget for the applicable year (collectively, the "Emergent Expenses").

(j) HCCA may hire or retain any consultants, accountants, attorneys or other professional personnel (collectively, "Consultants") which HCCA, in its sole and absolute discretion, determines it is necessary or appropriate to assist HCCA in carrying out its duties and responsibilities under this Agreement. The expense of any Consultants so retained shall be an expense of the District, but HCCA shall retain any such Consultants without the approval of the Governing Body, if the cost of such services shall exceed $100,000 in any calendar year for such services, unless otherwise set forth in the approved Annual Budget.

5.    **Fees and Revenues**.

Commencing on the Effective Date, HCCA shall have the exclusive right to receive, consistent with the terms of this Agreement, all fees and revenues generated by and payments received from the Operations, including without limitation professional and technical fees for provision of clinical and ancillary services (such as imaging and laboratory) for application to Operating Expenses and other expenses (as provided in Section 19(c)) relating to the Operations, with the balance, if any, remitted to the District as provided in Section 3(d).

6.    **Term and Termination**.

(a)    Initial Term. The initial term of this Agreement shall commence on the Effective Date and shall end on the date that is fifteen (15) years from and after the Effective Date of the MSA, as set forth therein (such period, plus any renewal Terms, are collectively referred to as the "Term").

(b)    Extension of Term. Upon completion of the initial Term or of any subsequent renewal Term, this Agreement shall automatically renew for additional 10-year periods, unless either party shall send a notice of intent not to renew the Agreement to the other party not less than twelve (12) months prior to the end of the initial Term or then current renewal Term, as applicable. Each renewal Term shall be on the same terms and conditions set forth herein. Notwithstanding the foregoing, nothing herein is intended to permit the Term to exceed such term as is permissible under any tax-exempt bond financing requirements under applicable Law, with respect to the Bonds. In the event the Term exceeds any permissible term, then the Term shall be conformed to the maximum term permitted under such Law.

(c)    Irrevocability of Agreement. The District acknowledges and agrees that HCCA is entering into this Agreement in reliance on the long term nature of this Agreement, and further acknowledges that the rights, duties, powers and authority of each of the parties hereto, are intended to be non-terminable throughout the Term, except in accordance with the express provisions of this Agreement. The District acknowledges that neither party will achieve the benefits intended to be achieved if the District has any continuing right or power to terminate this Agreement, or the relationship hereby created, except in accordance with the express provisions of this Agreement. Accordingly as a substantial inducement to HCCA to enter into this Agreement and provide its proprietary systems and knowledge, the District hereby irrevocably waives and relinquishes any right, power or authority existing at Law or in equity to terminate this Agreement, except in strict accordance with the express provisions of this Agreement. The parties further hereby acknowledge that any breach of this Section will cause irreparable and permanent damage to HCCA, not compensable by money damages.

17

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(d)  District Default.  The following occurrences shall each be deemed an event of default by the District ("**District Default**") unless waived in writing by HCCA:

(i)  Material breach of any representation, warranty, or covenant of the District contained within this Agreement, after giving written notice to the District, and the District's subsequent failure to cure the breach (if such breach is capable of being cured) within sixty (60) days (or ten (10) days in the event of a monetary breach or thirty (30) days in the event of a breach of any provision requiring the District to: (i) provide HCCA with a consent or approval or (ii) execute an agreement or document hereunder); provided, however, that if the cure cannot reasonably be effectuated within the applicable cure period, a longer period shall be allowed not to exceed ninety (90) days, if the District has commenced to cure such breach in good faith or has otherwise provided adequate protection or security to protect HCCA's interest hereunder (which security shall be sufficient in HCCA's sole and absolute discretion) within the applicable cure period, and the District is proceeding with due diligence to effect a cure.

(ii)  The occurrence of any of the following: (a) the filing by the District of a voluntary petition in bankruptcy or for reorganization under any bankruptcy Law, or (b) the filing of a petition for the appointment of a receiver for all or any portion of the property of the District, or (c) the taking of any voluntary or involuntary steps to dissolve or suspend the powers of the District (unless such steps to dissolve or suspend are removed) within thirty (30) days, or (d) the consent by the District to an order for relief under the federal bankruptcy Laws or the failure to vacate such an order for relief within sixty (60) days from and after the date of entry thereof, or (e) the entry of any order, judgment or decree, by any court of competent jurisdiction, on the application of any creditor of the District or any other Person, adjudicating the District as a bankrupt, or to be insolvent, or approving a petition seeking reorganization or the appointment of a receiver, trustee or liquidator of all or a substantial part of the District's assets, if such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days.  In the event that the District becomes a debtor under the Bankruptcy Code, the District agrees, to the extent permitted under applicable Law: (a) not to reject this Agreement; (b) to designate this Agreement as a non-executory agreement.

(iii)  If HCCA, at any time and in good faith, shall deem itself insecure and for the purposes of this Agreement, HCCA shall be entitled to deem itself insecure when some event occurs, fails to occur or is threatened or some objective condition exists or is threatened which significantly impairs the prospects that any of the obligations of the District hereunder will be paid when due, or which significantly affects the financial or business condition of the District.  If HCCA deems itself insecure, it shall have no obligation to continue performing hereunder more than thirty (30) days from and after it notifies the District that it has deemed itself insecure, unless the District provides HCCA with an unconditional, irrevocable letter of credit (the "**Letter of Credit**") from a U.S. banking institution acceptable to HCCA, insured by a federal insurance agency ("Issuer").  The Letter of Credit shall (i) meet the requirements of the "Uniform Customs and Practice for Documentary Credits," ICC No. 500 (1993 Edition), (ii) name HCCA as beneficiary, (iii) be in an amount equal to the lesser of (A) the Termination Fee or (B) such lesser amount as may be specified by HCCA, in its sole and absolute discretion, (iv) be payable in full or partial draws against HCCA's sight draft, (v) include an "evergreen" provision which provides that the Letter of Credit shall be renewed automatically on an annual basis following its issuance, unless the Issuer delivers thirty (30) days prior written notice of cancellation to HCCA, (vi) have an initial expiration date no earlier than one year from the date of issue, and (vii) otherwise be in form and substance satisfactory to HCCA.  In the event the Letter of Credit is ever not renewed when required hereunder, HCCA shall have the right, immediately upon receipt of the notice of cancellation described above, to draw upon the

18

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

Letter of Credit and hold the proceeds thereof as a cash security deposit. Provided that the District is not then in default of any of its obligations hereunder and no act, omission, fact, circumstance, condition or event that with the giving of notice or the passage of time or both would constitute a default hereunder exists, HCCA shall return the Letter of Credit to the District within forty-five (45) days after the expiration or termination of this Agreement. If the Letter of Credit is not timely provided, then HCCA shall have the right to immediately terminate this Agreement (with no right on the part of the District to cure same) and receive the Termination Fee.

        (e)    <u>Liquidated Damages</u>.

        (i)    Each of the parties acknowledges that it would be extremely difficult and impracticable, if not impossible, for HCCA to ascertain with any degree of certainty the amount of damages that would be suffered by HCCA in the event of the occurrence of a District Default. In the event this Agreement is terminated as a result of any District Default, or for any other reason other than a termination by HCCA under <u>Section 6(g)(i)</u>, or an HCCA Default, the District shall pay a fee (the "<u>**Termination Fee**</u>"), which fee is not a penalty, but rather is liquidated damages in accordance with California Civil Code Section 1671, which the parties have negotiated in good faith and have agreed is a reasonable fee under the circumstances. The Termination Fee shall be paid within five (5) days after the effective date of the termination of this Agreement.

        (ii)    The Termination Fee shall be an amount equal to Eighty Seven Thousand Five Hundred Dollars ($87,500) per month first increased by CPI, as provided below, and then multiplied by the remaining number of months in the Term (not to exceed 120 months) at the time of the termination, discounted to its present value using the discount rate of the Federal Reserve Bank of San Francisco at the time of termination plus one percent (1%).

        (1)    "CPI" means the monthly index of the U.S. City Average Consumer Price Index for Urban Wage Earners and Clerical Workers – Medical Care Services (1982-84 equals 100) published by the United States Department of Labor, Bureau of Labor Statistics or any successor agency that shall issue such index. In the event that the CPI is discontinued for any reason, the parties shall use such other index, or comparable statistics, on the cost of medical care services in the United States, as shall be computed and published by any agency of the United States or, if no such index is published by any agency of the United States, by a responsible financial periodical of recognized authority.

        (2)    The Termination Fee shall be adjusted for inflation by multiplying the above stated Termination Fee by the CPI percentage increase between January 1, 2015 and the date the Termination Fee is payable, using the latest published data since the last adjustment.

        (iii)    Notwithstanding the foregoing, nothing herein is intended to permit the Termination Fee to exceed such amount as is permissible under any tax-exempt financing requirements under applicable Law, with respect to the Bonds. In the event the Termination Fee exceeds any permissible limit upon such fees, then the Termination Fee shall be reduced to the maximum termination or similar fee permitted under such Law, however denominated, and the District shall enter into any agreements necessary to minimize any reduction to the Termination Fee.

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(iv)     If the District fails to pay the Termination Fee when due, then the Termination Fee, or any unpaid portion thereof, shall bear interest from the date such payment was required to be made until the date of payment at the interest rate set forth in Section 19(d).

(v)     If upon termination of this Agreement, the District contends that the Termination Fee is not due and owing and HCCA contends that same is due and owing, the District shall be obliged to deposit within three (3) days the amount of the Termination Fee into an Escrow account with a national bank with not less than $50,000,000,000 in assets.  The funds shall be released to the applicable party upon the sooner to occur of: (a) mutual instructions of HCCA and the District; (b) final non-appealable order of a court directing the release of the funds to a party; or (c) to the District if HCCA has not contested, in a judicial proceeding, that the funds are owed to it within twenty four (24) months of the termination.

(vi)     This Section shall survive the expiration or termination of this Agreement.

(f)     HCCA Default. The following occurrences shall each be deemed an event of default by HCCA ("**HCCA Default**"), unless waived in writing by the District:

(i)     Material breach of any material covenant of HCCA contained within this Agreement, after giving written notice to HCCA, and HCCA's subsequent failure to cure the breach within sixty (60) days provided, however, that if the cure cannot reasonably be effectuated within such sixty (60) day period, a longer period shall be allowed, if HCCA has commenced to cure such breach or has otherwise provided adequate protection or security to protect the District's interest hereunder and HCCA is proceeding to effect a cure.  In determining whether a breach has occurred, the District shall exercise its reasonable discretion in good faith and shall use its best efforts to assist HCCA in effectuating a cure.

(ii)     The occurrence of any of the following: (a) the filing by HCCA of a voluntary petition in bankruptcy or for reorganization under any bankruptcy Law, or (b) the filing of a petition for the appointment of a receiver for all or any substantial portion of the property of HCCA, or (c) the taking of any voluntary or involuntary steps to dissolve or suspend the powers of HCCA (unless such steps to dissolve or suspend are removed) within sixty (60) days, or (d) the consent by HCCA to an order for relief under the federal bankruptcy Laws or the failure to vacate such an order for relief within sixty (60) days from and after the date of entry thereof, or (e) the entry of any order, judgment or decree, by any court of competent jurisdiction, on the application of any creditor of HCCA or any other Person, adjudicating HCCA as a bankrupt, or to be insolvent, or approving a petition seeking reorganization or the appointment of a receiver, trustee or liquidator of all or a substantial part of HCCA's assets, if such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days.

(g)     Early Termination Events.

(i)     Notwithstanding anything herein to the contrary, during the first thirty-six (36) months after the Effective Date of the MSA, HCCA shall have the option to terminate this Agreement before its expiration, upon not less than six (6) months' notice to the District.

(ii)     In the event either party should be determined by a Governmental Authority to be in violation of any Law, by virtue of this arrangement or this arrangement is otherwise deemed illegal by a Court of competent jurisdiction in a final non-appealable

20

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

determination ("**_Jeopardy Events_**"), the parties shall use best efforts to negotiate an amendment to this Agreement to remove or negate the Jeopardy Event. If they are unable to do so within six (6) months, either party may terminate this Agreement by notice to the other, provided that upon such termination the District shall be obliged to pay the Termination Fee as provided in <u>Section 6(e)</u>.

        (iii)    In the event that: (A) (i) it shall be determined that the District has the right to: (i) make and enforce all rules, regulations and bylaws necessary for the administration, government, protection and maintenance of the Hospital and the Clinics and Other Health Care Facilities and the property belonging thereto or (ii) prescribe the terms upon which patients may be admitted thereto, as referenced in California Health and Safety Code § 32125(a) and (B) HCCA shall determine in good faith, in its sole and absolute discretion, that the District is exercising or threatening to exercise those rights in a manner that HCCA views as fundamentally inconsistent with HCCA's approach to the management of the Hospital and the Clinics and Other Facilities, then HCCA shall have the right to terminate this Agreement by notice to the District and upon such termination the District shall be obliged to pay the Termination Fee as provided in <u>Section 6(e)</u>.

        (h)    <u>Procedure</u>.

        (i)    In the event either party to this Agreement deems the other party to be in default of its obligations hereunder, then said party shall be required to provide notice of the alleged default to the other party, which notice shall contain a detailed description of the alleged default.

        (ii)    If the claim of default is disputed by the party receiving such notice, within ten (10) business days thereafter the party receiving the notice shall give notice to the charging party that the party receiving such notice disputes that the factual matters alleged constitute a default under this Agreement. If the parties cannot resolve such dispute within ten (10) business days thereafter (commencing on the date that the charging party receives notice of the dispute) the parties shall submit such matter to binding arbitration in Los Angeles County, California, in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules and Procedure for Arbitration, and applying the Law of the State. Any determination by the arbitrator shall be final and binding upon the parties, and judgment thereon may be entered in any court having jurisdiction thereof. The costs of arbitration shall be borne equally by the parties. During the pendency of any such arbitration and until final judgment thereon has been entered, this Agreement shall not be terminated as a result of the alleged default which is in dispute.

        (i)    <u>Termination</u>.

        (i)    In the event of a party's failure to cure a default within the time allowed herein for curing such default, the non-defaulting party may immediately terminate this Agreement by notice to the defaulting party, whereupon neither of the parties shall have any further obligations under this Agreement, except those obligations that by their terms or nature extend beyond the date of expiration or termination, and the non-defaulting party shall then have all rights and remedies available hereunder and at Law.

        (ii)    The parties may mutually agree at any time to terminate this Agreement.

21

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(j)     Reconveyance of Use of Assets.  Upon termination of this Agreement for any reason, other than entering into the Long Term Operating Agreement, HCCA shall convey to the District all rights of use in and to and possession of any and all of the District's facilities in its possession in order to preclude divesting the District from ownership of its facilities, as prohibited under California Health and Safety Code §32121(r).

7.     **HCCA Financial Responsibilities**.

(a)     HCCA undertakes the following obligations:

(i)     HCCA shall pay, from District Funds (including the Charitable Care and Operational Support Fund) and/or revenues derived from the Operations, all Operating Expenses associated with the Hospital and the Clinics and Other Facilities.  If the District fails to timely advance funds to HCCA hereunder, HCCA shall have the right, in its sole and absolute discretion, but not the obligation, to advance such funds, as provided in Section 2(g)(i);

(ii)     The parties believe that the Hospital and the Clinics and Other Facilities will not be subject to State excise taxes or property taxes. In the event, however, that such taxes shall be lawfully assessed against the Hospital or the Clinics and Other Facilities during the Term, HCCA shall pay, from District Funds (including the Charitable Care and Operational Support Fund) and/or revenues derived from the Operations, prior to delinquency all such assessments. The District authorizes HCCA to protest or contest any tax valuations or assessments and shall assist HCCA in assuring that the Hospital and the Clinics and Other Facilities are treated as exempt assets.

(iii)     HCCA shall pay, from District funds (including the Charitable Care and Operational Support Fund) and/or revenues derived from the Operations and perform the obligations arising under the Assumed Contracts. If the District fails to timely advance funds to HCCA hereunder, HCCA shall have the right, in its sole and absolute discretion, but not the obligation, to advance such funds, as provided in Section 2(g)(i);

(b)     Except as set forth above, no further payments or performance shall be due and owing from HCCA to the District or otherwise in connection with Operations.

(c)     HCCA, at its expense, may at any time, install or commence the installation of HCCA Property in the Hospital or the Clinics and Other Facilities, to such extent as HCCA may deem desirable. HCCA may also remove any of HCCA Property so installed by it. HCCA's Property shall remain the property of HCCA unless purchased by the District pursuant to this Section. The District shall have, at its option, the right to purchase HCCA Property as of the termination of this Agreement, for other than the District's Default, for a sum equal to HCCA's cost less ordinary depreciation. HCCA shall have the right to remove all HCCA Property from the Hospital and the Clinics and Other Facilities upon termination of this Agreement, if purchase is not made by the District.

8.     **Service Covenants**.

HCCA shall:

(a)     Operate a "24/7" (all hours) emergency department service, which need not be located in the Hospital but meets the requirements of applicable Law from time to time.

22

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(b) Provide, as required by Law, medical care to patients regardless of patients' ability to pay, subject to the charitable care polices of HCCA;

(c) Not enact financial admission policies that have the effect of denying essential medical services or treatment solely because of a patient's immediate inability to pay for the services or treatment,, where such treatment is required under applicable Law, including the Emergency Medical Treatment and Active Labor Act (EMTALA);

(d) Participate in and ensure that admission to and services of Operations are available to the beneficiaries of governmental reimbursement programs (Medicaid / Medicare) without discrimination or preference because they are beneficiaries of those programs;

(e) Provide reports to the District, including financial information for Operations, together with such information as may be required for the District to report to the community on the progress it is making towards the community's health needs;

(f) Conduct the Operations without discrimination based on race, color, sex, marital status, sexual orientation, ethnicity, or national origin; and

(g) Conduct the Operations, if California Health and Safety Code § 32125(a) is determined to be applicable as provided in Subsection 2(d)(i)(3), in accordance with: (i) all rules, regulations and bylaws the Governing Body determines are necessary for the administration, government, protection and maintenance of the Hospital and the Clinics and Other Facilities and the property belonging thereto and (ii) the Governing Body's prescribed terms upon which patients may be admitted thereto.

9. **Names and Branding**.

(a) License. HCCA shall have the exclusive, nontransferable, royalty free license and right (but not the obligation) to use the names "Tulare Regional Medical Center", "Tulare Hospital" and variations thereof and all other related names, logos, marks of the District which are and have been used by the District in connection with the operation of the Hospital and the Clinics and Other Facilities. The District shall not continue to use such names and logos in connection with the provision of healthcare services, but may use same in connection with its operation of other District non-healthcare programs. Neither party has any obligation to register, defend or preserve such names or marks.

(b) Signage; Branding. HCCA shall have the right to install signs upon the interior and exterior of the Hospitals and the Clinics and Other Facilities regarding the conduct of its business, subject to compliance with applicable Law. The Operations will be conducted under HCCA's name and in accordance with HCCA's naming and branding standards. Nothing herein licenses the District to use HCCA's names, brands or logos in conducting its business.

(c) Identification of the District. HCCA will identify in appropriate public locations, websites, and other media, the provision of support to the healthcare Operations by the District.

23

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

10.     **Assignment and Sublicensing**.

(a)     HCCA shall not sublicense all or substantially all of the Hospital or the Clinics and Other Facilities, or in any manner assign or transfer its rights and obligations under this Agreement without the prior written consent of the District; provided, however, that HCCA, in its sole and absolute discretion, may sublicense, transfer, assign, or delegate any portion of its rights or obligations under this Agreement to an Affiliate or to another Person that is acquiring all or substantially all of the assets and liabilities of HCCA, including a Person in which HCCA has an ownership interest, directly or indirectly, or with which HCCA may merge, affiliate, acquire or be acquired. Nothing herein prevents HCCA from subcontracting with third parties to perform any of the services required of HCCA hereunder.

(b)     The District may not in any manner assign or transfer its rights under this Agreement without prior written consent of HCCA.

(c)     Any purported assignment in violation of this Section shall be null and void.

11.     **Exclusivity**.

(a)     The District agrees that as a result of this Agreement with HCCA, HCCA has been granted the exclusive right and responsibility to conduct the Operations in the District's facilities, including the Hospital and the Clinics and Other Facilities, during the Term in accordance with the terms of this Agreement. Therefore, during the Term, the District shall not directly or indirectly own, lease, manage, operate, market, or engage in any business, enterprise, or other activity relating to the operation of a hospital, clinic, home health, or medical clinics, or any other activity which is competitive with any activity of HCCA during the Term within the District Service Area other than in accordance with this Agreement; provided that this Section shall not be construed as prohibiting the District from providing: (i) non-healthcare services; (ii) services to respond to an epidemic or other public health emergency or (iii) other services as it may be required by law to provide, that HCCA is not providing or willing to provide. The District further acknowledges and agrees that enforcement of the provisions of this Section would not unduly impact the availability of medical services within the District Service Area, or otherwise pose a threat of harm to the public health. The District further agrees that if the District should engage in a health-care-related activity or any other activity which is prohibited hereunder, in violation of the provisions of this Section 11, then such activity shall constitute a material breach of this Agreement, and shall afford HCCA its full rights of termination.

(b)     During the Term, the District shall not, within the District Service Area, directly or indirectly, operate or invest in the provision of medical or other clinical healthcare services, except with the prior consent of HCCA, unless required to do so under applicable Law. In the event the District in good faith believes that a need exists for additional health care services or programs not currently provided within the District Service Area, the District shall first bring such recommendations to HCCA which will consider undertaking such services or programs itself. If HCCA elects not to do so, the District may elect to provide such non-clinical healthcare services that are not competitive with services offered by HCCA, itself or to pursue alternate funding sources for operation of the new program. In addition, HCCA may at any time solicit input of the District regarding additional programs and services in the District Service Area.

24

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(c)     To the fullest extent allowable by Law, if any provision of this <u>Section 11</u> is held to be invalid or unenforceable, the invalid or unenforceable provision shall be deemed stricken from this Agreement, and the remainder of this <u>Section 11</u> shall nevertheless continue in full force and effect.

12.     **Employee Matters**.

(a)     <u>Employment</u>. As of the Effective Date, the District shall terminate all of its employees at the Hospital and at the Clinics and Other Facilities. HCCA, shall have the right, but not the obligation to offer employment on an at-will basis (or otherwise) and in accordance with HCCA's customary and usual new employee screening policies and procedures to the former employees of the District, or any of them.

(b)     <u>Wages</u>.   Each employee that accepts such offer and is hired by HCCA will be employed by HCCA at a base salary and wage as determined by HCCA, in its sole and absolute discretion, and HCCA shall not have any responsibility for any retirement or other benefits accorded to such Person by the District historically, all of which shall remain the liability of the District.

(c)     <u>Employment Decisions</u>.  Nothing herein shall be deemed to affect or limit in any way normal management prerogatives of HCCA or its Affiliate with respect to employees or to create or grant to any such employees third party beneficiary rights or claims of any kind or nature, except as provided in <u>Subsection 2(d)(i)(3)</u>. HCCA will have exclusive authority with respect to employment decisions, including length of employment, regarding each employee, and will have the right to change compensation and benefits for all of its employees from time to time as HCCA may deem appropriate. Unless HCCA agrees otherwise in writing, HCCA shall not assume or be responsible for any existing District employment agreements or obligations.

(d)     <u>Seniority</u>. Employees hired by HCCA will not be entitled to retain their current seniority for purposes of benefits (i.e., benefit eligibility or accrual levels for PTO purposes).

13.     **Insurance and Casualty.**

(a)     <u>Insurance</u>. HCCA shall maintain or obtain by purchase or self-insure for all risk property insurance including earthquake insurance covering the Hospital and the Clinics and Other Facilities and HCCA Property in an amount not less than full replacement cost. Such insurance (other than insurance covering HCCA Property) shall name the District as loss payee as its interests may appear. HCCA shall maintain by purchase or self-insurance for liability for operation of any motor vehicle, with limits of not less than $1,000,000 combined single limit per accident.  The cost of such insurance shall be paid as an Operations expense as provided in <u>Section 19(c)</u>.

(b)     <u>Damage</u>. If the Hospital or the Clinics and Other Facilities should be damaged or destroyed by any peril covered by the insurance to be provided by HCCA under <u>Section 13(a)</u>, HCCA shall promptly notify the District of such damage. If any Substantial Part of the Hospital or Clinics and Other Facilities should be destroyed by any peril covered by the insurance to be provided by under <u>Section 13(a)</u>, or if it should be so damaged thereby that rebuilding or repairs cannot be completed within two hundred (200) days after the date of such damage, as determined by HCCA in its sole and absolute discretion, then the Hospital and the Clinics and Other Facilities and other assets shall be re-conveyed back to the District (as

25

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

provided in Section 6(j)) and this Agreement shall terminate and be of no further force and effect, provided that HCCA shall be entitled to receive the Termination Fee. If the Hospital and the Clinics and Other Facilities should be damaged by any peril covered by the insurance to be provided by HCCA under Section 13(a), but only to such extent that rebuilding or repairs can, in the sole and absolute discretion of HCCA, be completed within two hundred (200) days after the date of such damage, this Agreement shall not terminate, and HCCA shall, thereupon proceed with reasonable diligence to rebuild and repair the affected facility to substantially the condition which existed prior to such damage to the extent of proceeds from such insurance. The District shall be responsible to fund restoration costs in excess of the proceeds from such insurance.

(c)     Waiver of Subrogation. The District and HCCA hereby waive all rights to recover against each other, for any loss or damage arising from any cause or risk which would be covered in whole or in part, by insurance of the type required to be carried by each of them pursuant to this Agreement, or any other insurance actually carried by either of them or reasonably and customarily carried by similarly situated parties to the extent such insurance would cover such loss or damage incurred by such party. The District and HCCA shall cause their respective insurers to issue waiver of subrogation rights endorsements to all policies of insurance carried in connection with the Hospital and the Clinics and Other Facilities, and any cost for the issuance of such endorsements shall be borne by the original insured under such policies consistent with the terms of this Agreement.

(d)     HCCA's Insurance.  HCCA shall obtain by purchase or self-insure throughout the Term, commercial general liability insurance against all claims, demands, or actions arising out of or in connection with the Operations after the Effective Date of the Hospital and the Clinics and Other Facilities. The limits of coverage maintained by HCCA for commercial general liability shall be not less than $1,000,000 with respect to each occurrence, not less than $3,000,000 general aggregate. The District shall be added as an additional insured to HCCA general liability policy but only with respect to the District's liability arising out of use or operation of the Hospital and the Clinics and Other Facilities. HCCA shall obtain by purchase or self-insure through the Term professional liability insurance covering its Operations.  Professional liability insurance limits shall not be less than $1,000,000 with respect to each occurrence and not less than $3,000,000 in general aggregate.  The cost of such insurance shall be paid as an Operations expense as provided in Section 19(c).

(e)     District Insurance. The District shall maintain and pay for "tail coverage" or comparable insurance coverage, to prevent any gap in insurance coverage for any liability arising from the District's actions or occurrences prior to the Effective Date. Such insurance shall have limits of liability in amounts and upon the terms required under the MSA.  In addition, the District shall be responsible for obtaining entity and individual professional liability, D & O / employment practices liability, and commercial general liability coverage in commercially reasonable amounts for its operations after the Effective Date.

(f)     Indemnity.

(i)     Subject to Section 13(c), HCCA covenants and agrees to hold harmless the District, its Governing Body, officers and employees from, and indemnify and defend them against, any and all liabilities, claims, penalties, fees, violations, fines, losses, costs, damages, Liens and expenses, including reasonable attorney's fees ("**Damages**"), in any way related to any material breach by HCCA of any covenant to be performed by it pursuant to this Agreement. This indemnity shall survive termination of this Agreement. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT (INCLUDING ANY

26

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

INDEMNIFICATION OBLIGATIONS), IN NO EVENT SHALL HCCA BE LIABLE (WHETHER IN AN ACTION IN NEGLIGENCE, CONTRACT OR TORT OR BASED ON A WARRANTY OR OTHERWISE) FOR (I) FAILURE TO REALIZE SAVINGS OR LOSS OF PROFITS, REVENUE, OR ANY OTHER INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, AND (II) DIRECT AND OTHER DAMAGES IN EXCESS OF THE AMOUNT OF OPERATING FEES EARNED BY HCCA UNDER THIS AGREEMENT DURING THE THREE (3) MONTHS PRIOR TO THE DATE OF THE APPLICABLE CLAIM FOR DAMAGES, IN EACH CASE, EVEN IF HCCA HAS BEEN ADVISED OF POSSIBILITY OF SUCH DAMAGES.

       (ii)     Subject to <u>Section 13(c)</u>, the District covenants and agrees to hold harmless HCCA, HCCA's, members, managers, officers and employees from, and indemnify and defend them against, any and all Damages, in any way related to (i) any breach by the District of any covenant to be performed by it pursuant to the Agreement, or (ii) any liability of the District arising from or related to the District activities, whether during or prior to the Term. This indemnity shall survive termination of this Agreement.

       (iii)     A party entitled to indemnification under this Section shall make commercially reasonable efforts to (i) mitigate the amount of any indemnification claim it has or may have against the Person giving the indemnity and (ii) pursue claims under insurance policies relating to the facts and circumstances giving rise to the indemnification claim. For purposes of determining the amount of liability under this Section, appropriate reductions shall be made to reflect the amount actually recovered pursuant to any insurance policy or other third party recovery that is received by the party entitled to indemnification in respect of the facts and circumstances giving rise to the indemnification claim.

       (g)    <u>Review</u>. Insurance coverage amounts for both parties will be reevaluated every five years and adjusted consistent with industry practices for similar operations as mutually agreed.

    14.    <u>**Condemnation**</u>.

       (a)    If a Substantial Part of the Hospital or the Clinics and Other Facilities should be taken for any public or quasi-public use under Law, or by right of eminent domain, or by private purchase in lieu thereof, then HCCA may terminate this Agreement and (i) the operation of the Hospital and the Clinics and Other Facilities shall revert to the District, and (ii) any proceeds received from the proceedings referenced by this Section shall be distributed to the District, subject to HCCA's right to recoup the value of its interest in the joint venture created hereunder, in an amount not less than the Termination Fee.

       (b)    If part of the Hospital or the Clinics and Other Facilities shall be taken for any public or quasi-public use under any Law, or by right of eminent domain, or by private purchase in lieu thereof, and this Agreement is not terminated as provided in <u>Section 14(a)</u>, the fact that space in the Hospital and the Clinics and Other Facilities has been taken by the taking shall not relieve HCCA from its obligation to fulfill its obligations hereunder; provided, however, that HCCA's obligations, as applicable, shall be reduced in accordance with the damage that occurs as a result of the taking, in HCCA's sole and absolute discretion.

    **15.**    <u>**Authority.**</u>

The District represents and warrants that it has full right and authority to enter into this Agreement.

27

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

16. **No Assumed Liabilities.**

(a)     Unless otherwise expressly set forth herein, by execution of this Agreement, HCCA assumes no liabilities whatsoever of the District or any previous tenant or operator of the Hospital and the Clinics and Other Facilities, including, but not limited to, liability for any claims, demands, actions, suits or other obligations arising from an occurrence prior to the Effective Date.

(b)     By executing this Agreement, the District hereby assumes no liabilities whatsoever of HCCA.

17. **Recording; Estoppel; Time.**

(a)     Recordation. At the request of either party and at the expense of the requesting party, the parties shall execute a short form memorandum of this Agreement which identifies this Agreement, the parties, the Term, the legal description of the real property upon which the Hospital and the Clinics and Other Facilities are located, the joint venture described herein and such other matters as the parties may agree.  Such memorandum shall be recorded in the Office of the County Recorder of Tulare County, California at the expense of the requesting party.

(b)     Estoppel Certificate. Each party hereto agrees from time to time, within twenty (20) business days after request of another party hereto, to deliver to said other party hereto, a commercially reasonable estoppel certificate stating (if true) that this Agreement is in full force and effect, that no default exists under this Agreement, the unexpired Term of this Agreement, and such other matters pertaining to this Agreement as may be requested by a party hereto.

(c)     TIME IS OF THE ESSENCE IN THE PERFORMANCE OF ALL COVENANTS OF THIS AGREEMENT.

18. **Legal Compliance.**

(a)     Compliance Plan.   HCCA has received a copy of the District's Compliance Policies and Procedures, including the Code of Conduct and the Physician Referral, Stark Law, and Anti-Kickback policies and procedures together with a copy of the District's Corporate Integrity Agreement with the HHS Office of Inspector General dated July 20, 2009 (the "**CIA**"). HCCA shall abide by these policies and procedures and applicable Law. Any recommendations and/or revisions of such policies made by HCCA must be reasonably designed to help assure compliance with applicable Law.  HCCA will be given prompt written notice of any changes made to the foregoing.   HCCA may develop and recommend changes to the District's existing Compliance Plan (the "**Compliance Plan**") for implementation during the Term. Any such recommendations and/or revisions to the Compliance Plan must be approved by the Governing Body. HCCA shall use its commercially reasonable efforts to implement the Compliance Plan.  All costs of developing, implementing and maintaining the Compliance Plan shall be borne by the District.

(b)     Government Regulations.  HCCA shall, subject to the limitations set forth herein, use its reasonable commercial efforts to help assure that: (1) the District continuously complies with all material applicable Laws, including without limitation, the Hospital Law, State and Federal False Claims Act, Civil Monetary Penalty Law, State and Federal Anti-Kickback

28

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

statutes, State and Federal self-referral prohibitions and applicable Medicare conditions of coverage and/or participation and (2) HCCA retains and maintains in good standing all necessary accreditations, licenses, permits, approvals and authorizations required for the ongoing operation of the Hospital and other Clinics and Other Facilities.

(c)     Accreditation Compliance.  HCCA shall, subject to the limitations set forth herein, take all steps necessary to assist the District to continue meeting the accreditation standards of the applicable accrediting agencies, as they exist or may be changed from time-to-time, and as may be applicable to the Hospital and other Clinics and Other Facilities' then current accreditation(s).  HCCA shall have the right to select and/or change the applicable accreditation agency for the Hospital, and if applicable, the Clinics and Other Facilities, in its sole and absolute discretion.

(d)     Ineligible Persons - Disclosure Obligation.  HCCA shall use reasonable commercial efforts to monitor that none of HCCA's employees employed at the Hospital and other Clinics and Other Facilities have been sanctioned, debarred or suspended or otherwise deemed ineligible to participate in Medicare, Medicaid or other Federal health care programs, and procurement, or non-procurement programs (collectively, an "Ineligible Person").  HCCA represents to the District that HCCA is not an Ineligible Person nor has any pending proceedings or received notice of any action or proceeding to exclude, debar, suspend, or otherwise declare HCCA ineligible under any federally funded health program.  HCCA shall notify the District within three (3) business days after becoming aware of any fact or circumstance that would make HCCA an Ineligible Person.

(e)     Access to Records.  HCCA shall, in accordance with Section 1395x(v)(1) of Title 42 United States Code until the expiration of four (4) years after the termination of this Agreement, make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of this Agreement and such books, documents and records as are necessary to verify the nature and extent of the costs of the services provided by HCCA under this Agreement.  HCCA further agrees that in the event HCCA carries out any duties under this Agreement through a subcontract with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve-month period with a related organization, such agreement shall contain a clause to the effect that until expiration of four (4) years, or longer as may be required by Law, after the furnishing of such services pursuant to such subcontract, the related organization shall make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of such contract and such books, documents and records of such organizations as are necessary to verify the nature and extent of such costs.  This Section is included pursuant to and is governed by the requirements of federal Law.  No attorney-client, accountant-client, or other legal privilege will be deemed to have been waived by the parties or any of the parties' representatives by virtue of this Agreement.

(f)     No Obligation to Refer Patients.  Nothing contained in this Agreement shall require (directly or indirectly, explicitly or implicitly) either HCCA or its affiliates or the District or its affiliates, to refer any patients to one another or to use the Hospital or the Clinics and Other Facilities as a precondition to receiving the benefits set forth herein.

29

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(g)  Regulatory Filings and Approval.  The District shall cooperate fully with any and all regulatory filings necessary for the approval of the execution and implementation of this Agreement, including those related to HCCA's use of any Permit and Medicare / Medi-Cal provider agreements in its name during the Term.

(h)  Tax and Medicare Effect. None of the parties (nor such parties' counsel or accountants) has made or is making any representations to any other party (nor such party's counsel or accountants) concerning any of the tax or Medicare effects of the transactions provided for in this Agreement, as each party hereto represents that each has obtained, or may obtain, independent tax and Medicare advice with respect thereto and upon which it, if so obtained, has solely relied.

19.  **Operating Fee.**

(a)  Operating Fee. As HCCA's fee for the performance of the services under this Agreement, HCCA shall receive monthly (in advance on the first day of each month) an amount (the "**Operating Fee**") equal to the last monthly Management Fee charged to the District under the MSA immediately prior to the Effective Date of this Agreement multiplied by 1.25. The Operating Fee shall thereafter be increased as provided in Section 19(b).

(b)  CPI Adjustment.

(i)  "CPI" means the monthly index of the U.S. City Average Consumer Price Index for Urban Wage Earners and Clerical Workers – Medical Care Services (1982-84 equals 100) published by the United States Department of Labor, Bureau of Labor Statistics or any successor agency that shall issue such index. In the event that the CPI is discontinued for any reason, the parties shall use such other index, or comparable statistics, on the cost of medical care services in the United States, as shall be computed and published by any agency of the United States or, if no such index is published by any agency of the United States, by a responsible financial periodical of recognized authority.

(ii)  Inflation Adjustment. Beginning on the first January 1 occurring after the Effective Date, and every year thereafter, the Operating Fee shall each be adjusted for inflation as follows:

(1)  The then existing Operating Fee shall be multiplied by the greater of (i) the CPI percentage increase using the latest published data since the last adjustment or (ii) five percent (5%) ("**CPI Increase**");

(2)  The then existing Operating Fee shall then be added to the CPI Increase ("**Net Adjusted Operating Fee**"); and

(3)  The Net Adjusted Operating Fee will then be multiplied by 1.01 to determine the Operating Fee for the next ensuing calendar year.

(4)  For example, the latest published CPI in January 2015 (e.g. November 2014) will be compared to the CPI for November 2013 (assuming that was the latest available published data) and the 2014 Operating Fee will be multiplied by the percentage difference.  Assuming a three percent increase, the Operating Fee of $225,000 would be increased by $6,750 for a new monthly Net Adjusted Operating Fee of $231,750.  That amount would then be multiplied by 1.01 resulting in a new monthly Operating Fee of $234,067.50.

30

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(c)    <u>Expenses</u>. Except as otherwise provided in this Agreement, all of the costs and expenses, including Operating Expenses, (whether operating or capital) of maintaining and operating the Hospital and other Clinics and Other Facilities and their respective facilities and the Operations shall be the sole cost and expense of the District, and shall not be an expense of HCCA. Expenses shall be paid by HCCA from revenues arising from the Operations and to the extent same are insufficient, the District shall fund same in accordance with <u>Section 2(g)</u>.

(d)    <u>Late Payments</u>. If payment of amounts due hereunder, including the Operating Fee, Operating Expenses, other expenses, employee compensation and reimbursement of other amounts, are not made on the due date then interest shall accrue on any unpaid amounts for each day beyond the due date at a rate equal to the lesser of: (a) one percent (1.0%) per month or (b) the maximum non-usurious interest rate allowable by Law.

(e)    <u>Senior Indebtedness Status</u>. The obligations of the District under this Agreement rank and shall rank at least senior in priority of payment to all other unsecured debt of the District. Fund transfers and other payments received by the District shall be directed, regardless of the payment purpose indicated in the payment document, according to the following priority ranking: (1) payment of the Bonds; (2) payment of the Operating Fee and other amounts due hereunder and (3) all other debts of the District.

(f)    <u>Setoff</u>. Notwithstanding any provision of this Agreement to the contrary, HCCA shall have the right from time to time to setoff any amounts owed by the District to HCCA against any amounts owed by HCCA to the District and/or from any funds of the District over which HCCA has a Power of Attorney or right of disbursement (including the Charitable Care and Operational Support Fund), whether pursuant to this Agreement or otherwise.

**20.**    <u>**Books and Records.**</u>

(a)    <u>Maintenance of Books and Records</u>. HCCA shall supervise the maintenance of the books of account covering the operation of the Hospital and the Clinics and Other Facilities. Such books of account shall be maintained on an accrual basis in accordance with GAAP.

(b)    <u>Reports and Financial Statements</u>. HCCA shall from time to time deliver to the Governing Body, from the District's data related to the Operations, the reports and financial statements reasonably requested by the Governing Body.

(c)    <u>Inspection of Records</u>. Authorized agents of the District shall have the right at all reasonable times during usual business hours, at the District's expense, to audit, examine and make copies of or extracts from the books of account maintained by HCCA with respect to the Operations. Such right may be exercised through any agent, independent public accountant or employee of the District designated by the District.

**21.**    <u>**Confidentiality**</u>.

(a)    <u>Confidentiality</u>. The parties agree that: (a) neither party will disclose any secrets or confidential technology, proprietary information, or trade secrets of the other party without the prior written consent of the transmitting party, except (i) to the receiving party's agents, advisors, auditors and representatives; or (ii) as may be necessary by reason of legal, accounting or regulatory requirements beyond the reasonable control of the recipient party; and

31

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(b) should this Agreement expire or terminate, neither party will take or retain any papers, records, files, computer programs and software, other documents or copies thereof, or other confidential information of any kind belonging to the other party, except for copies of same as may be reasonably necessary to defend any anticipated litigation or respond to claims or pursuant to ordinary data backup or storage processes.

(b) <u>Press Release</u>. Except as required by Law, it is understood that all press releases or other public communications of any sort relating to the negotiation, execution and/or operation of this Agreement, and the method of the release for publication thereof, will be subject to the prior written approval of HCCA.

22. **Long Term Joint Operating Agreement**.

(a) Attached hereto as Exhibit F is the form of Joint Operating Agreement (the "**Long Term Operating Agreement**") that the parties have executed and shall become effective, upon written notification from HCCA to the District after: (i) all Bonds which require compliance with Rev. Proc. 97-13 (or any successor regulatory requirement thereto containing similar limitations), have been repaid or otherwise defeased or the Internal Revenue Code limitations or that the conditions to the proposed transaction set forth in the Long Term Operating Agreement have been waived by the Bond trustee(s); (ii) any required notices to the Attorney General regarding the transaction, if any, have been provided, including any that may be required pursuant to <u>Cal. Code Regs.</u>, tit. 11, § 999.40; and (iii) any required approvals from the Attorney General with respect to the charitable care assumption by HCCA have been received, if any. The District shall use its reasonable commercial efforts to repay or defease the Bonds or obtain the Bond Trustee's consent as soon as reasonably practicable following the Effective Date. The District shall fully cooperate with HCCA's efforts to obtain the consent of the Attorney General, and the District shall promptly make such requests and take such actions as HCCA shall request to obtain the Attorney General's consent.

(b) The District agrees that HCCA shall have the right to determine and direct the strategy and process by which the District and HCCA effectuate the Long Term Operating Agreement. HCCA shall have the right to take the lead in all meetings and communications with the Bond trustee(s) and / or any other party whose consent is required to effectuate the Long Term Operating Agreement, including by determining the appropriate timing of any such meeting or communications (including the timing of the submission of any filing with, or the response to any request by, any consent party or any action to be taken pursuant to this Section).

(c) The District shall: (a) promptly give all notices which either party deems necessary, proper or advisable to the Bond trustee(s) and other applicable third parties which may be necessary or deemed desirable by HCCA in connection with effectuating the Long Term Operating Agreement and the consummation of the transactions contemplated thereby; (b) use its best efforts to obtain all Bond trustee and other approvals, consents, permits, authorizations, and orders necessary, proper or deemed desirable by HCCA in connection with effectuating the Long Term Operating Agreement and the consummation of the transactions contemplated thereby; (c) Permit HCCA to review in advance, and consult with HCCA on, any proposed filing, submission or communication (whether verbal or written) by the District or its Affiliates, and (d) give HCCA the opportunity to attend and participate at any meeting with the Bond trustee(s) or any other party's representatives that are necessary, proper or advisable to effectuate the Long Term Operating Agreement. The District and its accountants, and attorneys shall cooperate fully with HCCA in the preparation of any statements or applications made by HCCA to the Bond

32

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

trustee(s) and other applicable parties whose consent is required to effectuate the Long Term Operating Agreement and the transactions contemplated thereby and to furnish HCCA with all information concerning the District necessary or deemed desirable by HCCA for inclusion in such statements and applications, including, without limitation, all requisite financial statements and schedules.

(d)    Between the date hereof and the effective dates of the Long Term Operating Agreement, the District shall promptly notify HCCA of (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Long Term Operating Agreement becoming effective, (ii) any notice or communication from the Bond trustee(s) or any other party from whom consent is required, and (iii) any action or proceeding commenced or, to the knowledge of the District, threatened against HCCA and/or the District which relates to the consummation of the transactions proposed under the Operating Agreements.

23.    **Miscellaneous**.

(a)    <u>Additional Assurances</u>. The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of a party, the other party or parties shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement.

(b)    <u>Complete Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the operation of the Hospital and the Clinics and Other Facilities and supersedes any and all prior agreements, either oral or written, between the parties with respect thereto.

(c)    <u>Consequential Damages</u>. Except as expressly provided herein to the contrary, neither party shall be liable under this Agreement for consequential damages, incidental damages, indirect damages, or special damages or for loss of profit, loss of business opportunity or loss of income. Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge and agree that the terms and provisions of this <u>Section 23(c)</u> shall not limit, alter, modify, impair, or otherwise affect any of the remedies of HCCA set forth in this Agreement, including the right to be paid the Termination Fee.

(d)    <u>Limitation of Liability</u>. Notwithstanding any provision in this Agreement to the contrary, under no circumstances shall HCCA or any HCCA Party have any personal liability for any failure to perform any obligations arising out of or in connection with this Agreement or for any breach of the terms or conditions of this Agreement (whether written or implied). No personal judgment shall lie against HCCA or any HCCA Party and any judgments so rendered shall not give rise to any right of execution or levy against any of their assets. Any judgments rendered against HCCA shall be satisfied solely out of the assets of HCCA. The foregoing provisions are not intended to relieve HCCA from the performance of any of HCCA's obligations under this Agreement, but only to limit the personal liability of HCCA and HCCA Parties in case of recovery of a judgment against any of them.

(e)    <u>Binding Agreement</u>. This Agreement and the rights and obligations of the parties hereunder are binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

33

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(f) <u>Governing Law</u>.  This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in accordance with, the Laws of the State.  The parties agree that the exclusive jurisdiction and venue of all actions claims, or other legal proceedings arising in any manner pursuant to this Agreement, shall be vested in the Superior Court of the County of Los Angeles in the State and in no other.  Notwithstanding any other provisions contained in any other document executed simultaneously herewith, each party, for itself, and all successors, assigns, heirs, executors, or future parties at interest agree and accept the jurisdiction of these courts and waive any defense of personal jurisdiction, forum non conveniens, venue or similar defenses and irrevocably agree to be bound by any judgment rendered in the aforementioned Court; exclusive of any and all other Federal or state courts.

(g) <u>Headings</u>.  The section and subsection headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Agreement.

(h) <u>Notices</u>.  Except as otherwise expressly permitted herein, all notices required or permitted to be given hereunder shall be in writing (whether or not written notice is specified herein) and shall be personally delivered, or mailed by United States mail, postage prepaid, registered or certified, return receipt requested, or sent by a nationally recognized overnight delivery service, or sent by electronic transmission system.  Unless such information is changed by written notice given by the affected party, any such notices shall be sent to the following addresses:

If to HCCA:
HealthCare Conglomerate Associates
Attention:  Benny Benzeevi, M.D.
810 North Cherry Street
Tulare, CA  93274
Email: benny@Healthcca.com

With a copy to:
Bruce R. Greene, Esq.
Baker Hostetler LLP
11601 Wilshire Blvd. Suite 1400
Los Angeles, CA 90025
Email:  bgreene@bakerlaw.com

If to the District:
Tulare Regional Medical Center
Attention: Chair of the Board
869 North Cherry Street
Tulare, CA 93274
Email: sbell@tulareregional.org

With a copy to:
Dooley, Herr, Pedersen & Berglund Bailey
Attention: Kris Pedersen
100 Willow Plaza, Suite 300
Visalia, CA 93291
Email: kpedersen@dhlaw.net

34

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

All notices sent by personal delivery shall be effective and deemed served upon receipt thereof. All notices sent by mail shall be effective and deemed served three (3) calendar days after being deposited in the United States mail. All notices sent by overnight delivery service shall be effective and deemed served when delivered by such overnight delivery service. All notices sent by electronic transmission system shall be effective and deemed served on the day of transmission, if on a business day and during business hours (9am until 5pm, PT) or otherwise on the next business day thereafter.

(i) <u>Survival of Representations</u>. All of the representations and warranties, and those covenants and agreements contained in this Agreement which are stated to survive termination or expiration of this Agreement, shall survive the expiration or the termination, for any reason of this Agreement. No performance or execution of this Agreement, in whole or in part, by any party hereto, no course of dealing between the parties hereto or any delay or failure on the part of any party in exercising any rights hereunder or at Law or in equity, and no investigation by any party hereto, shall operate as a waiver of rights of such party, except to the extent expressly waived in writing by such party.

(j) <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Signatures transmitted by facsimile or e-mail or other digital means shall be accepted as original signatures.

(k) <u>Severability</u>.

(i) Each and every provision of this Agreement is severable, and the invalidity of one or more of such provisions shall not, in any way, affect the validity of this Agreement or any other provisions hereof. If any clause or provision of this Agreement is illegal, invalid or unenforceable, then and in that event, it is the intention of the parties hereto that the remainder of this Agreement shall not be affected thereby, and it is also the intention of the parties to this Agreement that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Agreement a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(ii) The parties hereby have made all reasonable efforts to ensure this Agreement represents and memorializes the complete and final agreement between the parties hereto, and that it complies with all applicable Law. In the event there is a change in Law, or the interpretations thereof, whether by statute, regulation, agency or judicial decision, or otherwise, that has any material effect on any term of this Agreement, or in the event that a party's reputable counsel (being counsel with at least ten (10) years' experience in health care Law) determines that any term of this Agreement poses a material risk of violating any Law, then the applicable term(s) of this Agreement shall be subject to renegotiation and either party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other party, to remedy such condition. In the interim, the parties shall perform their obligations hereunder in full compliance with applicable Law. The parties expressly recognize that upon request for renegotiation, each party has a duty and obligation to the other only to renegotiate the affected term(s) in good faith and, further, the parties expressly agree that their consent to proposals submitted by the other party during renegotiation efforts shall not be unreasonably withheld or delayed. The parties further expressly recognize that in any such renegotiation, the relative economics to each of the parties shall be preserved. Should the parties be unable to renegotiate the term or terms so affected so as to bring it/them into compliance with Law or the

35

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

interpretation thereof within sixty (60) days of the date on which written notice of a desire renegotiation is given, then either party shall be entitled, after the expiration of said sixty (60) day period, to terminate this Agreement upon sixty (60) additional days' notice to the other party, provided that such party has received an opinion of reputable legal counsel, which legal counsel and opinion are reasonably acceptable to the other party, that it is more likely than not that this Agreement violates applicable Law. If this Agreement is terminated pursuant to this Section 23(k), HCCA shall be entitled to receive payment of the Termination Fee.

      (l)    <u>Cumulative Rights and Remedies</u>.  Any right, power or remedy provided under this Agreement or any party hereto shall be cumulative and in addition to any other right, power or remedy provided under this Agreement or existing in Law or in equity, including, without limitation, the remedies of injunctive relief and specific performance.

      (m)    <u>Modification and Waiver</u>.

      (i)    This Agreement may only be amended by a writing signed by both parties.

      (ii)    No failure by any party to insist upon strict compliance with any term of this Agreement, to exercise any option, enforce any right, or seek any remedy upon any default of any other party shall affect, or constitute a waiver of, the first party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default; nor shall any custom or practice of the parties at variance with any provision of this Agreement affect or constitute a waiver of, any party's right to demand strict compliance with all provisions of this Agreement.

      (n)    <u>Attorneys' Fees</u>.  If any action at law (or in any arbitration proceeding required hereunder) is brought to enforce any of the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs in addition to any other relief, as determined by the applicable court or arbitrator.  The foregoing includes reasonable attorney's fees in connection with any bankruptcy proceeding (including relief from stay litigation), and in connection with any appeals.

      (o)    <u>Binding Effect</u>.  This Agreement has been duly executed by the parties hereto and constitutes a valid and binding obligation enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws affecting the rights of creditors generally, and except as enforceability may be subject to general principles of equity.

      (p)    <u>Independent Contractor Status</u>.  Notwithstanding any provision contained herein to the contrary, each party understands and agrees that the parties hereto intend to act and perform as independent contractors.  Therefore, the District is not an employee or partner of HCCA.  Nothing in this Agreement shall be construed as placing the District in a relationship of employer-employee or partners with HCCA.  The parties shall not have the right to make any promises, warranties or representations, or to assume or create any obligations, on behalf of the other party except as otherwise expressly provided herein or as otherwise agreed to in writing.  The District and HCCA agree to be solely and entirely responsible for their respective acts and for the acts of any of their respective employees and agents, except as otherwise expressly provided herein.

36

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(q)     Ambiguities and Uncertainties.  This Agreement and any ambiguities or uncertainties herein, or the documents referenced herein, shall be equally and fairly interpreted and construed without reference to the identity of the party or parties preparing this Agreement or any of the documents referred to herein, on the express understanding and agreement that the parties participated equally in the negotiation of the Agreement and the documents referred to herein, or have had equal opportunity to do so.  Accordingly, the parties hereby waive the benefit of California Civil Code section 1654 and any successor or amended statute providing that in cases of uncertainty, language or a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

(r)     Consents, Approvals and Discretion.  Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by any party or any party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld, conditioned or delayed and such discretion shall be reasonably exercised, except as otherwise provided herein.  If no response to a consent or request from HCCA to the District for approval is provided to HCCA within ten (10) days from the receipt by the District of the request, then the consent or approval of the District shall be deemed to have been given.

(s)     Expiration of Time Periods.  In the event that any date specified herein is, or that any period specified herein expires on, a Saturday, a Sunday, or a state or federal holiday, then such date or the expiration date of such period, as the case may be, will be extended to the next succeeding business day.  A business day is a day on which banks are required to be open for business in Los Angeles County, California.  All references in this Agreement to "days" are to calendar days, unless business days are so indicated.

(t)     Force Majeure.  Except with respect to payment obligations, neither party shall be liable nor deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, machinery or supplies, vandalism, strikes or other work interruptions beyond the reasonable control of either party. However, both parties shall make good faith efforts to perform under this Agreement in the event of any such circumstances.

(u)     No Third-Party Beneficiaries.  The rights, privileges, benefits, and obligations arising under or created by this Agreement are intended to apply to and shall only apply to the parties and to no other Persons, except as otherwise provided herein.

[Signatures on next page]

37

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates



**EXHIBIT A**
**HOSPITAL**

## 869 N Cherry St, Tulare, CA 93274



Exhibit A

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates



The parties acknowledge that the foregoing description and maps do not represent all of the real property associated with the Hospital which is owned by the District. The District hereby grants HCCA the right to amend and/or supplement this exhibit to properly describe the real estate associated with the Hospital, from time to time.

Exhibit A

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

**EXHIBIT B**
**CLINICS AND OTHER FACILITIES**


Evolutions Fitness & Wellness
1425 E. Prosperity Avenue
Tulare CA

Family X-Ray Center
880 E. Merritt Ave
Tulare, CA 93274

Hillman Healthcare Center - 1062 South K Street Tulare, CA. 93274

Kingsburg Healthcare Center - 1200 Smith Street  Kingsburg, CA. 93631

Lindsay Healthcare Center - 845 N Sequoia Ave Lindsay, CA. 93247

West Street Healthcare Center - 325 N West Street  Tulare, CA. 93274

Woodville Healthcare Center - 16796 Ave 168  Woodville, CA. 93257

Allied Services Center
    Tulare Regional Medical Center Clinical Laboratory
    Allied Services Building
    869 N. Cherry
    Tulare, CA 93274

    Tulare Regional Laboratory - Alternate Collection Site
    799 Cherry Street
    Tulare, CA 93274

    Mineral King Toxicology Laboratory
    880 E. Merritt, Suite 107
    Tulare, CA 93274

Retail Pharmacy
    Tulare District Hospital Pharmacy
    869 N Cherry St
    Tulare, CA 93274

Together with such other facilities and clinics as are owned, leased or otherwise operated by District that HCCA elects to operate hereunder, by notice to District from time to time.

Exhibit B

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

**EXHIBIT C**
**CONTRACTS**

Contracts shall include all Contracts that relate to the Operations as of the Effective Date. HCCA shall supplement this Exhibit within thirty (30) days following the Effective Date.

Exhibit C

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

**EXHIBIT D**
**ASSUMED CONTRACTS**

HCCA shall provide the information for this Exhibit within thirty (30) days following the Effective Date.

Exhibit D

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

**EXHIBIT E**
**CHARITABLE POLICIES OF THE HOSPITAL**

The District's Charity policy as in effect on May 1, 2014. The Charity Policy shall include the foregoing Charity Policy together with any changes thereto as mutually agreed to by the parties prior to the Effective Date pursuant to the terms of the MSA.

Exhibit E

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

# TULARE LOCAL HEALTH CARE DISTRICT
## dba TULARE REGIONAL MEDICAL CENTER

## POLICY / GUIDELINE

TO:        All Departments

FROM:      Administration

SUBJECT:   Financial Assistance (Charity Care) Program

## PURPOSE:

The mission of Tulare Regional Medical Center California is to provide safe, efficient, technologically advanced healthcare with the respect for the diversity of our region. Assembly Bill 774 (AB 774) became effective January 1, 2007. The law mandates that as a condition of obtaining or holding an acute care hospital license, Hospitals must limit bills to the uninsured with family incomes at or below 350% of the Federal Poverty Level (FPL) and individuals with high cost medical bills compared to their family income. Bills are limited to the higher of the government reimbursement rates for comparable health services. This policy complies with the requirements of AB 774.

## PROCEDURE:

Who is financially eligible?

Non-Insured Patients:
1. No third party insurance
2. No Medicare/Medi-Cal
3. No Workers Compensation
4. No Auto Insurance (medical portion for third party liability)
5. Family income at or below 350% of Federal Poverty Level (FPL)

Insured Patients with Patient Responsibility:

1. Family income at or below 350% FPL
2. Financial assistance is available for patients whose out of pocket expenses exceed 10% of family income in the prior 12 month period.
3. Special consideration may be made for patients with out of pocket expenses less than 10% of family income in the prior 12 month period.

---

Effective Date: 07/26/12                    (11)      Fiscal & Business
                                                      Patient Accounting:
**APPROVED:**                                         Financial Assistance (Charity Care)
                                                      Program
Board Of Directors: 07/25/12                          11-3028

# TULARE LOCAL HEALTH CARE DISTRICT
## dba TULARE REGIONAL MEDICAL CENTER

## POLICY/GUIDELINE MANUAL

1. Eligibility for financial assistance will be considered for all patients who meet the above criteria. The granting of financial assistance shall be based on an individualized determination of financial need and shall not take into account age, gender, race, socio-economic or immigrant status, sexual orientation, or religious affiliation.

2. Tulare Regional Medical Center recognizes that there may be unusual or extenuating financial circumstances which may exceed the specific criteria as established in this policy and warrant special consideration. In such cases, a description of the unusual circumstances should be forwarded by Hospital staff to the Director of Patient Access / or designee for review and then forward to the Chief Financial Officer who will make the final determination as to the amount, if any, of financial assistance allowance to be granted.

3. Tulare Regional Medical Center recognizes that the financial status of patients may change over time. Hospital personnel will actively assist families in securing eligibility for any program with the cooperation of patients and their families. Services for dates of service prior to discharge date of January 1, 2007 are not considered under this policy.

4. The Director of Patient Access /or designee will review all applications to determine eligibility for financial assistance. Reasonable efforts will be made to verify financial data. All financial information provided will be considered confidential and staff will respect each circumstance with dignity.

5. The Director of Patient Access or designee will use the following table to determine the amount of financial assistance. This schedule will be maintained and updated annually by the Patient Access Director or designee.

| Federal Poverty Level | Charity Care Allowance [write off] | |
| --- | --- | --- |
| | Inpatient | Outpatient |
| a. Less than 200% | 100% | 100% |
| b. 201-250% | 90% | 95% |
| c. 251-300% | 80% | 90% |
| d. 301 - 350% | 75% | 87% |

   e. Any other type of discount not adhering to the above schedule is not considered a Financial Assistance Discount and will follow the terms and conditions set forth in the Discount Policy.

   f. In all cases Tulare Regional Medical Center will not collect more than the average reimbursement of its government payers which includes but is not limited to Medicare, Medi-Cal, and Healthy Family Programs.

6. Patient guarantors must complete a financial assistance application, be in process with an eligibility application for a government sponsored insurance program or set

Exhibit 2, Page 129

up a payment plan within 150 days of service or the account will be assigned to a third party billing agency at full billed charges upon 150 days after initial billing.

7. Written notification of determination of eligibility or non-eligibility for financial assistance will be forwarded to the applicant by the Director of Patient Access / or designee, within 30 days of receipt of the Financial Profile.

8. Patients or guarantors have the right to appeal a non-eligible decision within 30 days of the denial letter. Appeals will be forwarded to the Director of Patient Access / or designee who will decide to uphold or overturn the original decision within 15 days.

9. An emergency physician as defined in AB 774, Section 127450, who provides emergency medical services in a hospital that provides emergency care is also required by to provide discounts to uninsured patients or patients with high medical costs who are at or below 350% of the federal poverty level.

10. Tulare Regional Medical will comply with OSHPD reporting requirements including the following information:

    a. Submission of charity care and discount policies
    b. Submission of eligibility procedures for charity care and discount payment
    c. Submission of review procedures for charity care and discount payment
    d. Submission of the application used for charity care and discount payment

## Charity Care Qualifications & Calculations

1. Financial obligations not eligible for consideration are those whose injury is a compensable injury for the purposes of workers' compensation or auto insurance. Further, not all services are eligible for charity care. Elective services are not eligible. Special consideration may be made by the Director of Patient Access /or designee, Chief Financial Officer, or Chief Executive Officer.

2. A patient may qualify for financial assistance prior to admission, after admission, or after discharge. Written price estimates are available prior to service for inpatient and outpatient services with the exception of emergency services. Every attempt will be made to identify all available funding sources prior to or at time of visit. If a funding source cannot be identified after full compliance by the patient or guarantor, financial assistance will be considered. The hospital contact information for financial assistance is listed on the Financial Assistance application.

3. A financial assistance application, provided by TRMC Hospital staff, must be completed with the assistance of a Financial Counselor or by completing, signing and returning it to Tulare Regional Medical Center Admitting Department. This document must be completed within 30 - 60 calendar days from date of discharge. The application shall remain valid for services rendered within a 180 day period or upon a new admission to the hospital. The financial assessment will include a

Exhibit 2, Page 130

review of the family's gross income, number of family members, outstanding balances of the medical bills, and assets when appropriate. Copies of prior year tax return (preferred documentation) or current pay stubs will be needed to verify income information. Other documents proving status of assets may be required. The information contained in the financial application will not be used in collection efforts.

4. For purposes of determining family size, the following guidelines will be used.
    a. For patients 18 years of age and older, patient's family includes spouse, domestic partner and dependent children under 21 years of age whether living at home or not.
    b. For patients under 18 years of age, patient's family includes parents, caretaker relatives and other children under 21 years of age of the parent or caretaker relative.

5. Financial assistance information is available from Tulare Regional Medical Center through various means, including the publication of notices in patient bills and by posting notices in high volume areas such as the Emergency Department, Clinics, Admitting, and other places as Tulare Regional Medical Center may elect. Such information shall be provided in English and Spanish, and will be translated for patients/guarantors who speak other languages.

6. Any patient account recommended for partial or total financial assistance, after meeting the guidelines set forth in this policy, requires the Director of Patient Access / or designee to prepare all the patient documentation. The following approval process applies:

    a. $0-$25,000- Patient Access Director
    b. Over $25,001- Chief Financial Officer

7. Tulare Regional Medical Center will assign any financial obligation to a debt collector after 150 calendar days from date of discharge of non-payment of an established payment plan or 30 calendar days of non-payment on an account where the patient guarantor is not in process with an eligibility application for a government sponsored insurance program or is attempting in good faith to settle an outstanding bill.

8. Interest or finance charges will not be added to any account that has been approved for Financial Assistance.

9. The financial assistance policy shall also include an extended payment plan to allow payment of the discounted price over time. The hospital and patient will negotiate terms of the payment plan. If the patient fails to make payments for a period of 90 days, the payment plan will be considered inoperative and TRMC will inform the patient via phone call and written correspondence that the payment plan has terminated and the account may be forwarded to collections.

10. In the course of debt collection involving low-income uninsured patients who are at or below 350% of the Federal Poverty Level, Tulare Regional Medical Center will follow all guidelines established by AB 774. This provision will not preclude Tulare Regional Medical Center from pursuing reimbursement from third party liability settlements.

11. A patient deemed homeless will qualify for presumptive eligibility. To be deemed homeless, the individual must not have a fixed, regular, and adequate nighttime residence or has a primary nighttime residence that is a supervisor publicly or privately operated shelter.

12. All documentation will be maintained by Patient Access Services in accordance with regulatory guidelines.

13. Tulare Regional Medical Center Home Care and Retail Pharmacy will use best efforts to follow the hospital's approved charity care policy. Separate or additional applications to be completed by the patient/family will not be required. Referral will be made to use the Hospital's financial information.

14. This policy does not apply to professional services provided to Hospital patients by physicians or other medical providers including but not limited to Radiology, Anesthesiology, Pathology other than Emergency Room services as required by AB774, Section 127450.

Questions concerning any aspect of this policy/guideline should be referred to Patient Access or Administration.

This policy/guideline replaces and supersedes all previous policies/guidelines concerning this matter and is effective immediately.

Exhibit 2, Page 132

Descriptive Name:      Financial Assistance (Charity Care) Program

Descriptive Type:      New Policy

Document Number:      11-3028

Attachments:      None

Author:      Karan Levering, Director, Patient Access (First Source) in conjunction with the Chief Financial Officer, TRMC

Typist:      Karan Levering

Creation Date:      04/15/12

Prev. Dist. Date:      None

| Committee Review and Approval: | Approval Date: | Comments: |
|---|---|---|
| Board of Directors | 07/25/12 | |

Effective Date:      07/26/12

Forward To:      Policy Binders – (PBX and Administration) and Post to Intranet Site

Disposition:      Copy and Distribution - Administration

Comments:      **Policy replaces 11-1002 Charity Care Program**

**EXHIBIT F**
**LONG TERM OPERATING AGREEMENT**

See attached

Exhibit F

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

## EXHIBIT C

JOINT OPERATING AGREEMENT


[Attached]

Exhibit C

# Interim Joint Operating Agreement

## between

## HealthCare Conglomerate Associates, LLC

## and

## Tulare Regional Medical Center

MAY 29, 2014

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

# INTERIM JOINT OPERATING AGREEMENT

This INTERIM JOINT OPERATING AGREEMENT ("**Agreement**") is made and entered into on ___MAY___ 29, 2014 to be effective upon the termination of the MSA, as defined below, ("**Effective Date**"), by and between HealthCare Conglomerate Associates, LLC, a California limited liability company ("**HCCA**"), and Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center ("**District**").

## R E C I T A L S:

WHEREAS, the District is the owner of the real property identified on **Exhibit A** hereto together with the Buildings thereon, and certain equipment, supplies and fixtures associated therewith on which it operates an acute care hospital facility, known as Tulare Regional Medical Center, located in Tulare, California (the "**Hospital**");

WHEREAS, the District is the owner or tenant of certain other real property, including, without limitation, the Buildings thereon, and the Clinics and Other Facilities, together with certain equipment, supplies and fixtures associated therewith;

WHEREAS, the parties, have previously entered into that certain Management Services Agreement, of even date herewith (the "**MSA**") which sets forth the terms and conditions pursuant to which HCCA provides certain management services to the District, and which contemplates the execution of this Agreement.

WHEREAS, the District has determined that it is in the best interests of the residents of the District that the operation of the Hospital and the Clinics and Other Facilities be delegated to HCCA, and that such delegation will best serve the interest of the District;

WHEREAS, HCCA and the District wish to enter into this Agreement for the purpose of forming an interim joint venture for the operation of the Hospital and the Clinics and Other Facilities in order to assure consistent high quality health care services are provided efficiently and to reduce the District's financial risk in providing those services;

WHEREAS, the District believes that this Agreement is necessary for the provision of adequate health services to the communities served by the District and that this arrangement constitutes a new method of providing adequate health care to the communities served by the District, as contemplated by California Health and Safety Code § 32126.5.

WHEREAS, the parties acknowledge that in today's healthcare environment, HCCA will need the flexibility to respond appropriately in conducting the Operations;

WHEREAS, the District shall act as an advocate for the community in its relations with HCCA; and

WHEREAS, under the Laws of the State, including, without limitation, California Health and Safety Code § 32121(o) and § 32126.5, the District and HCCA each is authorized to enter into and perform this joint venture arrangement and each has been duly authorized to do so by resolutions adopted by the Governing Body and by the manager of HCCA.

NOW, THEREFORE, for and in consideration of the premises and the mutual undertakings and representations herein contained and for other good and valuable consideration, the receipt and

1

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

sufficiency of which are hereby acknowledged, the parties hereto, intending to become legally bound, hereby agree as follows:

## AGREEMENT

1. **Definitions.**

All capitalized terms not defined elsewhere in this Agreement shall have the following meanings, unless a different meaning clearly appears from the context:

(a) "Affiliate" means any other firm, partnership, association, corporation, joint venture or public body, directly or indirectly controlling or controlled by, or under direct or indirect common control with, the District or HCCA. The term "control," when used with respect to a particular Person, means the possession, directly or indirectly, of the power to direct or cause the direction of management in the policies of such Person whether through the ownership of voting stock, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

(b) "Annual Budget" shall have the meaning set forth in Section 4(i)(i).

(c) "Assumed Contracts" means those contracts which HCCA elects or has previously elected, in its sole and absolute discretion, to assume, pursuant to the provisions of Section 3(a)(x).

(d) "Bonds" means the $15,700,000 Refunding Revenue Bonds, series 2007, the $8,595,000 General Obligation Bonds (2005 Election), Series B-1, 2009 and the $61,405,000 General Obligation Bonds (2005 Election), Series B-2, 2009 or any other bonds hereafter issued by the District with the consent of HCCA.

(e) "Buildings" means those buildings and other structures in which the Operations now or hereafter are conducted, together with such other buildings and structures now or hereafter owned, leased or otherwise operated by the District that HCCA elects, in its sole and absolute discretion, to operate hereunder, by notice to the District from time to time.

(f) "CIA" shall have the meaning set forth in Section 18(a).

(g) "Claims" shall have the meaning set forth in Section 2(f)(x)(iv).

(h) "Clinics and Other Facilities" means those facilities and businesses identified on Exhibit B to this Agreement, together with such other facilities and clinics owned, leased or otherwise operated by District that HCCA elects, in its sole and absolute discretion, to operate hereunder, by notice to District from time to time.

(i) "Compliance Plan" shall have the meaning set forth in Section 18(a).

(j) "Consultants" shall have the meaning set forth in Section 4(j).

(k) "Contracts" means all service, supply, maintenance, and utility agreements, all leases, and all other contracts, agreements, arrangements, and obligations relating to the Operations, whether oral or written, all of which are described in Exhibit C to this Agreement. True, correct, and complete copies of all of the written Contracts (including all

2

amendments thereto), in existence on the Effective Date, will be delivered to HCCA and detailed descriptions of all of the oral Contracts, in existence on the Effective Date, will also be delivered to HCCA.

(l)     "CPI" shall have the meaning set forth in Section 6(e)(ii)(1).

(m)     "CPI Increase" shall have the meaning set forth in Section 6(e)(ii)(1).

(n)     "District Default" shall have the meaning set forth in Section 6(d).

(o)     "District Service Area" means the geographic boundaries of the District established under applicable Law, as currently in effect and as hereafter amended.

(p)     "Emergent Expenses" shall have the meaning set forth in Section 4(i)(ii).

(q)     "GAAP" means United States generally accepted accounting principles and practices as in effect from time-to-time, as applied by HCCA.

(r)     "Governing Body" means the Board of Directors of the District.

(s)     "Governmental Authority" means any federal, State or local judicial, executive or legislative body or governmental municipality, department, commission board, agency or authority including government contractors for federal health programs, and including without limitation, the State of California – Health and Human Services Agency Office of Statewide Health Planning and Development.

(t)     "HCCA Default" shall have the meaning set forth in Section 6(f).

(u)     "HCCA Parties" means HCCA and its Affiliates, and their respective officers, directors, managers, employees, agents, contractors and representatives.

(v)     "HCCA Property" means any machinery, inventory, equipment, fixtures, hardware and software, or other personal property (tangible and intangible) associated with Operations that HCCA has constructed, installed or otherwise acquired, at its expense.

(w)     "Hospital" shall have the meaning set forth in the Recitals of this Agreement.

(x)     "Hospital Law" means California Health and Safety Code §32000 et seq.

(y)     "Ineligible Person" shall have the meaning set forth in Section 18(d).

(z)     "Jeopardy Events" shall have the meaning set forth in Section 6(g)(ii).

(aa)     "Law" means any constitutional provision, statute, ordinance, or other law, rule, regulation, interpretation, judgment, decree or order of any Governmental Authority or any settlement agreement or compliance agreement with any Governmental Authority, including Hospital Law.

(bb)     "Major Decisions" has the meaning set forth in Section 2(d).

(cc)     "Medical Staff" shall have the meaning set forth in Section 4(d)(i).

3

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(dd)    "OIG" shall mean the Office of Inspector General of the Department of Health and Human Services.

(ee)    "Operating Expenses" means all costs and expenses paid or incurred in connection with the Operations, determined in accordance with sound accounting and management practices, including without limitation, utilities, insurance, taxes, supplies, cost of Permits, salaries and other compensation due to employees or payable to third party consultants (including legal and accounting expenses) contractors, maintenance and repair of the Hospital or the Clinics and Other Facilities, including janitorial, security, elevator, painting, plumbing, electrical, carpentry, window washing, signage, landscaping, parking lot maintenance and waste disposal, including disposal of bio hazardous medical waste generated in Operations in accordance with applicable Law.

(ff)    "Operations" means the healthcare and other operations and programs which are conducted at the Hospital and the Clinics and Other Facilities, as the same may be modified by HCCA from time to time during the Term.

(gg)    "Permits" means all permits, licenses, registrations, orders, consents, certificates, accreditations, authorizations, waivers and approvals of any Governmental Authority.

(hh)    "Person" means an association, a corporation, a limited liability company, an individual, a partnership (general or limited), a trust, a hospital district organized under the Hospital Law, or any other entity or organization, including a Governmental Authority.

(ii)    "Preexisting Claims" shall have the meaning set forth in Section 2(f)(x)(r).

(jj)    "Project" shall have the meaning set forth in Section 2(f)(i).

(kk)    "State" means the State of California.

(ll)    "Substantial Part of the Hospital or the Clinics and Other Facilities" means the portion of such facilities, as HCCA, in its sole and absolute discretion, shall determine which would prevent or materially interfere with the use of any of the Hospital or the Clinics and Other Facilities for the purposes set forth herein.

(mm)    "Term" has the meaning set forth in Section 6.

(nn)    "Termination Fee" shall have the meaning set forth in Section 6(e)(i).

2.    **General Responsibilities of the Parties.**

(a)    Appointment.  The District hereby appoints HCCA and HCCA hereby accepts such appointment from the District, subject at all times to the terms and provisions herein, as the sole and exclusive agent to operate the Hospital and the Clinics and Other Facilities and to provide the day-to-day and strategic management of the foregoing.  HCCA shall have the general responsibility and authority to implement all aspects of the Operations in accordance with HCCA's policies and procedures, in such manner as HCCA shall determine in its sole and absolute discretion, subject to Section 2(d).  The parties intend that HCCA will operate and retain full control over the Hospital and the Clinics and Other Facilities and shall make all decisions and is hereby authorized to take any action of any kind and to do anything

4

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

and everything it deems necessary, in its sole and absolute discretion, in connection with the Operations, except as provided in <u>Subsection 2(d)(i)(3)</u>.  Nothing in this Agreement shall be construed to create any fiduciary duty owed by either party to the other party or any of their respective Affiliates.

(b)    <u>Ownership of Assets</u>.  The District will continue to retain ownership of the real and personal property (including the intangible property) of the Hospital and the Clinics and Other Facilities but subject to HCCA's right and authority to make use of such property for the purposes of this Agreement, as set forth in <u>Section 3(a)</u>.  This Agreement is not intended to: (i) be a lease, does not create any landlord/tenant relationship between the District and HCCA, and is not intended to convey or constitute an estate or interest in the real property of District or (ii) result in the transfer of the District's facilities from District ownership, as prohibited under California Health and Safety Code §32121(r).  It is intended that this Agreement shall constitute a license.

(c)    <u>Representations of the District</u>.    The District represents to HCCA as follows:

(i)    The execution and delivery of this Agreement by the District and the consummation by the District of the transactions contemplated hereby do not nor will they, after the giving of notice, or the lapse of time, or otherwise (i) violate any judgment, order, injunction, decree, regulation or ruling of any court or authority actually known to the District, or (ii) conflict with, result in a breach of, or constitute a default under any Bond, note or other evidence of indebtedness, any mortgage, or other material Contract or instrument to which the District is a party or by which the District is bound.

(ii)    Except for applicable consents described herein, no approval, consent or authorization of, filing or registration with or giving of notice to, any Governmental Authority or any other Person, including any Bond trustee, is required for the execution, delivery or performance of this Agreement or the consummation of the transactions contemplated hereby.

(d)    <u>Certain Rights and Obligations of the District</u>.

(i)    During the term hereof, the District shall do or cause all things to be done reasonably necessary to preserve, renew and keep in full force and effect its legal existence under the Law of the State.  In addition, the District shall participate in the following matters ("**Major Decisions**"):

(1)    Changes to the charity care policy of the Hospital that would result in a material change to the overall number of eligible participants in the charity care programs;

(2)    Changes in clinical or operational policies and procedures for District programs which would significantly and materially limit the scope of services provided at the Hospital;

(3)    In addition, while the District and HCCA believe that, as a result of the delegation of management duties hereunder, the Governing Body is not required to: (i) make and enforce all rules, regulations and bylaws necessary for the administration, government, protection and maintenance of the Hospital and the Clinics and Other Facilities and

5

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

the property belonging thereto or (ii) prescribe the terms upon which patients may be admitted thereto, as referenced in California Health and Safety Code § 32125(a). Notwithstanding the foregoing, in the event that it is determined that the Governing Body must continue to directly fulfill the duties set forth under California Health and Safety Code § 32125(a), then the Governing Body shall have the right, in consultation with HCCA, to: (i) make and enforce all rules, regulations and bylaws necessary for the administration, government, protection and maintenance of health care facilities under their management and all property belonging thereto; (ii) prescribe the terms upon which patients may be admitted to the Hospital; and (iii) establish and maintain minimum standards of operation, as prescribed under Division 23, Chapter 2, Article 2 of the California Health and Safety Code. In the event that the parties disagree as to the applicability of California Health and Safety Code § 32125(a), the District shall be required to bring a declaratory judgment action in a court in the venue set forth in Section 23(f) to determine the applicability of California Health and Safety Code § 32125(a) and the scope of the required management rights to be vested in the District hereunder; and

In connection with the participation by the District in Major Decisions, the parties shall use their good faith efforts to resolve any disagreements by consensus. HCCA shall give consideration to the views, positions and recommendations of the District. However, final decisions shall be made by HCCA, in its sole and absolute discretion, except as provided in Subsection 2(d)(i)(3). For the avoidance of doubt, the decision-making authority of the District with respect to the virtual joint venture formed hereunder is intended to be limited and advisory in nature, except as provided in Subsection 2(d)(i)(3). Except as otherwise expressly required by applicable Law (including as provided in Subsection 2(d)(i)(3)), the District shall not have any rights to vote or decide any matters related to the Operations or otherwise; and

(4) Matters pertaining to the Project (as defined herein) as described more fully in Section 2(f).

(e) Liaisons. Each party shall appoint one senior executive who possesses a general understanding of the issues related to the joint venture collaboration contemplated by this Agreement to act as its respective liaison for this relationship. The liaisons as of the date hereof shall be:

District: Chairman

HCCA: It's Manager

A party may replace its respective liaison at any time upon notice to the other party. Any liaison may designate a substitute to temporarily perform the functions of that liaison. Each liaison shall be charged with creating and maintaining a collaborative relationship. Each liaison will also be responsible for:

(i) coordinating the relevant functional representatives of the parties, in developing and executing strategies and plans hereunder;

(ii) providing a single point of communication both internally within the respective party's organizations and together regarding key strategy and plan issues; and

(iii) identifying and raising cross-party and/or cross-function disputes to the party's respective senior leadership team in a timely manner.

6

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

Upon the reasonable request of either party's liaison, and with reasonable notice, each party's liaison, as well as appropriate additional personnel involved in the performance of this Agreement, shall meet at a location mutually agreed to by the parties to discuss issues related to this Agreement.

       (f)   Construction Project Advice.

       (i)   HCCA shall provide the District with advice and recommendations regarding the current Hospital construction project (involving the construction of a new tower commonly referred to as the Tower No. 1 Expansion Project (the "**Project**")) and will assist the District in its coordination of the Project. HCCA shall not be a contractor on the Project and shall not have control over, charge of or responsibility for, the means, methods techniques, sequences, procedures, or for the safety precautions and programs related to such Project. HCCA shall not have control over or be responsible for the District's architects or contractors or their agents, nor shall HCCA be deemed to be responsible for the construction of the Project, directly or indirectly or the funding of such Project.

       (ii)   HCCA shall provide consultation and advice, and shall assist the District in the District's efforts to discharge all of the field operations requirements and responsibilities of the District as the owner of the Project as required under the construction contracts between the District and its contractors (the "**Contract Documents**") and to cause the District's contractors to perform the work required to construct the Project in accordance with the Contract Documents. In this regard, HCCA shall provide recommendations to the District to assist in its evaluation of the status of the on-going construction associated with the Project; HCCA shall provide on-site administration of the Contract Documents in cooperation with the Project architect. HCCA shall provide assistance, including administrative, management and related services, to coordinate scheduled activities and responsibilities of the contractors, and HCCA shall schedule and conduct meetings to discuss such matters as procedures, progress, coordination, and scheduling of the Project work.

       (iii)   HCCA shall endeavor to obtain satisfactory performance from the District's contractors, but shall have no liability for any failure of performance by any of such contractors. HCCA shall have no liability for any design defect or other matter which is the responsibility of the Project architect. HCCA shall recommend courses of action to the District when requirements of the Contract Documents are not being fulfilled. HCCA shall report to the District any defects or deficiencies in the work of any contractor or their agents or employees, or any other Person performing construction on or providing materials or equipment to the Project of which HCCA obtains actual knowledge. Notwithstanding the foregoing, HCCA shall have no obligation to investigate or take active steps to determine the existence of any such defects or deficiencies, nor shall HCCA be liable, for any failure to timely communicate any such defect or deficiency to the District. HCCA may recommend the rejection of any deficient or defective work to the District, if such work does not conform to the Contract Documents; however, the failure of HCCA to recommend rejection of any such work shall not constitute HCCA's approval or acceptance of the work.

       (iv)   HCCA shall review requests for changes in the construction contracts, assist in negotiating contractors' proposals, and provide recommendations to the Project architect and the District in connection therewith.

       (v)   HCCA shall monitor and evaluate actual costs for the construction work, and estimates for uncompleted work, and shall advise the District as to variances between

7

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

actual and budgeted or estimated costs. HCCA shall notify the District if there are any apparent inconsistencies or inaccuracies in the information presented by the District's contractors. HCCA shall also report the contractors' cost control information to the District.

(vi)     HCCA shall assist the District in developing and implementing procedures for the review and processing of applications for payment from the contractors for progress and final payments.

(vii)     HCCA shall record the progress of the Project. On a monthly basis or otherwise as requested by the District, HCCA shall submit written or oral progress reports to the District and attend monthly Governing Body meetings requested by the District.

(viii)     HCCA shall not have control over, charge of, or responsibility for the construction means, methods, techniques, sequences or procedures, or for safety precautions or programs in connection with the work of any contractors.

(ix)     Project Consultants. HCCA shall make recommendations if it determines that consultants are reasonably required for the Project, and shall assist the District in selecting and engaging such Consultants. HCCA shall supervise and coordinate Project Consultants.

(x)     Limitations.

(1)     HCCA has no authority to execute any Contract Documents or otherwise bind the District to any transactions with respect to the Project. HCCA shall not provide any legal services or architectural services with respect to the Project. The District agrees that although HCCA will make recommendations, HCCA shall not take any action in connection with the implementation of such recommendations without the District's prior approval.

(2)     The District will at all times maintain a meaningful and substantial involvement in all phases of the Project, and hereby accepts responsibility for the results of the Project. HCCA's recommendations concerning the terms of the Construction Contracts shall be subject to review and approval of the District and the District's attorneys or other advisers.

(3)     The District acknowledges that HCCA does not guarantee any particular results, notwithstanding projections which may be made by HCCA. HCCA's projections and forward looking statements are based on estimates and expectations, and reasonably available data from contractors, architects and others, and as a result are inherently uncertain. Actual results could differ materially from those anticipated as a result of a variety of factors.

(4)     Neither HCCA nor HCCA Parties shall be liable to the District for any claims, demands, costs, expenses, liabilities or obligations of any nature relating to the Project, ("**Claims**"), except to the extent resulting from the willful misconduct of HCCA or HCCA Parties. HCCA and HCCA Parties may be liable to the District for general and direct damages, but in no event shall HCCA or any HCCA Parties be liable to the District for any consequential damages, including loss of use, special, indirect or incidental damages. HCCA and HCCA Parties may be liable for punitive or exemplary damages to the extent resulting from their willful misconduct.

8

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(5)     The District shall defend, indemnify and hold HCCA and HCCA Parties free and harmless from and against all Claims (including reasonable attorney's fees), except to the extent resulting from the willful misconduct of HCCA or HCCA Parties.  It is understood and agreed that, HCCA and HCCA Parties shall have no liability whatsoever for any actions or failure to act which arose prior to the Effective Date, including Claims which relate in any way to construction activities which occurred prior to that date ("**Pre-existing Claims**").  In the event that any Claims are made against HCCA or any HCCA Party which may include Pre-existing Claims, then the indemnification and defense obligations of the District shall apply, even if they also involve Claims which are not Pre-existing Claims. However, in the event of a determination by a court or arbitrator that any Claims for which indemnification was provided by the District were not in fact Pre-Existing Claims and were not Claims for which indemnification is otherwise required hereunder, then HCCA shall be liable to reimburse the District for any reasonable costs or expenses incurred by the District in connection with the defense or indemnification.

(6)     In circumstances where any limitation on damages or indemnification provision hereunder is unenforceable or unavailable for any reason, the District shall contribute to any Claims, relating to the Services provided hereunder by HCCA, in such proportion proportional to the relative fault of the parties bears to all other conduct giving rise to such Claim.

(7)     Neither HCCA nor any HCCA Parties, or any of their respective Affiliates, shall have any liability hereunder to the District, and the District agrees it will not bring any action against any such Persons, except to the extent caused by the willful misconduct of such Persons.  Without limiting the foregoing, such Affiliates are intended third-party beneficiaries of these terms and may in their own right enforce such terms.

(8)     The provisions of Section 2(f)(x)(4)-(7) shall survive the expiration or termination of this Agreement.

(g)     Funds.  If HCCA shall determine that sufficient funds are not available from the Operations and amounts deposited with HCCA as provided in Section 2(h), the District shall furnish HCCA with timely and sufficient funds to timely pay the Operating Expenses, both operating and non-operating expenses.  HCCA will notify the District by submitting a fund request to the District and the District will supply the requested funds within three (3) calendar days of HCCA's notification of the District of the need for same, provided that for unanticipated Emergent Expenses, HCCA shall have the right to provide a shorter notice period. HCCA shall not be obliged to fund Operating Expenses or other expenses hereunder or provide funds to accommodate shortfalls in revenue, except where an expense is specifically and expressly allocated to HCCA herein.  Notwithstanding the foregoing, HCCA, may, in its sole and absolute discretion, advance funds as provided in Section 2(g)(i). HCCA shall not be in default hereunder if HCCA's failure to comply with the terms of this Agreement is due to the lack of adequate funds provided by the District.

(i)     Notwithstanding anything in this Agreement to the contrary, in the event the District fails to timely advance funds as required hereunder and/or meet any of its payment obligations under this Agreement, HCCA shall have the right, but not the obligation, in its sole and absolute discretion, to advance funds or agree to undertake to advance funds to any Person, as a loan to the District to meet the shortfall caused by the District's failure.  All sums advanced by HCCA pursuant to such agreements or undertakings shall be for the District's account.  The District shall pay HCCA interest on all advanced funds at the rate set

9

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

forth in Section 19(d) and the principal, upon demand by HCCA. Any advance made shall be evidenced by a promissory note issued by the District in an amount equal to the amount advanced.

(ii)     To the extent HCCA advances funds, this Agreement constitutes a security agreement pursuant to which the District provides HCCA with a lien on all of the District's Assets (as defined herein), to the extent allowed by Law, and HCCA shall have the right to file a Uniform Commercial Code financing statement with respect to such obligation without the signature of the District.

(iii)    HCCA shall have the right to execute the above described promissory note on behalf of the District, to the extent permitted by Law. The District hereby irrevocably appoints HCCA as its attorney-in-fact coupled with an interest with full power to prepare and execute any documents, instruments and agreements, including, but not limited to, any note evidencing the advance or loan and any Uniform Commercial Code financing statements, continuation statements and other security instruments as may be appropriate to perfect and continue its security interest in favor of HCCA.

(h)     Charitable Care and Operational Support Fund.

(i)     The District recognizes that the continued operation of the Hospital and Clinics and Other Facilities in accordance with the District's historical role as the primary provider of healthcare for the indigent and uninsured populations of Tulare County, California, precludes operation of the Hospital and Clinics and Other Facilities for the provision of high quality healthcare without support from sources other than patient revenues, especially in light of increasing indigent and charity populations and adverse reimbursement changes. The District has determined that in light of the increasing healthcare costs it is in the best interest of the District to subsidize the cost of providing healthcare services for the indigent and uninsured populations of Tulare County, California and surrounding areas through the arrangement set forth herein and that the provision of sufficient funds for such care is essential.

(ii)    Except for funds required to be held by the District to support principal and interest on the Bonds and such other amounts as may be required to satisfy covenants under the Bonds, that all funds derived from the District's regular annual tax and assessments shall be conveyed by the District to HCCA, on not less than a monthly basis, to be held by HCCA (the "**Charitable Care and Operational Support Fund**") to use to pay expenses incurred in connection with the operation and maintenance of the Hospital and the Clinics and Other Facilities in accordance with the provisions hereof, including the cost of providing charitable care, as provided herein. Notwithstanding the foregoing, the balance contained in the Charitable Care and Operational Support Fund shall not exceed the sum of ten percent (10%) of the estimated annual expenditures related to the Hospital and the Clinics and Other Facilities, if disbursements would otherwise require a written order of the District's President and Secretary, as provided under applicable Law.

(iii)   Upon termination of this Agreement, any amounts remaining in the Charitable Care and Operational Support Fund shall be: (i) transferred to the Subsidy Fund established under the Long Term Operating Agreement, if the parties hereto enter into such agreement or (ii) returned to the District by HCCA.

(iv)    The District shall use its reasonable commercial efforts to (i) obtain the consent of any Bond trustees required to effectuate and fund the foregoing Charitable

10

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

Care and Operational Support Fund arrangement as soon as reasonably practicable and (ii) reasonably minimize the amount of funds required to be held by the District to support principal and interest on the Bonds and such other amounts as may be required to satisfy covenants under the Bonds.

(v)     HCCA shall provide the District with a quarterly statement of the charitable care provided, including such care provided with funds from the Charitable Care and Operational Support Fund.

(vi)     HCCA shall have, to the fullest extent allowed by Law, the right to withdraw funds from the Charitable Care and Operational Support Fund, as it deems necessary or advantageous, for the operation of the Hospital and Clinics and Other Facilities and the provision of healthcare services, including amounts for capital expenditures.

(vii)     The District shall assure that its funds are used to support the Hospital and the Clinics and Other Facilities and to provide charitable care therein and are not diverted to other uses.

(i)     <u>Cooperation and Responsiveness.</u>

(i)     The District and its Governing Body shall fully and timely cooperate with HCCA and shall be responsive and available to HCCA during the Term in order that HCCA can carry out its duties and obligations hereunder.

(ii)     In any instance in which the District (or the Governing Body) has an obligation to provide input or decide an issue, or provide (or withhold) its approval or consent under the terms of this Agreement, the District (or the Governing Body) shall do so in accordance with <u>Section 23(r)</u>. Unless a specific period of time is set forth for a particular act, a reasonable period of time for the District to provide input or decide an issue, or provide (or withhold) its approval or consent shall generally be within five (5) to seven (7) days.

(iii)     In addition to the obligation to provide funds to HCCA, the District will timely provide HCCA with the necessary equipment and other resources to enable HCCA to fully and timely perform its services hereunder.

(j)     <u>Relationship.</u>

(i)     Except as specifically authorized hereunder, the District shall not interfere, directly or indirectly, with HCCA's decisions or the daily Operations, and shall not interfere with HCCA's ability to perform its obligations hereunder. The District representatives shall not access the Hospital and the Clinics and Other Facilities, except: (i) upon prior arrangement with HCCA, (ii) in the event of emergency; or (iii) as may be required pursuant to <u>Subsection 2(d)(i)(3)</u>. Except upon request of HCCA, individual members of the District's Governing Body, shall not issue directions to HCCA, except following and in accordance with the formal actions of the District's Governing Body.

(ii)     The District representatives' communications, formal and informal, regarding HCCA and the Operations with Persons associated or affiliated with the Operations or HCCA, shall be conducted exclusively with Persons designated by HCCA's manager or chief executive officer.

11

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(iii)     Neither the District nor its representatives shall (nor cause or encourage others to) disclose confidential or negative information regarding, or take any action or omit to take any action that is materially detrimental to the reputation of (anything which might tend to bring a party into public disrepute, hatred, contempt, scorn, scandal, or ridicule, or which might tend to reflect unfavorably on or otherwise degrade such party), HCCA or any of the other HCCA Parties, or make any statements, verbally, in writing or otherwise, that defame, disparage or in any way criticize the personal or business reputation, practices, or conduct of HCCA, or of the other HCCA Parties, to anyone other than HCCA's manager or chief executive officer. Notwithstanding the foregoing, negative information may be discussed within official District Governing Body meetings and in connection with its internal operations, provided that if such information is used in a non-confidential forum, the District shall use reasonable efforts to verify the veracity and objectivity of such information prior to disclosing same in a non-confidential forum.  However, nothing herein shall prevent the District or any of its representatives from testifying truthfully in a legal proceeding or governmental administrative proceeding.  The District acknowledges and agrees that this prohibition extends to statements, written or verbal, made to anyone, including but not limited to, the news media, bondholders, industry analysts, competitors, strategic partners, vendors, employees (past and present), and clients.

(iv)     The parties acknowledge that: (1) this Section is a material provision of this Agreement; (2) any breach of this Section shall be a material breach of this Agreement, and (3) a breach of this Section would cause irreparable harm.

(k)     Standards of Performance.  The District acknowledges that while HCCA shall expend its commercially reasonable efforts in performing its obligations under this Agreement, HCCA does not guarantee any particular results, notwithstanding projections which may be made by HCCA.  HCCA's projections and forward looking statements are based on estimates and expectations, and reasonably available competitive, financial, economic and other data, and as a result are inherently uncertain.  Actual results could differ materially from those anticipated as a result of a variety of factors.  HCCA shall use its commercially reasonable judgment in directing the Operations.  The parties acknowledge that implementation of the District's charitable care purposes may not permit the maximization of the District's profits.  The District is a California Health Care District organized and operating under the Hospital Law with, inter. alia., a charitable mission, and it has under the Hospital Law certain responsibilities and obligations, including, but not limited to, obligations to provide charity care and indigent care.  At all times, HCCA, shall, as required by Law, follow the charity and indigent care policies and obligations of the District (provided that the Hospital and the Clinics and Other Facilities' financial obligations in that regard shall not be materially changed unless such change is required by applicable Law) and shall assist the District in meeting all of the District's required obligations under the Hospital Law. The District will promptly notify HCCA of any changes to any policy, procedure, or the District Bylaw which may impact the Hospital and the Clinics and Other Facilities' charity care obligations.

3.     Virtual Joint Venture Economic Participation.

(a)     District Contribution.  On the Effective Date, the District shall convey to HCCA (or cause to be conveyed) to the virtual joint venture the exclusive right to use, during the Term, all of its assets (whether real or personal property, or tangible or intangible property), constituting and associated with the Hospital and the Clinics and Other Facilities, together with all other assets of the District as HCCA shall designate, provided that the foregoing shall not constitute a grant to HCCA of a proprietary or ownership interest in any of such assets. In

12

furtherance of the foregoing, on the Effective Date, the District shall convey to HCCA (or cause to be conveyed) the exclusive right to use the following assets:

(i)     all inventory and supplies, including, but not limited to, office, foodstuffs, medical, disposables, linens, prescription medications and pharmaceutical inventories and supplies and other inventories and supplies of every kind and nature used in connection with the Operations;

(ii)     all policies and procedures manuals, operating manuals, training materials, marketing, sales and promotional materials, intellectual property including, but not limited to, all patents, trademarks, service marks, copyrights (whether or not registered) and registrations and applications therefore, trade names, trade secrets, confidential know-how and similar proprietary information, and/or computer software owned by the District;

(iii)     all administrative records, financial books and records, employee records, including, but not limited to, all books, records, files, computer software, data or databases, correspondence, memoranda, notes and other documents or papers and other evidence thereof relating to the Operations;

(iv)     all patient medical records, medical staff records and medical/administrative libraries;

(v)     copies of all other books and records of or relating to the Operations;

(vi)     all Permits (including, but not limited to, any Life Safety Code or similar waivers, variances and any certificates of need), relating to the Operations;

(vii)     goodwill;

(viii)     all vehicles used in the Operations;

(ix)     the District's rights and interests in and to its provider number and provider and reimbursement agreement under the Medicaid/Medicare programs, managed care contracts, insurance contracts and any other third party payor programs, but only to the extent that the same are assignable to HCCA to use during the Term, but only to the extent that HCCA accepts such right to use such arrangements;

(x)     all of the District's rights and interests in all Contracts set forth on Exhibit D to this Agreement (the "<u>Assumed Contracts</u>").  Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute an agreement to assign any Contract or any claim, right or benefit arising thereunder or resulting therefrom, if a consent has not been obtained or if an attempted assignment thereof would be ineffective. If any such consent has not been obtained as of the Effective Date, or if an attempted assignment of any such Contract would be ineffective, (a) the District shall so advise HCCA and (b) the District shall reasonably cooperate with HCCA to obtain such consent, and absent obtaining such consent, in making commercially reasonable arrangements designed to provide to HCCA the benefits under such Contracts, including enforcement for the benefit of HCCA of any and all rights of the District against a third party arising out of any breach or cancellation by such third party or otherwise.  Fees, expenses and payments under all Assumed Contracts shall be pro-

13

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

rated as of the Effective Date. Expenses under the Assumed Contracts shall be paid as provided in Section 19(c).

(b)     Satisfaction of Bond Obligations. At its sole cost and expense, the District shall do all things necessary, desirable, and appropriate to pay or, otherwise satisfy the indebtedness related to the Hospital and the Clinics and Other Facilities, including the indebtedness related to the Project construction. Notwithstanding the foregoing, HCCA shall provide oversight of the District's funds and shall assist the District in making timely payments of its liabilities, including the Bonds and other obligations. It is specifically agreed and understood, however, that HCCA's obligations under this subsection are to assist in transmitting payments, subject to availability of District funds to make such payments. Nothing contained herein shall obligate HCCA to make any such payments from its own funds or resources or to advance any monies whatsoever to the District. However, HCCA shall have the right to pay such amounts, in its discretion, from the Charitable Care and Operational Support Fund. Further, HCCA shall not be liable either primarily or as guarantor for debts of the District as a result of HCCA's services hereunder.

(c)     HCCA Contribution. HCCA may, in its sole and absolute discretion, but shall not be required to, contribute working capital to the joint venture created hereunder, as same may be needed for the Operations, from time to time, and management resources to the joint venture created hereunder and provide all of the operational and strategic planning for the joint venture created hereunder.

(d)     Economic Distribution. During the Term, the District shall receive the net income resulting from the Operations in accordance with the following:

(i)     The annual net operating income from the Hospital and the Clinics and Other Facilities (calculated in accordance with GAAP) shall be determined for each fiscal year on a combined basis, and then allocated to the District after subtracting HCCA's fees set forth herein, including all expense reimbursement and the Operating Fee described in Section 19.

(ii)     If any losses are incurred in the operation of the Hospital and the Clinics and Other Facilities, such losses shall be the sole responsibility of the District.

(iii)     Distributions of allocated net income to the District shall be made when funds are reasonably available to do so, after considering the capital and operating needs of the Hospital and the Clinics and Other Facilities, including reasonable reserves determined in the sole and absolute discretion of HCCA.

(iv)     "True-up" payments shall be made between the parties, as may be necessary to reflect the proper allocation of income.

(e)     Proration of Expenses and Revenues. All expenses and revenues shall be prorated between the District and the virtual joint venture with HCCA acting as the joint venture's agent, as of the Effective Date. All prorations shall be made on the basis of actual days elapsed in the relevant accounting, billing or revenue period and shall be based on the most recent information available. "True-up" payments shall be made between the parties, as may be necessary to reflect the actual amount of any expense or revenue previously allocated between the parties based upon incomplete or inaccurate information or an estimate. The

14

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

parties shall each make such records available for inspection by the other party as are reasonable to demonstrate the accuracy of any prorations and adjustments.

4.  **HCCA'S Operational Covenants**.

(a)     Licensure. During the Term, HCCA shall: (i) maintain, in its name, in full force and effect, all necessary Permits required by applicable Law for the Operations; (ii) the Hospital and the Clinics and Other Facilities which are engaged in the Operations will be certified to participate in the Medicare program under Title XVIII of the Social Security Act and the Medi-Cal program, California's Medicaid program; (iii) HCCA will provide to the District copies of any Permits related to the Operations upon request; and (iv) HCCA will promptly notify the District of any change, relinquishment, revocation or suspension of, or the imposition of any material restriction to, any Permits.

(b)     Mission, Vision, Values and Policies. HCCA will conduct the Operations in compliance with HCCA's mission, vision, values and ethical policies and will operate under HCCA's clinical and administrative policies, systems, and procedures and standards, as they may be amended, except as may otherwise be required by Subsection 2(d)(i)(3). The District enters into this Agreement with HCCA after having determined that HCCA's mission, vision, values, and ethical policies are consistent with the mission and purposes of the District to provide access to high quality health services to the public in the District Service Area and access to specialized services to District residents.

(c)     Decision-making. HCCA may make all decisions regarding the Operations, in its sole and absolute discretion, recognizing that HCCA requires the flexibility, in its sole and absolute discretion, to determine how to deliver high quality healthcare services while maintaining financially sustainable Operations, except as provided in Subsection 2(d)(i)(3).

(d)     Medical Staff.

(i)     A separate medical staff (the "**Medical Staff**") will be maintained at the Hospital with credentialing services provided by HCCA. HCCA shall adopt Medical Staff Bylaws for the Operations effective on the Effective Date, and shall credential, appoint and grant Medical Staff privileges and membership status to physicians and other health care professionals, as is appropriate for the Hospital and the Clinics and Other Facilities in HCCA's sole and absolute discretion, except as provided in Subsection 2(d)(i)(3). HCCA shall be the governing body that approves the Medical Staff Bylaws, rules and regulations. Nothing herein restricts HCCA's ability to amend the Medical Staff Bylaws as it deems necessary and appropriate in its sole and absolute discretion, except as provided in Subsection 2(d)(i)(3).

(ii)     The District shall provide HCCA with a confidential written disclosure containing a brief description of all adverse actions taken against Medical Staff members or applicants in the past three (3) years that are not disclosed in the minutes of the meetings of the Medical Executive Committee of the Medical Staff.

(e)     Management and Governance. HCCA shall set strategic direction and provide strategic and operational planning for the Operations. HCCA shall have overall governance authority and responsibility for the Hospital and the Clinics and Other Facilities, except as provided in Subsection 2(d)(i)(3). HCCA will establish and select members of a community board to provide advice regarding the Operations, in its sole and absolute discretion. A majority of the members of the community board shall reside in the District and the initial

15

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

search committee for members of this community board shall include up to two (2) Persons selected by the District.

(f) <u>Programs</u>. The District shall have the right to: (i) reasonably request information regarding HCCA's performance hereunder, as may be required to satisfy its obligations under applicable Law and the Bonds, (ii) exercise taxing authority sufficient to satisfy debt obligations associated with the Hospital and the Clinics and Other Facilities; (iii) participate in Major Decisions, as provided in <u>Subsection 2(d)(i)</u>, (iv) dispose of surplus District assets (as defined herein) not used by HCCA under this Agreement, and (v) otherwise perform its statutory functions.

(g) <u>Charity Care</u>. HCCA will apply to the Operations the charity care policies established by HCCA (subject to the District's rights under <u>Subsection 2(d)(i)(1) and (3)</u>), which shall, subject to the financial performance of the Hospital and the Clinics and Other Facilities, generally be consistent with the existing charitable policies of the Hospital, a copy of which is set forth in Exhibit E to this Agreement.

(h) <u>Records</u>. On the Effective Date, the District will provide HCCA with all patient, medical staff, personnel, and other records of the District necessary for Operations including, without limitation, medical records, billing records, equipment records, operating manuals, employment records and financial data related to Operations and the Hospital and the Clinics and Other Facilities, and HCCA agrees to maintain such records during the Term pursuant to HCCA's policies and procedures. HCCA will provide reasonable access to such records to the District and its agents for preparation of cost reports and other post-closing filing, preparation of the District financial statements relating to the period prior to the Effective Date, defense of investigations and claims, and other reasonable purposes. HCCA will be deemed to have custody but not ownership of such records.

(i) <u>Annual Budget</u>.

(i) HCCA shall be responsible for preparation, presentation, monitoring, and reporting of the annual operating and capital budgets (collectively, the "Annual Budget"), except as may otherwise be required by <u>Subsection 2(d)(i)(3)</u>. Each proposed Annual Budget shall set forth an estimate of operating revenues and expenses for the next fiscal year, together with an explanation of anticipated changes in utilization, charges to patients and clients, payroll rates and positions, non-wage cost increases, and all other factors differing significantly from the then-current year. HCCA shall be responsible for the oversight and review of the Annual Budgets, except as may otherwise be required by <u>Subsection 2(d)(i)(3)</u>. The Annual Budget will be created and implemented to coincide with District's fiscal year, which is July 1st through June 30th of the following year.

(ii) Subject to the limitations set forth in <u>Section 2(g)</u>, HCCA shall make commercially reasonable efforts to oversee the management of the Hospital and the Clinics and Other Facilities so that the actual revenues, costs, and expenses of the operation and maintenance of the Hospital and the Clinics and Other Facilities shall be consistent with the Annual Budget. Inclusion of any item within the Annual Budget shall constitute all necessary approval for HCCA to effectuate the budgeted item. Notwithstanding anything to the contrary herein, HCCA shall have the right, in its sole and absolute discretion, to make any expenditures necessary on an emergent basis to avoid or mitigate damage to the Hospital and the Clinics and Other Facilities, obtain equipment repairs or to avoid or mitigate injury or potential injury to Persons or property or that are necessary on an emergent basis to comply with any Law or to

16

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

cure or prevent any violation of any Law, whether or not provided for or within the amounts provided for in the Annual Budget for the applicable year (collectively, the "Emergent Expenses").

(j)     HCCA may hire or retain any consultants, accountants, attorneys or other professional personnel (collectively, "Consultants") which HCCA, in its sole and absolute discretion, determines it is necessary or appropriate to assist HCCA in carrying out its duties and responsibilities under this Agreement. The expense of any Consultants so retained shall be an expense of the District, but HCCA shall retain any such Consultants without the approval of the Governing Body, if the cost of such services shall exceed $100,000 in any calendar year for such services, unless otherwise set forth in the approved Annual Budget.

5.     **Fees and Revenues**.

Commencing on the Effective Date, HCCA shall have the exclusive right to receive, consistent with the terms of this Agreement, all fees and revenues generated by and payments received from the Operations, including without limitation professional and technical fees for provision of clinical and ancillary services (such as imaging and laboratory) for application to Operating Expenses and other expenses (as provided in Section 19(c)) relating to the Operations, with the balance, if any, remitted to the District as provided in Section 3(d).

6.     **Term and Termination**.

(a)     Initial Term. The initial term of this Agreement shall commence on the Effective Date and shall end on the date that is fifteen (15) years from and after the Effective Date of the MSA, as set forth therein (such period, plus any renewal Terms, are collectively referred to as the "Term").

(b)     Extension of Term. Upon completion of the initial Term or of any subsequent renewal Term, this Agreement shall automatically renew for additional 10-year periods, unless either party shall send a notice of intent not to renew the Agreement to the other party not less than twelve (12) months prior to the end of the initial Term or then current renewal Term, as applicable. Each renewal Term shall be on the same terms and conditions set forth herein. Notwithstanding the foregoing, nothing herein is intended to permit the Term to exceed such term as is permissible under any tax-exempt bond financing requirements under applicable Law, with respect to the Bonds. In the event the Term exceeds any permissible term, then the Term shall be conformed to the maximum term permitted under such Law.

(c)     Irrevocability of Agreement. The District acknowledges and agrees that HCCA is entering into this Agreement in reliance on the long term nature of this Agreement, and further acknowledges that the rights, duties, powers and authority of each of the parties hereto, are intended to be non-terminable throughout the Term, except in accordance with the express provisions of this Agreement. The District acknowledges that neither party will achieve the benefits intended to be achieved if the District has any continuing right or power to terminate this Agreement, or the relationship hereby created, except in accordance with the express provisions of this Agreement. Accordingly as a substantial inducement to HCCA to enter into this Agreement and provide its proprietary systems and knowledge, the District hereby irrevocably waives and relinquishes any right, power or authority existing at Law or in equity to terminate this Agreement, except in strict accordance with the express provisions of this Agreement. The parties further hereby acknowledge that any breach of this Section will cause irreparable and permanent damage to HCCA, not compensable by money damages.

17

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(d)    <u>District Default</u>.  The following occurrences shall each be deemed an event of default by the District ("**<u>District Default</u>**") unless waived in writing by HCCA:

      (i)    Material breach of any representation, warranty, or covenant of the District contained within this Agreement, after giving written notice to the District, and the District's subsequent failure to cure the breach (if such breach is capable of being cured) within sixty (60) days (or ten (10) days in the event of a monetary breach or thirty (30) days in the event of a breach of any provision requiring the District to: (i) provide HCCA with a consent or approval or (ii) execute an agreement or document hereunder); provided, however, that if the cure cannot reasonably be effectuated within the applicable cure period, a longer period shall be allowed not to exceed ninety (90) days, if the District has commenced to cure such breach in good faith or has otherwise provided adequate protection or security to protect HCCA's interest hereunder (which security shall be sufficient in HCCA's sole and absolute discretion) within the applicable cure period, and the District is proceeding with due diligence to effect a cure.

      (ii)    The occurrence of any of the following: (a) the filing by the District of a voluntary petition in bankruptcy or for reorganization under any bankruptcy Law, or (b) the filing of a petition for the appointment of a receiver for all or any portion of the property of the District, or (c) the taking of any voluntary or involuntary steps to dissolve or suspend the powers of the District (unless such steps to dissolve or suspend are removed) within thirty (30) days, or (d) the consent by the District to an order for relief under the federal bankruptcy Laws or the failure to vacate such an order for relief within sixty (60) days from and after the date of entry thereof, or (e) the entry of any order, judgment or decree, by any court of competent jurisdiction, on the application of any creditor of the District or any other Person, adjudicating the District as a bankrupt, or to be insolvent, or approving a petition seeking reorganization or the appointment of a receiver, trustee or liquidator of all or a substantial part of the District's assets, if such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days.  In the event that the District becomes a debtor under the Bankruptcy Code, the District agrees, to the extent permitted under applicable Law: (a) not to reject this Agreement; (b) to designate this Agreement as a non-executory agreement.

      (iii)    If HCCA, at any time and in good faith, shall deem itself insecure and for the purposes of this Agreement, HCCA shall be entitled to deem itself insecure when some event occurs, fails to occur or is threatened or some objective condition exists or is threatened which significantly impairs the prospects that any of the obligations of the District hereunder will be paid when due, or which significantly affects the financial or business condition of the District.  If HCCA deems itself insecure, it shall have no obligation to continue performing hereunder more than thirty (30) days from and after it notifies the District that it has deemed itself insecure, unless the District provides HCCA with an unconditional, irrevocable letter of credit (the "<u>Letter of Credit</u>") from a U.S. banking institution acceptable to HCCA, insured by a federal insurance agency ("Issuer").  The Letter of Credit shall (i) meet the requirements of the "Uniform Customs and Practice for Documentary Credits," ICC No. 500 (1993 Edition), (ii) name HCCA as beneficiary, (iii) be in an amount equal to the lesser of (A) the Termination Fee or (B) such lesser amount as may be specified by HCCA, in its sole and absolute discretion, (iv) be payable in full or partial draws against HCCA's sight draft, (v) include an "evergreen" provision which provides that the Letter of Credit shall be renewed automatically on an annual basis following its issuance, unless the Issuer delivers thirty (30) days prior written notice of cancellation to HCCA, (vi) have an initial expiration date no earlier than one year from the date of issue, and (vii) otherwise be in form and substance satisfactory to HCCA.  In the event the Letter of Credit is ever not renewed when required hereunder, HCCA shall have the right, immediately upon receipt of the notice of cancellation described above, to draw upon the

18

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

Letter of Credit and hold the proceeds thereof as a cash security deposit. Provided that the District is not then in default of any of its obligations hereunder and no act, omission, fact, circumstance, condition or event that with the giving of notice or the passage of time or both would constitute a default hereunder exists, HCCA shall return the Letter of Credit to the District within forty-five (45) days after the expiration or termination of this Agreement. If the Letter of Credit is not timely provided, then HCCA shall have the right to immediately terminate this Agreement (with no right on the part of the District to cure same) and receive the Termination Fee.

      (e)   <u>Liquidated Damages</u>.

      (i)   Each of the parties acknowledges that it would be extremely difficult and impracticable, if not impossible, for HCCA to ascertain with any degree of certainty the amount of damages that would be suffered by HCCA in the event of the occurrence of a District Default. In the event this Agreement is terminated as a result of any District Default, or for any other reason other than a termination by HCCA under <u>Section 6(g)(i)</u>, or an HCCA Default, the District shall pay a fee (the "**<u>Termination Fee</u>**"), which fee is not a penalty, but rather is liquidated damages in accordance with California Civil Code Section 1671, which the parties have negotiated in good faith and have agreed is a reasonable fee under the circumstances. The Termination Fee shall be paid within five (5) days after the effective date of the termination of this Agreement.

      (ii)   The Termination Fee shall be an amount equal to Eighty Seven Thousand Five Hundred Dollars ($87,500) per month first increased by CPI, as provided below, and then multiplied by the remaining number of months in the Term (not to exceed 120 months) at the time of the termination, discounted to its present value using the discount rate of the Federal Reserve Bank of San Francisco at the time of termination plus one percent (1%).

      (1)   "CPI" means the monthly index of the U.S. City Average Consumer Price Index for Urban Wage Earners and Clerical Workers – Medical Care Services (1982-84 equals 100) published by the United States Department of Labor, Bureau of Labor Statistics or any successor agency that shall issue such index. In the event that the CPI is discontinued for any reason, the parties shall use such other index, or comparable statistics, on the cost of medical care services in the United States, as shall be computed and published by any agency of the United States or, if no such index is published by any agency of the United States, by a responsible financial periodical of recognized authority.

      (2)   The Termination Fee shall be adjusted for inflation by multiplying the above stated Termination Fee by the CPI percentage increase between January 1, 2015 and the date the Termination Fee is payable, using the latest published data since the last adjustment.

      (iii)   Notwithstanding the foregoing, nothing herein is intended to permit the Termination Fee to exceed such amount as is permissible under any tax-exempt financing requirements under applicable Law, with respect to the Bonds. In the event the Termination Fee exceeds any permissible limit upon such fees, then the Termination Fee shall be reduced to the maximum termination or similar fee permitted under such Law, however denominated, and the District shall enter into any agreements necessary to minimize any reduction to the Termination Fee.

19

(iv)    If the District fails to pay the Termination Fee when due, then the Termination Fee, or any unpaid portion thereof, shall bear interest from the date such payment was required to be made until the date of payment at the interest rate set forth in Section 19(d).

(v)    If upon termination of this Agreement, the District contends that the Termination Fee is not due and owing and HCCA contends that same is due and owing, the District shall be obliged to deposit within three (3) days the amount of the Termination Fee into an Escrow account with a national bank with not less than $50,000,000,000 in assets.  The funds shall be released to the applicable party upon the sooner to occur of: (a) mutual instructions of HCCA and the District; (b) final non-appealable order of a court directing the release of the funds to a party; or (c) to the District if HCCA has not contested, in a judicial proceeding, that the funds are owed to it within twenty four (24) months of the termination.

(vi)    This Section shall survive the expiration or termination of this Agreement.

(f)    HCCA Default. The following occurrences shall each be deemed an event of default by HCCA ("**HCCA Default**"), unless waived in writing by the District:

(i)    Material breach of any material covenant of HCCA contained within this Agreement, after giving written notice to HCCA, and HCCA's subsequent failure to cure the breach within sixty (60) days provided, however, that if the cure cannot reasonably be effectuated within such sixty (60) day period, a longer period shall be allowed, if HCCA has commenced to cure such breach or has otherwise provided adequate protection or security to protect the District's interest hereunder and HCCA is proceeding to effect a cure.  In determining whether a breach has occurred, the District shall exercise its reasonable discretion in good faith and shall use its best efforts to assist HCCA in effectuating a cure.

(ii)    The occurrence of any of the following: (a) the filing by HCCA of a voluntary petition in bankruptcy or for reorganization under any bankruptcy Law, or (b) the filing of a petition for the appointment of a receiver for all or any substantial portion of the property of HCCA, or (c) the taking of any voluntary or involuntary steps to dissolve or suspend the powers of HCCA (unless such steps to dissolve or suspend are removed) within sixty (60) days, or (d) the consent by HCCA to an order for relief under the federal bankruptcy Laws or the failure to vacate such an order for relief within sixty (60) days from and after the date of entry thereof, or (e) the entry of any order, judgment or decree, by any court of competent jurisdiction, on the application of any creditor of HCCA or any other Person, adjudicating HCCA as a bankrupt, or to be insolvent, or approving a petition seeking reorganization or the appointment of a receiver, trustee or liquidator of all or a substantial part of HCCA's assets, if such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) days.

(g)    Early Termination Events.

(i)    Notwithstanding anything herein to the contrary, during the first thirty-six (36) months after the Effective Date of the MSA, HCCA shall have the option to terminate this Agreement before its expiration, upon not less than six (6) months' notice to the District.

(ii)    In the event either party should be determined by a Governmental Authority to be in violation of any Law, by virtue of this arrangement or this arrangement is otherwise deemed illegal by a Court of competent jurisdiction in a final non-appealable

20

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

determination ("**Jeopardy Events**"), the parties shall use best efforts to negotiate an amendment to this Agreement to remove or negate the Jeopardy Event. If they are unable to do so within six (6) months, either party may terminate this Agreement by notice to the other, provided that upon such termination the District shall be obliged to pay the Termination Fee as provided in Section 6(e).

(iii)     In the event that: (A) (i) it shall be determined that the District has the right to: (i) make and enforce all rules, regulations and bylaws necessary for the administration, government, protection and maintenance of the Hospital and the Clinics and Other Health Care Facilities and the property belonging thereto or (ii) prescribe the terms upon which patients may be admitted thereto, as referenced in California Health and Safety Code § 32125(a) and (B) HCCA shall determine in good faith, in its sole and absolute discretion, that the District is exercising or threatening to exercise those rights in a manner that HCCA views as fundamentally inconsistent with HCCA's approach to the management of the Hospital and the Clinics and Other Facilities, then HCCA shall have the right to terminate this Agreement by notice to the District and upon such termination the District shall be obliged to pay the Termination Fee as provided in Section 6(e).

(h)     Procedure.

(i)     In the event either party to this Agreement deems the other party to be in default of its obligations hereunder, then said party shall be required to provide notice of the alleged default to the other party, which notice shall contain a detailed description of the alleged default.

(ii)     If the claim of default is disputed by the party receiving such notice, within ten (10) business days thereafter the party receiving the notice shall give notice to the charging party that the party receiving such notice disputes that the factual matters alleged constitute a default under this Agreement. If the parties cannot resolve such dispute within ten (10) business days thereafter (commencing on the date that the charging party receives notice of the dispute) the parties shall submit such matter to binding arbitration in Los Angeles County, California, in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules and Procedure for Arbitration, and applying the Law of the State. Any determination by the arbitrator shall be final and binding upon the parties, and judgment thereon may be entered in any court having jurisdiction thereof. The costs of arbitration shall be borne equally by the parties. During the pendency of any such arbitration and until final judgment thereon has been entered, this Agreement shall not be terminated as a result of the alleged default which is in dispute.

(i)     Termination.

(i)     In the event of a party's failure to cure a default within the time allowed herein for curing such default, the non-defaulting party may immediately terminate this Agreement by notice to the defaulting party, whereupon neither of the parties shall have any further obligations under this Agreement, except those obligations that by their terms or nature extend beyond the date of expiration or termination, and the non-defaulting party shall then have all rights and remedies available hereunder and at Law.

(ii)     The parties may mutually agree at any time to terminate this Agreement.

21

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(j)     Reconveyance of Use of Assets.  Upon termination of this Agreement for any reason, other than entering into the Long Term Operating Agreement, HCCA shall convey to the District all rights of use in and to and possession of any and all of the District's facilities in its possession in order to preclude divesting the District from ownership of its facilities, as prohibited under California Health and Safety Code §32121(r).

7.     **HCCA Financial Responsibilities**.

(a)     HCCA undertakes the following obligations:

(i)     HCCA shall pay, from District Funds (including the Charitable Care and Operational Support Fund) and/or revenues derived from the Operations, all Operating Expenses associated with the Hospital and the Clinics and Other Facilities.  If the District fails to timely advance funds to HCCA hereunder, HCCA shall have the right, in its sole and absolute discretion, but not the obligation, to advance such funds, as provided in Section 2(g)(i);

(ii)     The parties believe that the Hospital and the Clinics and Other Facilities will not be subject to State excise taxes or property taxes. In the event, however, that such taxes shall be lawfully assessed against the Hospital or the Clinics and Other Facilities during the Term, HCCA shall pay, from District Funds (including the Charitable Care and Operational Support Fund) and/or revenues derived from the Operations, prior to delinquency all such assessments. The District authorizes HCCA to protest or contest any tax valuations or assessments and shall assist HCCA in assuring that the Hospital and the Clinics and Other Facilities are treated as exempt assets.

(iii)     HCCA shall pay, from District funds (including the Charitable Care and Operational Support Fund) and/or revenues derived from the Operations and perform the obligations arising under the Assumed Contracts. If the District fails to timely advance funds to HCCA hereunder, HCCA shall have the right, in its sole and absolute discretion, but not the obligation, to advance such funds, as provided in Section 2(g)(i);

(b)     Except as set forth above, no further payments or performance shall be due and owing from HCCA to the District or otherwise in connection with Operations.

(c)     HCCA, at its expense, may at any time, install or commence the installation of HCCA Property in the Hospital or the Clinics and Other Facilities, to such extent as HCCA may deem desirable. HCCA may also remove any of HCCA Property so installed by it. HCCA's Property shall remain the property of HCCA unless purchased by the District pursuant to this Section. The District shall have, at its option, the right to purchase HCCA Property as of the termination of this Agreement, for other than the District's Default, for a sum equal to HCCA's cost less ordinary depreciation. HCCA shall have the right to remove all HCCA Property from the Hospital and the Clinics and Other Facilities upon termination of this Agreement, if purchase is not made by the District.

8.     **Service Covenants**.

HCCA shall:

(a)     Operate a "24/7" (all hours) emergency department service, which need not be located in the Hospital but meets the requirements of applicable Law from time to time.

22

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(b)     Provide, as required by Law, medical care to patients regardless of patients' ability to pay, subject to the charitable care polices of HCCA;

(c)     Not enact financial admission policies that have the effect of denying essential medical services or treatment solely because of a patient's immediate inability to pay for the services or treatment,, where such treatment is required under applicable Law, including the Emergency Medical Treatment and Active Labor Act (EMTALA);

(d)     Participate in and ensure that admission to and services of Operations are available to the beneficiaries of governmental reimbursement programs (Medicaid / Medicare) without discrimination or preference because they are beneficiaries of those programs;

(e)     Provide reports to the District, including financial information for Operations, together with such information as may be required for the District to report to the community on the progress it is making towards the community's health needs;

(f)     Conduct the Operations without discrimination based on race, color, sex, marital status, sexual orientation, ethnicity, or national origin; and

(g)     Conduct the Operations, if California Health and Safety Code § 32125(a) is determined to be applicable as provided in Subsection 2(d)(i)(3), in accordance with: (i) all rules, regulations and bylaws the Governing Body determines are necessary for the administration, government, protection and maintenance of the Hospital and the Clinics and Other Facilities and the property belonging thereto and (ii) the Governing Body's prescribed terms upon which patients may be admitted thereto.

9.     **Names and Branding**.

(a)     License.  HCCA shall have the exclusive, nontransferable, royalty free license and right (but not the obligation) to use the names "Tulare Regional Medical Center", "Tulare Hospital" and variations thereof and all other related names, logos, marks of the District which are and have been used by the District in connection with the operation of the Hospital and the Clinics and Other Facilities.  The District shall not continue to use such names and logos in connection with the provision of healthcare services, but may use same in connection with its operation of other District non-healthcare programs. Neither party has any obligation to register, defend or preserve such names or marks.

(b)     Signage; Branding. HCCA shall have the right to install signs upon the interior and exterior of the Hospitals and the Clinics and Other Facilities regarding the conduct of its business, subject to compliance with applicable Law. The Operations will be conducted under HCCA's name and in accordance with HCCA's naming and branding standards.  Nothing herein licenses the District to use HCCA's names, brands or logos in conducting its business.

(c)     Identification of the District. HCCA will identify in appropriate public locations, websites, and other media, the provision of support to the healthcare Operations by the District.

23

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

10. **Assignment and Sublicensing**.

(a)     HCCA shall not sublicense all or substantially all of the Hospital or the Clinics and Other Facilities, or in any manner assign or transfer its rights and obligations under this Agreement without the prior written consent of the District; provided, however, that HCCA, in its sole and absolute discretion, may sublicense, transfer, assign, or delegate any portion of its rights or obligations under this Agreement to an Affiliate or to another Person that is acquiring all or substantially all of the assets and liabilities of HCCA, including a Person in which HCCA has an ownership interest, directly or indirectly, or with which HCCA may merge, affiliate, acquire or be acquired. Nothing herein prevents HCCA from subcontracting with third parties to perform any of the services required of HCCA hereunder.

(b)     The District may not in any manner assign or transfer its rights under this Agreement without prior written consent of HCCA.

(c)     Any purported assignment in violation of this Section shall be null and void.

11.     **Exclusivity**.

(a)     The District agrees that as a result of this Agreement with HCCA, HCCA has been granted the exclusive right and responsibility to conduct the Operations in the District's facilities, including the Hospital and the Clinics and Other Facilities, during the Term in accordance with the terms of this Agreement. Therefore, during the Term, the District shall not directly or indirectly own, lease, manage, operate, market, or engage in any business, enterprise, or other activity relating to the operation of a hospital, clinic, home health, or medical clinics, or any other activity which is competitive with any activity of HCCA during the Term within the District Service Area other than in accordance with this Agreement; provided that this Section shall not be construed as prohibiting the District from providing: (i) non-healthcare services; (ii) services to respond to an epidemic or other public health emergency or (iii) other services as it may be required by law to provide, that HCCA is not providing or willing to provide. The District further acknowledges and agrees that enforcement of the provisions of this Section would not unduly impact the availability of medical services within the District Service Area, or otherwise pose a threat of harm to the public health. The District further agrees that if the District should engage in a health-care-related activity or any other activity which is prohibited hereunder, in violation of the provisions of this Section 11, then such activity shall constitute a material breach of this Agreement, and shall afford HCCA its full rights of termination.

(b)     During the Term, the District shall not, within the District Service Area, directly or indirectly, operate or invest in the provision of medical or other clinical healthcare services, except with the prior consent of HCCA, unless required to do so under applicable Law. In the event the District in good faith believes that a need exists for additional health care services or programs not currently provided within the District Service Area, the District shall first bring such recommendations to HCCA which will consider undertaking such services or programs itself. If HCCA elects not to do so, the District may elect to provide such non-clinical healthcare services that are not competitive with services offered by HCCA, itself or to pursue alternate funding sources for operation of the new program. In addition, HCCA may at any time solicit input of the District regarding additional programs and services in the District Service Area.

24

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(c)     To the fullest extent allowable by Law, if any provision of this <u>Section 11</u> is held to be invalid or unenforceable, the invalid or unenforceable provision shall be deemed stricken from this Agreement, and the remainder of this <u>Section 11</u> shall nevertheless continue in full force and effect.

12.     **Employee Matters**.

(a)     <u>Employment</u>. As of the Effective Date, the District shall terminate all of its employees at the Hospital and at the Clinics and Other Facilities. HCCA, shall have the right, but not the obligation to offer employment on an at-will basis (or otherwise) and in accordance with HCCA's customary and usual new employee screening policies and procedures to the former employees of the District, or any of them.

(b)     <u>Wages</u>.  Each employee that accepts such offer and is hired by HCCA will be employed by HCCA at a base salary and wage as determined by HCCA, in its sole and absolute discretion, and HCCA shall not have any responsibility for any retirement or other benefits accorded to such Person by the District historically, all of which shall remain the liability of the District.

(c)     <u>Employment Decisions</u>.  Nothing herein shall be deemed to affect or limit in any way normal management prerogatives of HCCA or its Affiliate with respect to employees or to create or grant to any such employees third party beneficiary rights or claims of any kind or nature, except as provided in <u>Subsection 2(d)(i)(3)</u>. HCCA will have exclusive authority with respect to employment decisions, including length of employment, regarding each employee, and will have the right to change compensation and benefits for all of its employees from time to time as HCCA may deem appropriate. Unless HCCA agrees otherwise in writing, HCCA shall not assume or be responsible for any existing District employment agreements or obligations.

(d)     <u>Seniority</u>. Employees hired by HCCA will not be entitled to retain their current seniority for purposes of benefits (i.e., benefit eligibility or accrual levels for PTO purposes).

13.     **Insurance and Casualty.**

(a)     <u>Insurance</u>. HCCA shall maintain or obtain by purchase or self-insure for all risk property insurance including earthquake insurance covering the Hospital and the Clinics and Other Facilities and HCCA Property in an amount not less than full replacement cost. Such insurance (other than insurance covering HCCA Property) shall name the District as loss payee as its interests may appear. HCCA shall maintain by purchase or self-insurance for liability for operation of any motor vehicle, with limits of not less than $1,000,000 combined single limit per accident.  The cost of such insurance shall be paid as an Operations expense as provided in <u>Section 19(c)</u>.

(b)     <u>Damage</u>. If the Hospital or the Clinics and Other Facilities should be damaged or destroyed by any peril covered by the insurance to be provided by HCCA under <u>Section 13(a)</u>, HCCA shall promptly notify the District of such damage. If any Substantial Part of the Hospital or Clinics and Other Facilities should be destroyed by any peril covered by the insurance to be provided by under <u>Section 13(a)</u>, or if it should be so damaged thereby that rebuilding or repairs cannot be completed within two hundred (200) days after the date of such damage, as determined by HCCA in its sole and absolute discretion, then the Hospital and the Clinics and Other Facilities and other assets shall be re-conveyed back to the District (as

25

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

provided in Section 6(j)) and this Agreement shall terminate and be of no further force and effect, provided that HCCA shall be entitled to receive the Termination Fee. If the Hospital and the Clinics and Other Facilities should be damaged by any peril covered by the insurance to be provided by HCCA under Section 13(a), but only to such extent that rebuilding or repairs can, in the sole and absolute discretion of HCCA, be completed within two hundred (200) days after the date of such damage, this Agreement shall not terminate, and HCCA shall, thereupon proceed with reasonable diligence to rebuild and repair the affected facility to substantially the condition which existed prior to such damage to the extent of proceeds from such insurance. The District shall be responsible to fund restoration costs in excess of the proceeds from such insurance.

(c)     Waiver of Subrogation. The District and HCCA hereby waive all rights to recover against each other, for any loss or damage arising from any cause or risk which would be covered in whole or in part, by insurance of the type required to be carried by each of them pursuant to this Agreement, or any other insurance actually carried by either of them or reasonably and customarily carried by similarly situated parties to the extent such insurance would cover such loss or damage incurred by such party. The District and HCCA shall cause their respective insurers to issue waiver of subrogation rights endorsements to all policies of insurance carried in connection with the Hospital and the Clinics and Other Facilities, and any cost for the issuance of such endorsements shall be borne by the original insured under such policies consistent with the terms of this Agreement.

(d)     HCCA's Insurance.  HCCA shall obtain by purchase or self-insure throughout the Term, commercial general liability insurance against all claims, demands, or actions arising out of or in connection with the Operations after the Effective Date of the Hospital and the Clinics and Other Facilities. The limits of coverage maintained by HCCA for commercial general liability shall be not less than $1,000,000 with respect to each occurrence, not less than $3,000,000 general aggregate. The District shall be added as an additional insured to HCCA general liability policy but only with respect to the District's liability arising out of use or operation of the Hospital and the Clinics and Other Facilities. HCCA shall obtain by purchase or self-insure through the Term professional liability insurance covering its Operations.  Professional liability insurance limits shall not be less than $1,000,000 with respect to each occurrence and not less than $3,000,000 in general aggregate.  The cost of such insurance shall be paid as an Operations expense as provided in Section 19(c).

(e)     District Insurance. The District shall maintain and pay for "tail coverage" or comparable insurance coverage, to prevent any gap in insurance coverage for any liability arising from the District's actions or occurrences prior to the Effective Date. Such insurance shall have limits of liability in amounts and upon the terms required under the MSA. In addition, the District shall be responsible for obtaining entity and individual professional liability, D & O / employment practices liability, and commercial general liability coverage in commercially reasonable amounts for its operations after the Effective Date.

(f)     Indemnity.

(i)     Subject to Section 13(c), HCCA covenants and agrees to hold harmless the District, its Governing Body, officers and employees from, and indemnify and defend them against, any and all liabilities, claims, penalties, fees, violations, fines, losses, costs, damages, Liens and expenses, including reasonable attorney's fees ("**Damages**"), in any way related to any material breach by HCCA of any covenant to be performed by it pursuant to this Agreement. This indemnity shall survive termination of this Agreement. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT (INCLUDING ANY

26

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

INDEMNIFICATION OBLIGATIONS), IN NO EVENT SHALL HCCA BE LIABLE (WHETHER IN AN ACTION IN NEGLIGENCE, CONTRACT OR TORT OR BASED ON A WARRANTY OR OTHERWISE) FOR (I) FAILURE TO REALIZE SAVINGS OR LOSS OF PROFITS, REVENUE, OR ANY OTHER INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES, AND (II) DIRECT AND OTHER DAMAGES IN EXCESS OF THE AMOUNT OF OPERATING FEES EARNED BY HCCA UNDER THIS AGREEMENT DURING THE THREE (3) MONTHS PRIOR TO THE DATE OF THE APPLICABLE CLAIM FOR DAMAGES, IN EACH CASE, EVEN IF HCCA HAS BEEN ADVISED OF POSSIBILITY OF SUCH DAMAGES.

(ii)     Subject to Section 13(c), the District covenants and agrees to hold harmless HCCA, HCCA's, members, managers, officers and employees from, and indemnify and defend them against, any and all Damages, in any way related to (i) any breach by the District of any covenant to be performed by it pursuant to the Agreement, or (ii) any liability of the District arising from or related to the District activities, whether during or prior to the Term. This indemnity shall survive termination of this Agreement.

(iii)     A party entitled to indemnification under this Section shall make commercially reasonable efforts to (i) mitigate the amount of any indemnification claim it has or may have against the Person giving the indemnity and (ii) pursue claims under insurance policies relating to the facts and circumstances giving rise to the indemnification claim. For purposes of determining the amount of liability under this Section, appropriate reductions shall be made to reflect the amount actually recovered pursuant to any insurance policy or other third party recovery that is received by the party entitled to indemnification in respect of the facts and circumstances giving rise to the indemnification claim.

(g)     Review. Insurance coverage amounts for both parties will be reevaluated every five years and adjusted consistent with industry practices for similar operations as mutually agreed.

14.     **Condemnation.**

(a)     If a Substantial Part of the Hospital or the Clinics and Other Facilities should be taken for any public or quasi-public use under Law, or by right of eminent domain, or by private purchase in lieu thereof, then HCCA may terminate this Agreement and (i) the operation of the Hospital and the Clinics and Other Facilities shall revert to the District, and (ii) any proceeds received from the proceedings referenced by this Section shall be distributed to the District, subject to HCCA's right to recoup the value of its interest in the joint venture created hereunder, in an amount not less than the Termination Fee.

(b)     If part of the Hospital or the Clinics and Other Facilities shall be taken for any public or quasi-public use under any Law, or by right of eminent domain, or by private purchase in lieu thereof, and this Agreement is not terminated as provided in Section 14(a), the fact that space in the Hospital and the Clinics and Other Facilities has been taken by the taking shall not relieve HCCA from its obligation to fulfill its obligations hereunder; provided, however, that HCCA's obligations, as applicable, shall be reduced in accordance with the damage that occurs as a result of the taking, in HCCA's sole and absolute discretion.

15.     **Authority.**

The District represents and warrants that it has full right and authority to enter into this Agreement.

27

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

16. **No Assumed Liabilities.**

      (a)    Unless otherwise expressly set forth herein, by execution of this Agreement, HCCA assumes no liabilities whatsoever of the District or any previous tenant or operator of the Hospital and the Clinics and Other Facilities, including, but not limited to, liability for any claims, demands, actions, suits or other obligations arising from an occurrence prior to the Effective Date.

      (b)    By executing this Agreement, the District hereby assumes no liabilities whatsoever of HCCA.

17. **Recording; Estoppel; Time.**

      (a)    Recordation. At the request of either party and at the expense of the requesting party, the parties shall execute a short form memorandum of this Agreement which identifies this Agreement, the parties, the Term, the legal description of the real property upon which the Hospital and the Clinics and Other Facilities are located, the joint venture described herein and such other matters as the parties may agree. Such memorandum shall be recorded in the Office of the County Recorder of Tulare County, California at the expense of the requesting party.

      (b)    Estoppel Certificate. Each party hereto agrees from time to time, within twenty (20) business days after request of another party hereto, to deliver to said other party hereto, a commercially reasonable estoppel certificate stating (if true) that this Agreement is in full force and effect, that no default exists under this Agreement, the unexpired Term of this Agreement, and such other matters pertaining to this Agreement as may be requested by a party hereto.

      (c)    TIME IS OF THE ESSENCE IN THE PERFORMANCE OF ALL COVENANTS OF THIS AGREEMENT.

18. **Legal Compliance.**

      (a)    Compliance Plan. HCCA has received a copy of the District's Compliance Policies and Procedures, including the Code of Conduct and the Physician Referral, Stark Law, and Anti-Kickback policies and procedures together with a copy of the District's Corporate Integrity Agreement with the HHS Office of Inspector General dated July 20, 2009 (the "**CIA**"). HCCA shall abide by these policies and procedures and applicable Law. Any recommendations and/or revisions of such policies made by HCCA must be reasonably designed to help assure compliance with applicable Law. HCCA will be given prompt written notice of any changes made to the foregoing. HCCA may develop and recommend changes to the District's existing Compliance Plan (the "**Compliance Plan**") for implementation during the Term. Any such recommendations and/or revisions to the Compliance Plan must be approved by the Governing Body. HCCA shall use its commercially reasonable efforts to implement the Compliance Plan. All costs of developing, implementing and maintaining the Compliance Plan shall be borne by the District.

      (b)    Government Regulations. HCCA shall, subject to the limitations set forth herein, use its reasonable commercial efforts to help assure that: (1) the District continuously complies with all material applicable Laws, including without limitation, the Hospital Law, State and Federal False Claims Act, Civil Monetary Penalty Law, State and Federal Anti-Kickback

28

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

statutes, State and Federal self-referral prohibitions and applicable Medicare conditions of coverage and/or participation and (2) HCCA retains and maintains in good standing all necessary accreditations, licenses, permits, approvals and authorizations required for the ongoing operation of the Hospital and other Clinics and Other Facilities.

(c)    Accreditation Compliance.  HCCA shall, subject to the limitations set forth herein, take all steps necessary to assist the District to continue meeting the accreditation standards of the applicable accrediting agencies, as they exist or may be changed from time-to-time, and as may be applicable to the Hospital and other Clinics and Other Facilities' then current accreditation(s).  HCCA shall have the right to select and/or change the applicable accreditation agency for the Hospital, and if applicable, the Clinics and Other Facilities, in its sole and absolute discretion.

(d)    Ineligible Persons - Disclosure Obligation.  HCCA shall use reasonable commercial efforts to monitor that none of HCCA's employees employed at the Hospital and other Clinics and Other Facilities have been sanctioned, debarred or suspended or otherwise deemed ineligible to participate in Medicare, Medicaid or other Federal health care programs, and procurement, or non-procurement programs (collectively, an "Ineligible Person").  HCCA represents to the District that HCCA is not an Ineligible Person nor has any pending proceedings or received notice of any action or proceeding to exclude, debar, suspend, or otherwise declare HCCA ineligible under any federally funded health program.  HCCA shall notify the District within three (3) business days after becoming aware of any fact or circumstance that would make HCCA an Ineligible Person.

(e)    Access to Records.  HCCA shall, in accordance with Section 1395x(v)(1) of Title 42 United States Code until the expiration of four (4) years after the termination of this Agreement, make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of this Agreement and such books, documents and records as are necessary to verify the nature and extent of the costs of the services provided by HCCA under this Agreement.  HCCA further agrees that in the event HCCA carries out any duties under this Agreement through a subcontract with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve-month period with a related organization, such agreement shall contain a clause to the effect that until expiration of four (4) years, or longer as may be required by Law, after the furnishing of such services pursuant to such subcontract, the related organization shall make available upon written request to the Secretary of the United States Department of Health and Human Services, or, upon request, to the Comptroller General of the United States Accounting Office, or any of their duly authorized representatives, a copy of such contract and such books, documents and records of such organizations as are necessary to verify the nature and extent of such costs.  This Section is included pursuant to and is governed by the requirements of federal Law.  No attorney-client, accountant-client, or other legal privilege will be deemed to have been waived by the parties or any of the parties' representatives by virtue of this Agreement.

(f)    No Obligation to Refer Patients.  Nothing contained in this Agreement shall require (directly or indirectly, explicitly or implicitly) either HCCA or its affiliates or the District or its affiliates, to refer any patients to one another or to use the Hospital or the Clinics and Other Facilities as a precondition to receiving the benefits set forth herein.

29

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(g)     <u>Regulatory Filings and Approval</u>. The District shall cooperate fully with any and all regulatory filings necessary for the approval of the execution and implementation of this Agreement, including those related to HCCA's use of any Permit and Medicare / Medi-Cal provider agreements in its name during the Term.

(h)     <u>Tax and Medicare Effect</u>. None of the parties (nor such parties' counsel or accountants) has made or is making any representations to any other party (nor such party's counsel or accountants) concerning any of the tax or Medicare effects of the transactions provided for in this Agreement, as each party hereto represents that each has obtained, or may obtain, independent tax and Medicare advice with respect thereto and upon which it, if so obtained, has solely relied.

19.     <u>Operating Fee.</u>

(a)     <u>Operating Fee</u>. As HCCA's fee for the performance of the services under this Agreement, HCCA shall receive monthly (in advance on the first day of each month) an amount (the "**Operating Fee**") equal to the last monthly Management Fee charged to the District under the MSA immediately prior to the Effective Date of this Agreement multiplied by 1.25. The Operating Fee shall thereafter be increased as provided in <u>Section 19(b)</u>.

(b)     <u>CPI Adjustment</u>.

(i)     "CPI" means the monthly index of the U.S. City Average Consumer Price Index for Urban Wage Earners and Clerical Workers – Medical Care Services (1982-84 equals 100) published by the United States Department of Labor, Bureau of Labor Statistics or any successor agency that shall issue such index. In the event that the CPI is discontinued for any reason, the parties shall use such other index, or comparable statistics, on the cost of medical care services in the United States, as shall be computed and published by any agency of the United States or, if no such index is published by any agency of the United States, by a responsible financial periodical of recognized authority.

(ii)     <u>Inflation Adjustment</u>. Beginning on the first January 1 occurring after the Effective Date, and every year thereafter, the Operating Fee shall each be adjusted for inflation as follows:

(1)     The then existing Operating Fee shall be multiplied by the greater of (i) the CPI percentage increase using the latest published data since the last adjustment or (ii) five percent (5%) ("**CPI Increase**");

(2)     The then existing Operating Fee shall then be added to the CPI Increase ("**Net Adjusted Operating Fee**"); and

(3)     The Net Adjusted Operating Fee will then be multiplied by 1.01 to determine the Operating Fee for the next ensuing calendar year.

(4)     For example, the latest published CPI in January 2015 (e.g. November 2014) will be compared to the CPI for November 2013 (assuming that was the latest available published data) and the 2014 Operating Fee will be multiplied by the percentage difference. Assuming a three percent increase, the Operating Fee of $225,000 would be increased by $6,750 for a new monthly Net Adjusted Operating Fee of $231,750. That amount would then be multiplied by 1.01 resulting in a new monthly Operating Fee of $234,067.50.

30

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(c)    <u>Expenses</u>. Except as otherwise provided in this Agreement, all of the costs and expenses, including Operating Expenses, (whether operating or capital) of maintaining and operating the Hospital and other Clinics and Other Facilities and their respective facilities and the Operations shall be the sole cost and expense of the District, and shall not be an expense of HCCA. Expenses shall be paid by HCCA from revenues arising from the Operations and to the extent same are insufficient, the District shall fund same in accordance with Section 2(g).

(d)    <u>Late Payments</u>. If payment of amounts due hereunder, including the Operating Fee, Operating Expenses, other expenses, employee compensation and reimbursement of other amounts, are not made on the due date then interest shall accrue on any unpaid amounts for each day beyond the due date at a rate equal to the lesser of: (a) one percent (1.0%) per month or (b) the maximum non-usurious interest rate allowable by Law.

(e)    <u>Senior Indebtedness Status</u>. The obligations of the District under this Agreement rank and shall rank at least senior in priority of payment to all other unsecured debt of the District. Fund transfers and other payments received by the District shall be directed, regardless of the payment purpose indicated in the payment document, according to the following priority ranking: (1) payment of the Bonds; (2) payment of the Operating Fee and other amounts due hereunder and (3) all other debts of the District.

(f)    <u>Setoff</u>. Notwithstanding any provision of this Agreement to the contrary, HCCA shall have the right from time to time to setoff any amounts owed by the District to HCCA against any amounts owed by HCCA to the District and/or from any funds of the District over which HCCA has a Power of Attorney or right of disbursement (including the Charitable Care and Operational Support Fund), whether pursuant to this Agreement or otherwise.

**20.**    **Books and Records.**

(a)    <u>Maintenance of Books and Records</u>. HCCA shall supervise the maintenance of the books of account covering the operation of the Hospital and the Clinics and Other Facilities. Such books of account shall be maintained on an accrual basis in accordance with GAAP.

(b)    <u>Reports and Financial Statements</u>. HCCA shall from time to time deliver to the Governing Body, from the District's data related to the Operations, the reports and financial statements reasonably requested by the Governing Body.

(c)    <u>Inspection of Records</u>. Authorized agents of the District shall have the right at all reasonable times during usual business hours, at the District's expense, to audit, examine and make copies of or extracts from the books of account maintained by HCCA with respect to the Operations. Such right may be exercised through any agent, independent public accountant or employee of the District designated by the District.

**21.**    **Confidentiality.**

(a)    <u>Confidentiality</u>. The parties agree that: (a) neither party will disclose any secrets or confidential technology, proprietary information, or trade secrets of the other party without the prior written consent of the transmitting party, except (i) to the receiving party's agents, advisors, auditors and representatives; or (ii) as may be necessary by reason of legal, accounting or regulatory requirements beyond the reasonable control of the recipient party; and

31

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(b) should this Agreement expire or terminate, neither party will take or retain any papers, records, files, computer programs and software, other documents or copies thereof, or other confidential information of any kind belonging to the other party, except for copies of same as may be reasonably necessary to defend any anticipated litigation or respond to claims or pursuant to ordinary data backup or storage processes.

(b)     Press Release. Except as required by Law, it is understood that all press releases or other public communications of any sort relating to the negotiation, execution and/or operation of this Agreement, and the method of the release for publication thereof, will be subject to the prior written approval of HCCA.

22.     **Long Term Joint Operating Agreement**.

(a)     Attached hereto as Exhibit F is the form of Joint Operating Agreement (the "**Long Term Operating Agreement**") that the parties have executed and shall become effective, upon written notification from HCCA to the District after: (i) all Bonds which require compliance with Rev. Proc. 97-13 (or any successor regulatory requirement thereto containing similar limitations), have been repaid or otherwise defeased or the Internal Revenue Code limitations or that the conditions to the proposed transaction set forth in the Long Term Operating Agreement have been waived by the Bond trustee(s); (ii) any required notices to the Attorney General regarding the transaction, if any, have been provided, including any that may be required pursuant to Cal. Code Regs., tit. 11, § 999.40; and (iii) any required approvals from the Attorney General with respect to the charitable care assumption by HCCA have been received, if any. The District shall use its reasonable commercial efforts to repay or defease the Bonds or obtain the Bond Trustee's consent as soon as reasonably practicable following the Effective Date. The District shall fully cooperate with HCCA's efforts to obtain the consent of the Attorney General, and the District shall promptly make such requests and take such actions as HCCA shall request to obtain the Attorney General's consent.

(b)     The District agrees that HCCA shall have the right to determine and direct the strategy and process by which the District and HCCA effectuate the Long Term Operating Agreement. HCCA shall have the right to take the lead in all meetings and communications with the Bond trustee(s) and / or any other party whose consent is required to effectuate the Long Term Operating Agreement, including by determining the appropriate timing of any such meeting or communications (including the timing of the submission of any filing with, or the response to any request by, any consent party or any action to be taken pursuant to this Section).

(c)     The District shall: (a) promptly give all notices which either party deems necessary, proper or advisable to the Bond trustee(s) and other applicable third parties which may be necessary or deemed desirable by HCCA in connection with effectuating the Long Term Operating Agreement and the consummation of the transactions contemplated thereby; (b) use its best efforts to obtain all Bond trustee and other approvals, consents, permits, authorizations, and orders necessary, proper or deemed desirable by HCCA in connection with effectuating the Long Term Operating Agreement and the consummation of the transactions contemplated thereby; (c) Permit HCCA to review in advance, and consult with HCCA on, any proposed filing, submission or communication (whether verbal or written) by the District or its Affiliates, and (d) give HCCA the opportunity to attend and participate at any meeting with the Bond trustee(s) or any other party's representatives that are necessary, proper or advisable to effectuate the Long Term Operating Agreement. The District and its accountants, and attorneys shall cooperate fully with HCCA in the preparation of any statements or applications made by HCCA to the Bond

32

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

trustee(s) and other applicable parties whose consent is required to effectuate the Long Term Operating Agreement and the transactions contemplated thereby and to furnish HCCA with all information concerning the District necessary or deemed desirable by HCCA for inclusion in such statements and applications, including, without limitation, all requisite financial statements and schedules.

(d)      Between the date hereof and the effective dates of the Long Term Operating Agreement, the District shall promptly notify HCCA of (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Long Term Operating Agreement becoming effective, (ii) any notice or communication from the Bond trustee(s) or any other party from whom consent is required, and (iii) any action or proceeding commenced or, to the knowledge of the District, threatened against HCCA and/or the District which relates to the consummation of the transactions proposed under the Operating Agreements.

23.     **Miscellaneous**.

(a)      <u>Additional Assurances</u>. The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of a party, the other party or parties shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement.

(b)      <u>Complete Agreement</u>. This Agreement constitutes the entire agreement between the parties with respect to the operation of the Hospital and the Clinics and Other Facilities and supersedes any and all prior agreements, either oral or written, between the parties with respect thereto.

(c)      <u>Consequential Damages</u>. Except as expressly provided herein to the contrary, neither party shall be liable under this Agreement for consequential damages, incidental damages, indirect damages, or special damages or for loss of profit, loss of business opportunity or loss of income. Notwithstanding anything to the contrary contained in this Agreement, the parties hereto acknowledge and agree that the terms and provisions of this <u>Section 23(c)</u> shall not limit, alter, modify, impair, or otherwise affect any of the remedies of HCCA set forth in this Agreement, including the right to be paid the Termination Fee.

(d)      <u>Limitation of Liability</u>. Notwithstanding any provision in this Agreement to the contrary, under no circumstances shall HCCA or any HCCA Party have any personal liability for any failure to perform any obligations arising out of or in connection with this Agreement or for any breach of the terms or conditions of this Agreement (whether written or implied). No personal judgment shall lie against HCCA or any HCCA Party and any judgments so rendered shall not give rise to any right of execution or levy against any of their assets. Any judgments rendered against HCCA shall be satisfied solely out of the assets of HCCA. The foregoing provisions are not intended to relieve HCCA from the performance of any of HCCA's obligations under this Agreement, but only to limit the personal liability of HCCA and HCCA Parties in case of recovery of a judgment against any of them.

(e)      <u>Binding Agreement</u>. This Agreement and the rights and obligations of the parties hereunder are binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

33

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(f)    Governing Law.  This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in accordance with, the Laws of the State.  The parties agree that the exclusive jurisdiction and venue of all actions claims, or other legal proceedings arising in any manner pursuant to this Agreement, shall be vested in the Superior Court of the County of Los Angeles in the State and in no other.  Notwithstanding any other provisions contained in any other document executed simultaneously herewith, each party, for itself, and all successors, assigns, heirs, executors, or future parties at interest agree and accept the jurisdiction of these courts and waive any defense of personal jurisdiction, forum non conveniens, venue or similar defenses and irrevocably agree to be bound by any judgment rendered in the aforementioned Court; exclusive of any and all other Federal or state courts.

(g)    Headings.    The section and subsection headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of the Agreement.

(h)    Notices.  Except as otherwise expressly permitted herein, all notices required or permitted to be given hereunder shall be in writing (whether or not written notice is specified herein) and shall be personally delivered, or mailed by United States mail, postage prepaid, registered or certified, return receipt requested, or sent by a nationally recognized overnight delivery service, or sent by electronic transmission system.  Unless such information is changed by written notice given by the affected party, any such notices shall be sent to the following addresses:

If to HCCA:
HealthCare Conglomerate Associates
Attention:  Benny Benzeevi, M.D.
810 North Cherry Street
Tulare, CA  93274
Email: benny@Healthcca.com

With a copy to:
Bruce R. Greene, Esq.
Baker Hostetler LLP
11601 Wilshire Blvd. Suite 1400
Los Angeles, CA 90025
Email:  bgreene@bakerlaw.com

If to the District:
Tulare Regional Medical Center
Attention: Chair of the Board
869 North Cherry Street
Tulare, CA 93274
Email: sbell@tulareregional.org

With a copy to:
Dooley, Herr, Pedersen & Berglund Bailey
Attention: Kris Pedersen
100 Willow Plaza, Suite 300
Visalia, CA 93291
Email: kpedersen@dhlaw.net

34

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

All notices sent by personal delivery shall be effective and deemed served upon receipt thereof. All notices sent by mail shall be effective and deemed served three (3) calendar days after being deposited in the United States mail. All notices sent by overnight delivery service shall be effective and deemed served when delivered by such overnight delivery service. All notices sent by electronic transmission system shall be effective and deemed served on the day of transmission, if on a business day and during business hours (9am until 5pm, PT) or otherwise on the next business day thereafter.

(i)    Survival of Representations.  All of the representations and warranties, and those covenants and agreements contained in this Agreement which are stated to survive termination or expiration of this Agreement, shall survive the expiration or the termination, for any reason of this Agreement.  No performance or execution of this Agreement, in whole or in part, by any party hereto, no course of dealing between the parties hereto or any delay or failure on the part of any party in exercising any rights hereunder or at Law or in equity, and no investigation by any party hereto, shall operate as a waiver of rights of such party, except to the extent expressly waived in writing by such party.

(j)    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Signatures transmitted by facsimile or e-mail or other digital means shall be accepted as original signatures.

(k)    Severability.

(i)    Each and every provision of this Agreement is severable, and the invalidity of one or more of such provisions shall not, in any way, affect the validity of this Agreement or any other provisions hereof.  If any clause or provision of this  Agreement is illegal, invalid or unenforceable, then and in that event, it is the intention of the parties hereto that the remainder of this Agreement shall not be affected thereby, and it is also the intention of the parties to this Agreement that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Agreement a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(ii)    The parties hereby have made all reasonable efforts to ensure this Agreement represents and memorializes the complete and final agreement between the parties hereto, and that it complies with all applicable Law.  In the event there is a change in Law, or the interpretations thereof, whether by statute, regulation, agency or judicial decision, or otherwise, that has any material effect on any term of this Agreement, or in the event that a party's reputable counsel (being counsel with at least ten (10) years' experience in health care Law) determines that any term of this Agreement poses a material risk of violating any Law, then the applicable term(s) of this Agreement shall be subject to renegotiation and either party may request renegotiation of the affected term or terms of this Agreement, upon written notice to the other party, to remedy such condition.  In the interim, the parties shall perform their obligations hereunder in full compliance with applicable Law.  The parties expressly recognize that upon request for renegotiation, each party has a duty and obligation to the other only to renegotiate the affected term(s) in good faith and, further, the parties expressly agree that their consent to proposals submitted by the other party during renegotiation efforts shall not be unreasonably withheld or delayed.  The parties further expressly recognize that in any such renegotiation, the relative economics to each of the parties shall be preserved.  Should the parties be unable to renegotiate the term or terms so affected so as to bring it/them into compliance with Law or the

35

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

interpretation thereof within sixty (60) days of the date on which written notice of a desire renegotiation is given, then either party shall be entitled, after the expiration of said sixty (60) day period, to terminate this Agreement upon sixty (60) additional days' notice to the other party, provided that such party has received an opinion of reputable legal counsel, which legal counsel and opinion are reasonably acceptable to the other party, that it is more likely than not that this Agreement violates applicable Law. If this Agreement is terminated pursuant to this Section 23(k), HCCA shall be entitled to receive payment of the Termination Fee.

(l)     Cumulative Rights and Remedies.  Any right, power or remedy provided under this Agreement or any party hereto shall be cumulative and in addition to any other right, power or remedy provided under this Agreement or existing in Law or in equity, including, without limitation, the remedies of injunctive relief and specific performance.

(m)     Modification and Waiver.

(i)     This Agreement may only be amended by a writing signed by both parties.

(ii)     No failure by any party to insist upon strict compliance with any term of this Agreement, to exercise any option, enforce any right, or seek any remedy upon any default of any other party shall affect, or constitute a waiver of, the first party's right to insist upon such strict compliance, exercise that option, enforce that right, or seek that remedy with respect to that default or any prior, contemporaneous, or subsequent default; nor shall any custom or practice of the parties at variance with any provision of this Agreement affect or constitute a waiver of, any party's right to demand strict compliance with all provisions of this Agreement.

(n)     Attorneys' Fees.  If any action at law (or in any arbitration proceeding required hereunder) is brought to enforce any of the terms of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs in addition to any other relief, as determined by the applicable court or arbitrator.  The foregoing includes reasonable attorney's fees in connection with any bankruptcy proceeding (including relief from stay litigation), and in connection with any appeals.

(o)     Binding Effect.  This Agreement has been duly executed by the parties hereto and constitutes a valid and binding obligation enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws affecting the rights of creditors generally, and except as enforceability may be subject to general principles of equity.

(p)     Independent Contractor Status.  Notwithstanding any provision contained herein to the contrary, each party understands and agrees that the parties hereto intend to act and perform as independent contractors.  Therefore, the District is not an employee or partner of HCCA.  Nothing in this Agreement shall be construed as placing the District in a relationship of employer-employee or partners with HCCA.  The parties shall not have the right to make any promises, warranties or representations, or to assume or create any obligations, on behalf of the other party except as otherwise expressly provided herein or as otherwise agreed to in writing.  The District and HCCA agree to be solely and entirely responsible for their respective acts and for the acts of any of their respective employees and agents, except as otherwise expressly provided herein.

36

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

(q)     Ambiguities and Uncertainties.  This Agreement and any ambiguities or uncertainties herein, or the documents referenced herein, shall be equally and fairly interpreted and construed without reference to the identity of the party or parties preparing this Agreement or any of the documents referred to herein, on the express understanding and agreement that the parties participated equally in the negotiation of the Agreement and the documents referred to herein, or have had equal opportunity to do so.  Accordingly, the parties hereby waive the benefit of California Civil Code section 1654 and any successor or amended statute providing that in cases of uncertainty, language or a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

(r)     Consents, Approvals and Discretion.  Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by any party or any party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld, conditioned or delayed and such discretion shall be reasonably exercised, except as otherwise provided herein.  If no response to a consent or request from HCCA to the District for approval is provided to HCCA within ten (10) days from the receipt by the District of the request, then the consent or approval of the District shall be deemed to have been given.

(s)     Expiration of Time Periods.  In the event that any date specified herein is, or that any period specified herein expires on, a Saturday, a Sunday, or a state or federal holiday, then such date or the expiration date of such period, as the case may be, will be extended to the next succeeding business day.  A business day is a day on which banks are required to be open for business in Los Angeles County, California.  All references in this Agreement to "days" are to calendar days, unless business days are so indicated.

(t)     Force Majeure.  Except with respect to payment obligations, neither party shall be liable nor deemed to be in default for any delay or failure in performance under this Agreement or other interruption of service deemed resulting, directly or indirectly, from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, machinery or supplies, vandalism, strikes or other work interruptions beyond the reasonable control of either party. However, both parties shall make good faith efforts to perform under this Agreement in the event of any such circumstances.

(u)     No Third-Party Beneficiaries.  The rights, privileges, benefits, and obligations arising under or created by this Agreement are intended to apply to and shall only apply to the parties and to no other Persons, except as otherwise provided herein.

[Signatures on next page]

37

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates



**EXHIBIT A**
**HOSPITAL**

## 869 N Cherry St, Tulare, CA 93274



Exhibit A

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates



POR SE¼ OF NW¼ SEC. 2, T. 20S., R. 24E., M. D. B. & M.

TAX CODE AREA 170-07
005-000
005-017

CITY OF TULARE
ASSESSOR'S MAPS BK. 170, PG. 07
COUNTY OF TULARE, CALIF.

POR. CROCKER OAK PARK, R.M. 8-9
TERRACE GARDEN, R.M. 21-95
GARDEN PLACE, R.M. 27-74
PARCEL MAP 930, P.M. 9-30
PARCEL MAP 1106, P.M. 12-7
PARCEL MAP 1170, P.M. 12-71
PARCEL MAP 1217, P.M. 13-18
PARCEL MAP 3237, P.M. 33-34
RECORD OF SURVEY L.S. 17-47
POR RECORD OF SURVEY L.S. 29-6

**The parties acknowledge that the foregoing description and maps do not represent all of the real property associated with the Hospital which is owned by the District. The District hereby grants HCCA the right to amend and/or supplement this exhibit to properly describe the real estate associated with the Hospital, from time to time.**

Exhibit A

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

**EXHIBIT B**
**CLINICS AND OTHER FACILITIES**


Evolutions Fitness & Wellness
1425 E. Prosperity Avenue
Tulare CA

Family X-Ray Center
880 E. Merritt Ave
Tulare, CA  93274

Hillman Healthcare Center - 1062 South K Street Tulare, CA. 93274

Kingsburg Healthcare Center - 1200 Smith Street  Kingsburg, CA. 93631

Lindsay Healthcare Center - 845 N Sequoia Ave Lindsay, CA. 93247

West Street Healthcare Center - 325 N West Street  Tulare, CA. 93274

Woodville Healthcare Center - 16796 Ave 168  Woodville, CA. 93257

Allied Services Center
    Tulare Regional Medical Center Clinical Laboratory
    Allied Services Building
    869 N. Cherry
    Tulare, CA  93274

    Tulare Regional Laboratory - Alternate Collection Site
    799 Cherry Street
    Tulare, CA  93274

    Mineral King Toxicology Laboratory
    880 E. Merritt, Suite 107
    Tulare, CA  93274

Retail Pharmacy
    Tulare District Hospital Pharmacy
    869 N Cherry St
    Tulare, CA 93274

Together with such other facilities and clinics as are owned, leased or otherwise
operated by District that HCCA elects to operate hereunder, by notice to District
from time to time.

Exhibit B

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

**EXHIBIT C**
**CONTRACTS**

Contracts shall include all Contracts that relate to the Operations as of the Effective Date. HCCA shall supplement this Exhibit within thirty (30) days following the Effective Date.

Exhibit C

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

**EXHIBIT D**
**ASSUMED CONTRACTS**

HCCA shall provide the information for this Exhibit within thirty (30) days following the Effective Date.

Exhibit D

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

**EXHIBIT E**
**CHARITABLE POLICIES OF THE HOSPITAL**

The District's Charity policy as in effect on May 1, 2014. The Charity Policy shall include the foregoing Charity Policy together with any changes thereto as mutually agreed to by the parties prior to the Effective Date pursuant to the terms of the MSA.

Exhibit E

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

# TULARE LOCAL HEALTH CARE DISTRICT
## dba TULARE REGIONAL MEDICAL CENTER

## POLICY / GUIDELINE

TO:        All Departments

FROM:      Administration

SUBJECT:   Financial Assistance (Charity Care) Program

### PURPOSE:

The mission of Tulare Regional Medical Center California is to provide safe, efficient, technologically advanced healthcare with the respect for the diversity of our region. Assembly Bill 774 (AB 774) became effective January 1, 2007. The law mandates that as a condition of obtaining or holding an acute care hospital license, Hospitals must limit bills to the uninsured with family incomes at or below 350% of the Federal Poverty Level (FPL) and individuals with high cost medical bills compared to their family income. Bills are limited to the higher of the government reimbursement rates for comparable health services. This policy complies with the requirements of AB 774.

### PROCEDURE:

Who is financially eligible?

Non-Insured Patients:
1. No third party insurance
2. No Medicare/Medi-Cal
3. No Workers Compensation
4. No Auto Insurance (medical portion for third party liability)
5. Family income at or below 350% of Federal Poverty Level (FPL)

Insured Patients with Patient Responsibility:

1. Family income at or below 350% FPL
2. Financial assistance is available for patients whose out of pocket expenses exceed 10% of family income in the prior 12 month period.
3. Special consideration may be made for patients with out of pocket expenses less than 10% of family income in the prior 12 month period.

---

Effective Date: 07/26/12                    (11)     Fiscal & Business
                                                     Patient Accounting:
**APPROVED:**                                        Financial Assistance (Charity Care)
                                                     Program
Board Of Directors: 07/25/12                         11-3028

# TULARE LOCAL HEALTH CARE DISTRICT
## dba TULARE REGIONAL MEDICAL CENTER

## POLICY/GUIDELINE MANUAL

1. Eligibility for financial assistance will be considered for all patients who meet the above criteria. The granting of financial assistance shall be based on an individualized determination of financial need and shall not take into account age, gender, race, socio-economic or immigrant status, sexual orientation, or religious affiliation.

2. Tulare Regional Medical Center recognizes that there may be unusual or extenuating financial circumstances which may exceed the specific criteria as established in this policy and warrant special consideration. In such cases, a description of the unusual circumstances should be forwarded by Hospital staff to the Director of Patient Access / or designee for review and then forward to the Chief Financial Officer who will make the final determination as to the amount, if any, of financial assistance allowance to be granted.

3. Tulare Regional Medical Center recognizes that the financial status of patients may change over time. Hospital personnel will actively assist families in securing eligibility for any program with the cooperation of patients and their families. Services for dates of service prior to discharge date of January 1, 2007 are not considered under this policy.

4. The Director of Patient Access /or designee will review all applications to determine eligibility for financial assistance. Reasonable efforts will be made to verify financial data. All financial information provided will be considered confidential and staff will respect each circumstance with dignity.

5. The Director of Patient Access or designee will use the following table to determine the amount of financial assistance. This schedule will be maintained and updated annually by the Patient Access Director or designee.

| Federal Poverty Level | Charity Care Allowance [write off] | |
|---|---|---|
| | Inpatient | Outpatient |
| a. Less than 200% | 100% | 100% |
| b. 201-250% | 90% | 95% |
| c. 251-300% | 80% | 90% |
| d. 301 - 350% | 75% | 87% |

   e. Any other type of discount not adhering to the above schedule is not considered a Financial Assistance Discount and will follow the terms and conditions set forth in the Discount Policy.

   f. In all cases Tulare Regional Medical Center will not collect more than the average reimbursement of its government payers which includes but is not limited to Medicare, Medi-Cal, and Healthy Family Programs.

6. Patient guarantors must complete a financial assistance application, be in process with an eligibility application for a government sponsored insurance program or set

Exhibit 2, Page 182

up a payment plan within 150 days of service or the account will be assigned to a third party billing agency at full billed charges upon 150 days after initial billing.

7. Written notification of determination of eligibility or non-eligibility for financial assistance will be forwarded to the applicant by the Director of Patient Access / or designee, within 30 days of receipt of the Financial Profile.

8. Patients or guarantors have the right to appeal a non-eligible decision within 30 days of the denial letter. Appeals will be forwarded to the Director of Patient Access / or designee who will decide to uphold or overturn the original decision within 15 days.

9. An emergency physician as defined in AB 774, Section 127450, who provides emergency medical services in a hospital that provides emergency care is also required by to provide discounts to uninsured patients or patients with high medical costs who are at or below 350% of the federal poverty level.

10. Tulare Regional Medical will comply with OSHPD reporting requirements including the following information:

    a. Submission of charity care and discount policies
    b. Submission of eligibility procedures for charity care and discount payment
    c. Submission of review procedures for charity care and discount payment
    d. Submission of the application used for charity care and discount payment

## Charity Care Qualifications & Calculations

1. Financial obligations not eligible for consideration are those whose injury is a compensable injury for the purposes of workers' compensation or auto insurance. Further, not all services are eligible for charity care. Elective services are not eligible. Special consideration may be made by the Director of Patient Access /or designee, Chief Financial Officer, or Chief Executive Officer.

2. A patient may qualify for financial assistance prior to admission, after admission, or after discharge. Written price estimates are available prior to service for inpatient and outpatient services with the exception of emergency services. Every attempt will be made to identify all available funding sources prior to or at time of visit. If a funding source cannot be identified after full compliance by the patient or guarantor, financial assistance will be considered. The hospital contact information for financial assistance is listed on the Financial Assistance application.

3. A financial assistance application, provided by TRMC Hospital staff, must be completed with the assistance of a Financial Counselor or by completing, signing and returning it to Tulare Regional Medical Center Admitting Department. This document must be completed within 30 - 60 calendar days from date of discharge. The application shall remain valid for services rendered within a 180 day period or upon a new admission to the hospital. The financial assessment will include a

Exhibit 2, Page 183

review of the family's gross income, number of family members, outstanding balances of the medical bills, and assets when appropriate. Copies of prior year tax return (preferred documentation) or current pay stubs will be needed to verify income information. Other documents proving status of assets may be required. The information contained in the financial application will not be used in collection efforts.

4. For purposes of determining family size, the following guidelines will be used.
    a. For patients 18 years of age and older, patient's family includes spouse, domestic partner and dependent children under 21 years of age whether living at home or not.
    b. For patients under 18 years of age, patient's family includes parents, caretaker relatives and other children under 21 years of age of the parent or caretaker relative.

5. Financial assistance information is available from Tulare Regional Medical Center through various means, including the publication of notices in patient bills and by posting notices in high volume areas such as the Emergency Department, Clinics, Admitting, and other places as Tulare Regional Medical Center may elect. Such information shall be provided in English and Spanish, and will be translated for patients/guarantors who speak other languages.

6. Any patient account recommended for partial or total financial assistance, after meeting the guidelines set forth in this policy, requires the Director of Patient Access / or designee to prepare all the patient documentation. The following approval process applies:

    a. $0-$25,000- Patient Access Director
    b. Over $25,001- Chief Financial Officer

7. Tulare Regional Medical Center will assign any financial obligation to a debt collector after 150 calendar days from date of discharge of non-payment of an established payment plan or 30 calendar days of non-payment on an account where the patient guarantor is not in process with an eligibility application for a government sponsored insurance program or is attempting in good faith to settle an outstanding bill.

8. Interest or finance charges will not be added to any account that has been approved for Financial Assistance.

9. The financial assistance policy shall also include an extended payment plan to allow payment of the discounted price over time. The hospital and patient will negotiate terms of the payment plan. If the patient fails to make payments for a period of 90 days, the payment plan will be considered inoperative and TRMC will inform the patient via phone call and written correspondence that the payment plan has terminated and the account may be forwarded to collections.

Exhibit 2, Page 184

10. In the course of debt collection involving low-income uninsured patients who are at or below 350% of the Federal Poverty Level, Tulare Regional Medical Center will follow all guidelines established by AB 774. This provision will not preclude Tulare Regional Medical Center from pursuing reimbursement from third party liability settlements.

11. A patient deemed homeless will qualify for presumptive eligibility. To be deemed homeless, the individual must not have a fixed, regular, and adequate nighttime residence or has a primary nighttime residence that is a supervisor publicly or privately operated shelter.

12. All documentation will be maintained by Patient Access Services in accordance with regulatory guidelines.

13. Tulare Regional Medical Center Home Care and Retail Pharmacy will use best efforts to follow the hospital's approved charity care policy. Separate or additional applications to be completed by the patient/family will not be required. Referral will be made to use the Hospital's financial information.

14. This policy does not apply to professional services provided to Hospital patients by physicians or other medical providers including but not limited to Radiology, Anesthesiology, Pathology other than Emergency Room services as required by AB774, Section 127450.

Questions concerning any aspect of this policy/guideline should be referred to Patient Access or Administration.

This policy/guideline replaces and supersedes all previous policies/guidelines concerning this matter and is effective immediately.

Exhibit 2, Page 185

Descriptive Name:       Financial Assistance (Charity Care) Program

Descriptive Type:        New Policy

Document Number:     11-3028

Attachments:          None

Author:               Karan Levering, Director, Patient Access (First Source) in conjunction with the Chief Financial Officer, TRMC

Typist:               Karan Levering

Creation Date:        04/15/12

Prev. Dist. Date:      None

| Committee Review and Approval: | Approval Date: | Comments: |
| --- | --- | --- |
| Board of Directors | 07/25/12 | |

Effective Date:        07/26/12

Forward To:           Policy Binders – (PBX and Administration) and Post to Intranet Site

Disposition:           Copy and Distribution - Administration

Comments:            **Policy replaces 11-1002 Charity Care Program**

**EXHIBIT F**
**LONG TERM OPERATING AGREEMENT**

See attached

Exhibit F

CONFIDENTIAL AND PROPRIETARY
© HealthCare Conglomerate Associates

## EXHIBIT D

### Limited Power of Attorney

**KNOW ALL MEN BY THESE PRESENTS**, that in accordance with the terms of that certain Management Services Agreement, dated of even date herewith, (the "<u>Agreement</u>"), by and among **HealthCare Conglomerate Associates, LLC** ("<u>Manager</u>") and **Tulare Local Healthcare District dba Tulare Regional Medical Center** (the "<u>District</u>"), the District hereby makes, constitutes and appoints Manager as the District's true and lawful attorney-in-fact (the "<u>Attorney-In-Fact</u>") and in the District's name, place and stead to act in connection with any and all matters relating to any of the following and with all requisite authority and power and as legally permissible:

1.      To bill, collect, or cause to be collected, all amounts related to the operation of the Hospital and the Clinics and the Other Facilities, including, but not limited to, the accounts receivable, in the District's name, and, when deemed appropriate by the Attorney-In-Fact, settle and compromise claims, and assign such other items to a collection agency, bring a legal action or take such other appropriate action against an obligee;

2.      To receive, take possession of, endorse in the name of the District, and deposit into the Depository Account, the Master Account or other account, as deemed appropriate by Manager, in accordance with the terms of the Agreement, any notes, checks, money orders, payments, insurance payments, and any other instruments received in payment of services provided at the Hospital and the Clinics and Other Facilities.

3.      To deposit all amounts collected into the Depository Account, Master Account or other account, as deemed appropriate by Manager, in accordance with the terms of the Agreement.

4.      To sign checks, drafts, bank notes or other instruments on behalf of the District, and to make withdrawals from the Depository Account, Master Account or other applicable account for payments specified in this Agreement.

5.      To execute any instruments or documents or take such other or further action necessary or appropriate in connection with any of the above.

This Power of Attorney is coupled with an interest, and shall give the Attorney-In-Fact the power and authority to act in the District's name as fully as the District could do if present. The District hereby ratifies and confirms and agrees to ratify and confirm whatsoever the Attorney-In-Fact shall do or purport to do by reason of these presents.

Capitalized terms not defined herein shall have the meaning ascribed to them by the Agreement. Any provision hereof which may prove unenforceable under any Law shall not affect the validity of any other provisions hereof.

Any photocopy of this Power of Attorney shall have the same force and effect as the original.

IN WITNESS WHEREOF, I have hereunto set my hand and seal effective as of the _____ day of
_____.

WITNESS:

**Tulare Local Healthcare District, d/b/a Tulare Regional Medical Center**

Signature:_____

Print Name:_____

By:_____

Sherrie Bell, Chairman of the Board/President

Signature:_____

Print Name:_____

Exhibit D

# EXHIBIT 3

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 (extrapolated to 12 months) | data 1.1.2016 through 9.2016 |
|---|---|---|---|---|---|---|---|
| ABRAHAM BETRE | 739 | 684 | 337 | 355 | 327* | 63* | 47 |
| PRADEEP KAMBOJ | 133 | 116 | 18 | 0 | 1 | 0 | 0 |
| ANIL PATEL | 201 | 172 | 55 | 1 | 0 | 0 | 0 |
| FADEL SHAMMOUT | 28 (first year in Tulare) | 458 | 171 | 176 | 120 | 7 | 5 (moved away midyear) |
| LONNIE SMITH | 3 | 4 | 6 | 1 | 2 | 0 | 0 |
| ARNOLD WELDEN | 146 | 146 | 67 | 4 | 0 | 0 | 0 |
| ISTVAN POTORKE | 487 | 380 | 239 | 208 | Retired* | Retired* | Retired* |

# EXHIBIT 4



**Tulare Local Health Care District
dba Tulare Regional Medical Center**

Financial Statements

June 30, 2013



# TABLE OF CONTENTS

|  | Page No. |
|---|---|
| Management's Discussion and Analysis | 1 - 3 |
| Independent Auditor's Report | 4 - 5 |
| Statement of Net Position | 6 |
| Statement of Revenues, Expenses, and Changes in Net Position | 7 |
| Statement of Cash Flows | 8 - 9 |
| Notes to Financial Statements | 10 - 27 |

_____

The management of the Tulare Local Health Care District (dba Tulare Regional Medical Center, or the District) has prepared this annual discussion and analysis in order to provide an overview of the District's performance for the fiscal year ended June 30, 2013 in accordance with the Governmental Accounting Standards Board Statement *No.34, Basic Financials Statements;Management's Discussion and Analysis for State and Local Governments.* The intent of this document is to provide additional information on the District's historical financial performance as a whole in addition to providing a prospective look at revenue growth, operating expenses, and capital development plans. This discussion should be reviewed in conjunction with the audited financial statements for the fiscal year ended June 30, 2013 and accompanying notes to the financial statements to enhance one's understanding of the District's financial performance.

### *Financial Highlights*

- Total assets increased by $1.3 million over the prior fiscal year.

- Cash and cash equivalents decreased to a balance of $8.7 million as of the end of the year.

- Net patient accounts receivable decreased by $825k for the year.

- There was a net increase in property, plant and equipment of $17.3 million.

- There was an operating loss of $(3.0) million as compared to 2012's loss of $(10.6) million, an improvement of $7.1 million.

- The operating margin as a percent of revenues was a negative (4.1%) as compared to the prior year of negative (14.2%).

- Operating expenses were 104% of total operating revenue as compared to the prior year of 114%.

### *Cash and Cash Equivalents*

For the year ending June 30, 2013, the District's cash and cash equivalents totaled $8.7 million.

### *Assets Limited as to Use*

For the year ending June 30, 2013, the District's assets limited as to use included the following: $10.6 million for the bond project fund; $1.8 million for the 2007 revenue bonds; and $9.4 million in cash with the County Treasury. The District's investment funds and general obligation funds are deposited with Cal Trust and Wells Capital Management, respectively, in accounts independent from operating funds.

### *Other Receivables*

Items totaling $6.9 million are outstanding from government agencies as of the end of fiscal year 2013: (1) a receivable in the amount of $0.9 million for the State's "meaningful use" program; (2) a receivable for PPS reconciliations for the rural health clinics in the amount of $1.2 million; and (3) a receivable for $3.1 million for Medi-Cal Managed Care supplemental payments; and (4) a receivable of $1.7 million for the Fee-for-Service IGT program.

### Inventory

The annual physical inventory, along with operational changes, resulted in a $211k decrease in the inventory value as of June 30, 2013 over the prior year.

### Net Patient Accounts Receivable

The net patient accounts receivable decreased in fiscal year 2013 by $825k. This was due to the overall reduction in volumes from the prior year.

### Capital Assets

During the year, the District had a net increase in property, plant and equipment of $17.3 million. The increase is due mainly to $20.1 million expended from general obligation bond funds for the new Tulare Regional Medical Center tower construction.

Other significant additions during fiscal year 2013 were: (1) $255k for Radiology Information Systems; (2) $822k for design of a future medical tower on the District's hospital campus and; (3) $167k for various other major medical equipment purchases. Offsetting these amounts was depreciation in the amount of $4.0 million.

### Volumes

For the year ended June 30, 2013, acute patient days were 18,310, a 13.1% decrease over the prior year. Med/Surg was down 14% from the prior year; ICU/post ICU was below the prior year by 13%; Obstetrics was down 7% from fiscal year 2012. A comparison to prior year showed admissions down 14%; surgeries down 11%; and rural health care clinic visits down 31%. Volumes in the ancillary services were generally below prior year levels by 8%.

### Gross Patient Charges

The District charges are based on its established pricing structure for the services rendered. The charges are compared to local and regional healthcare facilities to ensure competitive market rates. A 6% increase in ancillary rates and a market-based increase in room rates were implemented in October, 2011. Daily inpatient service revenue was $53.3 million, inpatient ancillary revenue was $80.2 million and outpatient ancillary revenue was $133.2 million for a total of $266.7 million. This is a $13.9 million decrease, or 4.9%, from the prior year.

### Deductions from Revenue

Contractual allowances are computed deductions based on the difference between gross charges and the contractually agreed upon rates of reimbursement with third party government-based programs such as Medicare and Medi-Cal and other third party payers. Contractual adjustments (as a percentage of gross patient revenue) were 69.2% for the year, compared to 67.9% for the prior year. Deductions from revenue for charity care adjustments (calculated by the inability for patients to pay) decreased from $3.0 million to $2.6 million, or 1.0% of gross patient revenue. Deductions from revenue for bad debt expense were $11.9 million or 4.5% of gross patient revenue.

### Net Patient Service Revenue

Net patient services revenues are the resulting difference between gross patient charges and deductions from revenue, including charity and bad debt. Net patient service revenue for the year was $67.6 million as compared to $66.9 million for the prior year. This was an increase of $720k, or 1.1%, over the prior year.

### Operating Expenses

Total operating expenses were $77.9 million for the twelve months compared to the prior year of $85.2 million. Operating expenses decreased by 8% while operating revenues increased by 0.5%. Total operating expenses were 104% of total operating revenues as compared to 114% in the prior year.

For the twelve months, salaries and wages totaled $26.7 million, or 36% of total operating revenue, compared to $29.0 million, or 39% of total operating revenue during the last fiscal year.

Employee benefits totaled $9.6 million, compared to $11.0 million in the prior year. Medical insurance costs decreased by $899k based on actual claims paid.

Contract labor and registry fees showed a slight increase of $22k as compared to the prior year.

Professional fees increased from prior year by $366k.

Supply costs for current year totaled $11.6 million, or 15.5% of operating revenue, compared to $12.2 million, or 16.3% in the prior year.

Purchased services totaled $13.1 million or 17.4% of operating revenues, compared to $15.0 million, or 20.2% in the prior year.

### Summary

The District's operating loss from hospital operations this year was $(3.0) million as compared to fiscal year 2012's loss of $(10.6) million. The related operating margin was a negative (4.0)% of operating revenue for fiscal year 2013 as compared to a negative margin of (14.2)% in 2012.



<u>INDEPENDENT AUDITOR'S REPORT</u>

The Board of Directors
Tulare Regional Medical Center
Tulare, California

**Report on the Financial Statements**

We have audited the accompanying financial statements of Tulare Local Health Care District, (dba Tulare Regional Medical Center, or the District) which comprise the statement of net position as of June 30, 2013 and the related statements of revenues, expenses and changes in net position, and cash flows for the year then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the District's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the District's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion the financial statements referred to above present fairly, in all material respects, the financial position of the District as of June 30, 2013, and changes in its financial position and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

*An independent firm associated with*
MOORE STEPHENS

**Other Matters - Uncertainties**

As further discussed in Note 16 to the financial statements, in the previous year the District self-reported potential noncompliance concerns with a "Corporate Integrity Agreement" previously established with a regulatory agency. It is uncertain as to what action, if any, may be taken by the regulatory agency and how it may affect the District's financial position as of June 30, 2013. The District's financial statements as of June 30, 2013 do not include any financial impact from this self-reporting action. Our opinion is not modified with respect to that matter.

As further discussed in Note 16 to the financial statements, subsequent to year end the District's Board of Directors took action to stop two internal reviews of specific hospital operations of the District. It is unclear as to whether or not these reviews were properly authorized. Again, it is uncertain as to what, if any, financial ramifications the results of these reviews may have had to the financial position of the District as of June 30, 2013 if these reviews had been completed. Our opinion is not modified with respect to that matter.

As more fully described in Notes 13 and 17 to the financial statements, the District has incurred negative cash flows from hospital operations, and has materially exceeded the Tower project budget, and may be unable to meet its future financial obligations. These conditions raise substantial doubt about the District's ability to continue hospital operations in the future. The District's plans in regard to these matters are also described in Notes 13 and 17. The financial statements do not include any adjustments to reflect the possible future effects on the recoverability and classification of assets or the amounts and classification of liabilities that may result from the possible inability of the District to continue hospital operations. Our opinion is not modified with respect to that matter.

**Other Matters - Required Supplementary Information**

Accounting principles generally accepted in the United States of America require that the management's discussion and analysis on pages 1 - 3 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context.

We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*Armanino LLP*

Armanino[LLP]
San Ramon, California

December 9, 2013

# TULARE REGIONAL MEDICAL CENTER
## Statement of Net Position
### June 30, 2013

_____

## ASSETS

Current assets

| | |
|---|---:|
| Cash and cash equivalents | $ 8,657,613 |
| Assets limited as to use available for current debt service | 8,648,655 |
| Patient accounts receivable, net of allowances | 7,763,678 |
| Other receivables and physician advances | 7,305,939 |
| Inventories | 1,349,617 |
| Prepaid expenses and deposits | 976,027 |
| Total current assets | 34,701,529 |
| | |
| Assets limited as to use, long term | 15,177,000 |
| Capital assets, net of accumulated depreciation | 133,693,937 |
| Bond issuance costs, net of accumulated amortization | 1,289,694 |
| | |
| Total assets | $ 184,862,160 |

## LIABILITIES AND NET POSITION

Current liabilities

| | |
|---|---:|
| Current maturities of debt borrowings | $ 1,698,152 |
| Accounts payable and accrued expenses | 11,180,505 |
| Accrued payroll and related liabilities | 2,382,591 |
| Estimated current third party payor settlements | 1,101,828 |
| Self-insurance program accrual | 918,000 |
| Total current liabilities | 17,281,076 |
| | |
| Deferred revenue | 9,079,552 |
| Debt borrowings, net of current maturities | 103,256,666 |
| Total liabilities | 129,617,294 |

Net position

| | |
|---|---:|
| Net investment in capital assets | 40,621,937 |
| Restricted, by bond indenture for debt service | 2,143,763 |
| Unrestricted | 12,479,166 |
| Total net position | 55,244,866 |
| | |
| Total liabilities and net position | $ 184,862,160 |

The accompanying notes are an integral part of these financial statements.

Exhibit 4, Page 200

| | |
|---|---|
| Operating revenues | |
| Net patient service revenue | $ 67,624,586 |
| Other operating revenue | 7,302,491 |
| Total operating revenues | 74,927,077 |
| | |
| Operating expenses | |
| Salaries and wages | 26,624,721 |
| Employee benefits | 9,575,495 |
| Professional fees | 9,132,574 |
| Contract labor and registry | 311,439 |
| Supplies | 11,632,935 |
| Purchased services | 13,060,524 |
| Repairs and maintenance | 310,416 |
| Utilities and phone | 1,438,533 |
| Building and equipment rent | 908,813 |
| Insurance | 605,835 |
| Depreciation and amortization | 4,025,809 |
| Other operating expenses | 315,715 |
| Total operating expenses | 77,942,809 |
| | |
| Operating loss | (3,015,732) |
| | |
| Nonoperating revenues (expenses) | |
| District tax revenues | 1,513,773 |
| Investment income | 101,961 |
| Interest expense | (839,225) |
| Grants and contributions | 247,812 |
| Other income | 683,011 |
| Total nonoperating net revenues | 1,707,332 |
| | |
| Excess of expenses over revenues | (1,308,400) |
| | |
| District taxes related to general obligation bonds debt service | 6,039,069 |
| | |
| Increase in net position | 4,730,669 |
| | |
| Net position at beginning of the year | 50,514,197 |
| | |
| Net position at end of the year | $ 55,244,866 |

The accompanying notes are an integral part of these financial statements.

| | |
|---|---:|
| **Cash flows from operating activities** | |
| Cash received from patients and third-parties on behalf of patients | $ 65,207,971 |
| Cash received from operations, other than patient services | 7,302,491 |
| Cash payments to suppliers and contractors | (38,684,206) |
| Cash payments to employees and benefit programs | (37,063,346) |
| Net cash used in operating activities | (3,237,090) |
| | |
| **Cash flows from noncapital financing activities** | |
| District tax revenues | 1,513,773 |
| Non-capital grants, contributions and other | 193,559 |
| Net cash provided by noncapital financing activities | 1,707,332 |
| | |
| **Cash flows from capital and related financing activities** | |
| Net purchase of capital assets | (21,182,218) |
| District tax revenues for debt service | 5,402,866 |
| Principal payments on debt borrowings | (1,640,656) |
| Net cash used in capital financing activities | (17,420,008) |
| | |
| **Cash flows from investing activities** | |
| Net (purchase) or sale of investments | 14,336,004 |
| Interest and dividends received from investments | 101,961 |
| Net cash provided by investing activities | 14,437,965 |
| | |
| Net decrease in cash and cash equivalents | (4,511,801) |
| Cash and cash equivalents at beginning of year | 13,169,414 |
| | |
| Cash and cash equivalents at end of year | $ 8,657,613 |

The accompanying notes are an integral part of these financial statements.

Reconciliation of operating loss to net cash provided
  by operating activities

| | |
|---|---:|
| Operating loss | $ (3,015,732) |
| Adjustments to reconcile operating loss to<br>  net cash provided by operating activities: | |
| Depreciation and amortization | 4,025,809 |
| Changes in operating assets and liabilities | |
| Patient accounts receivables | 825,399 |
| Other receivables | (4,065,093) |
| Inventories | 211,397 |
| Prepaid expenses and deposits | (51,870) |
| Accounts payable and accrued expenses | (1,104,949) |
| Accrued payroll and related liabilities | (863,130) |
| Estimated third party payor settlements | 823,079 |
| Self-insured program accrual | (22,000) |
| Net cash used in operating activities | $ (3,237,090) |

The accompanying notes are an integral part of these financial statements.

1.    Organization and Significant Accounting Policies

Reporting entity

Tulare Local Health Care District (dba Tulare Regional Medical Center, e.g. the District) is a public entity organized under Local Hospital District Law as set forth in the Health and Safety Code of the State of California.  The District is a political subdivision of the State of California and is generally not subject to federal or state income taxes.  The District is governed by a five-member Board of Directors, elected from within the District's geographical political divisions to specified terms of office.  The District is located in Tulare, California and operates a 112 bed general acute care hospital facility, a home health agency, several rural health care clinics and other patient service programs.  The District provides health care services primarily to individuals who reside in the local geographic area.

Basis of preparation

The District's financial statements are presented in accordance with the pronouncements of the Governmental Accounting Standards Board (GASB).  For purposes of presentation, transactions deemed by management to be ongoing, major or central to the provision of health care services are reported as operational revenues and expenses.  The financial statement presentation, required by GASB Statements No. 34, 37 and 38 provides a full accrual basis, comprehensive, entity-wide perspective of the District's assets, results of operations and cash flows.  The District follows the "business-type activities" reporting requirements of GASB Statement No. 34.

Effective July 1, 2012, the District adopted GASB No. 62, *Codification of Accounting and Financial Reporting Guidance Contained in Pre-November 30, 1989 FASB and AICPA Pronouncements*, which brings the top category of authoritative governmental accounting and financial reporting literature together into a single publication.  This GASB pronouncement did not have a significant impact on the District's June 30, 2013 financial statements.

Effective July 1, 2012, the District adopted GASBS No. 63, *Financial Reporting of Deferred Outflows of Resources, Deferred Inflows of Resources, and Net Position*, which establishes guidance for reporting deferred outflows of resources, deferred inflows of resources, and net position in a statement of financial position.  This GASB pronouncement did not have a significant impact on the District's June 30, 2013 financial statements.

Management's discussion and analysis

GASB Statement 34 requires that financial statements be accompanied by a narrative introduction and analytical overview of the District's financial activities in the form of "management's discussion and analysis" (MD&A).  This analysis is similar to the analysis provided in the annual reports of organizations in the private sector.

1.   Organization and Significant Accounting Policies (continued)

Use of estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amount of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

Cash and cash equivalents

The District considers cash and cash equivalents to include certain investments in highly liquid debt instruments, when present, with an original maturity of a short-term nature or subject to withdrawal upon request.

Investments

Investments in participating interest-earning investment contracts are recorded at amortized cost, which approximates fair value for these investments, and all other investments are stated at fair value in the statements of net assets based upon published market quotations, where available. Investment income or loss (including realized gains and losses on investments, interest and dividends) and unrealized gains and losses on investments are reported in the statement of revenues, expenses and changes in net assets.

Investments held by the District are included within assets limited as to use as of June 30, 2013.

The District invests in various investment securities including corporate bonds, government securities and US treasury notes.  Due to the level of risk associated with certain investment securities, it is at least reasonably possible that changes in the values of investment securities will occur in the near term and such changes could materially affect the amounts reported in the accompanying financial statements.

Patient accounts receivable

Patient accounts receivable consist of amounts owed by various governmental agencies, insurance companies and private patients.  The District manages its receivables by regularly reviewing the accounts, inquiring with respective payer's as to collectability and providing for allowances on their accounting records for estimated contractual adjustments and uncollectible accounts.

Inventories

Inventories are consistently reported from year to year at cost determined by average costs and replacement values which are not in excess of market.  The District does not maintain levels of inventory values such as those under a first-in, first out or last-in, first out method.

1.   Organization and Significant Accounting Policies (continued)

Assets limited as to use

Assets limited as to use include amounts designated by the Board of Directors for the replacement or purchases of capital assets, amounts required for future bond obligations and other specific purposes, and amounts held by trustees under specified agreements.  See footnote 8 for the composition of assets limited as to use at June 30, 2013.

Capital assets

Capital assets are stated at cost when purchased or constructed, or, for donated property, at the asset's estimated fair value at the time the donated property is received.  Depreciation is provided using the straight-line method over the assets' estimated useful lives ranging from 5 to 30 years. Depreciation for tenant improvements is provided using the straight-line method over the shorter of the assets estimated useful life or the lease term.  Whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recovered, the District, using its best estimates and projections, reviews for impairment the carrying value of long-lived identifiable assets to be held and used in the future.  Any impairment losses identified are recognized when determined.  Recoverability of assets is measured by comparison of the carrying amount of the asset to the net undiscounted future cash flows expected to be generated from the asset.  If the future undiscounted cash flows are not sufficient to recover the carrying value of the assets, the assets carrying value is adjusted to fair value.  As of June 30, 2013, the District has determined that no capital assets are significantly impaired; refer to Footnote 13 Commitments and Contingencies, for discussion of current status of construction in progress.

Bond issue costs

Bond issue costs are comprised of deferred financing cost of the issuance of revenue and general obligation bonds.  Amortization of these issuance costs is computed by the straight-line method over the life of the repayment agreements.  For current and advance refundings which result in defeasance of debt, the difference between the reacquisition price and the net carrying amount of the old debt, together with any unamortized deferred financing costs, is deferred and amortized over the remaining life of the old debt or the life of the new debt, whichever is shorter, in accordance with GASB 23.  Amortization expense was $161,626 for the year ended June 30, 2013.

Compensated absences

The District's employees earn paid-time-off benefits at varying rates depending on years of service; Paid-time-off benefits accumulate up to a specified maximum level.  Employees are paid for both accumulated vacation and other accumulated paid time off benefits if they leave either upon termination or before retirement.  Accrued paid time off liabilities as of June 30, 2013 were $1,432,055.

1.    Organization and Significant Accounting Policies (continued)

Risk management

The District is exposed to various risks of loss from torts; theft of, damage to, and destruction of assets; business interruption; errors and omissions; employee injuries and illnesses; natural disasters; and medical malpractice.  Commercial insurance coverage is purchased for claims arising from such matters.  In the case of employee health coverage, the District is self-insured for those claims and is discussed further in the footnotes.

Net position

Net position is comprised of the following three components:

Net investment in capital assets: consists of capital assets (both restricted and unrestricted), net of accumulated depreciation and reduced by the outstanding principal balances of any debt borrowings that were attributable to the acquisition, construction, or improvement of those capital assets.

Restricted net assets: consist of externally designated constraints placed on those net assets by creditors (such as through debt covenants), grantors, contributors, law or regulations of other governments or government agencies, or law or constitutional provisions or enabling legislation.

Unrestricted net assets: consists of net assets that do not meet the definition or criteria of the previous two categories.

Net patient service revenues

Net patient service revenues are reported in the period at the estimated net realized amounts from patients, third-party payors and others including estimated retroactive adjustments under reimbursement agreements with third-party programs.  Normal estimation differences between final reimbursement and amounts accrued in previous years are reported as adjustments of current year's net patient service revenues.

Charity care

The District accepts all patients regardless of their ability to pay.  A patient is classified as a charity patient by reference to certain established policies of the District.  Essentially, these policies define charity services as those services for which no payment is anticipated.  Because the District does not pursue collection of amounts determined to qualify as charity care, they are not reported as net patient service revenues.  Services provided are recorded as gross patient service revenues and then written off entirely as an adjustment to net patient service revenues.

1.    Organization and Significant Accounting Policies (continued)

District tax revenues

The District receives approximately 2% of its financial support from property taxes.  These funds are used to support operations and meet required debt service agreements.  They are classified as non-operating revenue as the revenue is not directly linked to patient care.  Property taxes are levied by the County on the District's behalf during the year, and are intended to help finance the District's activities during the same year.  Amounts are levied on the basis of the most current property values on record with the County.  The County has established certain dates to levy, lien, mail bills, and receive payments from property owners during the year.  Property taxes are considered delinquent on the day following each payment due date.

Deferred revenue

The District records property tax revenues received in support of its general obligation bonds to the extent of the current year's debt service associated with these bonds.  Property taxes and other funds received on behalf of the general obligation bonds that exceed the current year's debt service payments are recorded as deferred revenue, to be recognized in future years as the debt service payments become due.

Grants and contributions

From time to time, the District receives grants from various governmental agencies and private organizations.  The District also receives contributions from related foundation and auxiliary organizations, as well as from individuals and other private organizations.  Revenues from grants and contributions are recognized when all eligibility requirements, including time requirements are met.  Grants and contributions may be restricted for either specific operating purposes or capital acquisitions.  These amounts, when recognized upon meeting all requirements, are reported as components of the statement of revenues, expenses and changes in net position.

Operating revenues and expenses

The District's statement of revenues, expenses and changes in net assets distinguishes between operating and nonoperating revenues and expenses.  Operating revenues result from exchange transactions associated with providing health care services, which is the District's principal activity.  Operating expenses are all expenses incurred to provide health care services, other than financing costs.  Nonoperating revenues and expenses are those transactions not considered directly linked to providing health care services.

2.    Cash - Custodial Credit Risk

As of June 30, 2013, the District had deposits invested in various financial institutions in the form of operating cash and cash equivalents amounting to $8,657,613.  All of these funds were held in deposits, which are collateralized in accordance with the California Government Code (CGC), except for $250,000 per account that is federally insured.

Under the provisions of the CGC, California banks and savings and loan associations are required to secure the District's deposits by pledging government securities as collateral.  The market value of pledged securities must equal to at least 110% of the District's deposits.  California law also allows financial institutions to secure District deposits by pledging first trust deed mortgage notes having a value of 150% of the District's total deposits.  The pledged securities are held by the pledging financial institution's trust department in the name of the District.

3.    Investments

Interest rate risk

The District invests in various investment securities including corporate bonds, government securities and US treasury notes, which are classified as assets limited as to use.

Interest rate risk is the risk that changes in market rates will adversely affect the fair value of an investment.  Generally, the longer the maturity of an investment the greater the sensitivity of its fair value to changes in market interest rates.  The District does not have any policies specifically addressing interest rate risk.

At June 30, 2013, scheduled maturities of fixed income securities consisted of the following:

| Maturing in | |
|---|---|
| Less than 1 year | $4,237,864 |
| 1 year to 5 years | $2,126,863 |

Credit risk

The District's credit rating risk is governed by Section 53601 of the California Government Code, which, among others, limits investments in money market mutual funds to those funds with the highest ranking by at least one of the national rating agencies and investments in corporate bonds are limited to those with a minimum ranking of A by at least one national rating agencies.  The District did not hold any investments at June 30, 2013 that had ratings of less than A by national rating agencies.  There are no investment limits on the securities of the U.S. Treasury as these investments are backed by the full faith and credit of the United States government.

3.   Investments (continued)

Credit risk (continued)

The following is a summary of the credit quality distribution for securities with credit exposure as rated by Moody's Investor Service at June 30, 2013:

| | |
|---|---|
| Aaa | $5,509,572 |
| A1 | $  527,384 |
| A2 | $  327,771 |

Concentration of credit risk

The District diversifies its portfolio as required by the California Government Code.  At June 30, 2013, more than 5 percent of the District's investments are invested in the following:

| | |
|---|---|
| Freddie Mac fixed income | 14% |

4.   Net Patient Service Revenues

The District has agreements with third-party payors that provide for payments to the District at amounts different from its established rates.  A summary of the payment arrangements with major third-party payors follows:

Medicare

Payments for inpatient acute care services rendered to Medicare program beneficiaries are based on prospectively determined rates, which vary according to the patient diagnostic classification system.  Outpatient services are generally paid under an outpatient classification system subject to certain limitations.  The District is subject to cost reimbursable services in rural health care services.  Filed cost reports are subject to final settlements determined after submission of the annual cost reports and audits thereof by the Medicare fiscal intermediary.  At June 30, 2013, cost reports through June 30, 2008 have been final settled.

Medi-Cal

For traditional Medi-Cal (non-Medi-Cal managed care) services, payments for inpatient services rendered to patients are made based on reasonable costs while outpatient payments are based on pre-determined charge screens.  The District is paid for cost reimbursement services at an interim rate with final settlement determined after submission of annual cost reports and audits thereof by Medi-Cal.  At June 30, 2013, cost reports through June 30, 2010, have been final settled.  Medi-Cal managed care services are paid on a pre-determined rate and are not subject to cost reimbursement.

4.    Net Patient Service Revenues (continued)

Other

Payments for services rendered to other than Medicare and Medi-Cal patients are based on established rates or on agreements with certain commercial insurance companies, health maintenance organizations and preferred provider organizations which provide for various discounts from established rates.

Net patient service revenues summarized by service are as follows:

| | |
|---|---|
| Daily hospital services | $ 53,328,040 |
| Inpatient ancillary services | 80,189,279 |
| Outpatient services | 133,177,294 |
| Gross patient service revenues | 266,694,613 |
| Less deductions from revenue | (199,070,027) |
| Net patient service revenues | $ 67,624,586 |

Medicare and Medi-Cal revenue accounts for approximately 69% of the District's gross patient revenues.  Laws and regulations governing the Medicare and Medi-Cal programs are extremely complex and subject to interpretation.  As a result, there is at least a reasonable possibility that recorded estimates may change by material amounts in the near term as final settlements are determined.

5.    Patient Accounts Receivable and Concentration of Credit Risk

The District grants credit without collateral to its patients and third-party payors.  Patient accounts receivable from government agencies represent the only concentrated group of credit risk for the District and management does not believe that there are any credit risks associated with these governmental agencies.  Contracted and other patient accounts receivable consist of various payors including individuals involved in diverse activities, subject to differing economic conditions and do not represent any concentrated credit risks to the District.

Concentrations of patient accounts receivable at June 30, 2013 are as follows:

| | |
|---|---|
| Medicare | $ 9,195,533 |
| Medi-Cal and Medi-Cal managed care | 13,428,087 |
| Other third party payors | 11,532,796 |
| Self pay and other | 4,070,132 |
| Gross patient accounts receivable | 38,226,548 |
| Less allowances for contractual adjustments and bad debts | (30,462,870) |
| Net patient accounts receivable | $ 7,763,678 |

6.    Charity Care and Community Benefit Expense

The District maintains records to identify and monitor the level of charity care and community service it provides.  These records include: the amount of charges foregone, (based on established rates), for services and supplies furnished under its charity care and community service policies, the estimated cost of those services and supplies, and statistics quantifying the level of charity care as a percentage of expenses of the District as a whole.  The following is a summary of the District's charity care and community benefit expense for the year ended June 30, 2013, in terms of services to the poor and benefits to the broader community:

| | |
|---|---:|
| Benefits for the poor | |
| Traditional charity care | $   2,595,214 |
| Unpaid Medi-Cal and County indigent program charges | 89,954,889 |
| Total quantifiable benefits for the poor | 92,550,103 |
| | |
| Benefits for the broader community | |
| Unpaid Medicare program charges | 62,117,426 |
| Total quantifiable benefits for the broader community | 62,177,426 |
| Total quantifiable community benefits | $154,667,529 |

7.    Other Receivables

Other receivables as of June 30, 2013 were comprised of the following:

| | |
|---|---:|
| Advances to physicians | $1,115,147 |
| Tulare County property taxes | 31,289 |
| Net receivable from State disproportionate share and other programs | 6,902,992 |
| Grants receivable | 58,441 |
| Other receivables | 396,227 |
| Less allowance for doubtful accounts | (1,198,157) |
| | $7,305,939 |

Advances to physicians are comprised of physician income guarantees and/or business loans to those physicians requiring assistance to begin a local practice.  The District has entered into agreements with certain physicians whereby the District guarantees their income for a specified period of time.  These agreements are structured so that if a physician maintains a practice in the area for a specified period of time, the income guarantee in excess of collections may be forgiven in compliance with all federal and State laws and regulations.  The allowance for doubtful accounts is primarily attributed to three physician advances that are potentially uncollectible.

8.    Assets Limited as to Use

Assets limited as to use as of June 30, 2013 were comprised of the following:

| | |
|---|---:|
| Assets held under bond indenture agreements for construction projects | |
| US Treasury notes | $ 3,504,207 |
| US government agency securities | 2,005,364 |
| Corporate bonds | 855,156 |
| Money Market Funds | 4,187,951 |
| | 10,552,678 |
| Assets held under bond indenture agreements | |
| Money market funds | 1,813,539 |
| Cash in County Treasury | 9,409,776 |
| Bond rebate receivable | 704,522 |
| | 11,927,837 |
| Assets held as part of municipal lease obligation | 1,345,140 |
| Total | 23,825,655 |
| Less restricted trust funds available for current debt service | (8,648,655) |
| Assets limited as to use - long-term | $15,177,000 |

9.    Capital Assets

Capital assets as of June 30, 2013 were comprised of the following:

| | Balance at June 30, 2012 | Transfers / Additions | Reclasses / Retirements | Balance at June 30, 2013 |
|---|---:|---:|---:|---:|
| Land and land improvements | $  3,203,301 | $         - | $       (420) | $  3,202,881 |
| Buildings and improvements | 43,506,831 | 29,669 | - | 43,536,500 |
| Equipment | 36,155,372 | 4,030,299 | (4,962,947) | 35,222,724 |
| Construction-in-progress | 84,717,901 | 22,174,347 | (89,155) | 106,803,093 |
| Totals at historical cost | 167,583,405 | 26,234,315 | (5,052,522) | 188,765,198 |
| Less accumulated depreciation for | | | | |
| Land and land improvements | (885,326) | (89,622) | - | (974,948) |
| Buildings and improvements | (25,070,188) | (1,553,963) | - | (26,624,151) |
| Equipment | (25,251,984) | (2,220,178) | - | (27,472,162) |
| Total accumulated depreciation | (51,207,498) | (3,863,763) | - | (55,071,261) |
| Capital assets, net | $116,375,907 | $22,370,552 | $(5,052,522) | $133,693,937 |

- 19 -

10.   Debt Borrowings

As of June 30, 2013 debt borrowings were as follows:

|  |  |
|---|---|
| General obligation bonds, election of 2005, series A (2007); interest at 4.00% to 4.65% due semiannually; principal due in annual amounts ranging from $15,000 on August 1, 2012 to $2,000,000 due on August 1, 2037; collateralized by tax revenues. | $  14,985,000 |
| Series 2007 refunding revenue bonds; interest at 3.75% to 5.20% due semiannually; principal due in annual amounts ranging from $405,000 due on November 1, 2008 to $1,210,000 due on November 1, 2032; collateralized by District revenues. | 15,710,000 |
| General obligation bonds, election of 2005, series B (2009); interest at 6.45% to 8.00% due semiannually; principal due in annual amounts ranging from $100,000 on August 1, 2014 to $7,240,000 due on August 1, 2039; collateralized by tax revenues. | 70,000,000 |
| Note payable to a financial institution; interest at 1.913%; principal and interest payments of $104,938 Payable monthly through December, 2016; collateralized by equipment. | 4,259,818 |
| Total debt borrowings | 104,954,818 |
| Less current maturities of debt borrowings | (1,698,152) |
|  | $103,256,666 |

Future interest due and principal maturities of debt borrowings, at June 30, 2013 are as follows:

| | Interest | Principal | Total |
|---|---|---|---|
| 2014 | $  6,950,504 | $  1,698,152 | $  8,648,656 |
| 2015 | 6,902,538 | 1,861,080 | 8,763,618 |
| 2016 | 6,844,953 | 2,044,454 | 8,889,407 |
| 2017 | 6,778,119 | 1,591,132 | 8,369,251 |
| 2018 | 6,719,891 | 1,135,000 | 7,854,891 |
| 2019 - 2023 | 32,905,110 | 8,560,000 | 41,465,110 |
| 2024 - 2028 | 29,642,965 | 15,260,000 | 44,902,965 |
| 2029- 2033 | 24,562,336 | 25,410,000 | 49,972,336 |
| 2034 - 2038 | 17,429,274 | 33,540,000 | 50,969,274 |
| 2039 - 2040 | 8,644,839 | 13,855,000 | 22,499,839 |
|  | $147,380,529 | $104,954,818 | $252,335,347 |

10.  Debt Borrowings (continued)

The Series 2007 refunding revenue bonds require that the District maintain a long-term debt service coverage ratio of not less than 1.25 times.  For the fiscal year ended June 30, 2012, the District did not meet this requirement.  As a result, the District engaged the services of a management consultant as set forth in the Bond Indenture.  The District continues to work on operational improvements set forth by the management consultant, as well as those identified internally.  For the year ended June 30, 2013, the District did meet the debt service coverage ratio requirement.

The interest payments for the general obligation bonds issued in 2009 are subsidized over the life of the issue by a U.S. Government stimulus program entitled "Build America Bonds" by approximately 32%, leaving the tax revenues to cover approximately 68%.

In March, 2013, Fitch Ratings downgraded the $15.7 million refunding revenue bonds, series 2007 to a "B+" from a "BB+" and revised the rating outlook from "stable" to "negative" ($460,000 principal had been paid on November l, 2012 to bring the outstanding balance to $15,710,000 from June 30, 2012).  Some of the "key rating drivers" were (1) continued financial weakening; (2) large operating losses; (3) weak balance sheet; (4) construction project delays; and (5) recent management turnover.  The rating agency also cited the "sharp turn in fiscal 2012" in operating profitability and a "dramatic decline in unrestricted liquidity beginning fiscal 2011 followed by material deterioration in profitability and debt metrics in fiscal 2012".  The next rating review will not take place until the first quarter of 2014.

11.  Employees' Retirement Plans

The "Tulare Local Hospital District Money Purchase Pension Plan" (the Retirement Plan) is a defined contribution money purchase pension plan established by the District to provide retirement benefits for substantially all District employees.  The annual contribution to the Retirement Plan by the District is determined based on a percentage of the compensation paid to eligible employees and varies for each participant based on their respective years of employment at the District.  In order to be eligible to participate, the District has required that employees agree to contribute to a deferred compensation arrangement.  Total amounts contributed by the District to the Retirement Plan for the year ended June 30, 2013 was approximately $568,000.  The required employee contributions have been treated as contributed under a deferred compensation arrangement under the Internal Revenue Code Section 457.

11.   Employees' Retirement Plans (continued)

The District has also established the "Tulare Local Hospital District Social Security Alternative Savings Plan" (the SSA Plan) to provide retirement benefits to employees as an alternate method of pension and other benefit opportunities similar to those provided by Social Security.  The SSA Plan is available to all employees of the District who would otherwise have been covered by Social Security.  The District and employee level of contributions to the SSA Plan depend on the employees' most recent date of employment and differentiate between those employed prior to 1987 and later years, based on certain regulations.

Originally, the employee contributions to the SSA Plan were treated as contributions to a deferred compensation arrangement under the Internal Revenue Code Section 457.  Effective January 1, 1987, the employee contributions have been treated as "pick-up" contributions under the Internal Revenue Code Section 414(h)(2).  The District's contribution to the SSA Plan for the year ended June 30, 2013 was approximately $1,017,000.

12.   Post -Retirement Benefits

In years past, the District's SSA Plan provided for post-retirement health care benefits for employees who retire on or after age 55 and prior to July 31, 1998, with at least five years of service at the District.  Under this program, the District reimburses eligible health care expenses for the retirees.  Health care benefits are provided until the retiree is eligible for the Medicare program.

The District was also required to purchase Part A coverage under the Medicare Program for those eligible retirees who were hired between January 1, 1983 and April 1, 1986.  During that period, and under the conditions of the SSA Plan, the District was not required to withhold social security payroll taxes from its employees in order to fund their respective Medicare future benefit.  Regulations changed effective April 1, 1986, which required the funding to commence again for any new hire after the effective date.  As a result of this "three-year" period, the SSA Plan requires the District provide Part A coverage for these employees upon acceptance into the Medicare Program.  The District is not required to purchase Part A coverage if the retiree is eligible for the Medicare Program either through credits gained before January 1, 1983, employment credits at another place of employment, or eligibility through the retiree's current or former spouse.

The District has "board-designated" funds to meet these obligations.  At June 30, 2013, the board funded post-retirement health care benefit liability, as determined by actuarial studies, was approximately $73,000.  The discount rate used in determining the accumulated post-retirement health care benefit cost was 7% for each year.  The assumed health care cost trend rate was 7.5% in 1998, grading down to 5% in 2003 and beyond.  The District has amended its benefit plans to redesign future benefits to exclude post-retirement obligations.

13.  Commitments and Contingencies

Construction-in-progress

As of June 30, 2013, the District had recorded $106,803,093 as construction-in-progress representing cost capitalized of $103,234,298 for the "Tower Project" and $3,568,795 for other various remodeling, major repair, equipment installation and other expansion projects on the District's premises.  The District capitalizes related interest expense, net of interest earnings on capital related funding, to the District expansion project.  Estimated costs to complete all projects as of June 30, 2013 are approximately $28 million, of which $15.7 million pertains to the contract with the general contractor.

As to the ongoing construction of the four-story, 115,000 square foot "Tower Project" specifically, the District entered into a construction contract around March, 2010 and construction began around May, 2010.  The original completion date was December, 2012, however due to delays caused by several setbacks (as more fully described in footnote 14), the new completion date is now projected for 2015.

As of June 30, 2013, there is approximately $10.6 million remaining in the bond project fund.  As of December 9, 2013, it is uncertain if the District has the remaining funds available to complete the "Tower Project".  In addition, due to the present financial condition of the District, it is uncertain whether or not the District has the financial leverage to obtain additional financing in order to finance the completion of the "Tower Project".

Operating leases

The District leases various equipment and facilities under operating leases expiring at various dates.  Total building and equipment rent expense for the year ended June 30, 2013 was $908,813.  Future minimum lease payments for the succeeding years under operating leases as of June 30, 2013, which have initial or remaining lease terms in excess of one year are not considered material.

Employee health insurance

The District provides health benefits to employees through a self-funded plan financed by the District operations.  Estimated liabilities are recorded for claims which most likely have been incurred but are not yet reported for claims processing and payment (IBNR).  As of June 30, 2013, the IBNR was estimated at $883,000.  Commercial insurance is provided for "stop-loss" coverage for significant claims.

13.   Commitments and Contingencies (continued)

Workers compensation program

The District is a participant in the Association of California Hospital Districts Alpha Fund (the Fund) which administers a self-insured worker's compensation plan for participating hospital employees of its member hospitals.  The District pays premiums to the Fund which are adjusted annually.  If participation in the Fund is terminated by the District, the District would be liable for its share of any additional premiums necessary for final disposition of all claims and losses covered by the Fund.

Health Care Reform

The health care industry is subject to numerous laws and regulations of federal, state and local governments.  These laws and regulations include, but are not necessarily limited to, matters such as licensure, accreditation, government health care program participation requirements, reimbursement for patient services, and Medicare and Medi-Cal fraud and abuse.  Government activity has increased with respect to investigations and allegations concerning possible violations of fraud and abuse statutes and regulations by health care providers.  Violations of these laws and regulations could result in expulsion from government health care programs together with the imposition of significant fines and penalties, as well as significant repayments for patient services previously billed.  Management believes that the District is in compliance with fraud and abuse as well as other applicable government laws and regulations.  While no material regulatory inquiries have been made, compliance with such laws and regulations can be subject to future government review and interpretation as well as regulatory actions unknown or unasserted at this time.

14.   Litigation

Construction delays

Around March, 2010, the District entered into a construction contract with Harris Construction Co., Inc. (Harris) for the construction of the "Tower Project" (the Project).  Construction began around May, 2010 and is presently ongoing.  The initial completion date was approximately December, 2012.  In early 2012, the District was informed by Harris that there were issues involving delaminated concrete within the Project that required remediation efforts.  Although the issue is in process of being resolved, it has caused delays in the completion of the Project, and the estimated completion date has now been moved to 2015.  Presently, the Project completion date as required by the Project is March 15, 2013 and due to the failure of Harris to achieve Project completion by that date, as required by the contract, the District has elected to assess liquidated damages (at the contractual rate of $10,000 per day) until completion is achieved, but is not withholding those liquidated damages from monthly progress billings.

14.   Litigation (continued)

Construction delays (continued)

It is the position of the District that Harris remains 100% responsible for the concrete issue which has caused substantial delay to the Project.  Harris has advised the District that it believes other delays were caused by alleged errors, omissions and deficiencies in the Project plans and drawings which have resulted in additional costs and other related impacts for Harris.  The District disputes many of these claims.  As of the date of these financial statements, Harris (or those associated with Harris in the Project) has not asserted any claim against the District and it is uncertain if they will. If action is taken and an unfavorable outcome results, it is possible that damages could be material to the financial position of the District.  Due to the uncertainty of any action at this time, it is impractical to determine a possible loss or range of loss to the District.

Architect issues

During 2007 the District engaged an initial architect for the Project for certain design and construction administration services.  Around June, 2012, the District removed the initial architect from the Project and enlisted the services of another architect as a replacement.  Construction activities are currently proceeding and may not be complete until 2015.  As of the date of this report, it is uncertain as to whether or not the District will assert any claim against the former architect or whether the former architect will pursue a claim against the District.   Due to the uncertainty of any action at this time, it is impractical to determine a possible loss or range of loss to the District.

Public Records Act

On June 8, 2012, Harris served the District with a Public Records Act request.  The request generally sought all financial documents showing sums on account and all expenditures made for the Project from 2005 through June 30, 2012, as well as other financial information requests.  The District began responding to the requests, however on July 23, 2012, Harris filed a Petition for Writ of Mandate to Enforce Public Records Act.  A Court hearing was conducted on February 22, 2013, and on May 17, 2013 the judge issued an order whereby the Writ filed by Harris was denied, however the order indicated that the District had delayed in providing Harris with some public documents.  On July 3, 2013, Harris filed an untimely motion for attorney's fees and costs totaling $138,861.  The District then filed an opposing motion to strike all fees and costs.  The hearing for both motions occurred on September 10, 2013, and as of December 9, 2013, no ruling has been issued by the court.  Due to the uncertainty of the decision of the Court, it is impractical to determine a possible loss or range of loss to the District.  Legal counsel for the District has estimated a possible loss could be between $-0- and $138,861.

14.   Litigation (continued)

Other litigation

The District is involved in numerous other litigation matters which generally arise in the normal course of doing business.  After consultation with legal counsel, management estimates that these other matters existing as of June 30, 2013 will be resolved without material adverse effect on the District's future financial position, results from operations or cash flows.

15.   Related Party Transactions

The Tulare Hospital Foundation (the Foundation), has been established as a nonprofit public benefit corporation under the Internal Revenue Code Section 501(c)(3) to solicit contributions on behalf of the District.  Substantially all funds raised except for funds required for operation of the Foundation, are distributed to the District or held for the benefit of the District.  The Foundation's funds, which represent the Foundation's unrestricted resources, are distributed to the District in amounts and in periods determined by the Foundation's Board of Trustees, who may also restrict the use of funds for District property and equipment replacement or expansion or other specific purposes.  The Foundation, as specified in their mission statement, contributes annually, both in service and in funding, towards the healthcare of the residents of the Tulare healthcare service area, including the District.  The Tulare District Hospital Auxiliary (the Auxiliary) is a similar non-profit organization established to help solicit contributions for the District and also donates funds towards the healthcare effort of the Tulare area, including the District.

16.   Uncertainties

In November, 2012, the District's legal counsel had the District self-report to the Office of Inspector General (OIG) certain concerns associated with an existing "Corporate Integrity Agreement" (CIA) which had been in effect between the District and the OIG since July 20, 2009.  On April 3, 2013, the District received a letter from the OIG stating that "it appears that Tulare was in compliance with its reporting requirements of the CIA during its third Reporting Period", However, any self-reporting by the District after June 30, 2012, including the report mentioned above, would be during the fourth "Reporting Period".

On October 7, 2013, the District received a letter from the OIG with the following: "it appears that Tulare was in compliance with the reporting requirements of its CIA during its fourth Reporting Period."  The June 30, 2013 financial statements do not contemplate any material financial impact as a result of the November 2012 self-report.

In October, 2012, District management engaged an independent law firm to conduct an internal review into certain alleged misconduct within hospital operations.  The review had just begun when in December, 2012, new general legal counsel recommended suspension of the process pending a review of the Board's authority for such action.  In January, 2013, the newly elected Board of Directors ratified the suspension of the review on the basis of lack of Board authority until such time as the scope of the review could be identified and approved.

16. Uncertainties (continued)

Also in October, 2012, the Board of Directors authorized a "request for proposal" process to engage an independent accounting firm to review specific concerns related to the "bond financed" tower project. In January, 2013 the newly-elected Board of Directors decided not to engage an accounting firm to review specific concerns about the "bond financed" tower project due to the fact that they felt other actions were taken in its place. Previously the board engaged a Certified Public Accounting firm to complete three separate Agreed-Upon Procedure attest engagements related to general obligation bond expenditures. These audits did not identify any significant findings.

Generally accepted accounting principles require that loss contingencies be properly disclosed and reflected in the financial statements, however, it is not possible to disclose what outcome, if any, these aforementioned "uncertainties" may have on the financial position of the District as of June 30, 2013.

For the year ended June 30, 2013, management does not believe that there is any material impact on the financial position of the District as a result of the aforementioned "uncertainties".

17. Continued Hospital Operations

The District continues to suffer material operating losses from hospital operations through the date of these financial statements. District management is striving to improve operations through measured action plans. The ultimate success of these plans will depend primarily on the ability of the District's management to either operate the hospital with sufficient cash flows to meet their obligations in the normal course of operations or resolve the situation through other actions.

District management has developed an operational improvement plan which it believes will result in continued cash flow improvements. The plan includes revenue, service line and cost containment components. The financial statements do not include any adjustments relating to the recoverability and classification of asset amounts or the amounts and classification of liabilities that might be necessary should the District be unable to continue hospital operations.

18. Subsequent Events

The District has evaluated subsequent events through December 9, 2013, the date the financial statements were available to be issued. No subsequent events have occurred that would have a material impact on the presentation of the District's financial statements.