20
WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter #91839
Matthew P. Bunting #306034
Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone: (559) 435-9800
Facsimile: (559) 435-9868
E-mail: rileywalter@w2lg.com

Chapter 9 Counsel

MCCORMICK BARSTOW, LLP
Timothy L. Thompson #133537
Mandy L. Jeffcoach #232313
Niki E. Cunningham #277976
7647 N. Fresno Street
Fresno, CA 93720
Telephone: (559) 433-1300
Facsimile: (559) 433-2300
E-mail: mandy.jeffcoach@mccormickbarstow.com

District Counsel

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re<br><br>**TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER,**<br><br>Debtor.<br><br>Tax ID #: 94-6002897<br>Address: 869 N. Cherry St.<br>Tulare, CA 93274 | CASE NO. 17-13797<br><br>DC No.: WW-4<br><br>Chapter 9<br><br>Date: N/A<br>Time: N/A<br>Place: 2500 Tulare Street<br>Fresno, CA 93721<br>Courtroom 13<br>Judge: Honorable René Lastreto II |

**STATEMENT OF QUALIFICATIONS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT BY TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER**

///

///

///

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................. 3

II. CHAPTER 9 ELIGIBILITY ................................................................................ 4

III. BACKGROUND ................................................................................................. 5

   A. EVENTS LEADING UP TO A CHAPTER 9 FILING ..................................... 5

      1. TRMC'S Deteriorating Financial Situation ............................................. 12

   B. TRMC FILED ITS CHAPTER 9 PETITION .................................................. 14

IV. TRMC IS ELIGIBLE TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE ................................................................................ 15

   A. TRMC IS A MUNICIPALITY ........................................................................ 15

   B. STATE LAW AUTHORIZES THE PETITION .............................................. 15

   C. TRMC IS INSOLVENT .................................................................................. 16

   D. TRMC DESIRES TO EFFECT A PLAN TO ADJUST ITS DEBTS ................. 17

   E. TRMC WAS UNABLE TO NEGOTIATE WITH ITS CREDITORS BECAUSE SUCH NEGOTIATION WAS INPRACTICABLE AND TRMC REASONABLY BELIEVED THAT A CREDITOR WAS ATTEMPTING A TRANSFER AVOIDABLE UNDER SECTION 547 OF TITLE 11 ................................................................. 17

      1. Negotiation Impracticable ....................................................................... 17

      2. Threat of Avoidable Transfer ................................................................. 18

   F. TRMC FILED ITS PETITION IN GOOD FAITH ........................................... 19

V. CONCLUSION ................................................................................................... 20

TO THE HONORABLE RENÉ LASTRETO II, UNITED STATES BANKRUPTCY JUDGE:

Tulare Local Healthcare District, dba Tulare Regional Medical Center ("TRMC" or the "District" or the "Debtor"), submits the following Statement of Qualifications and Memorandum of Points and Authorities as follows:

## I. INTRODUCTION

After several years of community turmoil, after the District[1] was out of cash and not paying its utility bills, after payrolls were missed, creditors were not paid, numerous lawsuits were filed, after the patient census plummeted, after the medical staff's privileges were terminated and ceased to refer patients, after Southern California Edison threatened to shut off the power due to unpaid utility bills after direct interference with governance of the District, after the funds available to pay operating expenses dropped to less than zero, and maybe over drafted, after TRMC's management company attempted to preferentially pledge District assets for a loan and grant itself liens on District assets, and after its management company refused to provide meaningful financial information to the elected board and threatened to shut down the hospital, on September 30, 2017, TRMC filed a Chapter 9 petition.[2]

The financial position of TRMC has precipitously dropped in the past two years. Although the District's Board was not provided with critical financial information from the management company, Healthcare Conglomerate Associates, LLC ("HCCA") until very recently (and only partially) and cannot vouch for the accuracy of the financial disclosures made by HCCA, the District believes the position of TRMC has been as follows[3]:

---

[1] For an overview of the District and its assets and operations see the Declaration of Director Mike Jamaica filed concurrently herewith.
[2] The background to the filing of this Chapter 9 case has been addressed extensively in connection with the Motion for Authorization to Reject Executory Contract (Document No. 104, Exhibits 1-35), Tim Thompson (Document No. 106, Exhibits A-Q) and are not repeated here. The referenced declarations are incorporated herein by response.
[3] This information was provided by HCCA's CFO, Alan Germany, at a public board meeting held on September 27, 2017. See the Declaration of Kevin B. Northcraft (Document No. 107 and Document No. 113 and Declaration filed the date of this Statement of Qualifications). The information for September 30, 2017 was supplied by Hagop T. Bedoyan. Some information was supplied by Marc Levinson to Tim Thompson on September 12, 2017 as shown on Document No. 106.

|    | Cash | Accounts Receivable | Accounts Payable |
|---|---|---|---|
| 12/31/2014 | $10,513,677 | $24,848,284 | $17,323,919 |
| 12/31/2015 | $15,224,195 | $23,950,656 | $14,726,480 |
| 03/31/2016 | $12,472,924 | $25,871,462 | $14,077,829 |
| 06/30/2016 | $11,827,593 | $28,199,887 | $13,962,541 |
| 09/30/2016 | $7,169,579 | $34,177,767 | $14,447,880 |
| 12/31/2016 | $8,617,296 | $36,031,020 | $15,535,564 |
| 03/31/2017 | $3,622,318 | $46,145,864 | $17,823,266 |
| 06/30/2017 | $2,088,851 | $54,594,185 | $26,690,107 |
| 09/30/2017 | Told Zero[3] | $48,000,000[4] | $28,000,000+[3] |

Given its cash flow insolvency and severe cash shortage, given all of all HCCA's threats to shutdown, having concluded that negotiation with its creditors was impracticable and that preferential or avoidable transfers were threatened, on September 29, 2017 the board of directors of TRMC (the "Board") unanimously adopted a declaration of fiscal emergency and authorized the filing of the Chapter 9 petition.

TRMC hereby files its Statement of Qualifications Under Section 109(c) in which it certifies that it satisfies the eligibility criteria set forth in Section 109(c). Below, TRMC details the facts and law that demonstrate that its certification is correct, and that TRMC is eligible to be a debtor in a Chapter 9 case.

II. **CHAPTER 9 ELIGIBILITY**

To be eligible TRMC must satisfy 11 U.S.C. § 109(c). TRMC must show it:

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

---

[4] The collectible Accounts Receivable are believed to be worth far, far less due to mandated discounts, write offs, billing errors, software problems, and etc.

STATEMENT OF QUALIFICATIONS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT BY TRMC  -4-  M:\S-U\TRMC\PLEADINGS\WW-4 Statement of Qualifications\Statement of Qualifications.102617.gaa.docx

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of title 11.

## III. BACKGROUND

TRMC filed its Chapter 9 petition on September 30, 2017. TRMC took this action only after considering other alternatives and only after consultation with its attorneys and the community it serves and after concluding that in the business judgment of the elected, sworn directors a chapter 9 proceeding was necessary to recover control over the District's assets, to prevent a shutdown of the hospital, and to begin the process of rebuilding community trust and proposing a plan to repay creditors.

By way of understanding, the HCCA Contract obligates the District to pay HCCA roughly $3 million for management and, in addition, another $5-7 million for the 30% override on employee compensation, which is very substantially above market for a District of this size.

### A. EVENTS LEADING UP TO A CHAPTER 9 FILING

TRMC has had a tortured history for several years. There have been many public disputes over elections, bond measures, and etc. The chronology of the pre July 27, 2017 descent into insolvency is provided above at page 4 and need not be repeated

here. Public reports in area newspapers are referenced in the Northcraft Declaration filed concurrently in support of this Statement of Qualifications.

- July 27, 2017 – The majority of the Board voted to rescind any authority given to HCCA to seek any loans on behalf of TRMC. HCCA claimed this vote is invalid and attempted to thwart recognition of Gutierrez as a board member, despite her election on July 11 by a clear majority of more than 75%.

- September 2017 - TRMC governance issues and disputes with HCCA cause credit rating to further downgrade.

- September 8, 2017 - HCCA issued a notice of default to TRMC claiming TRMC owes it $8 million including expenses and charges incurred in connection with "leased" employees. HCCA also claimed TRMC is $526,066.86 past due in management fees. HCCA has not accounted for these claims, despite request.

- September 11, 2017 – The Tulare County District Attorney files a Petition for Writ of Mandate in the Tulare County Superior Court asking for an order naming Gutierrez as a board member. The writ was denied only after HCCA attorneys assured the Court that Gutierrez would be seated at the September 27, 2017 board meeting.

- September 15, 2017 – HCCA files a lawsuit in Los Angeles County Superior Court against TRMC alleging breach of contract. The lawsuit was not served on the District's Board until the emergency board meeting on September 27, 2017.

- September 27, 2017 – Efforts by HCCA and former Board members to thwart seating Senovia Gutierrez to the Board are concluded, and all members of the Board voted unanimously reconfirm decisions made July 27, 2017 to seat and recognize Ms. Gutierrez as a board member effective as of July 25, 2017 when she was administered the Oath of Office. All Board actions and resolutions after Gutierrez' election have been valid and proper.

- September 28, 2017 – HCCA informed the public and employees it is unable to make payroll and threatened to shut down all operations due to mounting significant financial issues and lack of available funds.

- September 29, 2017 – TRMC Board of directors held a public session and unanimously voted to seek Chapter 9 bankruptcy protection.

- September 30, 2017 – Petition for relief under Chapter 9 is filed[5].

The current board of TRMC believes that the genesis for the financial decline was in 2014, when a prior board of directors imprudently, and possibly illegally, entered into a 15 year contract ("Contract") with Healthcare Conglomerate Associates, LLC ("HCCA"). The main components of the Contract are detailed in the declaration of Kevin B. Northcraft (Document No. 34), chief among which were that control over all District operations and finances was given over to HCCA and that HCCA would be paid a management fee costing approximately $9 million per year. As a result of the Contract, all of the District's money and control thereof was turned over to HCCA, members of the Board were not allowed to enter onto District property without the consent of HCCA, and the Board was denied meaningful financial information. Northcraft Decl. (Document No. 104).

It is important that the Court understand just how sweeping and unfavorable to the District the Contract is. HCCA prepared the board agendas, controlled all incoming mail, unilaterally contracted with its own affiliates, paid enormous sums to its own managers, paid itself a 30% override on employee expenses, controlled all disbursements (the Board did not even know where the deposits were made), loaned and transferred the Debtor's assets and money to a failing district over which HCCA was the manager. In short, HCCA displaced the Board and usurped important governmental powers.

The Contract lead to widespread community and voter controversy. This lead to the recall of Parmod Kumar, M.D. on July 11, 2017 as director. Dr. Kumar was widely viewed as the leader of the community faction favoring HCCA. (Dr. Kumar was much rewarded for his support of HCCA.)

The recall of Dr. Kumar by 81% of votes was preceded by voter rejection of the

---

[5] See the Declaration of Kevin B. Northcraft filed concurrently with this Statement of Qualifications which details events occurring after September 30, 2017 for a brief chronology of the post-petition events up until date of this Memorandum.

new bond election in August 2016, which was heavily promoted by HCCA and advocated by HCCA and the then board. It was defeated by a large margin, showing the voter's dissatisfaction with the hospital management.

Once Dr. Kumar was recalled the new board, which was not differential to HCCA, began to seriously question and challenge HCCA's management of the public district. This questioning lead to significant conflict between Dr. Benveezi, HCCA's CFO, and the new board.

This culminated when Senovia Gutierrez was elected on July 11, 2017, giving the community faction opposed to HCCA's domination of the board and District. However, despite the clear electoral victory for Director Senovia Gutierrez, HCCA, thru its control over the District's then counsel (which had also been HCCA's counsel), asserting California's open meeting law, the Ralph M. Brown Act, and its own failure to include Gutierrez's seating as an agenda item, refused to acknowledge her election so as to cling to control, and attempt to obtain secured loans without the Board's consent, a result of which was the District Attorney filing a Petition for Writ of Mandate with the Tulare County Superior Court, as well as a Quo Warranto action to conclusively settle the legal question regarding the point at which an elected board member assumes official powers and responsibilities following a recall election, thus forcing HCCA's hand.

On September 27, 2017, Ms. Gutierrez was seated by vote of all of the members of the Board (including Director Richard Torrez who was a supporter of HCCA) and on the same day Director Torrez resigned. See the declaration of Kevin Northcraft as to HCCA's intentional omission of an agenda item relating to an HCCA arranged loan.

It should be noted that from January 2017 to the Petition Date the board sought meaningful financial information from HCCA and was rebuffed at every occasion. See the declaration of Kevin B. Northcraft (Document No. 34). See also the Declarations of Tim Thompson (Document Nos. 106, 107 and 113).

Only a very small portion of the requested information has been provided even as of the date of this Statement. HCCA essentially kept the board in the dark and has

continued to do so. It has consistently thwarted the new board in getting financial information about its management or mismanagement of the District's finances.

By early 2017 it was becoming increasingly apparent that the District's finances were seriously deteriorating. See page 4 for the financial free fall.

In addition to the HCCA contract issues and controversies surrounding board, TRMC was a named in 18+/- lawsuits still pending as of the date the Chapter 9 petition was filed. Those suits are described below.

| Case Details | Underlying Nature of Lawsuit |
|---|---|
| Thomas Drilling, et al. v. Sherrie Bell, et al.; Tulare County Superior Court; Case No. VCU267051 | Request for declaratory and injunctive relief; Taxpayer action to enjoin Illegal Expenditure or Waste of Public Funds. |
| Deanne Martin-Soares, et al. v. Tulare Local Healthcare District, et al.; Tulare County Superior Court; Case No. VCU266902 | Request for declaratory and injunctive relief; Request for production of documents under the Public Records Act. |
| David Phelps v. Bruce Greene, et al.; Tulare County Superior Court; Case No. VCU270681 | Request for declaratory relief re violation of Government Code §§ 1090, 87100; Recovery of funds expended in violation of Article XVI, §6 of the California Constitution. |
| Jon Opper, et al. v. Tulare Regional Medical Center; Tulare County Superior Court; Case No. VCU263554 | Medical Malpractice |
| Richard Metcalf, et al. v. Tulare Regional Medical Center; Tulare County Superior Court; Case No. VCU252446 | Medical Malpractice |
| Candice Anderson v. Parul Gupta, et al.; Tulare County Superior Court; Case No. VCU267737 | Medical Malpractice |
| Thomas J. Griesbach, et al. v. Tulare Regional Medical Center; Tulare County Superior Court; Case No. VCU 270010 | Medical Malpractice |

| | |
|---|---|
| Phillips Healthcare v. Tulare Regional Medical Center; Tulare County Superior Court; Case No. VCU271244 | Collections |
| John Torrez, III, et al. v. Tulare Local Healthcare District; Tulare County Superior Court; Case No. VCU268786 | Medical Malpractice |
| Graham Prewett, Inc. v. Tulare Local Healthcare District; Tulare County Superior Court; Case No. VPU269517 | Breach of Contract/Warranty |
| The People of the State of California v. Richard Torrez; Tulare County Superior Court; Case No. VPU271086 | Writ of Mandate (District not named as a party.) |
| Senovia Gutierrez v. Tulare Local Healthcare District; Tulare County Superior Court; Case No. VPU271265 | Declaratory Relief |
| Specialty Laboratories, Inc. v. HCCA Tulare Regional Medical Center; Tulare County Superior Court; Case No. 269056 | Writ of Mandate |
| Jaime Calderon, et al. v. Tulare Regional Medical Center U.S. District Court, Eastern District of California; Case No. 1:17-cv-00040 | Wrongful Death; Medical Malpractice |
| Firstsource Solutions, LLC v. Tulare Regional Medical Center, et al.; U.S. District Court, Eastern District of California; Case No. 1:15-cv-01136 | Breach of Contract |
| Lori Brooks v. Tulare Local Healthcare District, et al.; Tulare County Superior Court; Case No. VCU266862 | Medical Malpractice |
| Tulare Regional Medical Center Medical Staff v. Tulare Local Healthcare District, et al.; Tulare County Superior Court; Case No. VCU264227 | Writ Mandate – Termination of Medical Staff |

| Juanita Cabrera v. Tulare Regional Medical Center; Tulare County Superior Court; Case No. VCU268660 | Medical Malpractice[6] |

While several of these suits are fairly typical of a hospital, several others stem from actions and non-action by HCCA, including the very damaging suit for damages for termination of medical privileges, collection lawsuits, and PRA actions. All of these expenses were the results of HCCA's management.

All of these swirling controversies came to a head around July 27, 2017, when the board faction opposed to HCCA terminated then district's legal counsel that had been hand-picked by HCCA (having been Dr. Benveezi's own attorney and the attorney who formed HCCA and Medflow, another Benveezi entity, and the attorney for Southern Inyo Healthcare District) and engaged new counsel, McCormick Barstow, LLP, of Fresno.

New counsel immediately set about to, among other tasks, obtain critical financial information and documentation necessary to the District's operations, ascertain the true financial condition of the District including the status of TRMC's accounts payable and receivable, obtain copies of the District's legal files from prior counsel so as to assess the status of all litigation pending against the District (which files have not been received), assess and advise the District on the availability of relief via Chapter 9 bankruptcy filing, secure an advisor to the Board with experience in financially distressed hospitals and Chapter 9, and evaluate the Contract with HCCA.

All of this then lead to a board meeting held September 27, 2017, at which time HCCA's (and the District's) CFO, Alan Germany, publicly stated the District was "in dire circumstances" and "out of money." Northcraft Decl. filed concurrently.

After Mr. Germany had informed the board the District was "out of money," Dr. Benny Benzeevi, the CEO of HCCA, at the very same meeting, with Mr. Germany

---

[6] As of the date of this Memorandum HCCA was delinquent in paying the District's malpractice premiums for September and October and unable to cover deductibles on new matters.

presented in the room, told the board it "had only two options". Take a loan arranged by HCCA (*which he did not describe or provide any details*), or shut down.

The very next day HCCA called a meeting of employees and Mr. Germany publicly informed them that the board had not taken the loan arranged by HCCA and thus HCCA could not pay the employees. In fact, neither Dr. Benveezi or Mr. Germany had provided to the Board any details as to the so called loan.

On September 28, 2017, HCCA failed to pay all employees and Mr. Germany told the employees that the hospital would be shut down.

At 9:00 p.m. on Friday night September 29, 2017, after broad community input, the board adopted a declaration of fiscal emergency and directed the immediate filing of the Chapter 9 petition. On Saturday, September 30, 2017, at 1:51 p.m., the Chapter 9 Petition was filed.

1. **TRMC'S Deteriorating Financial Situation**

Census Decline

TRMC's revenues come from patient services. However, a hospital has very high fixed costs due to regulations enacted to ensure patient safety, which require high levels of staffing. Although there are far fewer patients, the staffing needs do not change very much. Largely due to HCCA's termination of many fine Tulare physicians the referral base and hospital census has plummeted.

At the board meeting on September 27, 2017 CFO Germany acknowledged the decline in the patient census. Dr. Benveezi also made remarks and the CFO was in attendance. In his remarks Dr. Benveezi made no mention of any details or remarks as to any loan purportedly arranged by HCCA. HCCA did not list a loan discussion or approval on the September 27, 2017 it prepared, which is required for the board to take any action. HCCA clearly had no intent to provide the board with any option other than shutting down. When Dr. Benveezi requested an emergency meeting the following day, we scheduled one for September 29, 2017 and listed a possible loan as an agenda item. We did not know when we rushed to set up this emergency meeting it was Yom

Kippur, and understand why Dr. Benveezi was not present. However, HCCA has more than 500 employees and multiple lawyers, yet none attended to provide the loan information and recommendation. Dr. Benveezi said the loan was so urgent it required a special meeting in his correspondence just a day before. Northcraft Declaration filed concurrently with this Statement of Qualifications.

As the census declines the revenues decline but the high fixed costs remain, thus creating a crisis. It is necessary to have a large staff even for a very few patients.

### Cash Position

As of September 30, 2016, there was $7,169,579 of cash. One year later, on September 30, 2017, there was almost no cash and the District's accounts may have been overdrafted. Payroll was being made on a rolling basis. Only critical expenses were being paid. Many vital creditors were not being paid including key software providers, critical service providers, malpractice coverage, insurances and suppliers of goods and supplies.

### Receivables

As of September 30, 2016, there was $34,177,767 of outstanding receivables. Based on a report finally received on October 13, 2017 there was about $48,000,000 of A/R. However, much of this is old or not code compliant or otherwise not collectible. The District has not been given access to the billing information to figure out what is likely to be received. Why HCCA allowed such an incredible build up is not yet known but the fact is that poor revenue cycle management has occurred.

### Payables

As of September 30, 2016, there were $14,447,880 of accounts payable. A year later, on September 30, 2017, payables had ballooned to well over $28,000,000 of accounts payable, including an asserted claim by HCCA for over $9,000,000 for which no documentary support has been provided despite request. Several absolutely critical obligations were not paid, including a Southern California Edison bill for over $350,000 and a major creditor, Navigant Cymetrix, was owed over $2,000,000. Malpractice

premiums and insurances were unpaid.

### Physicians

The heart of any hospital are the referring physicians. Many of the referring physicians have ceased to refer patients to the hospital citing serious concerns about HCCA's management and HCCA's termination of the medical privileges. The very actions of HCCA cut off the flow of patients to the hospital. The referring physicians were insulted and, as a result, the consensus plummeted.

### Bonded Indebtedness

There is over $85,000,000 of bonded indebtedness. Payment was current as of September 30, 2017 however it is not yet known if any bond proceeds have been improperly utilized.[7] The misuse, if any, may have happened prior to the HCCA Contract. See the Declaration by Kevin B. Northcraft filed concurrently.

### Employees

All employees are employed by HCCA and leased to the District for which HCCA receives a *30% bonus over and above the actual salaries.* This is on top of the escalating management fee of over $250,000 per month. As of October 13, 2017 fewer than all employees had received their October 11, 2017 paycheck.

Simply put, HCCA ran TRMC into the ground and the only way to avoid a shut-down was to file Chapter 9.

Immediately after filing the board engaged WIPFLi, LLP/HFS to serve as the district manager/crisis manager and commenced discussions about recovering on $48,000,000+/- of unrecovered or unbilled charges, financing and selection of an interim operator of the hospital, and engaged in discussions with HCCA for rejection[8] of the Contract and an orderly turnover of hospital operations, which discussions failed.

**B.    TRMC FILED ITS CHAPTER 9 PETITION**

On September 27, 2017, TRMC's board of directors voted to authorize TRMC to file a Petition for relief under Chapter 9 of the Bankruptcy Code expressing serious

---

[7] The October 15, 2017 revenue bond payment was not made.
[8] On October 25, 2017 the Court ruled on the Motion to Reject the Contract.

STATEMENT OF QUALIFICATIONS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT BY TRMC    -14-    M:\S-U\TRMC\PLEADINGS\WW-4 Statement of Qualifications\Statement of Qualifications.102617.gaa.docx

concern that the management company said it was out of money, had not paid employees, was threatening a shut down and was told that HCCA was intending to (or had already) pledged district assets to pay itself. TRMC filed its Chapter 9 Petition on September 30, 2017.

## IV. TRMC IS ELIGIBLE TO BE A DEBTOR UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

Chapter 9 affords a municipality temporary protection from debt collection efforts so that it may establish a plan of adjustment with its creditors. *In re Valley Health Sys.*, 383 B.R. 156, 163 (Bankr. C.D. Cal. 2008). To be eligible for relief under Chapter 9, a petitioner has the burden to show that it is eligible to file under 11 U.S.C. § 109(c). *In re City of Stockton*, 475 B.R. 720, 725-26 (Bankr. E.D.Cal. 2012), *Int'l Assn. of Firefighters; Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. BAP 2009); *Valley Health*, at 161. The eligibility requirements of Section 109(c) are to be broadly construed to provide "access to relief in furtherance of the Code's underlying policies." *Vallejo*, at 288 (quoting *Valley Health*, at 163). The burden of proof, is the preponderance-of-evidence standard. *In re City of San Bernardino*, 499 B.R. 776, (Bankr. C.D. Cal. 2013), citing *Collier § 109.04[3]*.

As detailed below, TRMC asserts it has carried its burden of proof and is eligible to be a debtor under Chapter 9.

### A. TRMC IS A MUNICIPALITY

The petitioner under Chapter 9 must be a municipality. See 11 U.S.C. § 109(c)(1). 11 U.S.C. § 101 (40) defines a municipality as a "political subdivision or public agency or instrumentality of a State." 11 U.S.C. § 101 (40). TRMC is a political subdivision of the State of California and is a municipality organized in 1947 as a California healthcare district.

### B. STATE LAW AUTHORIZES THE PETITION

A Chapter 9 petitioner must be specifically authorized under California law to be a debtor. Government Code Section 53760 requires that municipalities either

participate in a "neutral evaluation process" <u>or</u> utilize the emergency off-ramp by declaring a fiscal emergency and adopting a resolution by a majority vote of the governing board.

TRMC has demonstrated that it has in good faith complied with the statutory requirements. There was a long lead up to the public meeting on September 29, 2017 when TRMC's board declared a fiscal emergency and made findings that TRMC "is or likely will become unable to meet its financial obligations as and when those obligations are due or become due and owing," that "numerous reports of new UCC filings evidence possible preferential transfers of the Tulare Local Healthcare District's assets," and "[a]bsent a Chapter 9 filing, the fiscal condition of TRMC puts the health, safety, and welfare of its patients in jeopardy."

### C. TRMC IS INSOLVENT

After years of financial mismanagement and struggle, the day of reckoning has come. TRMC is broke; it needs relief from this Court to preserve its hospital, and to continue to operate, pay its creditors, and serve the people of the district.

A municipality is insolvent if it is not paying its bona fide debts as they come due or is unable to do so. *Int'l Assn. of Firefighters; Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. BAP 2009). Insolvency is determined based on the debtor's financial condition as of the date the petition is filed, in this case, September 30, 2017. *In re City of Bridgeport*, 129 B.R. 332, 337 (D. Conn. 1991). Insolvency is primarily evaluated under a cash flow analysis, as opposed to a balance sheet or budget deficit analysis. *Id*. If the debtor does not have the cash flow to meet its current debts it is insolvent.

TRMC was clearly insolvent as of the date of its Chapter 9 petition because it had zero cash on hand as of the Petition Date and over $28,000,000 in payables. See page 4. TRMC Is flat broke and out of money. By HCCA's own admissions the District was in "dire circumstances" and "out of money" as of September 27, 2017. Northcraft Declaration filed concurrently. Moreover, even if HCCA could have borrowed money

STATEMENT OF QUALIFICATIONS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT BY TRMC  -16-  M:\S-U\TRMC\PLEADINGS\WW-4 Statement of Qualifications\Statement of Qualifications.102617.gaa.docx

as a short term band aid the borrowed funds would not have addressed the over $28,000,000 of accounts payable.

As noted above, insolvency for Chapter 9 purposes is determined by a projected cash flow analysis. The question is whether, as of the date the petition was filed, TRMC "will be able to 'pay its bills as they become due'." *In re City of Bridgeport*, 129 B.R. 332, 337 (D. Conn. 1991). The answer to that question is unquestionably "no."

Absent protection under Chapter 9, TRMC will go out of business almost immediately and will be unable to continue to provide critical services to the people of the District.

### D. TRMC DESIRES TO EFFECT A PLAN TO ADJUST ITS DEBTS

No bright-line test exists for determining whether a debtor desires to effect a plan. It is a subjective test. See the concurrently filed Declaration of Kevin Northcraft wherein the Board chair declares that TRMC is not stalling but is being proactive at replacing HCCA and wishes to reorganize and propose a plan of adjustment.

After three years of declining revenues, contentious litigation, governance disputes, failed construction projects and mismanagement, it is clear to TRMC that it had no other option but to make a declaration of fiscal emergency to file a Chapter 9 petition to adjust its debts.

### E. TRMC WAS UNABLE TO NEGOTIATE WITH ITS CREDITORS BECAUSE SUCH NEGOTIATION WAS INPRACTICABLE AND TRMC REASONABLY BELIEVED THAT A CREDITOR WAS ATTEMPTING A TRANSFER AVOIDABLE UNDER SECTION 547 OF TITLE 11

In many cases the debtor must negotiate with its creditors before filing the petition. This was not possible here.

#### 1. Negotiation Was Impracticable

TRMC was unable to negotiate with its creditors because such negotiation was impracticable. See the Declaration of Kevin B. Northcraft filed concurrently. Whether

negotiations with creditors is impracticable depends upon the circumstances of the case. *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 714 (Bankr. W.D. Wash. 2009). "Impracticable" means "not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible." In Chapter 9, a debtor may demonstrate impracticability by the sheer number of its creditors or by its need to file a petition quickly to preserve its assets.

Here there was no time to negotiate with creditors given HCCA's threat to shut the hospital down. HCCA's refusal to provide basic financial information to TRMC which was necessary to engage in such negotiations, and the sheer number of parties competing for too few dollars made it highly unlikely that a global restructuring plan would have been achieved voluntarily.

Moreover, TRMC could not negotiate with creditors because it did not know who its creditors were because HCCA would not tell TRMC. TRMC has since been informed (on October 12, 2017 after repeated requests) that there are over 600 creditors. *See In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 276 (Bankr. S.D.N.Y. 2010) /// ("Courts frequently find that negotiations are impracticable where debtors have large numbers of creditors"). They may also show impracticability by their need to file a petition quickly to preserve their assets or to act quickly to protect the public from harm.

Simply put, TRMC could not negotiate because HCCA would not provide a listing of the creditors with claims against the District and there were simply too many creditors and no time given HCCA's threat to shut the hospital down.

### 2. Threat of Avoidable Transfer

Under 11 U.S.C. § 109(c)(5), one of the alternative tests in determining Chapter 9 eligibility is whether the debtor reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under Section 547 of Title 11. Here, TRMC was faced with numerous reports of HCCA soliciting new loans (despite withdrawal of authorization) and of new UCC filings evidencing possible preferential transfers of its assets. These threats of preferential transfers contributed to the Board's decision to

declare a fiscal emergency at the September 29, 2017 public hearing. See the UCC search attached as Exhibit E to the concurrently filed Declaration of Kevin Northcraft, showing recently filed financing statements by Leasing Innovations, Inc.[9]

### F. TRMC FILED THE PETITION IN GOOD FAITH

Even if all of the requirements under § 109(c) are met, the Court may dismiss a chapter 9 petition if the debtor did not file the petition in good faith. 11 U.S.C. § 921(c).

Courts have looked at a number of factors to determine whether the debtor acted in good faith. *Pierce County*, 414 B.R. at 714; *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, at 278. These include: (i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by Chapter 9; (iii); whether the debtor filed its Chapter 9 Petition for reasons consistent with the purposes of Chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practicable; (v) the extent that alternatives to Chapter 9 were considered; and (vi) the scope and nature of the debtor's financial problems. *Pierce County*, at 714. All these were considered by the Board.

Chapter 9 is truly a last resort for TRMC. The current board seeks to regain control over its assets, operations and finances so it can restructure its operations and propose a plan of arrangement. The District is not trying to thwart its creditors. It is attempting to regain control so it can pay its just creditors and continue to operate the only hospital in the District using taxes paid by property owners in the District.

///
///
///
///
///
///
///

---

[9] Note that after the Petition Date TRMC learned that on September 28, 2017, with no notice to the Board, HCCA recorded a disputed deed of trust on TRMC's Evolutions property.

## V. CONCLUSION

For these reasons, TRMC is eligible to be a debtor under Section 109(c) and the Court should so rule.

Dated: October 26, 2017

WALTER WILHELM LAW GROUP,
a Professional Corporation

By: /s/ Riley C. Walter
Riley C. Walter, Attorneys for Debtor,
Tulare Local Healthcare District, dba Tulare
Regional Medical Center