40

1  WALTER WILHELM LAW GROUP
A Professional Corporation
2  Riley C. Walter #91839
Matthew P. Bunting #306034
3  Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
4  Fresno, CA 93720
Telephone: (559) 435-9800
5  Facsimile: (559) 435-9868
E-mail: rileywalter@w2lg.com
6
7  Chapter 9 Counsel

8  MCCORMICK BARSTOW, LLP
Timothy L. Thompson #133537
9  Mandy L. Jeffcoach #232313
Nikole E. Cunningham #277976
10 7647 N. Fresno Street
Fresno, CA 93720
11 Telephone: (559) 433-1300
Facsimile: (559) 433-2300
12 E-mail: mandy.jeffcoach@mccormickbarstow.com

13 District Counsel

14            IN THE UNITED STATES BANKRUPTCY COURT

15               EASTERN DISTRICT OF CALIFORNIA

16                  FRESNO DIVISION

17 In re                      CASE NO. 17-13797

18 TULARE LOCAL HEALTHCARE     DC No.: WW-9
DISTRICT, dba TULARE REGIONAL
19 MEDICAL CENTER,            Chapter 9

20            Debtor.        Date: January 11, 2018
                             Time: 9:30 a.m.
21 Tax ID #: 94-6002897       Place: 2500 Tulare Street
Address: 869 N. Cherry Street           Fresno, CA 93721
22            Tulare, CA 93274           Courtroom 13
23                              Judge: Honorable René Lastreto II

24 **EXHIBITS TO DECLARATION OF SANFORD HASKINS (CHIEF ADMINISTRATIVE
25 OFFICER) IN SUPPORT OF MOTION TO REJECT EXECUTORY CONTRACT
(MEDFLOW, PC)**

26 ///

27 ///

28

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | Emergency Services Agreement | 22 |
| B | Amendment to Emergency Services Agreement | 3 |
| C | Second Amendment to Emergency Services Agreement | 13 |

Dated: December _11_, 2017

WALTER WILHELM LAW GROUP,
a Professional Corporation

By: _____

Riley C. Walter, Attorneys for Debtor,
Tulare Local Healthcare District dba
Tulare Regional Medical Center



## EMERGENCY SERVICES AGREEMENT

This EMERGENCY SERVICES AGREEMENT (the "Agreement") is made and entered into as of the date affixed to the last signature at the end of this Agreement and is effective as of July 1, 2013 ("Effective Date") by and between Tulare Local Healthcare District, doing business as Tulare Regional Medical Center ("Hospital") and Medflow, LLC, a California limited liability company ("Group").

### RECITALS

A. TLHD is the owner and operator of an acute care general hospital known as Tulare District Hospital (the "Hospital"), located at 869 Cherry Street, Tulare, CA 93274 and in connection with its operations, the Hospital operates an Emergency Department in which basic emergency services are provided twenty-four hours per day. For purposes of this Agreement, required basic emergency physician services shall be referred to as the "Services".

B. Group is a California limited liability company engaged in the practice of medicine. and Group has entered into employment or independent contractor provider agreements with physicians and other allied healthcare professionals who are duly licensed by the State of California and experienced and qualified to provide the Services (individually a "Provider" and collectively "Providers").

C. Hospital desires to retain the services of qualified Providers who specialize in urgent care and emergency medicine services.

D. . Hospital and Group desire to enter into this Agreement to arrange for the provision of the Services at the Hospital as specified herein.

E. Hospital entered into a Corporate Integrity Agreement (CIA) with the Office of Inspector General of the Department of Health and Human Services which requires certain covenants and conditions into this Agreement for purposes of Hospital compliance with the CIA.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the parties hereto agree as follows:

1. Responsibilities of Group.

    1.1    The Group shall provide the Services reasonably required for the emergency department, urgent care and in-house emergency response care of the patients of the Hospital as determined by the Hospital and the Hospital's Medical Staff, consistent with community and generally accepted medical standards.

    1.2    The Group agrees that all Providers who render the Services must (i) be approved in advance by the Hospital; (ii) maintain in good standing their licenses to render the Services in the State of California; (iii) if physicians, be members of the Medical Staff holding appropriate clinical privileges at the Hospital to perform the

1

Services; (iv) if allied health professionals, be authorized to provide patient care services in accordance with the Medical Staff Bylaws and Rules; and (v) abide by the bylaws, rules and regulations of the Hospital, the Emergency and Urgent Care Services Department (collectively the "Department"), and of the Medical Staff, which include, without limitation, the timely completion of medical records.

     1.3     While this Agreement is in effect, Group shall provide Providers to cover the Department on a 24-hour per day basis every day of the calendar year, with a sufficient number, as determined in accordance with Exhibit A, of Providers physically present in the Hospital to provide full coverage of the Department at all times. The Hospital's CEO or designee must approve each such Provider before he or she is scheduled, which approval will not be unreasonably withheld or delayed. However, Hospital agrees to engage in a discussion with Group and make a good faith effort to remediate or cure any problem in conjunction with Group prior to disapproving or withdrawing its approval of any Provider. If Hospital requests immediate removal of a Provider, Hospital agrees to make a good faith effort to having the Medical Staff expedite the granting of temporary privileges for a substitute Provider. On or before the first day of each calendar month, Group shall provide to the CEO or designee and, following approval by the CEO or designee, shall post within the Department, a schedule of Providers assigned to provide coverage in the Department during the calendar month.

     1.4     In connection with the operation and conduct of the Services, the Group shall ensure that all Providers providing the Services shall, at all times, comply with all of applicable laws, rules and regulations of all governmental authorities having applicable jurisdiction. In addition, the Group shall ensure that all Providers shall comply with the Bylaws of the Hospital, with all other rules and regulations established by the Hospital or the Medical Staff that are applicable to the operation of the Department and with the terms and conditions of this Agreement.

     1.5     The Group shall ensure that all Providers, regardless of whether such physicians are employees of the Group or are engaged as independent contractors, shall abide by all of the terms and conditions of this Agreement applicable to Providers. Group reserves the right, in Group's sole discretion, to determine the compensation payable to each Provider working in the Department. Group shall indemnify, defend and hold Hospital harmless from any and all claims concerning compensation payable to Providers, or based on Group's failure or alleged failure to either compensate Providers or to pay any required payroll tax, income tax or other obligation relating to Providers. The indemnification obligations herein stated in this Section shall survive the expiration or earlier termination of this Agreement.

     1.6     The Group shall ensure that all Providers shall abide by all standards specified by the Healthcare Facilities Accreditation Program (the "HFAP"), the Joint Commission on Accreditation of Healthcare Organization ("Joint Commission") or Det Norske Veritas-DNV Healthcare ("DNV") (whichever is applicable), or any comparable deemed status organization in the current accreditation manual for hospitals and all regulations set forth in Title 22, Division 5 of the California Code of Regulations, the Emergency Medical Treatment and Active Labor Act ("EMTALA")and Health Insurance Portability and Accountability Act ("HIPAA"), with respect to the operation of the Department and the provision of the Services.

1.7     No part of the Department premises shall be used at any time by the Group or any of its Providers as an office for the general practice of medicine unless approved in writing by the Hospital.

1.8     The Group and its Providers desire to assist the Hospital in compliance with and documentation of its efforts to comply with Federal and State laws relating to the provision of health care items and services, and with the CIA.

2.      Medical Director

2.1     The Group shall appoint a qualified Provider and administrative director, as designated in Exhibit "B" attached hereto, to provide the services of a medical director of the Department (the "Medical Director"). If, during the term of this Agreement, the Medical Director so designated is unable or unwilling to continue to serve as Medical Director, the Group may appoint another qualified physician to serve as Medical Director, subject to the Hospital's approval, which will not be unreasonably withheld or delayed. The Medical Director shall meet the qualifications applicable to physicians and as provided in this Agreement, and shall continue to meet such qualifications at all times during the term of this Agreement.

2.2     The Medical Director shall supervise the operation of the Department and the provision of the Services and devote the best of his or her ability to the proper operation thereof, using the premises of the Hospital solely for the conduct of the Services. The Medical Director shall supervise and coordinate the provision of the Services and the operation of the Department in conjunction with applicable committees of the Medical Staff and administrative personnel of the Hospital. The Medical Director shall supervise and manage utilization of the Services, relations with the Medical Staff and such other aspects of the Services and the Department as the Hospital determines to be in the best interests of the Hospital in delivering quality patient care. The Medical Director shall work in collaboration with and report to the Chief Executive Officer of the Hospital.

2.3     The Medical Director shall attend Department medical staff conferences; furnish instruction in the Services to personnel of the Hospital as reasonably requested by the Medical Staff and administrative personnel of the Hospital; participate in all teaching, mandatory training, continuing education and other activities undertaken by the Hospital as are in accordance with the recommendations or requirements of the American Medical Association, the HFAP, Joint Commission or DNV (whichever is applicable) or any comparable deemed status organization, the United States Department of Health and Human Services, the California Department of Health Services and any national society relating to the Services with respect to the provision of the Services in hospitals of the type and size of the Hospital; and assist such committees of the Hospital and the Medical Staff and attend, organize and participate in such conferences and other activities in order to maintain and improve the quality of care provided by the Hospital and the Department. The Group acknowledges the importance of quality of care as a material component to this Agreement and recognizes the quality and performance categories identified in the attached Exhibit "C".

2.4     The Medical Director shall advise and provide consultation to the Hospital concerning the proper recruitment and training of Department personnel and shall supervise the training of such personnel; cooperate with and assist physicians on the Medical Staff with preparations of reports and assist with the preparation of studies for publication as

3

reasonably requested; and employ his or her best efforts to elevate the standing of the Medical Staff by publication of significant studies made in the Department.

      2.5      The Medical Director shall devote as much time to the operation and conduct of the Department as is necessary to provide proper and adequate service levels and to obtain maximum efficiency.

      2.6      At such times as the Medical Director is unavailable, his duties may be assumed by the Associate Director, as so designated on Exhibit "B" attached hereto who must be approved in writing in advance by Hospital.

      3.      <u>Responsibilities of Hospital</u>.

      3.1      The Hospital shall furnish for the use of the Department such space as is necessary, following consultation with the Group, for the proper and efficient operation of the Services.

      3.2      The Hospital shall furnish, at its expense for use in the Department, such equipment as is reasonably necessary, following consultation with the Group, for the proper operation and conduct of the Department. The Hospital shall also, at its sole cost and expense, keep and maintain the aforementioned equipment in good working order and shall repair or replace such equipment or any part thereof which becomes worn out or obsolete. The Group shall provide the Hospital with such recommendations concerning equipment changes as may be necessary from time to time and shall advise the Hospital of the need for any repair or replacement of equipment of which the Group is aware.

      3.3      The Hospital shall, at its sole cost and expense, furnish the Group with ordinary janitor and reasonable in-house messenger services, telephones, dictation and other appropriate and methods for electronic medical record keeping services recommended by Group, security services, switchboard services, laundry, gas, water, ice, heat and electricity for light and power as may be required by the Group and as may be available to the Hospital for the operation and conduct of the Department. The Hospital shall also provide the services of its supporting departments, including but not limited to nursing, radiology, cardiology and laboratory personnel, administrative, engineering, purchasing and medical records that are necessary for the proper operation and conduct of the Department.

      3.4      The cost of all supplies, such as but not limited to chemicals, glassware, gases, medications, linens, stationary, printed forms and office supplies, and similar expendable items that are necessary for the proper operation and conduct of the Department shall be provided by the Hospital.

      3.5      The Hospital shall be responsible for employing all personnel required for the proper operation and conduct of the Department other than Providers, and shall be responsible for the payment of any payroll taxes, and for all salaries and benefits to which such personnel may be entitled as employees of the Hospital. Hospital shall request and consider input from Group regarding the qualifications, category/type/level of and number of personnel to be provided by the Hospital to the Department.

4.     <u>Billing and Compensation</u>

     4.1      The Group shall be solely entitled to bill and collect for all professional services rendered to patients in the Department. Likewise the Hospital shall be solely entitled to bill and collect for all technical or facility services rendered to patients in the Department. Hospital shall pay to Group thirty (30) days from receipt of invoice for each quarter during the term of this Agreement, the amount determined in accordance with Exhibit "C", (the customer service and core measure performance payment "Value Based Purchasing Performance Payment"), via direct deposit or electronic transfer. The Hospital is in the process of establishing a monthly/quarterly electronic transfer mechanism and will be able to comply with this obligation as soon as the electronic transfer process is established, which is expected to be in place no later than six (6) months from the Effective Date of this Agreement.. Based upon the Hospital's performance data, if Group has met all the specified customer service and core measure performance criteria, then Hospital shall make the Value Based Purchasing Performance Payment, accordingly. If the Hospital's performance data is not available within fifteen (15) days after the end of the quarter after the quarter in which the performance is being reviewed, then the full Performance Payment shall be made by the Hospital to the Group. In such event, then after the performance data becomes available and is reviewed, then any amount not earned by the Group shall be deducted from the next quarterly Performance Payment, or in the event of termination of the Agreement, the Group shall immediately reimburse the Hospital for any overpayment. Any such deduction or entitlement to reimbursement is waived if not collected within six (6) months of the date the performance data was initially due. The Group and its Providers agree not to bill, nor cause to be billed, Medicare patients or Medi-Cal carriers for administrative, supervisory or other provider services except as appropriate for co-insurance payments and deducibles (if applicable), whether performed by the Group or its Providers or to in any other way violate 42 C.F.R. 405. 550(d)(3). The Group hereby agrees to indemnify, defend and hold Hospital harmless against any and all claims, expenses, liabilities, consequences and actual attorney's fees arising or resulting from or incurred due to the billing of Medicare patients or Medicare carriers for Group administrative and supervisory services, or other violation of 42 C.F.R. 405.550(d)(3), or of any other federal or state law, by the Group or its Providers.

     4.2      The Group's and its Providers' professional fees and charges shall be in accordance with the Hospital's pre-approved Group professional fee schedule and all amendments thereto ("Fee Schedule"), to be filed in the office of the Hospital's Controller, which are incorporated here by reference. The parties agree that within sixty (60) days of the effective Date of this Agreement, the Hospital and the Group will agree to an approved Group Professional Fee Schedule., Thereafter during the term of this Agreement, the Group and its Providers shall submit to the Hospital in writing any proposed changes to the fees and charges set forth in the Fee Schedule, except for annualized increases which shall not exceed the Medical Economic Index ("MEI") and such changes shall be deemed approved unless rejected in writing by the Hospital within thirty (30) days after receipt thereof. The Hospital shall not unreasonably deny or unreasonably withhold approval of increases (or decreases) in professional fees demonstrated to be reasonable, competitive and in general accordance with customary local fees for comparable specialty services provided to hospital patients. The Group's and its Providers' current professional fees, as reflected in the Fee Schedule currently in effect and previously approved by the Hospital, are agreed to be reasonable, competitive and in general accordance with customary local fees for comparable specialty services to Hospital patients.

4.3     Except as set forth in paragraph 4.1, the Group or Provider shall be responsible for, and solely entitled to, billing and collection of the fees for all professional services rendered as part of the Services by the Group and its Providers. The Group and Providers shall accept assignment with respect to third party payors, subject to the provisions of Section 4.5 below.

4.4     The Group and Provider shall reduce their charges to the extent and in the proportion that the Hospital charges are reduced or waived for any reason, unless insurance reimbursement is accepted by Group as payment in full, for the provision of the Services to (i) employees of the Hospital for injuries sustained by such employees in the course of their employment; (ii) indigent patients and patients to whom professional courtesy is extended; and (iii) visitors injured on the premises of the Hospital, provided however that such reductions are not in violation of STARK or other anti-kickback laws.

4.5     The Group understands that the Hospital may enter into agreements from time to time with prepaid health plans, health maintenance organizations, preferred provider organizations, IPAs, the Medicare or Medi-Cal programs or other public or private health and/or hospital care programs or insurance companies ("Payors") to provide health care services, including the Services, to the enrollees or other patients covered by such agreements ("Payor Agreements.")   The Group agrees to treat patients of the Hospital covered by the Payor Agreements and to use its best efforts and negotiate in good faith agreements covering compensation for professional Services, on terms commensurate with those contained in other emergency department contracts that the Group has in place in the Central California market and those contained in other contracts the Group or its affiliates have signed.   The Group shall enter into an agreement with all Payors with whom the Hospital has existing Agreements within ninety (90) days of the Effective Date of this Agreement. Following the execution of this Agreement, Hospital shall provide Group with a list of all Payors with whom Hospital has payor agreements and shall provide written notification of any modification to said list from time to time during the term of this Agreement.   Group shall provide reasonable notice to Emergency Department patients of all Payors with which Hospital has a payor agreement but Group does not, in a manner that is compliant with EMTALA.

4.6     In addition, Hospital will pay to Group, a Monthly Service Fee for the Emergency Department professional services rendered to individual patients at the Hospital. The Monthly Service Fee shall be in the amount of Fifty-Four Thousand, Twenty-Seven Dollars and 50/100 ($54,027.50) and paid for each month of the Term of this Agreement, on or before the twelfth (12th) of the month following the month in which services are rendered. Monthly Service Fee includes any travel, lodging, and meal expenses incurred by Group's Providers.

4.7     Incentive for Local Provider Residences. The parties agree that Hospital may enter into separate and distinct agreements with some Physician Providers to assist them to establish primary residences in Hospital's service area.   The purpose of such agreements shall be to facilitate efficient and effective delivery of emergency care by Providers committed to the community.   Group shall have no financial obligation and shall derive no financial benefit from such agreements.

4.8     Medical Director Administrative Services Fee. Hospital shall also pay to the Group the amount of One Hundred Fifty Dollars ($150.00) per hour, up to a maximum of thirty (30) hours per month, for a maximum of Four Thousand, Five Hundred Dollars

EXHIBIT A
Page 6 Of 22

($4,500.00) per month for the administrative services provided by the Medical Director, which shall be documented on a time allocation sheet, attached as Exhibit "D. Hospital and Group agree the compensation paid by Hospital to the Group for said administrative services is consistent with and does not exceed the fair market value of such administrative services. Time records shall be submitted to Hospital by the 15th day of the month following the month in which services were rendered. If the Medical Director's time record is not received within 15 days of the date due, the Group shall forfeit all compensation due for such Administrative services rendered during the month in question.

      4.9     The parties acknowledge that none of the benefits granted to the Group or its Providers hereunder are conditioned on any requirement that the Group or its Providers make referrals to, be in a position to make or influence referrals to, or otherwise generate business for the Hospital. Nothing in this Agreement or in any other written or oral agreement between the Group and the Hospital contemplates or requires the admission or referral of any patient to the Hospital. This Agreement is not intended to influence the judgment of the Group or its Providers in choosing the medical facility appropriate for the proper care and treatment of any patient.

    5.     <u>Term</u>

      5.1     This Agreement shall commence on the Effective Date and shall remain in full force and effect for an initial term of three (3) years, unless earlier terminated pursuant to this Section 5. Thereafter, this Agreement shall automatically renew for additional and successive three (3) year terms unless either party provides written notice of non-renewal at least ninety (90) days prior to the end of the then current term.

      5.2     The Hospital may terminate this Agreement upon the occurrence of any of the following events which shall constitute a breach hereunder, provided that Group may cure such breach within thirty (30) days of notice from Hospital and if the cure is reasonably expected to take more than thirty (30) days, the Hospital may not terminate this Agreement for lack of curing said breach, as long as the Group commences the cure within such thirty (30) day period and thereafter diligently prosecutes the cure to completion:

        (a)    Any conduct of Group or any of its Providers which in the good faith judgment of the Hospital, jeopardizes the health, safety or welfare of any patient of the Hospital, provided however, that if such Provider is promptly removed or suspended, such conduct by any Provider shall not solely give rise to the termination right herein.

        (b)    Group's failure to provide the Services specified in Section 1.

        (c)    The failure of any of Group's Providers to meet the qualifications specified in this Agreement; provided however, that if such physician is removed or suspended, then failure to meet such qualifications for that removed physician shall not solely give rise to the termination right herein.

        (d)    Conviction of any of Providers of any crime punishable as a felony, provided however, that if such physician is promptly removed or suspended or ceases rendering Services hereunder, then such conviction shall not solely give rise to the termination right herein.

7

(e)     The attempt to assign this Agreement without Hospital's prior written consent, which consent shall not be unreasonably withheld, other than to an entity controlled by the principals of Group.

5.3    The Group may terminate this Agreement upon Hospital's failure to render payment within thirty (30) days of when said undisputed payment is due, which shall constitute a default hereunder, provided that Hospital may cure such breach within fifteen (15) days of notice from the Group of such default.

5.4    Automatic Termination. If, after providing reasonable advance notice to the CEO of the Hospital, Yorai (Benny) Benzeevi, M.D. is no longer associated with the Group for any reason, then this Agreement shall automatically terminate, but such termination shall not be effective for up to one hundred-twenty (120) days to enable the Hospital to find a replacement group to render the Services. In the event of such termination, the Hospital will not enter into another contract for the Services with the Group or any of its members or principals, or any other group affiliated with any of such members or principals (other than Yorai Benzeevi, M.D.) for a period of one (1) year after the date of termination.

6.     Effect of Termination. Upon expiration or termination of this Agreement, the Medical Staff clinical privileges of Group's Providers shall be governed by the Bylaws, rules and regulations of the Medical Staff.

7.     Independent Contractor. In performing the services herein specified, Group is acting as an independent contractor, and neither Group nor Providers shall be considered an employee of Hospital. It is agreed and acknowledged by the parties that, as an independent contractor, neither the Group nor Providers have any right or entitlement to any employment related benefit, including Hospital's worker's compensation coverage. In no event shall this Agreement be construed as establishing a partnership or joint venture or similar relationship between the parties hereto, and nothing herein contained shall be construed to authorize either party to act as agent for the other. Group shall be liable for Group's own debts, obligations, acts and omissions, including the payment of all withholding, social security and other taxes and benefits. As an independent contractor, Group and its health care sub-contractors a r e responsible for filing such tax returns and paying such self-employment taxes as may be required by law or regulations. Neither Group nor Providers shall be subject to any Hospital policies solely applicable to Hospital's employees, and shall not be eligible for any employee benefit plan offered by Hospital. Group and Providers shall be subject to the procedures and policies established by the Medical Staff, including but not limited to the Professional Standards and Code of Conduct policies.

8.     Liability and Insurance

8.1    The Hospital shall, at its sole cost and expense, provide, keep and maintain throughout the entire term of this Agreement, insurance coverage for and on behalf of the Group, the Medical Director and all Providers in the minimum amount of One Million Dollars per person and Three Million Dollars in the aggregate (which may be adjusted from time to time if the Medical Staff requirements should change), for professional and negligence liability. The coverage shall include separate provider and entity coverage limits for Group and is affiliates, such that any payment made on behalf of a provider or entities does not

8

reduce coverage limits for other providers or any such entities. The insurance may either be purchased from an insurance carrier in California authorized to sell such insurance, or at the option of Hospital, may be procured by Group through its policies with AIG and with captive insurance companies formed by the Group and/or its affiliated entities, in which event Hospital shall reimburse Group at the rate of $8.60 per visit. Said insurance policies shall provide for at least thirty (30) days' written notice to the Hospital for cancellation or diminution in coverage of said policies to take effect. The Group shall provide the Hospital with a certificate evidencing such insurance coverage at the time this Agreement is executed, and upon the Hospital's request from time to time thereafter. Should Hospital provide insurance then they will provide at Group's request duplicate certificates describing the Groups insurance coverage. In either event Hospital shall provide tail insurance coverage in the event that this Agreement is terminated for any reason.

8.3    Hospital shall provide for itself, its agents and employees, general errors and omissions coverage. Hospital's coverage shall include coverage for the Medical Directors' duties or other Group physicians in participating on Hospital committees and for other service rendered to the Hospital in the capacity of Medical Director, Associate Director or Group staff physician, provided that such duties are provided in good faith, within the course and scope of this Agreement.

9.    Assignment.    Nothing contained in this Agreement shall be construed to permit assignment by Group of any rights under this Agreement and any such assignment is expressly prohibited, without the written consent of Hospital, which shall not be unreasonably withheld.

10.    Disagreements.    In the event that there is any disagreement as to changes in the schedule of charges, such disagreements shall be referred to the CEO of the Hospital for a decision. Any questions or disagreements concerning the standards of professional practice or performance, or the character or quality of the Services rendered shall be governed by the Medical Staff Bylaws, Rules and Regulations..

11.    Verification of Costs.    To the extent necessary to avoid disallowances of reimbursement pursuant to Section 1395x (v) (1) of Title 42 of the United States Code and regulations promulgated by the Health Care Financing Administration to implement Section 1395x (v) (1), until the expiration of four (4) years after the termination of this Agreement, the Group shall make available to the Hospital and the Secretary of the United States Department of Health and Human Services, upon written request, and to the Comptroller General of the United States General Accounting Office, upon written request, or to any of their duly authorized representatives, a copy of this Agreement and such books, documents and records as are necessary to certify the nature and extent of the costs of the Services provided by the Group under this Agreement. The Group further agrees that in the event the Group, with the consent of the Hospital, carries out any of its duties under this Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000.00) or more over any consecutive twelve (12) month period, with a related organization, such contract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of the Services pursuant to such subcontract, the related organization shall make available to the Hospital and the Secretary of the United States Department of Health and Human Services,

upon written request, and to the Comptroller General of the United States General Accounting Office, upon written request, or to any of their duly authorized representatives, a copy of such subcontract and such books, documents and records of such organization as are necessary to verify the nature and extent of such costs.

12.   Compliance Provisions

12.1    Fraud and Abuse.   The parties enter into this Agreement with the intent of conducting their relationship in full compliance with applicable federal, state and local law, including without limitation various rules, administrative rulings and procedures, laws and ordinances, statutes and regulations and interpretations thereof, relating to federal Anti-Kickback law and the Medicare/Medicaid Anti-Fraud and Abuse provisions. The Services to be provided under this Agreement do not involve the promotion of a business arrangement or activity that violates any federal or state law. Despite any unanticipated effect of any of the provisions of this Agreement, neither party will conduct itself under the terms of this Agreement in a manner to constitute a violation of the law.

12.2.    Compliance with Laws and Standards.

12.2.1 The parties shall fully comply with all applicable laws, rules or regulations of any and all governmental authorities relating to licensure and regulations of the Group, its Providers and the Hospital, as well as the provision of, and payment for services, including without limitation the federal Physician Self-Referral Law, 42 U.S.C. 1395nn, and the regulations promulgated thereunder, similar state physician self-referral laws and regulations, the federal Medicare/Medicaid Anti-kickback Laws and HIPAA, as well as community standards of practice. In addition, the parties shall operate in accordance with the standards and recommendation of the relevant accrediting bodies, including without limitation, TJC, DNV, CDPH, CMS, and CAP. This Section 9 will survive the termination of this Agreement. Either party may terminate this Agreement in the event that the other party is unable to comply with this Section, subject to the notice and cure provision in Section 5.2.

12.2.2  Provisions Relating to certain Federal Regulations and Tulare's Corporate Integrity Agreement.

12.2.2.1    Medical Staff Privileges at any Hospital.   The Group and its Providers may establish medical staff privileges at any other hospital. Although Tulare requires The Group's Providers to maintain Medical Staff privileges at Tulare as a condition for the Group receiving benefits under this Agreement, The Group's Providers are not required to make referrals to, be in a position to make or influence referrals to, or otherwise generate business for Tulare as a condition for receiving benefits under this Agreement. The Group's Providers may refer any item or service, or generate business for any other entity, of the Provider's choosing.

12.2.2.2    Code of Conduct and Policies and Procedures. By the Group's signature on this Agreement, the Group acknowledges receipt and that each of the Group's Providers providing services under this Agreement will review Tulare's

10



EXHIBIT A
Page 10 Of 22

*Compliance Policies and Procedures*, including the Code of Conduct and the Physician Referral, Stark law, and Anti-kickback Policies and Procedures. The Group will ensure each of its Providers who provide services under this Agreement at Tulare's Hospital Facility shall receive and agree to read and abide by Tulare's *Compliance Policies and Procedures*, including the Code of Conduct and the Physician Referral, Stark law, and Anti-kickback Policies and Procedures, as such may be revised from time-to-time. If requested, the Group and/or its Providers will acknowledge receipt of any such revision.

       12.2.2.3    <u>Stark/Kickback Law Certification</u>. The parties certify that they shall not violate the Anti-kickback Statute (42 USC §1320a-7b(b)) and the Stark Law (42 USC §1395nn) with respect to the performance of this Agreement.

Tulare Initials        Group Initials

       12.2.2.4    <u>Physician and Physician Family; Financial Relationships with Tulare</u>. The Group agrees that any *Financial Relationship* between it Providers or its Provider's *Immediate Family Member* (as such italicized terms are defined in Schedule 12.2.2.4) and Tulare or Tulare's affiliates, whether direct or indirect, must be disclosed and may be referred to in subsequent attachments to this Agreement or other agreements between the parties. The Group's Providers and their *Immediate Family Members* have no *Financial Relationship* with Tulare other than this Agreement and those set forth on Schedule 12.2.2.4, if any.

       12.2.2.5    <u>Compliance Training</u>. All individuals who meet the definition of Covered Persons under Tulare's Corporate Integrity Agreement ("CIA") must comply with Tulare's compliance program including training related to the Anti-Kickback Statute and Stark Law. The Group's Providers are Covered Persons. The Group's Providers, who provide services under this Agreement, must agree to receive such two (2) hours of training within 30 days of the commencement of his/her services, unless such Provider has already received Tulare's training. Each of the Group's Providers must further agree to receive at least one (1) hour of general training in each subsequent annual reporting period. Such training will be provided at Tulare's cost.

       12.2.2.6    <u>Meeting with Compliance Officer</u>. The Group's Providers, who provide services under this Agreement, will be required to meet with Tulare's Compliance Officer and other Tulare designees at reasonable times and places to assess compliance with Tulare's obligations under its CIA, and to provide additional information regarding same, in writing, if Tulare so requests. The Group's Providers shall provide full and complete responses, in connection with such an assessment or request for information.

11

    12.2.2.7      **Failure to Comply with the Corporate Integrity Agreement.** As one of Tulare's remedies, but not by way of limitation, subject to the notice and cure provisions in Section 5.2, Tulare may exclude any Group Provider from performing Services under this Agreement, or may delay or cease payment to the Group in whole or in part, if Tulare does not have the cooperation and compliance with meeting, consulting, certifying and reporting requirements of this Agreement, or if in good faith Tulare believes that ceasing a payment or practice hereunder would assist in the settlement of matters that may arise between Tulare and the Federal government, its agencies, or contractors under any Federally funded or Federally required health care program or between the State, its agencies or contractors under any State funded or State required health care programs. In the event that the Group and/or its Providers do not cooperate or comply with Tulare's written request concerning the foregoing, within 10 days of such request, Tulare shall be relieved of any obligation to pay sums then due, in addition to any other remedy it may have. No additional damage can be sought against Tulare if it deposits or places such delayed or unpaid funds in a segregated account to be distributed according to a declaratory or other judgment of a court or arbitrator. Further, subject to the notice and cure provisions in Section 5.2, this Agreement may be terminated by notice to the Group from Tulare, if Tulare's legal counsel determines, in good faith, that the continued performance of this Agreement violates any applicable law or materially conflicts with any accreditation standard, the Corporate Integrity Agreement, or Federal or State health care program requirements (and provided that such violation cannot be cured within a reasonable time period).

    12.2.2.8      **Federal Program Exclusion Lists.** The Group represents to Tulare that as of the signing date and at all times continuing through the expiration or earlier termination of this Agreement, none of the Group's Providers, nor any of their Immediate Family Members is an "Ineligible Person". An ineligible Person is a person currently excluded, debarred, suspended, or otherwise ineligible to participate in Federal health care programs, and procurement, or non-procurement programs. The Group represents to Tulare that none of the Group's Providers, nor any of their Immediate Family Members have pending and proceeding, or received notice of any action or proceeding hat would exclude, debar, suspend or otherwise declare the Provider or such Family Member ineligible under any federally funded health program while awaiting any civil or criminal action with the scope of 42 USC §1320a-7(a). The Group is not included on the HHSOIG list of Excluded Individuals and Entities, http://www.oig.hhs.gov, or the General Services Administration's list of Parties Excluded from Federal Programs available through the internet at http://www.epls.gov, or any combined or successor lists.

    12.2.2.9      **Non-Discrimination-Other Law.** In the performance of this Agreement, the Group and its Providers will not unlawfully discriminate against individuals under the applicable Federal or state laws. The parties will comply with the Civil Rights Act of 1964 as amended, and all other applicable anti-discrimination laws, regulations, and policies. As a recipient of Federal financial assistance, Tulare does not exclude, deny benefits to, or otherwise unlawfully discriminate against any person on the ground of race, color, or national origin, or on the basis of disability or age in admission to,

12

participation in, or receipt of the services and benefits under any of its programs and activities, whether carried out by Tulare directly or through the Group or its Provider or any other entity with which the Group's Provider arranges to carry out his or her obligations, program and activities. The Group and its Providers agree to abide by Tulare's non-discrimination policies and the rules, procedures and regulations that Tulare may adopt to effectuate such policies and will cooperate in any investigation Tulare may have related to a complaint implicated by Tulare's non-discrimination policy. Tulare and the Group's Providers shall comply with applicable law, including without limitation, laws and regulations application to patient confidentiality, access and patient care. The Group and its Providers agree to treat in a non-discriminatory manner any and all Patients receiving medical benefits or assistance under any federal health care program.

           12.2.3  Required Disclosures. The Group shall notify Tulare in writing within three (3) days after the Group receives actual notice that any of the following events occurred:

           12.2.3.1.  The Group's Provider's license to practice medicine in the State or any other jurisdiction lapses or is denied, suspended, revoked, terminated, relinquished or made subject to terms of probation or other restriction;

           12.2.3.2  The Group's Provider's Medical Staff membership and/or privileges at any health care hospital are denied, suspended, revoked, terminated, relinquished (under threat of disciplinary action), or made subject to terms of probation or other restriction;

           12.2.3.3  The Group's Providers providing services under this Agreement becomes the subject of an investigatory, disciplinary, or other proceeding before any governmental, professional, licensing board, medical staff or peer review body;

           12.2.3.4  An event occurs that substantially interrupts all or a portion of the Group's Provider's professional practice or that materially adversely affects the Group's Provider's ability to perform his or her obligations under this Agreement;

           12.2.3.5  The Group of any of its Providers become actually aware of any threatened, proposed, or actual exclusion or is otherwise deemed ineligible from any federally funded health care program, including without limitation Medicare and Medicaid;

           12.2.3.6  The Group or any of its Providers is convicted of or enters a plea of guilty or no contest to a criminal offense related to health care;

           12.2.3.7  The Group or any of its Providers shall notify Tulare in writing within three (3) days of becoming aware that the *Financial Relationship Disclosure* between Tulare and the Group or any of its Providers or their *Immediate Family Members* as identified on Schedule 12.2.2.4 is or has become inaccurate or incomplete.

12.2.3.8    The Group or any of its Providers are charged with an offense related to health care or an action is commenced for suspension, debarment or exclusion from participation in the Medicare or Medi-Cal programs, or any other state or Federal healthcare program, or The Group or any of its Providers is listed by a state or federal agency as being debarred, excluded or otherwise ineligible for participation in any state or Federal healthcare program.

12.2.3.9    Unauthorized disclosure of protected health information in violation of this Agreement or applicable laws, regulations, or rules.

13.    <u>General Provisions</u>

13.1    This Agreement constitutes the entire agreement between the parties hereto with respect to the Services and supersedes all prior and contemporaneous negotiations, understandings and agreements. This Agreement may not be modified or amended by the parties hereto except by a written instrument executed by both of the parties hereto.

13.2    This Agreement shall be governed by and construed in accordance with the laws of the State of California.

13.3    All notices or other communications that either party may desire or may be required to deliver to the other party may be delivered in person or by depositing the same in the United States mail, postage prepaid, certified or registered mail, addressed

If to Hospital:        Tulare District Hospital
                       869 Cherry Street
                       Tulare, CA 93274
                       Attention: Shawn Bolouki, CEO

If to Group:           Medflow, LLC.
                       Bruce Greene
                       BAKER HOSTETLER
                       12100 Wilshire Boulevard
                       15th Floor
                       Los Angeles, CA 90025

Either party may change the address to which notices are to be delivered by giving notice as hereinabove provided.

13.4    Section headings are inserted herein solely for the purpose of convenience of reference and shall not be construed as part of this Agreement.

13.5    The parties hereto agree to execute such further and other documents and to take such further and other actions as may be necessary or appropriate in order to carry out the purpose of this Agreement.

13.6    In the event that any part of this Agreement is in violation of applicable law, then the parties agree to negotiate in good faith to amend the Agreement as

14

necessary to conform to law. If the parties are not able to reach agreement within sixty (60) days of notice of the written determination to avoid violation of an applicable law or obligation, this Agreement shall be terminated.

13.7    Notwithstanding anything to the contrary hereinabove contained, in the event that in the good faith opinion of legal counsel for the Hospital, the performance by either party hereto of any term, covenant, condition or provision of this Agreement shall jeopardize the licensure of the Hospital, its participation in Medicare, Medi-Cal, Tricare or any other governmental reimbursement or payment programs, or its full accreditation by the Healthcare Facilities Accreditation Program or a nationally recognized accreditation organization with deeming authority from CMS, or any other state or nationally-recognized accrediting organization, or if for any other reason performance by a party under this Agreement should be in violation of any statute, ordinance or be otherwise deemed illegal, or be deemed unethical by any nationally recognized body, agency or association in the medical or hospital fields (and provided that the foregoing cannot be cured within a reasonable time period), either party may at it option, initiate negotiations for up to ten days to remediate such jeopardy or violation, or failing to reach agreement, subject to the notice and cure provisions of Section 5.2, may terminate this Agreement by providing proper notice.

13.8    Any waiver of any term, covenant or condition of this Agreement by any party hereto shall not be effective unless set forth in writing signed by the party granting such waiver, and in no event shall any such waiver be deemed to be a waiver of any other term, covenant or conditions of this Agreement.

13.9    Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by arbitration in Bakersfield, California, in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration and applying the laws of the State. Any award rendered by the arbitrator shall be final and binding upon each of the parties, and judgment thereon may be entered in any court having jurisdiction thereof. Initially, the costs shall be borne equally by both parties. During the pendency of any such arbitration and until final judgment thereon has been entered, this Agreement shall remain in full force and effect unless otherwise terminated as provided hereunder. Upon rendering of a final decision the prevailing party shall be entitled to recover their reasonable legal fees. The provisions set forth herein shall survive expiration or other termination of this Agreement regardless of the cause of such termination

13.10   Group and Hospital recognize and acknowledge that, by virtue of entering into this Agreement and providing services to Hospital hereunder, Group and Hospital may have access to certain information of Group or Hospital that is confidential and constitutes valuable, special and unique property of Group or Hospital. Group and Hospital agree that they will not at any time, either during or subsequent to the term of this Agreement, disclose to others, use, copy or permit to be copied, without the other party's express prior written consent, except in connection with the performance of Group's duties hereunder or as otherwise required by law, any confidential or proprietary information of Group or Hospital, including, without limitation, information which concerns patients, costs, or treatment methods, and which is not otherwise available to the public.

13.11   This Agreement shall supersede and replace any prior agreement pertaining to the provision of the Services by the Group.

15

EXHIBIT A
Page 15 Of 22

13.12   This Agreement shall remain in full force and effect and shall be binding upon any successor in interest, which shall assume, in writing, the Hospital's obligations under this Agreement (unless the successor is otherwise obligated by law to assume such obligations without an express written assumption).

13.13   Time is of the essence in the performance of all duties and obligations set forth in this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

| Tulare Local Healthcare District, dba Tulare Regional Medical Center | Medflow, LLC, a California Limited Liability Company |
|---|---|
| By: _Sherrie Bell_ 4/17/13 <br> Sherrie Bell, Chairwoman _DATE_ | By: _____ 4/16/13 <br> Yorai Benzeevi, M.D. _DATE_ <br> President |
| By: _____ 4/11/13 <br> Shawn Bolouki, CEO _DATE_ | |

16

## EXHIBIT A

## STAFFING LEVELS

Group shall provide Providers to cover the Emergency Department on a 24-hour per day basis every day of the calendar year, with a sufficient number, as determined jointly by Hospital and Group, of Providers physically present in the Department to provide full coverage of the Department at all times.

The above notwithstanding, the Group shall provide the following professional staffing:

- Two (2) physician Providers per 24 hours in a manner not to exceed 12 hours of 'scheduled' clinical coverage per physician in a 24 hour period; and

- Two (2) mid-level provider per day, mid-level coverage may be adjusted as is determined from time-to-time by Group consistent with the requirement of maintaining proper patient flow and safety in the Department.

The above notwithstanding, the Hospital shall provide at a minimum, the nurse staffing requirements as required by Title 22 of the California Code of Regulations.

**EXHIBIT B**

Medflow, LLC

Designated Medical Director and Associate Medical Director for
Tulare Regional Medical Center

Medical Director: Yorai Benzeevi, M.D.

Associate Medical Director: To be designated by the Group in writing.

EXHIBIT C

Tulare Regional Medical Center

Value Based Purchasing Performance Payment

ED Physicians Performance Metrics as of March, 2013

## CORE MEASURES:

| Metric Group | Metric Objective | 100% of Bonus | 95% of Bonus | 70% of Bonus | 50% of Bonus | Opportunity /Quarter | Opportunity /Year |
|---|---|---|---|---|---|---|---|
| **Pneumonia** | | | | | | | |
| | Door to antibiotic < 6hrs | 100% | 99%-90% | 89%-80% | < 80% | $ 8,662.50 | $ 34,650.00 |
| | Antibiotic Choice = CDC Guidelines | 100%-90% | 89%-85% | 84%-80% | < 80% | $ 8,662.50 | $ 34,650.00 |
| **CARDIAC DISEASE** | | | | | | | |
| | ASA ON ARRIVAL | 100%-95% | 94%-90% | 89%-85% | < 85% | $ 4,567.50 | $ 18,270.00 |
| **Patient Flow** | | | | | | | |
| | LWBS | < 5% | 5%- 7.5% | 7.6%-9% | > 9% | $ 4,357.50 | $ 17,430.00 |
| | **Subtotal Available to Group for Core Measures** | | | | | $26,250.00 | $105,000.00 |

## CUSTOMER SERVICE:

The parties hereby agree to mutually establish the performance indicators by which the Group's Customer Service performance payment shall be measured within thirty (30) days of the Effective Date of this Agreement. Such mutually established performance indicators shall be reduced to a writing signed by both parties and which shall amend or supplement this Agreement.

| | | |
|---|---|---|
| Subtotal Available to Group for Customer Service | $11,250.00 | $45,000.00 |
| TOTAL PERFORMANCE PAYMENT AVAILABLE TO GROUP | $37,500.00 | $150,000.00 |

EXHIBIT A
Page 19 Of- 22

Exhibit "D"

**MEDICAL DIRECTOR AGREEMENT**
**TULARE REGIONAL MEDICAL CENTER**
To the extent you may want to add greater specificity please do so in blank space
provided under each service.
**TIME RECORD**

Name:   Yorai (Benny) Benzeevi, M.D.                        Month:

Unit     Emergency Department                               Date:

| Date | Description of Services Include Contracted Administrative Services Only | Total Time Spent On Task (Time in .25 Increments) |
|------|------------------------------------------------------------------------|---------------------------------------------------|
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      |                                                                        |                                                   |
|      | Total Number of Hours from Continuation Sheet(s)                       |                                                   |
|      | Total Number of Hours for Month                                        |                                                   |

SCHEDULE 12.2.2.4

FINANCIAL RELATIONSHIPS

A. The following constitute all Financial Relationships between Physician and Hospital as of the date of this Agreement. If a writing exists memorializing such Financial Relationship, please identify it by date, parties and annualized amount. Physician agrees to provide Hospital a copy of any such writing upon Hospital's request. If no writing exists, describe in general terms including the parties, the nature of the Financial Relationship and its purpose, and total annual consideration.

    1.     None

    2.

B. The following constitutes Financial Relationships known to Physician between an Immediate Family Member of Physician and the Hospital. If a writing exists memorializing such Financial Relationship, Physician agrees to provide the Hospital with a copy of any such writing that is available to Physician. If no writing exists, or Physician is unable to deliver a copy, describe the Financial Relationship between the Hospital and an Immediate Family Member as best you know it including the parties.

    1.     None

    2.

*Immediate Family Member* is defined in this Agreement as in 42 CFR 411.351.

*Financial Relationship* includes all Financial Relationships described under 42 CFR 411.354(g) without regard to any provision excepting the relationship from any statute or regulation.

Physician should provide additional attachments if the space is not adequate.

Physician/Director Initials

Tulare Regional Medical Center

Health Plan Agreements

As of March 6, 2013

Aetna
Anthem Blue Cross CaliforniaCare (HMO)
Anthem Blue Cross Prudent Buyer (PPO)
Anthem Blue Cross Medi-Cal
Blue Shield HMO/PPO
Cigna
First Health
Foundation for Medical Care
Great West
Healthnet HMO/PPO
Healthnet Medi-Cal
Humana
Interplan
Key Medical
Multiplan
TCMS
United Healthcare HMO/PPO

EXHIBIT A
Page 22 Of 22

# AMENDMENT
# TO
# EMERGENCY SERVICES AGREEMENT

This Amendment to the Emergency Services Agreement (hereinafter referred to as the "Amendment"), is made and effective as of the date of the last signature at the end of this Amendment (hereinafter referred to as the "Effective Date"), between **Tulare Local HealthCare District, dba Tulare Regional Medical Center** (hereinafter referred to as "Hospital"), a local health care district organized under the laws of the state of California, and **Medflow, PC** (previously identified as "Medflow, LLC", ("hereinafter referred to as "Group").

## RECITALS

A.      WHEREAS, the parties hereto entered into an Agreement effective July 1, 2013; and

B.      WHEREAS, it was and remains the parties' mutual intention that compensation paid by Hospital to Group shall be consistent with and not exceed the fair market value for Group's Services; and

C.      WHEREAS, the Agreement calls for total compensation in an amount that could exceed the appraised fair market value; and

D.      WHEREAS, by and through this Amendment, the parties hereby reaffirm their intention to abide by the appraised fair market value for the Services described in the Agreement. The parties acknowledge and agree they do not intend the compensation for the Services subject to the Agreement to be in excess of fair market value, and further acknowledge and agree compensation actually paid has not exceeded the appraised fair market value for the Services; and

E.      WHEREAS, to ensure the compensation provisions of the Agreement are consistent with the parties' express mutual intent as described herein, the parties do mutually desire to amend the Agreement.

NOW THEREFORE, in consideration of the material advantages accruing to the two parties and the mutual covenants contained herein, and intending to be legally and ethically bound thereby, Hospital and Group agree as follows:

## SECTION 1:  AMENDED TERMS

The following terms of the Agreement between Hospital and Group are hereby modified and amended as follows:

A.      Exhibit C, Value Based Purchasing Performance Payment, ED Physicians Performance Metrics is hereby deleted and replaced with the following:

EXHIBIT _____ B
Page ___ I __ Of- 3

Exhibit "C"

## Quality Indicators Earned Per Quarter

Hospital agrees to pay Group a Value Based Purchasing Performance Payment in addition to the Monthly Service Fee for Emergency Department Professional Services and Monthly Medical Directorship Fee, up to $7,750 per quarter, not to exceed $31,000 per year, according to the Quality Indicators described in this Exhibit "C".

| QUALITY INDICATORS | TARGET | Value |
|---|---|---|
| **CORE MEASURES:** | | |
| PNUEMONIA: Initial Antibiotic Selection for Non-ICU Pts. | 95% | $ 1,000 |
| **PATIENT FLOW** | | |
| 1. Left Without Being Seen: | | |
| 100% of Incentive | 3.5 – 4% | $ 1,000 |
| 75% of Incentive | 4.5 - 5% | $ 500 |
| 50% of Incentive | 5.5 – 6% | $ 250 |
| 0% of Incentive | 6.5% or above | $ 0 |
| 2. Provider Time To Patient Disposition Time: | | |
| 100% of Incentive | 140 – 180 Minutes | $ 1,250 |
| 75% of Incentive | 181 – 190 Minutes | $ 500 |
| 50% of Incentive | 191 – 200 Minutes | $ 250 |
| 0% of Incentive | 201 Minutes and above | $ 0 |
| **DOCUMENTATION** | | |
| 1. Physician/Midlevel date, time and initials on initial assessment. | | |
| 2. Condition and Disposition at time of charge, to include date, time and signature. | | |
| 3. All entries must be dated, timed and have a legible signature (to include printed name, stamp of printed name or Doctor ID number) | | |
| 100% of Incentive | 90 - 100% | $ 750 |
| 75% of Incentive | 80 – 89% | $ 500 |
| 50% of Incentive | 70 – 79% | $ 250 |
| 0% of Incentive | 60 or below | $ 0 |
| **CUSTOMER SERVICE** | | |
| Doctor Explained Things In An Understandable Way | > 90% | $ 750 |
| Confidence/Trust In Doctors | > 90% | $ 500 |
| Courtesy And Respect Of Doctors | > 90% | $ 250 |
| | **QUARTERLY TOTAL** | **$ 7,750** |

Quality Indicators will be measured based on the following fiscal quarters of each Term or Renewal Term: January through March; April through June; July through September; October through December. The Value Based Purchasing Performance Payment, if any is to be paid, will be prorated for any partial months the Agreement is in effect."

## SECTION 2:  RESTATEMENT OF REMAINING TERMS

The Agreement between the parties is modified and amended only as to those provisions specifically identified and stated under Section 1 of this Amendment.  All of the remaining provisions of the Agreement not modified and amended by the provisions of this Amendment shall continue in full force and effect and are hereby restated by the parties.

## SECTION 3:  GENERAL PROVISIONS

A.      This Amendment, as to those provisions set forth above in Section 1 hereof, supersedes only those provisions identified in the Agreement.  This Amendment, together with the Agreement, executed by the parties constitutes the entire agreement between the parties, supersedes any and all other agreements or contracts, either oral or written between the parties, and contains all the agreements between them with respect to the provisions of Services by Group for the benefit of Hospital.

B.      Except as otherwise specifically provided, the terms and conditions of this Amendment may be amended at any time by mutual agreement of the parties, provided that before any amendment shall be valid or effective it shall have been reduced to writing and signed by each party.

C.      The invalidity or unenforceability of any provision of this Amendment shall not affect its other provisions, and this Amendment shall be construed in all respects as if such invalid or unenforceable provisions had been omitted.

D.      This Amendment shall be construed and enforced under and in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the parties have executed this Amendment.

| TULARE LOCAL HEALTH CARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER | MEDFLOW, PC |
|---|---|
| By: _____ Shawn Bolouki | By: _____ Yorai Benzeevi, M.D. |
| Its: Chief Executive Officer | Its: President |
| Date: 10/31/2013 | Date: 10/24/13 |

## SECOND AMENDMENT TO EMERGENCY SERVICES AGREEMENT

This Second Amendment to Emergency Services Agreement ("**Amendment**") is made and entered into and effective as of the date of the last signature at the end of this Amendment (the "**Effective Date**") by and between Tulare Local Health Care District dba Tulare Regional Medical Center (the "**Hospital**") and Medflow, PC (the "**Group**").

### RECITALS

A. Hospital and Group entered into an Emergency Services Agreement effective July 1, 2013 (as amended by an amendment dated October 31, 2013, the "**Agreement**").

B. The parties desire to further amend the Agreement.

**NOW THEREFORE**, for and in consideration of the mutual covenants contained herein and other good and valuable consideration exchanged by each of the parties to this Amendment, the receipt and sufficiency of which are hereby acknowledged, the Agreement is hereby amended and the parties agree to as follows:

1.     **Recitals.**  Recitals B and C of the Agreement shall be deleted in their entirety.

2.     **General Appointment and Responsibilities of Group.**  As of the Effective Date, Section 1 of the Agreement shall be deleted in its entirety and shall be replaced by the following:

"1.     Responsibilities of Group.

1.1  Appointment.  Hospital hereby appoints Group, and Group accepts such appointment, to provide management and non-medical performance improvement services for Hospital with respect to its Emergency Department Services as described below:

(a)     Operational Oversight.  Group shall assist Hospital in operating the Emergency Department Services by providing day-to-day administrative oversight, which shall include, but not be limited to, the following general management services:

(i)     Administratively direct and coordinate the provision of Emergency Department Services in accordance with recognized standards to promote quality and efficient care of patients;

(ii)     Assist with the management of the Emergency Department Services in adherence with Hospital's policies and procedures, applicable laws and

096608.000006 605314291.5

EXHIBIT  C
Page  1  Of- 13

regulations, accrediting body requirements and other regulatory compliance and make recommendations to Hospital regarding the same;

(iii)    Make recommendations as to qualified non-physician personnel, including appropriate staffing complements to assist Hospital in its recruitment, hiring, job description, termination, discipline, reprimand, and the terms of employment for the Emergency Department employees.  Group's authority with respect to the Emergency Department employees shall be subject to Hospital's Department of Human Resources policies and procedures and the parameters of the approved operating budget of Hospital. Hospital shall be solely responsible for all decisions, acts and omissions with respect to Emergency Department employees;

(iv)    Recommend additions and/or revisions in policies and procedures pertaining to the operation of the Emergency Department;

(v)    Assist Hospital in the development and implementation of patient care protocols for the delivery of the Emergency Department Services;

(vi)    Assist Hospital in the development and implementation of a detailed medical staff development plan for the Emergency Department and assist Hospital in implementing such plans to (1) ensure that Emergency Department Services provided by Hospital meet the needs of the community in which Hospital operates, and (2) improve physician and patient satisfaction with respect to the provision of Emergency Department Services by Hospital;

(viii)    Perform such other services related to the efficient and effective delivery of quality Emergency Department Services as may be reasonably requested by Hospital and as agreed by Group;

(ix)    Provide reports regarding Emergency Department Services as may be reasonably requested by Hospital to include operational statistics, financial statements and productivity reports;

(x)    Act as a liaison among Hospital administrative departments, committees and Hospital's Emergency Department medical staff;

(xi)    Participate in strategic, financial and operational planning for future Emergency Department Services;

(xii)    Provide or arrange for the provision of consultative education and training support to staff in the provision of efficient and effective Emergency Department Services;

(xiii)    Assist Hospital in complying with the standards and requirements of nationally recognized hospital accrediting agencies and other

096608.000006 605314291.5

EXHIBIT C
Page 2 Of-13

applicable nationally recognized accreditation agencies specific to Emergency Department Services;

(xiv)  Participate in the preparation for and conduct of accrediting surveys and other similar activities with respect to the Emergency Department;

(xv)  Assist Hospital in the management of services that may be furnished through contractual arrangements;

(xvi)  Assist Hospital in preparing for and responding to third-party payor audits concerning Emergency Department Services as well as other government inquiries, including the compilation and timely delivery of all required documentation;

(xvii)  Assist in the development of Emergency Department patient care programs and protocols in response to pay-for-performance programs of third-party payors, including Medicare and Medicaid;

(xviii)  Make recommendations to help reduce adverse events, including medication errors in the Emergency Department;

(xix)  Make recommendations regarding marketing efforts associated with the Emergency Department;

(xx)  Assist Hospital in conducting appropriate quality assurance, utilization review, educational and risk management programs conducted by Hospital with respect to the Emergency Department;

(xxi)  Assist Hospital in appropriately increasing productivity in furtherance of and consistent with the objectives of the Agreement by providing Hospital with recommendations regarding:  the evaluation and restructuring of care delivery processes, evaluation of job descriptions and realignment of responsibilities as appropriate, establishment and maintenance of productivity standards; and

(xxii)  Assist Hospital in establishing and maintaining appropriate best practice standards, benchmarks, and development of quality review processes, through the review of pathways and protocols, current policies and procedures, and other activities to further advance the clinical direction of the Emergency Department Services from a quality and outcome perspective.

(b)    Special Projects.  Group shall provide special projects related to the Emergency Department Services, as agreed upon by Hospital and Group from time to time.

1.2    Nature of Duties.  Notwithstanding anything herein to the contrary, the duties of Group under the Agreement shall be administrative in nature, and shall not include any services for which a medical license is required under the laws of the State

3

of California. Accordingly, the Agreement is hereby modified to delete therefrom any services of Group the performance of which would require a medical license.

1.3     Physician Retention and Recruitment. Group shall assist Hospital in recruiting physicians for the Emergency Department. However, the terms and conditions of any physician contracts (including compensation) shall be established solely by Hospital, and Group shall have no liability if it is unable to recruit physicians for the Emergency Department for any reason whatsoever. Group shall interview physician candidates to be engaged by Hospital to provide services in the Emergency Department. Group shall also assist physician candidates with completing Hospital's credentialing process. Group shall also make recommendations to the Board of Directors of Hospital (the "**Board**") for the hiring and firing of physicians, but the physicians shall be independent contractors and/or employees of Hospital and not of Group.

1.4     Physician Scheduling. Group shall assist Hospital in coordinating the scheduling of Hospital's Emergency Department physicians in accordance with staffing levels established by Hospital.

1.5     Physician Compliance. To the extent that Group becomes aware that any Emergency Department physicians are not in substantial compliance with applicable laws, rules and regulations, Hospital's bylaws, the rules and regulations established by Hospital or the medical staff which are applicable to the operation of the Emergency Department, the terms of the physicians' agreements with Hospital, all standards specified by the applicable Healthcare Facilities Accreditation Program(s) (e.g., the Joint Commission or DNV), Medical Treatment & Labor Act, or Health Insurance Portability and Accountability Act of 1996, Group shall so report to the Board, shall (if requested by the Board) offer its recommendations to the Board, and shall follow the reasonable directions of the Board in response to such recommendations.

1.6     Quality Assurance and Utilization Review. Group shall assist Hospital in conducting any quality assurance, utilization review, educational and risk management programs related to the Emergency Department."

3.     **Administrative Director**. As of the Effective Date, Section 2 of the Agreement shall be deleted in its entirety and shall be of no further force and effect and shall be replaced by the following:

"2.1     Group shall appoint a qualified administrative director to provide the Emergency Department Services outlined herein (the "**Administrative Director**"). Upon the request of Hospital, the Administrative Director shall also serve as the Emergency Department's medical director (as defined in Hospital's bylaws). The Administrative Director may be a member of Hospital's medical staff (but shall be a member of the medical staff if he or she also serves as the medical director). The Administrative Director shall be subject to Board's approval, which shall not be unreasonably withheld or delayed.

4

EXHIBIT C
Page 4 Of- 13

2.2   The Administrative Director shall, in concert with Group, supervise the operation of the Emergency Department and the provision of the Emergency Department Services and devote the best of his or her ability to the proper operation thereof.  The Administrative Director shall supervise and coordinate the provision of the Emergency Department Services and the operation of the Emergency Department in conjunction with applicable committees of the medical staff and administrative personnel of Hospital.  The Administrative Director shall supervise and manage utilization of the Emergency Department Services, relations with the medical staff and such other aspects of the Emergency Department Services and the Emergency Department as Hospital determines to be in the best interests of Hospital in delivering quality patient care. The Administrative Director shall work in collaboration with Hospital's leadership.

2.3   The medical director shall (if provided by Group) attend Emergency Department staff conferences; furnish instruction in the Emergency Department Services to personnel of Hospital as reasonably requested by the medical staff and administrative personnel of Hospital; participate in teaching, mandatory training, continuing education and other activities undertaken by Hospital as are in accordance with the recommendations or requirements of the American Medical Association, the HFAP, Joint Commission or DNV (whichever is applicable) or any comparable deemed status organization, the United States Department of Health and Human Services, the California Department of Health Services and any national society relating to the Emergency Department Services with respect to the provision of the Emergency Department Services in hospitals of the type and size of Hospital; and assist such committees of Hospital and the medical staff and attend, organize and participate in such conferences and other activities in order to maintain and improve the quality of care provided by Hospital and the Emergency Department. The medical director shall also perform the following services:

a)   Provide administrative supervision of Emergency Department Services including managing the Emergency Department Services coverage and call arrangements.

b)   Assist in the development or selection of clinical practice guidelines and standard order sets.

(c)   Assist in the development of electronic medical record components.

(d)   Provide education and in-service instruction programs for the Hospital's nursing and ancillary personnel in the operation of the Emergency Department Services.

(e)   Make recommendations to Hospital's administration regarding the use of facility personnel, the necessary equipment, and general quality standards of patient care in connection with the Emergency Department Services.

EXHIBIT C
Page 5 Of- 13

(f)     Develop medical education programs for the Hospital's medical staff in the appropriate role of the Emergency Department Services.

(g)     Be a liaison to appropriate medical staff committees relevant to the Emergency Department Services.  In no event shall duties pursuant to this Agreement include attendance at meetings that medical director is required to attend as a result of medical director's licensure or medical staff membership, including mandatory medical staff meetings or governing board meetings.

(h)     Maintain communication with attending physicians admitting patients to the Emergency Department.

(i)     At least annually, review and make recommendations as necessary to revise the Emergency Department Services' policies and procedures.

(j)     Assist the appropriate medical staff committee in reviewing and revising medical staff rules and regulations which pertain to the Emergency Department Services.

(k)     Review records and reports of patient service in the Emergency Department Services to promote quality of patient care.

(l)     At Hospital's request, accompany the CEO or his/her designee to meetings in which Hospital and medical director discuss issues relating to medical director's duties under this Agreement.

(m)     Attend to issues of patient satisfaction, complaints, and flow.

(n)     Perform written quarterly performance reviews of all Emergency Department physicians and mid-levels.

(o)     Provide such other services as Hospital's CEO, or designee, shall direct which are consistent with the position of an Emergency Department medical director.

2.4     The Administrative Director shall advise and provide consultation to Hospital concerning the proper recruitment and training of Emergency Department personnel, and shall advise and provide consultation concerning the supervision and training of such personnel.

2.5     The Administrative Director shall devote as much time to the operation and conduct of the Emergency Department as is reasonably necessary to provide proper and adequate service levels and to obtain efficiency consistent with the Emergency Department's environment."

096608.000006 605314291.5

EXHIBIT C
Page 6 Of- 13

4.    **Hospital Responsibilities**.  As of the Effective Date, Section 3 of the Agreement shall be deleted in its entirety and shall be of no further force and effect and shall be replaced by the following:

"3.    Hospital Responsibilities.

3.1  Equipment.  Hospital shall, at its sole cost and expense, furnish for use in the Emergency Department, such equipment as is reasonably necessary, following consultation with Group, for the proper operation and conduct of the Emergency Department.  Hospital shall also, at its sole cost and expense, keep and maintain the aforementioned equipment in good working order and shall repair or replace such equipment or any part thereof which becomes worn out or obsolete.  Group shall provide Hospital with such recommendations concerning equipment changes as may be necessary from time to time and shall advise Hospital of the need for any repair or replacement of equipment of which Group is aware.

3.2    Services.  Hospital shall, at its sole cost and expense, furnish the Emergency Department with all customary services, including ordinary janitor and reasonable in-house messenger services, telephones, dictation and other appropriate methods for electronic medical record keeping services recommended by Group, security services, switchboard services, laundry, gas, water, ice, heat and electricity for light and power as may be required and as may be available to Hospital for the operation and conduct of the Emergency Department.  Hospital shall also provide the services of its supporting departments, including but not limited to nursing, radiology, cardiology and laboratory personnel, administrative, engineering, purchasing and medical records that are necessary for the proper operation and conduct of the Emergency Department.

3.3    Supplies.  The cost of all supplies, such as but not limited to chemicals, glassware, gases, medications, linens, stationary, printed forms and office supplies, and similar expendable items that are necessary for the proper operation and conduct of the Emergency Department shall be Hospital's sole responsibility.

3.4    Personnel.  Hospital shall be responsible for employing all personnel required for the proper operation and conduct of the Emergency Department in accordance with the terms of the Management Services Agreement, as amended, with HealthCare Conglomerate Associates, LLC, as long as such Management Services Agreement is in effect.  Hospital may request and consider input from Group regarding the qualifications, category/type/level of and number of personnel to be provided by Hospital to the Emergency Department.

3.5    Group Space.  Hospital shall provide Group with such space as may be necessary for Group to provide the services hereunder.

5.    **Billing and Collection**.  As of the Effective Date, Section 4 of the Agreement shall be deleted in its entirety and shall be of no further force and effect and shall be replaced by the following:

"4.    Revenue Cycle Management.

7

EXHIBIT __C__
Page __7__ Of- __13__

Group shall provide advice, direction and reasonable assistance to Hospital and assist it in overseeing its Emergency Department revenue cycle management. Services provided by Group include making recommendations regarding Hospital's:

(a) Charge master;

(b) Adjustment coding;

(c) Patient billing and collections; and

(d) Coding and billing compliance audits.

All direct, out-of-pocket fees, expenses and charges incurred in connection with actual revenue cycle management shall be Hospital expenses."

6.    **Termination.** As of the Effective Date, Sections 5.2, 5.3 and 5.4 of the Agreement shall be deleted in their entirety and shall be of no further force and effect and shall be replaced by the following:

"5.2 Either party hereto may terminate this Agreement for cause if the other party hereto fails to keep, observe or perform any covenant, agreement, term or provision of this Agreement required to be kept, observed or performed by such person and such default continues for a period of thirty (30) days for non-monetary defaults (or, if the cure cannot reasonably be completed within such thirty (30) days, if such party fails to commence the cure within thirty (30) days or fails to diligently pursue the cure to completion) and ten (10) days for monetary defaults, after written notice thereof, which notice will state the reason for which this Agreement is being terminated."

7.    **Section 6.** As of the Effective Date, Section 6 of the Agreement shall be deleted in its entirety and shall be of no further force and effect.

8.    **Independent Contractor.** As of the Effective Date, Section 7 of the Agreement shall be deleted in its entirety and shall be of no further force and effect and shall be replaced by the following:

"7.  Independent Contractor.  Notwithstanding any provision contained herein to the contrary, Hospital and Group each understand and agree that the parties hereto intend to act and perform as independent contractors. Therefore, Hospital is not an employee or partner of Group, and Group is not an employee or agent of Hospital. Nothing in this Agreement shall be construed as placing Hospital in a relationship of employer-employee or partners with Group. The parties shall not have the right to make any promises, warranties or representations, or to assume or create any obligations, on behalf of the other party except as otherwise expressly provided herein or as otherwise agreed. The parties agree to be solely and entirely responsible for their respective acts and for the acts of any of their respective employees and agents, except as otherwise expressly provided herein."

8

096608.000006 605314291.5

EXHIBIT  C
Page  8   Of- 13

9.  **Insurance**.  As of the Effective Date, Section 8 of the Agreement shall be deleted in its entirety and shall be of no further force and effect and shall be replaced by the following:

"8.  Insurance.

8.1  **Insurance Coverage**.  Hospital shall, solely at its own expense, obtain and maintain in full force and effect throughout the term of this Agreement with respect to the good faith performance of this Agreement, the following policies of insurance or self-insurance coverage for the benefit of Group and the Administrative Director:

(a)  General Liability Policy.  Comprehensive general liability policy, including personal injury and property damage liability insurance naming Hospital and Group as named insureds.

(b)  Professional Liability Policy.  Professional liability insurance coverage for and on behalf of Group, and the Administrative Director in the minimum amount of One Million Dollars per person and Three Million Dollars in the aggregate (which may be adjusted from time to time if the medical staff requirements should change).

(c)  Directors and Officers Insurance.  Directors' and officers' liability insurance for and on behalf of Group, and the Administrative Director with such coverage amounts and policy terms as is customary for public hospitals in California.

(d)  Property and Casualty Insurance.  Property and casualty insurance, including coverage for Emergency Department facilities and equipment naming Hospital and Group as insureds.

(e)  Automobile Liability Insurance.  If deemed necessary by Hospital or Group, comprehensive automobile liability insurance naming Hospital and Group as insureds.

(f)  Worker's Compensation and Employee Liability Insurance.  Worker's compensation and employer's liability insurance and other similar insurance naming Hospital and Group as insureds for persons employed by Hospital.

(g)  Commercial Umbrella and Excessive Liability Insurance.  Commercial umbrella or excess liability coverage and, to the extent available, regulatory insurance coverage, naming Hospital and Group as named insureds.

8.2  **Insurance Requirements**.  The following provisions apply to the foregoing provisions regarding insurance:

(a)  All such policies of insurance shall be in such amounts as are deemed necessary by Hospital and Group and shall provide for waiver of subrogation

EXHIBIT C
Page 9 Of 13

against Group and Hospital. The parties and their respective affiliates shall not assert against the others, and each does hereby waive with respect to the others, any claims for any losses, damages, liabilities or expenses (including attorneys' fees) incurred or sustained by any of them on account of damage or injury to persons or property arising out of the ownership, operation and/or maintenance of the Emergency Department, to the extent that the same would be covered and paid by the insurance required to be carried hereunder. Hospital shall present such policies of insurance to Group for review, upon request by Group.

(b)    Hospital shall cause Group, and its employees, officers and directors, to be named as additional insureds on the insurance coverage described above and on any fidelity bond (if any). It is the intention of the parties that the insurance and bond (if any) maintained by Hospital with respect to the operation of the Emergency Department shall protect both Hospital and Group and will be primary insurance for both parties for any and all losses covered thereby. Certificates of insurance for the above coverages and a copy of the bond (if any) and accompanying endorsement naming Group and/or Group's employees, as applicable, shall be provided to Group within thirty (30) calendar days of execution of this Agreement and thereafter within thirty (30) calendar days (i) of policy or bond (if any) renewal or replacement and (ii) of a request by Group. All such policies shall provide that the subject policy may not be canceled, modified or reduced (including, without limitation, any amendment that would reduce the scope or limit coverage or remove any endorsement to such policy or cause the same to no longer be in full force and effect) except upon not less than thirty (30) calendar days prior written notice to Group. Copies of each renewal policy or certificates therefore from the insurers evidencing the existence thereof shall be provided to Group at least thirty (30) calendar days prior to, but not later than, the expiration or termination dates of the applicable policy.

(c)    If, during the Term, Hospital is covered by general liability, or other liability insurance on a "claims made" basis, then ten (10) calendar days before the termination of this Agreement, Hospital shall procure and maintain, at its sole cost and expense, an extended reporting endorsement or "tail" insurance coverage for a period of at least six (6) Years after the termination date of this Agreement, with coverage limits and deductible amounts equivalent to those required hereunder on the date immediately preceding the termination of this Agreement for such coverage for general, professional and other liability claims reported after the termination of this Agreement but concerning services provided during the Term or the term of the claims made policy. Hospital shall provide Group with a certificate evidencing such coverage no later than ten (10) calendar days before the termination of this Agreement. Hospital shall be named as the primary insured party on each policy of tail insurance and Group shall be named as an additional insured.

(d)    To the extent any insurance is placed through a self-insurance program or captive insurance program, Hospital shall assure that such insurance shall comply with all applicable state and federal laws and regulations and/or applicable foreign laws and regulations if such self-insurance or captive program is domiciled

EXHIBIT C
Page 10 Of 13

outside the United States, and Hospital shall assure that such coverage shall be, as appropriate, reinsured by commercially acceptable reinsurers.

10.    **Exhibits.** As of the Effective Date, Exhibits A, B, C, D and E of the Agreement shall be deleted in their entirety and shall be of no further force and effect.

11.    **Management Fee.** As of the Effective Date, the Agreement shall be amended by adding a new Section 14 thereto to read as follows:

"14.1 **Management Fee.** As Group's fee for the performance of the administrative services under this Agreement, Group shall receive monthly (in advance on the first day of each month) the amount of Twenty Thousand Dollars ($20,000). Notwithstanding the foregoing, if the Administrative Director does not also serve as the Emergency Department's medical director, upon written request from Hospital, Group shall reduce its fee hereunder by an amount which does not exceed the amount determined to be fair market value for the medical director services in the valuation obtained by Hospital in connection with this Amendment. In no event shall the foregoing reduction exceed the monthly amount actually paid by Hospital to a medical director for the Emergency Department in the applicable month in accordance with applicable law for bona fide and necessary services.

14.2 **Expenses.** In addition to the above fees, Group shall be reimbursed monthly by Hospital for (i) expenses expressly made reimbursable hereunder together with (ii) other usual, customary, and commercially reasonable out-of-pocket expenses incurred on behalf of Hospital, in accordance with the budget approved by Hospital, or with approval from the Board, if such fees are in excess of the approved budget.

14.3 **Department Operating Expenses.** Except as otherwise provided in this Agreement, all of the costs and expenses of maintaining and operating the Emergency Department and its facilities, shall be the sole cost and expense of Hospital, and shall not be an expense of Group.

12.    As of the Effective Date, the Agreement shall be amended by amending Section 13.3 to provide that notices to the Parties shall be sent as follows:

**To Hospital:**

> Tulare Local Health Care District
> dba Tulare Regional Medical Center
> 869 North Cherry Street
> Tulare, CA  93274
> Attn:  Board Chair

096808.000006 605314291.5

EXHIBIT  C
Page  11  Of-  13

**To Group:**

Medflow, PC
3500 West Olive Street, Suite 300
Burbank, CA 91505
Attn: Benny Benzeevi

13.    **Miscellaneous**.

a.    <u>Counterparts</u>.   This Amendment may be executed in any number of counterparts via facsimile or electronic transmission or otherwise, each of which shall be deemed an original, but all of which, taken together, shall constitute one and the same instrument.

b.    <u>Entire Agreement</u>.   This Amendment sets forth the entire agreement between the parties with respect to the matters set forth herein.  There have been no additional oral or written representations or agreements.

c.    <u>Effective Date</u>.  This Amendment shall not take effect or be legally binding upon the parties until this Amendment has been executed by both parties hereto.

d.    <u>Authority</u>.   The parties signing below on behalf of the parties hereto represent and warrant that they have the authority and power to bind their respective party.

e.    <u>Terms</u>.  Capitalized terms not otherwise defined herein shall have the same meanings as are set forth in the Agreement.

f.    <u>Restatement of Terms of Agreement</u>. Except to the extent expressly stated, modified or amended herein, all terms and conditions of the Agreement are ratified and confirmed and shall remain in effect as originally written.  The parties agree that in the event of any conflict between the terms of the Agreement, as heretofore amended, and this Amendment, the provisions of this Amendment shall control. Notwithstanding the foregoing, in the event that any existing or future law, rule, regulation or determination of any federal or state agency or or other administrative body prohibits any of the terms in this Amendment or would penalize a party for participating therein, then, in addition to any rights set forth in the Agreement, either party may, by notice, propose an amendment to conform this Amendment to applicable laws.

g.    <u>Parties Bound</u>.  This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns.

h.    <u>Hospital Bylaws; Medical Staff Bylaws</u>.  Nothing in this Amendment is intended to, nor shall it afford Hospital any rights which are in conflict with either Hospital's bylaws or the medical staff bylaws.

EXHIBIT C
Page 12 of 13

IN WITNESS WHEREOF, the parties have executed this Amendment as of the Effective Date.

| HOSPITAL: | GROUP: |
|---|---|
| Tulare Local Health Care District dba Tulare Regional Medical Center | Medflow, PC |
| By: _Sherrie Bell_ | By: _[signature]_ |
| Sherrie Bell, Chairwoman of the Board | Yorai (Benny) Benzeevi, President |
| Dated: 2.3. , 2015 | Dated: 2.3. , 2015 |

096608.000006 605314291.5

EXHIBIT C
Page 13 Of 13