**45**

WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter, #91839
Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:    (559) 435-9800
Facsimile:    (559) 435-9868
E-mail:    rileywalter@w2lg.com

Attorneys for Debtor, Tulare Local Healthcare District,
dba Tulare Regional Medical Center

## IN THE UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  17-13797 |
| TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER, | Chapter 9<br><br>DC No.: WW-37 |
| Debtor. | Date:    May 17, 2018 |
| Tax ID #:    94-6002897<br>Address:    869 N. Cherry St.<br>    Tulare, CA 93274 | Time:    9:30 a.m.<br>Place:    2500 Tulare Street<br>    Fresno, CA  93721<br>    Courtroom 13<br>Judge:    Honorable René Lastreto II |

**EXHIBITS TO DECLARATION OF SANFORD HASKINS IN SUPPORT OF MOTION FOR ORDER EXTENDING TIME TO ASSUME OR REJECT NONRESIDENTIAL REAL PROPERTY LEASES**

///

///

///

///

///

///

///

| Exhibit | Description | Pages |
|---------|-------------|-------|
| A | Heiskell Ranches, LP – Commercial Lease 880 E. Merritt, Suites 105 and 106 (Family X-Ray Center Lease) | 9 |
| B | Heiskell Ranches, LP – Commercial Lease 880 E. Merritt, Suites 107 to 109 (Mineral King Toxicology Lease) | 8 |
| C | City of Tulare – Lease 325 N. West St. (Westside Clinic Lease) | 26 |

Dated: April 30, 2018

WALTER WILHELM LAW GROUP,
a Professional Corporation

By: _____
      Riley C. Walter,
      Attorneys for Debtor, Tulare Local
      Healthcare District, dba Tulare Regional
      Medical Center

## COMMERCIAL LEASE

This agreement is entered into effective March 1, 2011, between HEISKELL RANCHES, LP (Heiskell), as lessor, and Tulare Local Healthcare District d/b/a Tulare Regional Medical Center (TRMC), as lessee.

**THIS AGREEMENT IS ENTERED INTO WITH RESPECT TO THE FOLLOWING FACTS:**

1.      Heiskell owns certain real property (*the premises*) commonly described as 880 E. Merritt, Suites 105 & 106 , Tulare, California.

2.      TRMC desires to lease the premises from Heiskell on the terms and conditions set forth herein.

3.      Heiskell desires to lease the premises to TRMC on the terms and conditions set forth herein.

**IT IS THEREFORE AGREED AS FOLLOWS:**

4.      **Term of Lease.**  This lease shall be for a term of one (1) year, commencing March 1, 2011, and ending on February 29, 2012, unless sooner terminated as provided herein. TRMC is hereby given the option to renew this lease for two (2) additional one (1) year periods at a rental rate of $2,800 for the first year of this extended term and $2,850 for the second year of the extended term. To exercise these options TRMC must be in compliance with the terms of the lease and provide Heiskell with a written notice of its intent to renew within (30) days of the lease expiration.

EXHIBIT     A
Page  1  Of  9

5.    **Rental.**  During the term of this lease, TRMC agrees to pay to Heiskell for the use and occupancy of the premises the monthly sum of $2,750.  All payments are due on the first day of each month, and will be considered paid when actually received by Heiskell at the address set forth in paragraph 17 of this agreement.  If, during the term of this lease, TRMC is more than fifteen days late in making one of the rental payments described herein, TRMC will pay to Heiskell, in addition to the rent due, a late payment of $35.00.

6.    **Waste or Nuisance.**  TRMC shall not commit or permit the commission by others of any waste on the premises.  Additionally, TRMC shall not maintain, commit, or permit the maintenance or commission of any nuisance as defined in the California Civil Code on the premises, and TRMC shall not use or permit the use of the premises for any unlawful purpose.

7.    **Utilities.**  TRMC shall pay, and hold Heiskell and the property of Heiskell free and harmless from, all charges for the furnishing of gas, electricity, telephone service, water, sewer service and other public utilities to the premises during the term of this lease.

8.    **Repairs, Governmental Regulations, Waste and Advertising.**  TRMC shall, during the term of this lease and any extension thereof, at TRMC's cost and expense:

(a) Keep and maintain the interior of the leased premises, including all interior doors, all glass, plumbing, and interior electrical systems, in good and neat order and repair, and shall allow no nuisance to exist therein, waiving all rights to make repairs at the expense of Heiskell.

(b) Keep and maintain the heating and cooling system.

2

EXHIBIT A
Page 2 Of 9

(c) Comply and abide by all federal, state, county, municipal and other statutes, ordinances, laws and regulations affecting the leased premises, the improvement thereon, or any activity or condition on or in said premises.

Heiskell shall, at Heiskell's expense, make all exterior and structural repairs to said premises.

TRMC shall not commit or permit any waste upon the leased premises. TRMC shall place no new signs, advertising, or lettering upon the roofs, walls, windows, or exterior doors of said premises without prior written consent of Heiskell. Heiskell's consent shall not be unreasonably held.

9.     **Alterations and Liens.** TRMC shall not make or permit any other person to make any alterations to the premises or any improvements located thereon without first obtaining the written consent of Heiskell. TRMC shall keep the premises free and clear from any and all liens, claims and demands for work performed, materials furnished, or operations conducted on the premises at the request of TRMC.

10.     **Inspection by Heiskell.** TRMC shall permit the representatives of Heiskell to enter the premises at reasonable times for the purpose of inspecting the premises and doing other lawful acts that may be necessary to protect Heiskell's interest in the premises or to perform its duties under this lease.

11.     **Surrender of Premises.** On expiration or sooner termination of this lease, TRMC shall promptly surrender and deliver the premises to Heiskell in as good condition as they are at the date of this lease, reasonable wear and tear excepted.

3

12.    **Assignment and Sub-Leasing.**  TRMC shall not encumber, assign or otherwise transfer this lease or any interest in this lease without first obtaining the written consent of Heiskell.

13.    **Default by TRMC.**  TRMC's breach of any condition, covenant, or provision of this lease shall constitute a material breach.  For any material breach, Heiskell may provide TRMC with a fifteen (15) day notice that describes the breach and demands that TLHS cure the default (if a cure is possible).  If TRMC does not cure the default within forty-five (45) days, or if a cure is not possible, this lease will be terminated.  Heiskell may thereafter reenter and regain possession of the premises in the manner provided by the laws of unlawful detainer of the State of California then in effect. The above provision shall not apply to rental payment defaults, which shall be handled in accordance with CC 791 and CCP 1161.1 et seq.

14.    **Cumulative Remedies.**  The remedies given to Heiskell in this lease shall not be exclusive but shall be in addition to all remedies now or hereafter allowed by law.

15.    **Waiver of Breach.**  The waiver by Heiskell of any breach by TRMC of any of the provisions of this lease shall not constitute a continuing waiver or a waiver of any subsequent breach by TRMC either of the same or another provision of this lease.

16.    **Attorney's Fees.**  Should any litigation be commenced between the parties to this agreement concerning the premises, this agreement, or the rights and duties of either in relation to this agreement, the prevailing party in such litigation shall be entitled, in addition to any other relief to which it may be entitled, to a reasonable sum as and for its attorney's fees in such litigation.

EXHIBIT A
Page 4 Of- 9

17.    **Notices.**  Any and all notices (including three day notices to pay rent or quit) or other communications required or permitted by this lease to be served on either party hereto, shall be in writing and shall be deemed duly served when personally delivered to an authorized representative of the party to whom the notice is directed, or in lieu of such personal service when deposited in the United States mail, registered or certified mail, postage prepaid, addressed as follows:

    Heiskell:           Heiskell Ranches                    :
                        P.O. Box 1379
                        Tulare, California 93275
                        Attn: Scot Hillman

       TRMC:            Tulare Local Health Care District
                        dba Tulare Regional Medical Center
                        Director, Family X-Ray Center
                        869 Cherry Street
                        Tulare, California 93274

Either party may change its address for the purpose of this section by giving written notice of such change to the other party in the manner provided herein.

18.    **Binding on Successors.**  This lease shall be binding on and shall inure to the benefit of the heirs, personal representatives, successors and/or assign of the parties hereto, but nothing in this section shall be construed as a consent by Heiskell to any assignment of this lease.

19.    **Partial Invalidity.**  Should any provision of this lease be held by a court of competent jurisdiction to be either invalid, void, or unenforceable, the remaining provisions shall remain in full force and effect.

20.    **Sole and Only Agreement.**  This instrument constitutes the sole and only agreement between Heiskell and TRMC respecting the premises and correctly sets forth

EXHIBIT A
Page 5 Of- 9

the obligations of Heiskell and TRMC to each other as of this date. Any agreement or representations respecting the premises or their leasing by Heiskell to TRMC not expressly set forth in this instrument are null and void.

21. **Time of Essence.** Time is expressly declared to be the essence of this lease.

22. **Hazardous Materials.** TRMC shall not use, store, generate, release or dispose of any hazardous material on the Premises or the property of which the Premises are part. However, TRMC is permitted to make use of such materials that are required to be used in the normal course of TRMC's medical imagining and health care operations provided that TRMC complies with all applicable Laws related to the hazardous materials. TRMC is responsible for cost of removal and remediation, or any clean-up of any contamination caused by TRMC.

23. **Insurance.** TRMC's personal property, fixtures, equipment, inventory and vehicles are not issued by Heiskell against loss of damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. TRMC is to carry TRMC's own property insurance to protect TRMC from any such loss. In addition, TRMC shall carry liability insurance in an amount of not less than $1,000,000.00. TRMC's liability insurance shall name Heiskell as additional insured. TRMC, upon Heiskell's request, shall provide Heiskell with a certificate of insurance establishing TRMC's compliance. Heiskell shall maintain liability insurance insuring Heiskell, but not TRMC, in an amount of at least $1,000,000.00, plus property insurance in an amount sufficient to cover the replacement cost of the property. TRMC is advised to carry business interruption insurance in an

6

## THIRD EXTENSION OF LEASE

The undersigned Tulare Local Healthcare District, hereinafter referred to as ("Lessee") and Heiskell Ranches L.P., hereinafter referred to as ("Lessor"), hereby agree to extend the term of the March 1, 2011, Commercial Lease, hereinafter referred to as ("Lease"), as extended by the Extension of Lease, hereinafter referred to as ("Extension"), and the Second Extension of Lease, hereinafter referred to as ("Second Extension"). The leased premises under the Lease, Extension and Second Extension was and shall continue to be the premises located at 880 E. Merritt, Suites 107, 108 and 109, Tulare, California. A copy of the Lease, Extension, and Second Extension are attached hereto as Exhibit "1".

That Lease, Extension, and Second Extension shall continue in full force and effect with the following modifications:

     1.     **Term:** The extended Lease term shall commence March 1, 2017 and terminate February 28, 2019.

     2.     **Rent:** Commencing March 1, 2017, the minimum rent under this Lease, as extended, shall be the sum of $4,827.48, per month, and continue until March 1, 2018, when the minimum rent shall be increased to $4,924.03, per month.

     3.     **Terms and Conditions of Lease:** Except as stated above, all the terms and conditions of the Lease, Extension, and Second Extension shall continue to remain in full force and effect and shall be binding on both Lessor and Lessee.

**LESSOR:**                                 **LESSEE:**

Dated:_____       Dated: __2/9/17__

_____       _____
SCOT HILLMAN, General Partner,      ALAN GERMANY, CFO,
Heiskell Ranches L.P.                  Tulare Local Healthcare District

## THIRD EXTENSION OF LEASE

The undersigned Tulare Local Healthcare District, hereinafter referred to as ("Lessee") and Heiskell Ranches L.P., hereinafter referred to as ("Lessor"), hereby agree to extend the term of the March 1, 2011, Commercial Lease, hereinafter referred to as ("Lease"), as extended by the Extension of Lease, hereinafter referred to as ("Extension") and the Second Extension of Lease, hereinafter referred to as ("Second Extension"). The leased premises under the Lease, Extension, and Second Extension was and shall continue to be the premises located at 880 E. Merritt, Suites 105 and 106, Tulare, California. A copy of the Lease, Extension, and Second Extension are attached hereto as Exhibit "1".

That Lease, Extension, and Second Extension shall continue in full force and effect with the following modifications:

      1.    **Term:** The extended Lease term shall commence March 1, 2017 and terminate February 28, 2019.

      2.  **Rent:** Commencing March 1, 2017, the minimum rent under this Lease, as extended, shall be the sum of $3,024.44, per month, and continue until March 1, 2018, when the minimum rent shall be increased to $3,084.93, per month.

      3.    **Terms and Conditions of Lease:** Except as stated above, all the terms and conditions of the Lease, Extension, and Second Extension shall continue to remain in full force and effect and shall be binding on both Lessor and Lessee.

**LESSOR:**

Dated:_____

_____
SCOT HILLMAN, General Partner,
Heiskell Ranches L.P.

**LESSEE:**

Dated: 2/9/17

ALAN GERMANY, CFO,
Tulare Local Healthcare District

EXHIBIT A
Page 9 Of 9

## COMMERCIAL LEASE

This agreement is entered into effective March 1, 2011, between HEISKELL RANCHES, LP (Heiskell), as lessor, and Tulare Local Health Care District d/b/a Tulare Regional Medical Center (TRMC), as lessee.

**THIS AGREEMENT IS ENTERED INTO WITH RESPECT TO THE FOLLOWING FACTS:**

1.     Heiskell owns certain real property (*the premises*) commonly described as 880 E. Merritt, Suites 107, 108 & 109, Tulare, California.

2.     TRMC desires to lease the premises from Heiskell on the terms and conditions set forth herein.

3.     Heiskell desires to lease the premises to TRMC on the terms and conditions set forth herein.

**IT IS THEREFORE AGREED AS FOLLOWS:**

4.     **Term of Lease.** This lease shall be for a term of one (1) year, commencing March 1, 2011, and ending on February 29, 2012, unless sooner terminated as provided herein. TRMC shall have the option to renew this lease for two (2) additional one-year periods for a monthly rent of $4,500 per month during the first such renewal option period and $4,550 for the second such option period. To exercise these options TRMC must be in compliance with the terms of the lease and provide Heiskell with a written notice of its intent to renew within (30) days of the lease expiration.

EXHIBIT B
Page 1 Of 8

5. **Rental.** During the first year of the term of this lease, TRMC agrees to pay to Heiskell for the use and occupancy of the premises the monthly sum of $4,400. All payments are due on the first day of each month, and will be considered paid when actually received by Heiskell at the address set forth in paragraph 17 of this agreement. If, during the term of this lease, TRMC is more than fifteen days late in making one of the rental payments described herein, TRMC will pay to Heiskell, in addition to the rent due, a late payment of $35.00.

6. **Waste or Nuisance.** TRMC shall not commit or permit the commission by others of any waste on the premises. Additionally, TRMC shall not maintain, commit, or permit the maintenance or commission of any nuisance as defined in the California Civil Code on the premises, and TRMC shall not use or permit the use of the premises for any unlawful purpose.

7. **Utilities.** TRMC shall pay, and hold Heiskell and the property of Heiskell free and harmless from, all charges for the furnishing of gas, electricity, telephone service, water, sewer service and other public utilities to the premises during the term of this lease.

8. **Repairs, Governmental Regulations, Waste and Advertising.**
TRMC shall, during the term of this lease and any extension thereof, at TRMC's cost and expense:

(a) Keep and maintain the interior of the leased premises, including all interior doors, all glass, plumbing, and interior electrical systems, in good and neat order and repair, and shall allow no nuisance to exist therein, waiving all rights to make repairs at the expense of Heiskell.

2

(b) Keep and maintain the heating and cooling system.

(c) Comply and abide by all federal, state, county, municipal and other statutes, ordinances, laws and regulations affecting the leased premises, the improvement thereon, or any activity or condition on or in said premises.

Heiskell shall, at Heiskell's expense, make all exterior and structural repairs to said premises.

TRMC shall not commit or permit any waste upon the leased premises. TRMC shall place no new signs, advertising, or lettering upon the roofs, walls, windows, or exterior doors of said premises without prior written consent of Heiskell. Heiskell's consent shall not be unreasonably held.

9.      **Alterations and Liens.** TRMC shall not make or permit any other person to make any alterations to the premises or any improvements located thereon without first obtaining the written consent of Heiskell. TRMC shall keep the premises free and clear from any and all liens, claims and demands for work performed, materials furnished, or operations conducted on the premises at the request of TRMC.

10.      **Inspection by Heiskell.** TRMC shall permit the representatives of Heiskell to enter the premises at reasonable times for the purpose of inspecting the premises and doing other lawful acts that may be necessary to protect Heiskell's interest in the premises or to perform its duties under this lease.

11.      **Surrender of Premises.** On expiration or sooner termination of this lease, TRMC shall promptly surrender and deliver the premises to Heiskell in as good condition as they are at the date of this lease, reasonable wear and tear excepted.

3

EXHIBIT B
Page 3 Of- 8

12. **Assignment and Sub-Leasing.** TRMC shall not encumber, assign or otherwise transfer this lease or any interest in this lease without first obtaining the written consent of Heiskell.

13. **Default by TRMC.** TRMC's breach of any condition, covenant, or provision of this lease shall constitute a material breach. For any material breach, Heiskell may provide TRMC with a three day notice that describes the breach and demands that TRMC cure the default (if a cure is possible). If TRMC does not cure the default within three days, or if a cure is not possible, this lease will be terminated. Heiskell may thereafter reenter and regain possession of the premises in the manner provided by the laws of unlawful detainer of the State of California then in effect.

14. **Cumulative Remedies.** The remedies given to Heiskell in this lease shall not be exclusive but shall be in addition to all remedies now or hereafter allowed by law.

15. **Waiver of Breach.** The waiver by Heiskell of any breach by TRMC of any of the provisions of this lease shall not constitute a continuing waiver or a waiver of any subsequent breach by TRMC either of the same or another provision of this lease.

16. **Attorney's Fees.** Should any litigation be commenced between the parties to this agreement concerning the premises, this agreement, or the rights and duties of either in relation to this agreement, the prevailing party in such litigation shall be entitled, in addition to any other relief to which it may be entitled, to a reasonable sum as and for its attorney's fees in such litigation.

17. **Notices.** Any and all notices (including three day notices to pay rent or quit) or other communications required or permitted by this lease to be served on either party hereto, shall be in writing and shall be deemed duly served when personally delivered to

4

EXHIBIT B
Page 4 Of- 8

an authorized representative of the party to whom the notice is directed, or in lieu of such personal service when deposited in the United States mail, registered or certified mail, postage prepaid, addressed as follows:

| | |
|---|---|
| Heiskell: | Heiskell Ranches<br>P.O. Box 1379<br>Tulare, California 93275<br>Attn: Scot Hillman |
| TRMC: | Tulare Local Health Care District<br>dba Tulare Regional Medical Center<br>Director, Mineral King Laboratory<br>869 Cherry Street<br>Tulare, California 93274 |

Either party may change its address for the purpose of this section by giving written notice of such change to the other party in the manner provided herein.

18.　**Binding on Successors.** This lease shall be binding on and shall inure to the benefit of the heirs, personal representatives, successors and/or assign of the parties hereto, but nothing in this section shall be construed as a consent by Heiskell to any assignment of this lease.

19.　**Partial Invalidity.** Should any provision of this lease be held by a court of competent jurisdiction to be either invalid, void, or unenforceable, the remaining provisions shall remain in full force and effect.

20.　**Sole and Only Agreement.** This instrument constitutes the sole and only agreement between Heiskell and TRMC respecting the premises and correctly sets forth the obligations of Heiskell and TRMC to each other as of this date. Any agreement or representations respecting the premises or their leasing by Heiskell to TRMC not expressly set forth in this instrument are null and void.

5

EXHIBIT B
Page 5 Of- 8

21.    **Time of Essence.** Time is expressly declared to be the essence of this lease.

22.    **Hazardous Materials.** TRMC shall not use, store, generate, release or dispose of any hazardous material on the Premises or the property of which the Premises are part. However, TRMC is permitted to make use of such materials that are required to be used in the normal course of TRMC's business provided that TRMC complies with all applicable Laws related to the hazardous materials. TRMC is responsible for cost of removal and remediation, or any clean-up of any contamination caused by TRMC.

23.    **Insurance.** TRMCs personal property, fixtures, equipment, inventory and vehicles are not issued by Heiskell against loss of damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. TRMC is to carry TRMC's own property insurance to protect TRMC from any such loss. In addition, TRMC shall carry liability insurance in an amount of not less than $1,000,000.00. TRMC's liability insurance shall name Heiskell as additional insured. TRMC, upon Heiskell's request, shall provide Heiskell with a certificate of insurance establishing TRMC's compliance. Heiskell shall maintain liability insurance insuring Heiskell, but not TRMC, in an amount of at least $1,000,000.00, plus property insurance in an amount sufficient to cover the replacement cost of the property. TRMC is advised to carry business interruption insurance in an amount at least sufficient to cover TRMC's complete rental obligation to Heiskell. Both Heiskell and TRMC release each other, and waive their respective rights to subrogation against each other, for loss or damage covered by insurance.

24.    **Indemnification.** TRMC shall indemnify, defend and hold Heiskell

6

EXHIBIT B
Page 6 Of 8

Harmless from all claims, disputes, litigation, judgments and attorney fees arising out of TRMC's use of the Premises.

25.    **Waiver.**    The waiver of any breach shall not be constructed as a continuing waiver of the same breach of a waiver of any subsequent breach.

26.    **Property Taxes.**    Heiskell shall pay all property taxes and assessments levied upon or against the leased premises during the term hereof by the City of Tulare and the County of Tulare, including all taxes and assessments levied by school districts and other special districts appearing on the tax statements of the County of Tulare. TRMC shall timely pay all taxes and assessments on personal property belonging to TRMC located on the premises.

HEISKELL RANCHES, LP
By: Scot T. Hillman, General Partner

Tulare Local Health Care District
dba Tulare Regional Medical Center

By: Shawn Bolouki, CEO

7

## EXTENSION OF LEASE

The undersigned Tulare Local Healthcare District d/b/a Tulare Regional Medical Center (TRMC), hereinafter referred to as ("Lessee") and Heiskell Ranches L.P., hereinafter referred to as ("Lessor"),  hereby agree to extend the term of the March 1, 2011, Commercial Lease, hereinafter referred to as ("Lease").  The leased premises under the Lease was and shall continue to be the premises located at 880 E. Merritt, Suites 107, 108 and 109, Tulare, California.  A copy of the Lease is attached hereto as Exhibit "A".

That Lease shall continue in full force and effect with the following modifications:

      1.    **Term:** The extended Lease term shall commence March 1, 2014 and terminate February 28, 2015.

      2.    **Rent:** The minimum rent under this Lease shall be the sum of $4,550.00, per month, commencing March 1, 2014.

      3.    **Terms and Conditions of Lease:** Except as stated above, all the terms and conditions of the Lease shall continue to remain in full force and effect and shall be binding on both Lessor and Lessee.

LESSOR:

Dated: _____3/20/2014_____

_Scot Hillman_ (signature)

SCOT HILLMAN, General Partner,
Heiskell Ranches L.P.

LESSEE:

Dated: _____3.5.14_____

_Anthony K. Jones_ (signature)

TONY JONES, CEO/CRO,
Tulare Local Healthcare District
d/b/a Tulare Regional Medical
Center

EXHIBIT  B
Page  8  Of- 8

# LEASE

THIS LEASE is made as of this 8th day of September, 2011, by and between City of Tulare, ("Landlord") and the Tulare Local Healthcare District, doing business as Tulare Regional Medical Center ("Tenant").

## RECITALS

A. Landlord is the owner of an undeveloped parcel of land ("Property") located at 325 N. West Street consisting of approximately 30,117 square feet in City of Tulare, APN168-470-011. Tenant wishes to place and operate a local health care services facility ("Clinic") in a building of approximately 3,500 sq. ft. on an approximately 15,000 square foot portion of the Property.

B. Landlord desires to lease a portion of the Property necessary for Tenant's intended use ("Premises") to Tenant and Tenant desires to lease the Premises from Landlord on the terms and conditions hereinafter set forth.

C. Both parties acknowledge the terms and conditions of this Lease are not subject to any past, present, or future promise by either party to refer patients and/or other types of revenue-generating business to the other party.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, the parties hereto agree as follows:

1.     LEASED PREMISES AND PROPERTY.

Landlord hereby leases to Tenant and Tenant leases from Landlord, the Premises, along with all appurtenant rights for Tenant's use thereof as provided herein. Said Premises are more particularly described in Exhibit "A" attached hereto.

Landlord shall have the use of the remainder of the Property not subject to the Lease, so long as such use does not interfere with the Tenant's use and operation of the Clinic on the Premises.

2.     TERM.

The Lease shall commence on the date when both Tenant and Landlord have executed this Lease (the "Term Commencement Date") and shall expire twenty five (25) years after the Rent Commencement Date. The Rent Commencement Date is defined as the date which is the first day of the first full calendar month following the completion of on-site improvements on the Premises by the Landlord. Each twelve-month period thereafter during the term of the Lease shall be defined as a "Lease Year".

3.    LEASE PAYMENTS.

Tenant shall pay to Landlord on the Rent Commencement Date, an annual payment of $1.00.  Tenant, at its option may pay the entire Lease term amount of $25.00 on the first Rent Commencement Date, which would not be reimbursed or prorated in the event of early Lease termination.  Prepayment of the Lease by Tenant does not affect any of the termination rights of either Party contained in this Lease.   As further consideration Tenant agrees to waive any relocation assistance that would otherwise be available under the law.

The parties acknowledge that the rent charged hereunder is not based or conditioned upon any requirement that either party make referrals to, be in a position to make or influence referrals to, or otherwise generate business for the other party or its affiliates.

4.    HOLDING OVER.

If Tenant, with Landlord's consent, remains in possession of the Premises after expiration or termination of the Lease, or after the date in any notice given by either party terminating this Lease, such possession by Tenant shall be deemed to be a month-to-month tenancy with the amount of rent being equal to that payable under the Lease, terminable on thirty days' notice given at any time by either party.  All provisions of this Lease shall apply to the month-to-month tenancy.

5.    OPTIONS TO PURCHASE.

Tenant shall have the option to purchase the Premises at any time during the duration of the Lease.  Such option is subject to Landlord's consent to sell and successful negotiations of a sale/purchase agreement between the parties.  The option contained herein may not be separately assigned; assignment is only permitted as part of a permitted assignment of Tenant's entire interest in this Lease in conformance with Section 17 below.

6.    INTENTION OF THE PARTIES – TRIPLE NET LEASE.

It is understood and agreed that this Lease shall be a triple net Lease with respect to Landlord and that all taxes, including, but not limited to, business taxes or license fees associated with the collection of rent, assessments, insurance, utilities and other operating costs, and all repairs, remodeling, renovations, alterations and improvements (except those expressly made the obligation of Landlord under the express terms of this Lease) are to be paid and performed by Tenant so that the rental return to Landlord is not reduced, offset or diminished directly or indirectly by any cost or charge except as otherwise provided herein.  All such expenses, if necessary, shall be reimbursed to Landlord at all times during the term of this Lease.  Tenant's obligation to pay such expenses shall commence on the Rent Commencement Date.

7.    USE OF THE PREMISES AND IMPROVEMENTS.

Prior to Rent Commencement Date, Landlord shall, at its sole expense, complete all necessary on-site improvements, as set forth in Exhibit "B," including landscaping, paving and parking, perimeter fencing with one or more access gates, to have the Premises ready for placement of the modular building on the Premises by the Tenant.  Any additional

EXHIBIT    C

Page   2   Of   26

improvements, including composite deck(s), shade sails, or other additions if desired shall be installed by or at the expense of Tenant. Any work performed by or on behalf of the Tenant must be pre-approved in writing by the Landlord, which approval shall not be unreasonably withheld.

Tenant agrees that the Premises shall be used and occupied only for the purpose of a neighborhood health care clinic open to the general public. Tenant shall, within six months of the Term Commencement Date, at Tenant's sole cost, place on the Premises, fully equip and put into operation as a health care clinic, a modular building (approximately 3,500 sq. ft.). Tenant shall obtain at Tenant's sole cost all permits, licenses and other necessary approvals for the placement and operation of the clinic in accordance with the terms of this Lease. Tenant shall also comply with all reasonable requirements of any insurance organization or company pertaining to the use of the Premises necessary for maintenance of all insurance required under the terms of this Lease.

8.    REPAIRS, MAINTENANCE AND REPLACEMENT.

Throughout the Term hereof, Tenant shall, at Tenant's sole cost, keep and maintain the Premises and leased property in reasonable condition and repair in accordance with all applicable laws, rules, ordinances, orders, and regulations of all governmental authorities having jurisdiction over the Premises. Tenant shall be responsible for all building janitorial expenses. If Tenant fails to so maintain the on-site improvements constructed by the Landlord in reasonable condition and repair, Landlord may, after giving Tenant thirty (30) days' written notice (stating with reasonable specificity the matters requiring repair and maintenance), perform or contract for the performance of the necessary repairs and maintenance within thirty (30) days following delivery of said written notice and the sums so expended by Landlord shall become due and payable to Landlord (including any interest at the rate equal to the rate then earned under Local Agency Investment Fund (LAIF)) at the time the next installment of Rent shall become due and payable.

Tenant agrees to surrender to Landlord on the last day of the Term of this Lease, or upon sooner termination thereof, the Premises and any alterations, improvements and/or replacements thereto, with the exception of the modular building which the Tenant, at its sole option may remove and relocate to another property. In such event, Tenant shall surrender the Premises in the same condition (ordinary wear and tear excepted), as received prior to installation of the modular building by the Tenant. In the event that Tenant fails to remove the modular building at the end of the Lease or earlier termination thereof, Tenant shall surrender the Premises in its renovated, remodeled or replaced condition, ordinary wear and tear excepted; provided, however, that if no uncured default by Tenant under this Lease then exists, and no uncured event which, with the giving of notice or passage of time or both, would constitute a default by Tenant under this Lease then exists, then Tenant may remove all furniture, fixtures and equipment as are (a) then located on the Premises; (b) not permanently built into or affixed to the Premises; and (c) owned by Tenant or leased by Tenant from someone other than Landlord. Tenant shall promptly repair, at its sole expense, any damage occasioned by the removal of any furniture, fixtures, or equipment from the Premises.

EXHIBIT ___C___
Page __3__ Of- _26_

9.      ALTERATION.

Any alterations, additions, improvements or changes to the on-site improvements installed by the Landlord that Tenant may desire to make in, to or upon the Premises shall be made at Tenant's sole cost and expense, and only after first submitting plans and specifications therefor to Landlord and obtaining the consent of Landlord thereto in writing, which consent will not be unreasonably withheld. Any such alterations or improvements shall at once become a part of the Premises and shall be surrendered to Landlord upon the expiration or sooner termination of this Lease. Tenant shall notify Landlord in writing at least ten (10) days prior to the commencement by Tenant of any work of alteration or repair.

10.      COMPLIANCE WITH LAW; HAZARDOUS SUBSTANCES.

If any hazardous materials or substances prohibited by law are found to exist on the Premises and the presence of the materials or substances has not been caused by Tenant, Landlord shall, at Landlord's sole cost and expense, maintain liability for any resulting damages and compliance of the requirements, ordinances, regulations, and statutes of all municipal, state and federal authorities currently in or which may thereafter be in force, pertaining to the Premises and which materially affect the use and occupancy thereof. In the event that the extent of financial liability to be maintained by the Landlord is deemed unreasonable by Landlord, Landlord may terminate the Lease. This provision shall have full force and effect, no matter when the materials or substances are discovered, and shall survive termination or expiration of this Lease.

Landlord shall indemnify, protect, defend and hold harmless and reimburse Tenant from and against any and all liabilities, damages, suits, penalties, judgments, and environmental cleanup, removal, response, assessment, or investigation or remediation cost ("Environmental Cost") arising from contamination of the Premises or release of any Hazardous Substances, in, on or under the Premises which is caused by Hazardous Substances handled, stored, used or otherwise brought onto, or transported to or from, the Premises, to the extent the occurrence is not caused by Tenant or any of Tenant's employees, contractors, agents, customers, invitees or licensees. This indemnity shall survive the expiration or sooner termination of this Lease.

Tenant shall, at Tenant's sole cost and expense, at all times during the Term hereof, comply with all of the requirements, ordinances, regulations and statutes of all municipal, state and federal authorities currently in or which may thereafter be in force, pertaining to the Premises and which materially affect the use and occupancy thereof.

Upon the termination of this Lease or vacation of the Premises, Tenant shall at Tenant's sole expense and in compliance with all applicable federal, state, and local statutes, ordinances, regulations, rules, orders and other laws, remove all Hazardous Substances used, stored or otherwise brought onto the Premises by Tenant or its employees, contractors, agents, customers, invitees, and licensees. Tenant shall provide Landlord with copies of all records related to any Hazardous Substances that are required to be maintained by any applicable federal, state, or local statutes, regulations, or other laws.

Tenant shall indemnify, protect, defend and hold harmless and reimburse Landlord from and against any and all liabilities, damages, suits, penalties, judgments, and environmental

cleanup, removal, response, assessment, or investigation or remediation cost ("Environmental Cost") arising from contamination of the Premises or release of any Hazardous Substances, in, on or under the Premises which is caused by Hazardous Substances handled, stored, used or otherwise brought onto, or transported to or from, the Premises, by Tenant or any of Tenant's employees, contractors, agents, customers, invitees or licensees. This indemnity shall survive the expiration or sooner termination of this Lease.

11.     WASTE.

  Tenant shall not commit, or cause to be committed, any waste on said Premises, or any nuisance or other act or thing which may disturb the quiet enjoyment of the Premises or by Landlord or other tenants.

12.     TAXES.

  A.     Property Tax.

  The parties hereby acknowledge that the Premises are presently exempt from real property tax impositions and assessments. To the extent any future taxes and assessments, general and special, and all other real property tax impositions, ordinary and extraordinary (the "Property Taxes"), are levied or assessed on the Premises and/or on any buildings or improvements, the parties agree they shall cooperatively endeavor to apply for an exemption with the appropriate regulatory agencies. In the event the exemption is wholly or partially denied as a result of Tenant's use of the Premises, Tenant agrees to pay Landlord the proportionate share (based on square footage) of the Property Taxes imposed and due. Tenant's obligation under this section shall be limited to the then current tax assessments on the Premises and any lawful annual increases on such current assessment and will not be subject to a reassessment which may occur upon transfer of title of property or for any other reason. In the event of a reassessment due to a change in the property tax law, then Tenant will be responsible for any increase.

  In the event any future real Property Taxes become due under this Section, Landlord shall request payment for said Property Taxes from Tenant, in writing, not more than twice per calendar year. Tenant shall remit payment to Landlord within 30 days of Landlord's request.

  B.     Personal Property Taxes.

  Commencing on the Rent Commencement Date and continuing throughout the remainder of the Term hereof, Tenant shall pay prior to delinquency all taxes assessed against and levied upon Tenant's personal property located in or about the Premises. If any of Tenant's personal property shall at any time be assessed with Landlord's real property or Leased Property, Tenant shall pay Landlord, upon demand, the taxes attributable to Tenant.

  C.     Right to Contest.

  Tenant may contest the legal validity or amount of any taxes, assessments, or charges for which Tenant is responsible under this Lease, and may institute such proceeding as Tenant considers necessary or desirable. Landlord shall cooperate with Tenant in connection with any

EXHIBIT     C
Page   5   Of-  26

such contest. All notifications furnished by any taxing authority directly to Landlord relating to taxes, tax delinquencies, valuations or re-valuations, segregations, proposed assessments and the like concerning or incidental to any tax payable by Tenant shall be promptly delivered by Landlord to Tenant. Landlord, upon request by Tenant, will produce all necessary documentation evidencing the amounts of any charges, assessments, or other financial obligations required of Tenant under the terms of this Lease.

13.   UTILITIES.

Tenant shall pay for all water, gas and heat, light, refuse collection, power, telephone service and all other service supplied to said Premises to include the water used for landscaping beginning on the Rent Commencement Date and continuing throughout the entire Term of this Lease. Landlord represents and warrants that the infrastructure for water, gas and heat, light, refuse collection, power and telephone service is in place and, subject to Tenant's ordering of such services, are available to the Premises. Landlord shall not be liable to Tenant for any subsequent failure, interruption, rationing or other curtailment of any utilities from whatever cause (other than Landlord's negligence or willful misconduct) and Tenant shall not be entitled to terminate this Lease or to any reduction in or abatement of rent by reason of any of the foregoing.

14.   CASUALTY INSURANCE: DAMAGE OR DESTRUCTION.

A.   Casualty Insurance.

Tenant, at Tenant's expense, shall at all times during the Term of this Lease, maintain on the building and any other improvements as may be located on the Premises (for purposes of this Section 14, collectively referred to as the "Improvements"), a policy of standard fire and extended coverage insurance, to the extent of the full replacement value of said Improvements.

The "full replacement value" of the Improvements to be insured under this Paragraph 14A shall be determined by the company issuing the insurance policy at the time the policy is initially obtained. Not more frequently than once every two (2) years, either party shall have the right to notify the other party that it elects to have the replacement value re-determined by an insurance company. The re-determination shall be made promptly and in accordance with the rules and practices of the Board of Fire Underwriters, or a like board recognized and generally accepted by the insurance company, and each party shall be promptly notified of the results by the company. The casualty insurance policy shall be adjusted according to the re-determination.

B.   Insured Casualty.

If during the Term of this Lease the Improvements are totally or partially destroyed from any cause covered by Tenant's casualty insurance policy, rendering the Improvements totally or partially inaccessible or unusable, Tenant shall restore the Improvements to substantially the same condition they were in immediately before the destruction if the restoration can be made under existing laws and can be completed within one hundred twenty (120) business days after the date of destruction. Such destruction shall not terminate this Lease, provided, however, that if the restoration cannot be made in the time stated above, then within fifteen (15) days after the parties determine that the restoration cannot be made in the time stated in this Subsection B,

6

EXHIBIT   C
Page  6  Of-  24

which time period for determination shall not be longer than 30 days, Tenant can terminate this Lease effective as of the date of destruction by giving written notice to Landlord within said fifteen-day period. If existing laws do not permit the restoration, either party can terminate this Lease by giving notice to the other party within fifteen (15) days after the parties determine that existing laws do not permit the restoration.

C.    Uninsured Casualty.

If during the Term the Improvements are totally or partially destroyed from any cause not covered by Tenant's casualty insurance policy, rendering the Improvements totally or partially inaccessible or unusable, Tenant shall, subject to the termination rights described in clauses (i) and (ii) below, restore the Improvements to substantially the same condition they were in immediately before the destruction, if the restoration can be made under existing laws. Such destruction shall not terminate this Lease, provided, however that (i) if existing laws do not permit the restoration, either party can terminate this Lease immediately by giving notice to the other party, and (ii) if the cost of restoration exceeds ten percent (10%) of the then replacement cost of the Improvements that are destroyed, Tenant can elect to terminate this Lease by giving notice to Landlord within fifteen (15) days after determining the restoration cost and replacement value but not later than thirty (30) days after the date of destruction, which termination shall be deemed effective as of the date of destruction.

D.    Obligation to Continue Payment of Rent.

Except as otherwise expressly provided in this Lease, this Lease shall not terminate or be affected in any manner by reason of any damage or destruction, by fire or other casualty, in whole or in part, of the Premises or the Improvements thereon, or by reason of the untenantability of the Premises, except as may otherwise be expressly provided herein.

E.    Abatement of Rent; Termination.

(a)    This Lease shall not be terminated by any damage to or destruction of the Premises except as expressly provided herein, and Tenant hereby waives the provisions of Sections 1932(2) and 1933(4) of the California Civil Code with respect to any such damage or destruction, to the extent that waiver is not inconsistent with the provisions of this Lease.

(b)    Upon the termination of this Lease pursuant to the exercise of any termination right granted to Landlord or Tenant by this Section 14, Tenant shall be released from any further liability under this Lease as of the date of the destruction except for (a) obligations incurred by Tenant or otherwise accruing prior to the date of termination (including the payment of all rent accrued through the date of termination) and (b) obligations which by the express terms of this Lease are stated to survive a termination.

(c)    Also, upon the termination of this Lease pursuant to the exercise of any termination right granted to Landlord or Tenant by this Section 14, if Tenant has received casualty insurance proceeds, a portion of which are allocable to Landlord's installed on-site improvements, then Tenant shall pay Landlord a portion of such proceeds equal to

7

EXHIBIT    C
Page    7    Of-    26

the amount of the then depreciated value of the on-site improvements less an equitable portion of any deductible payable by Tenant under the casualty insurance policy.

F.     Option To Terminate Lease.

Notwithstanding the above provisions of Section 14, Landlord and Tenant shall each have the option to terminate this Lease when any casualty occurs which would preclude the Tenant from operating its business for a period more than one hundred twenty (120) continuous days. Landlord and Tenant shall each have thirty (30) days from the date of the casualty to elect to terminate the Lease.

## 15. LEASE TERMINATION.

Landlord may terminate this Lease upon 30 days' written notice to Tenant, upon the occurrence of any one of the following:

(a)     Tenant is adjudged bankrupt;

(b)     Tenant becomes insolvent or has a receiver appointed;

(c)     Tenant suffers any judgment which remains unsatisfied for 30 days, and which would substantively impair the ability of the judgment debtor to perform under this Agreement; or

(d)     Tenant materially breaches this Lease.

Tenant may terminate this Lease upon 30 days' written notice to Landlord, upon the occurrence of any one of the following:

(a)     The sale of Tenant's real property (commonly known as 128 and 140 North West Street, Tulare California) which is Tenant's designated source of funding for the establishment and development of the intended health care services clinic is not completed and the sale proceeds received on or before the Rent Commencement Date;

(b)     The reimbursement rates provided to Tenant's licensed business are reduced so that operation is no longer reasonably financially viable;

(c)     Tenant's business no longer qualifies for and/or is no longer designated as a rural health clinic or a federally qualified health center so that operation is no longer feasible;

(d)     Tenant's business suffers loss of its license;

(e)     The operation of Tenant's business is no longer reasonable financially viable; or

(f)     Landlord materially breaches this Lease.

It will be the responsibility of the Tenant to provide sufficient information to Landlord to support the reason for termination. In such case, Tenant may remove the modular building from the

8

EXHIBIT     C
Page   8   Of-   26

Premises within the 60 days of the written notice to terminate the Lease. Any improvement, alterations and changes to the on-site improvements become the property of the Landlord. In the event that Tenant does not remove the modular building within a reasonable time, Landlord at its option may retain the possession of the modular building or have it removed at Tenant's expense, and upon prior written notification.

16. <u>INDEMNITY: TENANT'S LIABILITY AND PROPERTY INSURANCE.</u>

     A.      <u>Indemnification Agreement.</u>

Landlord and Tenant shall hold each other harmless, defend and indemnify their respective agents, officers and employees from and against any liability, claims, actions, costs, damages, or losses of any kind, including death or injury to any person and/or damage to property, arising out of the activities of their own agents, officers, employees, or volunteers engaging in conduct within the course and scope of their employment or relationship under this Lease. This indemnification specifically includes any claims made against Tenant alleging civil rights violations by Landlord under Government Code section 12920 et seq. (California Fair Employment and Housing Act) arising out of the activities of Tenant engaging in the provision of rural health clinic medical services. This indemnification obligation shall include, but by no way be limited to reasonable attorneys' fees, arising from or attributable to such indemnification. This indemnification obligation shall continue beyond the term of this Lease as to any acts or omissions occurring under this Lease or any extension of this Lease.

     B.      <u>Insurance</u>

         (a)      <u>Insurance.</u>

Tenant further agrees to maintain in force throughout the Term hereof, at Tenant's sole cost and expense, public liability insurance against any liability to the public incident to the use of or resulting from any accident occurring in or about said Premises, the liability under such insurance to be not less than Two Million Dollars ($2,000,000.00) for one or more persons injured in any one accident, and Two Million Dollars ($2,000,000.00) for property damage. Said policies shall insure the contingent liability of Landlord and Landlord shall be named as additional insureds in such policies.

         (b)      <u>Tenant's Property Insurance.</u>

Tenant, at its own cost shall, at all times during the Term of this Lease, maintain on all the personal property and removable fixtures and equipment situated in, on or about the Premises, a policy of standard fire and extended coverage insurance, with vandalism and malicious mischief endorsements, in an amount equal to the full replacement cost thereof. The proceeds of any such policy that becomes payable due to damage, loss or destruction of such property shall be made payable to Tenant and shall be used by Tenant for the repair or replacement thereof.

9

(c)    <u>Proof of Insurance.</u>

A copy of the insurance policies required under this Lease shall be issued by insurers rated no less than A+ VI in the most recent edition of Best's Insurance Reports. Tenant agrees to obtain a written obligation on the part of the insurance carriers to notify Landlord in writing at least ten (10) days prior to any cancellation or non-renewal of any policy required of Tenant hereunder, and Tenant further agrees that if Tenant does not keep such insurance in full force and effect, Landlord may obtain the necessary insurance and pay the premium such payment shall be deemed to be Rent and shall be paid on the next Rent Commencement anniversary date.

17.    <u>ASSIGNING, SUBLETTING AND HYPOTHECATING.</u>

Tenant shall not sell, transfer or assign this Lease or any part thereof, or interest therein, or hypothecate or grant any rights hereunder, without in each case obtaining the prior written consent of Landlord, which consent shall not be unreasonably withheld. This Section 17 shall not preclude Tenant from assigning this Lease to an entity, provided, however, that (i) the originally named Tenant owns not less then fifty percent (50%) of the beneficial ownership of that entity; and (ii) notwithstanding the assignment of this Lease to an entity, the originally named Tenant shall remain liable under this Lease.

18.    <u>SIGNS.</u>

Tenant shall not inscribe, paint or affix any signs, advertisements, placards or awnings to the exterior of the Premises or elsewhere, except as expressly set forth herein. Subject to compliance with all applicable laws, Tenant shall have the right to install a monument sign on the parking lot and an illuminated signage on the front of the building containing the Premises, if allowed by City sign ordinances subject to Landlord's approval, which approval shall not be unreasonably withheld. The signage shall include Tenant's name and logo, and Tenant shall pay all fees and obtain all permits necessary to install the signage.

19.    <u>WAIVER OF BREACH.</u>

Any waiver, express or implied, by any party hereto, of any breach by any party of any covenant or provision of this Lease, shall not be, nor be construed to be, a waiver of any subsequent breach of any term or provision hereof.

20.    <u>ENTRY BY LANDLORD.</u>

Tenant shall permit Landlord or Landlord's agents to enter into and upon said Premises at all reasonable times with not less than twenty-four (24) hours prior written notice to Tenant (except in the case of an emergency, which shall not require any notice) for any lawful purpose contemplated by the provisions of this Lease. Landlord shall conduct any such allowed entry on the Premises in a manner that will cause the least possible inconvenience, annoyance or disturbance to Tenant.

EXHIBIT _____ C

Page _10_ Of- _26_

21.    NOTICES.

All notices hereunder shall be in writing and shall be given by sending the same by registered mail, postage prepaid, to the parties at their respective addresses as set forth below, or at such other addresses as the parties may from time to time notify each other in writing:

If to Tenant, at:          Tulare Regional Medical Center
                           Attention:  Shawn Bolouki, CEO
                           869 North Cherry Street
                           Tulare, California 93274

If to Landlord, at:

22.    CONFLICT RESOLUTION.

Any controversy or claim arising out of, or related to this Lease between the Landlord and the Tenant, other than Landlord's unlawful detainer claim, shall be mediated prior to initiation of any legal proceeding.  Costs of such mediation shall be equally shared by the parties.

23.    BINDING ON SUCCESSORS.

Landlord and Tenant agree that each of the terms, conditions and obligations of this Lease shall extend to and bind, or inure to the benefit of (as the case may require), not only the parties thereto, but to each and every one of the heirs, executors, administrators, representatives, successors and assigns of Landlord and Tenant.

24.    ATTORNEYS' FEES.

In the event that any legal action (including mediation in accordance with Section 22 hereof) is instituted by either of the parties hereto to enforce or construe the terms, conditions and covenants of this Lease, or the validity thereof, the party prevailing in any such action shall be entitled to recover from the other party all court costs and reasonable attorneys' fees, which shall be decided by the court in that action or litigation, or in a separate action brought for that purpose.

25.    PARTIAL INVALIDITY.

If any term or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforceable to the fullest extent permitted by law.

26.    GOVERNING LAW.

11

EXHIBIT  C
Page  11  Of- 26

This Lease shall be governed exclusively by the provisions hereof and by the laws of the State of California (without giving effect to its choice of law provisions), as the same from time to time exist.

27.　　**COMPLETE AGREEMENT.**

This Lease constitutes the entire agreement between the parties and may not be altered, amended, modified or extended except by an instrument in writing signed by the parties hereto.

28.　　**CERTIFICATION.**

By entering into this Lease, the parties hereby certify that they shall not violate the Anti-Kickback Statute and Stark Law with respect to the performance of this Lease.

29.　　**DISCLOSURE OBLIGATION.**

An "Ineligible Person" is a person excluded, debarred, suspended, or otherwise ineligible to participate in Federal health care programs, and procurement, or non-procurement programs. The parties to this Lease hereby represent to each other that he/she/it is not an "Ineligible Person" nor has any pending proceedings or received notice of any action or proceeding to exclude, debar, suspend or otherwise declare him/her/it ineligible under any federally funded health program. The parties shall notify one another within three (3) days after becoming aware of any fact or circumstance that would make him/her/it an "Ineligible Person."

30.　　**AUTHORITY TO EXECUTE.**

Each party executing this Lease on behalf of an entity represents and warrants that the party has authority to execute this Lease individually and on behalf of the entity represented and that such entity has entered into the appropriate resolution or authorization for granting such authority and that said signature is for and on behalf of the named entity.

IN WITNESS WHEREOF, the parties have executed this Lease on the respective day and year set forth above.

By: Wayne Ross, Mayor
Landlord

By: Shawn Bolouki, CEO
Tenant

EXHIBIT　C
Page　12　Of-　26

# Exhibit "A"

EXHIBIT C
Page 13 Of 26



EXHIBIT C
Page 14 Of 26

## FIRST AMENDMENT

## TO THE

## LEASE AGREEMENT

THIS FIRST AMENDMENT TO THE September 8, 2011 Lease is made as of April **25**, 2012 (the "First Amendment") by and between the City of Tulare ("Landlord"), and the Tulare Local Healthcare District, doing business as Tulare Regional Medical Center ("Tenant").

### RECITALS

A. **WHEREAS**, the parties to the LEASE have time-sensitive fiscal and other operational objectives that must be satisfied to ensure the success of the project subject to the Lease and this First Amendment; and

B. **WHEREAS**, parties agree that one Project Manager and a single bid process will provide for greater management and construction efficiency; and

C. **WHEREAS**, to advance the parties' mutual goals, Landlord and Tenant desire to modify certain terms and conditions of the Lease as contained in this First Amendment on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants hereinafter contained, the parties agree as follows:

### SECTION 1: AMENDED TERMS

The following terms of the Lease are hereby amended as follows:

A. Paragraph 2 TERM is hereby repealed and replaced with the following:

"2.     TERM.

The Lease shall commence on the date when both Tenant and Landlord have executed this Lease (the "Term Commencement Date") and shall expire twenty five (25) years thereafter. Each twelve-month period thereafter during the term of the Lease shall be defined as a 'Lease Year'."

B. Paragraph 3 LEASE PAYMENTS is hereby repealed and replaced with the following:

"3.     LEASE PAYMENTS.

Tenant shall pay to Landlord within thirty (30) days of the execution of the First Amendment, an annual payment of $1.00. Tenant, at its option may pay the entire Lease term amount of $25.00 on or before this date, which would not be reimbursed or prorated in the event of early Lease termination. Prepayment of the Lease by Tenant does not affect any of the termination rights of either party contained in this Lease. As further consideration Tenant agrees to waive any relocation assistance that would otherwise be available under the law.

The parties acknowledge that the rent charged hereunder is not based or conditioned upon any requirement that either party make referrals to, be in a position to make or influence referrals to, or otherwise generate business for the other party or its affiliates."

C. Paragraph 7 USE OF THE PREMISES AND IMPROVEMENTS is hereby repealed and replaced with the following:

"7.     USE OF THE PREMISES AND IMPROVEMENTS.

Tenant shall perform directly, or through an outside contractor, the function of Project Management for the development of the health clinic and on-site improvements in compliance with all City, State and Federal laws.

Tenant shall, at its sole expense, complete all necessary on-site improvements, as set depicted in Exhibit "A" and as forth in Exhibit "B" and Exhibit "C," except that Landlord shall be solely responsible for any claims by Tulare Irrigation District for the cost of any and/or all repairs or replacement to the irrigation water pipeline, owned by Tulare Irrigation District, which is presently located at or on the public roadway, along the perimeter and at or near ingress and egress of the Premises, and/or any claims of personal or property damage attributable to the irrigation water pipeline, except for those caused by the Tenant's sole negligence in constructing the on-site improvements.

Tenant agrees that the Premises shall be used and occupied only for the purpose of a neighborhood health care clinic open to the general public. Tenant shall assume responsibility for advertising and securing public bids to perform the on-site improvements as depicted in Exhibit "A" and as set forth in Exhibits "B" and "C." Tenant shall obtain at Tenant's sole cost all permits, licenses and other necessary approvals for the improvement in accordance with the terms of this Lease. Tenant shall also comply with all reasonable requirements of any insurance organization or company pertaining to the use of the Premises necessary for maintenance of all insurance required under the terms of this Lease."

D. Paragraph 8 REPAIRS, MAINTENANCE AND REPLACEMENT is hereby repealed and replaced with the following:

"8.     REPAIRS, MAINTENANCE AND REPLACEMENT.

EXHIBIT     C
Page  16  Of- 26

Throughout the Term hereof, Tenant shall, at Tenant's sole cost, keep and maintain the Premises and leased property in reasonable condition and repair in accordance with all applicable laws, rules, ordinances, orders, and regulations of all governmental authorities having jurisdiction over the Premises. Tenant shall be responsible for all building janitorial expenses.

Tenant agrees to surrender to Landlord on the last day of the Term of this Lease, or upon sooner termination thereof, the Premises and any alterations, improvements and/or replacements thereto, with the exception of the modular building which the Tenant, at its sole option may remove and relocate to another property. In the event that Tenant fails to remove the modular building at the end of the Lease or earlier termination thereof, Tenant shall surrender the Premises in its renovated, remodeled or replaced condition, ordinary wear and tear excepted; provided, however, that if no uncured default by Tenant under this Lease then exists, and no uncured event which, with the giving of notice or passage of time or both, would constitute a default by Tenant under this Lease then exists, then Tenant may remove all furniture, fixtures and equipment as are (a) then located on the Premises; (b) not permanently built into or affixed to the Premises; and (c) owned by Tenant or leased by Tenant from someone other than Landlord. Tenant shall promptly repair, at its sole expense, any damage occasioned by the removal of any furniture, fixtures, or equipment from the Premises."

E.  Paragraph 9 ALTERATION is hereby repealed.

F.  Paragraph 12 TAXES, Section B Personal Property Taxes, is hereby repealed and replaced with the following:

"B.    Personal Property Taxes.

Commencing within thirty (30) days of the execution of the First Amendment and continuing throughout the remainder of the Term hereof, Tenant shall pay prior to delinquency all taxes assessed against and levied upon Tenant's personal property located in or about the Premises. If any of Tenant's personal property shall at any time be assessed with Landlord's real property or Leased Property, Tenant shall pay Landlord, upon demand, the taxes attributable to Tenant."

G.  Paragraph 13 UTILITIES is hereby repealed and replaced with the following:

"13.    UTILITIES.

Tenant shall pay for all water, gas and heat, light, refuse collection, power, telephone service and all other service supplied to said Premises to include the water used for landscaping beginning ten (10) days after Tenant issues a Notice to Proceed to the general contractor selected to construct the improvements, and continuing throughout the entire Term of this Lease. Landlord represents and warrants that the

3

EXHIBIT ____C____
Page __17__ Of- __26__

infrastructure for water, gas and heat, light, refuse collection, power and telephone service is in place and, subject to Tenant's ordering of such services, are available to the Premises. Except for causes due to Landlord's negligence or willful misconduct or that result from the irrigation pipeline that runs along the perimeter of the Premises, Landlord shall not be liable to Tenant for any subsequent failure, interruption, rationing or other curtailment of any utilities from whatever cause, and Tenant shall not be entitled to terminate this Lease or to any reduction in or abatement of rent by reason of any of the foregoing."

H.  Paragraph 31 is hereby added as follows:

"31.    <u>CONSIDERATION FOR CERTAIN IMPROVEMENTS</u>.

In exchange for Tenant undertaking the Project Management functions and making certain on-site improvements to the Premises including landscaping, paving, parking, and perimeter fencing with one or more access gates, as more fully described in Exhibit "C," Landlord shall pay to Tenant $ 250,126.08 . Such payment must be paid by Landlord, in full, to Tenant on or before April 30, 2012."

I.  Paragraph 32 is hereby added as follows:

"32.    CHANGE-ORDERS; <u>RECONCILIATION; OWNERSHIP OF AS-BUILT PLANS</u>.

Any change orders related to the on-site improvements detailed in Exhibit "C" only must be pre-approved in writing by the Landlord, whose approval may not be unreasonably withheld. Upon completion of construction and prior to the City of Tulare issuing a certificate of occupancy, Tenant shall prepare and present to Landlord a full accounting of project costs and specifically reconcile the costs for those improvements specified in Exhibit "B" and Exhibit "C."

If the actual cost of the improvements specified in Exhibit "C" exceeds the payment provided by Landlord to Tenant as described in Paragraph 31, Landlord shall immediately issue its certificate of occupancy and, within seven (7) business days, remit the difference to Tenant.

If the actual cost of the improvements specified in Exhibit "C" is less than the payment provided by Landlord to Tenant as described in Paragraph 31, Tenant shall, within seven (7) business days, remit the difference to Tenant. Immediately upon receipt of such payment, Landlord shall issue its certificate of occupancy.

Following Tenant's receipt of the certificate of occupancy, Landlord shall become the owner of As-Built plans for the improvements specified in Exhibit "C" "



EXHIBIT  C
Page 18 of 26

## SECTION 2:  RESTATEMENT OF REMAINING TERMS

The Lease between the parties is modified and amended only as to those provisions specifically identified and stated under Section 1 of this First Amendment. All of the remaining provisions of the Lease not modified and amended by the provisions of this First Amendment shall continue in full force and effect and are hereby restated by the parties.

## SECTION 3:  GENERAL PROVISIONS

A.　　This First Amendment, together with the Lease executed by the parties constitutes the entire agreement between the parties and contains all the agreements between them with respect to the subject matter hereof.  This First Amendment, as to those provisions set forth above in Section 1, supersedes only those provisions specifically identified.  This First Amendment together with the remaining provisions of the Lease, supersede any and all other agreements or contracts, either oral or written, between the parties with respect to the subject matter hereof.

B.　　The invalidity or unenforceability of any provision of this First Amendment shall not affect its other provisions, and this First Amendment shall be construed in all respects as if such invalid or unenforceable provisions had been omitted.

C.　　This First Amendment shall be construed and enforced under and in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the parties have executed this Lease on the respective day and year set forth above.

4/17/12
_____
Date

_____
By: Don Dorman, City Manager
Landlord

2/28/12
_____
Date

_____
By: Shawn Bolouki, CEO
Tenant

5

EXHIBIT　　C
Page 19  Of- 26

## EXHIBIT "A"

**Architect's Rendering**

6

EXHIBIT____C____
Page _20_ Of- _26_

EXHIBIT    C
Page 21 Of 26

EXHIBIT C
Page 22 Of 26

## EXHIBIT "B"

[Detail of TRMC's Improvements and Costs – Chuck to Provide]

EXHIBIT ___C___
Page ___23__ Of- _26_

4/12/2012

# TULARE REGIONAL MEDICAL CENTER
## *WESTSIDE CLINIC*
325 N. West Street, Tulare, CA.

Kluger

| ITEM # | ITEM | QUANTITY | UNIT | ESTIMATED COST/UNIT | ESTIMATED O/A COST |
|---|---|---|---|---|---|
| 1 | Modular unit, consisting of three sections, 2 @ 12' W x 67' L & 1 @ 14' W x 67' L including basic electrical, plumbing & HVAC; lay-in ceilings, drywall & skim coat & painting to level 4 finish, baseboard, doors & hardware, windows etc. Modular units to be set on concrete slab by City. | 2546.00 | SF | $95.00 | $241,870.00 |
| 2 | Metal pier foundations | 2546.00 | SF | $13.00 | $33,098.00 |
| 3 | Delivery of units to site | 3.00 | EACH | $1,500.00 | $4,500.00 |
| 4 | Hook up to utilities | | | | Included in item 1 |
| 5 | Skirting to perimeter of building | 525.00 | SF | $2.20 | $1,155.00 |
| 6 | Interior fit-out, partitions etc. incl. 3 restrooms | 2546.00 | SF | $12.00 | $30,552.00 |
| 7 | Additional electrical (specific requirements) | 2546.00 | SF | $2.90 | $7,383.40 |
| 8 | Additional plumbing (specific requirements) | 2546.00 | SF | $4.50 | $11,457.00 |
| 9 | Additional HVAC (Specific requirements) | 2546.00 | SF | $5.75 | $14,639.50 |
| 10 | Cable & data hookup & installation | 2546.00 | SF | $5.00 | $12,730.00 |
| 11 | Fire alarm system | 2546.00 | SF | $6.75 | $17,185.50 |
| 12 | Sheet vinyl floor covering | 2450.00 | SF | $7.25 | $17,762.50 |
| 13 | Millwork for 7 exam rooms | 7.00 | EACH | $1,000.00 | $7,000.00 |
| 14 | Millwork for laboratory/nurse station | 12.00 | LF | $200.00 | $2,400.00 |
| 15 | Millwork for reception | 40.00 | LF | $250.00 | $10,000.00 |
| 16 | Entrance deck/ramp & stairs & rear entrance deck & stairs | 717.00 | SF | $35.00 | $25,095.00 |
| 17 | Stucco part of exterior | 610.00 | SF | $12.00 | $7,320.00 |
| 18 | Painting of exterior | 3100.00 | SF | $2.50 | $7,750.00 |
| 19 | Rooftop screening for HVAC units | 80.00 | LF | $25.00 | $2,000.00 |
| 20 | Decorative screening (vine trellises) | 4.00 | EACH | $600.00 | $2,400.00 |
| 21 | Exterior lighting attached to building (4 fixtures) | 4.00 | EACH | $500.00 | $2,000.00 |
| 22 | General Conditions & Project Management | 2546.00 | SF | $13.00 | $33,098.00 |
| 23 | Contingency of 12% | | | | $58,967.51 |
| | **TOTAL** | | >>>>>>>>> | | **$550,363.41** |
| | | | | Cost per square foot: | **$216.17** |
| | City of Tulare Conditional Use Permit | 1.00 | LS | $2,517.00 | $2,517.00 |
| | City of Tulare Environmental Fee | 1.00 | LS | $41.00 | $41.00 |
| | City of Tulare Sign Permit | 1.00 | LS | $133.00 | $133.00 |
| | City of Tulare Plan Check/permit fee (estimate) | 1.00 | LS | $2,500.00 | $2,500.00 |
| | OSHPD fee (estimated) | 1.00 | LS | $3,000.00 | $3,000.00 |
| | **TOTAL** | | >>>>>>>>> | | **$8,191.00** |

| | |
|---|---|
| Note 1 | The following items are NOT included in the above:<br>(A) furniture (waiting room chairs, staff chairs, doctors' workstations, tables, exam couches, planters, staff lockers, etc;<br>(B) appliances (refrigerators, freezers, copiers, microwave, time clock, paper shredders, televisions, DVD players, computers etc;<br>(C) Medical equipment of any kind, including mobile X-ray;<br>(D) Outdoor furniture, umbrellas, canopies, benches, tables, etc;<br>(E) Exterior & interior signage of any kind including those required by code. |
| Note 2 | The costs per square foot indicated in this document are based upon recent (i.e.mid-year 2011) generic experience and industry-wide information only. The availability of labor, local costs of materials and labor, profit element, overhead costs and similar expenses cannot be determined prior to availability of specific documentation for this project, and subsequent bidding by, or negotiation with, general contractors. These costs therefore should be used as a guide only, and no guarantee is given nor implied as a true representation of a final construction cost for this or any other project. |
| Note 3 | Year-on-year inflation of construction costs will vary depending upon market factors, Government fiscal policy etc. The above figures have increased by approximately 6% over 2009 figures. For projection of future costs, we suggest that a year-on-year inflationary increase of 10% per annum be allowed as a conservative figure. |

EXHIBIT      C
Page   24   Of-  24

## EXHIBIT "C"

[Detail of City's Improvements and Costs – Chuck to Provide]

8

EXHIBIT　　C
Page 25 Of- 26

## TULARE REGIONAL MEDICAL CENTER
### *WESTSIDE CLINIC*
325 N. West Street, Tulare, CA.

09/23/2011
REVISED 03/29/12

| ITEM # | ITEM | QUANTITY | UNIT | ESTIMATED COST/UNIT | ESTIMATED O/A COST |
|---|---|---|---|---|---|
| 1 | Level & grade site | 15000.00 | SF | $1.00 | $15,000.00 |
| 2 | Install new sewer connection from street to 5' from pad | 30.00 | LF | $80.00 | $2,400.00 |
| 3 | Install new potable water connection from street to 5' from pad | 30.00 | LF | $70.00 | $2,100.00 |
| 4 | Install new electrical connection from street to 5' from pad | 30.00 | LF | $70.00 | $2,100.00 |
| 5 | Install new gas connection from street to 5' from pad | 30.00 | LF | $70.00 | $2,100.00 |
| 6 | Install new cable/data connection from street to 5' from pad | 30.00 | LF | $70.00 | $2,100.00 |
| 7 | New curb cut, sidewalk, etc. | 120.00 | SF | $50.00 | $6,000.00 |
| 8 | Prepare new concrete footings for modular building (dependant upon design required) | 2546.00 | SF | $4.00 | $10,184.00 |
| 9 | Asphalt driveway inc. curbs | 8000.00 | SF | $5.50 | $44,000.00 |
| 10 | 72" high tube steel fencing on south and street sides, inc. gates. | 290.00 | LF | $90.00 | $26,100.00 |
| 11 | Painted concrete block wall 72" high on north and west sides, inc. strip footings, reinforcement & filled cells. | 290.00 | LF | $95.00 | $27,550.00 |
| 12 | Trash enclosure & concrete apron | 200.00 | SF | $80.00 | $16,000.00 |
| 13 | Landscaping, including planters, shrubs, etc.& irrigation system | 4200.00 | SF | $10.00 | $42,000.00 |
| 14 | 23 orchard trees, 6" caliper | 23.00 | tree | $250.00 | $5,750.00 |
| 15 | Electrical & motors for gates, including ground loop on exit side, conduit, operators, etc. | Lump Sum | LS | $25,000.00 | $25,000.00 |
| 16 | Knox Box, etc. for Fire Dept. | 1.00 | Item | $300.00 | $300.00 |
| 17 | Contingency of 12%. | | | | $27,442.08 |
| | **TOTAL** >>>>>>>> | | | | **$256,126.08** |

| | |
|---|---|
| Note 1 | Square footages indicated are provisional estimates only, and are likely to be modified as the program for the site and each building is developed. These square footages are for guidance only. |
| Note 2 | The costs per square foot indicated in this document are based upon recent (i.e. year-end 2010) generic experience and industry-wide information only. The availability of labor, local costs of materials and labor, profit element, overhead costs and similar expenses cannot be determined prior to availability of specific documentation for this project, and subsequent bidding by, or negotiation with, general contractors. These costs therefore should be used as a guide only, and no guarantee is given nor implied as a true representation of a final construction cost for this or any other project. |
| Note 3 | Year-on-year inflation of construction costs will vary depending upon market factors, Government fiscal policy etc. The above figures have increased by approximately 6% over 2009 figures. For projection of future costs, we suggest that a year-on-year inflationary increase of 10% per annum be allowed as a conservative figure. |



www.klugerarchitects.com

EXHIBIT    C
Page 26 Of- 26