35

WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter #91839
Kathleen D. DeVaney #156444
Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:  (559) 435-9800
Facsimile:   (559) 435-9868
E-mail:       rileywalter@w2lg.com

Chapter 9 Counsel for Tulare Local Healthcare District

MCCORMICK BARSTOW, LLP
Todd A. Wynkoop #308845
Benjamin T. Nicholson #239893
Benjamin E. Ladd #320466
7647 N. Fresno Street
Fresno, CA 93720
Telephone:  (559) 433-1300
Facsimile:   (559) 433-2300
E-mail:       todd.wynkoop@mccormickbarstow.com

District Counsel for Tulare Local Healthcare District

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  17-13797 |
| TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER, | Chapter 9<br>DC NO.:  WW-41 |
| Debtor. | Date:     N/A<br>Time:     N/A<br>Place:    2500 Tulare Street<br>             Fresno, CA 93721<br>             Courtroom 13 |
| Tax ID #:   94-6002897<br>Address:    869 N. Cherry Street<br>             Tulare, CA 93274 | Judge:    Honorable René Lastreto II |

**EXHIBIT TO DECLARATION OF RILEY C. WALTER IN SUPPORT OF APPLICATION FOR ORDER SHORTENING TIME ON MOTION FOR AUTHORITY TO ENTER INTO TRANSACTION INCLUDING BORROWING FUNDS, SALES OF PERSONAL PROPERTY AND PROVIDING SECURITY, ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND FOR AUTHORITY TO LEASE REAL PROPERTY PURSUANT TO 11 U.S.C. §§ 105, 362, 364, 365, 901 and 922**

| **Exhibit** | **Description** | **# of Pages** |
|---|---|---|
| A | DRAFT MOTION FOR AUTHORITY TO ENTER INTO TRANSACTION INCLUDING BORROWING FUNDS, SALES OF PERSONAL PROPERTY AND PROVIDING SECURITY, ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND FOR AUTHORITY TO LEASE REAL PROPERTY PURSUANT TO 11 U.S.C. §§ 105, 362, 364, 365, 901 and 922 | 30 |

Dated: July 19, 2018

WALTER WILHELM LAW GROUP,
a Professional Corporation

By: *Riley C. Walter*

Riley C. Walter, Attorneys for Debtor,
Tulare Local Healthcare District, dba Tulare
Regional Medical Center

# EXHIBIT A

**32**

1   WALTER WILHELM LAW GROUP
2   A Professional Corporation
    Riley C. Walter #91839
3   Kathleen D. DeVaney #156444
    Danielle J. Bethel #315945
4   205 East River Park Circle, Ste. 410
    Fresno, CA 93720
5   Telephone:    (559) 435-9800
    Facsimile:     (559) 435-9868
6   E-mail:       rileywalter@w2lg.com

7   Chapter 9 Counsel for Tulare Local Healthcare District

8   McCORMICK BARSTOW, LLP
    Todd A. Wynkoop #308845
9   Benjamin T. Nicholson #239893
    Benjamin E. Ladd #320466
10   7647 N. Fresno Street
    Fresno, CA 93720
11   Telephone:    (559) 433-1300
    Facsimile:     (559) 433-2300
12   E-mail:       todd.wynkoop@mccormickbarstow.com

13   District Counsel for Tulare Local Healthcare District

14         IN THE UNITED STATES BANKRUPTCY COURT

15           EASTERN DISTRICT OF CALIFORNIA

16             FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO. 17-13797 |
| TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER, | DC No.: WW-41 |
| Debtor. | Chapter 9 |
| Tax ID #:   94-6002897<br>Address:   869 N. Cherry Street<br>         Tulare, CA 93274 | Date:     August 2, 2018<br>Time:     9:30 a.m.<br>Place:    2500 Tulare Street<br>        Fresno, CA 93721<br>        Courtroom 13<br>Judge:   Honorable René Lastreto II |

**DEBTOR'S MOTION FOR AUTHORITY TO ENTER INTO TRANSACTION
INCLUDING BORROWING FUNDS, SALES OF PERSONAL PROPERTY AND
PROVIDING SECURITY, ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
LEASES AND FOR AUTHORITY TO LEASE REAL PROPERTY PURSUANT TO 11
U.S.C. Sections 105, 362, 364, 365, 901 AND 922**

Debtor, Tulare Local Healthcare District, doing business as Tulare Regional

Medical Center ("Debtor" or the "District") hereby moves the Court, pursuant to Sections

105, 362, 364, 365, 901 and 922 of Title 11, Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure ("FRBP") and Local Bankruptcy Rule ("LBR") 4001-1(c), for entry of an order in the form of Exhibit A to this Motion authorizing the District to enter into the transaction with Adventist Health described below so that it can reopen its Hospital and clinics to resume providing acute care services to the people of the District.

This Motion respectfully requests an order which provides for the following relief:

## I.

## SUMMARY OF TRANSACTION

The District seeks approval of a transaction ("Transaction") whereby Adventist Health ("AH") will:

A.      Lend up to $10 million to the District secured by assets of the District.

B.      Purchase for full value personal property owned by the District related to the Hospital facility and be assumed certain leases and executory contracts.

C.      Operate the Hospital pursuant to a management services agreement on an interim basis pending approval by the California Department of Public Health.

D.      Lease the Hospital for an initial term of 5.5 years for rent that will be determined by a fair market valuation performed by an independent valuation expert.

E.      Assume and assign various leases and executory contracts.

F.      Reopen the Hospital before October 28, 2018.

The Transaction must be approved by the District's elected board, the United States Bankruptcy Court and the voters of the District at an election to be held November 6, 2018.

The most current versions of each of the definitive documents relating to the Transaction as of July 20, 2018 are available at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab. As these documents are updated or revised they will also be

1  posted at the above website. Alternatively, PDF copies may be requested by email from

2  galfano@W2LG.com.

3      Because of deadlines related to putting voter approval on the ballot, the last day

4  to obtain Court approval of the Transaction is August 8, 2018.

5                                          II.

6                                    **BACKGROUND**

7      The District comes before the Court requesting such approvals as are

8  necessary under Chapter 9 to enter into a comprehensive Transaction with Adventist

9  Health/West, dba Adventist Health, a California non-profit religious corporation

10 ("AH").

11      This Background provides an overall summary of the Transaction

12 contemplated by the parties.  However, each of the definitive agreements requiring

13 Court approval is referenced within the body of this motion and the terms of the actual

14 agreements control.

15      On June 27, 2018 the publically elected board of directors of the District

16 resolved to negotiate the terms by which the District, owner of a 112 bed general

17 acute care hospital located at 869 N. Cherry Street, Tulare ("Hospital") including

18 outpatient services and clinics will become part of the Adventist Health Central Valley

19 Network which includes other AH health care facilities located in Hanford, Reedley,

20 Tehachapi, Sonora and Kingsburg (and soon Fowler).

21      In addition to final board approval, the transaction requires approval of the

22 voters of the District at the November 6, 2018 general election as well as all requested

23 approvals by various governmental agencies and United States Bankruptcy Court

24 approval to the extent required by Chapter 9.

25      Conditions of the Transaction include reinstatement of the suspended general

26 acute care license with California Department of Public Health ("CDPH") by October

27 28, 2018.  AH will form a new separate entity ("AH Lessee") to enter into the

28 agreements described within required for the Transaction.

Debtor's Motion for Authority to Enter Into Transaction          -3-
Including Borrowing Funds, Sales of Personal Property, etc.

M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

A. <u>Overview of Lease</u>.

The District will lease ("Lease") the Hospital to AH Lessee for the operation by AH as an acute care Hospital.  The Lease will be guaranteed by AH.

The current version of the Lease is provided at www.tularelocalhealthcaredistrict.org under Chapter 9 tab[1] ("Lease").  It is expected that the final version will be substantially similar to this version.

The Lease will be a triple net lease.  The rent to be paid will be the fair market value as determined by Deloitte, the fair market value consultant engaged by the District.  The results of the consultant's report will be made known to the public.  An independent valuation of the Lease is required by the Health and Safety Code and necessary as a part of the ballot.

The Lease will be for an initial term of five and a half (5.5) years with automatic renewal for five (5) additional five (5) year terms subject to AH's request not to renew upon notice to the District.

A portion of the rent will be used to repay amounts loaned to the District by AH as described below.

AH will be responsible for operation and routine maintenance of the Hospital excluding seismic compliance which is the responsibility of the District.

AH may terminate the Lease if the District does not complete construction of the not yet completed Tower within ten (10) years or does not become fully compliant with seismic compliance standards by 2030.

The Lease includes an option or right of first refusal to purchase the leased real property on certain conditions as spelled out in the Lease.

The Lease will involve a newly created entity as lessee, but the Lease will be guaranteed by AH.

///

---

[1] The current version of the Lease is available for review in its entirety at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab or by request from galfano@w2lg.com.  The final Lease will not vary materially from this version.

B. <u>Overview of Asset Purchase Agreement</u>.

As a part of the transaction, AH will purchase all personal property owned by the District located within the Hospital for fair value based on an independent valuation by Deloitte plus accounts owned by the District on the Closing Date. The Asset Purchase Agreement[2] ("APA") describes with particularity the assets being purchased and excluded from the Transaction.[3]

As a part of the price and Transaction, certain leases of equipment and certain executory contracts will be assumed by the District and assigned to AH. Assumption, assignment and cure amounts, if any, will be addressed by subsequent noticed motions. The Transaction also provides for taking subject to certain purchase money security interests against equipment.

Only specified assets related to the Hospital related to the District's CDPH license are a part of the Transaction. All excluded assets, including the Hospital real property and buildings remain with the District and under the control of the Board.

The purchase price to be paid is estimated by the District to be in the range of $4,000,000 to $6,500,000. The purchase price will be applied to the Loan.

C. <u>Financing</u>.

As a part of the transaction, and prior to closing on the Lease with AH Lessee, AH will provide a $10,000,000 revolving line of credit "Credit Agreement".[4]

The Credit Agreement will be secured to the extent permissible under applicable law by a lien on all District real property (excluding the Hospital) and on certain Hospital related personal property (pending purchase by AH) subject to existing valid liens.[4] The Hospital real property will <u>not</u> be pledged as collateral.

The amounts advanced under the Credit Agreement will bear interest at

---

[2] The current version of the Asset Purchase Agreement is available for review in its entirety at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab or by request from galfano@w2lg.com. The final Asset Purchase Agreement will not vary materially from this version.

[3] Bankruptcy Court approval of the APA is not needed.

[4] The current versions of the Credit Agreement and Security Agreement and Deed of Trust are available for review in their entirety at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab or by request from galfano@w2lg.com. The final Credit Agreement and Security Agreement will not vary materially from this version.

Debtor's Motion for Authority to Enter Into Transaction          -5-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.                Borrowing Funds and Providing Security [Adventist
                                                                          Health]\motion.7-19-18.gaa.6.docx

prime minus 50 basis points.  A portion of the amounts advanced will be treated as prepaid rent on the Lease.

The financing will allow the District to reopen and operate the Hospital before October 28, 2018.  AH will undertake interim operations under a Management Services Agreement after the vote on November 6, 2018, through the date the new license is issued to AH at which time the Lease will go into effect.

D. Impact on Bonded Indebtedness.

The District is obligated on $85,000,000± of general obligation bonds ("GO Bonds") being repaid from property taxes being paid by landowners in the District.  The transaction has no impact on the GO Bonds and the District will continue to receive the excess tax revenues of about $1,700,000 per year remaining after debt service.  Proceeds from the Build America Bonds will continue to be used to retire the GO Bonds.

The District is obligated on $13,750,000± of revenue bonds secured by the gross revenues of the District as modified by Section 928(b).  The District has committed to use its revenues, including excess property tax revenues, to repay the revenue bonds in accord with the existing documentation.[5]

E. Licenses/Certifications.

Immediately upon a successful vote on November 6, 2018, AH/AH Lessee will apply for a change of ownership for a new CDPH license to permit it to operate as an acute care hospital and will seek such other certifications with CMS, Medi-Cal and etc.

F. Management Services Agreement.

The Transaction contemplates that there may be a delay between the time the change of ownership of the license is submitted and its issuance.  So that AH Lessee can manage the day to day operations (subject to the District's authority as

---

[5]  The District and Wilmington Trust as trustee for the holders of revenue bonds are in negotiations as to adequate protection to be given to the revenue bond holders and it is hoped that agreement will be reached prior to the hearing on this Motion.

Debtor's Motion for Authority to Enter Into Transaction     -6-     M:\S-U\TRMC\PLEADINGS\WW-41 Motion to
Including Borrowing Funds, Sales of Personal Property, etc.          Borrowing Funds and Providing Security [Adventist
                                                                    Health]\motion.7-19-18.gaa.6.docx

owner and licensee) the parties will enter into an Interim Management Services Agreement ("Interim MSA") in exchange for a management fee equal to the net income of the Hospital.[6]  The District calls to the Court's attention the fact that the subject Interim MSA has been carefully vetted by counsel for the District to avoid the many problems stemming from the prior management services agreement rejected by this Court on October 19, 2018.

G. Other.

The Transaction has many conditions precedent, each of which must be satisfied, including approval of this Motion on or before August 8, 2018.  Without such Court approval, the District will be unable to comply with rules relating to the ballot measure that must be filed by August 8, 2018.  Without compliance with this timing the vote will not take place on November 6, 2018.

The closing date shall be the later of December 31, 2018 and the date the license ownership change is approved by CDPH, whichever is later.  To the extent required to consummate the transaction the automatic stays of Sections 362 and 922 will be modified to allow implementation of the transaction.

Pursuant to FRBP 4001(c) and LBR 4001-1(c), a detailed summary of the material provisions of the Credit Agreement, Asset Purchase Agreement and Lease are:

### MATERIAL TERMS OF CREDIT AGREEMENT

| Term | Details | Page |
|---|---|---|
| Parties | Tulare Local Healthcare District ("Borrower") and Adventist Health System/West ("Lender") | |
| Loan Commitment | $10,000,000 | 11 |
| Use of Funds | The proceeds shall be used only to finance costs incurred by the Borrower in connection with its efforts to seek reinstatement of the hospital's suspended general acute care hospital license and to reopen the hospital; for limited general working capital purposes in preparation for approval of by the voters; and for other purposes approved by Lender. | 11 |

---

[6]  The current version of the Management Services Agreement is available for review in its entirety at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab or by request from galfano@w2lg.com. The final Management Services Agreement will not vary materially from this version.

Debtor's Motion for Authority to Enter Into Transaction          -7-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.          Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

| Prepayment | Borrower may prepay at any time. | 11 |
|---|---|---|
| Loan Repayment | If the voters approve the Lease and Asset Purchase Agreement transactions, then principal and interest will be repaid as an offset against rent under the Lease (subject to the limitations for offset as set in the Lease). If the voters do not approve the Lease and Asset Purchase Agreement transactions, then the principal and interest will be repaid over a five-year period beginning the last business day of the third calendar month following November 6, 2018. | 12 |
| Mandatory Prepayment | The proceeds from the sale of the acquired assets under the Asset Purchase Agreement will be applied immediately against all amounts owed under the Credit Agreement | 12-13 |
| Interest Rate | Interest accrues on borrowed amounts at the prime rate minus 50 basis points. | 14 |
| Collateral | Borrower will pledge its interest in various real property and the personal property the subject of the Asset Purchase Agreement to secure repayment. | 14 |
| Representation and Warranties; Covenants | The agreement contains customary representations and warranties and covenants, including certain covenants not to make further borrowings or encumber assets, subject to negotiated exceptions. | 14-28 |
| Events of Default and Remedies | The agreement contains customary events of default for, among other things, failure to pay amounts owed as required by the agreement, defaults under other specified loan documents, defaults under the Lease or Asset Purchase Agreement, and bankruptcy-related occurrences. | 28-30 |
| Borrowing Limit | $10,000,000 | |

**MATERIAL TERMS OF LEASE**

| Term | Details | Page |
|---|---|---|
| Parties | Tulare Local Healthcare District ("Landlord") and a to-be-formed nonprofit corporation that will be a wholly-owned subsidiary of Adventist Health System/West ("Tenant"). | 1 |
| Initial Term and Commencement | 66 months beginning on the "Commencement Date" (the date of the closing under the Asset Purchase Agreement, which is the later of December 31, 2018 and the date on which the California Department of Public Health (the "CDPH") issues Tenant its license to operate the hospital). | 13 |
| Renewal Terms | Tenant has five 5-year options to extend the term to a maximum of 30 years, which will take place automatically unless Tenant gives Landlord 270 days' prior written notice before the expiration of the then-current term. | 13 |

| Rent | The annual rent payment will be the fair market value use of the leased premises, as determined by a nationally recognized, independent appraiser.  The lease payments (paid monthly in advance) will begin six months after the Commencement Date and are subject to offset only up to 50% of amounts owed under the Credit Agreement and for any amounts owed based on Landlord's breach of either this Lease or the Asset Purchase Agreement. | 12-14 |
|---|---|---|
| "Triple Net" Lease | Tenant, not Landlord, is solely responsible for all real estate-related taxes, insurance, and maintenance of the leased premises. | 14-15, 17; 25 |
| Use; Compliance; Bonds | Tenant shall use the leased premises for the operation of a generate acute care hospital and shall comply with all applicable laws in all material respects.  Tenant acknowledges the existence of (i) $15,000,000 Tulare Local Health Care District (Tulare County, California)  General Obligation Bonds, Election of 2005, Series A (2007); (ii) $8,595,000 Tulare Local Health Care District (Tulare County, California) General Obligation Bonds, Election of 2005, Series B-1 (2009)(Tax-Exempt); (iii) the $61,405,000 Tulare Local Health Care District (Tulare County, California) General Obligation Bonds, Election of 2005, Series B-2 (2009) (Federally Taxable-Direct Payment Build America Bonds); and (iv) $17,850,000 Tulare Local Healthcare District (Tulare County, California) Refunding Revenue Bonds, Series 2007 (collectively, the "Bonds"), and covenants not to take any action that breaches any Bond covenants or causes them to become taxable. | 16 |
| Capital Expenditures | If the parties agree that capital expenditures that go beyond normal maintenance is required, Tenant may offset such expenditures against rent subject to the 50% limitation noted above.  Any such tenant improvements would become a part of the premises and owned by Landlord. | 16-17 |
| Leasehold Mortgages | Tenant has a customary right to execute a leasehold mortgage, Tenant agrees to cooperate in customary ways, and a foreclosure of any leasehold mortgagee would not be a breach of the lease so long as the defaults are cured within specified time limits. | 17-20 |
| Prohibited Liens | Tenant must remove any lien that attaches to Landlord's fee estate in the leased premises. | 21 |
| Hazardous Substances | Tenant is required to comply with all applicable environmental laws and indemnify Landlord for any releases of hazardous substances during the term (other than those caused by Landlord).  Landlord is | 21-22 |

| | | required to comply with all applicable environmental laws and indemnify Tenant for any releases of hazardous substances caused by Landlord during the term or pre-dating the term of the Lease. | |
| Indemnification | | (other than regarding hazardous substances): Subject to Tenant's acknowledgment that Tenant has exclusive control of the leased premises, each party shall indemnify the other for damages the other sustains based on the indemnifying party's (a) wrongful act, wrongful omission, or negligence (and anyone claiming by or through the indemnifying party) or its or their partners, members, directors, officers, or employees; (b) breach or default by the indemnifying party under the Lease; or (c) breach of any representation or warranty made by indemnifying party in the Lease. In addition, Tenant shall indemnify Landlord against: (w) any tax-related contest Tenant initiates; (x) any local government application made at Tenant's request; (y) any construction undertaken by Tenant and any agreements that Tenant (or anyone claiming through Tenant) makes for any such construction; and (z) any accident, injury or damage whatsoever caused to any person in or on the leased premises or upon or under the sidewalks adjoining the leased premises. | 22-25 |
| Representations and Warranties | | Tenant makes customary representations and warranties regarding due authorization, litigation, condemnation, equipment liens, FIRPTA, construction liens, other tenants, and the Chapter 9 proceeding. | |
| Tentant's Purchase Option; Landlord's Inability to Sell Fee Estate | | Tenant has a right to purchase the leased premises for its then-current fair market value, as determined by a professional, independent appraiser, upon the earlier of Landlord's completion of the tower and Landlord's satisfaction of its seismic performance standards  under applicable law as to the improvements on the leased premises.  Landlord must obtain Tenant's prior written consent to sell the leased premises. | 30-32 |
| Default Remedies | | The Lease provides for customary defaults and rights of Tenant to cure non-monetary defaults.  The Lease also provides for customary remedies if Tenant were to default, including termination of the Lease. Landlord has the right, but not the obligation, to cure various Tenant defaults and claim reimbursement therefor. | 33-36 |
| Guarantee of Lease | | Guaranteed by AH | |

## MATERIAL TERMS OF ASSET PURCHASE AGREEMENT

| Term | Details | Page |
|---|---|---|
| Parties | Tulare Local Healthcare District ("Seller"); Adventist Health System/West ("AH"); a to-be-formed nonprofit corporation that will be a wholly-owned subsidiary of AH ("Buyer"). | 1 |
| Acquired Assets; Excluded Assets | Buyer will purchase all of the assets necessary to operate the hospital, including various equipment and other personal property, will assume certain leases and other contracts, certain inventory and prepaid items, and accounts receivable and bank accounts that arise after the date on which Buyer begins to operate the hospital under an Interim Management Services Agreement (as to which period Buyer bears profitability risk. Anything not expressly listed as an Acquired Asset is excluded, including specifically real property, tax revenues, cash and employee benefit plans. | 12-16 |
| Assumed Liabilities; Excluded Liabilities | Buyer assumes only liabilities associated with Assumed Contracts, and will be liable for all liabilities arising after the Closing in connection with the operation of the hospital. All other liabilities are Excluded Liabilities and retained by Seller. | |
| Purchase Price | The purchase price will be the assumption of the Assumed Liabilities plus a specified figure in the definitive agreement representing the fair market value of the Acquired Assets, as determined by a nationally recognized, independent appraiser. | 17-18 |
| Closing | The Closing Date is the later of December 31, 2018 and the date on which the California Department of Public Health (the "CDPH") issues Tenant its license to operate the hospital. The parties will exchange customary closing deliveries for a transaction such as this, though Buyer currently requests that Seller cause its Bond counsel to deliver a legal opinion concerning the Bonds and that the transactions contemplated in the agreement will not cause a breach of the Bonds. This term is being negotiated. | 19-21 |
| Seller's Representations and Warranties | Buyer requests Seller to make certain representations and warranties about its assets and operations, the accuracy of which are a condition to Buyer's obligation to close the transactions. The requested representations, which are being negotiated, cover organization and standing; authority, validity, and binding effect; No Violation or Bar; Required | 21-30 |

| | | | |
|---|---|---|---|
| | | Governmental Consents and Public Meetings; Absence of Certain Changes or Events; Title to Acquired Assets; Real Property; Environmental Matters; Employees; Employee Plans; Licenses and Permits; Insurance; Government Healthcare Programs; Medical Staff and Physician Relations; Title to Acquired Assets; Litigation, Claims and Proceedings; Orders, Decrees and Rulings; Compliance with Law; Broker's and Finder's Fees; and Medical Records. | |
| | Pre-Closing Covenants | After signing the agreement but before the Closing, Seller agrees (i) not to do certain things (including, without limitation, selling assets or subjecting assets to liens), (ii) to provide Buyer access to information and the hospital itself, (iii) notify Buyer of material changes, and (iv) to cooperate with Buyer regarding governmental authorizations. | 32-38 |
| | Conditions to Closing | Buyer's obligation to close the transactions is conditioned upon (i) the absence of a material casualty event to the Acquired Assets or the hospital or other event that constitutes a material adverse effect on Seller, (ii) Seller's compliance with the Agreement; (iii) the material accuracy of Seller's representations and warranties, (iv) obtaining the necessary government approvals, including the CDPH issuing a license to Buyer to operate the hospital, (v) Buyer's board and that of AH have approved the transactions, (vi) Seller's Bond counsel has issued the opinions discussed above, and (vii) Buyer's completion of site testing to confirm that the real property is reasonably satisfactory from an environmental compliance perspective. Some of these closing conditions are being negotiated. Seller's obligation to close is similarly conditioned, including upon voter approval of the transactions contemplated in this Agreement and the Lease. | 38-40 |
| | Non-Compete | Seller is prohibited from competing against Buyer, to the same extent as provided in the Lease, for five years following the Closing. This is being negotiated to remain consistent with the Lease such that the non-compete ceases if the Lease is terminated. | 40-41 |
| | Preservation of Records; Buyer Access to Records | After the Closing, Buyer must preserve all books and records in compliance with applicable law and Seller may, upon reasonable notice, gain access to such records for lawful purposes. | 42 |
| | Indemnification of Buyer; Environmental | Except for any Assumed Contracts and Assumed Liabilities assumed by Buyer pursuant, Seller will protect, indemnify, defend and hold Buyer, its and | 42-44 |

| | | |
|---|---|---|
| Indemnification of Buyer | Adventist Health, their respective members, officers, directors, trustees, agents, legal representatives, successors and assigns, and each of them, free and harmless from and against any and all claims, debts, liabilities, obligations, losses, damages, fines, penalties, judgments, assessments, costs and expenses (including but not limited to reasonable attorneys' fees and expenses), liens and encumbrances accruing, based upon, resulting from or directly or indirectly arising out of (a) any breach or default hereunder by Seller, or (b) defeasance of any bonds issued by Seller, or (c) Seller's operation of the hospital prior to the Closing, and with respect to the liabilities retained by Seller.  Seller hereby agrees to protect, indemnify, defend and hold Buyer and Adventist Health, their respective members, officers, directors, agents, legal representatives, successors and assigns, and each of them, free and harmless from and against any and all known or unknown costs, losses, liabilities, obligations, damages, lawsuits, deficiencies, claims, demands and expenses (whether or not arising out of third-party claims), including without limitation interest, penalties, costs of mitigation, any investigation or clean-up, remedial correction or response action, damages to the environment or natural resources, legal fees and all amounts paid in investigation, defense or settlement of any of the foregoing, incurred in connection with, arising out of or resulting from any liabilities arising under or noncompliance any environmental law or concerning any environmental condition or any property damage, natural resources damage, or bodily injury occurring as a result of Seller's operation of the hospital before the Closing Date and attributable to conditions on the hospital real property before the Closing Date. | |
| Indemnification of Seller | Buyer and Adventist Health hereby agree to protect, indemnify, defend and hold Seller, its members, officers, directors, trustees, agents, legal representatives, successors and assigns, and each of them, free and harmless from and against any and all claims, debts, liabilities, obligations, losses, fines, penalties, judgments, assessments, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses), liens and encumbrances accruing, based upon, resulting from or directly or indirectly arising out of (a) any breach or default hereunder by Buyer; (b) Buyer's or Adventist | 44-45 |

Debtor's Motion for Authority to Enter Into Transaction
Including Borrowing Funds, Sales of Personal Property, etc.          -13-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

| | | |
|---|---|---|
| | Health's operation of the Hospital after the Closing, (c) the Assumed Liabilities or (d) any mechanics' liens or other claims arising from or in connection with the due diligence activities conducted by Buyer and Adventist Health in connection herewith. | |
| Dispute Resolution | If the parties are unable to resolve a dispute, then the agreement requires arbitration pursuant to JAMS rules, and the agreement provides expedited periods for discovery and the hearing of the issue. | 46-47 |
| Termination; Release | Except in the case of mutual agreement, the agreement may be terminated by a party only if (i) the other party defaults, (ii) there is a failure of a condition to Closing, or (iii) the parties are unable to agree as to whether a matter that arises before Closing but after signing is materially adverse to Seller. The sole remedy is termination of the agreement, except if there is a breach of confidentiality provisions. | 48 |
| Adventist Health Guaranty | Adventist Health guarantees the payment and performance of Buyer's obligations under this asset purchase agreement and the Lease. The parties are discussing whether this will be memorialized in a stand-alone guaranty apart from this agreement. | 52-53 |

## III.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

The Court has jurisdiction over this Motion pursuant to Sections 157 and 1334 of title 28 of the United States Code. This is a core proceeding pursuant to Section 157(b)(2). Venue for proceedings on this Motion is proper in this District pursuant to Section 1409.

The statutory predicates for the relief requested herein are Sections 105, 362, 364, 365, 901 and 922, and FRBP 2002 and 4001.

## IV.

## HISTORY

The events leading to the District's filing of a petition under Chapter 9 are well known to the Court and set forth in pleadings filed in connection with the District's motion to reject the contract between the District and Healthcare Conglomerate Associates ("HCCA"). A very brief summary of certain relevant facts is below.

A.     The Debtor.

Tulare Local Health Care District is a public local health care district serving the residents of a large geographic area in southwestern Tulare County since 1945, which includes the City of Tulare and surrounding rural communities. The District serves the needs of over 70,000 residents of the City of Tulare and the surrounding rural communities, including Woodville, Tipton, Pixley and Waukena. It is bisected by Highway 99, a heavily traveled freeway in the San Joaquin Valley, and many tens of thousands of travelers potentially require emergency medical care due to accidents or illnesses in transit on any given day.

The District is a political subdivision of the State of California and was organized under the Local Hospital District Law set forth in California's Health and Safety Code. It is governed by a Board of Directors (the "Board") consisting of five members elected from within the District's geographical political divisions. The District owns and intends to operate its 112 bed general acute Hospital facility, medical clinics, a fitness facility (called Evolution Fitness Center) and other patient service programs. The general acute Hospital facility owned by the District is located at 869 Cherry Street in Tulare is known as the Tulare Regional Medical Center ("TRMC"). The District also owns and manages several other real properties in the vicinity of the Hospital, including a health club facility and medical office buildings.

B.     The Debtor's Former Manager And the Deterioration of Its Relationship with the District.

HCCA is a California limited liability company organized in December 2013.

In or around May 2014, HCCA and the District entered into a contract involving four interrelated agreements consisting of a Management Services Agreement, Interim Joint Operating Agreement, Joint Operating Agreement and Option (together, the "HCCA Contract"). The HCCA Contract provided, *inter alia*, that HCCA was responsible for the management, daily operations, and financial accounts of the District as set forth in greater detail in the HCCA Contract.

Debtor's Motion for Authority to Enter Into Transaction
Including Borrowing Funds, Sales of Personal Property, etc.     -15-     M:\S-U\TRMC\PLEADINGS\WW-41 Motion to
Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

1    Over time, the relationship between the District and HCCA soured and deteriorated

2 as questions and issues surfaced concerning HCCA's performance of its obligations

3 under the HCCA Contract, including claimed financial mismanagement and other

4 improprieties. On September 15, 2017, HCCA filed a lawsuit against the District in Los

5 Angeles County Superior Court (Case No. BC 676133) alleging claims for breach of

6 contract and declaratory relief (the "HCCA Lawsuit").[7]  The HCCA Lawsuit alleges, *inter*

7 *alia*, that the District owed HCCA the principal amount of $7 million for loans HCCA

8 allegedly advanced to the District for which "HCCA has received promissory notes."

9          C.    The District Learns HCCA Led It Into A Dire Fiscal Crisis and HCCA Races

10 to Encumber the District's Real Property.

11          On September 28, 2017, HCCA requested that the District's Board conduct an

12 emergency meeting on Sunday, October 1, 2017 (the "Benzeevi Letter").  In the Benzeevi

13 Letter, HCCA advised for the first time that the District had a "CRITICAL liquidity crisis,"

14 was "COMPLETELY out of cash," that many vendors were threatening to cease providing

15 goods and services, and that the District lacked "sufficient cash to fund the entire gross

16 payroll." HCCA also alleged it was owed $7 million and would not extend further credit to

17 the District. *Id.* HCCA further stated that it had notified the California Department of Public

18 Health ("CDPH") that day of "the District's inability to fund payroll." *Id.* Finally, Benzeevi

19 wrote "[w]ithout immediate approval for the District to obtain prompt funding, the only

20 alternative will be for HCCA to move immediately to cease operations at the Hospital and

21 to consider immediately a plan over the next several days to cease operations at the

22 Hospital." *Id.*

23          That very same day, September 28, armed with knowledge of the District's dire

24 financial straits and with the filing of a Chapter 9 petition known to be imminent, Benzeevi,

25

26 [7] The District removed the HCCA Lawsuit to this Court and filed an answer and counterclaim, and HCCA
has filed a motion seeking to remand it back to the Los Angeles Superior Court. See, generally, adversary
27 proceeding no. 17-01095 Docket No. 1, 4, 8 and 9.  The District maintains this Court is the proper court to
adjudicate the claims asserted by the parties, and has filed its response to HCCA's remand motion which
28 is currently set for hearing on August 15, 2018 on the same day the Court is scheduled to hear the
District's motion to avoid the HCCA deed of trust.

Debtor's Motion for Authority to Enter Into Transaction          -16-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.                    Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

1  claiming to be the Chief Executive Officer of the <u>District</u>, recorded a deed of trust

2  encumbering the Evolutions Plaza property. Specifically, on September 28, 2017, HCCA

3  recorded a Short Form Deed of Trust ("Deed of Trust") executed by Benzeevi, claiming

4  to be the Chief Executive Officer of the District, in favor of Benzeevi's company, HCCA,

5  which purports to secure a series of ten purported promissory notes.[7]   The $10.2 million

6  obligation alleged in the ten promissory notes is roughly $3.2 million more than HCCA

7  alleged it was owed in the Benzeevi Letter sent on the exact same date and alleged owed

8  in the HCCA Lawsuit.[8]  The Deed of Trust was recorded in the Official Records of Tulare

9  County as document no. 2017-0059339 and purports to encumber the Evolutions Plaza

10 property owned by the District. *Id*.  The District disputes the validity of the Deed of Trust,

11 any lien created by the recordation of the Deed of Trust and the amount of the obligation

12 alleged in the Deed of Trust.[7]

13      On January 23, 2018, the District filed Adversary Proceeding No. 18-01005-B in

14 this Court contending, *inter alia*, that the Deed of Trust and any lien created by the

15 recordation of the Deed of Trust is avoidable under 11 U.S.C. Sections 544, 547, 548 ,

16 and seeking declaratory relief.  The current status of this adversary proceeding is that the

17 District's motion for partial summary adjudication is set to be heard on August 15, 2018.[7]

18      D.      The District Files Its Petition to Save the Hospital.

19      Given the District's insolvency and its inability to fund payroll and pay other

20 obligations as and when they became due, HCCA's threat to cease operations at the

21 Hospital and medical facilities thereby creating a health and safety emergency for patients

22 and the public seeking medical care and the likelihood that the California Department of

23 Public Health ("CDPH") might involuntarily suspend the District's license, the District

24 commenced this Chapter 9 case on an emergency basis by filing a voluntary petition on

25 September 30, 2017 (the "Petition Date"). In light of the irreparable relationship between

26 the District and HCCA, the District immediately filed a motion to reject the Contract. On

27

28 _____

[8] The promissory notes are dated between July 31, 2015 and July 31, 2017.

Debtor's Motion for Authority to Enter Into Transaction          -17-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.                    Borrowing Funds and Providing Security [Adventist
                                                                              Health]\motion.7-19-18.gaa.6.docx

1  October 19, 2017, the Court granted the District's motion to reject the HCCA Contract.[9]

2         Given these desperate circumstances and with no ability to obtain adequate

3  funding on an urgent basis, the District voluntarily and temporarily suspended operations

4  effective midnight on October 28, 2017 and voluntarily surrendered its license to the

5  CDPH to avoid a forced shut down. The District did not gain control of its facilities,

6  documents, information and computer systems until November 22, 2017.

7         Since November 23, 2017 when the District regained control over its bank

8  accounts and facilities, the following has been accomplished.[10] These are set out in a

9  series of bullet points as follows:

10        (a)    The District has collected various monies owned on account of overdue

11 accounts and it has sought and obtained supplemental funds from various governmental

12 agencies.  These revenues have been used to engage a skeleton crew of people to work

13 on matters involved in getting the Hospital reopened.

14        (b)    The District has cooperated in various criminal and regulatory investigations

15 involving the Tulare County District Attorney's office, United States Department of Justice,

16 Department of Labor, Internal Revenue Service, and Labor Commissioner.

17        (c)    The District has committed significant resources in complying with an audit

18 by the State of California into the use of bond proceeds.

19        (d)    The District has evaluated many of the approximately 1,100 different

20 contractual relationships in an effort to determine which should be rejected, which were

21 essential to the reopening of the Hospital and etc.  Motions to assume and/or reject

22 various leases and executory contracts have been filed.

23        (e)    The District has negotiated with lessors of real property to the District.

24        (f)    The District has commenced adversary proceedings seeking to recover

25 monies claimed to be owed to the District.

26        (g)    The District has evaluated the removal of various actions, settled several

---

27  [9]  The order was entered on November 2, 2017.

28  [10] See the Debtor's Chapter 9 Status Report filed on June 12, 2018, as ECF 551 for a more complete
     description.

Debtor's Motion for Authority to Enter Into Transaction          -18-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.          Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

1    pre-petition litigation matters, and negotiated relief from stay as to several medical

2    malpractice matters.

3          (h)      The District sought and obtained a claims bar date and has assembled

4    information as to the various claims that have been asserted against the District.

5          (i)       As shown by the declaration of Daniel Heckathorne, the District has been

6    on a nearly perpetual quest for post petition financing.

7          (j)       On almost a daily basis the District has been involved in discussions with

8    the California Department of Public Health and other regulatory agencies relating to its

9    license and reinstatement of the license.

10         (k)      The District has resolved a longstanding lawsuit involving the Medical

11   Executive Committee which has resulted in the commitment of various medical

12   practitioners to resume privileges at the Hospital once it has reopened.

13         The District must reopen the Hospital before October 28, 2018 or its license to

14   operate as an acute care Hospital may be lost, which would be a disaster.

15         Additionally, the District must submit a ballot measure to the County of Tulare

16   Elections Office by August 8, 2018 to get the measure on the ballot for voter approval at

17   the November 6, 2018 election.

18         E.       The District's Efforts to Obtain Funding to Facilitate its Reorganization and

19   Path Toward A Plan of Adjustment.

20         To assist in the reorganization process, the District retained Wipfli LLP/HFS

21   Consultants ("HFS"), a company with a long history of assisting hospitals and hospital

22   districts in financial crisis. HFS' work includes, in part, evaluating and analyzing the

23   financial condition of the District, assessing the District's operations and reopening the

24   District's medical facilities, and advising the Board on recommendations to remedy the

25   financial crisis facing the District. *Id.* To facilitate that work, at the current time and

26   pursuant to a District Board resolution, Richard Gianello serves as the overall Senior

27   Project Manager, Larry Blitz of HFS serves as the District's Interim Chief Executive

28   Officer, Daniel Heckathorne of HFS acts as the District's Interim Chief Financial Officer

Debtor's Motion for Authority to Enter Into Transaction          -19-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.                    Borrowing Funds and Providing Security [Adventist
                                                                              Health]\motion.7-19-18.gaa.6.docx

1   and Sandford Haskins of HFS serves as the District's Chief Administrative Officer.

2       With the approval of the Board, HFS has developed a plan for reopening the

3   Hospital and establishing a firm fiscal foundation for the District's future to meet the

4   healthcare needs of the District's residents.   Toward that end, the District has secured a

5   commitment from AH to provide the District with the Credit Agreement, and is working on

6   obtaining additional financing.   As detailed above, as a part of the Transaction, AH has

7   also agreed to lease the Hospital if approved by the voters in the District and to purchase

8   certain personal property.

9       The rent to be paid for the Lease and the purchase price to be paid for the personal

10  property will be the fair market value as determined by Deloitte, a valuation expert

11  engaged by the District.   This is required by state law.   The Board will distribute the fair

12  market value to the public.

13      The terms of the Credit Agreement are summarized above.   The security for the

14  Credit Agreement will be all of the District's real property that can be lawfully pledged

15  (excluding the Hospital) and certain personal property pending purchase by AH.   The

16  District does not believe that the Hospital facility real property can be lawfully pledged,

17  but it owns the following real properties that it intends to pledge as collateral for the Credit

18  Agreement subject to any validly existing liens.

19      The property at 1725 East Prosperity is known as Evolutions.   It is subject to the

20  disputed HCCA deed of trust described above.

21      The property at 792 N. Cherry is subject of deed of trust recorded on September

22  7, 1989 in favor of Cyril H. Johnson, an individual, and Kenneth A. Kuney, as Trustee of

23  the Testamentary Trust created by the Will of Lucy Jane Johnson, deceased and the

24  Decree of Distribution of her Estate as to an undivided ½ interest.   Cyril H. Johnson

25  transferred his ½ interest to Georgianna Aileen Johnson McDonald on October 25, 2000

26  and the assignment deed of trust was recorded on October 30, 2000.   The District's

27  records show this debt was satisfied long ago but never reconvened.   The District has a

28  pending adversary proceeding (18-01020) seeking to clear title.

Debtor's Motion for Authority to Enter Into Transaction        -20-
Including Borrowing Funds, Sales of Personal Property, etc.

M:\S-U\TRMC\PLEADINGS\WW-41 Motion to
Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

The property at 941 N. Gem Street is subject to a deed of trust recorded on July 26, 1990 in favor of George D. Lavers and Elizabeth J. Lavers both individually and as trustees of the George D. Lavers and Elizabeth J. Lavers Revocable Living Trust Agreement dated May 10, 1995. The District's records show this debt was satisfied long ago but never reconveyed. The District has a pending adversary proceeding (18-01022) seeking to clear title.

The property at 591 E. Merritt Avenue was subject to a deed of trust recorded on October 4, 1996 in favor of Don A. Bravin and Elvira M. Bravin. The District's records show that this debt was satisfied long ago but never reconveyed. The District filed an adversary proceeding (18-01021) seeking to clear title. The Defendants have since given a full reconveyance of the deed of trust and the adversary proceeding was dismissed on June 29, 2018.

Other free and clear real property to be pledged as collateral are the following:

| Address | Description |
|---|---|
| Lots 24, 26 and 35 | |
| 935 – 945 N. Gem Street | |
| 591 E. Merritt Ave. | |
| 979 N. Gem Street | |
| 874, 890, 906 and 922 N. Cherry St. | |
| 793, 795 and 799 N. Cherry St. | |
| 1050 N. Cherry St. | |

**V.**

**THE DISTRICT HAS SATISFIED THE APPLICABLE LEGAL REQUIREMENTS FOR APPROVAL OF THE POST-PETITION FINANCING**

A Chapter 9 case is different than a case filed under Chapter 11 in many ways. One of those differences is found in Section 904 which, absent the municipality's consent, precludes bankruptcy courts from interfering with a municipality's political or governmental powers, property or revenues, and use or enjoyment of

Debtor's Motion for Authority to Enter Into Transaction
Including Borrowing Funds, Sales of Personal Property, etc.     -21-     M:\S-U\TRMC\PLEADINGS\WW-41 Motion to
Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

1   income-producing property. 11 U.S.C. Section 904; *Ass'n of Retired Employees of the*
2   *City of Stockton v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 13 (Bankr. E.D.
3   Cal. 2012) (Section 904 bars the court, without the municipality's consent, from
4   interfering with its political or governmental powers, property or revenues, and use or
5   enjoyment of income-producing property); *In re Valley Health Sys.*, 429 B.R. 692, 714
6   (Bankr. C.D. Cal. 2010) ("By virtue of Section 904, a debtor in Chapter 9 retains title to,
7   possession of, and complete control over its property and its operations, and is not
8   restricted in its ability to sell, use, or lease its property.").

9       As the Ninth Circuit recognized in *Silver Sage Ptnrs., Ltd. v. City of Desert Hot*
10  *Springs (In re City of Desert Hot Springs)*, 327 F.3d 930, 935 (9th Cir. 2003), "[m]any of
11  the protections afforded to creditors in the other chapters are missing in Chapter 9." The
12  Ninth Circuit noted that Chapter 9 debtors have few limitations and duties of a Chapter
13  11 debtor, and may borrow and spend without court authority. *Id.* (citing *In re Richmond*
14  *Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991). The Ninth Circuit also observed
15  that "a Chapter 9 debtor enjoys a full expanse of bankruptcy powers, including the benefit
16  of an enhanced automatic stay pursuant to *sections 362(a) and 922(a)*, the right to avoid
17  preferences, fraudulent conveyances and other transfers as provided in *sections 544*
18  *through 549*, the authority to borrow monies on the security of liens senior to existing liens
19  of record pursuant to *section 364(c)*, the right to reject executory contracts pursuant to
20  *section 365* and the ability to bind all creditors by a confirmed plan pursuant to *section*
21  *944*." *Id.*

22      A.     The District Has Satisfied Section 364(c)(1)'s Requirements.

23          Section 901 incorporates Sections 364(c) and (d) into Chapter 9 of the
24  Bankruptcy Code.[11] 11 U.S.C. Section 901. Pursuant to Section 364(c), a debtor may,
25  in the exercise of its business judgment, incur secured debt if the debtor has been
26  unable to obtain unsecured credit and the borrowing is in the best interests of the
27  estate. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (Bankr. D.

28  _____
[11] Sections 363, 364(a) and 364(b) are not incorporated into Chapter 9.

Debtor's Motion for Authority to Enter Into Transaction     -22-
Including Borrowing Funds, Sales of Personal Property, etc.

M:\S-U\TRMC\PLEADINGS\WW-41 Motion to
Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

Colo. 1985) (authorizing interim financing stipulation where debtor's best business

judgment indicated financing was necessary and reasonable for benefit of estates);

*In re Ames Dept. Stores,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to

post-petition credit, courts "permit debtors in possession to exercise their basic

business judgment consistent with their fiduciary duties.").

Section 364(c) provides, in pertinent part, that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -
>
> (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3)    secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. Section 364(c).

Bankruptcy courts defer to a debtor's business judgment on most business

decisions, especially in a Chapter 9 case where there is an elected board of directors,

including the decision to borrow money, unless such decision is arbitrary and

capricious. *Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines,*

*Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables

facility and asset-based facility were approved because they "reflect[ed] sound and

prudent business judgment . . . [were] reasonable under the circumstances and in the

best interests [of the debtor] and its creditors"); *In re Simasko Prod. Co.*, 47 B.R. 444,

449 (Bankr. D. Colo. 1985) ("In exercising [the debtor's] business judgment of

conducting its drilling operations, it has found it necessary to obtain loans to make

these endeavors possible."). Indeed, "[m]ore exacting scrutiny [of the debtor's business

decisions] would slow the administration of the debtor's estate and increase its cost,

interfere with the Bankruptcy Code's provision for private control of administration of the

Debtor's Motion for Authority to Enter Into Transaction          -23-          M:\S-U\TRMC\PLEADINGS\WW-41 Motion to
Including Borrowing Funds, Sales of Personal Property, etc.                    Borrowing Funds and Providing Security [Adventist
                                                                              Health]\motion.7-19-18.gaa.6.docx

1  estate, and threaten the court's ability to control a case impartially." *Richmond Leasing*

2  *Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985); *Simasko Prod.*, 47 B.R.

3  at 449 ("Business judgments should be left to the board room and not to this Court."

4  (quoting *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)). Thus, the

5  District submits that its business and political decision to enter into the LOC should be

6  approved.  This is especially true, as here, where the borrowing is approved by the

7  District's elected officials in accordance with applicable state law.

8          The District has satisfied Section 364(c)'s requirements because it has

9  been unable to obtain unsecured credit and the post-petition financing is

10  necessary and reasonable for the benefit of the District.  A debtor need not

11  seek credit from every available source to satisfy Section 364(c), but should

12  make a reasonable effort to seek other sources of credit available of the type

13  set forth in sections 364(a) and (b) of the Bankruptcy Code.[12]  *See, e.g., Bray v.*

14  *Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085,

15  1088 (4th Cir. 1986) (trustee demonstrated good faith effort that credit was not

16  available without senior lien by unsuccessfully contacting other financial

17  institutions in immediate geographic area; "the statute imposes no duty to seek

18  credit from every possible lender before concluding that such credit is

19  unavailable"); *Ames Dept. Stores,* 115 B.R. at 40 (finding that debtor

20  demonstrated the unavailability of unsecured financing where debtor

21  approached several lending institutions).  See the declaration of Daniel

22  Heckathorne which demonstrates the District's efforts to borrow on an

23  unsecured basis.

24          A debtor's efforts to obtain unsecured credit are considered on a case by case

25  basis, particularly "[g]iven the 'time is of the essence' nature of this type of

26  financing." *In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In

27  *In re Sky Valley, Inc.,* 100 B.R. 107, 112-13 (Bankr. N.D.Ga. 1988), the Court

28  _____

[12] Again, Sections 364(a) and (b) are not applicable in a chapter 9 case.

Debtor's Motion for Authority to Enter Into Transaction          -24-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.                              Borrowing Funds and Providing Security [Adventist
                                                                                         Health]\motion.7-19-18.gaa.6.docx

stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the debtors' approach of only four lenders was sufficient under such circumstances. *See also In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(l)(A) satisfied where two banks refused to provide unsecured credit to debtor); *see also In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992) (element satisfied where "specialist in commercial lending practices ... explained that most banks lend money only in return for a senior secured position. The debtor cannot obtain financing secured by a lien on unencumbered property ... because there is no property in the estate which is not already subject to a lien.").

In order for the District to achieve the necessary liquidity to reopen the Hospital and commence operations, it must have access to credit. The District sought but could not obtain postpetition financing on an unsecured basis in amounts sufficient to provide it with the necessary liquidity. As explained in the declaration of Daniel Heckathorne, the District's Chief Financial Officer contacted at least four lenders and none of those lenders was willing to extend credit or lend the District monies on an unsecured basis.[13]  No other lender or capital source will provide the District with postpetition financing on terms equal or more favorable to the District than AH under the circumstances. It is in the best interest of the District, its residents and its creditors for the Hospital to reopen as soon as is practicable in light of the facts and circumstances, and a proper exercise of the District's basic reasonable business and political judgment to borrow the funds required to make that happen.

///

///

---

[13]  Indeed, even prior to the District's filing this chapter 9 case, HCCA refused to continue to provide services under the HCCA Contract unless the District provided HCCA with an irrevocable letter of credit.

Debtor's Motion for Authority to Enter Into Transaction    -25-    M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.    Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

B.　　The Terms of the Postpetition Financing are Fair, Reasonable, and Appropriate.

The terms of the postpetition financing are the best that the District can hope to obtain under the circumstances. As set forth above, the District was forced to voluntarily surrender its license and temporarily suspend operations due to HCCA's threats to abruptly close the Hospital and the CDPH's concerns respecting patient safety. The resulting interruption of cash flow and costs to reopen the District's medical facilities means that the District will not have enough funds to resume operations without the Credit Agreement. The best option for the District is to obtain funding from a source such as AH with a demonstrated commitment to and investment in the health and well-being of the San Joaquin Valley and its residents.

AH is the largest healthcare network and employer in the San Joaquin Valley,[14] and is heavily invested in providing top notch medical care to residents of the San Joaquin Valley. It operates hospitals in Tehachapi, Sonora, Hanford, Reedley and Kingsburg (and soon Fowler). The District conducted arm's length negotiations with potential financing sources and ultimately determined that AH offered the best available option for obtaining postpetition financing. AH is willing to extend a revolving Credit Agreement to the District in the amount of up to $10,000,000 at a very favorable interest rate of prime minus 50 basis points. AH's long history of investment in the community and residents of the San Joaquin Valley makes it a logical choice to partner with the District, and the terms under which AH is willing to extend the credit are fair and reasonable. See the Declaration of Daniel R. Heckathorne.

**VI.**

**The District Has Satisfied The Applicable Legal Requirements**

**for Approval of the Lease**

Section 363 requires Court approval of a lease in Chapter 11, but not Chapter 9.

---

[14] AH is a locally owned, not-for-profit, public-benefit corporation based in Roseville, California.

However, here, the District seeks authority to lease its Hospital to AH and consents to the jurisdiction of the Court for that limited purpose.  The material terms of the proposed Lease are described above.  A complete copy of the Lease is available for review at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab.

To obtain approval of the Lease the District must demonstrate that entering into the Lease is justified by its business judgment.

The District submits that the Court should authorize the District to enter into and perform the Lease because the Lease is the key to the entire Transaction.  The Lease rent will be at the fair market value and the entire Transaction is subject to voter approval.

The publically elected board of the District will approve the Lease at a public meeting on July 25, 2018 following public comments.  If board approval is not given the Motion will be withdrawn.

The District's decision to lease the Hospital to AH is not capricious or done on a whim.  The District believes there is an urgent need to reopen to avoid permanent loss of its license.  The District's residents have an urgent need to have nearby acute hospital services the Lease should be approved (subject to voter approval).

The District submits that the Court should grant the request to enter into the Lease due to the above reasons and because it is justified by the District's business and political judgment and because the rent is established by an independent valuation consultant and is subject to approval by the electorate.

## VII.

## The Asset Purchase Agreement Should be Approved

Although Court approval of a sale of the District's assets is not required in Chapter 9, because the APA involves a sale of certain assets as well as assumption and assignment of leases, executory contracts and purchase money security interests, the District consents to the jurisdiction of the Court for approval of the Transaction.

Debtor's Motion for Authority to Enter Into Transaction
Including Borrowing Funds, Sales of Personal Property, etc.          -27-
M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

The Court should approve the APA because the sale is subject to the state law requirement that the price must be established by an independent third party valuation.

Additionally, the sale of certain assets must be approved by the elected board and subsequently also blessed by the electorate.

## VIII.

## Assumption and Assignment

As a part of the APA, certain executory contracts and unexpired leases ("Designated Contracts and Leases")[15] to be assumed by Debtor and assigned to AH.

**The Court Should Enter an Order Authorizing Debtor to Assume the Designated Contracts and Leases.**

11 U.S.C. §§ 365(a) and 901 allows the Debtor to assume any executory contract and/or lease, subject to the approval of the Court.

The standard for reviewing whether a contract should be assumed and on what terms it should be assumed is one of business judgment. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R.R. Co., 318 U.S. 523, 550 (1943). In applying the "business judgment standard, courts show great deference to a debtor's decision to assume executory contracts, with only a cursory review of [the debtor's] decision…." In re Pomona Valley Medical Group, Inc., 476 F.3d 665, 670 (9th Cir. 2007);. As long as the decision to assume such contracts is a reasonable exercise of business judgment, a court should approve the assumption or rejection of an executory contract. See e.g. NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984).

Assumption of the Designated Contracts and Leases is essential to the Transaction and to Debtor's successful reorganization. AH and Debtor have determined that the Designated Contracts and Leases are critical to the business

---

[15] It is not clear that all contracts listed in Exhibit "A" are either executory or unexpired non-residential real property leases. Debtor reserves the right to assert this in the future. A separate notice will be provided to the parties whose contracts or leases will be subject to assumption and assignment as provided in the APA.

Debtor's Motion for Authority to Enter Into Transaction    -28-    M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.    Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

1   operations for which AH will use the personal property assets that are to be transferred

2   from Debtor to AH in the Transaction.

3         To assume the Designated Contracts and Leases, Debtor must (1) cure defaults

4   under such agreements, (2) compensate non-debtor parties to such agreements for

5   pecuniary loss resulting from said defaults, and (3) provide adequate assurance of

6   future performance under the contract or lease to the non-debtor parties to such

7   agreements. 11 U.S.C. § 365(b); See also In re Bowman, 194 B.R. 227, 230 (Bankr. D.

8   Ariz. 1995).

9         Debtor will satisfy the requirements of 11 U.S.C. § 365(b) on the Closing Date by

10  curing all defaults under the Designated Contracts and Leases, compensating non-

11  Debtor parties to the Designated Contracts and Leases for pecuniary losses resulting

12  from said defaults, and providing adequate assurance of future performance under the

13  Designated Contracts and Leases to the non-debtor parties to those agreements

14  (adequate assurance of future performance is fully discussed below in Section II(B)).

15        Based on the foregoing, Debtor has exercised sound business judgment and

16  satisfied the requirements of 11 U.S.C. § 365(b), therefore the Court should entering an

17  order authorizing the assumption and assignment of the Designated Contracts and

18  Leases with such assumption and assignment to be effective upon the Closing Date.

19  **THE COURT SHOULD APPROVE DEBTOR'S ASSIGNMENT OF THE**

20  **DESIGNATED CONTRACTS AND LEASES.**

21        11 U.S.C. § 365(f) states that, with the court's approval, a debtor may assign an

22  executory contract or unexpired lease if "adequate assurance of future performance by

23  the assignee of such contract or lease is provided...." 11 U.S.C. § 365(f)(2). "This

24  requirement is to be given a practical, pragmatic construction based upon the

25  circumstances of the case." In re PRK Enters., Inc., 235 B.R. 597, 603 (Bankr. S.D. Tex.

26  1999). "An absolute guarantee, such as a letter of credit, is not required to meet this

27  standard." In re Teck Hifi, Inc., 49 B.R. 876, 879 (Bankr. D. Mass. 1985) (bankruptcy

28

Debtor's Motion for Authority to Enter Into Transaction    -29-    M:\S-U\TRMC\PLEADINGS\WW-41-Motion to
Including Borrowing Funds, Sales of Personal Property, etc.        Borrowing Funds and Providing Security [Adventist
                                                                  Health]\motion.7-19-18.gaa.6.docx

court held that assignment to newly formed corporation that was a subsidiary of a larger corporation with strong financial statements, without more, met § 365(f) requirements). "The assurance of future performance is adequate if performance is likely (i.e. more probable than not." In re Prime Motor Inns, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

AH is an established and well-capitalized entity. It has demonstrated its ability to perform by its prolonged growth and success in the health care industry. This status provides the non-Debtor parties to the Designated Contracts and Leases with adequate assurance of future performance by AH.

Based on the adequate assurance of future performance that AH's purchase of Debtor's personal property assets provides to non-Debtor parties to the Designated Contracts and Leases, Debtor's assignment of the Designated Contracts and Leases to AH satisfies the requirements of 11 U.S.C. § 365(f). For these reasons the Court should enter an order authorizing Debtor to assign the Designated Contracts and Leases to AH at the Closing Date.

**THE COURT SHOULD AUTHORIZE DEBTOR TO PAY THE CURE AMOUNTS, IF ANY EXIST, UNDER THE DESIGNATED CONTRACTS AND LEASES.**

A debtor must cure any existing defaults under an executory contract or unexpired lease satisfy the requirements of 11 U.S.C. § 365(f) for obtaining a court order authorizing assumption of such agreement. 11 U.S.C. § 365(f). Debtor will cure, where applicable, existing defaults under the Designated Contracts and Leases. Because the requested Order is not effective until the Closing, Debtor will have the financial ability to satisfy the cure requirement of 11 U.S.C. § 365(f).

It is noted that AH is not responsible for paying the cure amounts.

For these reasons the court should enter an order authorizing Debtor to pay, at the Closing Date, the cure amounts, if any exist, under the Designated Contracts and Leases.

///

Debtor's Motion for Authority to Enter Into Transaction        -30-        M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Including Borrowing Funds, Sales of Personal Property, etc.                Borrowing Funds and Providing Security [Adventist
                                                                            Health]\motion.7-19-18.gaa.6.docx

## IX.

### The Stay Under FRBP 6004(h) Should Be Waived

The District also requests that the Court waive the stay imposed by FRBP 6004(h).  FRBP 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FRBP 6004(h).  As described above, the relief requested in this Motion is critical for the District to reopen and operate its Hospital and medical facilities as soon as possible to serve the District's residents, generate revenue and move the District forward on its path to reorganization and confirmation of its plan of arrangement.

Accordingly, the District respectfully submits that there is good cause to waive the 14 day stay imposed by FRBP 6004(h).

## X.

### The District's Reservation of Rights

Nothing contained in this Motion is or should be construed as a consent to jurisdiction other than expressly stated herein.  The District's consent to jurisdiction is limited, as set out herein.

## XI.

### Business and Political Justification

It is noted that the Motion involves the assets of municipality.  While the District asserts that approval of the Transaction is supported by sound business judgment, it is also supported by the political judgment of the board as is amply demonstrated by the declaration of Kevin B. Northcraft, the board President.

## XII.

### CONCLUSION

For the foregoing reasons, the District respectfully requests that the Motion be granted, the Transaction be authorized and that it have such relief as is just and proper. It is vitally important to the people of the District that the motion be granted so the

Debtor's Motion for Authority to Enter Into Transaction
Including Borrowing Funds, Sales of Personal Property, etc.          -31-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx

1  Hospital can be reopened to provide acute care as soon as possible due to the critical

2  and time sensitive needs of the District.

3                                    **PRAYER**

4          WHEREFORE, Tulare Local Healthcare District, dba Tulare Regional Medical

5  Center, prays:

6          A.     That the Motion be granted in its entirety;

7          B.     That the District be authorized to enter into:

8                 1.  Lease;

9                 2.  Asset Purchase Agreement;

10                 3.  Credit Agreement, Security Agreement and Deed of Trust;

11                 4.  Interim Management Services Agreement;

12         C.     For assumption and assignment of certain contracts and leases.

13         D.     For relief from stay as sought by the Motion;

14         E.     For a finding that Adventist Health has negotiated the Transaction in

15         good faith; and

16         F.     For such other and further relief as is just and proper.

17  Dated: July ____, 2018                    WALTER WILHELM LAW GROUP,

18                                            a Professional Corporation

19

20                              By:    _____

21                                     Riley C. Walter
                                       Attorneys for Debtor Tulare Local Healthcare
22                                     District, dba Tulare Regional Medical Center

23

24

25

26

27

28

Debtor's Motion for Authority to Enter Into Transaction          -32-
Including Borrowing Funds, Sales of Personal Property, etc.

M:\S-U\TRMC\PLEADINGS\WW-41  Motion to
Borrowing Funds and Providing Security [Adventist
Health]\motion.7-19-18.gaa.6.docx