39

WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter #91839
Kathleen D. DeVaney #156444
Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:    (559) 435-9800
Facsimile:    (559) 435-9868
E-mail:        rileywalter@w2lg.com

Chapter 9 Counsel for Tulare Local Healthcare District

MCCORMICK BARSTOW, LLP
Todd A. Wynkoop #308845
Benjamin T. Nicholson #239893
Benjamin E. Ladd #320466
7647 N. Fresno Street
Fresno, CA 93720
Telephone:    (559) 433-1300
Facsimile:    (559) 433-2300
E-mail:        todd.wynkoop@mccormickbarstow.com

District Counsel for Tulare Local Healthcare District

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  17-13797 |
| TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER, | DC No.: WW-41 |
| | Chapter 9 |
| Debtor. | Date:      August 2, 2018<br>Time:      9:30 a.m.<br>Place:     2500 Tulare Street<br>            Fresno, CA 93721<br>            Courtroom 13 |
| Tax ID #:    94-6002897<br>Address:     869 N. Cherry Street<br>            Tulare, CA 93274 | Judge:     Honorable René Lastreto II |

**DEBTOR'S MOTION FOR AUTHORITY TO ENTER INTO TRANSACTION INCLUDING BORROWING FUNDS, SALES OF PERSONAL PROPERTY AND PROVIDING SECURITY, ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND FOR AUTHORITY TO LEASE REAL PROPERTY PURSUANT TO 11 U.S.C. SECTION 105, 362, 364, 365, 901 AND 922**

# TABLE OF CONTENTS

I. ...................................................................................................................1

**SUMMARY OF TRANSACTION** ...............................................................1

    A.   Lend up to $10 million to the District secured by assets of the District to reopen the Hospital before October 28, 2018. ..........................................1

    B.   Upon reinstatement of the Hospital's general acute care hospital license by the California Department of Public Health ("CDPH"), manage and operate, on the District's behalf, the Hospital pursuant to a management services agreement on an interim basis. ...................................................................1

    C.   Upon CDPH's approval of AHT's change of ownership application for the Hospital's general acute care hospital license ("Closing Date"), lease the Hospital for an initial term of 5.5 years for rent that will be determined by a fair market valuation performed by an independent valuation expert. ...........................1

    D.   On the Closing Date, purchase for full value personal property owned by the District related to the Hospital facility and be assigned certain leases and executory contracts. ....................................................................1

II. ..................................................................................................................2

**BACKGROUND** .......................................................................................2

    A.   Overview of Lease. ............................................................................3

    B.   Overview of Asset Purchase Agreement. ...........................................4

    C.   Financing. ..........................................................................................5

    D.   Impact on Bonded Indebtedness. ......................................................6

    E.   Licenses/Certifications. .....................................................................6

    F.   Management Services Agreement. ....................................................6

    G.   Other. ................................................................................................7

i

11 ...............................................................................................................7

III. ..............................................................................................................14

JURISDICTION, VENUE, AND STATUTORY PREDICATES.....................................14

IV. .............................................................................................................15

HISTORY ....................................................................................................15

   A.   The Debtor. ........................................................................................15

   B.   The Debtor's Former Manager And the Deterioration of Its Relationship with the
District. ...........................................................................................................16

   C.   The District Learns HCCA Led It Into A Dire Fiscal Crisis and HCCA Races to
Encumber the District's Real Property.................................................................16

   D.   The District Files Its Petition to Save the Hospital...............................18

   E.   The District's Efforts to Obtain Funding to Facilitate its Reorganization and Path
Toward A Plan of Adjustment.........................................................................20

V. ..............................................................................................................22

THE DISTRICT HAS SATISFIED THE APPLICABLE LEGAL REQUIREMENTS FOR
APPROVAL OF THE POST-PETITION FINANCING......................................................22

   A.   The District Has Satisfied Section 364(c)(1)'s Requirements...............................23

   B.   The Terms of the Post-Petition Financing are Fair, Reasonable,  and Appropriate.
     26

VI. .............................................................................................................27

The District Has Satisfied The Applicable Legal Requirements .............................27

for Approval of the Lease...............................................................................27

VII. ............................................................................................................28

The Asset Purchase Agreement Should be Approved .............................................28

VIII. ...........................................................................................................28

The Assumption and Assignment of Contracts Should be Approved ................... 28

IX. ....................................................................................................................... 31

The Stay Under FRBP 6004(h) Should Be Waived ........................................ 31

X. ......................................................................................................................... 32

The District's Reservation of Rights ................................................................. 32

XI. ....................................................................................................................... 32

Business and Political Justification .................................................................... 32

XII. ...................................................................................................................... 32

CONCLUSION ..................................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*(In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986 ................................32

), 478 B.R. 8, 13 (Bankr. E.D. Cal. 2012.........................................................29

194 B.R. 227 <u>In re Bowman</u>, 230 (Bankr. D. Ariz. 1995)...............................37

*In re City of Stockton)* ..............................................................................29

In *In re Sky Valley, Inc.,* 100 B.R. 107, 112-13 (Bankr. N.D.Ga. 1988.....................32

*In re 495 Cent. Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992..............32

*In re Ames Dept. Stores,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990 .....................30, 32

*In re Lifeguard Indus. Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983 .................................31

<u>In re Pomona Valley Medical Group, Inc.</u>, 476 F.3d 665, 670 (9th Cir. 2007)................36

<u>In re Prime Motor Inns</u>, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994 ...............................38

<u>In re PRK Enters., Inc.</u>, 235 B.R. 597, 603 (Bankr. S.D. Tex. 1999...............................37

*In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987 .......................32

*In re Richmond Sch. Dist.,* 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991 ..........................30

*In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985................................31

*In re Simasko Production Co.,* 47 B.R. 444, 448-9 (Bankr. D. Colo. 1985 .........30, 31

*In re Stanley Hotel, Inc.,* 15 B.R. 660, 663 (D. Colo. 1981 ..........................................32

<u>In re Teck Hifi, Inc.</u>, 49 B.R. 876, 879 (Bankr. D. Mass. 1985......................................37

*In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994 .....................31

*In re Valley Health Sys.*, 429 B.R. 692, 714 (Bankr. C.D. Cal. 2010..............................29

*Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985)......31

*Silver Sage Ptnrs., Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs),*

   327 F.3d 930, 935 (9th Cir. 2003 ..............................................................29

## Statutes

11 U.S.C. § 365(b ...........................................................................................37

11 U.S.C. § 365(f).....................................................................................37, 38

11 U.S.C. §§ 365(a) .........................................................................................36

11 U.S.C. Section 901 ......................................................................................30

362 ........................................................................................................22

364 ........................................................................................................22

*section 364(c)* .............................................................................30, 31, 32

*section 365* .......................................................................................30

Section 904 .......................................................................................29

*section 944* .......................................................................................30

Sections 105 .....................................................................................22

sections 364(a) and (b) ...................................................................32

*sections 544 through 549* ...............................................................30

Debtor, Tulare Local Healthcare District, doing business as Tulare Regional Medical Center ("Debtor" or the "District") hereby moves the Court, pursuant to Sections 105, 362, 364, 365, 901 and 922 of Title 11, Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure ("FRBP") and Local Bankruptcy Rule ("LBR") 4001-1(c), for entry of an order in the form of Exhibit A to this Motion authorizing the District to enter into the transaction with Adventist Health System/West, doing business as Adventist Health, a California non-profit religious corporation ("AH" or "Adventist Health"), described below so that it can reopen its general acute care hospital and clinics to resume providing acute care services to the people of the District.

This Motion respectfully requests an order which provides for the following relief:

I.

## SUMMARY OF TRANSACTION

The District seeks approval of a transaction ("Transaction") whereby AH, itself or through its wholly-owned subsidiary, Adventist Health Tulare ("AHT"), will:

A.   Lend up to $10 million to the District secured by assets of the District to reopen the Hospital before October 28, 2018.

B.   Upon reinstatement of the Hospital's general acute care hospital license by the California Department of Public Health ("CDPH"), manage and operate, on the District's behalf, the Hospital pursuant to a management services agreement on an interim basis.

C.   Upon CDPH's approval of AHT's change of ownership application for the Hospital's general acute care hospital license ("Closing Date"), lease the Hospital for an initial term of 5.5 years for rent that will be determined by a fair market valuation performed by an independent valuation expert.

D.   On the Closing Date, purchase for full value personal property owned by the District related to the Hospital facility and be assigned certain leases and executory contracts.

The Transaction must be approved by the District's elected board, the United

1  States Bankruptcy Court and the voters of the District at an election to be held
2  November 6, 2018.

3       AH has formed Adventist Health Tulare, a wholly-owned, non-profit religious
4  corporation that is seeking federal tax exemption as a 501(c)(3) entity ("AHT" or "AH
5  Lessee") to enter into certain of the agreements described within required for the
6  Transaction. Pursuant to a stand-alone guaranty, AH will guarantee the payment
7  and performance of AHT's obligations under such agreements.

8       The most current versions of each of the definitive documents relating to the
9  Transaction as of July 20, 2018 and a copy of this Motion are available at
10 www.tularelocalhealthcaredistrict.org under the Chapter 9 tab.  As these documents are
11 updated or revised they will also be posted at the above website. Alternatively, PDF
12 copies may be requested by email from galfano@W2LG.com.

13      Because of deadlines related to putting voter approval on the ballot, the last day
14 to obtain Court approval of the Transaction is August 2, 2018 so the District can meet
15 the deadline for submission of the ballot proposition.

16                                    II.

17                              **BACKGROUND**

18      The District comes before the Court requesting such approvals as are
19 necessary under Chapter 9 to enter into a comprehensive Transaction with AH.

20      This Background provides an overall summary of the Transaction
21 contemplated by the parties.  However, each of the definitive agreements requiring
22 Court approval is referenced within the body of this motion and the terms of the
23 actual agreements control.

24      On June 27, 2018, the publically elected board of directors of the District
25 resolved to negotiate the terms by which the District, owner of a 112 bed general
26 acute care hospital located at 869 N. Cherry Street, Tulare ("Hospital") including
27 outpatient services and clinics will become part of the Adventist Health Central
28 Valley Network which includes AHT and other AH subsidiaries operating health care

1  facilities located in Hanford, Reedley, Tehachapi, Sonora and Kingsburg (and soon
2  Fowler).

3      In addition to final board approval, the Transaction requires approval of the
4  voters of the District at the November 6, 2018 general election as well as all
5  requested approvals by various governmental agencies and United States
6  Bankruptcy Court approval to the extent required by Chapter 9.

7      Conditions of the Transaction include reinstatement of the suspended
8  general acute care license with CDPH by October 28, 2018, which is currently in
9  process.  AH has newly formed AHT to enter into certain of the agreements
10  described within required for the Transaction.

11      Assuming approval of this Motion, the District expects to reopen the Hospital
12  prior to October 28, 2018.

13      A. Overview of Lease.

14      The District will lease ("Lease") the Hospital to AH Lessee for the
15  operation by AH Lessee as an acute care Hospital.  The Lease will be guaranteed
16  by AH.

17      The current version of the Lease is provided at
18  www.tularelocalhealthcaredistrict.org under Chapter 9 tab[1] ("Lease").  It is expected
19  that the final version will be substantially similar to this version.

20      The Lease will be a triple net lease.  The rent to be paid will be the fair
21  market value as determined by Deloitte, the fair market value consultant engaged
22  by the District.  The results of the consultant's report will be made known to the
23  public.  An independent valuation of the Lease is required by the Health and Safety
24  Code and necessary as a part of the ballot.

25      The Lease will be for an initial term of five and a half (5.5) years with
26  automatic renewal for four (4) additional five (5) year terms and a fifth (5th) term of

27

28  _____
[1] The current version of the Lease is available for review in its entirety at
www.tularelocalhealthcaredistrict.org under the Chapter 9 tab or by request from galfano@w2lg.com.
The final Lease will not vary materially from this version.

four and a half (4.5) years, not to exceed 30 years subject to AH's request not to renew upon notice to the District.

A portion of the rent will be used to repay amounts loaned to the District by AH as described below.

AH Lessee will be responsible for operation and routine maintenance of the Hospital excluding seismic compliance which is the responsibility of the District.

AH Lessee may terminate the Lease if the District does not complete construction of the not yet completed Tower within ten (10) years or does not become fully compliant with seismic compliance standards by 2030.

The Lease includes a modified option and a right of first refusal to purchase the leased real property on certain conditions as spelled out in the Lease.

B. Overview of Asset Purchase Agreement.

As a part of the transaction, AHT will purchase all personal property and certain other assets owned by the District located within the Hospital for fair value based on an independent valuation by Deloitte plus accounts receivable owned by the District on the Closing Date. The Asset Purchase Agreement[2] ("APA") describes with particularity the assets being purchased and excluded from the Transaction.[3]

As a part of the price and Transaction, certain leases of equipment and certain executory contracts will be assumed by the District and assigned to AH on the Closing Date. The Transaction also provides for taking subject to certain purchase money security interests against equipment.

Only specified assets related to and used in connection with the Hospital and the District's CDPH license are a part of the Transaction. All excluded assets, including District tax revenues, remain with the District and under the control of the

[2] The current version of the Asset Purchase Agreement is available for review in its entirety at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab or by request from galfano@w2lg.com. The final Asset Purchase Agreement will not vary materially from this version.
[3] Bankruptcy Court approval of the APA is not legally required under Chapter 9, but has been requested by AH and is covered by the proposed Order.

4

Board, subject to the terms of the Lease.

The purchase price to be paid at closing is estimated by the District to be in the range of $4,000,000 to $6,500,000. The purchase price will be applied to the Loan.

C. <u>Financing</u>.

As a part of the Transaction, and prior to closing on the APA and commencement of the Lease with AH Lessee, AH will provide a $10,000,000 line of credit (the "Credit Agreement").[4]

The Credit Agreement will be secured to the extent permissible under applicable law by a lien on certain designated District real property (excluding the Hospital) and on certain Hospital related personal property (pending purchase by AHT under the APA) subject to existing valid liens.[4] The Hospital real property will <u>not</u> be pledged as collateral.

The amounts advanced under the Credit Agreement will bear interest at prime minus 50 basis points. A portion of the amounts advanced will be treated as prepaid rent on the Lease.

The financing will allow the District to reopen and operate the Hospital before October 28, 2018. AH will undertake interim operations under an interim Management Services Agreement upon CDPH's approval reinstating the District's general acute care hospital license through the Closing Date, at which time the Lease will go into effect.

At the hearing on August 2, 2018, the District will request that the Court approve the Motion in its entirety in accordance with the proposed Order attached as Exhibit A (the "Interim Order") and authorize the District to borrow up to $1,000,000, and at a later hearing to be held on August 9, 2018, or as soon thereafter as the Court is available (the "Final Hearing"), to authorize the District to borrow an aggregate amount

---

[4] The current versions of the Credit Agreement and Security Agreement and Deed of Trust are available for review in their entirety at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab or by request from galfano@w2lg.com. The final Credit Agreement and Security Agreement will not vary materially from this version.

of up to $10,000,000 . The funds authorized will be used to avoid immediate and irreparable harm to the District and to fund critical reopening costs and repairs pending the August 9, 2018 hearing. The District will provide notice of the Final Hearing on the same parties that received notice of the Motion promptly after the Court enters the Interim Order.

D. Impact on Bonded Indebtedness.

The District is obligated on $85,000,000± of general obligation bonds ("GO Bonds") being repaid from property taxes being paid by landowners in the District. The transaction has no impact on the GO Bonds and the District will continue to receive the excess tax revenues of about $1,700,000 per year remaining after debt service. Proceeds from the Build America Bonds will continue to be used to retire the GO Bonds.

The District is obligated on $13,750,000± of revenue bonds secured by the gross revenues of the District as modified by Section 928(b). The District has committed to use its revenues, including excess property tax revenues, to repay the revenue bonds in accord with the existing documentation.[5]

E. Licenses/Certifications.

Immediately upon a successful vote on November 6, 2018, AH/AH Lessee will apply with the CDPH for a change of ownership for the Hospital's license to permit it to operate as an acute care hospital and will seek such other certifications with CMS, Medi-Cal, and etc.

F. Management Services Agreement.

The Transaction contemplates that there may be a delay between the time the change of ownership of the license is submitted and its issuance. So that AH Lessee can manage the day to day operations (subject to the District's authority as owner and licensee) the parties will enter into an Interim Management Services

---

[5] The District and Wilmington Trust as trustee for the holders of revenue bonds are in negotiations as to adequate protection to be given to the revenue bond holders and it is hoped that agreement will be reached prior to the hearing on this Motion.

1   Agreement ("Interim MSA") in exchange for a management fee equal to the net

2   income of the Hospital, subject to a flat maximum monthly amount as determined to

3   be fair market value by a national recognized, independent appraiser.[6]  The District

4   calls to the Court's attention the fact that the subject Interim MSA has been carefully

5   vetted by counsel for the District to avoid the many problems stemming from the

6   prior management services agreement rejected by this Court on October 19, 2017.

7        G. Other.

8        The Transaction has many conditions precedent, each of which must be

9   satisfied, including approval of this Motion.  Without such Court approval, the

10  District will be unable to comply with rules relating to the ballot measure that must

11  be filed by August 8, 2018.  Without compliance with this timing the vote will not

12  take place on November 6, 2018.

13       The Closing Date shall be the later of December 31, 2018 and the date

14  the license ownership change is approved by CDPH..  To the extent required to

15  consummate the Transaction the automatic stays of Sections 362 and 922 will be

16  modified to allow implementation of the transaction.

17       Pursuant to FRBP 4001(c) and LBR 4001-1(c), a detailed summary of the

18  material provisions of the Credit Agreement, Asset Purchase Agreement and Lease are:

19                    **MATERIAL TERMS OF CREDIT AGREEMENT**

| Term | Details | Page |
|---|---|---|
| Parties | Tulare Local Healthcare District ("Borrower") and Adventist Health System/West ("Lender") | |
| Loan Commitment | $10,000,000 | 11 |
| Use of Funds | The proceeds shall be used only to finance costs incurred by the Borrower in connection with its efforts to seek reinstatement of the Hospital's suspended general acute care hospital license with the CDPH and to reopen the Hospital; and for other purposes approved by Lender. The Debtor is required to comply with the terms of an Approved Budget, subject to certain variances. | 11 |

---

[6]  The current version of the Management Services Agreement is available for review in its entirety at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab or by request from galfano@w2lg.com. The final Management Services Agreement will not vary materially from this version.

| Prepayment | Borrower may prepay at any time. | 11 |
|---|---|---|
| Loan Repayment | If the voters approve the Lease and Asset Purchase Agreement transactions, then principal and interest will be repaid as an offset against all or a portion of the rent under the Lease (subject to the limitations for offset as set in the Lease).  If the voters do not approve the Lease and Asset Purchase Agreement transactions, then the principal and interest will be repaid over a five-year period beginning the last business day of the first calendar month following November 6, 2018. | 12 |
| Mandatory Prepayment | If the voters approve the Lease and Asset Purchase Agreement transactions and the Lease is terminated or expires:<br>(a) due to a default of the landlord or any other reason after the initial term of the lease, then the principal and interest will be repaid over the ten-year period beginning the last business day of the first calendar month following the termination of the lease;<br>(b) due to a default of the tenant during the initial term of the lease, then the principal and interest will be repaid over a five-year period beginning the last business day of the first calendar month following the termination of the lease; and<br>(c) due to a default of the tenant after the initial term of the lease, then Lender may immediately cause the loans to accelerate. | 12-13 |
| Interest Rate | Interest accrues on borrowed amounts at the prime rate minus 50 basis points. | 14 |
| Collateral | Borrower will pledge its interest in various real property and the personal property the subject of the Asset Purchase Agreement to secure repayment. | 14 |
| Representation and Warranties; Covenants | The agreement contains customary representations and warranties and covenants, including certain covenants not to make further borrowings or encumber assets, subject to negotiated exceptions. | 14-28 |
| Events of Default and Remedies | The agreement contains customary events of default for, among other things, failure to pay amounts owed as required by the agreement, defaults under other specified loan documents, defaults under the Lease or Asset Purchase Agreement, and bankruptcy-related occurrences. | 28-30 |
| Borrowing Limit | $10,000,000 | |

## MATERIAL TERMS OF LEASE

| Term | Details | Page |
|---|---|---|

| Parties | Tulare Local Healthcare District ("Landlord") and a to-be-formed nonprofit corporation that will be a wholly-owned subsidiary of Adventist Health System/West ("Tenant"). | 1 |
|---|---|---|
| Initial Term and Commencement | 66 months beginning on the "Commencement Date" (the date of the closing under the Asset Purchase Agreement, which is the later of December 31, 2018 and the date on which the California Department of Public Health (the "CDPH") issues Tenant its license to operate the hospital). | 13 |
| Renewal Terms | Tenant has four 5-year options and one 4.5 year option to extend the term to a maximum of 30 years, which will take place automatically unless Tenant gives Landlord 270 days' prior written notice before the expiration of the then-current term. | 13 |
| Rent | The annual rent payment will be the fair market value use of the leased premises, as determined by a nationally recognized, independent appraiser.  The lease payments (paid monthly in advance) will begin six months after the Commencement Date.  In the first lease year, 100% of the rent is subject to offset and thereafter are subject to offset only up to 50% of amounts owed under the Credit Agreement and for any amounts owed based on Landlord's breach of either this Lease or the Asset Purchase Agreement. Offset can occur under this Lease other than for Landlord's breach, such as for the cost of capital improvements required for the Hospital from time to time as agreed between the parties or as required by law. | 12-14 |
| "Triple Net" Lease | Tenant, not Landlord, is solely responsible for all real estate-related taxes, insurance, and maintenance of the leased premises. | 14-15, 17; 25 |
| Use; Compliance; Bonds | Tenant shall use the leased premises for the operation of a generate acute care hospital and shall comply with all applicable laws in all material respects.  Tenant acknowledges the existence of (i) $15,000,000 Tulare Local Health Care District (Tulare County, California)  General Obligation Bonds, Election of 2005, Series A (2007); (ii) $8,595,000 Tulare Local Health Care District (Tulare County, California) General Obligation Bonds, Election of 2005, Series B-1 (2009)(Tax-Exempt); (iii) the $61,405,000 Tulare Local Health Care District (Tulare County, California) General Obligation Bonds, Election of 2005, Series B-2 (2009) (Federally Taxable-Direct Payment Build America Bonds); and (iv) $17,850,000 Tulare Local Healthcare District (Tulare County, California) | 16 |

| | | |
|---|---|---|
| | Refunding Revenue Bonds, Series 2007 (collectively, the "Bonds"), and covenants not to take any action that causes them to become taxable. | |
| Capital Expenditures | If capital expenditures are agreed to by the parties or required by law, Tenant will incur such expenditures and may offset such expenditures against rent, subject to the 50% limitation noted above. Any such capital improvements or repairs would become a part of the premises and owned by Landlord. | 16-17 |
| Leasehold Mortgages | Tenant has a customary right to execute a leasehold mortgage and the Lease contains customary leasehold mortgagee protections. | 17-20 |
| Prohibited Liens | Tenant must remove any lien that attaches to Landlord's fee estate in the leased premises. | 21 |
| Hazardous Substances | Tenant is required to comply with all applicable environmental laws and indemnify Landlord for any releases of hazardous substances caused by Tenant. Landlord is required to comply with all applicable environmental laws and indemnify Tenant for any releases of hazardous substances caused by Landlord during the term or pre-dating the term of the Lease. | 21-22 |
| Indemnification | (Other than regarding hazardous substances): Subject to Tenant's acknowledgment that Tenant has exclusive control of the leased premises, each party shall indemnify the other for damages the other sustains based on the indemnifying party's (a) wrongful act, wrongful omission, or negligence (and anyone claiming by or through the indemnifying party) or its or their partners, members, directors, officers, or employees; (b) breach or default by the indemnifying party under the Lease; or (c) breach of any representation or warranty made by indemnifying party in the Lease. In addition, Tenant shall indemnify Landlord against: (w) any tax-related contest Tenant initiates; (x) any local government application made at Tenant's request; (y) any construction undertaken by Tenant and any agreements that Tenant (or anyone claiming through Tenant) makes for any such construction; and (z) any accident, injury or damage whatsoever caused to any person in or on the leased premises or upon or under the sidewalks adjoining the leased premises. | 22-25 |
| Tenant's Purchase Option and Right of First Refusal; | Tenant has a right of first refusal and an option to purchase the leased premises for its then-current fair market value, as determined by a professional, independent appraiser, upon the earlier of | 30-32 |

| | | |
|---|---|---|
| Landlord's Inability to Sell Fee Estate | Landlord's completion of the tower and Landlord's satisfaction of its seismic performance standards under applicable law as to the improvements on the leased premises. Landlord must obtain Tenant's prior written consent to sell the leased premises. | |
| Default Remedies | The Lease provides for customary defaults and rights of Tenant to cure defaults. The Lease also provides for customary remedies if Tenant were to default, including termination of the Lease. Landlord has the right, but not the obligation, to cure various Tenant defaults and claim reimbursement therefor. | 33-36 |

## MATERIAL TERMS OF ASSET PURCHASE AGREEMENT

| Term | Details | Page |
|---|---|---|
| Parties | Tulare Local Healthcare District ("Seller"); Adventist Health System/West ("AH"); Adventist Health Tulare ("Buyer"). | 1 |
| Acquired Assets; Excluded Assets | Buyer will purchase all of the assets necessary to operate the hospital, including various equipment and other personal property, will assume certain leases and other contracts, certain inventory and prepaid items, and accounts receivable and bank accounts that arise after the date on which Buyer begins to operate the hospital under an Interim Management Services Agreement (as to which period Buyer bears profitability risk). Anything not expressly listed as an Acquired Asset is excluded, including specifically any bank accounts of Seller opened prior to the Interim Management Services Agreement effective date, real property, tax revenues, cash and employee benefit plans. | 12-16 |
| Assumed Liabilities; Excluded Liabilities | Buyer assumes only liabilities associated with Assumed Contracts, and will be liable for all liabilities arising after the Closing in connection with the operation of the hospital. All other liabilities are Excluded Liabilities and retained by Seller. | |

| Purchase Price | The purchase price will be the assumption of the Assumed Liabilities plus a specified figure in the definitive agreement representing the fair market value of the Acquired Assets, as determined by a nationally recognized, independent appraiser. | 17-18 |
|---|---|---|
| Closing | The Closing Date is the later of December 31, 2018 and the date on which the California Department of Public Health (the "CDPH") issues Buyer its license to operate the hospital pursuant to Buyer's change of ownership application. The parties will exchange customary closing deliveries for a transaction such as this, though Buyer currently requests that Seller cause its Bond counsel to deliver a legal opinion concerning the Bonds and that the transactions contemplated in the agreement will not cause a breach of the Bonds. This term is being negotiated. | 19-21 |
| Seller's Representations and Warranties | Buyer requests Seller to make certain representations and warranties about its assets and operations, the accuracy of which are a condition to Buyer's obligation to close the transactions. The requested representations, which are being negotiated, cover Organization and Standing; Authority, Validity, and Binding Effect; No Violation or Bar; Contracts and Other Obligations; Required Governmental Consents and Public Meetings; Absence of Certain Changes or Events; Title to Acquired Assets; Real Property; Environmental Matters; Employees; Employee Plans; Licenses and Permits; Insurance; Government Healthcare Programs; Medical Staff and Physician Relations; Title to Acquired Assets; Litigation, Claims and Proceedings; Orders, Decrees and Rulings; Compliance with Law; Broker's and Finder's Fees; and Medical Records. | 21-30 |
| Pre-Closing Covenants | After signing the agreement but before the Closing, Seller agrees (i) not to do certain things (including, without limitation, selling assets or subjecting assets to liens), (ii) to provide Buyer access to information and the hospital itself, (iii) notify Buyer of material changes, (iv) to cooperate with Buyer regarding governmental authorizations and regulatory approvals, (v) work with Buyer to obtain any required consent for assignment of the Assumed Contracts, and (vi) obtain a Title Report and conduct certain environmental tests. | 32-38 |
| Conditions to Closing | Buyer's obligation to close the transactions is conditioned upon (i) the absence of a material casualty event to the Acquired Assets or the hospital or other event that constitutes a material adverse effect on Seller, (ii) Seller's compliance with the | 38-40 |

| | | | |
|---|---|---|---|
| | | Agreement; (iii) the material accuracy of Seller's representations and warranties, (iv) obtaining the necessary government approvals, including the CDPH issuing a license to Buyer to operate the hospital, (v) Buyer's board and that of AH have approved the transactions, (vi) Seller's Bond counsel has issued the opinions discussed above, and (vii) Buyer's completion of site testing to confirm that the real property is reasonably satisfactory from an environmental compliance perspective, and (viii) the release of liens such that Buyer shall acquire the Acquired Assets free and clear of all Encumbrances other than the Permitted Encumbrances. Some of these closing conditions are being negotiated. Seller's obligation to close is similarly conditioned, including upon voter approval of the transactions contemplated in this Agreement and the Lease. | |
| | Non-Compete | Seller is prohibited from competing against Buyer, to the same extent as provided in the Lease, for five years following the Closing, while Buyer is operating the Hospital. The non-compete ceases if the Lease is terminated. | 40-41 |
| | Preservation of Records; Buyer Access to Records | After the Closing, Buyer must preserve all books and records in compliance with applicable law and Seller may, upon reasonable notice, gain access to such records for lawful purposes. | 42 |
| | Indemnification of Buyer; Environmental Indemnification of Buyer | Except for any Assumed Contracts and Assumed Liabilities assumed by Buyer pursuant, Seller will protect, indemnify, defend and hold Buyer, its and Adventist Health, their respective members, officers, directors, trustees, agents, legal representatives, successors and assigns, and each of them, free and harmless from and against any and all claims, debts, liabilities, obligations, losses, damages, fines, penalties, judgments, assessments, costs and expenses (including but not limited to reasonable attorneys' fees and expenses), liens and encumbrances accruing, based upon, resulting from or directly or indirectly arising out of (a) any breach or default hereunder by Seller, or (b) defeasance of any bonds issued by Seller, or (c) Seller's operation of the hospital prior to the Closing, and with respect to the liabilities retained by Seller. Seller hereby agrees to protect, indemnify, defend and hold Buyer and Adventist Health, their respective members, officers, directors, agents, legal representatives, successors and assigns, and each of them, free and harmless from and against any and all known or unknown costs, losses, liabilities, obligations, damages, | 42-44 |

| | | |
|---|---|---|
| | lawsuits, deficiencies, claims, demands and expenses (whether or not arising out of third-party claims), including without limitation interest, penalties, costs of mitigation, any investigation or clean-up, remedial correction or response action, damages to the environment or natural resources, legal fees and all amounts paid in investigation, defense or settlement of any of the foregoing, incurred in connection with, arising out of or resulting from any liabilities arising under or noncompliance any environmental law or concerning any environmental condition or any property damage, natural resources damage, or bodily injury occurring as a result of Seller's operation of the hospital before the Closing Date and attributable to conditions on the hospital real property before the Closing Date. | |
| Indemnification of Seller | Buyer and Adventist Health hereby agree to protect, indemnify, defend and hold Seller, its members, officers, directors, trustees, agents, legal representatives, successors and assigns, and each of them, free and harmless from and against any and all claims, debts, liabilities, obligations, losses, fines, penalties, judgments, assessments, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses), liens and encumbrances accruing, based upon, resulting from or directly or indirectly arising out of (a) any breach or default hereunder by Buyer; (b) Buyer's or Adventist Health's operation of the Hospital after the Closing, (c) the Assumed Liabilities or (d) any mechanics' liens or other claims arising from or in connection with the due diligence activities conducted by Buyer and Adventist Health in connection herewith. | 44-45 |
| Dispute Resolution | If the parties are unable to resolve a dispute, then the agreement requires arbitration pursuant to JAMS rules, and the agreement provides expedited periods for discovery and the hearing of the issue. | 46-47 |
| Termination; Release | Except in the case of mutual agreement, the agreement may be terminated by a party only if (i) the other party defaults, (ii) there is a failure of a condition to Closing, or (iii) the parties are unable to agree as to whether a matter that arises before Closing but after signing is materially adverse to Seller. The sole remedy is termination of the agreement, except if there is a breach of confidentiality provisions. | 48 |

## III.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

The Court has jurisdiction over this Motion pursuant to Sections 157 and 1334 of title 28 of the United States Code. This is a core proceeding pursuant to Section 157(b)(2). Venue for proceedings on this Motion is proper in this District pursuant to Section 1409.

The statutory predicates for the relief requested herein are Sections 105, 362, 364, 365, 901 and 922, and FRBP 2002 and 4001.

## IV.

## HISTORY

The events leading to the District's filing of a petition under Chapter 9 are well known to the Court and set forth in pleadings filed in connection with the District's motion to reject the contract between the District and Healthcare Conglomerate Associates ("HCCA"). A very brief summary of certain relevant facts is below.

A.     The Debtor.

Tulare Local Health Care District is a public local health care district serving the residents of a large geographic area in southwestern Tulare County since 1945, which includes the City of Tulare and surrounding rural communities. The District serves the needs of over 70,000 residents of the City of Tulare and the surrounding rural communities, including Woodville, Tipton, Pixley and Waukena. It is bisected by Highway 99, a heavily traveled freeway in the San Joaquin Valley, and many tens of thousands of travelers potentially require emergency medical care due to accidents or illnesses in transit on any given day.

The District is a political subdivision of the State of California and was organized under the Local Hospital District Law set forth in California's Health and Safety Code. It is governed by a Board of Directors (the "Board") consisting of five members elected from within the District's geographical political divisions. The District owns and intends to operate its 112 bed general acute Hospital facility, medical clinics, a fitness facility (called Evolution Fitness Center) and other patient service programs. The general acute Hospital facility owned by the District is located at 869 Cherry Street in Tulare is known

as the Tulare Regional Medical Center ("TRMC"). The District also owns and manages several other real properties in the vicinity of the Hospital, including a health club facility and medical office buildings.

B.     The Debtor's Former Manager And the Deterioration of Its Relationship with the District.

HCCA is a California limited liability company organized in December 2013.

In or around May 2014, HCCA and the District entered into a contract involving four interrelated agreements consisting of a Management Services Agreement, Interim Joint Operating Agreement, Joint Operating Agreement and Option (together, the "HCCA Contract"). The HCCA Contract provided, *inter alia*, that HCCA was responsible for the management, daily operations, and financial accounts of the District as set forth in greater detail in the HCCA Contract.

Over time, the relationship between the District and HCCA soured and deteriorated as questions and issues surfaced concerning HCCA's performance of its obligations under the HCCA Contract, including claimed financial mismanagement and other improprieties. On September 15, 2017, HCCA filed a lawsuit against the District in Los Angeles County Superior Court (Case No. BC 676133) alleging claims for breach of contract and declaratory relief (the "HCCA Lawsuit").[7] The HCCA Lawsuit alleges, *inter alia*, that the District owed HCCA the principal amount of $7 million for loans HCCA allegedly advanced to the District for which "HCCA has received promissory notes."

///

///

C.     The District Learns HCCA Led It Into A Dire Fiscal Crisis and HCCA Races to Encumber the District's Real Property.

On September 28, 2017, HCCA requested that the District's Board conduct an

---

[7] The District removed the HCCA Lawsuit to this Court and filed an answer and counterclaim, and HCCA has filed a motion seeking to remand it back to the Los Angeles Superior Court. See, generally, adversary proceeding no. 17-01095 Docket No. 1, 4, 8 and 9. The District maintains this Court is the proper court to adjudicate the claims asserted by the parties, and has filed its response to HCCA's remand motion which is currently set for hearing on August 15, 2018 on the same day the Court is scheduled to hear the District's motion to avoid the HCCA deed of trust.

emergency meeting on Sunday, October 1, 2017 (the "Benzeevi Letter"). In the Benzeevi Letter, HCCA advised for the first time that the District had a "CRITICAL liquidity crisis," was "COMPLETELY out of cash," that many vendors were threatening to cease providing goods and services, and that the District lacked "sufficient cash to fund the entire gross payroll." HCCA also alleged it was owed $7 million and would not extend further credit to the District. *Id*. HCCA further stated that it had notified the California Department of Public Health ("CDPH") that day of "the District's inability to fund payroll." *Id*. Finally, Benzeevi wrote "[w]ithout immediate approval for the District to obtain prompt funding, the only alternative will be for HCCA to move immediately to cease operations at the Hospital and to consider immediately a plan over the next several days to cease operations at the Hospital." *Id*.

That very same day, September 28, armed with knowledge of the District's dire financial straits and with the filing of a Chapter 9 petition known to be imminent, Benzeevi, claiming to be the Chief Executive Officer of the District, recorded a deed of trust encumbering the Evolutions Plaza property. Specifically, on September 28, 2017, HCCA recorded a Short Form Deed of Trust ("Deed of Trust") executed by Benzeevi, claiming to be the Chief Executive Officer of the District, in favor of Benzeevi's company, HCCA, which purports to secure a series of ten purported promissory notes.[7] The $10.2 million obligation alleged in the ten promissory notes is roughly $3.2 million more than HCCA alleged it was owed in the Benzeevi Letter sent on the exact same date and alleged owed in the HCCA Lawsuit.[8] The Deed of Trust was recorded in the Official Records of Tulare County as document no. 2017-0059339 and purports to encumber the Evolutions Plaza property owned by the District. *Id*. The District disputes the validity of the Deed of Trust, any lien created by the recordation of the Deed of Trust and the amount of the obligation alleged in the Deed of Trust.[7]

On January 23, 2018, the District filed Adversary Proceeding No. 18-01005-B in this Court contending, *inter alia*, that the Deed of Trust and any lien created by the

---

[8] The promissory notes are dated between July 31, 2015 and July 31, 2017.

recordation of the Deed of Trust is avoidable under 11 U.S.C. Sections 544, 547, 548 , and seeking declaratory relief.  The current status of this adversary proceeding is that the District's motion for partial summary adjudication is set to be heard on August 15, 2018.[7]

D.     The District Files Its Petition to Save the Hospital.

Given the District's insolvency and its inability to fund payroll and pay other obligations as and when they became due, HCCA's threat to cease operations at the Hospital and medical facilities thereby creating a health and safety emergency for patients and the public seeking medical care and the likelihood that the California Department of Public Health ("CDPH") might involuntarily suspend the District's license, the District commenced this Chapter 9 case on an emergency basis by filing a voluntary petition on September 30, 2017 (the "Petition Date"). In light of the irreparable relationship between the District and HCCA, the District immediately filed a motion to reject the Contract. On October 19, 2017, the Court granted the District's motion to reject the HCCA Contract.[9]

Given these desperate circumstances and with no ability to obtain adequate funding on an urgent basis, the District voluntarily and temporarily suspended operations effective midnight on October 28, 2017 and voluntarily surrendered its license to the CDPH to avoid a forced shut down. The District did not gain control of its facilities, documents, information and computer systems until November 22, 2017.

Since November 23, 2017 when the District regained control over its bank accounts and facilities, the following has been accomplished. [10]  These are set out in a series of bullet points as follows:

(a)     The District has collected various monies owned on account of overdue accounts and it has sought and obtained supplemental funds from various governmental agencies.  These revenues have been used to engage a skeleton crew of

---

[9]  The order was entered on November 2, 2017.
[10]  See the Debtor's Chapter 9 Status Report filed on June 12, 2018, as ECF 551 for a more complete description.

1 | people to work on matters involved in getting the Hospital reopened.

2 |     (b)    The District has cooperated in various criminal and regulatory
3 | investigations involving the Tulare County District Attorney's office, United States
4 | Department of Justice, Department of Labor, Internal Revenue Service, and Labor
5 | Commissioner.

6 |     (c)    The District has committed significant resources in complying with an audit
7 | by the State of California into the use of bond proceeds.

8 |     (d)    The District has evaluated many of the approximately 1,100 different
9 | contractual relationships in an effort to determine which should be rejected, which were
10 | essential to the reopening of the Hospital and etc.  Motions to assume and/or reject
11 | various leases and executory contracts have been filed.

12 |     (e)    The District has negotiated with lessors of real property to the District.

13 |     (f)    The District has commenced adversary proceedings seeking to recover
14 | monies claimed to be owed to the District.

15 |     (g)    The District has evaluated the removal of various actions, settled several
16 | pre-petition litigation matters, and negotiated relief from stay as to several medical
17 | malpractice matters.

18 |     (h)    The District sought and obtained a claims bar date and has assembled
19 | information as to the various claims that have been asserted against the District.

20 |     (i)    As shown by the declaration of Daniel Heckathorne, the District has been
21 | on a nearly perpetual quest for post-petition financing.

22 |     (j)    On almost a daily basis the District has been involved in discussions with
23 | the California Department of Public Health and other regulatory agencies relating to its
24 | license and reinstatement of the license.

25 |     (k)    The District has resolved a longstanding lawsuit involving the Medical
26 | Executive Committee which has resulted in the commitment of various medical
27 | practitioners to resume privileges at the Hospital once it has reopened.

28 |     The District must reopen the Hospital before October 28, 2018 or its license to

1 | operate as an acute care Hospital may be lost, which would be a disaster.

2 | Additionally, the District must submit a ballot measure to the County of Tulare
3 | Elections Office by August 8, 2018 to get the measure on the ballot for voter approval at
4 | the November 6, 2018 election.

5 | E.    The District's Efforts to Obtain Funding to Facilitate its Reorganization and
6 | Path Toward A Plan of Adjustment.

7 | To assist in the reorganization process, the District retained Wipfli LLP/HFS
8 | Consultants ("HFS"), a company with a long history of assisting hospitals and hospital
9 | districts in financial crisis. HFS' work includes, in part, evaluating and analyzing the
10 | financial condition of the District, assessing the District's operations and reopening the
11 | District's medical facilities, and advising the Board on recommendations to remedy the
12 | financial crisis facing the District. *Id.* To facilitate that work, at the current time and
13 | pursuant to a District Board resolution, Richard Gianello serves as the overall Senior
14 | Project Manager, Larry Blitz of HFS serves as the District's Interim Chief Executive
15 | Officer, Daniel Heckathorne of HFS acts as the District's Interim Chief Financial Officer
16 | and Sanford Haskins of HFS serves as the District's Chief Administrative Officer.

17 | With the approval of the Board, HFS has developed a plan for reopening the
18 | Hospital and establishing a firm fiscal foundation for the District's future to meet the
19 | healthcare needs of the District's residents. Toward that end, the District has secured a
20 | commitment from AH to provide the District with the Credit Agreement, and is working
21 | on obtaining additional financing. As detailed above, as a part of the Transaction, AH
22 | has also agreed to lease the Hospital if approved by the voters in the District and to
23 | purchase certain personal property.

24 | The rent to be paid for the Lease and the purchase price to be paid for the
25 | personal property will be the fair market value as determined by Deloitte, a valuation
26 | expert engaged by the District. This is required by state law. The Board will distribute
27 | the fair market value to the public.

28 | The terms of the Credit Agreement are summarized above. The security for the

Credit Agreement will be certain designated real property owned by the District that can be lawfully pledged (excluding the Hospital) and certain personal property pending purchase by AH. The District does not believe that the Hospital facility real property can be lawfully pledged, but it owns the following real properties that it intends to pledge as collateral for the Credit Agreement subject to any validly existing liens.

The property at 1725 East Prosperity is known as Evolutions. It is subject to the disputed HCCA deed of trust described above.

The property at 792 N. Cherry is subject of deed of trust recorded on September 7, 1989 in favor of Cyril H. Johnson, an individual, and Kenneth A. Kuney, as Trustee of the Testamentary Trust created by the Will of Lucy Jane Johnson, deceased and the Decree of Distribution of her Estate as to an undivided ½ interest. Cyril H. Johnson transferred his ½ interest to Georgianna Aileen Johnson McDonald on October 25, 2000 and the assignment deed of trust was recorded on October 30, 2000. The District's records show this debt was satisfied long ago but never reconveyed. The District has a pending adversary proceeding (18-01020) seeking to clear title.

The property at 941 N. Gem Street is subject to a deed of trust recorded on July 26, 1990 in favor of George D. Lavers and Elizabeth J. Lavers both individually and as trustees of the George D. Lavers and Elizabeth J. Lavers Revocable Living Trust Agreement dated May 10, 1995. The District's records show this debt was satisfied long ago but never reconveyed. The District has a pending adversary proceeding (18-01022) seeking to clear title.

The property at 591 E. Merritt Avenue was subject to a deed of trust recorded on October 4, 1996 in favor of Don A. Bravin and Elvira M. Bravin. The District's records show that this debt was satisfied long ago but never reconveyed. The District filed an adversary proceeding (18-01021) seeking to clear title. The Defendants have since given a full reconveyance of the deed of trust, which was recorded, and the adversary proceeding was dismissed on June 29, 2018.

Other free and clear real property to be pledged as collateral are the following:

| Address |
|---|
| Lots 24, 26 and 35 |
| 935 – 945 N. Gem Street |
| 591 E. Merritt Ave. |
| 979 N. Gem Street |
| 874, 890, 906 and 922 N. Cherry St. |
| 793, 795 and 799 N. Cherry St. |
| 1050 N. Cherry St. |

## V.

## THE DISTRICT HAS SATISFIED THE APPLICABLE LEGAL REQUIREMENTS FOR APPROVAL OF THE POST-PETITION FINANCING

A Chapter 9 case is different than a case filed under Chapter 11 in many ways. One of those differences is found in Section 904 which, absent the municipality's consent, precludes bankruptcy courts from interfering with a municipality's political or governmental powers, property or revenues, and use or enjoyment of income-producing property. 11 U.S.C. Section 904; *Ass'n of Retired Employees of the City of Stockton v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 13 (Bankr. E.D. Cal. 2012) (Section 904 bars the court, without the municipality's consent, from interfering with its political or governmental powers, property or revenues, and use or enjoyment of income-producing property); *In re Valley Health Sys.*, 429 B.R. 692, 714 (Bankr. C.D. Cal. 2010) ("By virtue of Section 904, a debtor in Chapter 9 retains title to, possession of, and complete control over its property and its operations, and is not restricted in its ability to sell, use, or lease its property.").

As the Ninth Circuit recognized in *Silver Sage Ptnrs., Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs)*, 327 F.3d 930, 935 (9th Cir. 2003), "[m]any of the protections afforded to creditors in the other chapters are missing in Chapter 9." The Ninth Circuit noted that Chapter 9 debtors have few limitations and duties of a Chapter 11 debtor, and may borrow and spend without court authority. *Id.* (citing *In re Richmond*

1  *Sch. Dist., 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991)*.  The Ninth Circuit also observed
2  that "a Chapter 9 debtor enjoys a full expanse of bankruptcy powers, including the
3  benefit of an enhanced automatic stay pursuant to *sections 362(a) and 922(a)*, the right
4  to avoid preferences, fraudulent conveyances and other transfers as provided in
5  *sections 544 through 549*, the authority to borrow monies on the security of liens senior
6  to existing liens of record pursuant to *section 364(c)*, the right to reject executory
7  contracts pursuant to *section 365* and the ability to bind all creditors by a confirmed plan
8  pursuant to *section 944*." *Id.*

9          A.      The District Has Satisfied Section 364(c)(1)'s Requirements.

10          Section 901 incorporates Sections 364(c) and (d) into Chapter 9 of the
11  Bankruptcy Code.[11] 11 U.S.C. Section 901. Pursuant to Section 364(c), a debtor may,
12  in the exercise of its business judgment, incur secured debt if the debtor has been
13  unable to obtain unsecured credit and the borrowing is in the best interests of the
14  estate. *See, e.g., In re Simasko Production Co.,* 47 B.R. 444, 448-9 (Bankr. D.
15  Colo. 1985) (authorizing interim financing stipulation where debtor's best business
16  judgment indicated financing was necessary and reasonable for benefit of estates);
17  *In re Ames Dept. Stores,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to
18  post-petition credit, courts "permit debtors in possession to exercise their basic
19  business judgment consistent with their fiduciary duties.").

20          Section 364(c) provides, in pertinent part, that:

21          If the trustee is unable to obtain unsecured credit allowable under
22          section 503(b)(1) of this title as an administrative expense, the
            court, after notice and a hearing, may authorize the obtaining of
23          credit or the incurring of debt -

24          (1)     with priority over any or all administrative expenses of the kind
                    specified in section 503(b) or 507(b) of this title;
25
            (2)     secured by a lien on property of the estate that is not
26          otherwise subject to a lien; or

27          (3)     secured by a junior lien on property of the estate that is
                    subject to a lien.
28

---

[11] Sections 363, 364(a) and 364(b) are not incorporated into Chapter 9.

11 U.S.C. Section 364(c)

Bankruptcy courts defer to a debtor's business judgment on most business decisions, especially in a Chapter 9 case where there is an elected board of directors, including the decision to borrow money, unless such decision is arbitrary and capricious. *Trans World Airlines, Inc. v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interests [of the debtor] and its creditors"); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("In exercising [the debtor's] business judgment of conducting its drilling operations, it has found it necessary to obtain loans to make these endeavors possible."). Indeed, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985); *Simasko Prod.*, 47 B.R. at 449 ("Business judgments should be left to the board room and not to this Court." (quoting *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983)). Thus, the District submits that its business and political decision to enter into the Credit Agreement should be approved. This is especially true, as here, where the borrowing is approved by the District's elected officials in accordance with applicable state law.

The District has satisfied Section 364(c)'s requirements because it has been unable to obtain unsecured credit and the post-petition financing is necessary and reasonable for the benefit of the District. A debtor need not seek credit from every available source to satisfy Section 364(c), but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the Bankruptcy Code.[12] *See, e.g., Bray v.*

---

[12] Again, Sections 364(a) and (b) are not applicable in a chapter 9 case.

1 | *Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085,
2 | 1088 (4th Cir. 1986) (trustee demonstrated good faith effort that credit was not
3 | available without senior lien by unsuccessfully contacting other financial
4 | institutions in immediate geographic area; "the statute imposes no duty to seek
5 | credit from every possible lender before concluding that such credit is
6 | unavailable"); *Ames Dept. Stores,* 115 B.R. at 40 (finding that debtor
7 | demonstrated the unavailability of unsecured financing where debtor
8 | approached several lending institutions).  See the declaration of Daniel
9 | Heckathorne which demonstrates the District's efforts to borrow on an
10 | unsecured basis.

11 |      A debtor's efforts to obtain unsecured credit are considered on a case by case
12 | basis, particularly "[g]iven the 'time is of the essence' nature of this type of
13 | financing." *In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In
14 | *In re Sky Valley, Inc.,* 100 B.R. 107, 112-13 (Bankr. N.D.Ga. 1988), the  Court
15 | stated that "it would be unrealistic and unnecessary to require Debtors to conduct
16 | such an exhaustive search for financing" where the business suffered from financial
17 | stress, had little or no unencumbered property, and the primary property was
18 | subject to numerous liens, and thus the debtors' approach of only four lenders was
19 | sufficient under such circumstances. *See also In re Stanley Hotel, Inc.,* 15 B.R. 660,
20 | 663 (D. Colo. 1981) (section 364(d)(l)(A) satisfied where two banks refused to
21 | provide unsecured credit to debtor); *see also In re 495 Cent. Park Ave. Corp.,* 136
22 | B.R. 626, 631 (Bankr. S.D. N.Y. 1992) (element satisfied where "specialist in
23 | commercial lending practices ... explained that most banks lend money only in
24 | return for a senior secured position. The debtor cannot obtain financing secured by a
25 | lien on unencumbered property ... because there is no property in the estate which
26 | is not already subject to a lien.").

27 |      In order for the District to achieve the necessary liquidity to reopen the Hospital
28 | and commence operations, it must have access to credit.  The District sought but could

1   not obtain post-petition financing on an unsecured basis in amounts sufficient to provide

2   it with the necessary liquidity. As explained in the  declaration of Daniel Heckathorne,

3   the District's Chief Financial Officer contacted at least four lenders and none of those

4   lenders was willing to extend credit or lend the District monies on an unsecured

5   basis.[13]  No other lender or capital source will provide the District with post-petition

6   financing on terms equal or more favorable to the District than AH under the

7   circumstances.  It is in the best interest of the District, its residents and its creditors for

8   the Hospital to reopen as soon as is practicable in light of the facts and circumstances,

9   and a proper exercise of the District's basic reasonable business and political judgment

10  to borrow the funds required to make that happen.

11         B.      The Terms of the Post-Petition Financing are Fair, Reasonable,  and

12  Appropriate.

13         The terms of the post-petition financing are the best that the District can hope to

14  obtain under the circumstances.  As set forth above, the District was forced to

15  voluntarily surrender its license and temporarily suspend operations due to HCCA's

16  threats to abruptly close the Hospital and the CDPH's concerns respecting patient

17  safety.  The resulting interruption of cash flow and costs to reopen the District's medical

18  facilities means that the District will not have enough funds to resume operations

19  without the Credit Agreement.  The best option for the District is to obtain funding from

20  a source such as AH with a demonstrated commitment to and investment in the health

21  and well-being of the San Joaquin Valley and its residents.

22         AH is the largest healthcare network and employer in the San Joaquin Valley,[14]

23  and is heavily invested in providing top notch medical care to residents of the San

24  Joaquin Valley.  It operates hospitals in Tehachapi, Sonora, Hanford, Reedley and

25  Kingsburg (and soon Fowler).  The District conducted arm's length negotiations with

26  potential financing sources and ultimately determined that AH offered the best available

27

28  [13] Indeed, even prior to the District's filing this chapter 9 case, HCCA refused to continue to provide
    services under the HCCA Contract unless the District provided HCCA with an irrevocable letter of credit.
    [14] AH is a locally owned, not-for-profit, public-benefit corporation based in Roseville, California.

option for obtaining post-petition financing.  AH is willing to extend a Credit Agreement to the District in the amount of up to $10,000,000 at a very favorable interest rate of prime minus 50 basis points.  AH's long history of investment in the community and residents of the San Joaquin Valley makes it a logical choice to partner with the District, and the terms under which AH is willing to extend the credit are fair and reasonable. See the Declaration of Daniel R. Heckathorne.

VI.

The District Has Satisfied The Applicable Legal Requirements

for Approval of the Lease

Section 363 requires Court approval of a lease in Chapter 11, but not Chapter 9.

However, here, the District seeks authority to lease its Hospital to AH and consents to the jurisdiction of the Court for that limited purpose.  The material terms of the proposed Lease are described above.  A complete copy of the Lease is available for review at www.tularelocalhealthcaredistrict.org under the Chapter 9 tab.

To obtain approval of the Lease the District must demonstrate that entering into the Lease is justified by its business judgment.

The District submits that the Court should authorize the District to enter into and perform the Lease because the Lease is the key to the entire Transaction.  The Lease rent will be at the fair market value and the entire Transaction is subject to voter approval.

The publically elected board of the District will approve the Lease at a public meeting on August 1, 2018 following public comments.  If board approval is not given the Motion will be withdrawn.

The District's decision to lease the Hospital to AH is not capricious or done on a whim.  The District believes there is an urgent need to reopen to avoid permanent loss of its license.  The District's residents have an urgent need to have nearby acute hospital services the Lease should be approved (subject to voter approval).

27

The District submits that the Court should grant the request to enter into the
Lease due to the above reasons and because it is justified by the District's business and
political judgment and because the rent is established by an independent valuation
consultant and is subject to approval by the electorate.

## VII.

## The Asset Purchase Agreement Should be Approved

Although Court approval of a sale of the District's assets is not required in
Chapter 9, because the APA involves a sale of certain assets as well as assumption
and assignment of leases, executory contracts and purchase money security interests,
the District consents to the jurisdiction of the Court for approval of the Transaction.

The Court should approve the APA because the sale is subject to the state law
requirement that the price must be established by an independent third party valuation.

Additionally, the sale of certain assets must be approved by the elected board
and subsequently also blessed by the electorate.

## VIII.

## The Assumption and Assignment of Contracts Should be Approved

As a part of the APA, certain executory contracts and unexpired leases
("Designated Contracts and Leases") are to be assumed by Debtor and assigned to AH
or AHT. The actual list of Designated Contracts and Leases to be assigned to AH or
AHT as of the Closing Date will be finalized by the parties prior to Closing. On the date
the Motion was filed, the Debtor served notice (the "**Assumption and Assignment
Notice**") upon all of the non-debtor counterparties to the potential Designated Contracts
and Leases (the "**Contract Counterparties**" and each a "**Contract Counterparty**")
setting forth: (i) the contract(s) and/or lease(s) that may be assumed by the Debtor and
assigned to AH or AHT; (ii) the name and address of the Contract Counterparty thereto;
(iii) notice of the proposed effective date of the assignment (subject to the right of the
Debtor and/or AH or AHT to withdraw such request for assumption and assignment of
the Designated Contracts and Leases prior to the Closing); (iv) the amount, if any,

determined by the Debtor to be necessary to be paid to cure and compensate for any existing default in accordance with Bankruptcy Code sections 365(b) and 365(f)(2) (the "Cure Amount"); and (v) the deadlines by which any such Contract Counterparty must file an objection to the proposed assumption and assignment of any Designated Contracts and Leases.

**The Court Should Enter an Order Authorizing Debtor to Assume the Designated Contracts and Leases.**

11 U.S.C. §§ 365(a) and 901 allows the Debtor to assume any executory contract and/or lease, subject to the approval of the Court.

The standard for reviewing whether a contract should be assumed and on what terms it should be assumed is one of business judgment. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R.R. Co., 318 U.S. 523, 550 (1943). In applying the "business judgment standard, courts show great deference to a debtor's decision to assume executory contracts, with only a cursory review of [the debtor's] decision...." In re Pomona Valley Medical Group, Inc., 476 F.3d 665, 670 (9th Cir. 2007);. As long as the decision to assume such contracts is a reasonable exercise of business judgment, a court should approve the assumption or rejection of an executory contract. See e.g. NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984).

Assumption of the Designated Contracts and Leases is essential to the Transaction and to Debtor's successful reorganization. AH and Debtor have determined that the Designated Contracts and Leases are critical to the business operations for which AH will use the personal property assets that are to be transferred from Debtor to AH in the Transaction.

To assume the Designated Contracts and Leases, Debtor must (1) cure defaults under such agreements, (2) compensate non-debtor parties to such agreements for pecuniary loss resulting from said defaults, and (3) provide adequate assurance of future performance under the contract or lease to the non-debtor parties to such

1  agreements. 11 U.S.C. § 365(b); See also, 194 B.R. 227 In re Bowman, 230 (Bankr. D.
2  Ariz. 1995).

3     Debtor will satisfy the requirements of 11 U.S.C. § 365(b) on the Closing Date by
4  curing all defaults under the Designated Contracts and Leases, compensating non-
5  Debtor parties to the Designated Contracts and Leases for pecuniary losses resulting
6  from said defaults, and providing adequate assurance of future performance under the
7  Designated Contracts and Leases to the non-debtor parties to those agreements.

8     Based on the foregoing, Debtor has exercised sound business judgment and
9  satisfied the requirements of 11 U.S.C. § 365(b), therefore the Court should enter an
10 order authorizing the assumption and assignment of the Designated Contracts and
11 Leases with such assumption and assignment to be effective upon the Closing Date.

12 **THE COURT SHOULD APPROVE DEBTOR'S ASSIGNMENT OF THE**
13 **DESIGNATED CONTRACTS AND LEASES.**

14    11 U.S.C. § 365(f) states that, with the court's approval, a debtor may assign an
15 executory contract or unexpired lease if "adequate assurance of future performance by
16 the assignee of such contract or lease is provided...." 11 U.S.C. § 365(f)(2). "This
17 requirement is to be given a practical, pragmatic construction based upon the
18 circumstances of the case." In re PRK Enters., Inc., 235 B.R. 597, 603 (Bankr. S.D. Tex.
19 1999). "An absolute guarantee, such as a letter of credit, is not required to meet this
20 standard." In re Teck Hifi, Inc., 49 B.R. 876, 879 (Bankr. D. Mass. 1985) (bankruptcy
21 court held that assignment to newly formed corporation that was a subsidiary of a larger
22 corporation with strong financial statements, without more, met § 365(f) requirements).
23 "The assurance of future performance is adequate if performance is likely (i.e. more
24 probable than not." In re Prime Motor Inns, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994).

25    AH is an established and well-capitalized entity. It has demonstrated its ability to
26 perform by its prolonged growth and success in the health care industry. This status
27 provides the non-Debtor parties to the Designated Contracts and Leases with adequate
28 assurance of future performance by AH.

Based on the adequate assurance of future performance that AH's purchase of Debtor's personal property assets provides to non-Debtor parties to the Designated Contracts and Leases, Debtor's assignment of the Designated Contracts and Leases to AH satisfies the requirements of 11 U.S.C. § 365(f). For these reasons the Court should enter an order authorizing Debtor to assign the Designated Contracts and Leases to AH at the Closing Date.

**THE COURT SHOULD AUTHORIZE DEBTOR TO PAY THE CURE AMOUNTS, IF ANY EXIST, UNDER THE DESIGNATED CONTRACTS AND LEASES.**

A debtor must cure any existing defaults under an executory contract or unexpired lease satisfy the requirements of 11 U.S.C. § 365(f) for obtaining a court order authorizing assumption of such agreement. 11 U.S.C. § 365(f). Debtor will cure, where applicable, existing defaults under the Designated Contracts and Leases to be assumed and assigned. Because the requested Order is not effective until the Closing, Debtor will have the financial ability to satisfy the cure requirement of 11 U.S.C. § 365(f).

It is noted that AH is not responsible for paying the cure amounts.

For these reasons the court should enter an order authorizing Debtor to pay, at the Closing Date, the cure amounts, if any exist, under the Designated Contracts and Leases to be assumed and assigned.

///

///

## IX.

### The Stay Under FRBP 6004(h) Should Be Waived

The District also requests that the Court waive the stay imposed by FRBP 6004(h). FRBP 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FRBP 6004(h). As described above, the relief requested in this Motion is critical for the District to reopen and operate its

1   Hospital and medical facilities as soon as possible to serve the District's residents,

2   generate revenue and move the District forward on its path to reorganization and

3   confirmation of its plan of arrangement.

4         Accordingly, the District respectfully submits that there is good cause to waive

5   the 14 day stay imposed by FRBP 6004(h).

6                                         **X.**

7                    **The District's Reservation of Rights**

8         Nothing contained in this Motion is or should be construed as a consent to

9   jurisdiction other than expressly stated herein.  The District's consent to jurisdiction is

10  limited, as set out herein.

11                                        **XI.**

12                 **Business and Political Justification**

13        It is noted that the Motion involves the assets of municipality.  While the District

14  asserts that approval of the Transaction is supported by sound business judgment, it is

15  also supported by the political judgment of the board as is amply demonstrated by the

16  declaration of Kevin B. Northcraft, the board President.

17                                        **XII.**

18                                  **CONCLUSION**

19        For the foregoing reasons, the District respectfully requests that the Motion be

20  granted, the Transaction be authorized and that it have such relief as is just and proper.

21  It is vitally important to the people of the District that the motion be granted so the

22  Hospital can be reopened to provide acute care as soon as possible due to the critical

23  and time sensitive needs of the District.

24                                    **PRAYER**

25        WHEREFORE, Tulare Local Healthcare District, dba Tulare Regional Medical

26  Center, prays:

27        A.      That the Motion be granted in its entirety;

28        B.      That the District be authorized to enter into:

1            1.   Lease;

2            2.   Asset Purchase Agreement;

3            3.   Credit Agreement, Security Agreement and Deed of Trust;

4            4.   Interim Management Services Agreement;

5    C.      For assumption and assignment of certain contracts and leases.

6    D.      For relief from stay as sought by the Motion;

7    E.      For a finding that Adventist Health has negotiated the Transaction in

8         good faith; and

9    F.      For such other and further relief as is just and proper.

10   Dated: July 20, 2018         WALTER WILHELM LAW GROUP,

11                         a Professional Corporation

12

13                  By: _Riley C. Walter_____

14                         Riley C. Walter

                             Attorneys for Debtor Tulare Local Healthcare

15                         District, dba Tulare Regional Medical Center

16

17

18

19

20

21

22

23

24

25

26   M:\S-U\TRMC\PLEADINGS\WW-41  Motion to Borrowing Funds and Providing Security [Adventist Health]\motion.final.072018.gaa.docx

27

28