**39**
WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter, #91839
Kathleen D. DeVaney #156444
Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:   (559) 435-9800
Facsimile:   (559) 435-9868
E-mail:      ri|eywalter@w2lg.com

Chapter 9 Counsel for Tulare Local Healthcare District

MCCORMICK BARSTOW, LLP
Todd A. Wynkoop #308845
Benjamin T. Nicholson #239893
Benjamin E. Ladd #320466
7647 N. Fresno Street
Fresno, CA 93720
Telephone:   (559) 433-1300
Facsimile:   (559) 433-2300
E-mail:      todd.wynkoop@mccormickbarstow.com

District Counsel for Tulare Local Healthcare District

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  17-13797 |
| TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER, | Chapter 9 |
| | DC No.: WW-41 |
| Debtor. | Date:    August 2, 2018 |
| | Time:    9:30 a.m. |
| Tax ID #:   94-6002897 | Place:   2500 Tulare Street |
| Address:   869 N. Cherry St. | Fresno, CA  93721 |
| Tulare, CA 93274 | Courtroom 13 |
| | Judge:   Honorable René Lastreto II |

**EXHIBITS IN SUPPORT OF MOTION FOR AUTHORITY TO ENTER INTO TRANSACTION INCLUDING BORROWING FUNDS, SALES OF PERSONAL PROPERTY AND PROVIDING SECURITY, ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND FOR AUTHORITY TO LEASE REAL PROPERTY PURSUANT TO 11 U.S.C. §§ 105, 362, 364, 365, 901 AND 922**

///

Exhibits in Support of Motion for Authority to Enter into        -1-        M:\S-U\TRMC\PLEADINGS\WW-41  Motion to Borrowing
Transaction Including Borrowing Funds, Sales of Personal                      Funds and Providing Security [Adventist
Property, etc.                                                                Health]\exh.072018.gaa.final.docx

| Exhibit | Description | Pages |
|---|---|---|
| A | Proposed Order Pursuant to 11 U.S.C. §§ 105, 362, 364, 365, 901 and 922 | 37 |
| B | Declaration of Daniel R. Heckathorne in Support of Motion for Authority to Borrow Funds, Sales of Personal Property and Provide Security and for Authority to Lease Real Property Pursuant to 11 U.S.C. §§ 105, 362, 364, 465, 901 and 922 | 3 |
| C | Declaration of Richard Gianello in Support of Motion for Authority to Borrow Funds, Sales of Personal Property and Provide Security and for Authority to Lease Real Property Pursuant to 11 U.S.C. §§ 105, 362, 364, 465, 901 and 922 | 2 |
| D | Declaration of Kevin B. Northcraft in Support of Motion for Authority to Borrow Funds, Sales of Personal Property and Provide Security and for Authority to Lease Real Property Pursuant to 11 U.S.C. §§ 105, 362, 364, 465, 901 and 922 | 3 |

Dated:  July 20, 2018

WALTER WILHELM LAW GROUP,
a Professional Corporation

By:  *Riley C. Walter*
Riley C. Walter,
Attorneys for Debtor, Tulare Local
Healthcare District, dba
Tulare Regional Medical Center

WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter #91939
Kathleen D. DeVaney #156444
Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone: (559) 435-9800
Facsimile: (559) 435-9868
E-mail: rileywalter@w2lg.com

Chapter 9 Counsel for Tulare Local Healthcare District

MCCORMICK BARSTOW, LLP
Todd Wynkoop #308845
Benjamin T. Nicholson #239893
Benjamin E. Ladd #320466
7647 N. Fresno Street
Fresno, CA 93720
Telephone: (559) 433-1300
Facsimile: (559) 433-2300
E-mail: todd.wynkoop@mccormickbarstow.com

District Counsel for Tulare Local Healthcare District

## IN THE UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF CALIFORNIA

### FRESNO DIVISION

| | |
|---|---|
| In re<br><br>TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER,<br><br>        Debtor.<br><br>Tax ID #: 94-6002897<br>Address: 869 N. Cherry St.<br>        Tulare, CA 93274 | CASE NO. 17-13797<br><br>DC No.: WW-41<br><br>Chapter 9<br><br>Date: August 2, 2018<br>Time: 9:30 a.m.<br>Place: 2500 Tulare Street<br>       Fresno, CA 93721<br>       Courtroom 13<br>Judge: Honorable René Lastreto II |

EXHIBIT A
Page 1 Of 37

1   **FINAL ORDER AUTHORIZING THE DEBTOR TO ENTER INTO TRANSACTIONS,
    INCLUDING THE SALE OF PERSONAL PROPERTY, THE ASSUMPTION AND**
2   **ASSIGNMENT OF CONTRACTS AND LEASES, THE LEASE OF REAL PROPERTY,
    AND ENTRY INTO AN INTERIM MANAGEMENT SERVICES AGREEMENT, AND**
3   **INTERIM ORDER AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION
    FINANCING, PURSUANT TO 11 U.S.C. SECTIONS 105, 362, 364, 365, 901 AND 922**

4
5       At Fresno, in the Eastern District of California.

6       Upon consideration of the motion (the "**Motion**")[1] of Tulare Local Healthcare District,

7   doing business as Tulare Regional Medical Center (the "**Debtor**" or the "**Borrower**") for entry

8   of an order:

9       (a)     authorizing the Debtor to obtain secured postpetition financing consisting of a

10  superpriority loan facility (i) during the period (the "**Interim Period**") from the date of the entry

11  of this order (the "**Interim Order**" or the "**Order**") through and including the earlier to occur of

12  (x) the date of entry of the Final Order (defined below) by this Court and (y) the Termination

13  Date (defined below), in an aggregate principal amount not to exceed $1,000,000, and (ii) upon

14  entry of the Final Order and thereafter until the Termination Date, in an aggregate principal

15  amount not to exceed $10,000,000 (the "**DIP Facility**" and, the loans under the DIP Facility, the

16  "**DIP Loans**"), subject to the terms and conditions hereof, and as set forth in the Loan

17  Documents (as defined below);

18      (b)     authorizing the Debtor to execute and deliver that certain Debtor-in-Possession

19  Credit Agreement (substantially in the form attached hereto as Exhibit A and as it may be

20  amended, modified or supplemented in accordance with the terms hereof and thereof, the "**DIP**

21  **Credit Agreement**" and, together with the Security Agreement and Chattel Mortgage, between

22  the Debtor and Lender (substantially in the form attached hereto as Exhibit B and as it may be

23  amended, modified or supplemented in accordance with the terms hereof and thereof, the

24  "**Security Agreement**") and all other agreements, documents and instruments executed and

25  delivered in connection therewith, including this Interim Order, the "**Loan Documents**"),

26  between the Debtor and Adventist Health System/West, doing business as Adventist Health, as

27
28

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

EXHIBIT A
Page 2 Of 37

lender (the "**Lender**" or "**Adventist Health**"), and to perform such other and further acts as may be required in connection with the Loan Documents;

(c)      granting the DIP Facility and all obligations owing thereunder and under the Loan Documents to the Lender and all other "Obligations" as described in the DIP Credit Agreement (collectively, the "**DIP Obligations**") allowed superpriority administrative expense claims status in the Chapter 9 Case (as defined below);

(d)      granting to the Lender automatically perfected security interests in and liens on all of the Collateral (as defined below), which security interests and liens shall have the priorities set forth in this Interim Order;

(e)      authorizing the Debtor to use the proceeds of the DIP Facility in accordance with this Interim Order, the Loan Documents and the Approved Budget;

(f)      authorizing the Lender to exercise remedies under the Loan Documents upon the occurrence and during the continuance of an Event of Default (as defined below);

(g)      waiving the Debtor's right to surcharge against the Collateral pursuant to Bankruptcy Code section 506(c);

(h)      modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(i)      scheduling a final hearing (the "**Final Hearing**") to consider entry of an order (the "**Final Order**") granting the relief requested in the Motion relating to the DIP Facility on a final basis and approving the form of notice with respect to the Final Hearing and the transactions contemplated by the Motion relating to the DIP Facility;

(j)      approving the sale of the Debtor's assets (the "**Sale**") pursuant to the Agreement for Purchase and Sale of Assets, by and among the Debtor, Adventist Health Tulare, as buyer (the "**Buyer**" or "**AH Tulare**"), and Adventist Health (substantially in the form attached hereto as Exhibit C and as it may be amended, modified, or supplemented in accordance with the terms hereof, the "**APA**"), free and clear of all Interests (as defined below);

(k)      approving the Debtor's lease of the Premises (as defined in the Lease) pursuant to the Lease, by and between the Debtor, as landlord, and AH Tulare, as tenant (substantially in the

1　form attached hereto as <u>Exhibit D</u> and as it may be amended, modified or supplemented in

2　accordance with the terms hereof and thereof, the "**Lease**");

3　　　　　　(l)　　　establishing certain notice procedures for determining cure amounts for executory

4　contracts and unexpired leases to be assumed and assigned in connection with the Lease and/or

5　the APA and authorizing the assumption and assignment of certain executory contracts and

6　unexpired leases (the "**Assigned Contracts**");

7　　　　　　(m)　　authorizing the Debtor's entry into the Interim Management Services Agreement,

8　by and between the District and AH Tulare, as manager (substantially in the form attached hereto

9　as <u>Exhibit E</u> and as it may be amended, modified or supplemented in accordance with the terms

10　hereof and thereof, the "**Interim MSA**" and, together with the Loan Documents, the APA and

11　the Lease, the "**Transaction Documents**"); and

12　　　　　　(n)　　granting related relief.

13　　　　　　The Court having reviewed the Motion; and the Court having jurisdiction over this matter

14　under 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding

15　pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with

16　Article III of the United States Constitution; and the Court having found that venue of this

17　proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

18　the Court having determined that the relief requested in the Motion is fair and reasonable and is

19　essential to preserve the value of the Debtor's assets; and the hearing on the Motion having been

20　held on August 2, 2018 (the "**Interim Hearing**"); and it appears that the interim relief requested

21　in the Motion is necessary to avoid immediate and irreparable harm to the Debtor pending the

22　Final Hearing; and it appearing that proper and adequate notice of the Motion has been given and

23　that no other or further notice is necessary; and the Court having waived the notice requirements

24　provided for by Federal Rule of Bankruptcy Procedure 6004(h); and upon the record herein; and

25　after due deliberation thereon; and good and sufficient cause appearing therefor, **IT IS**

26　**HEREBY FOUND**[2]**:**

27　_____

[2]　　Findings of facts shall be construed as conclusions of law, and conclusions of law shall

28　be construed as findings of fact, pursuant to Bankruptcy Rule 7052.


EXHIBIT A
Page 4 Of 37

A.     <u>Petition Date</u>. On September 30, 2017 (the "**Petition Date**"), the Debtor filed a voluntary petition with this Court for relief under chapter 9 of the Bankruptcy Code (the "**Chapter 9 Case**").

B.     <u>Jurisdiction and Venue</u>. This Court has core jurisdiction over the Chapter 9 Case, the parties, and the Debtor's property. Venue for the Chapter 9 Case is proper before this Court.

C.     <u>Notice</u>. Proper notice under the circumstances has been given by the Debtor of the Motion and the Interim Hearing. Actual written notice of the Interim Hearing, the APA, the Lease, the Interim MSA and the assumption, assignment and/or transfer of the Assigned Contracts, and a reasonable opportunity to object or be heard with respect thereto and to the entry of this Order, has been afforded to all known interested persons and entities entitled to receive such notice, including, but not limited to (i) the Office of the United States Trustee, (ii) all entities (or counsel therefore) known to have asserted any lien, charge, claim or encumbrance on the Collateral, the Acquired Assets (as defined in the APA), the Premises or any other property of the Debtor, (iii) all federal, state and local regulatory or taxing authorities which are reasonably ascertainable by the Debtor to have a known interest in the Acquired Assets or the Premises; (iv) known non-debtor counterparties to any unexpired leases or executory contracts that could potentially be assumed and assigned to Buyer; (v) those parties that requested notice pursuant to Bankruptcy Rule 2002; (vi) the trustees on bonds issued by the Debtor; (vii) the California Department of Public Health; and (viii) the Debtor's twenty largest unsecured creditors (collectively, the "**Notice Parties**"). As evidenced by the affidavits of service filed with this Court: (i) due, proper, timely, adequate and sufficient notice of the Motion, the Interim Hearing, the assumption and assignment of the Assigned Contracts, the Lease, the Interim MSA, and the Sale has been provided to all parties-in-interest; (ii) such notice was, and is, good, sufficient and appropriate under the circumstances of this Chapter 9 Case, provided a fair and reasonable opportunity for parties-in-interest to object, and to be heard, with respect thereto, and was provided in accordance with Bankruptcy Code sections 102(1), 363 and 365, Rules 2002, 6004, 6006, 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the applicable Local Rules of Practice for the United States

1    Bankruptcy Court, Eastern District of California (the "**Local Rules**"); and (iii) no other or further

2    notice with respect to such matters is necessary or shall be required.

3            D.      Findings Regarding the DIP Facility.

4            1.     Purpose and Necessity of Financing.  The Debtor requires the financing described

5    in the Motion to, among other things, finance costs incurred by the Debtor in connection with its

6    efforts to seek reinstatement of its suspended general acute care hospital license with the

7    California Department of Public Health and to reopen the Debtor's acute care general hospital

8    located in Tulare, California, heretofore known as Tulare Regional Medical Center (the

9    "**Hospital**") without which the Debtor may suffer immediate and irreparable harm.  The Debtor

10    is unable to obtain adequate unsecured credit allowable as an administrative expense under

11    Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c) or (d),

12    on equal or more favorable terms than those set forth herein based on the totality of the

13    circumstances.  The borrowing is in the best interests of the Debtor and its creditors under the

14    circumstances.

15            2.     Good Cause.  The terms of the Loan Documents are fair and reasonable under the

16    circumstances and reflect the Debtor's exercise of prudent business judgment.  The ability of the

17    Debtor to obtain sufficient working capital and liquidity under this Interim Order is vital to the

18    Debtor, its creditors, and in particular, to the ability of the Debtor to preserve the Hospital and

19    restructure its indebtedness under the Bankruptcy Code.  The Debtor may be immediately and

20    irreparably harmed if this Interim Order is not entered.  Good cause has, therefore, been shown

21    for the relief sought in the Motion.

22            3.     Good Faith.  The DIP Facility has been negotiated by and among the Debtor and

23    the Lender at arm's-length and in good faith as that term is used in Bankruptcy Code section

24    364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).

25    Subject to the terms of this Interim Order, the DIP Obligations, the DIP Liens and the DIP

26    Superpriority Claims (as defined below) shall be entitled to the full protection of Bankruptcy

27    Code section 364(e) in the event that this Interim Order or any provision hereof is vacated,

28    reversed, or modified on appeal or otherwise, and any liens or claims granted to the Lender

1    hereunder arising prior to the effective date of any such vacatur, reversal or modification of this

2    Interim Order shall be governed in all respects by the original provisions of this Interim Order,

3    including entitlement to all rights, remedies, privileges and benefits granted herein.  The terms of

4    the DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business

5    judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value

6    and fair consideration.

7         4.    <u>Lender Claims</u>.  As of the date hereof, no undisclosed claims of the Debtor exist

8    against the Lender.

9         E.    <u>Findings Regarding the Interim MSA, Lease and APA</u>.

10        1.    <u>Assignment and Assumption Notice</u>.    The Debtor has served notice (the

11   "**Assumption and Assignment Notice**") upon all of the non-debtor counterparties to the

12   Assigned Contracts (the "**Contract Counterparties**" and each a "**Contract Counterparty**")

13   setting forth: (i) the contract(s) and/or lease(s) that may be assumed by the Debtor and assigned

14   to the Buyer; (ii) the name and address of the Contract Counterparty thereto; (iii) notice of the

15   proposed effective date of the assignment (subject to the right of the Debtor and/or the Buyer to

16   withdraw such request for assumption and assignment of the Assigned Contract(s) prior to the

17   Closing (as defined in the APA); (iv) the amount, if any, determined by the Debtor to be

18   necessary to be paid to cure and compensate for any existing default in accordance with

19   Bankruptcy Code sections 365(b) and 365(f)(2) (the "**Cure Amount**"); and (v) the deadlines by

20   which any such Contract Counterparty must file an objection to the proposed assumption and

21   assignment of any Assigned Contract.  The service of such Assumption and Assignment Notice

22   (i) was good, sufficient and appropriate under the circumstances of this Chapter 9 Case; (ii)

23   provides such counterparties with a full and fair opportunity to object to such assumption,

24   assignment, or transfer and to the proposed Cure Amount set forth in the Assumption and

25   Assignment Notice; and (iii) was in compliance with applicable provisions of the Bankruptcy

26   Rules and Local Rules.  Accordingly, no other or further notice need be given in connection with

27   such assumption, assignment, or transfer or with respect to Cure Amounts.

28

US-DOCS\102533474.1

EXHIBIT A
Page 7 of 37

2. <u>Business Judgment</u>. The Debtor has demonstrated good, sufficient and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale, the Lease and other transactions contemplated by the APA, the Lease and the Interim MSA, including, without limitation, the assumption, assignment, and/or transfer of the Assigned Contracts (collectively, the "**Transactions**") pursuant to Bankruptcy Code sections 363 and 365, prior to and outside of a plan of adjustment, and such action is an appropriate exercise of the Debtor's business judgment and in the best interests of the Debtor, its estate, and its creditors. Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk of depreciation of the value of the Acquired Assets if the Sale is not consummated promptly; (ii) the APA constitutes the highest or otherwise best offer for the Acquired Assets; (iii) the APA and the Lease will present the best opportunity to realize the value of the Debtor on a going concern basis and to avoid decline and devaluation of the Hospital; and (iv) unless the Sale and the Lease are approved expeditiously so that they may be included in the Electorate Approval process (as defined in the APA), potential creditor recoveries may be substantially diminished. Given the circumstances of the Chapter 9 Case and the adequacy and fair value of the Purchase Price (as defined in the APA) under the APA, the proposed transfer of the Acquired Assets to the Buyer constitutes a reasonable and sound exercise of the Debtor's business judgment, is in the best interests of the Debtor, its Estate, and its creditors, and should be approved. The consummation of the Transactions is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105, 363 and 365, and all of the applicable requirements of such sections have been complied with in respect of the Transactions.

3. <u>Good Faith of the Buyer/Tenant</u>. The Buyer is not an insider (as that term is defined in Bankruptcy Code section 101(31)) of the Debtor. The Buyer is purchasing the Acquired Assets and entering into the Lease in good faith, and it is a good faith purchaser, within the meaning of Bankruptcy Code section 363(m), and is therefore entitled to, and granted pursuant to paragraph 35 below, the full rights, benefits, privileges, and protections of that provision, and has otherwise proceeded in good faith in all respects in connection with the

1    Transactions in that, *inter alia*: (i) the Buyer recognized that the Debtor was free to deal with any

2    other party interested in acquiring the Acquired Assets and entering into the Lease; (ii) the Buyer

3    has not violated Bankruptcy Code section 363(n) by any action or inaction; and (iii) the

4    negotiation and execution of the APA and the Transaction Documents were at arms' length and

5    in good faith. Neither the Debtor or the Buyer, or any of their respective representatives, has

6    engaged in any conduct that would cause or permit the APA, the Lease, or the Interim MSA, or

7    the consummation of the Transactions, to be avoidable or avoided, or for costs or damages to be

8    imposed, under Bankruptcy Code section 363(n), or has acted in bad faith or in any improper or

9    collusive manner with any person in connection therewith.

10        4.    <u>Highest and Best Offer</u>. The APA and the Lease constitute the highest and best

11    offer for the purchase of the Acquired Assets and the lease of the Premises, respectively, and will

12    provide a greater recover for the Debtor's estate than would be provided by any other available

13    alternatives, and will help facilitate the reopening of the Hospital for the benefit of the Tulare

14    community. The Debtor's determination that the APA and the Lease constitute the highest and

15    best offer for the Acquired Assets and the Premises lease constitutes a valid and sound exercise

16    of the Debtor's business judgment.

17        5.    <u>No Fraudulent Transfer/Not a Successor</u>. The APA, the Lease and the Interim

18    MSA were not entered into, and the Transactions are not being consummated, for the purpose of

19    hindering, delaying or defrauding creditors of the Debtor under applicable Law (as defined in the

20    APA), and none of the parties to the APA, the Lease or the Interim MSA are consummating the

21    Transactions with any fraudulent or otherwise improper purpose. The Purchase Price for the

22    Acquired Assets constitutes (i) reasonably equivalent value under the Bankruptcy Code and the

23    Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent

24    Conveyance Act and (iii) reasonably equivalent value, fair consideration, and fair value under

25    any other applicable Laws of the United States, any state, territory or possession or the District of

26    Columbia. Except as expressly set forth in the APA with respect to the Assumed Liabilities (as

27    defined in the APA), the Buyer shall have no liability, responsibility, or obligations of any kind

28    or nature whatsoever for any Interest (as defined below) of or against the Debtor, or otherwise

1   related to the Acquired Assets, by reason of the transfer of the Acquired Assets to the Buyer.

2   The Buyer shall not be deemed, as a result of any action taken in connection with the

3   Transactions, to: (1) be a successor (or other such similarly situated party) to the Debtor (other

4   than with respect to the Assumed Liabilities as expressly stated in the APA); or (2) have, *de facto*

5   or otherwise, merged or consolidated with or into the Debtor.  The Buyer is not acquiring or

6   assuming any Interest, except as expressly set forth in the APA with respect to the Assumed

7   Liabilities.

8          6.     Validity of Transfer.  Subject to the entry of this Order and, with respect to the

9   Lease and the APA, Electorate Approval, the Debtor has full power and authority (i) to perform

10  all of its obligations under the APA, the Lease and the Interim MSA, and (ii) to consummate the

11  Transactions.  The APA, the Lease and the Interim MSA, and the Transactions contemplated

12  thereby, have been duly and validly authorized by all necessary action, subject, with respect to

13  the Lease and the APA, to Electorate Approval.  No further consents or approvals, other than the

14  Electorate Approval with respect to the Lease and the APA, are required for the Debtor to

15  consummate the Transactions or otherwise perform its obligations under the APA, the Lease or

16  the Interim MSA, except in each case as otherwise expressly set forth in such documents.  As of

17  the Closing, the transfer of the Acquired Assets to the Buyer, including, without limitation, the

18  assumption, assignment and transfer of the Assigned Contracts, will be a legal, valid, and

19  effective transfer thereof, and vests the Buyer with all right, title, and interest of the Debtor in

20  and to the Acquired Assets, free and clear of all Interests accruing or arising any time prior to the

21  Closing, except as expressly set forth in the APA with respect to the Assumed Liabilities or

22  Permitted Encumbrances (as defined in the APA).

23         7.     Section 363(f) is Satisfied.  The Buyer would not have entered into the APA and

24  would not consummate the transactions contemplated thereby if the Sale of the Acquired Assets,

25  including the assumption, assignment and transfer of the Assigned Contracts, to the Buyer were

26  not free and clear of all Interests of any kind or nature whatsoever (except as expressly set forth

27  in the APA with respect to the Permitted Encumbrances and Assumed Liabilities), or if the

28  Buyer, any of its Affiliates (as defined in the APA) or subsidiaries, or any of their respective

representatives, would, or in the future could, be liable for any of such Interests (except as expressly set forth in the APA with respect to the Permitted Encumbrances and Assumed Liabilities). The Debtor may sell or otherwise transfer the Acquired Assets free and clear of all Interests because, in each case, one or more of the standards set forth in Bankruptcy Code section 363(f)(1)–(5) has been satisfied. Those holders of Interests against the Debtor, its Estate or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Motion are deemed to have consented thereto pursuant to Bankruptcy Code section 363(f)(2) . Those holders of such Interests who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Interests, if any, attach to the proceeds of the Sale ultimately attributable to the Acquired Assets in which such creditor alleges or asserts an Interest, in the same order of priority, with the same validity, force and effect, that such creditor had immediately prior to consummation of the Sale, subject to any claims and defenses the Debtor and the Estate may possess with respect thereto. As used in this Order, the term "**Interest**" includes, in addition to the types of claims described below, all of the following, in each case to the extent against or with respect to the Debtor or in, on, or against or with respect to any of the Acquired Assets: liens (as defined in Bankruptcy Code section 101(37), and whether consensual, statutory, possessory, judicial or otherwise), claims (as defined in Bankruptcy Code section 101(5)), debts (as defined in Bankruptcy Code section 101(12)), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, or interests of any kind or nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this Chapter 9 Case, whether imposed by agreement, understanding, Law, equity or otherwise, including, but not limited to, (i) Interests that purport to give to any person a right or option to effect a setoff against or any forfeiture, modification or termination of the Debtor's interests in the Acquired Assets, or any similar rights; (ii) Interests arising under all mortgages, deeds of trust, security interests, conditional sale or other title

1   retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal

2   or charges of any kind or nature, (iii) Interests that are or constitute, or that arise in connection

3   with or with respect to, any Excluded Liabilities (as defined in the APA); (iv) Interests that arise

4   from or in connection with any bulk sales or similar law, and (v) Interests arising under or in

5   connection with any acts, or failures to act, of any of the Debtor or any of the Debtor's Affiliates,

6   or subsidiaries, or any of their respective representatives, including, but not limited to, Interests

7   arising under any doctrines of successor, transferee, or vicarious liability, violation of any

8   applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of

9   fiduciary duty, or any similar theories under applicable Law or otherwise.

10          8.      Except as expressly set forth in the APA with respect to the Assumed Liabilities or

11  Permitted Encumbrances, and without limiting the nature or scope of paragraph E.7. above, the

12  transfer of the Acquired Assets, including the assumption, assignment and/or transfer of the

13  Assigned Contracts, to the Buyer will not subject the Buyer or its Affiliates or subsidiaries, or

14  any of their respective representatives to, or subject any Acquired Asset to or provide recourse

15  for, any liability or encumbrance whatsoever with respect to the operation or condition of any of

16  the Acquired Assets prior to the Closing or with respect to any facts, acts, actions, omissions,

17  circumstances or conditions existing, occurring or accruing with respect thereto prior to the

18  Closing, including, without limitation, any liability or encumbrance arising from any of the

19  following: (i) any employment or labor agreements, consulting agreements, severance

20  arrangements, change in control agreements or other similar agreements to which the Debtor is

21  or was a party, (ii) any pension, welfare, compensation or other employee benefit plans,

22  agreements, practices, and programs, including without limitation, any pension plan of the

23  Debtor, (iii) the cessation of the Debtor's operations, dismissal of employees, or termination of

24  employment or labor agreements or pension, welfare, compensation or other employee benefit

25  plans, agreements, practices and programs and any obligations with respect thereto that arise

26  from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title

27  VII of the Civil rights Act of 1964, the Age Discrimination and Employment Act of 1967, the

28  Americans with Disabilities Act of 1990, the Federal Rehabilitation Act of 1973, the National

1   Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the

2   Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation,

3   occupational disease or unemployment or temporary disability insurance claims, (v) environment

4   liabilities, debts, claims or obligations which may be asserted on any basis, including, without

5   limitation, under the Comprehensive Environmental Response, Compensation and Liability Act

6   or any Environmental Laws (as defined in the APA), (vi) products liability or warranties,

7   (vii) any bulk sales or similar law, (viii) any litigation by or against the Debtor and (ix) the Laws

8   of the United States, any state, territory or possession thereof, or the District of Columbia, based,

9   in whole or in part, directly or indirectly, in any theory of law or equity, including, without

10  limitation, any theory of antitrust, products liability, or successor, vicarious or transferee

11  liability.  For the avoidance of doubt, the liabilities and encumbrances set forth in this paragraph

12  are included in the defined term "**Interests**" for all purposes of this Order.

13      9.    Assumption, Assignment and/or Transfer of the Assigned Contracts.    The

14  assumption, assignment and/or transfer of the Assigned Contracts to the Buyer pursuant to the

15  terms of this Order is integral to the APA and is in the best interests of the Debtor and its Estate,

16  creditors and other parties in interest, and represents the reasonable exercise of sound and

17  prudent business judgment by the Debtor.  To the extent necessary or required by applicable

18  Law, the Debtor has or will have as of the Closing:  (i) cured, or provided adequate assurance of

19  cure, of any default existing prior to the Closing with respect to the Assigned Contracts, within

20  the meaning of Bankruptcy Code sections 365(b)(1)(A) and 365(f)(2)(A), and (ii) provided

21  compensation, or adequate assurance of compensation, to any party for any actual pecuniary loss

22  to such party resulting from such default, within the meaning of Bankruptcy Code section

23  365(b)(1)(B).  The respective amounts included in the Debtor's Assumption and Assignment

24  Notice (or any supplemental Assumption and Assignment Notice(s)) are the sole amounts

25  necessary under Bankruptcy Code sections 365(b)(1)(A) and 365(f)(2)(A) to cure all such

26  monetary defaults and pay all actual pecuniary losses under the Assigned Contracts.    The

27  promise of the Buyer to perform the obligations first arising under the Assigned Contracts after

28  their assumption and assignment to the Buyer constitutes adequate assurance of future

1   performance within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B) to

2   the extent that any such assurance is required and not waived by the counterparties to such

3   Assigned Contracts. Any objections to the foregoing, the determination of any Cure Amount, or

4   otherwise related to or in connection with the assumption, assignment or transfer of any of the

5   Assigned Contracts to the Buyer are hereby overruled on the merits. Those non-Debtor parties to

6   Assigned Contracts who did not object to the assumption, assignment or transfer of their

7   applicable Assigned Contract, or to their applicable Cure Amount, are deemed to have consented

8   thereto for all purposes of this Order. The Buyer shall maintain the right to modify the list of the

9   Assigned Contracts, after the date of this Order and up to the Closing. Such modification rights

10   include, but are not limited to, the right of the Buyer to designate a Contract for assumption by

11   the Debtor and assignment to the Buyer, as well as for rejection by the Debtor. The Buyer would

12   not have agreed to the Transactions without such modification rights. The notice and

13   opportunity to object provided to Contract Counterparties to such Assigned Contracts and to

14   other parties in interest fairly and reasonably protects any rights that such counterparties and

15   other parties in interest may have with respect to such Contracts.

16       G.    Immediate Entry of Order. This Order constitutes a final order within the meaning

17   of 28 U.S.C. § 158(a). The Debtor has requested immediate entry of this Order.

18   Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under

19   Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made

20   applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for

21   delay in the implementation of this Order and expressly directs entry of judgment as set forth

22   herein. The permission granted herein to enter into the Transactions and the DIP Facility and to

23   obtain funds thereunder up the Interim Loan Amount (as defined below) during the Interim

24   Period is necessary to avoid immediate and irreparable harm to the Debtor. Based upon the

25   foregoing findings, acknowledgements, and conclusions, and upon the record made before this

26   Court at the Interim Hearing, and good and sufficient cause appearing therefor;

27

28

**IT IS HEREBY ORDERED:**

1. <u>Disposition</u>.  The Motion is granted and the Transactions and the DIP Facility contemplated thereby and by the Transaction Documents are approved, in each case subject to the terms set forth herein.  All objections to the Motion and/or entry of this Order, to the extent not withdrawn or resolved, are hereby overruled.

2. <u>Binding Obligations</u>.  Upon entry of this Order, this Order and the Transaction Documents shall constitute legal, valid, and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.

   A.     **The Loan Documents**

3. <u>Authorization</u>.  The Debtor is hereby authorized to obtain immediately the DIP Loans during the Interim Period up to an aggregate principal amount of $1,000,000 (the "**Interim Loan Amount**"), pursuant to the terms of this Interim Order.  Promptly upon entry of this Interim Order and provided that the Debtor is not in default under the terms of this Interim Order, the Debtor is authorized to borrow the DIP Loans as provided herein.  The Debtor is hereby expressly authorized and empowered, to execute and deliver and, on such execution and delivery, directed to perform under the Loan Documents, including the DIP Credit Agreement, in accordance with the terms of the Loan Documents and this Interim Order.

4. <u>Postpetition Credit Obligation</u>.  Notwithstanding anything in this Interim Order to the contrary, the Lender's obligation to make the DIP Loans in accordance with the Loan Documents up to the Interim Loan Amount shall automatically terminate without any further action by this Court upon the earliest to occur of (the "**Termination Date**"): (i) November 6, 2018 (the "**Outside Date**"); (ii) the dismissal of the Chapter 9 Case, and (iii) the acceleration of the DIP Loans following an Event of Default (as defined below).

5. <u>Permitted Uses and Approved Budget</u>.  In accordance with the terms of this Interim Order and the Loan Documents, the proceeds of the DIP Loans shall be used solely for the purposes permitted under the Loan Documents, this Interim Order and in accordance with the Approved Budget.  Except as otherwise provided herein, unless otherwise authorized by this Court or agreed upon by the Lender, the Debtor may only use the proceeds of the DIP Loans

during the Interim Period and pursuant to and solely in accordance with the Approved Budget in all respects; *provided, however,* that the Debtor shall be permitted to (i) carry over any amounts not expended for a particular line item in any week to succeeding weeks, (ii) expend up to 15% more than the amounts set forth in a particular line item for a specific week in such week so long as the aggregate expenditures during the period covered by the Approved Budget do not exceed the total shown on the Approved Budget by more than 15% and (iii) pay amounts incurred from and after the Petition Date, in addition to or for categories not listed in the Approved Budget with the prior written consent of the Lender. On Wednesday of every second week, the Debtor shall provide the Lender with an updated rolling 13-week cash flow statement which shall include a variance report comparing actual cash flow results for all applicable prior periods to the forecasted cash flow results for such periods, and a statement of any weekly or cumulative variances in any line item for receipts or disbursements. Any proposed amendments to the Approved Budget shall not become effective until such amendments have been approved by the Lender in writing, and absent the written consent of the Lender, the existing Approved Budget shall remain in effect without any modifications or amendments. The consent of the Lender to the Approved Budget shall not be construed as consent to the use of any proceeds of the DIP Loans after the occurrence of an Event of Default, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

6. <u>Interest</u>. The interest rate on amounts drawn under the DIP Loan shall be equal to the Prime Rate (as defined in the DIP Credit Agreement) minus 50 basis points (absent an Event of Default), compounded annually and calculated on a 365/366-day year, actual days elapsed basis. Interest shall accrue and be due and payable in cash each Repayment Date (as defined in the DIP Credit Agreement). The default rate shall be two percent (2.00%) over and above the non-default rate.

7. <u>Mandatory Prepayment</u>. Promptly after, and in no event more than one (1) Business Day after, the closing of the APA, the Borrower shall make, or direct the Buyer to make on the Borrower's behalf, a prepayment of the DIP Loans in an amount equal to 100% of the Purchase Price thereunder; <u>provided</u>, that such Purchase Price shall first be applied to prepay

all interest accrued and unpaid as of the date of such prepayment, and then any remaining amount shall then be applied to prepay all or a portion of the Outstanding Loan Amount (as defined in the DIP Credit Agreement). In the event that the Electorate Approval is received and the Lease is terminated or expires prior to the Maturity Date (as defined in the DIP Credit Agreement), repayment of the DIP Loans shall be made in accordance with Section 2.1(e)(ii) of the Credit Agreement.

8.      <u>Conditions Precedent</u>.  Prior to the funding of any draw under the DIP Credit Agreement, the conditions set forth in Section 4.1 or Section 4.2 of the DIP Credit Agreement, as applicable, must be met.

9.      <u>Events of Default</u>.  The following constitute an event of default (collectively, the "**Events of Default**") unless waived by the Lender:

a.      the occurrence of any "Event of Default" (as defined in the DIP Credit Agreement) under the Loan Documents, that is not waived by the Lender, in accordance with the terms of the Loan Documents;

b.      the proposal of any plan of adjustment that does not provide for the payment in full in cash of the DIP Loan or if a plan of adjustment modifies any of Lender's rights except in a manner acceptable to Lender;

c.      the incurrence or payment by the Debtor of expenses other than as enumerated in the Approved Budget;

d.      reversal, vacatur, or modification (without consent of the Lender) of this Interim Order;

e.      the entry by the Court of an order, or the filing by the Debtor of a motion which seeks entry of an order, (i) dismissing the Chapter 9 Case, or (ii) appointing a trustee or examiner with the expanded powers to operate the Debtor's business in the Chapter 9 Case;

f.      the Debtor files or supports a motion challenging the validity, extent or priority of any of the DIP Obligations or the DIP Liens;

g.      except as expressly allowed in this Interim Order or the Final Order, the entry by the Court of an order granting any lien on, or security interest in, any Collateral in favor

EXHIBIT
Page 17 Of 37

1    of any party other than the Lender, or granting an administrative claim payable by the Debtor to

2    any party other than the Lender that is senior to, or pari passu with, the DIP Superpriority

3    Claims, or the DIP Obligations, without the express written consent of the Lender;

4              h.       any material breach by the Debtor of any obligations, representations,

5    warranties or covenants in this Interim Order; and

6              i.        entry of an order granting relief from the automatic stay to permit

7    foreclosure on any Collateral in which the Lender would have an interest.

8         10.    <u>Remedies</u>.   Upon the occurrence of an Event of Default, Lender shall have no

9    further obligation to advance any further monies under the DIP Facility and shall have the right

10   to accelerate the DIP Facility without further order of the Court.  The Debtor shall immediately

11   provide notice to the Lender of the occurrence of any Event of Default, at which time the

12   Debtor's ability to use the proceeds of the DIP Loans shall automatically terminate subject to the

13   provisions below.  Upon the occurrence of an Event of Default and following the giving of not

14   less than five (5) business days' (the "**Notice Period**") advance written notice (the

15   "**Enforcement Notice**"), unless the Court orders otherwise, the Lender may exercise any

16   remedies available to it under this Interim Order, the Loan Documents and applicable non-

17   bankruptcy law.   Absent order of the Court to the contrary, the automatic stay pursuant to

18   Bankruptcy Code section 362 shall be automatically terminated at the end of the Notice Period,

19   without further notice or order of the Court, unless the Lender elects otherwise in a written notice

20   to the Debtor, and the Lender shall be permitted to exercise all rights and remedies, including

21   with respect to the Collateral set forth in this Interim Order, and as otherwise available at law

22   without further order or application or motion to the Court, and without restriction or restraint by

23   any stay under Bankruptcy Code sections 362 or 105 or otherwise.  The delay or failure of the

24   Lender to exercise rights and remedies under this Interim Order, the Loan Documents or

25   applicable law shall not constitute a waiver of their respective rights thereunder or otherwise.

26        11.    <u>Limitation on Use of DIP Loans and the Collateral.</u>  No proceeds of the DIP

27   Loans or  Collateral may be used: (i) to investigate, initiate, prosecute, join, or finance the

28   initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding,

1    application, motion, objection, defense, or other litigation of any type (A) against the Lender or

2    seeking relief that would impair the rights and remedies of the Lender under the Loan

3    Documents or this Interim Order; (B) invalidating, setting aside, avoiding, or subordinating, in

4    whole or in part, the DIP Obligations or the Lender's liens or security interests in the Collateral;

5    or (C) for monetary, injunctive, or other affirmative relief against the Lender or its liens on or

6    security interests in the Collateral, that would impair the ability of the Lender to assert or enforce

7    any lien, claim, right, or security interest or to realize or recover on the DIP Obligations; (ii) for

8    objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability

9    of the claims, liens, or interests (including the DIP Liens) held by or on behalf of the Lender

10   related to the DIP Obligations; or (iii) for prosecuting an objection to, contesting in any manner,

11   or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of

12   any of the DIP Liens or any other rights or interests of the Lender related to the DIP Obligations

13   or the DIP Liens.

14          12.    <u>Indemnity</u>.   The Debtor will indemnify the Lender and each of the Lender's

15   agents, representatives, employees, officers, directors, affiliates, attorneys and professionals and

16   hold them harmless from and against all reasonable costs, expenses (including fees,

17   disbursements and other charges of counsel) and liabilities arising out of or relating to any

18   litigation or other proceeding (regardless of whether the Lender is a party thereto) that relate to

19   the within transactions or any transactions related thereto, including the enforcement of any

20   rights of the Lender, to the extent finally determined by a court of competent jurisdiction to have

21   resulted primarily from the Debtor's negligence, gross negligence or willful misconduct.

22          13.    <u>Authority to Execute and Deliver Necessary Documents</u>.

23          a.     The automatic stay imposed by Bankruptcy Code section 362 is hereby

24   lifted or modified to the extent necessary and the Debtor is hereby authorized to perform all acts

25   (and to the extent such acts have already occurred, such acts are ratified) and to execute and

26   deliver all instruments and documents, and to pay all fees, that may be required or necessary for

27   the Debtor's performance of its obligations under this Interim Order, the DIP Credit Agreement

28   and the Loan Documents.

EXHIBIT A
Page 19 Of 37

b.      The Debtor is directed to enter into, execute and deliver to the Lender any and all other documents, agreements and instruments to be executed and delivered pursuant to this Interim Order, each as may be amended hereafter from time to time in accordance with the terms of this Interim Order or otherwise reasonably requested by the Lender. The Debtor is further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing statements, pledge and security agreements, encumbering all of the Collateral (defined below) and securing all of the Debtor's obligations under the DIP Loans solely as set forth herein including payment of the DIP Loans in cash, that are reasonably requested by the Lender.

c.      The Lender is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien or similar instruments in order to validate and perfect the liens and security interests granted hereunder. Whether or not either the Lender shall, in its sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order. If the Lender determines to file or execute any financing statements, agreements, notice of liens or similar instruments, the Debtor shall cooperate and assist in any such execution and/or filings as reasonably requested by the Lender, and the automatic stay shall be modified to allow such filings.

d.      A certified copy of this Interim Order may, in the discretion of the Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided* that, notwithstanding the date of any such filing, the date of such perfection shall be the date of entry of this Interim Order.

e.      Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge,

grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the granting of DIP Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by the Debtor in accordance with the terms of this Interim Order.

        f.      The Debtor is hereby authorized and directed to (i) perform all of its obligations under the DIP Credit Agreement, and such other agreements as may be required by the DIP Facility to give effect to the terms of the financing provided for under the DIP Credit Agreement, and (ii) perform all acts required under the Loan Documents.

        g.      All obligations under the DIP Credit Agreement and the Loan Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms, the terms of the DIP Credit Agreement and the Loan Documents, and the terms of this Interim Order, and no obligation, payment, transfer or grant of a security under the Loan Documents or this Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d) or 548 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law).

        14.      <u>Lender's Lien Priority</u>.

        a.      To secure the DIP Loans, immediately upon entry of this Interim Order, the Lender is hereby granted valid, enforceable, non-avoidable and fully perfected, liens on and security interests in (collectively, all liens and security interests granted to the Lender pursuant to this Interim Order and any Final Order, the "**DIP Liens**"), the following (i) pursuant to Bankruptcy Code section 364(c)(3), a second priority security interest in and lien upon the Evolutions Property (as defined in the DIP Credit Agreement), (ii) pursuant to Bankruptcy Code section 364(c)(2), (A) a first priority security interest in and lien upon all unencumbered Real Property Collateral (as defined in the DIP Credit Agreement), as further described in and subject to the terms of the Mortgage (as defined in the DIP Credit Agreement), and (B) a first priority

security interest in and lien upon the Acquired Assets that constitute unencumbered property, assets and interests in property of the Debtor that are not subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by Bankruptcy Code section 546(b); and (iii) pursuant to Bankruptcy Code section 364(c)(3), (A) a junior security interest in and lien upon the Acquired Assets that are subject to a Permitted Personal Property Encumbrance (as defined in the DIP Credit Agreement) subject solely to such Permitted Personal Property Encumbrances, and (B) a junior security interest in and lien upon the Real Property Collateral that is subject to a Permitted Real Property Encumbrance (as defined in the DIP Credit Agreement) subject solely to such Permitted Real Property Encumbrances (collectively, the "**Collateral**"). Other than as permitted in the Credit Agreement as to the Evolutions Property, the DIP Liens shall not at any time be made subject or subordinate to, or made *pari passu* with, any other lien, security interest or claim not existing as of the Petition Date.

         b.      <u>DIP Superpriority Claims</u>. Pursuant to Bankruptcy Code section 364(c)(1), all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtor's estate (the "**DIP Superpriority Claims**") with priority over any and all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) and 507(b), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.

         c.      The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective, binding and perfected upon the date of this Interim Order without the necessity of execution, recordation of filings by the Debtor of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Lender of, or over, any Collateral, such that no additional steps need be taken by the Lender to perfect such interests.

    d.  The Debtor will (i) maintain books, records and accounts to the extent and as required by the Loan Documents and (ii) cooperate, confer with, and provide to the Lender all such information reasonably requested by the Lender related to the Loan Documents.

    15.  Extensions of Credit.  The Lender shall have no obligation to make any loan or advance unless all of the conditions precedent to the making of such extension of credit under the Loan Documents and this Interim Order have been satisfied in full or waived by the Lender in its sole discretion.

    16.  Application of Repayment Proceeds.  The Lender shall retain and apply all collections on the DIP Loan, first to fees, costs and expenses owed under the DIP, then to interest, and then to principal.

    17.  Payments Free and Clear.  All payments or proceeds remitted to the Lender pursuant to the provisions of this Interim Order, any Final Order or any other subsequent order of the Court shall be irrevocable and indefeasible, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b).

    18.  Limitation on Charging Expenses Against Collateral.  No expenses of administration of the Chapter 9 Case or any future proceeding that may result therefrom shall be charged against or recovered from the Collateral or the Lender pursuant to Bankruptcy Code sections 105(a), 506(c) or 552(b) or any similar principle of law or equity, without the prior written consent of the Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender.

    19.  Default Rate.  Immediately upon the occurrence of an Event of Default, without providing any prior notice thereof (A) the Lender, may charge interest at the default rate and (B) the Lender shall have no further obligation to provide financing under the DIP Credit Agreement, this Order or otherwise, and may, in its sole discretion, terminate all commitments with respect to the DIP Loans.

US-DOCS\102533474.1

EXHIBIT A
Page 23 Of 31

20.     <u>Survival</u>.  Except as expressly provided in this Interim Order or any Final Order, the DIP Liens, the DIP Superpriority Claims, the other administrative claims granted pursuant to this Order and all other rights and remedies of the Lender granted by the provisions of this Interim Order shall survive (i) the entry of an order dismissing the Chapter 9 Case, (ii) the entry of an order approving the sale of any Collateral, or (iii) the entry of an order confirming a plan of adjustment in the Chapter 9 Case.  The terms and provisions of this Interim Order shall continue in the Chapter 9 Case.  The DIP Liens, the DIP Superpriority Claims, the other administrative claims granted pursuant to this Interim Order and all other rights and remedies of the Lender granted by the provisions of this Interim Order shall continue in full force and effect until all DIP Obligations or adequate protection obligations, as applicable, are indefeasibly paid in full, in cash.

21.     <u>Release</u>.  Each of the Debtor and the Debtor's estate, on its own behalf and on behalf of each of their predecessors, their successors, and assigns (collectively, the "**Releasors**") shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge the Lender and each of its former and current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "**Releases**"), each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the Loan Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii)

1  any and all claims and causes of action regarding the validity, priority, extent, enforceability,

2  perfection or avoidability of the liens or claims of the Lender.

3          22.      Limitation on Liability. By virtue of determining to make any loan under the DIP

4  Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this

5  Interim Order or the Loan Documents, the Lender shall not be deemed to be in control of the

6  operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with

7  respect to the operation or management of the Debtor (as such terms, or any similar terms, are

8  used in the United States Comprehensive Environmental Response, Compensation and Liability

9  Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore,

10  nothing in this Interim Order or the Loan Documents shall in any way be construed or interpreted

11  to impose or allow the imposition upon the Lender of any liability for any claims arising from

12  the prepetition or postpetition activities of the Debtor.

13          23.      Proofs of Claim. The Lender shall not be required to file a proof of claim in the

14  Chapter 9 Case in respect of the DIP Obligations.

15          24.      Modifications of DIP Loans. The Debtor and the Lender are hereby authorized to

16  implement, in accordance with the terms of the Loan Documents, any non-material modifications

17  of the Loan Documents (other than this Interim Order or any Final Order), but without motion or

18  application to, order of or hearing before, this Court. Any material modification or amendment

19  to the Loan Documents shall only be permitted pursuant to an order of this Court, after being

20  submitted to this Court upon notice to any party required by the Bankruptcy Rules; *provided,*

21  *however,* that any forbearance from, or waiver of, (a) a breach by the Debtor of a covenant

22  representation or any other agreement or (b) a Default or an Event of Default, in each case under

23  the Loan Documents shall not require an order of this Court.

24          25.      Insurance. At all times the Debtor shall maintain casualty and loss insurance

25  coverage for the Collateral on substantially the same basis as maintained prior to the Petition

26  Date.

27          26.      Successors and Assigns. The Loan Documents and the provisions of this Interim

28  Order shall be binding upon the Debtor, the Lender and each of their respective successors and

1　assigns, and shall inure to the benefit of the Debtor, the Lender and each of their respective

2　successors and assigns.

3　　　　27.　　Binding Nature of Agreement.　This Interim Order and the Loan Documents shall

4　constitute legal, valid, and binding obligations of the Debtor, enforceable against the Debtor in

5　accordance with their terms.　The rights, remedies, powers, privileges, liens, and priorities of the

6　Lender provided for in this Interim Order and in the Loan Documents shall not be modified,

7　altered or impaired in any manner by any subsequent order (including a confirmation order), by

8　any plan of adjustment or otherwise in the Chapter 9 Case or by the dismissal of the Chapter 9

9　Case until the DIP Obligations have first been paid in full in cash and completely satisfied and

10　the commitments terminated in accordance with this Interim Order and the DIP Loans.

11　　　　28.　　Subsequent Reversal or Modification.　If any or all of the provisions of this

12　Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i)

13　the validity of any obligation, indebtedness or liability incurred hereunder by the Debtor to the

14　Lender prior to the date of receipt by the Lender of written notice of the effective date of such

15　action or (ii) the validity and enforceability of any lien, claim or priority authorized or created

16　under this Interim Order or pursuant to the Loan Documents.　Notwithstanding any such reversal,

17　stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by

18　the Debtor to the Lender prior to written notice to the Lender of the effective date of such action,

19　shall be governed in all respects by the original provisions of this Interim Order and the Loan

20　Documents, as applicable, and the Lender shall be entitled to all the rights, remedies, privileges,

21　and benefits granted herein and in the Loan Documents with respect to all such indebtedness,

22　obligations or liability.

23　　　　29.　　Final Hearing.　The Final Hearing to consider entry of the Final Order and final

24　approval of the DIP Facility is scheduled for _____, 2018 at _____.m. (Pacific

25　time) at the United States Bankruptcy Court for the Eastern District of California.　If no

26　objections to the relief sought in the Final Hearing are filed and served in accordance with this

27　Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the

28　Debtor and entered by this Court.

30.    On or before _____, 2018, the Debtor shall serve, by United States mail, first class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "**Final Hearing Notice**"), together with copies of this Interim Order (without exhibits) and the Motion on the Notice Parties and to any other party that has filed a request for notices with this Court prior thereto.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Court no later than _____, 2018 at 4:00 p.m. (Pacific time), which objections shall be served so that the same are received on or before such date by: (a) counsel for the Debtor, Walter Wilhelm Law Group, 205 East River Park Circle, Ste. 410, Fresno, CA  93720, facsimile: (559) 435-9868, Attention: Riley C. Walter; (b) counsel for Adventist Health, Latham & Watkins LLP, 355 S. Grand Avenue, Suite 100, Los Angeles, CA 90071-1560, facsimile: (213) 891-8763, Attention: Kimberly A. Posin; and (c) the Office of the United States Trustee.

**B.    The Lease, Interim MSA and APA**

31.    Approval of APA, Interim MSA and Lease; Binding Nature.  The APA, Interim MSA and the Lease, and all of the terms and conditions thereof, are hereby approved as set forth herein.  The consideration provided by the Buyer for the Acquired Assets under the APA is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code and any other applicable Law, and the Transactions may not be avoided, or costs or damages imposed or awarded, under Bankruptcy Code section 363(n) or any other provision of the Bankruptcy Code.  Pursuant to Bankruptcy Code sections 363 and 365, subject to the Electorate Approval with respect to the Lease and the APA, the Debtor is authorized and empowered to, and shall, take any and all actions necessary or appropriate to (a) consummate the Sale, and the lease of the Premises pursuant to and in accordance with the terms and conditions of the APA and the Lease, respectively, and (b) execute and deliver, perform under, consummate, implement, and take any and all other acts or actions as may be reasonably necessary or appropriate to the performance of its obligations as contemplated by the APA, the Interim MSA and the Lease, in each case



1   without further notice to or order of this Court.  This Order shall be binding in all respects upon

2   the Debtor, its Estate, all creditors, all holders of any Claim(s) (whether known or unknown)

3   against the Debtor, any holders of Interests against, in or on all or any portion of the Acquired

4   Assets, all non-Debtor parties to the Assigned Contracts, the Buyer, and all successors and

5   assigns of the foregoing.

6         32.   <u>Transfer of Acquired Assets Free and Clear of Interests; Injunction.</u>

7         a.   Pursuant to Bankruptcy Code sections 105(a), 363(b), 363(f), 365(b) and

8   365(f) and subject to the Electorate Approval, the Debtor is authorized and directed to transfer

9   the Acquired Assets, including but not limited to the Assigned Contracts, to the Buyer on the

10  Closing in accordance with the APA.  Upon and as of the Closing, such transfer shall constitute a

11  legal, valid, binding and effective transfer of such Acquired Assets and the Buyer shall take title

12  to and possession of such Acquired Assets free and clear of all Interests (except as expressly set

13  forth in the APA).  All such Interests shall attach solely to the proceeds of the Sale with the same

14  validity, priority, force and effect that they now have as against the Acquired Assets, subject to

15  any claims and defenses the Debtor and its Estate may possess with respect thereto.  This Order

16  shall be effective as a determination that, on and as of the Closing, all Interests of any kind or

17  nature whatsoever (except as expressly set forth in the APA) have been unconditionally released,

18  discharged and terminated in, on or against the Acquired Assets.  The provisions of this Order

19  authorizing and approving the transfer of the Acquired Assets free and clear of Interests shall be

20  self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases,

21  termination statements, assignments, consents, or other instruments in order to effectuate,

22  consummate and implement the provisions of this Order.

23        b.   Except as expressly permitted by the APA or this Order, all persons and

24  entities holding Interests (other than the Permitted Encumbrances and Assumed Liabilities) are

25  hereby forever barred, estopped and permanently enjoined from asserting their respective

26  Interests against the Buyer, any of its Affiliates and subsidiaries, and any of their respective

27  representatives, and each of their respective property and assets, including, without limitation,

28  the Acquired Assets.  On and after the Closing, the Buyer shall be authorized to execute and file

1     such documents, and to take all other actions as may be necessary, on behalf of each holder of an

2     Interest to release, discharge and terminate such Interests in, on and against the Acquired Assets

3     as provided for herein, as such Interests may have been recorded or may otherwise exist.  On and

4     after the Closing, and without limiting the foregoing, the Buyer shall be authorized to file

5     termination statements or lien terminations in any required jurisdiction to remove any record,

6     notice filing, or financing statement recorded to attach, perfect or otherwise notice any Interest

7     that is extinguished or otherwise released pursuant to this Order.  This Order constitutes

8     authorization under all applicable jurisdictions and versions of the Uniform Commercial Code

9     for the Buyer to file UCC termination statements with respect to all security interests in or liens

10     on the Acquired Assets.

11           c.      On and after the Closing, the persons holding an Interest (other than a

12     Permitted Encumbrance or an Assumed Liability) shall execute such documents and take all

13     other actions as may be reasonably necessary to release their respective Interests in the Acquired

14     Assets, as such Interests may have been recorded or otherwise filed.  The Buyer may, but shall

15     not be required to, file a certified copy of this Order in any filing or recording office in any

16     federal, state, county or other jurisdiction in which the Debtor has real or personal property, or

17     with any other appropriate clerk or recorded with any other appropriate recorder, and such filing

18     or recording shall be accepted and shall be sufficient to release, discharge and terminate any of

19     the Interests as set forth in this Order as of the Closing.  All persons and entities that are in

20     possession of any portion of the Acquired Assets on the Closing shall promptly surrender

21     possession thereof to the Buyer at the Closing.  The transfer of the Acquired Assets to the Buyer

22     pursuant to the APA does not require any consents other than specifically provided for in the

23     APA.

24           d.      This Order is and shall be binding upon and govern the acts of all persons

25     and entities (including, without limitation, all filing agents, filing officers, title agents, title

26     companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

27     agencies, governmental departments, and secretaries of state, federal and local officials) who

28     may be required by operation of law, the duties of their office, or contract to accept, file, register

1    or otherwise record or release any documents or instruments, or who may be required to report or

2    insure any title or state of title in or to any lease. Each of the foregoing persons and entities shall

3    accept for filing any and all of the documents and instruments necessary and appropriate to

4    release, discharge and terminate any of the Interests contemplated by this Order, the APA or any

5    Transaction Document.

6        33.      Assigned Contracts; Cure Payments.

7        a.      Pursuant to Bankruptcy Code sections 105(a), 363 and 365, and subject to

8    and conditioned upon the Closing, the Debtor's assumption, and assignment and transfer to the

9    Buyer of the Assigned Contracts are hereby authorized and approved in full subject to the terms

10    set forth below. The Debtor shall, on or prior to the Closing, pay the Cure Amounts (or reserve

11    the amount of the Alleged Cure Claims as set forth below) and cure any and all other defaults

12    and breaches under the Assigned Contracts so that such Contracts may be assumed by the Debtor

13    and assigned to Buyer on the Closing in accordance with this Order, the APA and the other

14    Transaction Documents. To the extent the Debtor is responsible for any Cure Amount pursuant

15    to the terms of the APA or the other Transaction Documents, the Buyer may, upon prior written

16    notice to the Debtor and in its sole discretion, (i) pay such amount(s) on behalf of the Debtor, in

17    which case the Debtor shall have no further responsibility therefor, and (ii) offset such amount(s)

18    against any amount(s) Buyer may owe the Debtor (including by deducting such amounts, at the

19    Closing, from the Purchase Price); provided, however, that to the extent the Debtor objects to

20    any Cure Amount, this Court shall retain jurisdiction over such dispute.

21        b.      Upon and as of the Closing, the Debtor is authorized and empowered to,

22    and shall, assume, assign and/or transfer each of the Assigned Contracts to the Buyer free and

23    clear of all Interests (except as expressly set forth in the APA). The payment of the applicable

24    Cure Amounts (if any), or the reservation by the Debtor of an amount of cash that is equal to the

25    lesser of (i) the amount of any cure or other compensation asserted by the applicable Contract

26    Counterparty as required under Bankruptcy Code section 365 or (ii) the amount approved by

27    order of this Court to reserve for such payment (such lesser amount, the "**Alleged Cure Claim**")

28    shall, pursuant to Bankruptcy Code section 365 and other applicable Law, (a) effect a cure, or

1    provide adequate assurance of cure, of all defaults existing thereunder as of the Closing Date and

2    (b) compensate, or provide adequate assurance of compensation, for any actual pecuniary loss to

3    such non-Debtor party resulting from such default.  Accordingly, on and as of the Closing, other

4    than such payment or reservation, none of the Debtor or the Buyer shall have any further

5    liabilities or obligations to the non-Debtor parties to the Assigned Contracts with respect to, and

6    the non-Debtor parties to the Assigned Contracts shall be forever enjoined and barred from

7    seeking, any additional amounts or claims (as defined in Bankruptcy Code section 101(5)) that

8    arose, accrued or were incurred at any time on or prior to the Closing on account of the Debtor's

9    cure or compensation obligations arising under Bankruptcy Code section 365.  The Buyer has

10   provided adequate assurance of future performance under the relevant Assigned Contracts within

11   the meaning of Bankruptcy Code section 365(f).

12              c.      To the extent any provision in any Assigned Contract assumed or assumed

13   and assigned (as applicable) pursuant to this Order (including, without limitation, any "change of

14   control" provision) (a) prohibits, restricts or conditions, or purports to prohibit, restrict or

15   condition, such assumption or assignment, or (b) is modified, breached or terminated, or deemed

16   modified, breached or terminated by any of the following: (i) the commencement of this Chapter

17   9 Case, (ii) the insolvency or financial condition of the Debtor at any time before the closing of

18   this Chapter 9 Case, (iii) the Debtor's assumption or assumption and assignment (as applicable)

19   of such Assigned Contract, or (iv) the consummation of the Transactions, then such provision

20   shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or

21   condition such assumption or assignment, to modify or terminate such Assigned Contract, or to

22   exercise any other default-related rights or remedies with respect thereto, including, without

23   limitation, any such provision that purports to allow the non-Debtor party thereto to recapture

24   such Assigned Contracts, impose any penalty thereunder, condition any renewal or extension

25   thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any

26   other fees or other charges in connection therewith.  All such provisions constitute unenforceable

27   anti-assignment provisions that are void and of no force and effect pursuant to Bankruptcy Code

28   sections 365(b), 365(e) and 365(f).

d.      All requirements and conditions under Bankruptcy Code sections 363 and 365 for the assumption by the Debtor and assignment to the Buyer of the Assigned Contracts have been satisfied.  Upon the Closing, in accordance with Bankruptcy Code sections 363 and 365, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtor in and under the Assigned Contracts, and each Assigned Contract shall be fully enforceable by the Buyer in accordance with its respective terms and conditions, except as limited or modified by the provisions of this Order.  Upon and as of the Closing, the Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Contracts and, accordingly, the Debtor shall be relieved from any further liability under the Assigned Contracts.

e.      Upon the payment of the applicable Cure Amount or reservation of the Alleged Cure Claim, if any, the Assigned Contracts will remain in full force and effect, and no default shall exist, or be deemed to exist, under the Assigned Contracts as of the Closing nor shall there exist, or be deemed to exist, any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

f.      The rights of the Buyer to modify the list of the Assigned Contracts after the date of this Order and up to the earlier of (a) the Closing Date, and (b) any applicable deadline under the Bankruptcy Code, are hereby approved.  All Contract Counterparties to the Assigned Contracts shall be deemed to have consented to such assumption and assignment under Bankruptcy Code section 365(c)(1)(B) and the Buyer shall enjoy all of the Debtor's rights, benefits and privileges under each such Assigned Contract as of the applicable date of assumption and assignment without the necessity to obtain any non-Debtor parties' written consent to the assumption or assignment thereof.  The failure of the Debtor or the Buyer to enforce at any time one or more terms or conditions of any Assigned Contract shall not be a waiver of such terms or conditions, or of its respective rights to enforce every term and condition of the Assigned Contracts.

34.     <u>Additional Injunction; No Successor Liability.</u>

a.      Effective upon the Closing and except as expressly set forth in the APA, all persons and entities are forever prohibited and permanently enjoined from (i) commencing or

continuing in any manner any action or other proceeding, the employment of process, or any act (whether in law or equity, in any judicial, administrative, arbitral or other proceeding), to collect, recover or offset any Interest, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order with respect to an Interest, (iii) creating, perfecting or enforcing any Interest, or (iv) asserting any setoff, right of subrogation or recoupment of any kind with respect to an Interest, in each case as against the Buyer, any of its Affiliates or subsidiaries, or any of their respective representatives, or any of their respective property or assets, including the Acquired Assets.

b.      The Transactions contemplated by the APA and the Transaction Documents do not cause there to be, and there is not (i) a consolidation, merger, or *de facto* merger of the Buyer with or into the Debtor or the Debtor's Estates; (ii) a substantial continuity between the Buyer and the Debtor or the Debtor's Estate, (iii) a common identity between the Buyer and the Debtor or the Debtor's Estate, or (iv) a mere continuation of the Debtor or its Estate with the Buyer.

c.      Except as expressly set forth in the APA, the transfer of the Acquired Assets, including, without limitation, the assumption, assignment and transfer of any Assigned Contract, to the Buyer shall not cause or result in, or be deemed to cause or result in, the Buyer, any of its Affiliates or subsidiaries, or any of their respective representatives, having any liability, obligation, or responsibility for, or any Acquired Assets being subject to or being recourse for, any Interest whatsoever, whether arising under any doctrines of successor, transferee or vicarious liability, breach of fiduciary duty, aiding or abetting breach of fiduciary duty or otherwise, whether at Law or in equity, directly or indirectly, and whether by payment, setoff, recoupment, or otherwise.

d.      For the avoidance of doubt, notwithstanding the consummation of the Transactions and the employment by the Buyer of certain persons previously employed by the Debtor, (i) the Buyer shall not have any obligations or liabilities to any employee of the Debtor or in respect of any employee benefits owing to any employee of the Debtor by the Debtor or by any plan or program administered by the Debtor or for the benefit of the Debtor's employees,

1    and (ii) any obligations of the Buyer to any such person shall be expressly limited to (i) those

2    obligations expressly agreed upon by the Buyer (if any) with such person, and (ii) those

3    obligations explicitly assumed by the Buyer (if any) under the APA.

4        35.    Good Faith.  The Transactions contemplated by this Order, the APA, the Interim

5    MSA and the Lease are undertaken by the Buyer without collusion and in good faith, as that term

6    is defined in Bankruptcy Code section 363(m), and accordingly, the reversal or modification on

7    appeal of the authorization provided herein to consummate the Sale and other Transactions shall

8    not alter, affect, limit, or otherwise impair the validity of the Sale or such other Transactions

9    (including the assumption, assignment and/or transfer of the Assigned Contracts), unless such

10   authorization and consummation are duly stayed pending such appeal.  The Buyer is a good faith

11   purchaser within the meaning of Bankruptcy Code section 363(m) and, as such, is entitled to, and

12   hereby granted, the full rights, benefits, privileges and protections of Bankruptcy section 363(m).

13       36.    Other Provisions Pertaining to the Lease, the Interim MSA and the Lease.

14       a.    The Buyer is hereby authorized, in its discretion, in connection with

15   consummation of the Transactions to allocate the Acquired Assets, Assumed Liabilities, and

16   Assigned Contracts among its Affiliates, subsidiaries, designees, assignees, and/or successors in

17   a manner as it, in its discretion, deems appropriate and such person shall be entitled to all of the

18   rights, benefits, privileges and protections of the Buyer as are accorded to the Buyer under this

19   Order, and the Debtor shall, to the extent set forth in the APA or Lease, cooperate with and take

20   all actions reasonably requested by Buyer to effectuate any of the foregoing.  In the event that the

21   Buyer designates any Buyer designee (a "**Buyer Designee**") to acquire any Acquired Assets,

22   including, without limitation, any Assigned Contracts, then any reference to the "Buyer" in this

23   Order shall be deemed to be a reference to "the Buyer and/or such applicable Buyer Designee,"

24   unless the context requires otherwise.  Upon the transfer of any Acquired Asset or Assigned

25   Contract to, or the assumption of any Assumed Liability by, a Buyer Designee, such Buyer

26   Designee shall be solely responsible for such Acquired Asset, Assumed Liability, or Assigned

27   Contract (including performance thereunder), as applicable.

28       b.    Nothing contained in any plan of adjustment, or order of any type or kind

1   entered in (a) this Chapter 9 Case, or (b) any related proceeding subsequent to entry of this

2   Order, shall conflict with or derogate from the provisions of the APA, the Lease, the other

3   Transaction Documents or the terms of this Order. To the extent of any such conflict or

4   derogation, the terms of this Order shall govern.

5           c.     Nothing in this Order shall modify or waive any closing conditions or

6   termination rights in the APA or the Lease, and all such conditions and rights shall remain in full

7   force and effect in accordance with their terms. No bulk sales law or any similar law of any state

8   or other jurisdiction applies in any way to the Transactions.

9           d.     All payment or reimbursement obligations of the Debtor owed to the

10   Buyer pursuant to the APA or the Lease shall be paid in the manner provided therein, without

11   further notice to or order of this Court. All such obligations shall constitute allowed

12   administrative claims against the Debtor, with first priority administrative expense status under

13   Bankruptcy Code sections 503(b) and 507(a)(2). Until satisfied in full in cash, all such

14   obligations shall continue to have the protections provided in this Order, and shall not be

15   discharged, modified or otherwise affected by any plan of adjustment for the Debtor.

16           e.     The failure specifically to include any particular provision of the APA, the

17   Interim MSA or the Lease in this Order shall not diminish or impair the effectiveness of such

18   provision, it being the intent of this Court that the APA, the Interim MSA and the Lease be

19   authorized and approved in their entirety.

20      37.    <u>Modifications to Documents</u>. The APA, the Lease and the other Transaction

21   Documents may be modified, amended or supplemented in a writing signed by the parties thereto

22   and in accordance with the terms thereof, without further notice to or order of this Court.

23      **C.**    **<u>Other Provisions.</u>**

24      38.    <u>Time Periods</u>. All time periods set forth in this Order shall be calculated in

25   accordance with Bankruptcy Rule 9006(a).

26      39.    <u>Automatic Stay</u>. The automatic stay provisions of section 362 of the Bankruptcy

27   Code are vacated and modified to the extent necessary to implement the provisions of this Order

28   and the terms and conditions of the APA, the Lease and the other Transaction Documents.

40.     <u>No Third Party Beneficiary</u>.  No rights are created hereunder for the benefit of any third party, any creditor, any party in a successor case or any direct, indirect or incidental beneficiary.

41.     <u>Adequate Notice</u>.  Adequate notice under the circumstances has been given.  The Debtor shall promptly mail copies of this Order to the parties entitled to notice.

42.     <u>Entry of Final Order; Effect</u>.  This Order shall take effect immediately upon execution hereof.  Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

43.     <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Order, the DIP Facility and/or the Transaction Documents.  This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b), to, among other things, (i) interpret, implement, and enforce the terms and provisions of this Order, the APA, the DIP Credit Agreement, the Loan Documents, the Interim MSA, the Lease and the other Transaction Documents, and any amendments thereto and any waivers and consents given thereunder, (ii) compel delivery of the Acquired Assets to the Buyer; (iii) enforce the injunctions and limitations of liability set forth in this Order, and (iv) enter any orders under Bankruptcy Code sections 363 and 365 with respect to the Assigned Contracts.

44.     <u>Findings of Fact and Conclusions of Law</u>.  This Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the entry thereof.  To the extent that any findings of fact are determined to be conclusions of law, such findings of fact shall be adopted as such; and to the extent that any conclusions of law are determined to be findings of fact, such conclusions of law shall be adopted as such.

45.     <u>Order Controls</u>.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Order shall control.  To the extent there are any inconsistencies between this Order, on the one hand, and the Transaction Documents, on the other hand, the terms of this Order shall govern.

1   Submitted by:

2

3   _____

4   Riley C. Walter

5   Counsel for Debtor Tulare Local Healthcare District

6

7   IT IS SO ORDERED.

8

9   Date: _____          _____

10                                      René Lastreto II
                                        United States Bankruptcy Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT A
Page 37 Of- 37

**3**

1  WALTER WILHELM LAW GROUP
2  A Professional Corporation
   Riley C. Walter #91839
   Kathleen D. DeVaney #156444
3  Danielle J. Bethel #315945
   205 East River Park Circle, Ste. 410
4  Fresno, CA 93720
   Telephone:    (559) 435-9800
5  Facsimile:    (559) 435-9868
6  E-mail:       rileywalter@w2lg.com

7  Chapter 9 Counsel for Tulare Local Healthcare District

8  MCCORMICK BARSTOW, LLP
   Todd A. Wynkoop #308845
9  Benjamin T. Nicholson #239893
   Benjamin E. Ladd #320466
10 7647 N. Fresno Street
   Fresno, CA 93720
11 Telephone:    (559) 433-1300
   Facsimile:    (559) 433-2300
12 E-mail:       todd.wynkoop@mccormickbarstow.com

13 District Counsel for Tulare Local Healthcare District

14                IN THE UNITED STATES BANKRUPTCY COURT

15                    EASTERN DISTRICT OF CALIFORNIA

16                            FRESNO DIVISION

17 | In re | CASE NO.  17-13797 |
18 | | DC No.: WW-41 |
   | TULARE LOCAL HEALTHCARE | |
19 | DISTRICT, dba TULARE | |
   | REGIONAL MEDICAL CENTER, | Chapter 9 |
20 | | |
   | Debtor. | Date:    August 2, 2018 |
21 | | Time:    9:30 a.m. |
   | Tax ID #:   94-6002897 | Place:   2500 Tulare Street |
22 | Address:    869 N. Cherry Street | Fresno, CA 93721 |
   | Tulare, CA 93274 | Courtroom 13 |
23 | | Judge:   Honorable René Lastreto II |

24

25      **DECLARATION OF DANIEL R. HECKATHORNE IN SUPPORT OF MOTION FOR
26  AUTHORITY TO ENTER INTO TRANSACTION INCLUDING BORROWING FUNDS,
    SALES OF PERSONAL PROPERTY AND PROVIDING SECURITY, ASSUMPTION
27  AND ASSIGNMENT OF CONTRACTS AND LEASES AND FOR AUTHORITY TO
    LEASE REAL PROPERTY PURSUANT TO 11 U.S.C. §§ 105, 362, 364, 365, 901 AND
                                    922**

28

Declaration of Daniel Heckathorne in Support of Motion for
Authority to Enter into Transaction Including Borrowing Funds,
etc.                                                          - 1 -

M:\S-U\TRMC\PLEADINGS\WW-41 Motion to Borrowing
Funds and Providing Security [Adventist
Health]\dec.heckathorne.071918.gaa.final.docx

EXHIBIT B
Page   1   Of   3

1.      My name is Daniel R. Heckathorne.  I am the Interim Chief Financial Officer of Tulare Local Healthcare District ("District").   I make this declaration based on my personal knowledge and information obtained in the course of my duties as CFO.  If called upon as a witness, I could and would competently testify to the facts set forth herein.

2.      I have over 30 years experience as CFO or Interim CEO of acute care hospitals.

3.      I am the person charged with obtaining credit for the District.

4.      The District was only able to resume control over its books and record on November 22, 2017.  Since that time, I have been on a continual quest to obtain financing.

5.      I led the District's efforts to borrow from no less than 7 lenders:

(a)      Community Medical Center;

(b)      CNH Finance, LP - AR financing;

(c)      Community Health System;

(d)      MidCap Financial Services, LLC - AR financing;

(e)      Wertheim Group, LLC - AR financing;

(f)      Lancaster Pollard Mortgage Company – AR financing;

(g)      Alleon Capital, LLC – AR financing

6.      In each instance, my request to borrow on an unsecured basis was rejected.

7.      In each instance, after discussion and submittal of documentation, each lender declined to make any loan to the District.

8.      I am personally familiar with the terms of the proposed borrowing pursuant to the line of credit and based on my many years of experience as either CFO or CEO of hospitals, the terms of the financing are extremely favorable to the District and more favorable than any other borrowing we sought.

///

///

///

Declaration of Daniel Heckathorne in Support of Motion for Authority to Enter into Transaction Including Borrowing Funds, etc.    -2-    M:\S-U\TRMC\PLEADINGS\WW-41  Motion to Borrowing Funds and Providing Security [Adventist Health]\dec.heckathorne.071918.gaa.final.docx

EXHIBIT _B_
Page ___2___ Of- _5_

9.     In my judgment, I believe that the terms of the financing as presented by Adventist Health are very favorable to the District and the terms of the Credit Agreement are fair and reasonable.

I SO DECLARE and represent this _19TH_ day of July, 2018 under penalty of perjury at Tulare, California.

Daniel R. Heckathorne

Declaration of Daniel Heckathorne in Support of Motion for Authority to Enter into Transaction Including Borrowing Funds, etc.     -3-

M:\S-U\TRMC\PLEADINGS\WW-41  Motion to Borrowing Funds and Providing Security [Adventist Health]\dec.heckathorne.071918.gaa.final.docx

EXHIBIT D
Page  3  Of- 3

**2**

WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter #91839
Kathleen D. DeVaney #156444
Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:   (559) 435-9800
Facsimile:    (559) 435-9868
E-mail:        rileywalter@w2lg.com

Chapter 9 Counsel for Tulare Local Healthcare District

MCCORMICK BARSTOW, LLP
Todd A. Wynkoop #308845
Benjamin T. Nicholson #239893
Benjamin E. Ladd #320466
7647 N. Fresno Street
Fresno, CA 93720
Telephone:   (559) 433-1300
Facsimile:    (559) 433-2300
E-mail:        todd.wynkoop@mccormickbarstow.com

District Counsel for Tulare Local Healthcare District

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  17-13797 |
| TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER, | DC No.: WW-41 |
| | Chapter 9 |
| Debtor. | Date:     August 2, 2018 |
| | Time:     9:30 a.m. |
| Tax ID #:   94-6002897 | Place:    2500 Tulare Street |
| Address:   869 N. Cherry Street | Fresno, CA 93721 |
| Tulare, CA 93274 | Courtroom 13 |
| | Judge:    Honorable René Lastreto II |

**DECLARATION OF RICHARD GIANELLO IN SUPPORT OF MOTION FOR AUTHORITY TO ENTER INTO TRANSACTION INCLUDING BORROWING FUNDS, SALES OF PERSONAL PROPERTY AND PROVIDING SECURITY, ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND FOR AUTHORITY TO LEASE REAL PROPERTY PURSUANT TO 11 U.S.C. §§ 105, 362, 364, 365, 901 AND 922**

Declaration of Richard Gianello in Support of Motion for Authority to Enter into Transaction Including Borrowing Funds, Sales of Personal Property, etc.          -1-

M:\S-U\TRMC\PLEADINGS\WW-41  Motion to Borrowing Funds and Providing Security [Adventist Health]\dec.gianello.071918.cs.docx

EXHIBIT___C___
Page___1___Of-_2_

1        1.     My name is Richard Gianello.  I am the senior project manager of the

2    management team of Tulare Regional Medical Center.  My business address is 505

3    Fourteenth Street, Fifth Floor, Oakland, California. I make this declaration based on my

4    personal knowledge and information obtained in the course of my engagement as the

5    senior member of the District's management.  If called upon as a witness, I could and

6    would competently testify to the facts set forth herein.

7        2.     I am a the senior consultant from Wipfli/HFS and person responsible for

8    this engagement.

9        3.     I am the lead negotiator for the District on the Transaction proposed with

10   Adventist Health.

11       4.     I have served as a crisis manager in over 20 difficult hospital insolvencies.

12       5.     California Department of Public Health has informed me that the Hospital

13   license may be permanently lost unless the Hospital reopens prior to October 28, 2018.

14       6.     I know that state law requires voter approval of a lease of the Hospital and

15   a showing that the rent to be paid is at fair market value and the District has engaged

16   Deloitte to provide this opinion.

17       7.     It is my belief that Adventist Health has acted in good faith through the

18   negotiations for the Transaction.

19       8.     I am personally familiar with all aspects of the Transaction and it is my

20   professional opinion that the Transaction should be approved as a fair deal supported

21   by sound business judgment.

22       I declare under penalty of perjury that the foregoing is true and correct. Executed

23   on July 19 , 2018 at  July        , California.

24

25                    Richard Gianello

26

27

28

---

Declaration of Richard Gianello in Support of Motion for
Authority to Enter into Transaction Including Borrowing Funds,   -2-
Sales of Personal Property, etc.

M:\S-U\TRMC\PLEADINGS\WW-41  Motion to Borrowing
Funds and Providing Security [Adventist
Health]\dec.gianello.071918.cs.docx

EXHIBIT  C
Page   2   Of  2

3

WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter #91839
Kathleen D. DeVaney #156444
Danielle J. Bethel #315945
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:   (559) 435-9800
Facsimile:   (559) 435-9868
E-mail:       rileywalter@w2lg.com

Chapter 9 Counsel for Tulare Local Healthcare District

MCCORMICK BARSTOW, LLP
Todd A. Wynkoop #308845
Benjamin T. Nicholson #239893
Benjamin E. Ladd #320466
7647 N. Fresno Street
Fresno, CA 93720
Telephone:   (559) 433-1300
Facsimile:   (559) 433-2300
E-mail:       todd.wynkoop@mccormickbarstow.com

District Counsel for Tulare Local Healthcare District

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO.  17-13797 |
| TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER, | DC No.: WW-41 |
| | Chapter 9 |
| Debtor. | Date:  August 2, 2018 |
| | Time:  9:30 a.m. |
| Tax ID #:   94-6002897 | Place: 2500 Tulare Street |
| Address:    869 N. Cherry Street | Fresno, CA 93721 |
| Tulare, CA 93274 | Courtroom 13 |
| | Judge: Honorable René Lastreto II |

**DECLARATION OF KEVIN B. NORTHCRAFT IN SUPPORT OF MOTION FOR AUTHORITY TO ENTER INTO TRANSACTION INCLUDING BORROWING FUNDS, SALES OF PERSONAL PROPERTY AND PROVIDING SECURITY, ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES AND FOR AUTHORITY TO LEASE REAL PROPERTY PURSUANT TO 11 U.S.C. §§ 105, 362, 364, 365, 901 AND 922**

1.      My name is Kevin B. Northcraft.  I am President of the board of directors of

Declaration of Kevin B. Northcraft in Support of Motion for
Authority to Enter into Transaction Including Borrowing Funds,
Sales of Personal Property, etc.                  - 1 -

M:\S-U\TRMC\PLEADINGS\WW-41 Motion to Borrowing
Funds and Providing Security [Adventist
Health]\dec.northcraft.071918.gaa.6.docx

EXHIBIT ___D___
Page___1__ Of-__3__

1 | Tulare Local Healthcare District, doing business as Tulare Regional Medical Center
2 | ("District"). I make this declaration based on my personal knowledge and information
3 | obtained in the course of serving as a director and officer of the District. If called upon as
4 | a witness, I could and would competently testify to the facts set forth herein.

5 |     2.      I am a duly elected Director of Tulare Healthcare District, dba Tulare
6 | Regional Medical Center.

7 |     3.      I am the duly elected President of the board of directors.

8 |     4.      The District is a public healthcare district serving the City of Tulare and
9 | several rural communities. The District serves the needs of over 70,000 residents.
10 | Additionally, the District is bisected by Highway 99 and many, many vehicles transverse
11 | the District every day possibly needing medical services.

12 |     5.      The District is a political subdivision of the State of California.

13 |     6.      The District is governed by a five person board of directors elected by
14 | District.

15 |     7.      The District owns and intends to resume operation of its 112 bed acute
16 | hospital facility and medical clinics.

17 |     8.      In addition to the Hospital, the District also owns a partially completed
18 | Tower. It also owns numerous other real properties including a fitness facility known as
19 | Evolutions and medical office buildings.

20 |     9.      I am personally familiar with the deterioration of the District's relationship
21 | with its prior manager, Healthcare Conglomerate Associates, LLC.

22 |     10.     It is true that the District did surrender its hospital license to the California
23 | Department of Public Health on October 28, 2017. It is also true that unless the Hospital
24 | re-opens by October 28, 2018 it may very well lose its license and this would be a disaster
25 | because the Hospital would have to come up to new standards, and this would cost many
26 | millions of dollars.

27 |     11.     I have been intimately involved in the negotiations with Adventist Health
28 | concerning the proposed Transaction.

---

Declaration of Kevin B. Northcraft in Support of Motion for
Authority to Enter into Transaction Including Borrowing Funds,
Sales of Personal Property, etc.                    -2-

EXHIBIT _____
Page __ð__ Of- __3__

M:\S-U\TRMC\PLEADINGS\WW-41 Motion to Borrowing
Funds and Providing Security [Adventist
Health]\dec.northcraft.071918.gaa.6.docx

12.     I declare that the Board, by a vote of 4:1 on June 27, 2018, did select Adventist Health as the exclusive party with whom to negotiate a Transaction and directed the District's management team to negotiate with Adventist Health.

13.     The District cannot reopen without the funding to be provided as a part of the Transaction.

14.     On July 25, 2018 the Board will discuss the approval of the definitive legal agreements pertinent to the Transaction as described in the Motion. The public will be given an opportunity to comment before the Board votes. If the Board does not approve the Transaction I will instruct our counsel to withdraw the Motion. If the Board approves the Transaction that approval must be ratified by a public vote to be held November 6, 2018.

15.     I believe that if the Transaction is not approved by the Court by August 8, 2018 the District will be unable to get the measure on the ballot for the November election.

16.     I believe that the District's decision to enter into the transaction with Adventist Health is supported by sound business and political judgment. It is vitally important to the people of the District that the Hospital be reopened at the earliest possible date. Not only will a reopened Hospital provide people of the District with easier and nearby access to acute healthcare services, it will also alleviate the burden that has been imposed upon nearby hospitals in Hanford, Fresno, Visalia and Porterville due to the closure of the Hospital.

I am over the age of 18, and if I were called as a witness in connection with this proceeding I would and could testify as is set out in this declaration.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 19, 2018 at Tulare, California.

Kevin B. Northcraft

Declaration of Kevin B. Northcraft in Support of Motion for Authority to Enter into Transaction Including Borrowing Funds, Sales of Personal Property, etc     -3-

M:\S-U\TRMC\PLEADINGS\WW-41 Motion to Borrowing Funds and Providing Security [Adventist Health]\dec.northcraft.071918.gaa.6.docx

EXHIBIT D
Page 3 Of 3.