**45**

1  WALTER WILHELM LAW GROUP
   A Professional Corporation
2  Riley C. Walter, #91839
   Kathleen D. DeVaney #156444
3  Danielle J. Bethel #315945
   205 East River Park Circle, Ste. 410
4  Fresno, CA 93720
   Telephone:   (559) 435-9800
5  Facsimile:   (559) 435-9868
   E-mail:      rileywalter@w2lg.com
6
   Chapter 9 Counsel for Tulare Local Healthcare District
7
   MCCORMICK BARSTOW, LLP
8  Todd A. Wynkoop #308845
   Benjamin T. Nicholson #239893
9  Benjamin E. Ladd #320466
   7647 N. Fresno Street
10 Fresno, CA 93720
   Telephone:   (559) 433-1300
11 Facsimile:   (559) 433-2300
   E-mail:      todd.wynkoop@mccormickbarstow.com
12
13 District Counsel for Tulare Local Healthcare District

14              IN THE UNITED STATES BANKRUPTCY COURT

15                 EASTERN DISTRICT OF CALIFORNIA

16                        FRESNO DIVISION

17 In re                              CASE NO.  17-13797

18 TULARE LOCAL HEALTHCARE           Chapter 9
   DISTRICT, dba TULARE
19 REGIONAL MEDICAL CENTER,          DC No.: WW-41

20        Debtor.                     Date:      August 2, 2018
                                      Time:      9:30 a.m.
21 Tax ID #:   94-6002897            Place:     2500 Tulare Street
   Address:    869 N. Cherry St.                Fresno, CA  93721
22             Tulare, CA 93274                 Courtroom 13

23                                    Judge:     Honorable René Lastreto II

24
25       SECOND SUPPLEMENT TO MOTION FOR AUTHORITY TO ENTER INTO
     TRANSACTION INCLUDING BORROWING FUNDS, SALES OF PERSONAL
26   PROPERTY AND PROVIDING SECURITY, ASSUMPTION AND ASSIGNMENT OF
     CONTRACTS AND LEASES AND FOR AUTHORITY TO LEASE REAL PROPERTY
27       PURSUANT TO 11 U.S.C. §§ 105, 362, 364, 365, 901 AND 922
28

Second Supplement to Motion for Authority to Enter into          -1-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to Borrowing
Transaction Including Borrowing Funds, Sales of Personal                    Funds and Providing Security [Adventist Health]\second
Property, etc.                                                              supplement.080218.gaa.V2.docx

1    TO THE HONORABLE RENÉ LASTRETO II, UNITED STATES BANKRUPTCY
2    JUDGE:

3    Tulare Local Healthcare District, dba Tulare Regional Medical Center, by counsel,
4    respectfully comes before the Court to supplement the Motion for Authority to Enter into
5    Transaction Including Borrowing Funds, Sales of Personal Property and Providing
6    Security Assumption and Assignment of Contracts and Leases and for Authority to
7    Lease Real Property Pursuant to U.S.C. §§ 105, 362, 364, 365, 901 and 922, as
8    follows:

9        1.    On July 19, 2018, the Court granted an Order Shortening Time allowing
10   for a hearing on the District's Motion for Authority to Enter into Transaction Including
11   Borrowing Funds, Sales of Personal Property and Providing Security Assumption and
12   Assignment of Contracts and Leases and for Authority to Lease Real Property Pursuant
13   to U.S.C. §§ 105, 362, 364, 365, 901 and 922 ("Motion").

14       2.    Pursuant to the Order Shortening Time, on July 20, 2018 the Debtor gave
15   the notice required by the Order Shortening Time.

16       3.    Since giving notice, the District has learned of needed additional
17   corrections and clarifications to the Motion that it wishes to draw to the attention of the
18   Court.

19       4.    Redlined versions of the definitive documents reflecting changes July 31,
20   2018 have been posted to the District's website at www.tularelocalhealthcaredistrict.org.

21       5.    The District and Wilmington Trust as indenture trustee/paying agent on the
22   District's revenue bonds and general obligation bonds and Syncora, the insurer of some
23   of the GO bonds, have reached an agreement for adequate protection.  The redlined
24   draft Order authorizing the District to enter into the Transaction and providing adequate
25   protection to the indenture trustee is attached as Exhibit A.  The proposed Order reflects
26   all of the negotiated changes as of 7:45 a.m. on August 2, 2018.

27       6.    As of 7:45 a.m. this date there were no objections to the Transaction, but
28   there were numerous objections to the assume and cure provisions of the Motion, most,

Second Supplement to Motion for Authority to Enter into          -2-          M:\S-U\TRMC\PLEADINGS\WW-41  Motion to Borrowing
Transaction Including Borrowing Funds, Sales of Personal                    Funds and Providing Security [Adventist Health]\second
Property, etc.                                                              supplement.080218.gaa.V2.docx

1  if not all, of which have been resolved.

2      WHEREFORE, Tulare Local Healthcare District, dba Tulare Regional Medical

3  Center, prays that the Court be so informed and apprised accordingly and it seeks such

4  other and further relief as is just and proper.

5  Dated:  August 2, 2018                    WALTER WILHELM LAW GROUP,

6                                            a Professional Corporation

7                                            By: _Riley C. Walter_____

8                                            Riley C. Walter,
                                             Attorneys for Debtor, Tulare Local
9                                            Healthcare District, dba
                                             Tulare Regional Medical Center

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second Supplement to Motion for Authority to Enter into        -3-        M:\S-U\TRMC\PLEADINGS\WW-41  Motion to Borrowing
Transaction Including Borrowing Funds, Sales of Personal              Funds and Providing Security [Adventist Health]\second
Property, etc.                                                        supplement.080218.gaa.V2.docx

# EXHIBIT A

1

WALTER WILHELM LAW GROUP
2  A Professional Corporation
Riley C. Walter #91939
3  Kathleen D. DeVaney #156444
Danielle J. Bethel #315945
4  205 East River Park Circle, Ste. 410
Fresno, CA 93720
5  Telephone: (559) 435-9800
Facsimile:  (559) 435-9868
6  E-mail:      rileywalter@w2lg.com

7  Chapter 9 Counsel for Tulare Local Healthcare District

8  MCCORMICK BARSTOW, LLP
Todd Wynkoop #308845
9  Benjamin T. Nicholson #239893
Benjamin E. Ladd #320466
10  7647 N. Fresno Street
Fresno, CA 93720
11  Telephone:  (559) 433-1300
Facsimile:  (559) 433-2300
12  E-mail:      todd.wynkoop@mccormickbarstow.com

13  District Counsel for Tulare Local Healthcare District

14

15              IN THE UNITED STATES BANKRUPTCY COURT

16                  EASTERN DISTRICT OF CALIFORNIA

17                          FRESNO DIVISION

18

19  In re                             CASE NO.  17-13797

20  TULARE LOCAL HEALTHCARE           DC No.:  WW-41
    DISTRICT, dba TULARE REGIONAL
21  MEDICAL CENTER,                   Chapter 9

22              Debtor.               Date:    August 2, 2018
                                      Time:    9:30 a.m.
23                                    Place:   2500 Tulare Street
                                               Fresno, CA 93721
24  Tax ID #:   94-6002897                     Courtroom 13
    Address:    869 N. Cherry St.    Judge:   Honorable René Lastreto II
25              Tulare, CA 93274

26

27

28

**FINAL ORDER AUTHORIZING THE DEBTOR TO ENTER INTO TRANSACTIONS, INCLUDING THE SALE OF PERSONAL PROPERTY, THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, THE LEASE OF REAL PROPERTY, AND ENTRY INTO AN INTERIM MANAGEMENT SERVICES AGREEMENT, AND INTERIM ORDER AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, PURSUANT TO 11 U.S.C. SECTIONS 105, 362, 364, 365, 901 AND 922**

At Fresno, in the Eastern District of California.

Upon consideration of the motion (the "**Motion**")[1] of Tulare Local Healthcare District, doing business as Tulare Regional Medical Center (the "**Debtor**" or the "**Borrower**") for entry of an order:

(a)        authorizing the Debtor to obtain secured postpetition financing consisting of a superpriority loan facility (i) during the period (the "**Interim Period**") from the date of the entry of this order (the "**Interim Order**" or the "**Order**") through and including the earlier to occur of (x) the date of entry of the Final Order (defined below) by this Court and (y) the Termination Date (defined below), in an aggregate principal amount not to exceed $1,000,000, and (ii) upon entry of the Final Order and thereafter until the Termination Date, in an aggregate principal amount not to exceed $10,000,000 (the "**DIP Facility**" and, the loans under the DIP Facility, the "**DIP Loans**"), subject to the terms and conditions hereof, and as set forth in the Loan Documents (as defined below);

(b)        authorizing the Debtor to execute and deliver that certain Debtor-in-Possession Credit Agreement (substantially in the form attached hereto as Exhibit A and as it may be amended, modified or supplemented in accordance with the terms hereof and thereof, the "**DIP Credit Agreement**" and, together with the Security Agreement and Chattel Mortgage, between the Debtor and Lender (substantially in the form attached hereto as Exhibit B and as it may be amended, modified or supplemented in accordance with the terms hereof and thereof, the "**Security Agreement**") and all other agreements, documents and instruments executed and delivered in connection therewith, including this Interim Order, the "**Loan Documents**"), between the Debtor and Adventist Health System/West, doing business as Adventist Health, as

---

[1]        Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1  lender (the "**Lender**" or "**Adventist Health**"), and to perform such other and further acts as may

2  be required in connection with the Loan Documents;

3          (c)      granting the DIP Facility and all obligations owing thereunder and under the Loan

4  Documents to the Lender and all other "Obligations" as described in the DIP Credit Agreement

5  (collectively, the "**DIP Obligations**") allowed superpriority administrative expense claims status

6  in the Chapter 9 Case (as defined below);

7          (d)      granting to the Lender automatically perfected security interests in and liens on all

8  of the Collateral[2] (as defined below), which security interests and liens shall have the priorities

9  set forth in this Interim Order;

10          (e)      authorizing the Debtor to use the proceeds of the DIP Facility in accordance with

11  this Interim Order, the Loan Documents and the Approved Budget;

12          (f)      authorizing the Lender to exercise remedies under the Loan Documents upon the

13  occurrence and during the continuance of an Event of Default (as defined below);

14          (g)      waiving the Debtor's right to surcharge against the Collateral pursuant to

15  Bankruptcy Code section 506(c);

16          (h)      modifying the automatic stay imposed by Bankruptcy Code section 362 to the

17  extent necessary to implement and effectuate the terms of this Interim Order;

18          (i)      scheduling a final hearing (the "**Final Hearing**") to consider entry of an order

19  (the "**Final Order**") granting the relief requested in the Motion relating to the DIP Facility on a

20  final basis and approving the form of notice with respect to the Final Hearing and the

21  transactions contemplated by the Motion relating to the DIP Facility;

22          (j)      approving the sale of the Debtor's assets (the "**Sale**") pursuant to the Agreement

23  for Purchase and Sale of Assets, by and among the Debtor, Adventist Health Tulare, as buyer

24  (the "**Buyer**" or "**AH Tulare**"), and Adventist Health (substantially in the form attached hereto

25  as Exhibit C and as it may be amended, modified, or supplemented in accordance with the terms

26  hereof, the "**APA**"), free and clear of all Interests (as defined below);

27  _____

   [2]     For the avoidance of doubt, the Collateral shall not include any assets that are not owned

28  by the Debtor.

(k)     approving the Debtor's lease of the Premises (as defined in the Lease) pursuant to the Lease, by and between the Debtor, as landlord, and AH Tulare, as tenant (substantially in the form attached hereto as <u>Exhibit D</u> and as it may be amended, modified or supplemented in accordance with the terms hereof and thereof, the "**Lease**");

(l)     establishing certain notice procedures for determining cure amounts for executory contracts and unexpired leases to be assumed and assigned in connection with the Lease and/or the APA and authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "**Assigned Contracts**");

(m)     authorizing the Debtor's entry into the Interim Management Services Agreement, by and between the Debtor and AH Tulare, as manager (substantially in the form attached hereto as <u>Exhibit E</u> and as it may be amended, modified or supplemented in accordance with the terms hereof and thereof, the "**Interim MSA**" and, together with the Loan Documents, the APA and the Lease, the "**Transaction Documents**"); and

(n)     granting related relief.

The Court having reviewed the Motion; and the Court having jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having determined that the relief requested in the Motion is, on the terms of this Order, fair and reasonable and is essential to preserve the value of the Debtor's assets; and the hearing on the Motion having been held on August 2, 2018 (the "**Interim Hearing**"); and it appears that the interim relief requested in the Motion is, on the terms of this Order, necessary to avoid immediate and irreparable harm to the Debtor pending the Final Hearing; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and the Court having waived the notice requirements provided for by Federal Rule of

1  Bankruptcy Procedure 6004(h); and upon the record herein; and after due deliberation thereon;

2  and good and sufficient cause appearing therefor, **IT IS HEREBY FOUND[3]:**

3     A.     Petition Date.  On September 30, 2017 (the "**Petition Date**"), the Debtor filed a

4  voluntary petition with this Court for relief under chapter 9 of the Bankruptcy Code (the

5  "**Chapter 9 Case**").

6     B.     Jurisdiction and Venue.  This Court has core jurisdiction over the Chapter 9 Case,

7  the parties, and the Debtor's property.  Venue for the Chapter 9 Case is proper before this Court.

8     C.     Notice.  Proper notice under the circumstances has been given by the Debtor of the

9  Motion and the Interim Hearing.  Actual written notice of the Interim Hearing, the APA, the

10  Lease, the Interim MSA and the assumption, assignment and/or transfer of the Assigned

11  Contracts, and a reasonable opportunity to object or be heard with respect thereto and to the

12  entry of this Order, has been afforded to all known interested persons and entities entitled to

13  receive such notice, including, but not limited to (i) the Office of the United States Trustee, (ii)

14  all entities (or counsel therefore) known to have asserted any lien, charge, claim or encumbrance

15  on the Collateral, the Acquired Assets[4] (as defined in the APA), the Premises or any other

16  property of the Debtor, (iii) all federal, state and local regulatory or taxing authorities which are

17  reasonably ascertainable by the Debtor to have a known interest in the Acquired Assets or the

18  Premises; (iv) known non-debtor counterparties to any unexpired leases or executory contracts

19  that could potentially be assumed and assigned to Buyer; (v) those parties that requested notice

20  pursuant to Bankruptcy Rule 2002; (vi) Wilmington Trust, N.A., as indenture trustee and paying

21  agent for the Debtor's revenue bonds and as paying agent for the Debtor's general obligation

22  bonds (in such roles, the "**Trustee/Paying Agent**")[5]; (vii) the California Department of Public

---

3     Findings of facts shall be construed as conclusions of law, and conclusions of law shall
be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

4     For the avoidance of doubt, the Acquired Assets shall not include any assets that are not
owned by the Debtor.

5     The Debtor's bonds include (i) the Tulare Local Health Care District (Tulare County,
California) Refunding Revenue Bonds, Series 2007 (the "**Revenue Bonds**"), (ii) the Tulare
Local Health Care District (Tulare County, California) General Obligation Bonds, Election of
2005, Series A (2007) (the "**Series A General Obligation Bonds**"), and (iii) the Tulare Local
Health Care District (Tulare County, California) General Obligation Bonds, Election of 2005,

1   Health; and (viii) the Debtor's twenty largest unsecured creditors (collectively, the "**Notice**

2   **Parties**").  As evidenced by the affidavits of service filed with this Court:  (i) due, proper,

3   timely, adequate and sufficient notice of the Motion, the Interim Hearing, the assumption and

4   assignment of the Assigned Contracts, the Lease, the Interim MSA, and the Sale has been

5   provided to all parties-in-interest; (ii) such notice was, and is, good, sufficient and appropriate

6   under the circumstances of this Chapter 9 Case, provided a fair and reasonable opportunity for

7   parties-in-interest to object, and to be heard, with respect thereto, and was provided in

8   accordance with Bankruptcy Code sections 102(1), 105 and 365, Rules 2002, 6004, 6006, 9006,

9   9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

10  the applicable Local Rules of Practice for the United States Bankruptcy Court, Eastern District of

11  California (the "**Local Rules**"); and (iii) no other or further notice with respect to such matters is

12  necessary or shall be required.

13          D.      Findings Regarding the DIP Facility.

14          1.      Purpose and Necessity of Financing.  The Debtor requires the financing described

15  in the Motion to, among other things, finance costs incurred by the Debtor in connection with its

16  efforts to seek reinstatement of its suspended general acute care hospital license with the

17  California Department of Public Health and to reopen the Debtor's acute care general hospital

18  located in Tulare, California, heretofore known as Tulare Regional Medical Center (the

19  "**Hospital**") without which the Debtor may suffer immediate and irreparable harm.  The Debtor

20  is unable to obtain adequate unsecured credit allowable as an administrative expense under

21  Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c) or (d),

22  on equal or more favorable terms than those set forth herein based on the totality of the

23  circumstances.  The borrowing, on the terms of this Order, is in the best interests of the Debtor

24  and its creditors under the circumstances.

25          2.      Good Cause.  The terms of the Loan Documents are fair and reasonable under the

26  circumstances and reflect the Debtor's exercise of prudent business judgment.  The ability of the

27  ───────────────────────────────

28  Series B-1 (2009) and Series B-2 (2009) (collectively with the "**Series A General Obligation Bonds**", the "**General Obligation Bonds**").

1  Debtor to obtain sufficient working capital and liquidity under this Interim Order is vital to the

2  Debtor, its creditors, and in particular, to the ability of the Debtor to preserve the Hospital and

3  restructure its indebtedness under the Bankruptcy Code.  The Debtor may be immediately and

4  irreparably harmed if this Interim Order is not entered.  Good cause has, therefore, been shown

5  for the relief sought in the Motion.

6        3.  <u>Good Faith</u>.  The DIP Facility has been negotiated by and among the Debtor and

7  the Lender at arm's-length and in good faith as that term is used in Bankruptcy Code section

8  364(e) and in express reliance upon the protections offered by Bankruptcy Code section 364(e).

9  Subject to the terms of this Interim Order, the DIP Obligations, the DIP Liens and the DIP

10  Superpriority Claims (as defined below) shall be entitled to the full protection of Bankruptcy

11  Code section 364(e) in the event that this Interim Order or any provision hereof is vacated,

12  reversed, or modified on appeal or otherwise, and any liens or claims granted to the Lender

13  hereunder arising prior to the effective date of any such vacatur, reversal or modification of this

14  Interim Order shall be governed in all respects by the original provisions of this Interim Order,

15  including entitlement to all rights, remedies, privileges and benefits granted herein.  The terms of

16  the DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business

17  judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value

18  and fair consideration.

19        4.  <u>Lender Claims</u>.  As of the date hereof, no undisclosed claims of the Debtor exist

20  against the Lender.

21        E.  <u>Findings Regarding the Interim MSA, Lease and APA</u>.

22        1.  <u>Assignment and Assumption Notice</u>.  The Debtor has served notice (the

23  "**<u>Assumption and Assignment Notice</u>**") upon all of the non-debtor counterparties to the

24  Assigned Contracts (the "**<u>Contract Counterparties</u>**" and each a "**<u>Contract Counterparty</u>**")

25  setting forth: (i) the contract(s) and/or lease(s) that may be assumed by the Debtor and assigned

26  to the Buyer; (ii) the name and address of the Contract Counterparty thereto; (iii) notice of the

27  proposed effective date of the assignment (subject to the right of the Debtor and/or the Buyer to

28  withdraw such request for assumption and assignment of the Assigned Contract(s) prior to the

1   Closing (as defined in the APA); (iv) the amount, if any, determined by the Debtor to be

2   necessary to be paid to cure and compensate for any existing default in accordance with

3   Bankruptcy Code sections 365(b) and 365(f)(2) (the "**Cure Amount**"); and (v) the deadlines by

4   which any such Contract Counterparty must file an objection to the proposed assumption and

5   assignment of any Assigned Contract. The service of such Assumption and Assignment Notice

6   (i) was good, sufficient and appropriate under the circumstances of this Chapter 9 Case; (ii)

7   provides such counterparties with a full and fair opportunity to object to such assumption,

8   assignment, or transfer and to the proposed Cure Amount set forth in the Assumption and

9   Assignment Notice; and (iii) was in compliance with applicable provisions of the Bankruptcy

10  Rules and Local Rules. Accordingly, no other or further notice need be given in connection with

11  such assumption, assignment, or transfer or with respect to Cure Amounts.

12         2.    <u>Business Judgment</u>.   The Debtor has demonstrated good, sufficient and sound

13  business purposes and justifications for, and compelling circumstances to promptly consummate,

14  the Sale, the Lease and other transactions contemplated by the APA, the Lease and the Interim

15  MSA, including, without limitation, the assumption, assignment, and/or transfer of the Assigned

16  Contracts (collectively, the "**Transactions**") pursuant to Bankruptcy Code sections 105 and 365,

17  prior to and outside of a plan of adjustment, and such action is an appropriate exercise of the

18  Debtor's business judgment and in the best interests of the Debtor, its estate, and its creditors.

19  Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk of

20  depreciation of the value of the Acquired Assets if the Sale is not consummated promptly; (ii) the

21  APA constitutes the highest or otherwise best offer for the Acquired Assets; (iii) the APA and

22  the Lease will present the best opportunity to realize the value of the Debtor on a going concern

23  basis and to avoid decline and devaluation of the Hospital; and (iv) unless the Sale and the Lease

24  are approved expeditiously so that they may be included in the Electorate Approval process (as

25  defined in the APA), potential creditor recoveries may be substantially diminished. Given the

26  circumstances of the Chapter 9 Case and the adequacy and fair value of the Purchase Price (as

27  defined in the APA) under the APA, the proposed transfer of the Acquired Assets to the Buyer

28  constitutes a reasonable and sound exercise of the Debtor's business judgment, is in the best

1   interests of the Debtor, its Estate, and its creditors, and should be approved. The consummation

2   of the Transactions is legal, valid and properly authorized under all applicable provisions of the

3   Bankruptcy Code, including, without limitation, Bankruptcy Code sections 105 and 365, and all

4   of the applicable requirements of such sections have been complied with in respect of the

5   Transactions.

6        3.    <u>Good Faith of the Buyer/Tenant</u>. The Buyer is not an insider (as that term is

7   defined in Bankruptcy Code section 101(31)) of the Debtor. The Buyer is purchasing the

8   Acquired Assets and entering into the Lease in good faith, and it is a good faith purchaser, and is

9   therefore entitled to, and granted pursuant to paragraph 35 below, the full rights, benefits,

10   privileges, and protections of this Order and the Bankruptcy Code, and has otherwise proceeded

11   in good faith in all respects in connection with the Transactions in that, *inter alia*: (i) the Buyer

12   recognized that the Debtor was free to deal with any other party interested in acquiring the

13   Acquired Assets and entering into the Lease; and (ii) the negotiation and execution of the APA

14   and the Transaction Documents were at arms' length and in good faith. Neither the Debtor or the

15   Buyer, or any of their respective representatives, has engaged in any conduct that would cause or

16   permit the APA, the Lease, or the Interim MSA, or the consummation of the Transactions, to be

17   avoidable or avoided, or for costs or damages to be imposed or has acted in bad faith or in any

18   improper or collusive manner with any person in connection therewith.

19        4.    <u>Highest and Best Offer</u>. The APA and the Lease constitute the highest and best

20   offer for the purchase of the Acquired Assets and the lease of the Premises, respectively, and will

21   provide a greater recover for the Debtor's estate than would be provided by any other available

22   alternatives, and will help facilitate the reopening of the Hospital for the benefit of the Tulare

23   community. The Debtor's determination that the APA and the Lease constitute the highest and

24   best offer for the Acquired Assets and the Premises lease constitutes a valid and sound exercise

25   of the Debtor's business judgment.

26        5.    <u>No Fraudulent Transfer/Not a Successor</u>. The APA, the Lease and the Interim

27   MSA were not entered into, and the Transactions are not being consummated, for the purpose of

28   hindering, delaying or defrauding creditors of the Debtor under applicable Law (as defined in the

APA), and none of the parties to the APA, the Lease or the Interim MSA are consummating the Transactions with any fraudulent or otherwise improper purpose. The Purchase Price for the Acquired Assets constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act and (iii) reasonably equivalent value, fair consideration, and fair value under any other applicable Laws of the United States, any state, territory or possession or the District of Columbia. Except as expressly set forth in the APA with respect to the Assumed Liabilities (as defined in the APA), the Buyer shall have no liability, responsibility, or obligations of any kind or nature whatsoever for any Interest (as defined below) of or against the Debtor, or otherwise related to the Acquired Assets, by reason of the transfer of the Acquired Assets to the Buyer. The Buyer shall not be deemed, as a result of any action taken in connection with the Transactions, to: (1) be a successor (or other such similarly situated party) to the Debtor (other than with respect to the Assumed Liabilities as expressly stated in the APA); or (2) have, *de facto* or otherwise, merged or consolidated with or into the Debtor. The Buyer is not acquiring or assuming any Interest, except as expressly set forth in the APA with respect to the Assumed Liabilities.

6.    Validity of Transfer. Subject to the entry of this Order and, with respect to the Lease and the APA, Electorate Approval, the Debtor has full power and authority (i) to perform all of its obligations under the APA, the Lease and the Interim MSA, and (ii) to consummate the Transactions. The APA, the Lease and the Interim MSA, and the Transactions contemplated thereby, have been duly and validly authorized by all necessary action, subject, with respect to the Lease and the APA, to Electorate Approval. No further consents or approvals, other than the Electorate Approval with respect to the Lease and the APA, are required for the Debtor to consummate the Transactions or otherwise perform its obligations under the APA, the Lease or the Interim MSA, except in each case as otherwise expressly set forth in such documents. As of the Closing, the transfer of the Acquired Assets to the Buyer, including, without limitation, the assumption, assignment and transfer of the Assigned Contracts, will be a legal, valid, and effective transfer thereof, and vests the Buyer with all right, title, and interest of the Debtor in

1    and to the Acquired Assets, free and clear of all Interests accruing or arising any time prior to the

2    Closing, except as expressly set forth in the APA with respect to the Assumed Liabilities or

3    Permitted Encumbrances (as defined in the APA).

4        7.    <u>Sale to Be Free and Clear of Interests</u>. The Buyer would not have entered into the

5    APA and would not consummate the transactions contemplated thereby if the Sale of the

6    Acquired Assets, including the assumption, assignment and transfer of the Assigned Contracts,

7    to the Buyer were not free and clear of all Interests of any kind or nature whatsoever (except as

8    expressly set forth in the APA with respect to the Permitted Encumbrances and Assumed

9    Liabilities), or if the Buyer, any of its Affiliates (as defined in the APA) or subsidiaries, or any of

10   their respective representatives, would, or in the future could, be liable for any of such Interests

11   (except as expressly set forth in the APA with respect to the Permitted Encumbrances and

12   Assumed Liabilities). The Debtor may sell or otherwise transfer the Acquired Assets free and

13   clear of all Interests. With respect to the Revenue Bonds and General Obligation Bonds, the

14   Debtor is providing the Bond Treatment set forth in this Order below to provide the

15   Trustee/Paying Agent adequate protection for its interests in the Debtor's assets in the context of

16   the Transactions. Those holders of Interests against the Debtor, its Estate or any of the Acquired

17   Assets who did not object, whether formally or informally, or who withdrew their objections, to

18   the Sale or the Motion are deemed to have consented thereto. Those holders of such Interests

19   who did object, whether formally or informally, are adequately protected by having their

20   Interests, if any, attach to the proceeds of the Sale ultimately attributable to the Acquired Assets

21   in which such creditor alleges or asserts an Interest, in the same order of priority, with the same

22   validity, force and effect, that such creditor had immediately prior to consummation of the Sale,

23   subject to any claims and defenses the Debtor and the Estate may possess with respect thereto.

24   As used in this Order, the term "**<u>Interest</u>**" includes, in addition to the types of claims described

25   below, all of the following, in each case to the extent against or with respect to the Debtor or in,

26   on, or against or with respect to any of the Acquired Assets: liens (as defined in Bankruptcy

27   Code section 101(37), and whether consensual, statutory, possessory, judicial or otherwise),

28   claims (as defined in Bankruptcy Code section 101(5)), debts (as defined in Bankruptcy Code

section 101(12)), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment, or interests of any kind or nature whatsoever, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this Chapter 9 Case, whether imposed by agreement, understanding, Law, equity or otherwise, including, but not limited to, (i) Interests that purport to give to any person a right or option to effect a setoff against or any forfeiture, modification or termination of the Debtor's interests in the Acquired Assets, or any similar rights; (ii) Interests arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, (iii) Interests that are or constitute, or that arise in connection with or with respect to, any Excluded Liabilities (as defined in the APA); (iv) Interests that arise from or in connection with any bulk sales or similar law, and (v) Interests arising under or in connection with any acts, or failures to act, of any of the Debtor or any of the Debtor's Affiliates, or subsidiaries, or any of their respective representatives, including, but not limited to, Interests arising under any doctrines of successor, transferee, or vicarious liability, violation of any applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable Law or otherwise.

8.     Except as expressly set forth in the APA with respect to the Assumed Liabilities or Permitted Encumbrances, and without limiting the nature or scope of paragraph E.7. above, the transfer of the Acquired Assets, including the assumption, assignment and/or transfer of the Assigned Contracts, to the Buyer will not subject the Buyer or its Affiliates or subsidiaries, or any of their respective representatives to, or subject any Acquired Asset to or provide recourse for, any liability or encumbrance whatsoever with respect to the operation or condition of any of the Acquired Assets prior to the Closing or with respect to any facts, acts, actions, omissions, circumstances or conditions existing, occurring or accruing with respect thereto prior to the Closing, including, without limitation, any liability or encumbrance arising from any of the

following: (i) any employment or labor agreements, consulting agreements, severance arrangements, change in control agreements or other similar agreements to which the Debtor is or was a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtor, (iii) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Americans with Disabilities Act of 1990, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims, (v) environment liabilities, debts, claims or obligations which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any Environmental Laws (as defined in the APA), (vi) products liability or warranties, (vii) any bulk sales or similar law, (viii) any litigation by or against the Debtor and (ix) the Laws of the United States, any state, territory or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any theory of antitrust, products liability, or successor, vicarious or transferee liability. For the avoidance of doubt, the liabilities and encumbrances set forth in this paragraph are included in the defined term "**Interests**" for all purposes of this Order.

9. <u>Assumption, Assignment and/or Transfer of the Assigned Contracts</u>. The assumption, assignment and/or transfer of the Assigned Contracts to the Buyer pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtor and its Estate, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor. To the extent necessary or required by applicable Law, the Debtor has or will have as of the Closing: (i) cured, or provided adequate assurance of

1    cure, of any default existing prior to the Closing with respect to the Assigned Contracts, within

2    the meaning of Bankruptcy Code sections 365(b)(1)(A) and 365(f)(2)(A), and (ii) provided

3    compensation, or adequate assurance of compensation, to any party for any actual pecuniary loss

4    to such party resulting from such default, within the meaning of Bankruptcy Code section

5    365(b)(1)(B).  The respective amounts included in the Debtor's Assumption and Assignment

6    Notice (or any supplemental Assumption and Assignment Notice(s)) are the sole amounts

7    necessary under Bankruptcy Code sections 365(b)(1)(A) and 365(f)(2)(A) to cure all such

8    monetary defaults and pay all actual pecuniary losses under the Assigned Contracts.  The

9    promise of the Buyer to perform the obligations first arising under the Assigned Contracts after

10   their assumption and assignment to the Buyer constitutes adequate assurance of future

11   performance within the meaning of Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B) to

12   the extent that any such assurance is required and not waived by the counterparties to such

13   Assigned Contracts.  A continued hearing will be held on November 29, 2018 at 9:30 a.m.

14   (Pacific time) at the United States Bankruptcy Court for the Eastern District of California to

15   address timely-filed objections to the proposed Cure Amounts (as contained in the Assumption

16   and Assignment Notice), including the cure objection filed by Roche Diagnostics Corporation

17   ("**Cure Amount Objections**").  The Debtor shall file its response(s) to Cure Amount Objections

18   not later than 14 days prior to the continued hearing thereon.  Any objections to the foregoing,

19   other than Cure Amount Objections, related to or in connection with the assumption, assignment

20   or transfer of any of the Assigned Contracts to the Buyer are hereby overruled on the merits.

21   Those non-Debtor parties to Assigned Contracts who did not object to the assumption,

22   assignment or transfer of their applicable Assigned Contract, or to their applicable Cure Amount,

23   are deemed to have consented thereto for all purposes of this Order.  The Buyer shall maintain

24   the right to modify the list of the Assigned Contracts, after the date of this Order and up to the

25   Closing.  Such modification rights include, but are not limited to, the right of the Buyer to

26   designate a Contract for assumption by the Debtor and assignment to the Buyer, as well as for

27   rejection by the Debtor.  The Buyer would not have agreed to the Transactions without such

28   modification rights.  The notice and opportunity to object provided to Contract Counterparties to

US-DOCS\102653744.3

1  such Assigned Contracts and to other parties in interest fairly and reasonably protects any rights

2  that such counterparties and other parties in interest may have with respect to such Contracts.

3      **F.**    <u>Bond Treatment</u>

4      1.    <u>Adequate Protection</u>.  In connection with the financing and other Transactions

5  described in the Motion, the Debtor is providing adequate protection with respect to the Revenue

6  Bonds and General Obligation Bonds on the terms described more fully below (the "**Bond**

7  **Treatment**").

8      2.    <u>Good Cause</u>.  The Bond Treatment is fair and reasonable under the circumstances

9  and reflect the Debtor's exercise of prudent business judgment.  Good cause has, therefore, been

10  shown for the Bond Treatment.

11      3.    <u>Good Faith</u>.  The Bond Treatment has been negotiated by and among the Debtor

12  and the Trustee/Paying Agent at arm's-length and in good faith.

13      G.    <u>Immediate Entry of Order</u>.  This Order constitutes a final order within the meaning

14  of 28 U.S.C. § 158(a).   The Debtor has requested immediate entry of this Order.

15  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under

16  Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made

17  applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for

18  delay in the implementation of this Order and expressly directs entry of judgment as set forth

19  herein.   The permission granted herein to provide the Bond Treatment and to enter into the

20  Transactions and the DIP Facility and to obtain funds thereunder up to the Interim Loan Amount

21  (as defined below) during the Interim Period is necessary to avoid immediate and irreparable

22  harm to the Debtor.   Based upon the foregoing findings, acknowledgements, and conclusions,

23  and upon the record made before this Court at the Interim Hearing, and good and sufficient cause

24  appearing therefor;   **IT IS HEREBY ORDERED:**

25      1.    <u>Disposition</u>.  The Motion is granted and the Transactions, Bond Treatment and the

26  DIP Facility contemplated thereby and by the Transaction Documents are approved, in each case

27  subject to the terms set forth herein.  All objections to the Motion and/or entry of this Order, to

28  the extent not withdrawn or resolved, are hereby overruled.

2.     _Binding Obligations._   Upon entry of this Order, this Order, the Transaction Documents and the Bond Treatment shall constitute legal, valid, and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.  This Order does not in any way modify the terms of the General Obligation Bonds, including the Series A General Obligation Bonds.

   **A.     The Loan Documents**

3.     _Authorization._   The Debtor is hereby authorized to obtain immediately the DIP Loans during the Interim Period up to an aggregate principal amount of $1,000,000 (the "**Interim Loan Amount**"), pursuant to the terms of this Interim Order.  Promptly upon entry of this Interim Order and provided that the Debtor is not in default under the terms of this Interim Order, the Debtor is authorized to borrow the DIP Loans as provided herein.  The Debtor is hereby expressly authorized and empowered, to execute and deliver and, on such execution and delivery, directed to perform under the Loan Documents, including the DIP Credit Agreement, in accordance with the terms of the Loan Documents and this Interim Order.

4.     _Postpetition Credit Obligation._   Notwithstanding anything in this Interim Order to the contrary, the Lender's obligation to make the DIP Loans in accordance with the Loan Documents up to the Interim Loan Amount shall automatically terminate without any further action by this Court upon the earliest to occur of (the "**Termination Date**"): (i) November 6, 2018 (the "**Outside Date**"); (ii) the dismissal of the Chapter 9 Case, and (iii) the acceleration of the DIP Loans following an Event of Default (as defined below).

5.     _Permitted Uses and Approved Budget._   In accordance with the terms of this Interim Order and the Loan Documents, the proceeds of the DIP Loans shall be used solely for the purposes permitted under the Loan Documents, this Interim Order and in accordance with the Approved Budget.  Except as otherwise provided herein, unless otherwise authorized by this Court or agreed upon by the Lender, the Debtor may only use the proceeds of the DIP Loans during the Interim Period and pursuant to and solely in accordance with the Approved Budget in all respects; _provided, however,_ that the Debtor shall be permitted to (i) carry over any amounts not expended for a particular line item in any week to succeeding weeks, (ii) expend up to 15%

more than the amounts set forth in a particular line item for a specific week in such week so long as the aggregate expenditures during the period covered by the Approved Budget do not exceed the total shown on the Approved Budget by more than 15% and (iii) pay amounts incurred from and after the Petition Date, in addition to or for categories not listed in the Approved Budget with the prior written consent of the Lender.  On Wednesday of every second week, the Debtor shall provide the Lender with an updated rolling 13-week cash flow statement which shall include a variance report comparing actual cash flow results for all applicable prior periods to the forecasted cash flow results for such periods, and a statement of any weekly or cumulative variances in any line item for receipts or disbursements.  Any proposed amendments to the Approved Budget shall not become effective until such amendments have been approved by the Lender in writing, and absent the written consent of the Lender, the existing Approved Budget shall remain in effect without any modifications or amendments.  The consent of the Lender to the Approved Budget shall not be construed as consent to the use of any proceeds of the DIP Loans after the occurrence of an Event of Default, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

6.    Interest.  The interest rate on amounts drawn under the DIP Loan shall be equal to the Prime Rate (as defined in the DIP Credit Agreement) minus 50 basis points (absent an Event of Default), compounded annually and calculated on a 365/366-day year, actual days elapsed basis.  Interest shall accrue and be due and payable in cash each Repayment Date (as defined in the DIP Credit Agreement). The default rate shall be two percent (2.00%) over and above the non-default rate.

7.    Mandatory Prepayment.  Promptly after, and in no event more than one (1) Business Day after, the closing of the APA, the Borrower shall make, or direct the Buyer to make on the Borrower's behalf, a prepayment of the DIP Loans in an amount equal to 100% of the Purchase Price thereunder; provided, that such Purchase Price shall first be applied to prepay all interest accrued and unpaid as of the date of such prepayment, and then any remaining amount shall then be applied to prepay all or a portion of the Outstanding Loan Amount (as defined in the DIP Credit Agreement).  In the event that the Electorate Approval is received and

the Lease is terminated or expires prior to the Maturity Date (as defined in the DIP Credit Agreement), repayment of the DIP Loans shall be made in accordance with Section 2.1(e)(ii) of the Credit Agreement.

8.    Conditions Precedent.    Prior to the funding of any draw under the DIP Credit Agreement, the conditions set forth in Section 4.1 or Section 4.2 of the DIP Credit Agreement, as applicable, must be met.

9.    Events of Default.    The following constitute an event of default (collectively, the "**Events of Default**") unless waived by the Lender:

a.    the occurrence of any "Event of Default" (as defined in the DIP Credit Agreement) under the Loan Documents, that is not waived by the Lender, in accordance with the terms of the Loan Documents;

b.    the proposal of any plan of adjustment that does not provide for the payment in full in cash of the DIP Loan or if a plan of adjustment modifies any of Lender's rights except in a manner acceptable to Lender;

c.    the incurrence or payment by the Debtor of expenses other than as enumerated in the Approved Budget;

d.    reversal, vacatur, or modification (without consent of the Lender) of this Interim Order;

e.    the entry by the Court of an order, or the filing by the Debtor of a motion which seeks entry of an order, (i) dismissing the Chapter 9 Case, or (ii) appointing a trustee or examiner with the expanded powers to operate the Debtor's business in the Chapter 9 Case;

f.    the Debtor files or supports a motion challenging the validity, extent or priority of any of the DIP Obligations or the DIP Liens;

g.    except as expressly allowed in this Interim Order or the Final Order, the entry by the Court of an order granting any lien on, or security interest in, any Collateral in favor of any party other than the Lender, or granting an administrative claim payable by the Debtor to any party other than the Lender that is senior to, or pari passu with, the DIP Superpriority Claims, or the DIP Obligations, without the express written consent of the Lender;

h.     any material breach by the Debtor of any obligations, representations, warranties or covenants in this Interim Order; and

i.     entry of an order granting relief from the automatic stay to permit foreclosure on any Collateral in which the Lender would have an interest.

10.   <u>Remedies</u>.  Upon the occurrence of an Event of Default, Lender shall have no further obligation to advance any further monies under the DIP Facility and shall have the right to accelerate the DIP Facility without further order of the Court.  The Debtor shall immediately provide notice to the Lender of the occurrence of any Event of Default, at which time the Debtor's ability to use the proceeds of the DIP Loans shall automatically terminate subject to the provisions below.  Upon the occurrence of an Event of Default and following the giving of not less than five (5) business days' (the "**Notice Period**") advance written notice to the Debtor and the Trustee/Paying Agent (the "**Enforcement Notice**"), unless the Court orders otherwise, the Lender may exercise any remedies available to it under this Interim Order, the Loan Documents and applicable non-bankruptcy law.  Absent order of the Court to the contrary, the automatic stay pursuant to Bankruptcy Code section 362 shall be automatically terminated at the end of the Notice Period, without further notice or order of the Court, unless the Lender elects otherwise in a written notice to the Debtor, and the Lender shall be permitted to exercise all rights and remedies, including with respect to the Collateral set forth in this Interim Order, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise.  The delay or failure of the Lender to exercise rights and remedies under this Interim Order, the Loan Documents or applicable law shall not constitute a waiver of their respective rights thereunder or otherwise.

11.   <u>Limitation on Use of DIP Loans and the Collateral.</u>  No proceeds of the DIP Loans or  Collateral may be used: (i) to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type (A) against the Lender or seeking relief that would impair the rights and remedies of the Lender under the Loan

Documents or this Interim Order; (B) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Lender's liens or security interests in the Collateral; or (C) for monetary, injunctive, or other affirmative relief against the Lender or its liens on or security interests in the Collateral, that would impair the ability of the Lender to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations; (ii) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the DIP Liens) held by or on behalf of the Lender related to the DIP Obligations; or (iii) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Liens or any other rights or interests of the Lender related to the DIP Obligations or the DIP Liens.

12.    <u>Indemnity</u>.    The Debtor will indemnify the Lender and each of the Lender's agents, representatives, employees, officers, directors, affiliates, attorneys and professionals and hold them harmless from and against all reasonable costs, expenses (including fees, disbursements and other charges of counsel) and liabilities arising out of or relating to any litigation or other proceeding (regardless of whether the Lender is a party thereto) that relate to the within transactions or any transactions related thereto, including the enforcement of any rights of the Lender, to the extent finally determined by a court of competent jurisdiction to have resulted primarily from the Debtor's negligence, gross negligence or willful misconduct.

13.    <u>Authority to Execute and Deliver Necessary Documents</u>.

a.    The automatic stay imposed by Bankruptcy Code section 362 is hereby lifted or modified to the extent necessary and the Debtor is hereby authorized to perform all acts (and to the extent such acts have already occurred, such acts are ratified) and to execute and deliver all instruments and documents, and to pay all fees, that may be required or necessary for the Debtor's performance of its obligations under this Interim Order, the DIP Credit Agreement and the Loan Documents.

b.    The Debtor is directed to enter into, execute and deliver to the Lender any and all other documents, agreements and instruments to be executed and delivered pursuant to

1    this Interim Order, each as may be amended hereafter from time to time in accordance with the

2    terms of this Interim Order or otherwise reasonably requested by the Lender.  The Debtor is

3    further authorized and directed to negotiate, prepare, enter into and deliver any UCC financing

4    statements, pledge and security agreements, encumbering all of the Collateral (defined below)

5    and securing all of the Debtor's obligations under the DIP Loans solely as set forth herein

6    including payment of the DIP Loans in cash, that are reasonably requested by the Lender.

7            c.     The Lender is hereby authorized, but not required, to file or record

8    financing statements, intellectual property filings, mortgages, depository account control

9    agreements, notices of lien or similar instruments in order to validate and perfect the liens and

10   security interests granted hereunder.  Whether or not either the Lender shall, in its sole

11   discretion, choose to file such financing statements, intellectual property filings, mortgages,

12   notices of lien or similar instruments, such liens and security interests shall be deemed valid,

13   perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or

14   subordination as of the date of entry of this Interim Order.  If the Lender determines to file or

15   execute any financing statements, agreements, notice of liens or similar instruments, the Debtor

16   shall cooperate and assist in any such execution and/or filings as reasonably requested by the

17   Lender, and the automatic stay shall be modified to allow such filings.

18           d.     A certified copy of this Interim Order may, in the discretion of the Lender,

19   be filed with or recorded in filing or recording offices in addition to or in lieu of such financing

20   statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby

21   authorized to accept such certified copy of this Interim Order for filing and recording; *provided*

22   that, notwithstanding the date of any such filing, the date of such perfection shall be the date of

23   entry of this Interim Order.

24           e.     Any provision of any lease or other license, contract or other agreement

25   that requires (i) the consent or approval of one or more landlords or other parties or (ii) the

26   payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge,

27   grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or

28   other collateral related thereto, has been satisfied on the terms of this Order or is otherwise

US-DOCS\102653744.3

hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any such provision shall have no force and effect with respect to the granting of DIP Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by the Debtor in accordance with the terms of this Interim Order.

f.     The Debtor is hereby authorized and directed to (i) perform all of its obligations under the DIP Credit Agreement, and such other agreements as may be required by the DIP Facility to give effect to the terms of the financing provided for under the DIP Credit Agreement, and (ii) perform all acts required under the Loan Documents.

g.     All obligations under the DIP Credit Agreement and the Loan Documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms, the terms of the DIP Credit Agreement and the Loan Documents, and the terms of this Interim Order, and no obligation, payment, transfer or grant of a security under the Loan Documents or this Interim Order shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d) or 548 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law).

14.    <u>Lender's Lien Priority</u>.

a.     To secure the DIP Loans, immediately upon entry of this Interim Order, the Lender is hereby granted valid, enforceable, non-avoidable and fully perfected, liens on and security interests in (collectively, all liens and security interests granted to the Lender pursuant to this Interim Order and any Final Order, the "**DIP Liens**"), the following (i) pursuant to Bankruptcy Code section 364(c)(3), a second priority security interest in and lien upon the Evolutions Property (as defined in the DIP Credit Agreement), as further described in and subject to the terms of the Mortgage (as defined in the DIP Credit Agreement), (ii) pursuant to Bankruptcy Code section 364(c)(2), (A) a first priority security interest in and lien upon all unencumbered Real Property Collateral (as defined in the DIP Credit Agreement), as further described in and subject to the terms of the Mortgage, and (B) a first priority security interest in

1　and lien upon the Acquired Assets that are not subject to any Permitted Personal Property

2　Encumbrances; and (iii) pursuant to Bankruptcy Code section 364(c)(3), (A) a junior security

3　interest in and lien upon the Acquired Assets that are subject to a Permitted Personal Property

4　Encumbrance (as defined in the DIP Credit Agreement) subject solely to such Permitted Personal

5　Property Encumbrances, and (B) a junior security interest in and lien upon the Real Property

6　Collateral, other than the Evolutions Property, that is subject to a Permitted Real Property

7　Encumbrance (as defined in the DIP Credit Agreement) subject solely to such Permitted Real

8　Property Encumbrances (collectively, the "**Collateral**").　Other than as permitted in the Credit

9　Agreement as to the Evolutions Property or Permitted Personal Property Encumbrances, the DIP

10　Liens shall not at any time be made subject or subordinate to, or made *pari passu* with, any other

11　lien, security interest or claim not existing as of the Petition Date.　For the avoidance of doubt,

12　Collateral shall not include the following, whether now existing or hereafter arising: tax accruals

13　or tax revenues of the Debtor, any subsidy the Debtor receives from the United States Treasury

14　under the federal Recovery Act in relation to any General Obligation Bonds, any funds held by

15　the Trustee/Paying Agent, any rights in the forgoing, or any proceeds thereof.

16　　　　　　b.　　DIP Superpriority Claims.　Pursuant to Bankruptcy Code section

17　364(c)(1), all of the DIP Obligations shall constitute allowed superpriority administrative

18　expense claims against the Debtor's estate (the "**DIP Superpriority Claims**") with priority over

19　any and all administrative expenses of the kind specified in Bankruptcy Code sections 503(b)

20　and 507(b), whether or not such expenses or claims may become secured by a judgment lien or

21　other non-consensual lien, levy or attachment.　For the avoidance of doubt, the DIP Superpriority

22　Claim shall not extend to the following, whether now existing or hereafter arising: tax accruals or

23　tax revenues of the Debtor, any subsidy the Debtor receives from the United States Treasury

24　under the federal Recovery Act in relation to any General Obligation Bonds, any funds held by

25　the Trustee/Paying Agent, any rights in the forgoing, or any proceeds thereof.

26　　　　　　c.　　The DIP Liens shall be and hereby are deemed fully perfected liens and

27　security interests, effective, binding and perfected upon the date of this Interim Order without the

28　necessity of execution, recordation of filings by the Debtor of mortgages, security agreements,

US-DOCS\102653744.3

control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Lender of, or over, any Collateral, such that no additional steps need be taken by the Lender to perfect such interests.

d.      The Debtor will (i) maintain books, records and accounts to the extent and as required by the Loan Documents and (ii) cooperate, confer with, and provide to the Lender all such information reasonably requested by the Lender related to the Loan Documents.

15.    <u>Extensions of Credit</u>.  The Lender shall have no obligation to make any loan or advance unless all of the conditions precedent to the making of such extension of credit under the Loan Documents and this Interim Order have been satisfied in full or waived by the Lender in its sole discretion.

16.    <u>Application of Repayment Proceeds</u>.  The Lender shall retain and apply all collections on the DIP Loan, first to fees, costs and expenses owed under the DIP, then to interest, and then to principal.

17.    <u>Payments Free and Clear</u>.  All payments or proceeds remitted to the Lender pursuant to the provisions of this Interim Order, any Final Order or any other subsequent order of the Court shall be irrevocable and indefeasible, received free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, Bankruptcy Code sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtors) or 552(b).

18.    <u>Limitation on Charging Expenses Against Collateral</u>. No expenses of administration of the Chapter 9 Case or any future proceeding that may result therefrom shall be charged against or recovered from the Collateral or the Lender pursuant to Bankruptcy Code sections 105(a), 506(c) or 552(b) or any similar principle of law or equity, without the prior written consent of the Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the Lender.

19.    <u>Default Rate</u>.  Immediately upon the occurrence of an Event of Default, without providing any prior notice thereof (A) the Lender, may charge interest at the default rate and (B) the Lender shall have no further obligation to provide financing under the DIP Credit

1  Agreement, this Order or otherwise, and may, in its sole discretion, terminate all commitments

2  with respect to the DIP Loans.

3       20.   Survival.  Except as expressly provided in this Interim Order or any Final Order,

4  the DIP Liens, the DIP Superpriority Claims, the other administrative claims granted pursuant to

5  this Order and all other rights and remedies of the Lender granted by the provisions of this

6  Interim Order shall survive (i) the entry of an order dismissing the Chapter 9 Case, (ii) the entry

7  of an order approving the sale of any Collateral, or (iii) the entry of an order confirming a plan of

8  adjustment in the Chapter 9 Case.  The terms and provisions of this Interim Order shall continue

9  in the Chapter 9 Case.  The DIP Liens, the DIP Superpriority Claims, the other administrative

10  claims granted pursuant to this Interim Order and all other rights and remedies of the Lender

11  granted by the provisions of this Interim Order shall continue in full force and effect until all DIP

12  Obligations or adequate protection obligations, as applicable, are indefeasibly paid in full, in

13  cash.

14       21.   Release.  Each of the Debtor and the Debtor's estate, on its own behalf and on

15  behalf of each of their predecessors, their successors, and assigns (collectively, the "**Releasors**")

16  shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully

17  forever release, remise, acquit, relinquish, irrevocably waive and discharge the Lender and each

18  of its former and current officers, employees, directors, agents, representatives, owners,

19  members, partners, financial advisors, legal advisors, shareholders, managers, consultants,

20  accountants, attorneys, affiliates, and predecessors in interest (collectively, the "**Releases**"), each

21  in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities,

22  disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations,

23  actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs,

24  expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected,

25  unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without

26  limitation, all legal and equitable theories of recovery, arising under common law, statute or

27  regulation or by contract, of every nature and description that exist on the date hereof relating to

28  any of the Loan Documents or the transactions contemplated under such documents, including,

1    without limitation, (i) any so-called "lender liability" or equitable subordination claims or

2    defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii)

3    any and all claims and causes of action regarding the validity, priority, extent, enforceability,

4    perfection or avoidability of the liens or claims of the Lender.

5        22.    <u>Limitation on Liability</u>. By virtue of determining to make any loan under the DIP

6    Credit Agreement or in exercising any rights or remedies as and when permitted pursuant to this

7    Interim Order or the Loan Documents, the Lender shall not be deemed to be in control of the

8    operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with

9    respect to the operation or management of the Debtor (as such terms, or any similar terms, are

10    used in the United States Comprehensive Environmental Response, Compensation and Liability

11    Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore,

12    nothing in this Interim Order or the Loan Documents shall in any way be construed or interpreted

13    to impose or allow the imposition upon the Lender of any liability for any claims arising from

14    the prepetition or postpetition activities of the Debtor.

15        23.    <u>Proofs of Claim</u>. The Lender shall not be required to file a proof of claim in the

16    Chapter 9 Case in respect of the DIP Obligations.

17        24.    <u>Modifications of DIP Loans</u>. The Debtor and the Lender are hereby authorized to

18    implement, in accordance with the terms of the Loan Documents, any non-material modifications

19    of the Loan Documents (other than this Interim Order or any Final Order), but without motion or

20    application to, order of or hearing before, this Court. Any material modification or amendment

21    to the Loan Documents shall only be permitted pursuant to an order of this Court, after being

22    submitted to this Court upon notice to any party required by the Bankruptcy Rules; *provided,*

23    *however*, that any forbearance from, or waiver of, (a) a breach by the Debtor of a covenant

24    representation or any other agreement or (b) a Default or an Event of Default, in each case under

25    the Loan Documents shall not require an order of this Court.

26        25.    <u>Insurance</u>. At all times the Debtor shall maintain casualty and loss insurance

27    coverage for the Collateral on substantially the same basis as maintained prior to the Petition

28    Date.

US-DOCS\102653744.3

26.    <u>Successors and Assigns</u>.  The Loan Documents and the provisions of this Interim Order shall be binding upon the Debtor, the Lender and each of their respective successors and assigns, and shall inure to the benefit of the Debtor, the Lender and each of their respective successors and assigns.

27.    <u>Binding Nature of Agreement</u>.  This Interim Order and the Loan Documents shall constitute legal, valid, and binding obligations of the Debtor, enforceable against the Debtor in accordance with their terms.  The rights, remedies, powers, privileges, liens, and priorities of the Lender provided for in this Interim Order and in the Loan Documents shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order), by any plan of adjustment or otherwise in the Chapter 9 Case or by the dismissal of the Chapter 9 Case until the DIP Obligations have first been paid in full in cash and completely satisfied and the commitments terminated in accordance with this Interim Order and the DIP Loans.

28.    <u>Subsequent Reversal or Modification</u>.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtor to the Lender prior to the date of receipt by the Lender of written notice of the effective date of such action or (ii) the validity and enforceability of any lien, claim or priority authorized or created under this Interim Order or pursuant to the Loan Documents.  Notwithstanding any such reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by the Debtor to the Lender prior to written notice to the Lender of the effective date of such action, shall be governed in all respects by the original provisions of this Interim Order and the Loan Documents, as applicable, and the Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the Loan Documents with respect to all such indebtedness, obligations or liability.

29.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for August 7, 2018 at 1:30 p.m. (Pacific time) at the United States Bankruptcy Court for the Eastern District of California.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no

US-DOCS\102653744.3

1   Final Hearing may be held, and a separate Final Order may be presented by the Debtor and

2   entered by this Court.

3          30.    On or before August __, 2018, the Debtor shall serve Adventist Health, California

4   Department of Public Health, all secured creditors and counsel, counsel for the Trustee/Paying

5   Agent, all persons having requested special notice, the twenty largest unsecured creditors, all

6   taxing authorities, the Debtor, and the U.S. Trustee's Office with notice of the entry of this

7   Interim Order and of the Final Hearing (the "**Final Hearing Notice**"). The Final Hearing Notice

8   shall state that any party in interest objecting to the entry of the proposed Final Order shall file

9   written objections with the Clerk of the Court no later than August __, 2018 at 4:00 p.m. (Pacific

10  time), which objections shall be served so that the same are received on or before such date by:

11  (a) counsel for the Debtor, Walter Wilhelm Law Group, 205 East River Park Circle, Ste. 410,

12  Fresno, CA   93720, facsimile: (559) 435-9868, Attention: Riley C. Walter; (b) counsel for

13  Adventist Health, Latham & Watkins LLP, 355 S. Grand Avenue, Suite 100, Los Angeles, CA

14  90071-1560, facsimile: (213) 891-8763, Attention: Kimberly A. Posin; and (c) the Office of the

15  United States Trustee.

16         31.    A  copy  of  this  Order  shall  be  posted  on  the  Debtor's  website

17  (www.tularelocalhealthcaredistrict.org) by the close of business on August ___, 2018.  An

18  electronic copy shall be available from Gable Alfano at galfano@W2LG.com.

19    **B.**    **The Lease, Interim MSA and APA**

20         31.    Approval of APA, Interim MSA and Lease; Binding Nature.  The APA, Interim

21  MSA and the Lease, and all of the terms and conditions thereof, are hereby approved as set forth

22  herein.  The consideration provided by the Buyer for the Acquired Assets under the APA is fair

23  and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value,

24  fair value, and fair consideration under the Bankruptcy Code and any other applicable Law, and

25  the Transactions may not be avoided, or costs or damages imposed or awarded, under any

26  provision of the Bankruptcy Code.  Pursuant to Bankruptcy Code sections 105 and 365, subject

27  to the Electorate Approval with respect to the Lease and the APA, the Debtor is authorized and

28  empowered to, and shall, take any and all actions necessary or appropriate to (a) consummate the

1　Sale, and the lease of the Premises pursuant to and in accordance with the terms and conditions

2　of the APA and the Lease, respectively, and (b) execute and deliver, perform under,

3　consummate, implement, and take any and all other acts or actions as may be reasonably

4　necessary or appropriate to the performance of its obligations as contemplated by the APA, the

5　Interim MSA and the Lease, in each case without further notice to or order of this Court. This

6　Order shall be binding in all respects upon the Debtor, its Estate, all creditors, all holders of any

7　Claim(s) (whether known or unknown) against the Debtor, any holders of Interests against, in or

8　on all or any portion of the Acquired Assets, all non-Debtor parties to the Assigned Contracts,

9　the Buyer, and all successors and assigns of the foregoing.

10　　　　32.　　Transfer of Acquired Assets Free and Clear of Interests; Injunction.

11　　　　　　a.　　Pursuant to Bankruptcy Code sections 105(a), 365(b) and 365(f) and

12　subject to the Electorate Approval, the Debtor is authorized and directed to transfer the Acquired

13　Assets, including but not limited to the Assigned Contracts, to the Buyer on the Closing in

14　accordance with the APA. Upon and as of the Closing, such transfer shall constitute a legal,

15　valid, binding and effective transfer of such Acquired Assets and the Buyer shall take title to and

16　possession of such Acquired Assets free and clear of all Interests (except as expressly set forth in

17　the APA). All such Interests shall attach solely to the proceeds of the Sale with the same

18　validity, priority, force and effect that they now have as against the Acquired Assets, subject to

19　any claims and defenses the Debtor and its Estate may possess with respect thereto. This Order

20　shall be effective as a determination that, on and as of the Closing, all Interests of any kind or

21　nature whatsoever (except as expressly set forth in the APA) have been unconditionally released,

22　discharged and terminated in, on or against the Acquired Assets. The provisions of this Order

23　authorizing and approving the transfer of the Acquired Assets free and clear of Interests shall be

24　self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases,

25　termination statements, assignments, consents, or other instruments in order to effectuate,

26　consummate and implement the provisions of this Order.

27　　　　　　b.　　Except as expressly permitted by the APA or this Order, all persons and

28　entities holding Interests (other than the Permitted Encumbrances and Assumed Liabilities) are

hereby forever barred, estopped and permanently enjoined from asserting their respective Interests against the Buyer, any of its Affiliates and subsidiaries, and any of their respective representatives, and each of their respective property and assets, including, without limitation, the Acquired Assets. On and after the Closing, the Buyer shall be authorized to execute and file such documents, and to take all other actions as may be necessary, on behalf of each holder of an Interest to release, discharge and terminate such Interests in, on and against the Acquired Assets as provided for herein, as such Interests may have been recorded or may otherwise exist. On and after the Closing, and without limiting the foregoing, the Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect or otherwise notice any Interest that is extinguished or otherwise released pursuant to this Order. This Order constitutes authorization under all applicable jurisdictions and versions of the Uniform Commercial Code for the Buyer to file UCC termination statements with respect to all security interests in or liens on the Acquired Assets.

        c.     On and after the Closing, the persons holding an Interest (other than a Permitted Encumbrance or an Assumed Liability) shall execute such documents and take all other actions as may be reasonably necessary to release their respective Interests in the Acquired Assets, as such Interests may have been recorded or otherwise filed. The Buyer may, but shall not be required to, file a certified copy of this Order in any filing or recording office in any federal, state, county or other jurisdiction in which the Debtor has real or personal property, or with any other appropriate clerk or recorded with any other appropriate recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge and terminate any of the Interests as set forth in this Order as of the Closing. All persons and entities that are in possession of any portion of the Acquired Assets on the Closing shall promptly surrender possession thereof to the Buyer at the Closing. The transfer of the Acquired Assets to the Buyer pursuant to the APA does not require any consents other than specifically provided for in the APA.

US-DOCS\102653744.3

d.      This Order is and shall be binding upon and govern the acts of all persons and entities (including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, and secretaries of state, federal and local officials) who may be required by operation of law, the duties of their office, or contract to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease.  Each of the foregoing persons and entities shall accept for filing any and all of the documents and instruments necessary and appropriate to release, discharge and terminate any of the Interests contemplated by this Order, the APA or any Transaction Document.

33.      <u>Assigned Contracts; Cure Payments</u>.

a.      Pursuant to Bankruptcy Code sections 105(a) and 365, and subject to and conditioned upon the Closing, the Debtor's assumption, and assignment and transfer to the Buyer of the Assigned Contracts are hereby authorized and approved in full subject to the terms set forth below.  The Debtor shall, on or prior to the Closing, pay the Cure Amounts (or reserve the amount of the Alleged Cure Claims as set forth below) and cure any and all other defaults and breaches under the Assigned Contracts so that such Contracts may be assumed by the Debtor and assigned to Buyer on the Closing in accordance with this Order, the APA and the other Transaction Documents.  To the extent the Debtor is responsible for any Cure Amount pursuant to the terms of the APA or the other Transaction Documents, the Buyer may, upon prior written notice to the Debtor and in its sole discretion, (i) pay such amount(s) on behalf of the Debtor, in which case the Debtor shall have no further responsibility therefor, and (ii) offset such amount(s) against any amount(s) Buyer may owe the Debtor (including by deducting such amounts, at the Closing, from the Purchase Price); <u>provided</u>, <u>however</u>, that to the extent the Debtor objects to any Cure Amount, this Court shall retain jurisdiction over such dispute.

b.      Upon and as of the Closing, the Debtor is authorized and empowered to, and shall, assume, assign and/or transfer each of the Assigned Contracts to the Buyer free and clear of all Interests (except as expressly set forth in the APA).  The payment of the applicable

Cure Amounts (if any), or the reservation by the Debtor of an amount of cash that is equal to the lesser of (i) the amount of any cure or other compensation asserted by the applicable Contract Counterparty as required under Bankruptcy Code section 365 or (ii) the amount approved by order of this Court to reserve for such payment (such lesser amount, the "**Alleged Cure Claim**") shall, pursuant to Bankruptcy Code section 365 and other applicable Law, (a) effect a cure, or provide adequate assurance of cure, of all defaults existing thereunder as of the Closing Date and (b) compensate, or provide adequate assurance of compensation, for any actual pecuniary loss to such non-Debtor party resulting from such default.  Accordingly, on and as of the Closing, other than such payment or reservation, none of the Debtor or the Buyer shall have any further liabilities or obligations to the non-Debtor parties to the Assigned Contracts with respect to, and the non-Debtor parties to the Assigned Contracts shall be forever enjoined and barred from seeking, any additional amounts or claims (as defined in Bankruptcy Code section 101(5)) that arose, accrued or were incurred at any time on or prior to the Closing on account of the Debtor's cure or compensation obligations arising under Bankruptcy Code section 365.  The Buyer has provided adequate assurance of future performance under the relevant Assigned Contracts within the meaning of Bankruptcy Code section 365(f).

        c.      To the extent any provision in any Assigned Contract assumed or assumed and assigned (as applicable) pursuant to this Order (including, without limitation, any "change of control" provision) (a) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, such assumption or assignment, or (b) is modified, breached or terminated, or deemed modified, breached or terminated by any of the following: (i) the commencement of this Chapter 9 Case, (ii) the insolvency or financial condition of the Debtor at any time before the closing of this Chapter 9 Case, (iii) the Debtor's assumption or assumption and assignment (as applicable) of such Assigned Contract, or (iv) the consummation of the Transactions, then such provision shall be deemed modified so as to not entitle the non-Debtor party thereto to prohibit, restrict or condition such assumption or assignment, to modify or terminate such Assigned Contract, or to exercise any other default-related rights or remedies with respect thereto, including, without limitation, any such provision that purports to allow the non-Debtor party thereto to recapture

1   such Assigned Contracts, impose any penalty thereunder, condition any renewal or extension

2   thereof, impose any rent acceleration or assignment fee, or increase or otherwise impose any

3   other fees or other charges in connection therewith.  All such provisions constitute unenforceable

4   anti-assignment provisions that are void and of no force and effect pursuant to Bankruptcy Code

5   sections 365(b), 365(e) and 365(f).

6            d.       All requirements and conditions under Bankruptcy Code sections 105 and

7   365 for the assumption by the Debtor and assignment to the Buyer of the Assigned Contracts

8   have been satisfied.  Upon the Closing, in accordance with Bankruptcy Code sections 105 and

9   365, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtor

10  in and under the Assigned Contracts, and each Assigned Contract shall be fully enforceable by

11  the Buyer in accordance with its respective terms and conditions, except as limited or modified

12  by the provisions of this Order.  Upon and as of the Closing, the Buyer shall be deemed to be

13  substituted for the Debtor as a party to the applicable Assigned Contracts and, accordingly, the

14  Debtor shall be relieved from any further liability under the Assigned Contracts.

15           e.       Upon the payment of the applicable Cure Amount or reservation of the

16  Alleged Cure Claim, if any, the Assigned Contracts will remain in full force and effect, and no

17  default shall exist, or be deemed to exist, under the Assigned Contracts as of the Closing nor

18  shall there exist, or be deemed to exist, any event or condition which, with the passage of time or

19  giving of notice, or both, would constitute such a default.

20           f.       The rights of the Buyer to modify the list of the Assigned Contracts after

21  the date of this Order and up to the earlier of (a) the Closing Date, and (b) any applicable

22  deadline under the Bankruptcy Code, are hereby approved.  All Contract Counterparties to the

23  Assigned Contracts shall be deemed to have consented to such assumption and assignment under

24  Bankruptcy Code section 365(c)(1)(B) and the Buyer shall enjoy all of the Debtor's rights,

25  benefits and privileges under each such Assigned Contract as of the applicable date of

26  assumption and assignment without the necessity to obtain any non-Debtor parties' written

27  consent to the assumption or assignment thereof.  The failure of the Debtor or the Buyer to

28  enforce at any time one or more terms or conditions of any Assigned Contract shall not be a

US-DOCS\102653744.3

33

1    waiver of such terms or conditions, or of its respective rights to enforce every term and condition

2    of the Assigned Contracts.

3         34.    <u>Additional Injunction; No Successor Liability</u>.

4              a.    Effective upon the Closing and except as expressly set forth in the APA,

5    all persons and entities are forever prohibited and permanently enjoined from (i) commencing or

6    continuing in any manner any action or other proceeding, the employment of process, or any act

7    (whether in law or equity, in any judicial, administrative, arbitral or other proceeding), to collect,

8    recover or offset any Interest, (ii) enforcing, attaching, collecting or recovering in any manner

9    any judgment, award, decree or order with respect to an Interest, (iii) creating, perfecting or

10   enforcing any Interest, or (iv) asserting any setoff, right of subrogation or recoupment of any

11   kind with respect to an Interest, in each case as against the Buyer, any of its Affiliates or

12   subsidiaries, or any of their respective representatives, or any of their respective property or

13   assets, including the Acquired Assets.

14             b.    The Transactions contemplated by the APA and the Transaction

15   Documents do not cause there to be, and there is not (i) a consolidation, merger, or *de facto*

16   merger of the Buyer with or into the Debtor or the Debtor's Estates; (ii) a substantial continuity

17   between the Buyer and the Debtor or the Debtor's Estate, (iii) a common identity between the

18   Buyer and the Debtor or the Debtor's Estate, or (iv) a mere continuation of the Debtor or its

19   Estate with the Buyer.

20             c.    Except as expressly set forth in the APA, the transfer of the Acquired

21   Assets, including, without limitation, the assumption, assignment and transfer of any Assigned

22   Contract, to the Buyer shall not cause or result in, or be deemed to cause or result in, the Buyer,

23   any of its Affiliates or subsidiaries, or any of their respective representatives, having any

24   liability, obligation, or responsibility for, or any Acquired Assets being subject to or being

25   recourse for, any Interest whatsoever, whether arising under any doctrines of successor,

26   transferee or vicarious liability, breach of fiduciary duty, aiding or abetting breach of fiduciary

27   duty or otherwise, whether at Law or in equity, directly or indirectly, and whether by payment,

28   setoff, recoupment, or otherwise.

d.      For the avoidance of doubt, notwithstanding the consummation of the Transactions and the employment by the Buyer of certain persons previously employed by the Debtor, (i) the Buyer shall not have any obligations or liabilities to any employee of the Debtor or in respect of any employee benefits owing to any employee of the Debtor by the Debtor or by any plan or program administered by the Debtor or for the benefit of the Debtor's employees, and (ii) any obligations of the Buyer to any such person shall be expressly limited to (i) those obligations expressly agreed upon by the Buyer (if any) with such person, and (ii) those obligations explicitly assumed by the Buyer (if any) under the APA.

35.     <u>Good Faith</u>. The Transactions contemplated by this Order, the APA, the Interim MSA and the Lease are undertaken by the Buyer without collusion and in good faith, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale and other Transactions shall not alter, affect, limit, or otherwise impair the validity of the Sale or such other Transactions (including the assumption, assignment and/or transfer of the Assigned Contracts), unless such authorization and consummation are duly stayed pending such appeal. The Buyer is a good faith purchaser and, as such, is entitled to, and hereby granted, the full rights, benefits, privileges and protections of this Order and the Bankruptcy Code.

36.     <u>Other Provisions Pertaining to the Lease, the Interim MSA and the Lease</u>.

a.      The Buyer is hereby authorized, in its discretion, in connection with consummation of the Transactions to allocate the Acquired Assets, Assumed Liabilities, and Assigned Contracts among its Affiliates, subsidiaries, designees, assignees, and/or successors in a manner as it, in its discretion, deems appropriate and such person shall be entitled to all of the rights, benefits, privileges and protections of the Buyer as are accorded to the Buyer under this Order, and the Debtor shall, to the extent set forth in the APA or Lease, cooperate with and take all actions reasonably requested by Buyer to effectuate any of the foregoing. In the event that the Buyer designates any Buyer designee (a "**<u>Buyer Designee</u>**") to acquire any Acquired Assets, including, without limitation, any Assigned Contracts, then any reference to the "Buyer" in this Order shall be deemed to be a reference to "the Buyer and/or such applicable Buyer Designee,"

US-DOCS\102653744.3

1   unless the context requires otherwise. Upon the transfer of any Acquired Asset or Assigned

2   Contract to, or the assumption of any Assumed Liability by, a Buyer Designee, such Buyer

3   Designee shall be solely responsible for such Acquired Asset, Assumed Liability, or Assigned

4   Contract (including performance thereunder), as applicable.

5       b.    Nothing contained in any plan of adjustment, or order of any type or kind

6   entered in (a) this Chapter 9 Case, or (b) any related proceeding subsequent to entry of this

7   Order, shall conflict with or derogate from the provisions of the APA, the Lease, the other

8   Transaction Documents or the terms of this Order. To the extent of any such conflict or

9   derogation, the terms of this Order shall govern.

10      c.    Nothing in this Order shall modify or waive any closing conditions or

11  termination rights in the APA or the Lease, and all such conditions and rights shall remain in full

12  force and effect in accordance with their terms. No bulk sales law or any similar law of any state

13  or other jurisdiction applies in any way to the Transactions.

14      d.    All payment or reimbursement obligations of the Debtor owed to the

15  Buyer pursuant to the APA or the Lease shall be paid in the manner provided therein, without

16  further notice to or order of this Court. All such obligations shall constitute allowed

17  administrative claims against the Debtor, with first priority administrative expense status under

18  Bankruptcy Code sections 503(b) and 507(a)(2). Until satisfied in full in cash, all such

19  obligations shall continue to have the protections provided in this Order, and shall not be

20  discharged, modified or otherwise affected by any plan of adjustment for the Debtor.

21      e.    The failure specifically to include any particular provision of the APA, the

22  Interim MSA or the Lease in this Order shall not diminish or impair the effectiveness of such

23  provision, it being the intent of this Court that the APA, the Interim MSA and the Lease be

24  authorized and approved in their entirety.

25      37.   <u>Modifications to Documents</u>. Except as otherwise set forth in this Order, the

26  APA, the Lease and the other Transaction Documents may be modified, amended or

27  supplemented in a writing signed by the parties thereto and in accordance with the terms thereof,

28  without further notice to or order of this Court.

US-DOCS\102653744.3

38.     <u>Bond Treatment</u>.  The following Bond Treatment shall be and hereby is approved:

a.      The definition of "Revenues" and "Gross Revenues" under the documents that evidence and otherwise secure the Revenue Bonds (the "**Revenue Bond Documents**") is deemed amended to expressly include Debtor income from ad valorem taxes on real property, other Debtor income from taxes, proceeds thereof, and all Debtor rights to receive the same, except to the extent the foregoing are pledged to and necessary to pay Debtor obligations on the General Obligation Bonds.

b.      As additional security for the Debtor's obligations under the Revenue Bond Documents in addition to the Debtor's ongoing pledge of Revenues and Gross Revenues, the Trustee/Paying Agent is granted a junior lien in the Collateral, subject and subordinate to: (a) the DIP Obligations and the DIP Liens; and (b) any Permitted Personal Property Encumbrances and Permitted Real Property Encumbrances. The foregoing liens shall be released as to any Debtor property AH Tulare acquires or leases from the Debtor in the Transactions upon the occurrence of such sale or lease.  For the avoidance of doubt, the foregoing liens shall not attach to revenues AH Tulare generates from its operation of Debtor assets that are sold or leased to AH Tulare.  The foregoing liens shall be further subordinated to any valid, unavoidable Debtor expenses incurred during, and prior to the effective date of any plan in, the Chapter 9 Case, including reasonable fees and expenses of Debtor attorneys and other professionals, and any exit financing on reasonable terms the Debtor may obtain to satisfy these expenses.   This supplemental lien shall be deemed perfected without any requirement for the filing or recordation of any further documents and shall be fully released upon the earlier of (i) the Debtor's full compliance with its obligations under the Revenue Bond Documents for 24 consecutive months and (ii) so long as there are no existing defaults under the Revenue Bond Documents, other than any defaults resulting from the Transactions or this Order, any release of such Collateral by AH Tulare.

c.      The Debtor's existing commitment to provide the Trustee/Paying Agent an administrative priority claim for diminution from the Petition Date for the Debtor's use of Revenues and Gross Revenues in the Chapter 9 Case is maintained.

d.      Any plan confirmed in this Chapter 9 Case shall ratify and otherwise reinstate the Revenue Bond Documents, as modified by the Bond Treatment and to render them otherwise consistent with the Transaction Documents, on terms reasonably acceptable to the Debtor and Trustee/Paying Agent.

e.      The Debtor shall continue to comply with its obligations under the documents evidencing and otherwise securing the General Obligation Bonds (the "**General Obligation Bond Documents**"), which shall include the Series A General Obligation Bonds.

f.      Any plan confirmed in this Chapter 9 Case shall ratify and otherwise reinstate the General Obligation Bond Documents without any change or modification to the terms of the General Obligation Bonds or the insurance policy issued by Syncora Guarantee Inc. ("**Syncora**") in connection with the Series A General Obligation Bonds.

g.      For the avoidance of doubt, neither Adventist Health nor AH Tulare is acquiring any right, title or interest in any *ad valorum* or other tax revenues of the Debtor, any subsidy payments to the Debtor under the federal recovery act with respect to the General Obligation Bonds, any funds held by the Trustee/Paying Agent, any rights to receive the foregoing, or any proceeds thereof.

h.      For the avoidance of doubt, the Debtor's grant and maintenance of the Bond Treatment is authorized by and shall not constitute a default under the Transaction Documents.

i.      The Debtor, Trustee/Paying Agent and Syncora in connection with the Series A General Obligation Bonds are each authorized to take such other actions and execute and file such other documents, as either party may reasonably request to implement, evidence or perfect the Bond Treatment or that are reasonably necessary in connection with these matters. The Debtor and Trustee/Paying Agent shall consult with Syncora prior to taking any such actions and in any event shall provide reasonable notice in advance of any action to be taken or the execution of any documents in connection with the Series A General Obligation Bond Documents. The automatic stay is modified to the extent necessary to permit the foregoing matters.

j.      Any plan confirmed in this Chapter 9 Case shall reinstate the Revenue Bonds and General Obligation Bonds in their then existing principal amount and all duties and obligations set forth in the General Obligation Bond Documents.

k.      Any plan confirmed in this Chapter 9 Case shall contain treatment for the Revenue Bonds and General Obligation Bonds consistent with the Bond Treatment. If any such plan purports to treat the Revenue Bonds or General Obligation Bonds in a manner inconsistent with the Bond Treatment or otherwise provide treatment that attempts to modify the underlying Bond Documents in any way, this Order shall control.

l.      The Debtor shall continue to consult with the Trustee/Paying Agent and Syncora regarding Transaction Documents and provide the Trustee/Paying Agent and Syncora any financial reporting it is required to provide Adventist Health or AH Tulare under the Transaction Documents. The Trustee/Paying Agent and Syncora will receive a timely copy of any valuation materials prepared by any Debtor consultant for use in the Transactions. The Debtor shall not amend any Transaction Documents in a manner that is materially adverse to the Revenue Bonds or the General Obligation Bonds without prior consent of the Trustee/Paying Agent and Syncora if any amendments are proposed to the Series A General Obligation Bonds or further approval of the Bankruptcy Court, after notice to the Trustee/Paying Agent and Syncora.

m.      The Trustee/Paying Agent and Syncora have reserved all rights to seek further adequate protection if the Trustee/Paying Agent or Syncora determines the adequate protection set forth herein is not sufficient.

**C.      Other Provisions.**

39.      Time Periods. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

40.      Automatic Stay. The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to implement the provisions of this Order and the terms and conditions of the APA, the Lease and the other Transaction Documents.

41.      No Third Party Beneficiary. No rights are created hereunder for the benefit of any third party, any creditor, any party in a successor case or any direct, indirect or incidental

US-DOCS\102653744.3

1  beneficiary.

2         42.    <u>Adequate Notice</u>.  Adequate notice under the circumstances has been given.  The

3  Debtor shall promptly mail copies of this Order to the parties entitled to notice.

4         43.    <u>Entry of Final Order; Effect</u>.  This Order shall take effect immediately upon

5  execution hereof.  Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order

6  shall be effective and enforceable immediately upon entry hereof.

7         44.    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction over all matters

8  pertaining to the implementation, interpretation and enforcement of this Order, the DIP Facility

9  and/or the Transaction Documents.  This Court retains jurisdiction, pursuant to its statutory

10 powers under 28 U.S.C. § 157(b), to, among other things, (i) interpret, implement, and enforce

11 the terms and provisions of this Order, the APA, the DIP Credit Agreement, the Loan

12 Documents, the Interim MSA, the Lease and the other Transaction Documents, and any

13 amendments thereto and any waivers and consents given thereunder, (ii) compel delivery of the

14 Acquired Assets to the Buyer; (iii) enforce the injunctions and limitations of liability set forth in

15 this Order, and (iv) enter any orders under Bankruptcy Code sections 105 and 365 with respect to

16 the Assigned Contracts.

17        45.    <u>Findings of Fact and Conclusions of Law</u>.  This Order shall constitute findings of

18 fact and conclusions of law and shall take effect and be fully enforceable immediately upon the

19 entry thereof.  To the extent that any findings of fact are determined to be conclusions of law,

20 such findings of fact shall be adopted as such; and to the extent that any conclusions of law are

21 determined to be findings of fact, such conclusions of law shall be adopted as such.

22        46.    <u>Order Controls</u>.  To the extent that this Order is inconsistent with any prior order

23 or pleading with respect to the Motion, the terms of this Order shall control.  To the extent there

24 are any inconsistencies between this Order, on the one hand, and the Transaction Documents, on

25 the other hand, the terms of this Order shall govern.

26 Submitted by:

27

28 _____

1  Riley C. Walter

2  Counsel for Debtor Tulare Local Healthcare District

3

4  IT IS SO ORDERED.

5

6  Date: _____

7                                    René Lastreto II
                                     United States Bankruptcy Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28