8
WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter #91839
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone: (559) 435-9800
Facsimile: (559) 435-9868
E-mail: rileywalter@W2LG.com

Chapter 9 Counsel for Tulare Local Healthcare District

IN THE UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| In re<br><br>TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER,<br><br>　　　　Debtor.<br><br>Tax ID #:　94-6002897<br>Address:　869 N. Cherry Street<br>　　　　　Tulare, CA 93274 | CASE NO. 17-13797<br><br>Chapter 9<br><br>DC No.: WW-103<br><br>Date:　May 16, 2019<br>Time:　9:30 a.m.<br>Place:　2500 Tulare Street<br>　　　　Fresno, CA 93721<br>　　　　Courtroom 13<br>Judge:　Honorable René Lastreto II |

**EXHIBIT TO DECLARATION OF SANFORD HASKINS IN SUPPORT OF MOTION FOR ORDER AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACT (STEVE CLARK & ASSOCIATES, INC.)**

| No. | Description | Pages |
|---|---|---|
| A | Letter of Agreement | 7 |

Dated: May 1, 2019　　　　　WALTER WILHELM LAW GROUP,
　　　　　　　　　　　　　　a Professional Corporation

　　　　　　　　　　　　　　By: /s/ Riley C. Walter
　　　　　　　　　　　　　　Riley C. Walter, Attorneys for Debtor
　　　　　　　　　　　　　　Tulare Local Healthcare District dba Tulare
　　　　　　　　　　　　　　Regional Medical Center

Filed 05/01/19                    Case 17-13797                    Doc 1359



**Steve Clark & Associates**

1120 Iron Point Road, Suite 150
Folsom, CA 95630
p (916) 673-2020
f (916) 673-2025
www.scainc.net

January 16, 2018

Mr. Daniel Heckathorne
Acting Chief Financial Officer
Tulare Regional Medical Center
869 North Cherry Street
Tulare, California  93274

Re:   Medi-Cal Reimbursement Consulting Services

Dear Mr. Heckathorne:

This is our proposal to continue and expand the provision of Medi-Cal Reimbursement Consulting Services for Tulare Regional Medical Center. The specific project is outlined in the attached Exhibit A.

We are pleased to submit this letter for your review and signature (the "*Agreement*"), which sets forth the terms according to which Steve Clark & Associates will provide you with certain consulting services. The term of this contract is for three years, April 1, 2018 through March 31, 2021. This contract will cover work that relates to the Medi-Cal DSH eligibility process for state fiscal year ends 2019-2020, 2020-2021, and 2021-2022. In addition, during the term of this contract Consultant will also provide analysis and support related to other Medi-Cal supplemental program assistance (as described in Exhibit A), as well as DSH work related to prior state fiscal year DSH audits and/or data reporting requirements that may become necessary. This contract is subject to the termination provisions described in "5" below.

We look forward to working with you in reaching your objectives, and ask that you review this letter to ensure that we understand and agree upon the terms governing the provision of our services. For convenience, this letter will refer to Steve Clark & Associates as "*Consultant*" and to Tulare Regional Medical Center as "*Client*." The terms and conditions of our Agreement are as follows:

1.   **Consulting Services.** Consultant agrees to provide the consulting services described on Exhibit A attached hereto. The foregoing collectively shall be referred to as the "*Services*." Consultant further agrees to consult with Client regarding the Services during the term of this Agreement.

2.   **Performance Standards.** Consultant agrees to perform the duties required by this Agreement in good faith, and in a timely manner that Consultant believes to be con-

EXHIBIT  A
Page  1  Of-  7

Daniel Heckathorne
January 16, 2018
Page 2

sistent with the needs of the Client. Consultant is not an agent or employee of Client, and has no fiduciary duty, nor any duty of care, disclosure or inquiry, other than as expressly set forth in this Agreement. Consultant shall be entitled to rely on the completeness and accuracy of all information, documents and materials provided by Client to Consultant in connection with the Services and this Agreement.

3.  **Compensation and Expenses.** In return for the Services provided by Consultant as specified in Exhibit A, Client agrees to pay Consultant $5,700 a month. In addition, a data fee in the amount of $4,000 will be charged each year to cover such costs as the paid claim files. For other consulting services not specified in Exhibit A, Client agrees to pay Consultant $250 per hour, for each hour or portion thereof (billable in fifteen (15) minute increments), performed by Consultant hereunder. Billable time includes all travel time, both local and out-of-town.

Client agrees to reimburse Consultant for all out-of-pocket costs incurred in the course of performance of the Services hereunder, including, without limitation, reasonable travel and lodging expenses, photocopying, mailing, messenger and delivery services, long distance telephone service, facsimile transmissions, parking, sales and similar taxes, and any other fees advanced by Consultant on behalf of Client.

4.  **Payment Terms.** Client agrees to pay Consultant within thirty (30) days from the date of the invoice, with payment sent to Consultant at the letterhead address set forth above. If Consultant does not receive complete payment within the foregoing time frame, then Client shall be in material breach of this Agreement. In such case, Client agrees (i) that Consultant may immediately and indefinitely discontinue providing the Services hereunder; and, (ii) that all working papers, documents and materials prepared by Consultant for which payment has not been received shall be and remain the sole and exclusive property of Consultant, and shall not be released by Consultant until complete payment of all fees and expenses due hereunder has been received by Consultant. The foregoing remedies shall be in addition to (and not exclusive of) any other remedies to which Consultant may be entitled as a result of Client's breach of this Agreement.

5.  **Termination.** Either party may terminate this Agreement at any time without cause upon the provision of ten (10) days prior written notice to the other. Following receipt of any notice of termination without cause, Consultant may, but shall not be obligated to, continue to provide the Services to Client pursuant to this Agreement. Either party also may terminate this Agreement immediately as a result of a material breach by the other party, upon the provision of written notice to the other. If this Agreement is terminated by either party, either with or without cause, all fees and expenses due Consultant, up to and including the effective date of the termination, shall be paid immediately to Consultant. Client further agrees, if this Agreement is terminated by either party in

EXHIBIT A
Page 2 Of 7

Daniel Heckathorne
January 16, 2018
Page 3

accordance with this section, that all work papers, confidential information, literature and any other documentation acquired or developed by Consultant directly related to this Agreement, shall not be provided to Client by Consultant until all fees and expenses have been paid to Consultant.

6. **Confidential Information.** Client agrees to provide Consultant with all information in its possession or reasonably available to it that is necessary for Consultant to provide the Services. Consultant shall, under all circumstances, have the right to rely, without independent investigation or verification, on all such information provided by Client to Consultant. Consultant agrees not to disclose any confidential documents or information provided to Consultant by Client pursuant to this Agreement, except: (i) to the directors, officers, employees, subcontractors and legal counsel of Consultant who have a need to know such information for the purpose of assisting Consultant in the performance of this Agreement; and (ii) when required by law to do so, but only if Consultant first notifies Client and affords Client a reasonable opportunity to oppose such disclosure by such means as Client deems necessary or appropriate. Notwithstanding the foregoing, confidential information shall not include any information which (i) is on the date hereof, or hereafter becomes, generally available to the public other than as a result of a disclosure, directly or indirectly, by Consultant; (ii) was available to Consultant on a non-confidential basis prior to its disclosure to Consultant by Client, or its representatives; or (iii) becomes available to Consultant on a non-confidential basis from a source other than Client or its representatives.

7. **Representations and Warranties of Client.** Client represents and warrants to Consultant that: (i) Client owns or has the legal right to use all patents, copyrights, trademarks, trade names, service marks, service names, and other intangible property or property rights relating to the Services (collectively, the "*Intellectual Property*"); (ii) each item of Intellectual Property may be disclosed to and used by Consultant within the course and scope of performing the Services on behalf of Client; (iii) Client's disclosure or Consultant's use of the Intellectual Property as permitted under this Agreement will not infringe upon, misappropriate, or otherwise conflict with any property rights of third parties; (iv) all information provided by Client shall be complete and accurate in all material respects, and not misleading; and (v) Client shall be solely responsible for the accuracy and completeness of all information provided by Client to Consultant.

8. **Disclaimer of Warranties.** Client acknowledges that the conduct of its business involves substantial regulatory risks, including but not limited to, risks relating to existing and future federal and state laws affecting governmental reimbursement policies. Client assumes sole responsibility for the assessment and assumption of any and all such risks, and for the compliance of its business and operations with applicable laws. Consultant warrants only that the Services provided under this Agreement will be performed by

EXHIBIT A
Page 3 Of- 7

Daniel Heckathorne
January 16, 2018
Page 4

Consultant, in a competent manner. Except for the foregoing limited warranty, Consultant makes no warranty, express or implied, and expressly disclaims: (i) any implied warranty of merchantability or fitness for a particular purpose; (ii) any warranty of any assumption or projection; and (iii) any warranty of the results or success of any strategy or recommendation made or otherwise included as part of the Services provided by Consultant to Client.

**9.　Limitation of Liability.** In no event will Consultant be liable to Client, or any third party, for any special damages, including any lost profits, lost savings, or other incidental or consequential damages, even if Consultant has been advised of the possibility of such damages. Consultant's entire liability and Client's exclusive remedy for any breach of this Agreement by Consultant shall be the replacement of any materials not meeting Consultant's obligations hereunder that are returned by Client to Consultant, or if Consultant is unable to deliver replacement materials, the refund by Consultant of the fees (but not the expenses) paid by Client for the Services.

**10.　Indemnification.** Client agrees to indemnify, defend and hold Consultant harmless from and against any and all liability, loss, damage, claim, cause of action or cost (including, but not limited to, court costs and attorneys' fees) which may result directly or indirectly, from any act, error, or omission of Client, or from any information, documents or materials provided by Client.

**11.　Proprietary Rights.** Subject to Consultant's receipt of complete and timely payment as required by this Agreement, all work product prepared for Client by Consultant shall belong exclusively to Client. All work products prepared by Consultant for others, for itself, or prior to or after the term of this Agreement, shall remain the exclusive property of Consultant.

**12.　Non-Exclusivity.** This Agreement shall be non-exclusive. Consultant may provide consulting services to Consultant's existing clients, and to any other persons or entities who may in the future become clients of Consultant.

**13.　General Terms.** Consultant shall act as an independent contractor and not as an agent or employee of Client and Consultant shall make no representation that it is an agent or employee of Client. Consultant is responsible for all taxes as an independent contractor. Consultant shall not have the authority to bind Client or incur other obligations on behalf of Client, unless Client so directs Consultant in writing. This Agreement may not be assigned by either party without the written consent of the other party. This Agreement will be retroactive to the date Consultant first performed the Services for Client. California law will govern the interpretation and enforcement of this Agreement, and each party consents to the jurisdiction of the courts of California in any action or pro-

Filed 05/01/19    Case 17-13797    Doc 1359

Daniel Heckathorne
January 16, 2018
Page 5

ceeding with respect to this Agreement. The prevailing party in any such proceeding shall be entitled to recover its attorneys' fees and costs of suit.

**14.    Access to Records.** Consultant agrees, in accordance with 42 U.S.C. §1395x(V)(1)(I) and 42 C.F.R. Part 420, Subpart D §420.300 *et seq.*, until the expiration of four (4) years after the furnishing of Medicare reimbursable services pursuant to this Agreement, or as otherwise required by federal or state law, upon proper written request, to allow the Comptroller General of the United States, the Secretary of Health and Human Services, and their duly authorized representatives access to this Agreement and to Consultant's books, documents, and records necessary to certify the nature and extent of costs of Medicare reimbursable services provided under this Agreement. In accordance with such laws and regulations, if Medicare reimbursable services provided by Consultant under this Agreement are carried out by means of a subcontract with an organization related to Consultant, and such related organization provides the services at a value or cost of Ten Thousand Dollars ($10,000.00) or more over a twelve (12) month period, then the subcontract between Consultant and the related organization shall contain a clause comparable to the clause specified in the preceding sentence.

If you are in agreement with the terms of this letter of Agreement, please sign both enclosed copies and deliver one copy to us.

Sincerely,

*[signature]*

Stephen C. Clark
Director

Agree to the terms of the January 16, 2018 proposal to provide Medi-Cal Reimbursement Consulting Services for Tulare Regional Medical Center as outlined in Exhibit A, and accepted by:

Signed: *[signature]*    Date: 3/7/17

Title: CEO

EXHIBIT A
Page 5 Of 7

Daniel Heckathorne
January 16, 2018
Page 6

# EXHIBIT A
# ANNUAL CONSULTING SERVICES

- Set up and communicate the time table for the hospital's data submission, data integrity analysis, and refilling of the OSHPD annual report.
- Analyze data, work with hospital staff on any identified problems, and recommend changes for any data modifications.
- Download and analyze Medi-Cal data from the State of California for each appropriate fiscal year.
- Evaluate and advise hospital on methods to maintain or increase total funds available pursuant to disproportionate share funding.
- Submit final draft of the revised OHSPD report to the Hospital for review & signature prior to final filing with OSHPD.
- Work directly with OSHPD staff to address revision issues and obtain interpretations as necessary.
- Submit timely revisions on behalf of the hospital to OSHPD.
- Review process and make any recommendations of strategies and actions for improved OSHPD report submission.
- Modify quarterly OSHPD reports to incorporate any revisions made on the annual OSHPD disclosure reports.
- Assist hospital staff as requested in analyzing the impact on Disproportionate Share payments of such things as increase in prices, reduction in or increase in Medi-Cal and Charity care.
- The Disproportionate Share payments and eligibility will be monitored throughout the year to provide for estimates, to respond to requests from the State, and to ensure that the State is using correct and accurate information before finalizing their payments.
- Assist hospital staff in reconciling any discrepancies related to the Cap Days process, namely the managed Medi-Cal days data. Ensure that any changes are submitted timely in order to meet deadlines.
- Evaluate the State's OBRA Limit factors, working with hospital staff to address any relevant issues. In addition, assist hospital staff with the CMS Workbook process by providing various preliminary estimations until completion of the audited results in order to report all cost and payment data as accurately as possible. Work with State auditors directly on any data or instruction interpretations.
- Review data that affects the hospital's AB 113 funding, ensuring accuracy of reporting. Evaluate processes in place such that data is being reported correctly such that it's captured accurately when reporting to the State.

EXHIBIT A
Page 6 Of 7

Daniel Heckathorne
January 16, 2018
Page 7

- Assist in the completion of the AB 915 funding submittal, ensuring accuracy of data especially as this program's patient volume transitions to that of managed Medi-Cal. Work with the DHCS as needed related to interpretation of instruction, audit questions, etc.
- As future program changes occur, assist hospital in obtaining monies from the Public Hospital Supplemental Fund (old SB1255). Monitor the process during the year so that if qualified the hospital receives its appropriate funding.
- Evaluate and advise hospital as to 'Rate Range' funding opportunities. As with any supplemental funding and the fact that DHLF has secured additional funding for its facilities, all sources of Medi-Cal and Uninsured funding must be analyzed as payment cannot exceed cost. If payment does exceed cost or the gap narrows, it is important that the hospital's "ask" does not exceed its limit.
- Review and modify as necessary data that will be utilized in determining the hospital's Quality Assurance Fee (QAF) for each program period. Monitor the IGT and payment cycle such that the facility meets deadlines.
- Identify other supplemental funding, as applicable. Assist hospital with data gathering, submission and deadlines related to this other existing or newly created funding.
- Hospital shall, in its sole and absolute discretion, determine whether to modify previously filed data reports and shall, if it determines in its sole and absolute discretion to do so, submit such revised data reports to OSHPD or other governmental agencies. If the data reports that are modified are audited by either a private or government entity, Hospital will be responsible for the content contained in the data reports. Consultant will assist Hospital with providing data, working with the audit firm, or in any other capacity requested by Hospital. Fees for such assistance are included in Section 3 of this agreement.