58

WALTER WILHELM LAW GROUP
A Professional Corporation
Riley C. Walter #91839
Michael L. Wilhelm #101495
Kathleen D. DeVaney #156444
205 East River Park Circle, Ste. 410
Fresno, CA 93720
Telephone:	(559) 435-9800
Facsimile:	(559) 435-9868
E-mail:	rileywalter@W2LG.com

Chapter 9 Counsel for Tulare Local Healthcare District, dba
Tulare Regional Medical Center

## IN THE UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

In re

**TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER,**

Debtor.

Tax ID #:	94-6002897
Address:	869 N. Cherry Street
	Tulare, CA 93274

CASE NO.	17-13797

Chapter 9

WW-95

Date:	July 3, 2019
Time:	10:00 a.m.
Place:	2500 Tulare Street
	Fresno, CA  93721
	Courtroom 13
Judge:	Honorable René Lastreto II

**DISCLOSURE STATEMENT DATED AS OF APRIL 30, 2019**

Disclosure Statement Dated as of April 30, 2019

-1-

## **Table of Contents**

I.     Preface ........................................................................................... 2

II.    OVERVIEW .................................................................................... 2

     A.      Introduction ..................................................................... 2

     B.      Disclaimers ...................................................................... 4

     C.      The Chapter 9 Process ................................................... 5

     D.      Plan Summary .................................................................. 7

     E.      Voting on the Plan ........................................................ 11

     F.      Confirmation of the Plan ............................................... 13

III.   HISTORY AND ACTIVITIES OF THE DEBTOR ......................... 14

     A.      Overview of the Debtor ................................................. 14

     B.      The Filing of the Chapter 9 Case .................................. 21

     C.      No Creditors' Committee ................................................ 21

     D.      Patient Care Ombudsman .............................................. 21

     E.      Funding Operations ....................................................... 21

     F.      Bar Date for Filing Proofs of Claim ............................... 22

     G.      Other Postpetition Matters ............................................ 22

IV. PLAN OVERVIEW .......................................................................... 30

V. ADMINISTRATIVE CLAIMS ............................................................ 30

     A.      General Treatment ......................................................... 30

     B.      Administrative Claim Bar Date ...................................... 31

     C.      Assumption Obligations and Rejection of Agreements ............................ 32

     D.      Payments for Services or Expenses in the Chapter 9 Case .................... 32

VI.   CLASSES 1 THROUGH 10 ........................................................... 32

     A.      Summary ........................................................................ 32

     B.      Classification of Claims Against the Debtor .................. 32

     C.      Treatment of Claims Against the Debtor ....................... 33

VII. ACCEPTANCE OR REJECTION OF THE PLAN .............................. 40

| | A. | Voting Classes | 40 |
|---|---|---|---|
| | B. | Acceptance by Impaired Classes | 40 |
| | C. | Presumed Acceptance/Rejection of Plan | 40 |
| | D. | Nonconsensual Confirmation | 40 |
| | E. | How to Vote | 41 |
| VIII. | | IMPLEMENTATION OF THE PLAN | 41 |
| | A. | Retention of Property. | 41 |
| | B. | Post-Confirmation Operations. | 41 |
| | C. | Retained Claims and Defenses. | 42 |
| | D. | Distributions. | 43 |
| | E. | Power and Authority of the Disbursing Agent | 45 |
| IX. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 46 |
| | A. | Assumption. | 46 |
| | B. | Rejection. | 46 |
| | C. | Assumption Obligations. | 47 |
| | D. | Effect of Confirmation Order. | 47 |
| | E. | Insurance/Coverage Agreement. | 48 |
| | F. | Indentures. | 48 |
| X. | | CONDITIONS PRECEDENT | 48 |
| | A. | Conditions to Confirmation. | 48 |
| | B. | Conditions to Effectiveness. | 48 |
| | C. | Waiver of Conditions. | 48 |
| XI. | | EFFECTS OF CONFIRMATION | 49 |
| | A. | Binding Effect. | 49 |
| | B. | Vesting. | 49 |
| | C. | Discharge. | 49 |
| | D. | No Exceptions to Discharge Under Plan. | 50 |
| | E. | Limitation of Liability. | 50 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

F.　　Exoneration. ................................................................ 50

G.　　Retention of Jurisdiction. ........................................... 51

XII. FEASIBILITY AND BEST INTERESTS ..................................... 51

A.　　Feasibility ................................................................... 52

B.　　Best Interests of Creditors.......................................... 52

XIII. CERTAIN TAX CONSEQUENCES OF THE PLAN ................... 54

XIV.　Conclusion ....................................................................... 55

# I.

# PREFACE

Pursuant to Chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 901, *et seq.* (the "Bankruptcy Code"), the Tulare Local Health Care District, dba Tulare Regional Medical Center (the "Debtor" or the "District" or "TRMC")[1], hereby submits this disclosure statement dated (the "Disclosure Statement") in support of its Plan of Adjustment dated April 30, 2019 (the "Plan"). The Plan has been filed concurrently with the Disclosure Statement. The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in Article I of the Plan also apply to any capitalized terms used herein that are not otherwise defined.

# II.

# OVERVIEW

## A. Introduction

On September 30, 2017 (the "Petition Date"), the Debtor commenced this bankruptcy case (the "Chapter 9 Case") by filing a voluntary petition under Chapter 9 of the Bankruptcy Code. This Disclosure Statement, submitted in accordance with Sections 901 and 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtor. This Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about voting the Plan.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the business background and history of the Debtor; (2) significant events during the Chapter 9 Case; (3) the property available for distribution under the Plan; and (4) a summary of the Plan. The Debtor urges you to review this Disclosure Statement and the Plan (including all exhibits to both documents) before making a decision to accept or reject the Plan.

The Bankruptcy Court has approved this Disclosure Statement as containing

---

[1] Throughout the Disclosure Statement reference is made to "TRMC" as meaning the Debtor. Occasionally reference is made to the "hospital" meaning the actual physical structure and campus.

adequate information to enable a hypothetical reasonable investor to make an informed judgment about the Plan.

<u>Your vote is important</u>.  The Plan represents the maximum amount that the District believes it can pay Creditors while maintaining legally required and mandated vital district healthcare functions and services for the benefit of the community.  Due to considerable deferred maintenance of the District's facilities, much of the revenue must be devoted to correcting this in order to satisfy requirements of the California Health and Safety Code.  The Hospital owned by the District is a critical component of the overall economic health of the community.  Confirmation of the Plan will permit the District to continue to provide healthcare services to meet its obligations as a California healthcare district and the health care needs of District residents[2].  Although the District has made drastic changes to its annual operating budget and reduced to three employees, it nonetheless lacks sufficient funds to pay all of its debts in full, make needed repairs, fund required capital projects, and comply with legal and safety requirements imposed on healthcare districts.[3]

Absent acceptance of the Plan, there are likely to be protracted delays in payment to Creditors or the possible dismissal of the Chapter 9 Case resulting in races to courthouses by each Creditor.  Under state law, however, Creditors may not exercise prejudgment remedies (such as levy and attachment) or compel a sale of District property.  Consequently, these state law remedies would likely not provide for a distribution to Creditors as good as the distributions contemplated by the Plan.  The Debtor believes that the treatment afforded Creditors under the Plan is superior to dismissal of this Chapter 9 case.  Accordingly, the Debtor urges you to **accept** the Plan by completing and returning the ballot by the deadline.

---

[2] The District must also provide healthcare services to comply with applicable laws to avoid efforts to dissolve the District.

[3] As an example, the District must pay out on or before December 31, 2019 $1.5 million for seismic compliance, over $1.6 million for chiller replacements and $190,000 for IT compliance. These are part of the significant expenditures necessary in the relatively short term.

## B. Disclaimers

The purpose of the Disclosure Statement is to provide "adequate information" of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, that would enable a hypothetical reasonable investor typical of the holders of claims of the relevant class to make an informed judgment concerning the Plan. *See* 11 U.S.C. § 1125(a).

For the convenience of Creditors, this Disclosure Statement summarizes the terms of the Plan but the Plan itself controls. If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.

No representation concerning the Debtor's financial condition or any aspect of the Plan is authorized by the Debtor other than as set forth in this Disclosure Statement and the exhibits thereto. Any representations or inducements made to secure your acceptance or rejection that are other than as contained in or included with this Disclosure Statement should not be relied upon by you in arriving at your decision.

The financial information contained herein, unless otherwise indicated, is unaudited.[4] Moreover, because of the Debtor's history, financial difficulties and previous mismanagement, as well as the complexity of the Debtor's financial matters, the books and records of the Debtor, upon which this Disclosure Statement in part is based, may be incomplete or inaccurate. However, reasonable effort has been made to ensure that all such information is fairly presented.

Walter Wilhelm Law Group ("W2LG") is general insolvency counsel to the Debtor. W2LG has relied upon information provided by the Debtor and management in connection with the preparation of this Disclosure Statement. Although W2LG has conducted certain limited due diligence in connection with the preparation of this

---

[4] See Exhibit B which is the Audited Financial Statements for FY 2017 and 2018 prepared by JWT & Associates, LLP. See also Exhibit A, financial projections, which has been prepared by Wipfli CPAs and consultants at the request and under the direction of the District's board of directors.

1 Disclosure Statement, counsel has not independently verified all of the information

2 contained herein. Each creditor should consult his or her own legal counsel or as to

3 matters concerning his or her claim.

4          **C. The Chapter 9 Process**

5          Chapter 9 of the Bankruptcy Code is a chapter of the federal bankruptcy law that

6 is reserved exclusively for municipalities (*e.g.*, political subdivisions or public agencies

7 of the State), such as a healthcare district. Chapter 9 provides a municipality with a

8 "breathing spell" within which to propose a plan for the adjustment of its debts.  The

9 municipal debtor generally retains the full authority to conduct its business and manage

10 its affairs in the ordinary course on a day-to-day basis without Bankruptcy Court

11 approval.  Generally speaking, court approval is quite limited and only required for

12 certain specific matters such as secured financing transactions or the assumption or

13 rejection of executory contracts and unexpired leases and confirmation of a Plan.

14          The filing of the Chapter 9 bankruptcy petition gives rise to an "automatic stay"

15 which, generally, enjoins creditors from taking any action to collect or recover

16 obligations owed by the municipal debtor prior to the commencement of the Chapter 9

17 Case.  The Bankruptcy Court can grant relief from the automatic stay under certain

18 limited conditions or for cause.

19          Chapter 9 is significantly different in many aspects from Chapter 11. Section

20 943(b)(7) requires that the proposed plan is "in the best interests of creditors and is

21 feasible. According to one judicial opinion, the "'best interests' test acts as a floor

22 requiring a reasonable effort at payment of creditors by the municipal debtor and that

23 the 'feasibility' requirement sets a corresponding ceiling which prevents the Chapter 9

24 debtor from promising more than it can deliver." In re Mount Carbon Metro. Dist., 242

25 B.R. 18, 34 (Bankr. D. Colo. 1999).

26          "Best interests of creditors" is not defined for purposes of Chapter 9. In Chapter

27 11, a plan is said to be in the best interests of creditors if creditors would receive at least

28 as much under the plan as they would if the debtor were liquidated under Chapter 7.

1  Courts generally have refused to apply the same definition in the Chapter 9 context

2  because § 1129(a)(7) is not incorporated into Chapter 9 and liquidation cannot be

3  compelled in Chapter 9.  See, e.g., In re City of Stockton, Cal., 542 B.R. 261, 270 (9th

4  Cir. B.A.P. 2015). A similar but less extreme definition of the best interests of creditors

5  test is that a Chapter 9 debtor's plan must pay creditors more than they would receive if

6  the case were dismissed, which would permit "every creditor to fend for itself in the race

7  to obtain the mandamus remedy and to collect the proceeds." 6 Collier on Bankruptcy

8  ¶ 943.03[7][a] (16th ed. 2017). See also In re City of Detroit, Mich., 524 B.R. 147, 213

9  (Bankr. E.D. Mich. 2014) ("Courts generally agree that the best interests of creditors test

10  in § 943(b)(7) requires 'that a proposed plan provide a better alternative for creditors

11  than what they already have.'") (citations omitted). See In re Stockton, 542 B.R. at 283

12  ("By its terms, the 'best interests' test in Chapter 9 is collective rather than

13  individualized, and that interpretation is supported by the very context of Chapter 9.").

14      Section 943(b)(7) also requires that the proposed plan be feasible. The Chapter

15  11 standards for feasibility do not apply in Chapter 9. In evaluating feasibility, the judge

16  must determine whether the revenue and expense projections submitted by the debtor

17  are reasonable and whether, based on those numbers, the debtor should be able to

18  make payments called for under the plan while also continuing to provide services to the

19  public. See In re Mount Carbon Metro. Dist., 242 B.R. 18, 35 (Bankr. D. Colo. 1999)

20  (reasoning that a finding of feasibility in a Chapter 9 case "should prevent confirmation

21  of visionary schemes which promise creditors . . . more under a proposed plan than the

22  debtor can possibly attain after confirmation . . . this requires a practical analysis of

23  whether the debtor can accomplish what the plan proposes and provide governmental

24  services").

25      Chapter 9 debtors emerge from bankruptcy by successfully confirming a plan of

26  adjustment.  A plan divides Creditors into classes and either leaves the rights of

27  Creditors unaltered (i.e., unimpaired), or changes the rights of Creditors (such as by

28  paying a reduced amount of the claim over a longer period of time).  Only Creditors

Disclosure Statement Dated as of April 30, 2019        -6-

whose rights are changed (*i.e.*, impaired) are entitled to vote to accept or reject the Plan. Upon confirmation, the rights afforded under the plan and the treatment of Claims under the plan will be binding and in complete satisfaction, discharge, and release of all Claims by Creditors against the Debtor.

### D. Plan Summary

The following is a brief overview of the material provisions of District's Plan. The Plan is a plan of adjustment and provides for the distribution of a stream of payments to Class 8 general unsecured creditors ("Plan Fund") over 5 years which will commence in about 5 years after the District repays certain unimpaired loans previously approved by the Bankruptcy Court. The Plan further provides for the classification and treatment of Claims against the Debtor. The Plan designates various Classes of Claims. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims. (Pursuant to Section 901, the claim priorities in Chapter 9 are different from Chapter 11 and very limited.)

The Plan provides for the creation of a Plan Fund from which disbursements will be made to Class 8 for five years, beginning in Year 6 of the Plan. The Plan Fund to be distributed on a pro rata basis to general unsecured creditors (Class 8) will be distributed over 5 consecutive years beginning in 2025 and continuing through 2029, for a total distribution of $5,000,000 to Class 8. The payouts will be $500,000 in 2025, $750,000 in 2026, $1,000,000 in 2027, $1,250,000 in 2028 and $1,500,000 in 2029. Payments will be made semi-annually. Distributions to Class 8 will be made after repayment of the loans from Adventist Health and the City of Tulare. Thus, the term of the Plan is ten years. See Exhibit A to this Disclosure Statement for the Debtor's projected revenues and expenses for July 1, 2019 (FY 2020) to June 30, 2029 (FY 2030).

The following chart[5] summarizes the treatment of Creditors under the Plan. Certain amounts listed below are estimated. Actual Claims and distributions under the Plan will vary depending upon, among other things, the outcome of objections to Claims and pending or to be filed litigation. The estimated Class 8 claims to be ultimately allowed ranges from $16,500,000 on the low end to $26,000,000 on the high end but could be greater or less.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| N/A | Administrative Claims<br><br>Recovery: 100% | Debtor estimates all Administrative Claims will be paid in full. | Each Allowed Administrative Claim shall, unless the holder of such Claim has agreed to different treatment of such Claim, be paid in full in Cash. Does not vote. |
| 1 | Series A General Obligation Bonds Claims<br><br>Recovery: 100%<br><br>Unimpaired. | $15,000,000 | **Classification** Class 1 consists of the GO Bonds Series A.<br>**Treatment**: Each Claim in Class 1 will be treated as follows: (a) any default, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, shall be cured, and (b) the maturity of the Claim shall be reinstated as the maturity existed before any defaults.<br>**Voting**: Class 1 is not impaired under the Plan and the holders of the GO Bonds Series A are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan. |
| 2 | Series B-1 General Obligation Bonds Series B-1<br><br>Recovery: 100%<br><br>Unimpaired. | $7,945,000 | **Classification** Class 2 consists of the GO Bonds Series B-1.<br>**Treatment:** Each Claim in Class 2 will be treated as follows: (a) any default, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, shall be cured, and (b) the maturity of the Claim shall be reinstated as the maturity existed before any defaults.<br>**Voting:** Class 2 is not impaired under the Plan and the holders of the GO Bonds Series B-1 are deemed to have accepted |

---

[5] This chart is only a summary of the classification and treatment of Claims under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims.

M:\S-U\TRMC\PLEADINGS\WW-95 Chapter 9 Plan\DS.052219.nam.docx

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | | | the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan. |
| 3 | Series B-2 General Obligation Bonds Claims<br><br>Recovery: 100%<br><br>Unimpaired. | $60,380,000 | **Classification** Class 3 consists of the GO Bonds Series B-2.<br>**Treatment:** Each Claim in Class 3 will be treated as follows: (a) any default, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, shall be cured, and (b) the maturity of the Claim shall be reinstated as the maturity existed before any defaults.<br>**Voting:** Class 3 is not impaired under the Plan and the holders of the GO Bonds Series B-2 are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan. |
| 4 | Revenue Bonds Series 2007<br><br>Recovery: 100%<br><br>Impaired. | $13,650,000 | **Classification** Class 4 consists of the Revenue Bonds Series 2007.<br>**Treatment:** Each Claim in Class 4 will be treated as follows: (a) any default, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code, shall be cured, and (b) the maturity of the Claim shall be reinstated as the maturity existed before any defaults.<br>**Voting:** Class 4 is impaired under the Plan and the holders of the Revenue Bonds 2007 are entitled to vote on the Plan. |
| 5 | Adventist Health<br><br>Recovery: 100%<br><br>Unimpaired. | $3,300,000 (est.) | **Classification** Class 5 consists of the claims by Adventist Health.6<br>**Treatment:** Class 5 will be treated as follows:<br><br>Payable over 5.5 years from the effective date of the lease which was March 15, 2019, (b) interest at prime minus 50 basis points and (c) payment made by rent offsets.<br><br>**Voting:** Class 5 is not impaired under the Plan and is deemed to have accepted the Plan and is not entitled to vote on the Plan. |

[6] Adventist Health is presently owed approximately $3,300,000 but the Court approved loan allows for a $10,000,000 line of credit. The amount owed will fluctuate over time but the entire loan will be repaid prior to the previously agreed maturity date as required by an Order dated August 7, 2018. The repayment will be made by the rent offsets.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| 6 | City of Tulare<br><br>Estimated Recovery: 100%<br><br>Unimpaired. | $9,000,000 | **Classification:** Class 6 consists of the City of Tulare claim.[7]<br><br>**Treatment:** Class 6 will be treated as follows:<br><br>(a) Payable monthly, (b) interest at 6%, (c) interest only for first 36 months, (d) principal and interest payable all due 60 months from date of the loan, (e) secured by Evolutions real property.<br><br>**Voting:** Class 6 is not impaired under the Plan. |
| 7 | Miscellaneous Secured Claims[8]<br><br>Estimated Recovery: 100% | The District believes there are no Class 7 secured claims. | **Classification:** Class 7 consists of all Secured Claims against the Debtor not included in Classes 1 through 6, if any. Each holder of a Secured Claim in Class 7 is considered to be in its own separate subclass within Class 7, and each such subclass is deemed to be a separate Class for purposes of the Plan and is numbered Class 7A, Class 7B, etc.<br>**Treatment:** On or before the date of a distribution to each holder of an Allowed Secured Claim in Class 7, the Debtor shall elect, in its discretion, one of the alternative treatments described in the Plan.<br>**Voting:** Class 7 is not impaired under the Plan and the holders of Secured Claims in Class 7 are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan. |
| 8 | Unsecured Claims | $16,500,000 to $26,000,000 | **Classification:** Class 8 consists of all Unsecured Claims against the Debtor not included in any other Class. |

---

[7] By an Order dated February 22, 2019 the Court authorized the District to borrow up to $9,000,000. As of April 30, 2019 the District had borrowed about $6,500,000 of this sum but intends to draw down on the balance of the authorized amount. This loan will be repaid pursuant to its terms.

[8] Jiame Calderon filed a claim for $1,000,000 asserting it is a secured claim. The District has objected to this malpractice claim asserting that the claim is disputed and not entitled to secured status. Iron Mountain Information Management, LLC filed a secured claim for $880 and this claim was paid so no such secured claim exists. The District believes there are no other secured claims included in Class 7.

M:\S-U\TRMC\PLEADINGS\WW-95 Chapter 9 Plan\DS.052219.nam.docx

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | Estimated Recovery: 19.2% - 30.3% Impaired. | | **Treatment:** Each holder of an Allowed Unsecured Claim shall receive, in exchange for and in full and final satisfaction of such Claim, a Pro Rata share of distributions from the Plan Fund. **Voting:** Class 8 is impaired under the Plan and all holders of Unsecured Claims are entitled to vote on the Plan. |
| 9 | Liability Claims Recovery: 100% | $ To Be Determined, but paid by risk management contracts. | **Classification:** Class 9 consists of all Liability Claims against the Debtor. **Treatment:** Each holder of a Liability Claim shall be paid from the proceeds of any applicable insurance or coverage policy issued to or for the benefit of the District. **Voting:** Class 9 is not impaired under the Plan and the holders of Liability Claims are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan. |
| 10 | Administrative Convenience Claim Recovery: 50% See within for a listing of all potential Class 10 claims. | Approx. $109,000 will be reserved for Class 10 as it is assumed all eligible claimants will opt into Class 10. | **Classification:** Class 10 consists of all allowed unsecured claims filed or scheduled for $5,000 or less who elect treatment in Class 10. **Treatment:** Each electing holder of a Class 10 claim will be paid 50% of the allowed claim amount on the Effective Date. Class 10 is a subclass of Class 8. **Voting:** Class 10 is not impaired under the Plan and the holders of Administrative Convenience Claims who make the election are deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan. |

## E. Voting on the Plan

### 1. Who May Vote

The Plan divides Allowed Claims into Classes. Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which case the Class is conclusively deemed not to have accepted the Plan). A Class is impaired if the legal, equitable or contractual rights attaching to the Claims of the Class are modified, other than by curing defaults and

Disclosure Statement Dated as of April 30, 2019

M:\S-U\TRMC\PLEADINGS\WW-95 Chapter 9 Plan\DS.052219.nam.docx

reinstating maturities.

Under the Plan, Administrative Claims are unclassified and are not entitled to vote. Classes 1, 2, 3, 5, 6, 7, 9 and 10 are not impaired and are therefore conclusively presumed to have accepted the Plan pursuant to Section 1126(f) and are not entitled to vote under the Plan. Accordingly, only Classes 4 and 8 are impaired and entitled to vote to accept or reject the Plan. Only those votes cast by holders of Allowed Claims shall be counted to determine whether a sufficient number of acceptances have been received to obtain Confirmation of the Plan.

**2.      How to Vote**

All votes to accept or to reject the Plan must be cast by using the appropriate form of Ballot. Each voting class has its own form of ballot. No votes other than ones using such Ballots will be counted unless otherwise ordered. A form of Ballot is being provided to Creditors in Classes 4 and 8 and  by which Creditors in such Classes may vote their acceptance or rejection of the Plan. The Ballot gives holders of impaired Claims a simple choice to make with respect to the Plan – whether to vote for or against the Plan.

Any Ballot which is executed by a holder of an Allowed Claim but which does not indicate an acceptance or rejection of the Plan shall be deemed to be an acceptance of the Plan.

To vote on the Plan, you must complete the Ballot, as indicated thereon, by indicating on the Ballot for your class that you (a) accept the Plan or (b) reject the Plan, and by signing your name and returning by the deadline the Ballot to W2LG as to Class 8 and Epiq Corporate Restructuring, LLC as to Class 4 who will act as the balloting agents for the Debtor.[9]

---

[9] The Ballots for Class 4 will be sent to Epiq Corporate Restructuring, LLC pursuant to the Solicitation Procedures Order.  Class 8 creditors will send their ballots to Walter Wilhelm Law Group, as will eligible Class 8 Creditors who affirmatively elect treatment in Class 10 .

1    IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND

2    RECEIVED BY MAIL BY THE DEADLINE As directed by the solicitation materials as

3    shown on the face of the Ballot.

4         If your ballot is not properly completed, signed and received as described, it will

5    not be counted.  If your ballot is damaged or lost, you may request a replacement by

6    making a request to the address shown above, or by calling Nicole Medina at (559) 490-

7    0707 or by emailing her at nmedina@W2LG.com.

8         **F.  Confirmation of the Plan**

9         **1.     Generally**

10        "Confirmation" is the technical term for the Bankruptcy Court's approval of a plan

11   of adjustment.

12        **2.     Objections to Confirmation**

13        Objections to Confirmation of the Plan must be in writing, must conform to

14   Bankruptcy Rule 3007, and must be filed with the Bankruptcy Court and served on the

15   required parties on or before the date set forth in the notice of the Confirmation Hearing.

16        **3.     Hearing on Confirmation**

17        The Bankruptcy Court has set a hearing (the "Confirmation Hearing") to

18   determine whether the Plan has been accepted by the requisite number of Creditors

19   and whether the other requirements for confirmation of the Plan have been satisfied.

20   The Confirmation Hearing will be held at 2500 Tulare Street, Fresno, California,

21   Courtroom 13, before the Honorable René Lastreto II, United States Bankruptcy Judge.

22   The Confirmation Hearing may be continued from time to time and day to day without

23   further notice.  If the court confirms the Plan, it will enter the Confirmation Order and

24   Notice of Confirmation will be given.

25   ///

26   ///

27   ///

28

# III.

# HISTORY AND ACTIVITIES OF THE DEBTOR

### A. Overview of the Debtor

#### 1.    Health Care District

The District is a municipal corporation and healthcare district formed in 1948 and organized under the California Constitution. Its governing body is a five-member elected Board. The current members of the Board are Kevin B. Northcraft, Mike Jamaica, Senovia Gutierrez, Stephen Harrell and Xavier Avila.

The District encompasses a very large area in the Southwestern part of Tulare County and includes the City of Tulare. The permanent resident population of the District is estimated to be approximately 70,000+ persons. The District provides healthcare services primarily to individuals who reside in the local area. The District's hospital is leased to AH Tulare and is the only hospital in the District.

The fact that the Board is elected by the public creates both problems and opportunities that are generally associated with local government entities. The District's governing body and management undergo much closer public scrutiny and must devote more time to public affairs than would be the case if it were a private entity. On the other hand, as a local public entity, local residents tend to be supportive of the District.

The Board oversees operations conducted by management. Since October 2017, day-to-day District operations have been conducted by the District's crisis management team, consisting of Richard Gianello, Daniel Heckathorne, Sanford Haskins and Teresa Jacques of Wipfli/HFS. The current Chief Executive Officer is Sandra Ormonde.

Since August 2017 the District has been represented by McCormick Barstow as District Counsel, principally by Todd Wynkoop, Benjamin Nicholson, and Jason Howard.

---

From May 2014 until November 22, 2017, day-to-day operations and finances of the District were under the control of Healthcare Conglomerate Associates, LLC ("HCCA") under various agreements. There were serious, major disputes between TRMC and HCCA, discussed below.

Like most rural hospital districts in California, the District faces immense financial pressures. Payment reductions by federal and state governments and insurance programs, and increased regulatory requirements have substantially negatively changed the hospital operating environment.

Additionally, very large payables mounted during the prior administration and there was very considerable deferred maintenance of facilities and systems and all reserves were depleted.

### 2. Matters Leading up to Filing Chapter 9

The District has contended with significant disruptions in its finances and governance over many years. A brief chronology that explains this political unrest and which lead to governance and management turnover is as follows:

- 1994: Pamod Kumar, M.D. is appointed to the Board of Directors of TRMC. He soon becomes the president.

- November 2005: Voters approve a bond measure to build a tower alongside the existing hospital.

- 2005 – 2010: Tower planning expands and the cost of the project exceeds original projections while hospital revenues decline.

- May 2010: Tower construction finally breaks ground and the CEO at the time tries to speed up the construction project. Construction disputes and suits erupt.

- January 2014: The then elected Board votes to enter into a series of agreements with Healthcare Conglomerate Associates ("HCCA") and turned over pretty much total control over the District's functions and finances. This was a 15 year agreement which the District views as being unfavorable.

- By November 2015 unpaid vendor invoices began to mound up. This continued through 2017 with a large number of lawsuits being filed by vendors, suppliers and contractors. .

- In January 2016 HCCA terminated the Agreement with the Medical Executive Committee ("MEC"). Revenues dropped and referrals declined. The MEC thereafter sued the District.

- Throughout 2016 community agitation for and against HCCA boiled over. During this time voters turned down a proposed bond measure to secure financing to complete the Tower. During this time management represented that there had been 30 months of consecutive profits. At the same time creditors were clamoring for payment.

- In November 2016 The community faction opposed to HCCA succeeded in electing Kevin Northcraft and Mike Jamaica as directors.

- In May 2017 doctor Parmod Kumar was recalled as a director and Senovia Gutierrez was thereafter elected in his place. She was seated on July 27, 2017. At this point a majority of the directors are opposed to management. From May until September 2017 there were strenuous disagreements between the Board and HCCA. There was significant legal wrangling over the election of Senovia Gutierrez.

- In September 2017 the government issues and disputes with management lead to a credit rating downgrade. In September 2017 HCCA asserts that it is owed $8,000,000. On September 28, 2017 management is unable to make payroll and threatens to shut down the hospital.

- On September 29, 2017 the District Board unanimously votes to seek Chapter 9 bankruptcy protection.

- On September 30, 2017 a petition for relief under Chapter 9 was filed.

- In October, 2017 Xavier Avila is appointed to the Board.

- In October, 2017 the District files its motion to reject the contracts with HCCA.

- On November 1, 2017 the Court grants the rejection motion but allows HCCA to remain in control of finances until November 27, 2017.

- In November 2017 Stephen Harrell is appointed to the Board.

- On November 27, 2017 the District regains "control" but there is virtually no available cash.

- See below for post November 27, 2017 events.

### 3.     The District's Governance

As discussed above, the District is governed by a five-member Board of Directors comprised of persons elected by registered voters of the District in accordance with the

1  Local Health Care District Law under Sections 32000 *et seq*. of the California Health
2  and Safety Code.

### 4. Financing and Classified Indebtedness

4       TRMC is obligated on certain bond indebtedness.

5       General Obligation Bonds, Election of 2005, Series A (2007) interest at 4.0% to
6  5.0% due semi-annually; principal due in annual amounts ranging from $15,000.00 on
7  August 1, 2012 to $2 million due on August 1, 2037; collateralized by ad valorem tax
8  revenues. (Class 1). The current amount owed is 14,530,000. These bonds are current.

9       General Obligation Bonds, Election of 2005, Series B-1 (2009); interest at 3.75%
10  to 6.0% due semi-annually; principal due in annual amounts ranging from $100,000.00
11  on August 1, 2014 to $2,005,000 due on August 1, 2026; collateralized by ad valorem tax
12  revenues. (Class 2). The current amount owed is $7,945,000. These bonds are current.

13       General Obligation Bonds, Election of 2005, Series B-2 (2009); interest at 6.45%
14  to 8.0% due semi-annually; principal due in annual amounts ranging from $450,000.00
15  on August 1, 2017 to $7,240,000.00 due on August 1, 2039; collateralized by ad valorem
16  tax revenues. (Class 3). The current amount owed is $60,380,000. These bonds are
17  current. B-1 and B-2 bond payments are remitted to bond holders by the Tulare County
18  Tax Collector.

19       Series 2007 Refunding Revenue Bonds: Interest at 3.75% to 5.2% due semi-
20  annually; principal due in annual amounts ranging from $405,000.00 due on November
21  1, 2008 to $1,210,000.00 due on November 1, 2032; collateralized by District revenues.
22  (Class 4). Payments on the Revenue Bonds were not current as of the date of this
23  Disclosure Statement, but are being reinstated pursuant to prior Court orders and the
24  Plan. The current amount owed on the revenue bonds is $13,650,000 and the required
25  reserve must be replenished to $705,000 as required by the indenture. Exhibit A discloses
26  timing of the amounts being paid to replenish the revenue bond reserve over a two year
27  period.

28

1    Adventist Health (Class 5) is owed approximately $3,300,000. As described

2  below, Adventist Health made a loan to the District in the amount of almost $10

3  million.  This line of credit has been reduced to approximately $3.3 million due to

4  purchases of equipment and supplies by AH Tulare.  Pursuant to the terms of the orders

5  entered on August 3, 2018 and August 7, 2018, the obligation owed to Adventist Health

6  will be repaid over a period of time by set offs against rents owed by AH Tulare to the

7  Debtor.[10]  Class 5 is current and unimpaired.

8    City of Tulare (Class 6)  is (or will be) owed $9,000,000.  By an Order dated

9  February 22, 2019, the Debtor was authorized to borrow $9 million from the City of

10  Tulare.  The loan is collateralized by a deed of trust on the Evolutions facility.  The loan

11  bears interest at 6.0%.   For the first 36 months the loan is interest only.  For the

12  remaining 24 months there will be payments of principal and interest. This claim is

13  current and unimpaired. Class 6 will be paid by 60 months from February 22, 2019 and

14  possibly earlier if the District decides to sell real property encumbered by the Class 6

15  deed of trust.

16    The District believes there are no claims to be included in Class 7.

17    In Class 8 the Debtor has outstanding general unsecured obligations to vendors,

18  other trade creditors and the counter-parties to various agreements in the aggregate

19  amount of approximately $16,500,000 to $26,000,000.  A very limited amount of these

20  obligations may qualify as administrative expense claims (such as claims for goods

21  received by the Debtor within 20 days prior to the Petition Date under Section 503(b)(9)).

22  (Most claims arising after the Petition Date are not entitled to treatment as administrative

23  expense claims and are included in Class 8.)

24

25

26

27  [10] It should be noted that the District will need to re-borrow funds from Adventist Health to meet legal
requirements for facilities, capital expenditures and seismic requirements.  It is expected such advances

28  from the line of credit will be repaid within the originally agreed time frame. Such capital loans are
reflected on Exhibit A.

Disclosure Statement Dated as of April 30, 2019     -18-

Class 9 consists of various malpractice or tort claims being asserted against the District. All claims are covered by risk contracts and will be covered by BETA, except for "deductibles". These claims are not impaired.

Class 10 consists of allowed general unsecured claims of $5,000 or less otherwise included in Class 8 who make an election to accept 50% of the allowed claim payable on or before the Effective Date.

### 5. Primary Assets.

The District owns a 112 bed general acute Hospital facility, a fitness center known as Evolutions and an incomplete, unoccupied Tower. It also owns several nearby buildings that are or will be rented to lessees and three vacant lots. The general acute Hospital facility owned by the District and leased to AH Tulare is located at 869 Cherry Street in Tulare.

The Debtor owns the following real property:

    A.      The Hospital and adjacent administrative building and partially built (unoccupied) Tower. The Hospital is leased to AH Tulare for an interim term of 5.5 years with options to extend for a total of 30 years.

    B.      Evolutions is a health club owned by the Debtor and it is leased to EVO Management Company, LLC. This real property is valued at between $9,875,000 and $12,260,000 and is subject to the $9,000,000 loan owed to the City of Tulare. A four ± acre parcel is in escrow for $1,800,000 (net) and the sale is due to close by September 30, 2019. Closure of this sale is not certain.

    C.      The Debtor also owns 935-945 Gem Street, 591 E. Merritt Ave., 979 N. Gem Street, 890, 906 & 922 Cherry Street, 874 Cherry Street, 793, 795 and 799 North Cherry St., 1050 Cherry St., and a modular structure at 398 S. Church St., Earlimart, and three vacant lots.

As shown by Exhibits A and B, there is very substantial deferred maintenance of the real properties, especially the hospital campus. See the footnotes to Exhibit A as an example. Routine maintenance and repairs have been neglected for many years. As

such the Debtor must fix very expensive parking lots, roofs, chillers and computer systems among many items. The Debtor must also comply with expensive California seismic requirements and must comply with the provisions of the lease to AH Tulare.

### 6.    The Tower.

Prior to 2010, the voters of the District passed bond measures intending to fund the construction of a four story tower ("Tower") adjacent to the existing hospital facility. The funds were obtained and construction commenced but was repeatedly stalled by disputes and lawsuits. The District has expended over $135,000,000 million on the Tower and it is unusable and not complete. It is estimated that it will cost $50 million to $100 million to complete the Tower, bring it to code and put it to use.

### 7.    HCCA Dispute.

In or around May 2014, HCCA and the District entered into a contract involving four interrelated agreements consisting of a Management Services Agreement, Interim Joint Operating Agreement, Joint Operating Agreement and Option (together, the "HCCA Contract"). The HCCA Contract provided, *inter alia*, that HCCA was responsible for the management, employees daily operations, and financial accounts of the District.

Over time, the relationship between the District and HCCA bitterly soured as questions and issues surfaced concerning performance of the contractual obligations. On September 15, 2017, HCCA filed a lawsuit against the District in Los Angeles County Superior Court alleging claims for breach of contract and declaratory relief (the "HCCA Lawsuit"). The HCCA Lawsuit alleged, *inter alia*, that the District owed HCCA the principal amount of $7 million for loans HCCA claimed to have been advanced to the District.

Post-Petition, on January 23, 2018, the District filed an Adversary Proceeding against HCCA contending, *inter alia*, that the Deed of Trust recorded by HCCA and any lien created by the recordation of the Deed of Trust was avoidable and sought declaratory relief. This litigation was brutal, intense and expensive. In August 2018, the District and HCCA reached a financial arrangement by which HCCA reconveyed all of

1　its liens and released $17,000,000 ± of claims asserted against the District. The

2　resolution of this dispute allowed the District to borrow against its real property to make

3　it possible to file the Plan.

4　　　　　**B. The Filing of the Chapter 9 Case**

5　　　　　The Debtor filed its petition under Chapter 9 on September 30, 2017. On

6　November 22, 2017, the Bankruptcy Court entered its order establishing a deadline of

7　January 11, 2018, for any party in interest to object to the eligibility of the District to be a

8　debtor under Chapter 9. There was no objection. The Order for Relief was entered on

9　January 26, 2018. Following compliance with court orders and publication, the claims

10　bar date set as April 10, 2018.

11　　　　　The Order authorizing the rejection of the agreements with HCCA was entered

12　on November 1, 2017, but the effective date of the rejection was delayed leaving HCCA

13　in control of finances until November 27, 2017. During the gap period a large amount of

14　payables accrued.

15　　　　　**C. No Creditors' Committee**

16　　　　　A Creditor's Committee was appointed on February 26, 2018 but was thereafter

17　disbanded by an Order entered June 18, 2018.

18　　　　　**D. Patient Care Ombudsman**

19　　　　　On October 25, 2017, the Bankruptcy Court entered its *Order for Appointment of*

20　*Health Care Ombudsman* providing for the appointment of a patient care ombudsman

21　(PCO) for the Debtor. Consequently, on December 18, 2017, the U.S. Trustee's Office

22　appointed a PCO in the Chapter 9 Case. The PCO thereafter resigned on February 23,

23　2018.

24　　　　　**E. Funding Operations**

25　　　　　From and after the Petition Date the Debtor has scrambled to accumulate

26　funding for its limited operations utilizing a variety of sources including excess ad

27　valorem tax revenues, accounts, lease revenues and governmental transfers. After the

28

1 hospital was reopened the District also utilized funds borrowed from Adventist Health
2 and the City of Tulare as discussed above.

3      **F. Bar Date for Filing Proofs of Claim**

4      On October 27, 2017, using information provided by prior management as the
5 District did not have its own creditor list, the Debtor filed a *List of Creditors* with the
6 Bankruptcy Court, which was later amended, which set forth, *inter alia*, the creditors
7 holding claims against the Debtor based on HCCA's books and records. Many of the
8 claims listed in the *List of Creditors* were identified by the Debtor as contingent or
9 unliquidated and scheduled as disputed, $-0- or "unknown". Pursuant to an Order
10 entered on January 26, 2018, the Court established April 10, 2018 (the "Bar Date"), as
11 the deadline for filing Proofs of Claim. As of April 11, 2019, 259 Creditors had filed
12 Proofs of Claim with the Bankruptcy Court.[11]

13      **G. Other Postpetition Matters**

14      Subsequent to the Petition Date, the Debtor directed substantially all of its efforts
15 towards streamlining operations, getting the license reinstated, reopening the hospital,
16 reducing costs, re-negotiating contracts and leases and resolving certain litigation
17 disputes. Some of these activities are described in greater detail below but not
18 necessarily in chronological order.

19      **1. Stipulation with Navigant Cymetrix Corporation**

20      On November 1, 2017 the Court entered the *Order Approving Stipulation*
21 approving an arrangement between the Debtor and Navigant Cymetrix Corporation
22 whereby the Master Services Agreement was terminated and deemed rejected as of the
23 Petition Date and granting related relief.

24      **2. Stipulation with BETA Risk Management Authority**

25      Pursuant to the *Order Authorizing Assumption of Executory Contract Pursuant to*
26 *Stipulation (BETA Risk Management Authority)*, entered on January 26, 2018, the

27
28 [11] On February 1, 2019, the District obtained another claims bar date order relating to about 24 possible claimants that had been omitted from the List of Creditors.

1  District was authorized to assume certain casualty and liability, auto and D&O insurance

2  arrangements (collectively, the "BETA Agreements"), among the Debtor and BETA Risk

3  Management Authority and its affiliated entities ("BETA"). The District was authorized to

4  pay the amounts owed under the Agreements. There are no further Assumption

5  Obligations due from the District under the BETA Agreements and the District is current

6  with BETA.

### 3.  Stipulation with Phoenix Healthcare Systems

8  On January 26, 2018 the Court entered the Order Authorizing Assumption of

9  Executory Contract Pursuant to Stipulation with Phoenix Healthcare Systems in order to

10  preserve the Debtor's integrated information technology services.

### 4.  Adventist Health Transaction

12  On August 7, 2018 the Court entered the *Final Order Authorizing the Debtor to*

13  *Obtain Post-Petition Financing* [Docket No. 702] as part of an overall deal with AH

14  Tulare for the lease of the hospital facility and purchase of certain excess medical

15  equipment and supplies. Subsequent to the approval of this transaction the Debtor was

16  able to reinstate it's license and the hospital facility was able to re-open to the

17  community on October 15, 2018 under the management of AH Tulare. Effective March

18  15, 2019 a change of ownership was issued by the State of California and on March 15,

19  2019, AH Tulare resumed full operation and financial liability for all Hospital functions

20  pursuant to the lease.

21  By the Order of August 7, 2017 and subsequent agreements, and voter approval

22  on November 6, 2018, the District, AH Tulare and Adventist Health documented the

23  transaction ("Transaction") as follows:

24  The material points of the Transaction are: (1) AH Tulare's lease of the hospital

25  from the District; (2) AH Tulare's purchase of specified intangible property from the

26  District; (3) the District's engagement of AH Tulare to manage TRMC during an interim

27  period prior to commencement of the AH Tulare leasehold interest in the Hospital; and

28  (4) Adventist Health's extension to the District of a $10,000,000 line of credit. The

District, Adventist Health and AH Tulare memorialized the Transaction in the following documents:

1. Lease and Memorandum of Lease (collectively "Lease");
2. Agreement for Purchase and Sale of Assets ("APA");
3. Debtor in Possession Credit Agreement ("Credit Agreement")
4. Security Agreement and Chattel Mortgage (Security Agreement") (liens released);
5. Deed of Trust ("Deed") (reconveyed);
6. Interim Management Services Agreement ("MSA")

Lease:

The Lease has an initial term of 66 months with a 6 month fixturization period during which AH Tulare does not pay the District rent. In the first year of the Lease after the fixturization period, AH Tulare will pay the District $2,335,000 in rent on a triple net basis. As required by law, this rental rate is based on a fair market valuation conducted by Deloitte. The rental rate increases annually by the increase in CPI with a cap of 3% and a floor of 0%; the actual annual increase may be less than 3%. The Lease includes the Hospital and ancillary buildings on the hospital campus. It does not include the District's off-campus properties. Finally, the Lease requires the District to complete the unoccupied and incomplete Tower by the tenth year of the Lease, or allow AH Tulare to do so.[12] AH Tulare does not have any particular right to complete the tower if the District fails to do so within 10 years of execution of the lease but AH Tulare has a termination right. The Lease provides AH Tulare four five-year renewal options which are automatic unless AH Tulare elects not to have the term extended and a purchase option, subject to certain conditions including completion of the Tower and seismic compliance, at appraised market value that exceeds the then-outstanding amount of the bonds, and approval of the voters. The purchase option becomes effective when the District completes the Tower and the fair market value of the Tower exceeds all bond balances related to the Tower. District voters approved the Lease on November 6, 2018 with 89% of the electorate voting in favor of the Lease arrangement.

---

[12] The District has estimates of $50,000,000 to $100,000,000 to complete the Tower and make it useable.

The Lease became effective and rent commenced as of March 15, 2019 as a consequence of the change of ownership document issued by the California Department of Public Health.

APA:

Upon obtaining its own hospital license, AH Tulare purchased non-fixed assets required for operation of the Hospital pursuant to the Lease for approximately $6,158,611. After crediting the agreed prices, AH Tulare is currently owed approximately $3,300,000.

Credit Agreement, Security Agreement, and Deed of Trust:

Pursuant to the Credit Agreement, Adventist Health agreed to lend the District up to $10,000,000 on a line of credit for the District to use to "reopen" TRMC prior to the required vote on the Lease.  The District reopened TRMC on October 15, 2018.  As indicated above, the ballot measure on the Lease ("Measure H") passed on November 6, 2018 with an overwhelming majority.  The Credit Agreement and the Security Agreement provide for the District to repay Adventist Health on the line of credit through: (1) a principal reduction in an amount equal to the amount that AH Tulare must pay the District pursuant to the APA with (2) any remaining balance paid through a 100% rent offset for a period of one year, then (3) any remaining balance paid through a 50% rent offset.  The District secured the line of credit with its intangible assets and real property assets, including a second on Evolutions.  However, Adventist Health has since released its security interests in the District's real and personal property.  The Lease became effective as of March 15, 2019 after the State of California issued a change of ownership letter to AH Tulare.

### 5.    Compromise with HCCA

In August 2018, after bitter, intense, protracted, expensive litigation the District reached a financial arrangement with HCCA and its affiliates by which HCCA released all of its claims, liens and the disputed deed of trust on Evolutions. Approximately $17,000,000± in claims asserted by HCCA and affiliates were released, as were all

1  liens. This resolution allowed the District to borrow against its assets and to proceed to
2  seek confirmation of the Plan.

### 6. Medline.

4  MedLine was allowed an administrative expense claim based on Section
5  503(b)(9) and has an unsecured claim included in Class 8.

### 7. Celtic/MB Financial.

7  Celtic/MB Financial claimed to have ownership of substantially all of the District's
8  equipment by virtue of a disputed sale lease back transaction entered into by
9  HCCA. An adversary proceeding was filed by the District seeking to avoid this
10 transaction. Over time the matter was ultimately resolved by the District paying to Celtic
11 $500,000 and allowing it a $2,500,000 unsecured claim, which may be reduced by
12 sums Celtic claims against HCCA, which are subject to pending proceedings brought by
13 the District Attorney for the County of Tulare. Celtic released all claims of ownership of
14 the District's equipment and much of the equipment was sold to AH Tulare.

### 8. Tax Payer Suits.

16 There were three taxpayer lawsuits on file as of the petition date. These
17 generally related to what the District contended were improper and unauthorized uses
18 of District funds. These disputes were settled and the lawsuits will be dismissed.

### 9. Malpractice Suits.

20 On the petition date there were 14 pending malpractice or tort
21 lawsuits. Additional suits were filed post-petition. All of these lawsuits are covered by
22 insurance coverage agreements with BETA. At the time of this Disclosure Statement
23 there were fewer than 5 such lawsuits still pending. The District has a $100,000 per suit
24 "deductible".

### 10. CERNER.

26 Cerner Corporation and Cerner Health Services, Inc. (together, "Cerner") claim to
27 be entitled to in excess of $2.2 million as of the Petition Date on account of unpaid pre-
28 petition claims, and over $1,500,000 for services claimed after the petition was filed,

related to the services and intellectual property licensed from Cerner. The Debtor, AH Tulare and Cerner are working together to resolve certain of these claims and any remaining open issues between them, including the terms under which certain of the Cerner claims will be included in Class 8.

### 11. Audit.

In March 2019 the District was able to obtain an audited financial statements by JWT & Associates, LLP for years 2017 and 2018, thus bringing the District into compliance with the requirements imposed upon healthcare districts by the California Healthcare District Law.

Attached as Exhibit B is the audited financial statements for 2017 and 2018 prepared by JWT & Associates, certified public accountants and auditors. Exhibit B reveals the extent of the deferred maintenance of the District's facilities and systems. It also shows that the District's facilities are carried at cost, which is not reflective of the value of the partially constructed Tower, especially given the costs of making the Tower usable.

### 12. Kumar v. Betre.

On the Petition Date there was a pending appeal related to Kumar v. Betre, stemming from what the District contended were illegal uses of tax payer money. The District was not a party to the appeal but the District worked with the Appellee and Appellant to arrive at an overall resolution whereby the appeal and underlying State Court action were dismissed and one half of the appeal deposit was paid to Dr. Betre and the other half was paid to the District.

### 13. Settlement of MEC Dispute.

While under the administration of HCCA, the District unlawfully terminated the medical privileges of all physicians. This led to a dramatic decrease in patient census and resulting reduction in revenue. After the Chapter 9 petition was filed, the District reached an overall agreement with the Medical Executive Committee to settle the dispute.

### 14. First Source

Pre-petition First Source sued TRMC for non-payment of services. TRMC, then managed by HCCA and represented by Baker Hostetler, failed to adequately participate in the litigation and the U.S. District Court has found the District at fault. Thereafter, there was briefing on the issue of the entitlement to legal fees, That mater has been briefed and the parties are awaiting a decision. It is expected that the award against the District will be sizeable and included in Class 8.

### 15. District Attorney

The Tulare County District Attorney seized $932,000 from HCCA/Benzeevi on account of funds it claims to have traced back to being proceeds of moneys received from Celtic Bank. The District has disclaimed any interest in the seized funds. If the seized funds end up going to Celtic Bank there will be a significant reduction in the amount of the Celtic Bank Class 8 claim based on the settlement with Celtic.

### 16. Southern Inyo Healthcare District

HCCA was managing SIHCD and TRMC at the same time and caused transfers of money and equipment from TRMC to SIHCD. SIHCD filed its own Chapter 9 proceeding. TRMC has asserted a large claim against SIHCD and the claim has not been objected to and it still pending. SIHCD has asserted an "unknown" claim against TRMC. This dispute will be dealt with in the future.

### 17. Leases and Executory Contracts

In connection with the AH Tulare transaction described above, the Debtor has been authorized to lease its hospital facility and to assume and/or reject about 1,100 executory contracts and unexpired leases. As of the date of this Disclosure Statement many motions for rejection, assumption and/or assignment have been filed and approved by the Court. The Debtor continues to evaluate the remaining contracts that will be assumed, rejected or assigned.

### 18. Avoidance Claims.

The District has reviewed and evaluated possible adversary proceedings to

recover on account of avoidance claims. The District has identified approximately 50 - 70 of such claims. The District will soon commence making demands for payment of avoidance claims and will pursue recoveries.

### 19. Baker Hostetler and Former Director Claims.

The District has engaged the Law Office of Michael Lampe to commence a suit against Baker Hostetler, the Debtor's former counsel, and three former board members. The suit has been filed in the Tulare County Superior Court and is pending. The suit alleges malpractice, breach of contract, fraud and breach of fiduciary duty. The District expects it will take 14-18 months before trial and appeals could go for many months thereafter. The former directors named in this suit are Parmod Kumar, M.D., Linda Willoughby and Richard Torrez.

### 20. Seismic Compliance.

Pursuant to the California Health & Safety Code, the District must expend at least $1.5 million on seismic compliance by December 31, 2019. There are and will be significant ongoing expenditures to comply with the laws and rules.

### 21. EVO Management Company, LLC.

Shortly after the petition date the District entered into an agreement with Evo Management Company, LLC for the management of the Evolutions facility. By the lease arrangement Evo pays rent to the District. The District reserves the right to retake control over the Evolutions facility and operate it by itself or with another operator, and the right to sell the business and or the facility.

### 22. Deferred Maintenance.

The District has been short of funds for many years. Its facilities have fallen into serious disrepair. Seismic rules must be followed. Roofs will have to be fixed. Parking lots will need to be resurfaced. Chillers must be replaced and elevators will need to be upgraded. The list of deferred maintenance is extensive and the costs are extremely high.

23.     **City of Tulare**

As discussed above, on February 22, 2019 the District was authorized to borrow $9,000,000 from the City on favorable terms. This loan made it possible for the District to move forward to propose the Plan.

24.     **Projections.**

Attached as Exhibit A are the Debtor's projections prepared by Wipfli CPAs and consultants for the period of July 1, 2019 to June 30, 2029. The projections show that the Adventist Health Class 5 loan is to be fully paid by June 30, 2024.

Similarly, Exhibit A shows that the City of Tulare Class 6 loan is to be fully paid by December 31, 2024.

Once the Class 5 and Class 6 loans are paid the Debtor will then be in a position to make payments in the amounts shown above at page 7, beginning at line 16 into the Plan Fund for a period of 5 years from which pro rata payments will be made to Class 8 claimants with Allowed Claims.

## IV.

## PLAN OVERVIEW

A discussion of the principal provisions of the plan as they relate to the treatment of Classes of allowed claims is set forth below. The discussion of the Plan herein constitutes a summary only and should not be relied upon for voting purposes. You are urged to carefully read the proposed Plan to decide whether to accept or reject the Plan.

## V.

## ADMINISTRATIVE CLAIMS

A.  **General Treatment**

Administrative Claims are not placed into voting Classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code.

1   Each Administrative Claim shall, unless the holder of such Claim shall have

2   agreed to different treatment of such Claim, be paid in full in Cash on the latest of: (a)

3   the 5th Business Day following the Effective Date, or as soon thereafter as practicable;

4   (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as

5   practicable; (c) the 10th Business Day after such Claim is Allowed, or as soon thereafter

6   as practicable; and (d) such date as the holder of such Claim and the Debtor may

7   agree.

8   The Debtor as Disbursing Agent shall make Distributions to the holders of

9   Administrative Claims.

10   **B. <u>Administrative Claim Bar Date</u>**

11   All requests for allowance and payment of administrative expenses including only

12   unimpaired claims arising post-petition not entitled to priority as an administrative

13   expense of the Chapter 9 Case must be filed by the Administrative Claim Bar Date to be

14   set by order of the Court. The Administrative Claim Bar Date applies to any Claim (or

15   portion of a Claim) that has previously been filed (in a proof of claim) or listed as

16   undisputed (in the List of Creditors). To the extent any Creditor asserts that any portion

17   of its Claim (whether filed or listed) is entitled to priority under Section 503(b) and 901 of

18   the Bankruptcy Code or otherwise, that Creditor must file a timely separate request for

19   payment of such priority portion by the Administrative Claim Bar Date (unless such

20   amount has been previously Allowed by order of the Bankruptcy Court).

21   The Administrative Claim Bar Date does not apply to (a) Administrative Claims

22   previously Allowed by order of the Bankruptcy Court, or (b) administrative expenses that

23   have previously been paid by the Debtor, in whole or in part, in the ordinary course of

24   the Debtor's business.

25   Any Administrative Claim that must be filed by the Administrative Claim Bar Date

26   and is not timely filed shall be forever barred from asserting a Claim against the Debtor

27   or the Debtor or its property, voting on the Plan, and sharing in any distribution under

28

the Plan.  The definition of an Administrative Claim in Chapter 9 is very limited as compared to Chapter 11.

## C. Assumption Obligations and Rejection of Agreements

The District has already addressed hundreds of executory contracts. Orders assuming, rejecting and assigning are on record.

At least fifteen days prior to the Confirmation hearing the District will determine the treatment of any remaining executory contracts. Any such remaining executory contracts that are not assumed will be deemed rejected, except for Provider Agreements between the District, Medicare, Medi-Cal, Medicaid and the State of California.

## D. Payments for Services or Expenses in the Chapter 9 Case

All amounts to be paid by the Debtor for services and expenses in the Chapter 9 Case or incident to this Plan must be fully disclosed and reasonable pursuant to Section 943(b)(3) of the Bankruptcy Court.  Applications for ratification of all such fees will be filed on or before the Effective Date.  Most such fees have been paid in the ordinary course of business as is allowed in Chapter 9.

## VI.

## CLASSES 1 THROUGH 10

### A. Summary

In accordance with Section 1123(a)(1) of the Bankruptcy Code, all Claims of Creditors (except those Claims receiving the treatment set forth in Article II of the Plan) are placed in the Classes described below for all purposes, including voting on, confirmation of, and distribution under, the Plan:

### B. Classification of Claims Against the Debtor

The classification of Claims against the Debtor pursuant to the Plan is as follows:

| Class | Status | Voting Rights |
|---|---|---|
| Class 1 – Series A General Obligation Bonds Claims | Unimpaired | Not Entitled to Vote |

| Class | Status | Voting Rights |
|---|---|---|
| Class 2 -  Series B-1 General Obligation Bonds Claims | Unimpaired | Not Entitled to Vote |
| Class 3 –  Series B-2 General Obligation Bonds Claims | Unimpaired | Not Entitled to Vote |
| Class 4 –  All Revenue Bonds | Impaired | Entitled to Vote |
| Class 5 –  Adventist Health | Unimpaired | Not Entitled to Vote |
| Class 6 –  City of Tulare | Unimpaired | Not Entitled to Vote |
| Class 7 –  Miscellaneous Secured Claims | Unimpaired | Not Entitled to Vote |
| Class 8 –  Unsecured Claims | Impaired | Entitled to Vote |
| Class 9 –  Liability Claims | Unimpaired | Not Entitled to Vote |
| Class 10  Administrative Convenience Class | Unimpaired | Not Entitled to Vote |

## C. **Treatment of Claims Against the Debtor**

### 1. **Bonds.**

Class 1 Series A General Obligation Bonds Claims.  On the Effective Date, the Series A General Obligation Bonds Claims shall be Allowed in the amount of all then outstanding principal, accrued but unpaid interest on the Series A General Obligation Bonds, plus then existing and unpaid Paying Agent and Bond Insurer expenses (including professional fees) regarding the Series A General Obligation Bonds, and all Series A General Obligation Bonds Claims and related Bond Documents shall be Reinstated.  From and after the Effective Date, the Series A General Obligation Bonds shall continue to be paid in accordance with the applicable Bond Documents.  For the avoidance of doubt, all revenues pledged or otherwise used for payment of Series A General Obligation Bonds Claims shall remain special revenues as defined in Section 902 of the Bankruptcy Code, and the obligations of the Bond Insurer with respect to Series A General Obligation Bonds Claims shall remain in full force and effect on and after the Effective Date.  All Claims of the Paying Agent and Bond Insurer for fees, costs and expenses arising in connection with the Series A General Obligation Bonds shall be paid in full in Cash on presentment, or as otherwise agreed by the Paying Agent, Bond Insurer and District, as applicable. The District shall maintain the existing cash

management system used with respect to the collection of ad valorem taxes and subsidy payments and the distribution of payments to the Trustee/Paying Agent. Class 1 is unimpaired.

Class 2 Series B-1 General Obligation Bonds Claims. On the Effective Date, the Series B-1 General Obligation Bonds Claims shall be Allowed in the amount of all then outstanding principal, accrued but unpaid interest on the Series B-1 General Obligation Bonds, plus then existing and unpaid Paying Agent expenses (including professional fees) regarding the Series B-1 General Obligation Bonds, and all Series B-1 General Obligation Bonds Claims and related Bond Documents shall be Reinstated. From and after the Effective Date, the Series B-1 General Obligation Bonds shall continue to be paid in accordance with the applicable Bond Documents. For the avoidance of doubt, all revenues pledged or otherwise used for payment of Series B-1 General Obligation Bonds Claims shall remain special revenues as defined in Section 902 of the Bankruptcy Code. All Claims of the Paying Agent for fees, costs and expenses arising in connection with the Series A General Obligation Bonds shall be paid in full in Cash on presentment, or as otherwise agreed by the Paying Agent and District. The District shall maintain the existing cash management system used with respect to the collection of ad valorem taxes and subsidy payments and the distribution of payments to the Trustee/Paying Agent. Class 2 is unimpaired.

Class 3 Series B-2 General Obligation Bonds Claims. On the Effective Date, the Series B-2 General Obligation Bonds Claims shall be Allowed in the amount of all then outstanding principal, accrued but unpaid interest on the Series B-2 General Obligation Bonds, plus then existing and unpaid Paying Agent expenses (including professional fees) regarding the Series B-2 General Obligation Bonds, and all Series B-2 General Obligation Bonds Claims and related Bond Documents shall be Reinstated. From and after the Effective Date, the Series B-2 General Obligation Bonds shall continue to be paid in accordance with the applicable Bond Documents. For the avoidance of doubt, all revenues pledged or otherwise used for payment of Series B-2 General Obligation

1  Bonds Claims shall remain special revenues as defined in Section 902 of the

2  Bankruptcy Code and all subsidy payments from the United States Treasury with

3  respect to the Series B-2 General Obligation Bonds shall be applied to the Series B-2

4  General Obligation Bonds in accordance with the District's practices during the Chapter

5  9 Case, or as otherwise agreed by the Paying Agent and District. All Claims of the

6  Paying Agent for fees, costs and expenses arising in connection with the Series B-2

7  General Obligation Bonds shall be paid in full in Cash on presentment, or as otherwise

8  agreed by the Paying Agent and District. The District shall maintain the existing cash

9  management system used with respect to the collection of ad valorem taxes and

10  subsidy payments and the distribution of payments to the Trustee/Paying Agent. Class

11  3 is unimpaired.

12       Class 4 Revenue Bonds Claims. On the Effective Date and consistent with the

13  orders entered August 3 and 7, 2018 and February 22, 2019, the Revenue Bonds

14  Claims shall be Allowed in the amount of all then outstanding principal, accrued but

15  unpaid interest on the Revenue Bonds, plus then existing and unpaid Revenue Bonds

16  Trustee expenses (including professional fees), and all Revenue Bonds Claims and

17  related Bond Documents shall be Reinstated subject to the terms of this this Section

18  3.A. The Revenue Bond Supplement shall:

19       (a)    specify the terms for the District's return to compliance with the payment

20  schedule for the Revenue Bonds.

21       (b)    memorialize revisions made to the definitions of Revenues and Gross

22  Revenues under the related Bond Documents during the Chapter 9 Case to expressly

23  include District income from ad valorem taxes on real property, other District income

24  from taxes, proceeds thereof, and all District rights to receive the same, except to the

25  extent pledged to and necessary to pay District obligations on District general obligation

26  bonds in existence as of the Effective Date;

27

28

(c)    memorialize the District's agreements with the Trustee previously reached during the pendency of this Chapter 9 case to pledge additional real and personal property as collateral for the Revenue Bonds; and

(d)    otherwise ratify the District's obligations under the related Bond Documents.

From and after the Effective Date, the Revenue Bonds shall continue to be paid in accordance with the applicable Bond Documents, as modified by this Plan and the Revenue Bond Supplement. For the avoidance of doubt, all revenues pledged or otherwise used for payment of Revenue Bonds Claims shall remain special revenues as defined in Section 902 of the Bankruptcy Code. All claims of the Revenue Bonds Trustee for fees, costs and expenses arising in connection with the Revenue Bonds shall be paid in full in Cash on presentment, or as otherwise agreed by the Revenue Bonds Trustee and District. The District shall maintain the existing cash management system used with respect to the collection of ad valorem taxes and subsidy payments and the distribution of payments to the Trustee/Paying Agent. Class 4 is impaired and is entitled to vote to accept or reject this Plan in accordance with procedures approved by the Bankruptcy Court.

**2. Adventist Health.**

This Class 5 claim is unimpaired and will be paid in accordance with the terms of its Credit Agreement and the Orders dated August 3 and August 7, 2018.

**3. City of Tulare.**

This Class 6 claim is Unimpaired and it will be paid in accordance with its terms and the Order dated February 22, 2019.

**4. Miscellaneous Secured Claims.**

The Debtor is not currently aware of the existence of any miscellaneous Class 7 Secured Claims. To the extent any such claims are asserted and Allowed then, on or before the Effective Date of the Plan, the Debtor will select one of the following alternative treatments for each holder of an Allowed Secured Claim: (1) the Debtor will

leave unaltered the legal, equitable, and contractual rights constituting such Claim, including, without limitation, any Liens related thereto and, on the Effective Date, the Claim shall be reinstated and cured, (2) the Debtor will abandon or surrender to the holder of such Claim the property securing the Claim, in full satisfaction and release of such Claim, or (3) the Debtor will make a Cash payment equal to the amount of such Claim, or such lesser amount to which the holder of the Claim and the Debtor shall agree, in full satisfaction and release of the Claim.

### 5. Unsecured Claims.

Unsecured Claims are provided for in Class 8.

Each holder of an Allowed Unsecured Claim shall receive, in exchange for and in full and final satisfaction of such Claim, a Pro Rata share of the distributions to Class 8 from the Plan Fund.  The Debtor estimates that the aggregate amount of allowed Unsecured Claims will be approximately $16,500,000 to $26,000,000 million held by approximately 250± Class 8 Creditors.[13] The Debtor further estimates that the aggregate percentage distribution to the holders of an Allowed Unsecured Claim will be 19.2% to 30.3%, which is more than will be received if this Chapter 9 case is dismissed. Payment to Class 8 will commence in 2025. Pro rata Payments will be made semi-annually to Class 8 claimants with Allowed Claims for 5 years as described above.

### 6. Liability Claims

Each holder of a Liability Claim shall be paid from the proceeds of any applicable insurance policy or coverage agreement issued to or for the benefit of the District.  The District will honor any "deductible" from its operating revenues.  These amounts, to the extent determined to constitute a liability of the Debtor, would be payable under applicable insurance or coverage agreements (except any deductible).  These claims

---

[13] The Debtor recognizes that there is a significant variation between the low and high ends of the unsecured claims estimate.  Much of this is due to large disputed proofs of claim filed by governmental entities by which large overpayment claims are being asserted.  The Debtor has filed all necessary cost reports and believes that once these audits are completed, in 24-36 months, the overpayment claims will be eliminated and about $300,000 of escrowed funds will be released back to the Debtor.  Other reductions may be achieved through objections to claims and pending or to be filed litigation. Objections to these overpayment claims are on file or will soon be.

are provided for in Class 9.

**7.    Administrative Convenience Claims.**

Class 10 is a subclass of Class 8 and is comprised of Administrative Convenience Class Claims, which are defined in the Plan as Allowed Claims that are for $5,000 or less whose holders irrevocably elect to be reduced to 50% of the allowed amount as evidenced on the Ballot submitted by such holder. Under the Plan, on the Effective Date, each holder of an Allowed Administrative Convenience Class Claim who opts into Class 10 will be paid said amount in complete settlement of such claim.  The Class 10 Claims are not impaired. The following Class 8 claimants are eligible to opt into to Class 10.

| Name | Filed Amt. |
|---|---|
| Chemsci Technologies, Inc. | $ 4,860.00 |
| Tri-Anim Health Services Inc | $ 4,722.96 |
| Will Tiesiera Ford | $ 4,450.04 |
| Res Com Pest Control | $ 4,423.00 |
| Shred−It Usa Llc | $ 4,349.51 |
| Freedom Medical, Inc. | $ 4,103.44 |
| Bayer Healthcare | $ 3,890.52 |
| Cummins West Inc. | $ 3,881.44 |
| Alimed Inc | $ 3,825.94 |
| Language Line Services | $ 3,740.07 |
| Leaf Capital Funding | $ 3,705.52 |
| GE Healthcare Life Sciences | $ 3,583.27 |
| Baxter Healthcare Corp | $ 3,515.53 |
| HD Supply Facilities Maintenance Ltd | $ 3,375.11 |
| Stryker Instruments | $ 3,170.43 |
| Sigma-Aldrich / Supelco | $ 3,013.68 |
| Allied Reliability Inc. | $ 2,950.00 |
| Kerma Medical Products, Inc. | $ 2,938.27 |
| Iron Mountain | $ 2,718.51 |
| Sumwalt, Todd | $ 2,605.00 |
| Src. Medical | $ 2,509.89 |
| A&M Compressors | $ 2,479.27 |
| Agilent Technologies, Inc | $ 2,445.99 |
| Lifenet Health | $ 2,415.00 |
| Aetna | $ 2,033.42 |
| Rotoco Inc., Dba Roto-Rooter | $ 1,825.00 |
| Mobile Mini, Llc | $ 1,816.24 |
| Trackstar Printing, Inc. | $ 1,718.79 |

| Name | Filed Amt. |
|---|---|
| Todd Mackey | $ 1,320.00 |
| Leticia York, Slp | $ 1,260.00 |
| Maine Standards Company, Llc | $ 1,102.96 |
| Memories Unlimited | $ 1,000.83 |
| Morris Levin & Son | $ 982.01 |
| Federal Insurance Company | $ 971.00 |
| J's Communications, Inc. | $ 914.10 |
| Tech-Time Communications, Inc. | $ 875.00 |
| AT&T Corp. | $ 828.73 |
| Pacific Bell Telephone Company | $ 796.43 |
| AT&T Mobility | $ 758.77 |
| Marketlab Inc | $ 738.71 |
| Henry Schein, Inc. | $ 730.25 |
| Av Now, Inc. | $ 658.97 |
| Landauer Inc | $ 642.09 |
| Mimedx Group Inc. | $ 627.00 |
| Ansell Sandel Medical Solutions, Llc | $ 561.04 |
| Axces Industrial Supply | $ 521.51 |
| Mobile Modular Management Corp | $ 509.98 |
| Abbott Nutrition | $ 454.07 |
| El Sohly Laboratories, Inc. | $ 453.20 |
| American Academy Of Pediatrics | $ 413.58 |
| Green Box Rentals, Inc | $ 351.80 |
| Identicard Systems | $ 270.63 |
| Uline | $ 217.41 |
| AT&T Long Distance, LLC | $ 170.41 |
| Instant Storage | $ 164.63 |
| Your Water Birth | $ 105.00 |
| Helmer Scientific | $ 79.83 |
| Seton Identification Products | $ 56.65 |
| **Total** | **$ 109,632.43** |

### D.   Risk Factors.

There are risks associated with the **Debtor's** ability to perform the Plan including:

- Ad valorem tax revenues may decline.
- Cost and expenses of maintaining District properties may be greater than projected.
- Lessors of real property may default on payments of rent.
- AH Tulare may not continue to lease the Hospital.
- Malpractice awards could exceed coverage.

- Rent revenues may not be achieved.
- Anticipated sales of assets may fail.
- Recoveries in litigation and avoidance claims may not be achieved.
- Additional costly seismic and other regulations may be imposed on the District.
- Government laws and rules may result in decreased funding.
- California and federal laws may impose much greater expenses on healthcare districts.
- Claims may exceed the high end estimate.

## VII.

### ACCEPTANCE OR REJECTION OF THE PLAN

#### A. Voting Classes

Each holder of an Allowed Claim in Classes 4 and 8 is entitled to vote either to accept or to reject the Plan. Only those votes cast by holders of Allowed Claims shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation.

#### B. Acceptance by Impaired Classes

An impaired Class of Claims shall have accepted the Plan if (a) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any holder designated under Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

#### C. Presumed Acceptance/Rejection of Plan

Classes 1, 2, 3, 5, 6, 7, 9 and 10 are unimpaired and the holders of Claims in such Class are therefore deemed to accept the Plan and are not entitled to vote.

#### D. Nonconsensual Confirmation

In the event that any impaired Class of Claims does not accept the Plan in accordance with Sections 1126 and 1129(a)(8) of the Bankruptcy Code, the Debtor hereby reserves the right to (i) request that the Bankruptcy Court confirm the Plan in accordance with Section 1129(b) of the Bankruptcy Code on the basis that the Plan is

fair and equitable as to the holders of Claims in any such Class, or (ii) amend or modify the Plan in accordance with its terms or as otherwise permitted.

### E. How to Vote

A form of Ballot is being provided to Creditors in Classes 4 and 8  pursuant to which Creditors in such Classes may vote their acceptance or rejection of the Plan.  In order to vote on the Plan, a Creditor should complete the Ballot, as indicated thereon, and return the Ballot as instructed on the Ballot.

### VIII.
### IMPLEMENTATION OF THE PLAN

The Plan shall be implemented on the Effective Date.  In addition to the provisions set forth elsewhere in this Plan regarding means of execution, the following shall constitute the principal means for the implementation of the Plan.

### A. Retention of Property.

Upon the Effective Date, the Debtor shall be vested with all right, title and interest in all of the assets of the Debtor for the purposes set forth in this Plan.

### B. Post-Confirmation Operations.

#### 1.   Continued Business.

On and after the Effective Date, the Debtor shall continue to operate pursuant to the District Law and other applicable law.  The Debtor will continue to own and maintain the Hospital and will monitor the lease of the Hospital, own, maintain and operate its other assets, provide healthcare services and programs, and may use, acquire and dispose of its assets without supervision by the Bankruptcy Court and free of any restrictions under the Bankruptcy Code.

#### 2.   Payment of Expenses.

The expenses incurred by the Debtor on and after the Effective Date (including the fees and costs of attorneys and other professionals), may be paid in the ordinary

course of its affairs without further notice to Creditors or approval of the Bankruptcy Court.

### 3.　Governance.

On and after the Effective Date, the management, control and operation of the Debtor shall continue to be the general responsibility of the District Governing Body. The members of the District Governing Body shall serve in accordance with applicable non-bankruptcy law.

### 4.　Plan Fund.

On the Effective Date, the Debtor shall establish the Plan Fund for purposes of making Distributions to Class 8 under the Plan. The Debtor will deposit into the Plan Fund sufficient funds to make the semi-annual distributions to Class 8 as provided in the Plan. The Plan Fund shall secure the payment of the obligations of the Debtor to Class 8 as provided in the Plan.  The Confirmation Order shall appoint the Debtor as the Disbursing Agent under the Plan for the purposes set forth in Section 944(b)(2) of the Bankruptcy Code.

### C.　Retained Claims and Defenses.

### 1.　Retention.

None of the Retained Claims or Defenses shall be precluded, barred or subject to estoppel or laches because the Plan or the Disclosure Statement does not specifically identify a Retained Claim or Defense or the entity against whom a Retained Claim or Defense may be asserted.  **Parties in interest, including Creditors, may not rely on the absence of a reference in the Disclosure Statement or the Plan as any indication that the Debtor will not pursue any available Retained Claims and Defenses against such parties**.  The Bankruptcy Court shall retain jurisdiction to determine any Retained Claims or Defenses.  Following the Effective Date, the Debtor may pursue, litigate, negotiate, mediate, compromise or dispose of the Retained Claims and Defenses, including avoidance claims, without further notice to Creditors or authorization of the Bankruptcy Court.

1  **2.  Investigation and Enforcement.**

2  Pursuant to Section 901 and 1123(b)(3) of the Bankruptcy Code, the Debtor shall

3  have and may enforce all lawful powers and authority under the Bankruptcy Code to the

4  extent of and consistent with its authority under the Plan.  The Debtor may investigate

5  Retained Claims and Defenses and may assert, settle, adjust or enforce any such

6  claims or defenses without further court approval.

7  **3.  Preference Actions Not Waived.**

8  The statute of limitation for the Debtor to commence actions to recover

9  preferential transfers under Section 547 of the Bankruptcy Code will expire on January

10  27, 2020, which is two years after entry of the Order for Relief.  The Debtor has

11  reviewed potential Preference Actions under Section 547 of the Bankruptcy Code

12  against Creditors that received payments within the 90 and 365 days preceding the

13  Petition Date and determined that the pursuit of such actions will be cost effective and

14  all rights to pursue all preference or other avoidance actions are preserved.

15  **D. Distributions.**

16  **1.  Reserves for Disputed Claims.**

17  On the Effective Date, and from time to time thereafter, the Debtor will establish

18  adequate and prudent reserves in an amount that is sufficient to make the payments

19  required under the Plan to the holders of Disputed Claims against the Debtor,

20  as and when such claims may be Allowed, amended, settled or withdrawn.  The funds

21  reserved on account of Disputed Claims will not be distributed but will be retained by the

22  Disbursing Agent in accordance with this Plan pending resolution of such Disputed

23  Claims.  No holder of a Disputed Claim shall have any Claim against the reserve with

24  respect to such Claim until such Disputed Claim shall become an Allowed Claim.

25  **2.  Full and Final Satisfaction.**

26  Upon the Effective Date, the Debtor as the Disbursing Agent shall be authorized

27  and directed to distribute the amounts required under the Plan according to the

28  provisions of the Plan.  Upon the Effective Date, all Debts of the Debtor shall be

deemed fixed and adjusted pursuant to this Plan and the Debtor shall have no further liability on account of any Claims except as set forth in this Plan.

### 3.     No Post-Petition Interest.

For purposes of computing distributions under the Plan, unless specifically allowed by the Plan or order confirming the Plan no Claim shall include any interest, penalty, premium or late charge accruing on such claim from and after the Petition Date, other than as permitted pursuant to Section 506(b) of the Bankruptcy Code or by a Final Order of the Bankruptcy Court.

### 4.     Distribution Procedures.

Except as otherwise agreed by the holder of a particular Claim, or as provided in this Plan, all amounts to be paid by the Debtor under the Plan shall be distributed in such amounts and at such times as is provided for by the Plan.  The Debtor shall file all objections to Disputed Claims on or before ninety (90) days of the Effective Date, unless the Bankruptcy Court, for cause shown, extends such deadline.

### 5.     Disputed Claims.

The Debtor shall be authorized to settle, or withdraw any objections to, any Disputed Claims following the Confirmation Date without further notice to Creditors or authorization of the Bankruptcy Court, in which event such Claim shall be deemed to be an Allowed Claim in the amount compromised for purposes of this Plan.

### 6.     Unclaimed Distributions.

Any entity which fails to claim any Cash within ninety (90) days from the date upon which a Distribution is first made to such entity shall forfeit all rights to such Distribution under the Plan.  Pursuant to Section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Debtor.  Upon forfeiture, the claim of any Creditor with respect to such cash shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary, and

such Creditor shall have no claim on account of such cash whatsoever against the Debtor.

### 7. Setoff.

Nothing contained in this Plan shall constitute a waiver or release by the Debtor of any right of setoff or recoupment the Debtor may have against any Creditor. The Debtor may, but is not required to, set off or recoup against any Claim and the payments or other distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Debtor may have against the holder of such Claim.

### 8. Taxes.

The Disbursing Agent shall be entitled to deduct any federal, state or local withholding taxes from Distributions. The Disbursing Agent shall be authorized to take all actions necessary to comply with applicable withholding and reporting requirements. Notwithstanding any other provision of this Plan, each holder of an Allowed Claim that receives a Distribution shall have responsibility for the satisfaction or payment of any tax obligation imposed by any governmental unit, including income, withholding and other tax obligation on account of such Distribution.

### 9. De Minimis Distributions.

If any interim distribution under the Plan to the holder of an Allowed Claim (other than Class 10) would be less than $50.00, the distribution may be withheld until a final distribution is made to such holder. If any final distribution under the Plan to the holder of an Allowed Claim would be less than $50.00, the distribution may be cancelled. Any unclaimed distributions shall be treated as unclaimed property under the Plan.

### E. **Power and Authority of the Disbursing Agent**

The Debtor may employ or contract with other entities to perform the obligations created under the Plan and such entities shall receive reasonable compensation for services rendered and reimbursement for expenses incurred in connection with the Plan or any functions or responsibilities adopted under the Plan which amounts may be paid

without further notice to Creditors or approval of the Bankruptcy Court. The Debtor shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all distributions contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested by order of the Bankruptcy Court, pursuant to the Plan, or deemed to be necessary and proper to implement the provisions hereof.  To the extent that the Debtor acts as the Disbursing Agent, the Debtor shall not receive a fee for such services, although the Debtor may employ and pay persons or entities salaries, wages or ordinary compensation for services performed.

## IX.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption.

The Plan provides the Debtor will assume only the executory contracts and unexpired leases of the Debtor that (i) have otherwise been assumed by a prior order of the Bankruptcy Court, or (ii) are the subject of a pending motion to assume as of the Confirmation Date. All other remaining such agreements will be deemed rejected, except for Provider Agreements between the District, Medicare, Medi-Cal, Medicaid and the State of California .

### B. Rejection.

On the Effective Date, unless previously ordered or subject to a then pending motion to assume or reject, pursuant to Section 1123(b)(2) of the Bankruptcy Code, the Debtor will reject all remaining executory contracts that have not been previously assumed or rejected (together with any additions, deletions, modifications or other revisions to such Exhibits as may be made by the Debtor prior to the Confirmation Date).  Each such executory contract and unexpired lease shall include any modifications, amendments and supplements to such agreement. Any Person asserting any Claim for damages arising from the rejection of an executory contract or unexpired

1　lease of the Debtor under this Plan shall file such Claim on or before the Rejection

2　Claim Bar Date (unless governed by an earlier Order), or be forever barred from (i)

3　asserting such Claim against the Debtor, the Debtor or any property of the Debtor, and

4　(ii) sharing in any distribution under the Plan.

5　　　　　　　　**C. Assumption Obligations.**

6　　　　　　Any Person that fails to object to the assumption by the Debtor of an executory

7　contract or unexpired lease on or prior to the deadline set or previously set by the

8　Bankruptcy Court for filing objections to Confirmation of the Plan shall be forever barred

9　from (i) asserting any other, additional, or different amount on account of such

10　obligations against the Debtor or the Debtor, and (ii) sharing in any other, additional or

11　different distribution under the Plan on account of such obligations. If and to the extent

12　any Assumption Obligation is determined and allowed by the Bankruptcy Court, the

13　Debtor shall satisfy such cure Assumption Obligation by making a Cash payment in the

14　manner provided for Administrative Claims under Article II of the Plan.

15　　　　　　　　**D. Effect of Confirmation Order.**

16　　　　　　The Confirmation Order shall constitute an order of the Bankruptcy Court

17　approving, as of the Effective Date, the assumption or rejection by the Debtor pursuant

18　to Sections 365(a), 901 and 1123(b)(2) of the Bankruptcy Code of all executory

19　contracts and unexpired leases identified under Article VI of the Plan. The contracts

20　and leases identified in the Plan will be assumed or rejected, respectively, only to the

21　extent that such contracts or leases constitute pre-petition executory contracts or

22　unexpired leases of the Debtor, and the identification of such agreements under the

23　Plan does not constitute an admission with respect to the characterization of such

24　agreements or the existence of any unperformed obligations, defaults, or damages

25　thereunder. The Plan does not affect any executory contracts or unexpired leases that

26　(a) have been previously assumed, rejected or terminated prior to the Confirmation

27　Date, (b) are the subject of a pending motion to assume, reject or terminate as of the

28　Confirmation Date, or (c) are not identified for assumption or rejection in the Plan.

1     **E.  Insurance/Coverage Agreement.**

2          Any insurance policy or coverage agreement issued to or for the benefit of the

3   Debtor (or any member of the District Governing Body or other Agent of the Debtor)

4   before or after the Petition Date shall remain in full force and effect after the Effective

5   Date according to its terms, including agreements with BETA

6     **F.  Indentures.**

7          The General Obligation and Revenue Bond Indentures relating to Classes 1 to 4

8   shall remain in full force and effect after the Effective Date according to their respective

9   terms.

10                                    **X.**

11                        **CONDITIONS PRECEDENT**

12     **A.  Conditions to Confirmation.**

13         The following is a condition to the confirmation of the Plan:  the Confirmation

14   Order shall have been entered and shall be in a form and substance reasonably

15   acceptable to the Debtor.

16     **B.  Conditions to Effectiveness.**

17         The following are conditions to the occurrence of the Effective Date: (1) the

18   Confirmation Date shall have occurred; (2) the Confirmation Order must be reasonably

19   acceptable and approved by the Bond Insurer and Paying Agent; (3) the Revenue Bond

20   Supplement on terms acceptable to the Debtor and Trustee shall have been executed;

21   and (4) the Confirmation Order shall be a Final Order, except that the Debtor reserves

22   the right, in its sole discretion, to cause the Effective Date to occur notwithstanding the

23   pendency of an appeal of the Confirmation Order.

24     **C.  Waiver of Conditions.**

25         Conditions to Confirmation, except as provided in B(2) and B(3) above, and the

26   Effective Date may be waived in whole or in part by the Debtor at any time without

27   notice, an order of the Bankruptcy Court, or any further action other than proceeding to

28   Confirmation and consummation of the Plan.

## XI.

### EFFECTS OF CONFIRMATION

#### A. Binding Effect.

The rights afforded under the Plan and the treatment of Claims under the Plan shall be the sole and exclusive remedy on account of such Claims against the Debtor and the Debtor, including any interest accrued on such Claims from and after the Petition Date or interest which would have accrued but for the commencement of the Chapter 9 Case. Confirmation of the Plan shall bind and govern the acts of the Debtor and any Creditor of the Debtor, whether or not: (i) a proof of Claim is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim is allowed pursuant to Section 502 of the Bankruptcy Code, or (iii) the holder of a Claim has accepted the Plan.

#### B. Vesting.

Upon the Effective Date, all property of the Debtor shall vest in the Debtor. Following the Effective Date, the Debtor may use, transfer and dispose of any such property free of any restrictions imposed by the Bankruptcy Code or the Bankruptcy Rules and without further approval of the Bankruptcy Court or notice to Creditors, except as may otherwise be required under the Plan or the Confirmation Order.

#### C. Discharge.

The rights afforded under the Plan and the treatment of Claims under the Plan are in exchange for and in complete satisfaction, discharge, and release of all Claims by Creditors against the Debtor. Except as otherwise expressly provided in the Plan, Confirmation of the Plan shall discharge the Debtor from all Claims or other debts that arose at any time before the Effective Date whether or not: (i) a proof of claim based on such debt is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim based on such debt is Allowed pursuant to Section 502 of the Bankruptcy Code; or (iii) the holder of a Claim has accepted the Plan. As of the Effective Date, all Creditors that have held, currently hold or may hold a Claim or other debt or liability that

is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined from commencing or continuing any action, the employment of process, or other act, to collect, recover or offset any such Claim as a personal liability of the Debtor or the Debtor to the full extent permitted by Sections 524(a)(1) and (2) of the Bankruptcy Code.

### D. **No Exceptions to Discharge Under Plan.**

There are no debts of the Debtor that are excepted by the Plan from the discharge afforded the Debtor under Section 944 of the Bankruptcy Code. All debts including debts arising post-petition not qualified as administrative expense claims will be discharged upon Confirmation.

### E. **Limitation of Liability.**

The and its Agents shall have all of the benefits and protections afforded under Section 1125(e) of the Bankruptcy Code and applicable law.

### F. **Exoneration.**

The Debtor and its Agents, attorneys, financial consultants and the Bond Trustee, Paying Agent and Syncora Guarantee Inc., and their attorneys shall not be liable, other than for gross negligence or willful misconduct, to any holder of a Claim or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date and prior to the Effective Date in connection with: (a) the management or operation of the Debtor or the discharge of its duties under the Bankruptcy Code, (b) the implementation of any of the transactions provided for, or contemplated in, the Plan, (c) any action or inaction taken in connection with either the enforcement of the Debtor's rights against any entities or the defense of Claims asserted against the Debtor with regard to the Chapter 9 Case, (d) any action taken in the negotiation, formulation, development, proposal, disclosure, Confirmation or implementation of the Plan, or (e) the administration of the Plan or the assets and property to be distributed pursuant to the Plan. The exonerated persons, and their respective Agents, may reasonably rely upon the opinions of their respective

1   counsel, accountants, and other experts and professionals and such reliance, if

2   reasonable, shall conclusively establish good faith and the absence of gross negligence

3   or willful misconduct; provided however, that a determination that such reliance is

4   unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross

5   negligence or willful misconduct. Any action, suit or proceeding by any holder of a

6   Claim or any other entity contesting any action, omission, forbearance from action,

7   decision or exercise of discretion in connection with the matters in subsections *(a)*

8   through *(e)* above, by the Debtor, the exonerated persons and their respective Agents,

9   or any of them, whether commenced before or after the Effective Date, shall be

10   commenced only in the Bankruptcy Court.[14]

11                 **G. Retention of Jurisdiction.**

12       Notwithstanding the entry of the Confirmation Order and the occurrence of the

13   Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 9 Case

14   after the Effective Date to the extent legally permissible pursuant to Section 945(a) of

15   the Bankruptcy Code, including, without limitation, jurisdiction to determine the matters

16   identified in Article IX of the Plan.

17                             **XII.**

18             **FEASIBILITY AND BEST INTERESTS**

19       Confirmation of the Plan requires, among other things, that (a) each impaired

20   Class accepts the Plan, and (b) the Plan is in the best interests of creditors and is

21   feasible. The Bankruptcy Court must also find that the Plan meets several requirements

22   that are generally applicable to reorganizations under Chapter 11 of the Bankruptcy

23   Code as well as certain requirements that are particular to municipal debtors under

24   Chapter 9. For example, the court must determine that the Debtor has obtained any

25   regulatory or electoral approval necessary to carry out the Plan. In this case, the Debtor

26

27 [14] For the avoidance of doubt, nothing herein shall affect the rights and obligations of Adventist Health, AH Tulare, the Debtor and the Reorganized Debtor under or pursuant to the Lease, the APA, the Credit

28 Agreement, the Security Agreement, the Deed, the MSA or any related documents, nor the loan agreements with the City of Tulare.

believes that the Plan complies with all applicable regulatory requirements and that no voter approval is needed in order to implements the Plan.

### A. Feasibility

The Debtor believes that the Plan is feasible in accordance with Section 943(b)(7) of the Bankruptcy Code. The Debtor's projected operating budget as prepared by Wipfli CPAs and consultants for July 1, 2019 to June 30, 2029, is attached hereto as Exhibit A. The Debtor believes that these projections reflect its ability to both meet its ongoing obligations under the Plan, maintain the Hospital facility and other owned assets, and maintain its legally mandated healthcare services at an adequate level and comply with applicable law.

As shown by Exhibit A, there will be no funds available to fund the Plan Fund until after repayment of Classes 5 and 6. Thus, payment into the Plan Fund will commence after June 30, 2024 and be paid in semi-annual distributions over five years on a pro rata basis to holders of Allowed Claims in Class 8.

Because of the potential variance in Class 8 Allowed Claims in this Chapter 9 Case, it is difficult to project the range of recoveries for Class 8 Claims, although the Debtor estimates that the holders of Allowed Class 8 Claims may receive a recovery of approximately 19.2% to 30.3% by semi-annual payments commencing in 2024 and continuing for 5 years.

### B. Best Interests of Creditors

In order to confirm a plan under chapter 11 of the Bankruptcy Code, unless there is unanimous acceptance of a plan by an impaired class, the debtor must demonstrate that each holder of a claim in such class will receive property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date. This requirement is generally referred to as the "best interests of creditors" test.

Although a debtor in a Chapter 9 case must also satisfy this test, the debtor is **not** required to demonstrate that the distributions under the plan are superior to the

1  amount that would be generated from the liquidation of the debtor in a chapter 7
2  liquidation case.  A municipal debtor cannot be involuntarily liquidated.  Instead, under
3  Chapter 9, the debtor must show that confirmation of the plan is preferable to other
4  reasonable alternatives to the plan.

5       Under Chapter 9, creditors cannot propose their own plan nor can the case be
6  converted to a case under chapter 7 of the Bankruptcy Code.  Hence, the most likely
7  alternative to the confirmation of the Plan is that the Debtor will be granted a reasonable
8  opportunity to formulate and confirm an amended Plan.  If, however, an amended plan
9  is not confirmed then the most likely outcome is the dismissal of the Chapter 9 Case.  In
10  that event, creditors must individually resort to state law remedies to pursue and enforce
11  a judgment against the District on account of their respective debts, which leads to a
12  race to the courthouses and considerable delay and disruption.

13       Generally speaking, the enforcement of a judgment against a public entity is not
14  subject to the usual remedies afforded to private parties (such as writs of execution,
15  levy and garnishment).  California's Enforcement of Judgments Law ("EJL") set forth in
16  the Code of Civil Procedure (Cal. Civ. Proc. Code §§ 680.010, et seq.), is **not** applicable
17  to any "final judgment for the payment of money rendered against a local public entity."
18  The District qualifies as a local public entity made the EJL.  *See* Cal. Civ. Proc. Code §
19  695.050, Cal. Gov't Code §§ 970.1(b).  Instead of the EJL, a more narrow set of
20  enforcement options is specified in the Government Code.

21       There are three options for satisfying judgments under the Government Code: (a)
22  payment in the fiscal year the judgment becomes final "to the extent funds are available"
23  in that year, or (b) payment in the following fiscal year "immediately upon the obtaining
24  of sufficient funds for that purpose," or (c) payment in 10 equal annual installments, with
25  interest, upon a finding of "unreasonable hardship" by both the governing body of the
26  public entity and the court that entered the judgment.

27       The exclusive means to compel compliance with the requirements for satisfaction
28  of a judgment is a request for a writ of mandate against the public entity "to perform any

1  act required by this article." Cal Gov't Code § 970.2. A writ of mandate will typically

2  provide that the entity must (i) immediately take steps to obtain funds to satisfy the

3  judgment, (ii) appropriate such funds in its current and future budgets, or (iii) apply for

4  permission to pay the amounts owed in 10 equal installments under the "unreasonable

5  hardship" exemption.

6        All of these factors lead to the conclusion that recoveries under the Plan would

7  be at least as much, and probably greater and sooner, than the individual remedies

8  available to Creditors under state law following a dismissal of the Chapter 9 Case.

9                                    **XIII.**

10                **CERTAIN TAX CONSEQUENCES OF THE PLAN**

11        The implementation of the Plan may have federal, state, local and foreign tax

12  consequences to the District and its creditors. No tax opinion has been sought or will be

13  obtained with respect to any tax consequences of the Plan. However, because the

14  District is a municipal corporation duly organized and existing under its Charter and the

15  California Constitution, and is treated as a political subdivision of the State of California

16  for federal income tax purposes, the District believes that it will not be subject to any

17  federal income tax liability from implementation of the Plan. The District anticipates that,

18  in conformity with past practice, it will not file any federal corporate income tax returns

19  with respect to the periods in which the Plan is implemented nor report any income for

20  federal income tax purposes as a result of implementing the Plan. The District may file

21  certain tax returns associated with the restructuring of some of its tax-exempt bonds

22  affected by the Plan, which returns may be required in order to maintain the exclusion

23  from gross income of interest on the bonds for purposes of federal income taxes

24  applicable to the holders thereof.

25        Because individual circumstances may differ, and the income tax consequence

26  of a Chapter 9 case are complex and uncertain, this summary does not address the

27  federal income tax consequences that may be relevant to the Creditors of the District as

28  a result of the Plan.

1        Accordingly, Creditors should consult with their own tax advisors regarding the

2   income tax consequences of the Plan to them, including the effect, if any, the Plan may

3   have on prior outstanding obligations the interest components of which the Creditors

4   were treating as excludable from gross income for federal income tax purposes.

5                                    **XIV.**

6                           **CONCLUSION**

7        The District believes that confirmation and implementation of the Plan is

8   preferable to all other available alternatives. Accordingly, the District urges holders of

9   Impaired claims in Classes 4 and 8 to vote to **accept** the Plan.

10

11   Dated: May 22, 2019             TULARE LOCAL HEALTHCARE DISTRICT,

12                                        dba Tulare Regional Medical Center

13

14                               By: _____

15                                    Kevin B. Northcraft, President

16   Dated: May 22, 2019             WALTER WILHELM LAW GROUP

17                                        a Professional Corporation

18                               By: _____

19                                    Riley C. Walter, Attorneys for

20                                    Tulare Local Healthcare District dba
                                         Tulare Regional Medical Center

21

22

23

24

25

26

27

28

M:\S-U\TRMC\PLEADINGS\WW-95  Chapter 9
Plan\DS.052219.nam.docx