**42**
**WANGER JONES HELSLEY, PC**
Riley C. Walter #91839
265 East River Park Circle, Ste. 310
Fresno, CA 93720
Telephone:     (559) 490-0949
Facsimile:     (559) 233-9330
E-mail:         rwalter@wjhattorneys.com

Chapter 9 Counsel for Tulare Local Healthcare District

## IN THE UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re | CASE NO. 17-13797 |
| TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER, | Chapter 9 |
| | **WW-95** |
| Debtor. | **DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF PLAN FOR ADJUSTMENT OF DEBTS DATED APRIL 30, 2019** |
| Tax ID #:   94-6002897 Address:   869 N. Cherry Street   Tulare, CA 93274 | Date:       August 15, 2019 Time:      9:30 a.m. Place:      2500 Tulare Street             Fresno, CA 93721             Courtroom 13 Judge:     Honorable René Lastreto II |

## I.     INTRODUCTION

On July 3, 2019, the Court issued its "Order Approving Disclosure Statement; Setting Record Date for Voting Purposes; Fixing Time for Filing Acceptance or Rejection of Plan of Adjustment and Objections Thereto and Notice of Confirmation Hearing on Chapter 9 Plan" ("July 3 Order") (Dkt. 1528). On July 9, 2019, Tulare Local Healthcare District, dba Tulare Regional Medical Center ("Debtor" or "District") commenced solicitation of acceptances of its

"Plan for the Adjustment of Debts Dated April 30, 2019" (the "Plan").[1] The District, by and through its counsel, mailed the Solicitation Packages in accordance with the Court's "Order Granting Motion for Entry of an Order: (a) Approving Solicitation and Tabulation Procedures and Materials and (b) Granting Related Relief Relating to the Plan of Adjustment Confirmation" (the "Solicitation Order")(Dkt. 1455) to all eligible voters, and mailed a notice of the Confirmation Hearing to all creditors who had timely filed proofs of claim along with the Plan (Dkt. 1440), Disclosure Statement (Dkt. 1441) and related materials. Dkts. 1542-1546. The deadline for objections to the Plan was August 6, 2019 and no objections were filed.

The tabulation of votes is due to be filed on August 13, 2019 at noon as to Classes 4 and 8. However, preliminary indications are wide acceptance of the Plan. The apparent support for the Plan from Class 8 creditors who are receiving a 19.2% to 30.3% recovery on their claims over a long time is strong evidence of the District's good faith in proposing the Plan and the merits of the Plan itself. The District submits this brief in support of confirmation of the Plan under Bankruptcy Code §§ 941 through 946 and the other provisions of titles 11[2] and 28 applicable in chapter 9 cases. For the reasons set forth below and the supporting evidence in the records of this Chapter 9 case, the District requests entry of an order confirming the Plan substantially in the form attached as Exhibit A.

## II.   STATEMENT OF FACTS

The District is a public local healthcare district organized under the Local Hospital District Law set forth in California's Health and Safety Code. The Tulare Local Healthcare District Bylaws ("Bylaws") provide for a five-member Board of Directors ("Board") that are elected or appointed by the registered voters in specific electoral zones within the District's geographic boundaries. The current members of the Board are Kevin B. Northcraft, Mike Jamaica, Senovia Gutierrez, Stephen Harrell and Xavier Avila. The District's Board oversees the District's operations. The Chief Executive Officer of the District is Sandra Ormonde. The Chief

---

[1] All capitalized terms used but not defined herein are used as defined in the Plan or Disclosure Statement.
[2] Unless otherwise indicated, "Section" references mean sections of title 11 of the U.S. Code, the Bankruptcy Code.

1  Financial Officer is Daniel Heckathorne.

2      The District's Bylaws provide that its mission is to "provide safe, efficient,

3  technologically advanced healthcare with respect for the diversity of our region. "In

4  accordance with its Bylaws, the District provides healthcare services primarily to individuals

5  who reside in the District's geographic boundaries, which is a very large area in the

6  Southwestern part of Tulare County including the City of Tulare and surrounding rural areas.

7  The population in the District's geographic boundaries is estimated to be over approximately

8  70,000 persons. The District owns a 101-bed hospital ("Hospital") now leased to Advent Health

9  Tulare ("AH Tulare"), a fitness facility, several "cottages" and parcels and provides other

10 healthcare services on its campus located at 869 Cherry Street and elsewhere in Tulare,

11 California.

12     **A.**    **Brief Summary of Events Leading to the Filing of the Chapter 9 Case**

13     Like many rural hospital districts in California, the District has faced immense financial

14 pressures over the years. Payment reductions by federal and state governments and insurance

15 programs as well as increased regulatory requirements have made the operating environment for

16 hospitals very challenging, particularly in areas that have significant numbers of patients that

17 rely on Medicare and Medicaid to meet their healthcare needs. Roughly 70% of the District's

18 revenue is from payments made by the Medicare and Medicaid programs. These factors, as well

19 as the actions of the Hospital's former manager and the former District Board's lack of oversight

20 led to the District's bankruptcy case.

21     For many years, the District has faced uncertainty in its financial stability, and disputes

22 and controversies regarding various decisions made by the former District's former Board. In

23 November 2005, the District's voters approve a bond measure to build a state-of-the art medical

24 tower (the "Tower") adjacent to the Hospital in order to expand the services provided to

25 residents of the District. Between 2005 and 2010, the District planned for and partially

26 constructed the Tower, and the cost of the Tower far exceeded the original projections. During

27 this same time period, revenues from the District's operations declined. In around May 2010,

28 construction of the Tower began, and the District's then chief executive officer tried to speed up

Debtor's Memorandum of Law in Support of Confirmation of Plan          -3-          J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
for Adjustment of Debts Dated April 30, 2019          Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

construction which led to costly disputes and litigation. The Tower remains only partially constructed and is unoccupied.

Between January 2014 and late November of 2017, Healthcare Conglomerate Associates, LLC ("HCCA") managed the Hospital (then known as the Tulare Regional Medical Center) and other District facilities pursuant to a Management Services Agreement. There were serious, major disputes between the District and prior management described, in part, below and in various pleadings filed in this Court by the parties to that litigation.[3] In January 2014, the Board voted to enter into certain agreements with prior management which gave prior management nearly complete control over the Hospital and the District's finances. By November 2015, unpaid vendor invoices began to pile up which continued through the filing of the District's chapter 9 petition as demonstrated by a large number of lawsuits filed by vendors, suppliers and contractors. In January 2016, prior management terminated the agreement with the Medical Executive Committee ("MEC"), the entity that was responsible for monitoring and supervising the hospital's medical staff's compliance with generally accepted medical standards and for ensuring the accountability of the medical staff to the District's Board. This decision to terminate the MEC led, in part, to a decline in patient volume as local doctors did not refer as many patients to the Hospital and a resulting drop in revenue, as well as a lawsuit filed by the MEC against the District.

As these events unfolded in 2016, the members of the Tulare community became dissatisfied with the management of the Hospital and the then Board's oversight of the District's operations, the progress on construction of the Tower, and the use or misuse of the bond revenues for the Tower. As a result, the District's voters rejected a proposed bond measure to secure the financing needed to complete the Tower. In November 2016, the community members opposed to prior management of the Hospital succeeded in electing Kevin Northcraft and Mike Jamaica to serve as members of the Board. Dissatisfaction with management continued and, in May 2017, then Board member Parmod Kumar, M.D. was recalled and

---

[3] *See, e.g.,* Adversary Proceeding No. 17-01095 and Adversary Proceeding No. 18-01005, both of which have been settled and dismissed.

Senovia Gutierrez was elected to replace him. She was seated on the District's Board in July 2017 and, thereafter, a majority of the Board members were opposed to the Hospital's then manager. Between approximately May 2017 and September 2017, there were very serious and acrimonious disagreements between the Board and prior management, one of which led to litigation respecting the election and seating of Senovia Gutierrez on the District's Board. During the tenure of prior management, the District suffered very large accounts payable accrued, maintenance of the District's facilities and systems was deferred, and all the District's reserves were depleted. The District's audited financial statements reflect that the District suffered an operating loss of nearly $41 million for fiscal year ending June 30, 2017, and an operating loss of just over $28 million for fiscal year ending June 30, 2018.[4]

In September 2017, the disputes between the District's Board and prior management led to a credit rating downgrade, as well as a lawsuit filed by prior management against the District alleging that it was owed many millions of dollars in damages. On September 28, 2017, management threatened to shut down the Hospital due to inability to make payroll. On September 29, 2017 the District's Board unanimously voted to seek Chapter 9 bankruptcy protection after learning of the District's dire financial condition and that it had almost no cash. On September 30, 2017 (the "Petition Date"), the District commenced this bankruptcy case (the "Chapter 9 case") by filing a voluntary petition under Chapter 9 of the Bankruptcy Code. Dkt. 1.

**B.      The Administration of the Bankruptcy Case**

On the Petition Date, the District's Board was faced with extremely challenging circumstances. It did not have access to the District's Hospital facility without seeking permission from prior management, and it did not have access to or control over most all of the District's books and records and financial information. It had no access to its bank accounts. It was in a dire fiscal crisis, and faced litigation by several parties and a threat to close the Hospital. This section briefly summarizes the District's herculean efforts to: (a) regain control of

---

[4] The District's audited financial statements are attached as Exhibit B to the Disclosure Statement.

its facilities, operations, and books and records; (b) reopen the Hospital to continue its mission to provide healthcare services to the District's residents and others; and (c) put its financial house in order so that it could propose and confirm a chapter 9 plan of adjustment and emerge from bankruptcy.

### 1. Litigation Respecting the Rejection of the District's Contracts in order to Regain Control of the Hospital

Very shortly after the Petition Date, the District filed a motion to reject the hotly disputed contracts with prior management and the ensuing litigation was both extensive and acrimonious. While the District was embroiled in litigation for control of the Hospital and the District's other facilities, the District's fiscal crisis and threats to close the Hospital compelled the District to suspended operations effective midnight on October 28, 2017 and voluntarily surrendered its license to the California Department of Public Health ("CDPH") in order to avoid a forced shut down due to the threat to abruptly close the Hospital and the CPDH's concerns respecting patient safety under those circumstances. On November 1, 2017, the Court entered its order granting that motion, but the Court's order allowed prior management to remain in possession of the District's facilities and control the District's finances and checkbook until late November 2017. On November 27, 2017 the District regained control of its facilities and operations and discovered that it had virtually no available cash and its financial and accounting records were in disarray.

### 2. The Order for Relief and Claims Bar Date

On November 22, 2017, the Bankruptcy Court entered its order establishing a deadline of January 11, 2018 for any party in interest to object to the eligibility of the District to be a debtor under Chapter 9.[5] No objections to the District's eligibility for Chapter 9 relief were filed. The Order for Relief was entered on January 26, 2018.

On October 27, 2017, using information provided by prior management as the District did not have access to any list of its creditors, the Debtor filed a *List of Creditors* (which was

---

[5] Dkt. 236.

later amended) which set forth, *inter alia*, the creditors holding claims against the Debtor based on information in the books and records.[6] Many of the claims listed in the *List of Creditors* were identified by the Debtor as contingent or unliquidated and scheduled as disputed, $-0- or "unknown." Pursuant to an Order entered on January 26, 2018, the Court established April 10, 2018 (the "Bar Date").[7] As of April 11, 2019, 259 creditors had filed Proofs of Claim.[8]

### 3.    Appointment and Resignation of Patient Ombudsman and Appointment and Disbandment of Creditors' Committee

A Creditors' Committee was appointed on February 26, 2018, and was thereafter disbanded on June 18, 2018.[9] On October 25, 2017, the Court entered its *Order for Appointment of Health Care Ombudsman* providing for the appointment of a patient care ombudsman (PCO). On December 18, 2017, the U.S. Trustee's Office appointed a PCO, but the PCO thereafter resigned on February 23, 2018.

### 4.    The District's Steps to Get its Fiscal House in Order and Reopen the Hospital

Subsequent to the Petition Date, the District directed most all of its efforts towards, *inter alia*, the following objectives: (a) obtaining financing and a reliable partner to work with to reopen the Hospital; (b) evaluating and rectifying its financial dire straits; (c) streamlining operations and reducing costs; (d) evaluating contracts; (e), getting its license reinstated; (f) renegotiating certain contracts and leases; (g) assessing deferred maintenance issues and necessary capital improvements; (h) taking inventory of its equipment and supplies; and (i) resolving litigation and other disputes in an efficient manner.

As an initial step, in October 2017, the District retained Wipfli/HFS to assist the District in remedying its operational and financial crisis, and to manage the day-to-day operations of the District. From and after the Petition Date, the District scrambled to obtain funding necessary for

---

[6] Dkts. 154 and 373.

[7] Dkt. 377.

[8] On February 1, 2019, the District obtained another claims bar date order relating to about 24 possible claimants that had been omitted from the List of Creditors.

[9] Dkt. 565.

Debtor's Memorandum of Law in Support of Confirmation of Plan          -7-          J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
for Adjustment of Debts Dated April 30, 2019                                    Plan\Confirmation Module\CLEAN.Confirmation
                                                                               Brief.08919.jt.docx

1   its limited operations utilizing a variety of sources, including excess ad valorem tax revenues,

2   accounts receivable, lease revenues and governmental transfers. These efforts were challenging

3   due to a lien considered to be unlawfully recorded against certain of the District's real property,

4   the disarray of its finances and financial records under prior management, and the fact that the

5   District was forced to temporarily suspend operations in order to avoid a forced shutdown by the

6   CDPH and had very little revenue.

7          As part of its efforts to get its fiscal house in order, the District retained JWT &

8   Associates, LLP ("JWT") to prepare audited financial statements. In March 2019, JWT provided

9   the District with audited financial statements for fiscal years ended 2017 and 2018, which

10  brought the District into compliance with the requirements imposed upon healthcare districts by

11  the California Healthcare District Law. These audited financial are attached as Exhibit B to the

12  Disclosure Statement.[10]

13         The District also entered into stipulations with certain creditors to resolve motions for

14  relief from stay, and filed numerous motions to assume or reject contracts as part of its efforts to

15  streamline its operations and minimize litigation. As part of those efforts, the Court approved a

16  stipulation with Beta Risk Management Authority to assume certain casualty and liability, auto

17  and D&O insurance arrangements (collectively, the "BETA Agreements"), by and between the

18  District and BETA Risk Management Authority and its affiliated entities ("BETA"). The

19  District was authorized to pay the amounts owed under the BETA Agreements, and there are no

20  further Assumption Obligations due from the District under the BETA Agreements and the

21  District is current with BETA. The Court also approved a stipulation between the District and

22  Phoenix Healthcare Systems in order to preserve the District's integrated information technology

23  services.

24         **5.      Litigation with Creditors and Other Parties, and Certain Settlements**

25                  **of Major Litigation**

26         Both prior to and after the Petition Date, the District has faced litigation with multiple

27  parties and made every effort to resolve that litigation as economically and efficiently as

28

[10] Dkt. 1442.

Debtor's Memorandum of Law in Support of Confirmation of Plan          -8-          J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
for Adjustment of Debts Dated April 30, 2019                                      Plan\Confirmation Module\CLEAN.Confirmation
                                                                                 Brief.08919.jt.docx

1 possible. In that regard, as discussed briefly below, the District has settled its disputes with prior

2 management, the parties to the Celtic Transaction litigation, the Medical Executive Committee

3 lawsuit, the Betre litigation, the tax payor suits and numerous other lawsuits. The District also

4 has resolved motions filed by creditors asserting that their claims should be paid as

5 administrative expenses when, in a chapter 9 case, there are virtually no administrative expenses.

6     **The HCCA Litigation**. On September 15, 2017, prior management filed a lawsuit

7 against the District in Los Angeles County Superior Court alleging claims for breach of contract

8 and declaratory relief (the "HCCA Lawsuit"). The HCCA Lawsuit alleged, *inter ali*a, that the

9 District owed prior management many millions of dollars for loans prior management allegedly

10 made to the District, as well as other amounts allegedly due under the Management Services

11 Agreement. The District removed the prior management lawsuit to this Court as Adversary

12 Proceeding No. 17-01095. On January 23, 2018, the District filed a complaint against prior

13 management contending, *inter alia*, that the Deed of Trust recorded by prior management and

14 any lien created by the recordation of the Deed of Trust on the District's real property was

15 avoidable and sought declaratory relief as set forth in greater detail in Adversary Proceeding No.

16 18-01005. The litigation between the District and prior management was very protracted,

17 contentious, hostile and expensive. In August 2018, the District and prior management reached a

18 financial arrangement by which prior management reconveyed all liens on the District's property

19 and released approximately $17 million of claims asserted against the District. The resolution of

20 these dispute allowed the District to use its real property assets as collateral to obtain financing

21 which, in turn, made it possible to propose a Plan.

22     **The Medical Executive Committee Lawsuit.** During prior management's tenure as

23 manager of the Hospital, prior management terminated the agreement with the Medical

24 Executive Committee ("MEC"), the entity that was responsible for monitoring and supervising

25 the hospital's medical staff's compliance with generally accepted medical standards and for

26 ensuring the accountability of the medical staff to the District's Board. Prior management

27 decision to terminate the MEC led, in part, to a decline in patient volume and a resulting drop in

28 revenue, as well as a lawsuit filed by the MEC against the District contending that prior

Debtor's Memorandum of Law in Support of Confirmation of Plan     -9-     J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
for Adjustment of Debts Dated April 30, 2019                                        Plan\Confirmation Module\CLEAN.Confirmation
                                                                                                  Brief.08919.jt.docx

1  management and the District unlawfully terminated the medical privileges of all physicians.

2  During this Chapter 9 case, the District reached an agreement with the Medical Executive

3  Committee to settle the dispute.

4       **The Celtic/MB Financial Litigation**. In August 2017, the hospital's former manager

5  orchestrated a "sale/leaseback" transaction with Celtic Leasing Corp. ("Celtic") and MB

6  Financial, a national banking association ("MB Financial") to (a) sell personal property assets of

7  the District to Celtic for the sum of $3,000,000; (b) obligate the District to lease that personal

8  property back from Celtic for the sum of $82,026.00 per month over a period of years which

9  obligations were secured by certain collateral; and (c) then directed Celtic to wire transfer the

10 $3,000,000 in proceeds from the sale of District assets to a bank account that was *not* a District

11 bank account, but rather was a bank account of Tulare Asset Management (the "Celtic

12 Transaction"). In connection with the Celtic Transaction, on August 28, 2017, BakerHostetler,

13 acting as "special counsel" to the Hospital's former manager, provided Celtic with an opinion

14 letter with respect to the sale and leaseback of the District's assets to Celtic. The District filed a

15 complaint commencing Adversary Proceeding No. 18-01008 to avoid the transfer of the

16 District's personal property and equipment. Over time, the matter was resolved by the District

17 paying to Celtic $500,000, and allowing it a $2.5 million unsecured claim in Class 8 which may

18 be reduced by any sums Celtic recovers from prior management in connection with proceedings

19 brought by the District Attorney for the County of Tulare. Celtic released all of its claims of

20 ownership of the District's equipment, and much of that equipment subsequently was sold to AH

21 Tulare.

22      **The Betre Litigation.** Prior to the Petition Date, a lawsuit was commenced in Tulare

23 County Superior Court entitled *Kumar, et al. v. Betre,* being case no. VCU265230 in the Tulare

24 County Superior Court. As of the Petition Date, there was an appeal pending of an order

25 dismissing that case, and the District contended that District funds were unlawfully used to pay

26 for the appeal bond and pay the plaintiffs' attorneys fees in filing and litigation the case and the

27 appeal. Although the District was not a party to the appeal, the District worked to achieve a

28 resolution of the litigation whereby the appeal was dismissed, and half of the money deposited

Debtor's Memorandum of Law in Support of Confirmation of Plan
for Adjustment of Debts Dated April 30, 2019          -10-          J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

with the Tulare County Superior Court to bond the appeal was paid to Dr. Betre, while the other half was paid to the District.

**Taxpayer and Medical Malpractice Lawsuits.** There were three taxpayer lawsuits pending as of the Petition Date. These generally related to allegations respecting the improper and unauthorized uses of District funds. These disputes were settled and the lawsuits have been dismissed. As of the Petition Date, there were 14 pending medical malpractice or tort lawsuits. Additional lawsuits were filed post-petition. These lawsuits are covered under insurance coverage agreements with BETA. At the time of the filing of the Disclosure Statement, there were fewer than five such lawsuits still pending. The District has a $100,000 per suit "deductible", some of which have been waived.

**Motions filed by Medline, Owens & Minor and Cerner Corporation.** Medline, Owens & Minor, and Cerner Corporation and Cerner Health Services, Inc. ("Cerner") filed motions for payment of administrative expenses pursuant to, *inter alia*, Section 503(b)(9). The District settled these motions by agreeing to pay a certain amount of the asserted claims as administrative expenses under Bankruptcy Code § 503(b)(9). Cerner asserted that it was entitled to in excess of $2.2 million as of the Petition Date on account of unpaid pre-petition claims, and over $1.5 million for services it claims it provided after the Petition Date. The District, AH Tulare and Cerner are working together to resolve certain of these claims and any remaining open issues between them, including the terms under which certain of the Cerner claims will be included in Class 8.

**First Source Litigation.** Prior to the Petition Date, First Source sued the District for non-payment for services rendered to the District. The District, which was represented by Baker Hostetler LLP at that time, failed to adequately participate in the litigation and the U.S. District Court issued a decision adverse to the District. Thereafter, the parties briefed the issue of any entitlement to legal fees. On June 13, 2018 the Court handed down its order allowing a claim for $724,385.08, plus attorney's fees and costs for a total of $1,570,136.52, which will be included in Class 8.

**Disputes with Southern Inyo Healthcare District (SIHCD).** HCCA managed the SIHCD and the District's Hospital at the same time, and caused transfers of money and equipment to be made from the District to SIHCD as well as used District personnel to work on SIHCD matters. SIHCD filed a Chapter 9 petition, and the District has asserted a large claim against SIHCD in SIHCD's chapter 9 proceeding. SIHCD has objected to the District's claim, and has asserted a claim in an unknown amount in the District's Chapter 9 case. At this time, this dispute has not been resolved.

**Claims Against Baker Hostetler and Former District Board Members.** The District engaged the Law Office of Michael Lampe to commence a lawsuit against the law firm of Baker Hostetler LLP, Bruce Greene and three former District Board members (Parmod Kumar M.D., Linda Wilbourn and Richard Torrez). The lawsuit was filed in the Tulare County Superior Court, and alleges causes of action for legal malpractice, breach of contract, fraud and breach of fiduciary duty against one or more of the defendants. Defendant Baker Hostetler removed the lawsuit to this Court as Adversary Proceeding No. 19-01052,a motion to remand the suit back to the Tulare County Superior Court is now pending. The District expects it will take between 14 and 18 months before a trial is conducted in that case, and appeals of any judgment rendered could take years.

**Avoidance Claims.** The District has reviewed its records to evaluate whether it has grounds to commence adversary proceedings to recover monies on account of preferential payments, fraudulent transfers or bring other avoidance claims. The District estimates that there are between 50 and70 potential such claims. The District has commenced demands for payment of any avoidable payments and is pursuing recoveries.

### 6.    Other Investigations

Not long after the Petition Date, the Tulare County District Attorney's office seized certain of the District's books and records pursuant to a search warrant, and has conducted an investigation related to events that occurred prior to the Petition Date. Recently, the sum of $932,000 was seized from accounts under the control of the principal of prior management and Tulare Asset Management, which are claimed by the District Attorney and Celtic to be the

Debtor's Memorandum of Law in Support of Confirmation of Plan          -12-          J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
for Adjustment of Debts Dated April 30, 2019                                    Plan\Confirmation Module\CLEAN.Confirmation
                                                                               Brief.08919.jt.docx

1 proceeds of monies the District should have received from the sale of its equipment in the Celtic

2 Transaction. The District has disclaimed any interest in those funds, and if the funds are returned

3 to Celtic there will be a significant reduction in the amount of Celtic's Class 8 claim under the

4 settlement with Celtic.

5       In addition to the investigation by the Tulare County District Attorney's office, in light of

6 the District's filing of this Chapter 9 case and the ensuing closure of the Hospital, California's

7 Joint Legislative Audit Committee requested that the California State Auditor investigate the

8 District's past oversight of operations of the Hospital. The California State Auditor's report was

9 released in October 2018 and is available to the public. The District believes that it has addressed

10 all of the recommendations made by the California State Auditor to the extent that such

11 recommendations had not been corrected prior to the issuance of the report and remain relevant

12 to its current operations.

13       **7.**    **The District Reopens the Hospital and the Tulare Adventist Health**

14 **Transaction**

15       After diligent and time consuming efforts to identify a partner to work with the District to

16 reopen the Hospital so the District could resume its mission to provide healthcare services to the

17 District's residents, the District entered into a transaction with AH Tulare. On August 7, 2018,

18 the Court entered the *Final Order Authorizing the Debtor to Obtain Post-Petition Financing*

19 ("Financing Order")(Dkt. 702) as part of an overall transaction with AH Tulare for the lease of

20 the Hospital and the purchase of certain medical equipment and supplies. Subsequent to the

21 approval of this transaction, the District was able to reinstate it's license and the Hospital was

22 reopened on October 15, 2018 under the management of AH Tulare.

23       The District, AH Tulare and Adventist Health documented the transaction between the

24 parties, the material terms of which were as follows: (1) AH Tulare would enter an agreement to

25 lease the hospital from the District; (2) AH Tulare agreed to purchase specified intangible

26 property from the District; (3) the District would engage of AH Tulare to manage the hospital

27 during an interim period prior to commencement of the AH Tulare leasehold interest in the

28 Hospital; and (4) Adventist Health would extend to the District a $10,000,000 line of credit. The

Debtor's Memorandum of Law in Support of Confirmation of Plan    -13-    J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
for Adjustment of Debts Dated April 30, 2019    Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

1  District, Adventist Health and AH Tulare memorialized the Transaction in the following

2  documents: (1) Lease and Memorandum of Lease (collectively "Lease"); (2) Agreement for

3  Purchase and Sale of Assets ("APA"); (3) Debtor in Possession Credit Agreement ("Credit

4  Agreement"); (4) Security Agreement and Chattel Mortgage (Security Agreement") (liens

5  released); (5) Deed of Trust ("Deed") (reconveyed); and (6) Interim Management Services

6  Agreement ("MSA"). Effective March 15, 2019, a change of ownership was issued by the State

7  of California, and AH Tulare assumed as of that date responsibility for all operations and

8  financial liability for all Hospital services and functions pursuant to its lease with the District.

9        The Lease has an initial term of 66 months with a 6 month fixturization period during

10  which AH Tulare will not pay rent to the District. In the first year of the Lease after the

11  fixturization period, AH Tulare will pay the District $2,335,000 in rent on a triple net basis. As

12  required by law, this rental rate is based on a fair market valuation conducted by Deloitte. The

13  rental rate increases annually by the increase in CPI with a cap of 3% and a floor of 0%; the

14  actual annual increase may be less than 3%. The Lease includes the Hospital and ancillary

15  buildings on the Hospital campus. It does not include the District's real estate located off-

16  campus. The Lease also requires the District to complete the unoccupied and partially-

17  constructed Tower by the tenth year of the Lease, or allow AH Tulare to do so.[11] AH Tulare does

18  not have any particular right to complete the Tower if the District fails to do so within 10 years

19  of execution of the Lease, but AH Tulare has a termination right. The Lease provides AH Tulare

20  with five 5-year renewal options which are automatic (unless AH Tulare elects not to have the

21  term extended) and a purchase option (subject to certain conditions including completion of the

22  Tower and seismic compliance) at an appraised market value that exceeds the then-outstanding

23  amount of the bonds, and approval of the voters. The purchase option becomes effective when

24  the District completes the Tower and the fair market value of the Tower exceeds all bond

25  balances related to the Tower. The District's voters approved the Lease on November 6, 2018

26  with 89% of the electorate voting in favor. The Lease became effective and rent commenced as

27  _____

[11] The District has estimates that it will cost from $50,000,000 to $100,000,000 to complete the

28  Tower and make it useable.

Debtor's Memorandum of Law in Support of Confirmation of Plan        -14-        J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
for Adjustment of Debts Dated April 30, 2019                                 Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

1  of March 15, 2019 as a consequence of the CDPH's issuance of the change of ownership.

2  Under the Asset Purchase Agreement, upon obtaining its own hospital license, AH Tulare

3  purchased non-fixed assets required for operation of the Hospital pursuant to the Lease for

4  approximately $6,158,611. After crediting the agreed prices, AH Tulare is currently owed

5  approximately $3,300,000. Pursuant to the Credit Agreement, Adventist Health agreed to lend

6  the District up to $10,000,000 on a line of credit for the District to use to "reopen" the Hospital

7  prior to the required vote on the Lease. The District reopened the Hospital on October 15, 2018.

8  As indicated above, the ballot measure seeking approval of the Lease ("Measure H") passed on

9  November 6, 2018 by an overwhelming majority of the vote. The Credit Agreement and the

10  Security Agreement provide for the District to repay Adventist Health on the line of credit

11  through a principal reduction in an amount equal to the amount that AH Tulare must pay the

12  District pursuant to the APA, with any remaining balance paid through a 100% rent offset for a

13  period of one year. After that, any remaining balance will be paid through a 50% rent offset. The

14  District secured the line of credit with its intangible assets and real property assets, including a

15  second Deed of Trust on the Evolutions property. However, Adventist Health has since released

16  its security interests in the District's real and personal property.

17  In connection with the AH Tulare transaction described above, the District has been

18  authorized to lease its Hospital and to assume and/or reject about 700± executory contracts and

19  unexpired leases. As of the date of the Disclosure Statement, many motions for rejection,

20  assumption and/or assignment of executory contracts have been filed and approved by the

21  Court. The Debtor continues to evaluate the remaining contracts that will be assumed, rejected

22  or assigned.

23  **C.    The District's Assets and Liabilities**

24  This section summarizes certain of the District's principal liabilities and assets, which

25  includes an overview of the District's financial condition, financial projections and the

26  classification of claims in the Plan.

27

28

Debtor's Memorandum of Law in Support of Confirmation of Plan
for Adjustment of Debts Dated April 30, 2019

J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

### 1.    The District's Real Property

The District owns the Hospital and an unoccupied Tower adjacent to the Hospital, a fitness center known as Evolutions, certain "cottages" and parcels and certain other real property. The District has expended over $135 million to construct the Tower. At this time, the Tower is only partially constructed and not usable. It is estimated that it will cost between $50 and $100 million to complete the Tower in accordance with applicable laws, rules and regulations. The Evolutions facility is a health club leased to EVO Management Company, LLC. The Evolutions facility is valued at between $9,875,000 and $12,260,000, and is encumbered by a lien securing a $9,000,000 loan made to the District by the City of Tulare. A four ± acre parcel is in escrow to be sold for $1,800,000 (net), and the sale is due to close by November 15, 2019. At this time, it is uncertain as to whether escrow will close on the sale of this parcel. The District also owns buildings near the Hospital that are or will be leased to third parties, and three vacant lots. The Debtor also owns real property commonly known as 935-945 Gem Street, 591 E. Merritt Ave., 979 N. Gem Street, 890, 906 & 922 Cherry Street, 874 Cherry Street, 793, 795 and 799 North Cherry St., 1050 Cherry St., and a modular structure at 398 S. Church St., Earlimart, California.

### 2.    Deferred Maintenance and Required Capital Improvements to the District's Real Property Assets

The District has suffered from financial difficulties and challenges for many years. As shown by Exhibits A and B to the Disclosure Statement, there is substantial deferred maintenance plaguing the District's real property assets, especially the Hospital campus in Tulare. Routine maintenance and repairs were neglected for many years. As such, the District must make expensive repairs and improvements including, but not limited to: (a) resurfacing and repairing parking lots, repairing roofs, (b) replacing chillers, (c) upgrading elevators and computer systems, and (d) other improvements necessary to maintain the Hospital complex. The District must also comply with California's seismic requirements. The District believes that it must expend at least $1.5 million on seismic compliance by December 31, 2019 to meet the requirements in the California Health & Safety Code.

### 3.      The District's Bond Debt and other Secured Debt

The District is obligated to pay certain bond indebtedness as described in the Plan and Disclosure Statement. Class 1 represents its obligations under the General Obligation Bonds, Election of 2005, Series A (2007) with interest at 4.0% to 5.0% due semi-annually; principal due in annual amounts ranging from $15,000.00 beginning on August 1, 2012 to $2 million due on August 1, 2037. These bonds are collateralized by ad valorem tax revenues, and the current amount owed is approximately $14,530,000. These bonds are current.

Class 2 represents the District's obligations under General Obligation Bonds, Election of 2005, Series B-1 (2009) with interest at 3.75% to 6.0% due semi-annually, and principal due in annual amounts ranging from $100,000.00 on August 1, 2014 to $2,005,000 due on August 1, 2026. These bonds are collateralized by ad valorem tax revenues. The current amount owed is approximately $7,945,000. These bonds are current.

Class 3 represents the District's obligations under General Obligation Bonds, Election of 2005, Series B-2 (2009) with interest at 6.45% to 8.0% due semi-annually; principal due in annual amounts ranging from $450,000 on August 1, 2017 to $7,240,000 due on August 1, 2039. These bonds are collateralized by ad valorem tax revenues. The current amount owed is $60,380,000. These bonds are current. The Series B-1 and B-2 bond payments are remitted to bond holders by the Tulare County Tax Collector.

Class 4 represents the District's obligations under the Series 2007 Refunding Revenue Bonds with interest at 3.75% to 5.2% due semi-annually; principal due in annual amounts ranging from $405,000 due on November 1, 2008 to $1,210,000 due on November 1, 2032; collateralized by District revenues. Payments on the Revenue Bonds were not current as of the date of this Disclosure Statement, but are being reinstated pursuant to prior Court orders and the Plan. The current amount owed on the revenue bonds is $13,650,000, and the required reserve must be replenished to $705,000 as required by the indenture. The amounts being paid to replenish the 2007 Refunding Revenue Bond reserve over a two year period are set forth in Exhibit A to the Disclosure Statement. In connection with approvals of the AH Lease and City Loan, the District and Wilmington Trust agreed to enter into a Plan Supplement to reaffirm the terms for

1  reinstatement of the bonds and these terms are included as a part of the proposed order confirming

2  the Plan.  (It is noted that the Order to be submitted will include additional language incorporating

3  the Plan Supplement provisions. Those terms are under discussion.)

4          Class 5 represents the amount owed to Adventist Health of approximately $3.3 million. As

5  previously discussed, Adventist Health loaned the District almost $10 million so that the District

6  could reopen the hospital and resume its mission to provide healthcare services to the District's

7  residents. This amount due under the line of credit was reduced by AH Tulare's purchases of

8  District owned equipment and supplies. Pursuant to the terms of this Court's orders entered on

9  August 3, 2018 and August 7, 2018, the obligation owed to Adventist Health will be repaid over a

10  period of time by set offs against rents owed by AH Tulare to the District.[12]  Class 5 is current and

11  unimpaired.

12          Class 6 represents the District's obligations to the City of Tulare. By this Court's Order

13  dated February 22, 2019, the Debtor was authorized to borrow $9 million from the City of Tulare.

14  The loan is secured by a Deed of Trust on the Evolutions facility. This loan bears interest at 6.0%.

15  For the first 36 months of the loan term, only interest is payable.  For the remaining 24 months of

16  the loan term, the District is obligated to make payments of principal and interest. This claim is

17  current and unimpaired. Class 6 will be paid in 60 months or possibly earlier if the District opts to

18  sell the Evolutions facility. The loan from the City of Tulare made it possible for the District to

19  move forward with its reorganization and propose the Plan.

20          **4.    The District's Unsecured Debt**

21          Class 8[13] includes the District's general unsecured obligations to vendors, other trade

22  creditors and parties to various agreements in the aggregate amount of between approximately

23

24

25  _____

26  [12] It should be noted that the District will need to utilize the line of credit extended by Adventist Health to meet legal requirements for facilities, capital expenditures and seismic requirements. It

27  is expected that such advances from the line of credit will be repaid within the originally agreed upon time frame. These loans for capital and other expenditures are reflected on Exhibit A to the

28  Disclosure Statement.
[13] The District believes that there are no claims in Class 7.

Debtor's Memorandum of Law in Support of Confirmation of Plan    -18-    J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
for Adjustment of Debts Dated April 30, 2019                          Plan\Confirmation Module\CLEAN.Confirmation
                                                                     Brief.08919.jt.docx

$16.5 million and $26 million.[14] Class 9 consists of various malpractice or tort claims against the District which are covered by risk contracts and will be covered by BETA, except for any "deductibles." Class 10 consists of certain claimants in Class 8 who elect to receive treatment as an administrative convenience class.

### D.    The District's Current Operations and Financial Projections

The District currently operates primarily as a lessor of its Hospital and other healthcare facilities and real estate assets in order to fulfill its mission to provide healthcare services to residents of the District. As described in Section B(7) above, the District currently leases the Hospital to AH Tulare. The District leases the Evolutions facility to Evo Management Company, LLC ("Evo") for the management of that facility so that residents can enjoy facilities that enhance their overall health and well-being. Under that lease, Evo pays rent to the District. The District reserved the right to take control of the Evolutions facility and operate it itself or through another operator, and the District also has the right to sell the Evolutions facility.

The Debtor's financial projections supporting the Plan are based on certain assumptions and projected revenue and expenses for the 10 year period from July 1, 2019 to June 30, 2029 as set forth in Exhibit A to the Disclosure Statement. These financial projections are based on current financial information, including the District's audited financial statements for the fiscal year ended June 30, 2018, as well as the District's actual revenues and expenses for the eight month period ending February 28, 2019. The District's financial projections show that the District will have positive net operating income in each year covered by the financial projections. The District's financial projections also show that the net operating income will be sufficient to make the payments proposed in the Plan.

Specifically, the District's financial projections show that the District has sufficient funds to remain current on its bond obligations included in Class 1, Class 2 and Class 3, and reinstate the bonds obligations included in Class 4. The projections also show that the District has

---

[14] A few of these obligations may qualify for treatment under Section 503(b)(9). There are no administrative expense claims under 503(b)(1)(A) for the reasons set forth in this memorandum of law.

Debtor's Memorandum of Law in Support of Confirmation of Plan    -19-    J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
for Adjustment of Debts Dated April 30, 2019        Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

1  sufficient resources to repay the secured loan to Adventist Health in Class 5 and the secured loan

2  to the City of Tulare in Class 6 in accordance with the loan terms. Beginning in fiscal year

3  ending 2025, the District will be able to fund the payments to the Class 8 claimants with Allowed

4  Claims in the estimated amounts set forth in the Plan over a period of 5 years on a *pro rata* basis.

5  Although the financial projections show a slight available cash net decrease in fiscal years

6  ending 2024 and 2025, the District believes that any necessary adjustments can be made so that it

7  has adequate cash reserves to operate in a financially sound manner.

8       Importantly, the District's financial projections show that it will be able to devote some

9  funds to capital expenditures as well as necessary community healthcare programs, which is an

10  important part of fulfilling its mission to the residents of the District that pay taxes for such

11  healthcare services. However, the District was required to reduce the amounts devoted to capital

12  expenditures and community needs in fiscal years ending 2021 through 2024 to less than the

13  amount that is otherwise required for these obligations in order to have enough money to pay the

14  loan obligations to Adventist Health and the City of Tulare. The needs of the community for

15  services have been identified in the 2016 Community Needs Assessment completed by the

16  County of Tulare and in 2019 by the California Hospital Council of Northern and Central

17  California. After these loans are repaid, the District can then increase the amount devoted to

18  capital expenditures and the community needs to the amount of the historical averages, as well as

19  begin to fund the payments to Class 8 unsecured creditors.

20  **E.    Risks Factors in the District's Ability to Make Plan Payments**

21       In its Disclosure Statement, the District identified and disclosed numerous risks associated

22  with the District's ability to perform under the Plan. Risks associated with the Plan include: (a) ad

23  valorem tax revenues may decline which may result in insufficient revenues to pay the bond

24  indebtedness; (b) the cost and expenses of maintaining the District's real estate assets and facilities

25  may be greater than projected; (c) the lessors of the District's real property may default on

26  payments of rent; (d) AH Tulare may choose not to continue to lease the Hospital; (e) medical

27  malpractice awards could exceed available insurance coverage; (f) rent revenues may not be

28  achieved; (g) anticipated sales of real property may not close escrow; (h) recoveries anticipated

Debtor's Memorandum of Law in Support of Confirmation of Plan    -20-    J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
for Adjustment of Debts Dated April 30, 2019    Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

1  from litigation and avoidance claims may not be achieved; (i) additional costly seismic and other

2  regulations may be imposed on the District; (j) government laws and rules may result in decreased

3  funding available to the District; (k) California and federal laws may impose much greater

4  expenses on healthcare districts; (l) the District may not succeed on its objections to the claims of

5  governmental units for alleged overpayments and other amounts, and (m) the District's estimates

6  of the dollar amount of allowed claims may exceed the high end estimate. Notwithstanding these

7  risks, the District believes that it will be able to operate in a manner that allows it to make the

8  payments required by the Plan and still fulfill its mission to provide healthcare services to the

9  District's residents.

10  **III.      THE COURT SHOULD CONFIRM THE PLAN**

11        A bankruptcy court "shall" confirm a plan of adjustment if the debtor has satisfied all the

12  applicable confirmation requirements set forth in Section 943(b) by a preponderance of the

13  evidence. *In re Barnwell Cnty. Hosp.,* 471 B.R. 849, 855-56 (Bankr. D.S.C. 2012) ("*Barnwell*")

14  ("Debtor has met its burden of satisfying the confirmation requirements of § 943(b) by a

15  preponderance of the evidence, which is the applicable evidentiary standard.").[15] Section 943(b)

16  lists seven conditions to confirmation. Once those conditions are met, the court must confirm the

17  plan. *In re Pierce County Hous. Auth.*, 414 B.R. 702, 715 (Bankr. W.D.Wash. 2009) ("*Pierce*");

18  *Collier on Bankruptcy,* ¶ 943.03 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (further

19  references are cited as "*Collier*"). As demonstrated below, the Plan meets each of the seven

20  confirmation requirements of Section 943(b).

21        **A.      The Plan Complies with the Provisions of Chapter 11 Made Applicable in**

22              **Chapter 9 Cases (Section 943(b)(1))**

23        Section 943(b)(1) requires that a plan of adjustment "compl[y] with the provisions of this

24  title made applicable by sections 103(e) and 901 of this title." The chapter 11 provisions made

25  applicable by section 901 to the confirmation of a plan of adjustment include sections 1122,

26  _____

27  [15] *In re Connector 2000 Ass'n, Inc.*, 447 B.R. 752, 761 (Bankr. D.S.C. 2011) (preponderance of
evidence is the burden of proof for confirming a chapter 9 plan); *In re Pierce County Hous.*

28  *Auth.*, 414 B.R. 702, 715 (Bankr. W.D.Wash. 2009) (same); *In re Mount Carbon Metro. Dist.*,
242 B.R. 18, 31 (Bankr. D. Colo. 1999) (same).

Debtor's Memorandum of Law in Support of Confirmation of Plan          -21-          J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
for Adjustment of Debts Dated April 30, 2019                                    Plan\Confirmation Module\CLEAN.Confirmation
                                                                               Brief.08919.jt.docx

1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), 1123(d), 1124, 1125,
1126(a), 1126(b), 1126(c), 1126(e), 1126(f), 1126(g), 1127(d), 1128, 1129(a)(2), 1129(a)(3),
1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), and 1129(b)(2)(B). The Plan's
compliance with each of those requirements is discussed below.

> **1.     The Plan Complies with Section 1122(a)'s Requirements Concerning the Classification of Claims or Interests**

Section 1122(a) provides that, except for administrative convenience classes dealt with in
Section 1122(b), "a plan may place a claim or an interest in a particular class only if such claim
or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. §
1122(a). A claim that is not "substantially similar" to another – for example, because it is secured
by collateral – must be classified separately. *Collier* ¶ 1122.03[3][c] ("[A]s a general rule each
holder of an allowed claim secured by a security interest in specific property of the debtor should
be placed in a separate class.").

While unsecured claims are generally similar, however, it is well established that the
proponent of the plan has wide latitude in determining whether similar claims should be
separately classified. *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327-28 (9th Cir.
1993); *Franklin High Yield Tax-Free Income Fund et al. v. City of Stockton, California (In re
City of Stockton, California)*, 542 B.R. 261, 280 (B.A.P. 9th Cir. 2015) ("*B.A.P. Stockton
Opinion*") ("Generally, § 1122 allows plan proponents broad discretion to classify claims and
interests according to the particular facts and circumstances of each case.") (quoting *In re City of
Colo. Springs Spring Creek Gen. Improvement Dist.,* 187 B.R. 683, 687 (Bankr. D. Colo. 1995)).
[16] If the District can point to "a legitimate business or economic reason" for separate

---

[16] *See also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280
F.3d 648, 661 (6th Cir. 2002) (holding that section 1122(a) requires that a claim be classified in a
particular class only if it is substantially similar to the other claims in that class, but it does not
require that all similar claims be in the same class, and holding further that the bankruptcy court
has substantial discretion to place similar claims in different classes); *In re Wabash Valley Power
Ass'n*, 72 F.3d 1305, 1321 (7th Cir. 1995) (a debtor has considerable discretion to classify claims
in a reorganization plan, and although a debtor may not separately classify claims solely to
gerrymander affirmative votes, claims may be separately classified if significant differences exist
between the legal rights of the holders that render the claims not substantially similar, if there are

Debtor's Memorandum of Law in Support of Confirmation of Plan          -22-          J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
for Adjustment of Debts Dated April 30, 2019                                        Plan\Confirmation Module\CLEAN.Confirmation
                                                                                   Brief.08919.jt.docx

classification, such classification is proper as long as the purpose of separate classification is not to secure the vote of an impaired, consenting class of claims. *In re Barakat*, 99 F.3d 1520, 1525-26 (9th Cir. 1996); *In re Johnston*, 21 F.3d at 328; *In re Loop 76, LLC*, 465 B.R. 525, 536 (9th Cir. B.A.P. 2012) (upholding separate classification).

### a.　Separate Classification of Claims

The Plan provides for separate classification of claims based on the differences in the nature of the claims. Classes 1, 2, 3 and 4 are comprised of holders of bonds that are secured by separate rights and collateral: General Obligation Bonds in the case of Classes 1, 2 and 3; and Revenue Bonds in the case of Class 4. Classes 5, 6 and 7 are comprised of claims secured by real or personal property of the District. Class 8 is comprised of all unsecured claims against the District that arose prior to confirmation of the District's Plan. Class 9 is compromised of liability claims which may be paid from the proceeds of any applicable insurance or coverage policy issued to or for the benefit of the District. Class 10 is a conventional administrative convenience class, and the Plan offered certain creditors in Class 8 the opportunity to opt into the treatment offered under Class 10.

### b.　Each Class Contains Only Substantially Similar Claims

No creditor has asserted that the claims in classes 1 through 10 are not substantially similar to the other claims in each such class. Substantially similar claims are those that "share common priority and rights against the debtor's estate." *In re Greystone III Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1991). "Unsecured claims will, generally speaking, comprise one class . . . because they are claimants of equal legal rank entitled to share pro rata in values remaining after payment of secured and priority claims." *FGH Realty Corp. v. Newark Airport/Hotel Ltd. P'ship*, 155 B.R. 93, 99 (D. N.J. 1993); *In re One Times Square Assoc. Ltd. P'ship*, 165 B.R. 773, 776 (Bankr. S.D.N.Y. 1994) (same). The similarity of claims is not judged by comparing creditor claims *inter se*, but rather, the question is whether the claims in a class have the same or

good business reasons to do so, or if the claimants have sufficiently different interests in the plan).

similar legal status in relation to the assets of the debtor. *In re AOV Industries, Inc.*, 792 F.2d
1140, 1150 (D.C. Cir. 1986).

Section 1129(b) authorizes the Court to confirm the Plan even if not all impaired classes
have accepted the Plan, provided that the Plan has been accepted by at least one impaired class
and that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each
class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. §
1129(b)(1). Because impaired Classes 4 and 8 voted to accept the Plan, the Plan has been
accepted by at least one impaired class.

Section 1129(b)(2)(B) (the codification of the so-called "absolute priority rule") provides
that for a plan to be fair and equitable, unsecured creditors may receive less than the value of
their claims as of the effective date of a plan only if no class of junior claims or interests receives
any distribution on account of their claims or interests. 11 U.S.C. § 1129(b)(2)(B). Application
of the absolute priority rule to unsecured creditors of a municipal debtor is not possible because,
in chapter 9, there can be no junior class of equity interests, the class most commonly prevented
from receiving or retaining property by the application of the absolute priority rule. *In re
Corcoran Hosp. Dist.*, 233 B.R. 449, 458 (Bankr. E.D. Cal. 1999) ("*Corcoran*") (holding that the
proposed chapter 9 plan did not implicate the absolute priority rule because there were no
holders of equity interests in the debtor hospital). Rather, the requirement that a plan be fair and
equitable as to unsecured creditors of a municipal debtor is satisfied where creditors receive "all
that they can reasonably expect in the circumstances." *Lorber v. Vista Irr. Dist.*, 127 F.2d 628,
639 (9th Cir. 1942) (collecting cases), *cert. denied* 323 U.S. 784, 65 S. Ct. 270 (1944); *West
Coast Life Ins. Co. v. Merced Irr. Dist.*, 114 F.2d 654, 679 (9th Cir. 1940) (affirming
confirmation of plan under municipal debtor provisions of Bankruptcy Act of 1898 when the
plan payments were "all that could reasonably be expected in all the existing circumstances"). In
determining what can reasonably be expected under the circumstances, it is not necessary that all
taxes collected go to pay creditors. *Lorber*, 127 F.2d at 639. It is also not necessary that taxes be
increased. *Corcoran*, 233 B.R. at 459; *Collier* ¶ 943.03[1][f][B]. In fact, it is critical that the

Debtor's Memorandum of Law in Support of Confirmation of Plan
for Adjustment of Debts Dated April 30, 2019     **-24-**     J:\Client\9703-001\PLEADINGS\WW-95  Chapter 9
Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

1  municipality must retain adequate funding to continue operations because the chapter 9 debtor

2  cannot be dismantled or liquidated. *Corcoran*, 233 B.R. at 459; *Collier* ¶ 943.03[1][f][B].

3         Here, the District is proposing to pay creditors what the District's financial projections

4  will allow, which is all that can reasonably be expected. Under the Plan, the Class 8 General

5  Unsecured Claims will receive a distribution of 19.2% to 30.3% on the Allowed Claims over

6  time. As set forth in the District's financial projections and discussed in Section II(D) above, the

7  District does not now have, and is not projected to have, the financial resources to fund more

8  than a minimum amount to address its deferred maintenance obligations and make other

9  necessary repairs, make required capital expenditures, and pay for all programs identified in

10  community needs assessments performed by third parties, let alone pay anything more on general

11  unsecured claims than provided in the Plan. Even the limited amounts that the District can

12  budget in the coming years are based on the assumption that the District will be able to discharge

13  its unsecured claims with a 19.2% to 30.3% distribution. If the District is required to pay more

14  on general unsecured claims, it will not have enough money to fund its rehabilitation and ensure

15  that it can meet its obligations under the Lease with AH Tulare, comply with California's seismic

16  rules and regulations, make necessary repairs and capital improvements, build cash reserves to

17  ensure that the District has enough cash in lean times, and continue to provide healthcare

18  services to address the needs of the District's residents. Thus, the District's proposed 19.2% to

19  30.3% distribution to general unsecured creditors is all that can reasonably be expected under the

20  existing circumstances.[17] Therefore, the Plan is fair and equitable. This assertion is buttressed by

21  the overwhelming favor vote of the impaired creditors.

22

23  [17] Therefore, consideration of alternative classification schemes would be entirely academic and

24  beside the point. *See, e.g., In re Red Mountain Mach. Co.*, 451 B.R. 897, 907 (Bankr. D. Ariz. 2011) (explaining that "even if there is a technical legal question as to the propriety of the

25  classification, it makes no practical difference and is therefore harmless error"); *In re ARN, Ltd. Ltd. P'ship*, 140 B.R. 5, 10 (Bankr. D.D.C. 1992) (finding that question of proper classification

26  was "not a germane issue" when voting outcome would have been the same regardless of how

27  claims were classified); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 647 (2d Cir. 1988) ("The harmless error rule has been invoked in the bankruptcy context where procedural irregularities,

28  including alleged errors in voting procedures, would not have had an effect on the outcome of the case.").

## 2.     The Plan Complies with Section 1129(b)(1) Because it Does Not Unfairly Discriminate

By its terms, Section 1129(b)(1) prohibits only unfair discrimination, not all discrimination. *In re Plant Insulation Co.*, 2012 Bankr. LEXIS 1716, at *27-28 (Bankr. N.D. Cal. Mar. 15, 2012); *In re Aztec Co.*, 107 B.R. 585, 588-89 (Bankr. M.D. Tenn. 1989) (same). Indeed, it is "necessarily inherent in the term 'unfair discrimination' . . . that there may be 'fair' discrimination in the treatment of classes of creditors." *In re Simmons*, 288 B.R. 737, 747-48 (Bankr. N.D. Tex. 2003) (citing 7 Collier on Bankruptcy ¶ 1129.04[3] (15th ed. 2002)). "By making 'fair[ness]' the touchstone of the legal standard, Congress eschewed any rigid mechanical test and instead made clear that courts should apply a flexible standard that takes all relevant circumstances into account." *Brinkley v. Chase Manhattan Mortg. & Realty Trust (In re LeBlanc)*, 622 F.2d 872, 879 (5th Cir. 1980).

Here, no party pointed to any unfair discrimination and the settlements described in the Disclosure Statement and herein were critical to the District's ability to reopen the Hospital and get to a position where it could propose a confirmable Plan. Because settlements are fundamental to the bankruptcy process, creditors who have settled with a debtor and agree to accept a plan or make other valuable concessions may receive more favorable treatment than non-settling creditors without running afoul of section 1129(b)(1)'s prohibition on unfair discrimination. In the Chapter 9 case of *Corcoran Hospital District*, 233 B.R. 449, the court approved the separate classification and preferential treatment of the unsecured claim of a particular creditor, consistent with a settlement agreement with the debtor. The settlement agreement resolved ongoing litigation between the parties and enabled the debtor to propose a plan of adjustment under which it could both "devot[e] its resources to maintaining its hospital operations and [make] the payments under the [p]lan." *Id.* at 456.  The *Corcoran* court explained that "[i]f the debtor were forced to expend resources in continued litigation with [the settling creditor]…, it most likely would not have been able to propose a feasible, confirmable [p]lan." Accordingly, "[g]iven the magnitude of [the creditor's] compromise in the [s]ettlement [a]greement, the court [wa]s unable to say that the disparate treatment of [the creditor] from the other unsecured creditors

1  constitute[d] unfair discrimination." *Id.* at 457. Similarly, in *In re Western Real Estate Fund,*

2  *Inc.*, 75 B.R. 580 (Bankr. W.D. Okla. 1987), secured creditors objected to the debtors' plan of

3  reorganization because "those creditors who ha[d] settled with the debtors . . . obtain[ed] more

4  favorable treatment than those creditors who ha[d] not settled." *Id.* at 585. The court rejected this

5  argument, stating: "[T]hat those creditors which have reached an accommodation with the

6  debtors . . . are to receive differing treatment from that of the remaining creditors[] does not

7  constitute impermissible discrimination." *Id.* at 586. The court explained that denying

8  confirmation of the plan "would discourage and remove any incentive for negotiation and

9  resolution of differences prior to confirmation." *Id.* Because the court believed that settlements

10  or "work outs" are "fundamental to effective reorganization and rehabilitation," it overruled the

11  objections and held that the plan was not unfairly discriminatory. *Id.*

12      The District is not required to show that the Plan satisfies the "no unfair discrimination"

13  requirement of Section 1129(b) because all classes of impaired claims voted to confirm the Plan.

14  As the court stated in the *B.A.P. Stockton Opinion*, "Franklin is merely a dissenting creditor in

15  the accepting class of general unsecured creditors. In these circumstances, "cramdown" analysis

16  under *§ 1129(b)* is not required, and we do not consider further Franklin's "unfair

17  discrimination" argument based on *§ 1129(b)*." *B.A.P. Stockton Opinion* at 283 (citing *In re City*

18  *of Colo. Springs Spring Creek Gen. Improvement Dist.,* 187 B.R. 683, 690 (Bankr. D. Colo.

19  1995)).

20          **3.      The Plan Complies with Section 1122(b) because Class 10 is**
               **Reasonable and Necessary for Administrative Convenience Purposes**
21

22      Section 1122(b) authorizes plans to create an administrative convenience class of general

23  unsecured claims that are reduced to a specific amount. Class 10 is just such a class in that it

24  allows Class 10 General Unsecured Creditors who would receive less than $5,000 on their claim

25  to elect to receive 50% of the amount of such claim on the Effective Date. As a practical matter,

26  Class 10 will benefit substantially all general unsecured creditors with claims under $5,000 who

27  opt into Class 10. The availability of Class 10 treatment will facilitate settlement with numerous

28  of the District's creditors by reducing the cost of liquidating and allowing claims after

Debtor's Memorandum of Law in Support of Confirmation of Plan          -27-          J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
for Adjustment of Debts Dated April 30, 2019                                    Plan\Confirmation Module\CLEAN.Confirmation
                                                                               Brief.08919.jt.docx

confirmation of the Plan. Class 10 meets the requirements of Section 1122(b). See the ballot tally for a description of the Class 10 claimants.

### 4. The Plan Complies with Section 1123 Because it Contains All Mandatory Provisions and Several Permitted Provisions

Section 1123(a) sets forth seven requirements which every chapter 11 plan must satisfy in order to be confirmed. The first five requirements set forth in Section 1123(a)(1)-(5) are incorporated into chapter 9. 11 U.S.C. § 901(a). Section 901 also incorporates into chapter 9 the permissive provisions of section 1123(b), several of which apply to the Plan. As demonstrated below, the Plan fully complies with each of these mandatory and permissive provisions.

Section 1123(a)(1) requires a plan to designate classes of claims, other than claims of a kind specified in Sections 507(a)(2), 507(a)(3), or 507(a)(8), and classes of interests. 11 U.S.C. § 1123(a)(1). The Plan designates 10 classes of claims, none of which contain claims of the kind specified in Sections 507(a)(2) (claims of federal reserve banks, and claims entitled to administrative priority under Section 503(b)), 507(a)(3) (involuntary case gap claims), or 507(a)(8) (claims of governmental units for taxes, customs duties and penalties related thereto); and there are no classes of interests under the Plan because there are no equity holders in this chapter 9 case. Thus, the Plan satisfies the requirements of Section 1123(a)(1).

The Plan complies with the requirements of section 1123(a)(2) by specifying in Article III of the Plan the classes of claims that are not impaired under the Plan. Classes 1, 2, 3, 5, 6, 7, 9 and 10 are unimpaired under the Plan and are deemed to have accepted the Plan. The Plan complies with the requirements of section 1123(a)(3) by specifying in Article III of the Plan the treatment of the impaired classes of claims, which are Classes 4 and 8. The Plan complies with the requirements of Section 1123(a)(4) by providing for the same treatment for each claim in each respective class. Plan §§ III and IV. The Plan complies with the requirements of Section 1123(a)(5) by providing adequate means for its implementation. The District prepared detailed long-term financial projections that show that the District will be able to achieve a balanced and sustainable budget for the foreseeable future and make the payments proposed in the Plan based

on current financial information and audited financial statements. *See* Exhibits A and B to the Disclosure Statement.

As provided in the Plan, the District will implement the Plan by continuing to operate pursuant to the District Bylaws and other governing documents, the Local Health Care District Law, and other applicable state and federal laws. The District will continue to collect tax revenues, rents, and other revenues following the Effective Date. These revenues will enable the District to continue its mission set forth in the District Bylaws, and maintain and fund the services set forth in Article I, § 6 of the District Bylaws, as well as to satisfy the District's obligations to its creditors as restructured and adjusted pursuant to the Plan.

Section 1123(b) sets forth the provisions that may, but need not, be incorporated into a chapter 9 plan. Each provision of the Plan is consistent with section 1123(b). Section 1123(b)(1) provides that a plan may impair or leave unimpaired any class of claims, secured or unsecured, or of interests. As discussed above, the Plan impairs some classes of claims and leaves unimpaired other classes of claims. Plan §§ III and IV. Section 1123(b)(2) provides that a plan may, subject to section 365, provide for the assumption, rejection or assignment of an executory contract or unexpired lease. In compliance with this provision, the Plan provides in Article VI a description of which contracts and leases will be assumed, assigned or rejected pursuant to the Plan. Section 1123(b)(3) provides that a plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor, or the retention and enforcement by the debtor of any such claim or interest. The Plan specifies at Article V, § 5.1 that the District shall be vested with all right, title and interest in all of the assets of the Debtor, which includes the claims and interests pursuant to Section 1123(b)(3).

### 5.    The Plan Complies with Section 1129(a)(2) Because the District Has Complied with the Applicable Provisions of Title 11

Section 1129(a)(2) provides that a plan may be confirmed only if the plan proponent complies with the applicable provisions of title 11. The legislative history to section 1129(a)(2) reveals that the purpose of this requirement is to include the provisions of sections 1125 and 1126 regarding disclosure and plan solicitation. *See* H.R. Rep. No. 95-595, at 412 (1977); S.

Rep. No. 95-989 (1978). Section 1125(b) provides that a proponent may not solicit acceptances of its plan unless, at or before the time of such solicitation, there is transmitted to the solicitee a copy of the plan and a court-approved disclosure statement containing "adequate information." 11 U.S.C. § 1125(b). Under Section 1126, only holders of allowed claims may accept or reject a plan. 11 U.S.C. § 1126(a). The District has complied with Sections 1125 and 1126 because on July 9, 2019, the District served by mail the documents required by the Solicitation Order on all eligible voters deemed to be holders of allowed claims for voting purposes. Thus the District complied with the requirements of Sections 1125 and 1126.

6. **The Plan Complies with Section 1129(a)(3) Because the District has Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law**

Section 1129(a)(3) requires that a plan be proposed in good faith and not by any means forbidden by law. The determination of what constitutes good faith is based upon the totality of the circumstances in a particular case, and is a very fact-dependent exercise. *B.A.P. Stockton Opinion* at 278-79. "In order to satisfy the statutory requirement of good faith, a plan must be intended to achieve a result consistent with the objectives of the Bankruptcy Code." *In re Corey*, 892 F.2d 829, 835 (9th Cir. 1989) (citing *Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*, 84 Bankr. 167, 172 (Bankr. 9th Cir. 1988) and *Jorgensen v. Federal Land Bank of Spokane (In re Jorgensen)*, 66 Bankr. 104, 108-09 (Bankr. 9th Cir. 1986).

In assessing whether a plan was proposed in good faith, the *Mount Carbon* court determined that the test was whether the Plan allowed allow an insolvent municipality to restructure its debts in order to continue to provide public services." *Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999). As discussed throughout this brief, and as the District has demonstrated throughout this chapter 9 case, the District's primary objective in proposing the Plan is to restructure its debts in order to continue to provide healthcare services to the residents it serves, and the Plan achieves that result.

The Plan satisfies the good faith standard. As demonstrated by the records of this Court and the facts discussed in the Disclosure Statement and herein, ever since the District filed its petition for relief under Chapter 9, the District's actions have demonstrated good faith. Since

receiving the benefit of the breathing spell afforded by filing its petition under Chapter 9, the District's management team and its outside professionals have devoted thousands of hours to negotiating with the District's creditors to settle litigation, resolve claims and disputes, obtain financing, and identify a suitable partner to reopen the Hospital in order to fulfill the District's mission of providing healthcare services to the District's residents.

The District has thus satisfied the requirements of section 1129(a)(3).

**7.    Section 1129(a)(6) is not Applicable in this Chapter 9 Case**

The District is not subject to any governmental rate-setting commission and, therefore, Section 1129(a)(6) is not applicable.

**8.    The Plan Complies with Section 1129(a)(8) Because the Plan Has Been Accepted by All Classes Whose Acceptance Is Required**

Section 1129(a)(8) requires that each class of claims or interests vote to accept a plan or that such class is not impaired under a plan. 11 U.S.C. § 1129(a)(8). An impaired class of claims accepts the plan if the holders of at least two-thirds in dollar amount and more than one-half number, in each case of only the voted claims, vote to accept the plan.  11 U.S.C. § 1126(c). A class that is not impaired is deemed to have accepted the plan. 11 U.S.C. § 1126(f).  Classes 1, 2, 3, 5, 6, 7, 9 and 10 are unimpaired under the Plan. Therefore, assuming the final ballot tallies to be filed on August 13, 2019 are consistent with voting to date, these classes are deemed to have accepted the Plan. 11 U.S.C. § 1126(f). Classes 4 and 8 are impaired under the Plan and entitled to vote. It is believed that the Ballot Tabulation will show that each such class voted to accept the Plan. Thus, the Plan complies with the requirement set forth in section 1129(a)(8).

**9.    The Plan Complies with Section 1129(a)(10) Because the Plan Has Been Accepted by an Impaired Class**

Section 1129(a)(10) requires that at least one class of claims that is impaired under the Plan accept the Plan, determined without including acceptances of the Plan by any insider. The ballot tally will show each of impaired Classes 4 and 8 voted to accept the Plan. Thus, the Plan satisfies Section 1129(a)(10).

**10.    The Plan Complies with the Plan of Adjustment Provisions of Chapter 9 in Sections 941, 942 and 943(b)**

The plan confirmation requirements of chapter 9 are found in Bankruptcy Code §§ 941, 942 and 943(b). Section 941 requires that the debtor file a plan of adjustment with the petition for relief, or by any deadline for doing so set by the Court. Section 942 authorizes the District to file Plan modifications any time before confirmation as long as the modifications do not cause the Plan to fail to meet the plan confirmation requirements of the Bankruptcy Code. As no deadline was set by the Court to file the Plan and the District has not filed any Plan modifications prior to the confirmation hearing, the Plan satisfies Sections 941 and 942.

Section 943(b) provides that the Court shall confirm the Plan if the seven conditions contained therein are met. Section 943(b)(1) requires that the Plan must meet the requirements of chapter 11 made applicable to chapter 9. The Plan's compliance with those applicable chapter 11 provisions is discussed above, and the District incorporates all of those arguments herein. Section 943(b)(2) requires that the Plan comply with the plan confirmation requirements expressly provided in chapter 9. As discussed above, the Plan complies with the requirements of Section 941 and 942. The Plan's compliance with the remaining requirements of Section 943 is discussed below.

Section 943(b)(3) requires that all amounts to be paid by the District or by any person for services or expenses in the case have been fully disclosed and are reasonable. While this section requires the disclosure of payments to be made by the District, "it does not authorize the allowance of, or require payment of, compensation for services provided to, or reimbursement of expenses incurred by, the debtor. The debtor's obligation to pay for services rendered and expenses incurred is governed by non-bankruptcy law." *Collier* ¶ 943.03[3]. The District has been paying its professionals on a current basis and does not expect that there will be any future payments that fall within the ambit of section 943(b)(3). Accordingly, the District has satisfied the requirements of this section.

Section 943(b)(4) prevents confirmation of a plan of adjustment that requires the debtor to take any action prohibited by law. This section is intended to prevent chapter 9 debtors from

1 | using chapter 9 cases for the purpose of circumventing compliance with state law after

2 | confirmation. *In re Sanitary & Improvement Dist. No. 7*, 98 B.R. 970 (Bankr. D. Neb. 1989);

3 | *Collier* ¶ 943.03[4]. The District intends to comply with all laws, regulations, and ordinances

4 | following confirmation of the Plan, and nothing in the Plan proposes an action in violation of

5 | existing applicable laws. Accordingly, the District has satisfied the requirements of this section.

6 |     Section 943(b)(5) provides that a plan cannot be confirmed unless it provides for the

7 | payment in full in cash on the effective date of the plan of all claims specified in Section

8 | 507(a)(2). Section 507(a)(2) in turn references (i) claims of any Federal Reserve bank for loans

9 | authorized under section 13(3) of the Federal Reserve Act, (ii) fees and charges assessed against

10 | the estate under chapter 123 of title 28 of the U.S. Code, and (iii) administrative claims allowed

11 | under Section 503(b). The District is not aware of any claims based upon Federal Reserve bank

12 | loans authorized under section 13(3) of the Federal Reserve Act, or fees and charges assessed

13 | under chapter 123 of title 28.

14 |     Certain of the subsections of Section 503(b) make reference to claims that arise in chapter

15 | 9. Those are Sections 503(b)(3)(D) and (F), and 503(b)(4) and (b)(5), which are claims that arise

16 | out of the administration of the chapter 9 case, rather than for preserving a non-existent estate.

17 | Specifically, those are claims for making a substantial contribution in the chapter 9 case,

18 | expenses of official committee members incurred in the performance of their duties, and

19 | reasonable compensation for attorneys or accountants working for parties making a substantial

20 | contribution to the chapter 9 case. The District disputes the allowance of any such claims. Claims

21 | arising under Sections 503(b)(7), (8) and (9) may be allowable administrative expenses in

22 | chapter 9. In order to avoid protracted and costly litigation, the District has entered into

23 | settlement agreements with Medline, Owens & Minor, and Cerner to pay part of their claims

24 | asserted as administrative expenses under Section 503(b)(9). The District believes there are no

25 | claims pending against the District for rejection of previously assumed real property leases or

26 | closing down of a health care business. The Plan does not provide for the allowance or payment

27 | of alleged administrative claims outside the narrowly construed terms of Section 503(b).

28 |

Debtor's Memorandum of Law in Support of Confirmation of Plan
for Adjustment of Debts Dated April 30, 2019

J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

In a chapter 7 or 11 case, claims arising under Section 503(b)(1)(A) for "the actual, necessary costs and expenses of preserving the estate," are allowable administrative expenses. However, there is no estate in a chapter 9 case. *Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.),* 371 B.R. 412, 419 n.4 (B.A.P. 9th Cir. 2007); *In re City of Vallejo,* 403 B.R. 72, 78 n.2 (Bankr. E.D. Cal. 2009*); In re Jefferson County, Ala.*, 484 B.R. 427, 460-61 (Bankr. N.D. Ala. 2012). There can be no "necessary costs and expenses of preserving the estate" in a case where no estate exists such as in a chapter 9 case. *In re New York City Off-Track Betting Corp.,* 434 B.R. 131, 142 (Bankr. S.D.N.Y. 2010) ("*OTB*"); *In re Texas Wyoming Drilling, Inc.*, 486 B.R. 746, 759 (Bankr. N.D. Tex. 2013). In *OTB,* Judge Glenn considered the motions filed by several New York racetracks to compel the chapter 9 debtor to pay certain statutorily-mandated fees that had accrued post-petition. The court rejected the argument that such payments were entitled to administrative priority under section 503(b)(1)(A) as follows:

> "Because a chapter 9 debtor's property remains its own and does not inure into a bankruptcy estate as provided by section 541 of the Bankruptcy Code, there can be no administrative expenses for 'the actual and necessary costs of preserving the estate' as contemplated by section 503(b)(1)(A) of the Bankruptcy Code."

*OTB*, 434 B.R. at 142. The *OTB* court's conclusion is consistent with, and indeed mandated by Section 904, which prevents bankruptcy courts from exercising jurisdiction over a municipality's use of its revenues, absent the municipality's consent. *Ass'n of Retired Employees of the City of Stockton v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 13 (Bankr. E.D. Cal. 2012) (§ 904 bars the court, without the municipality's consent, from interfering with its political or governmental powers, property or revenues, and use or enjoyment of income-producing property); *In re Valley Health Sys.*, 429 B.R. 692, 714 (Bankr. C.D. Cal. 2010) ("By virtue of § 904, a debtor in chapter 9 retains title to, possession of, and complete control over its property and its operations, and is not restricted in its ability to sell, use, or lease its property."). The Plan does not provide for payment of claims arising under section 503(b)(1)(A) as allowable administrative expenses in the Chapter 9 Case.

Statutes allowing administrative priorities in bankruptcy "must be tightly construed." *Howard Delivery Serv. v. Zurich Am. Ins. Co., 547* U.S. 651, 667, 126 S. Ct. 2105, 2116 (2006). "[I]f one claimant is to be preferred over others, the purpose should be clear from the statute. "

1  *Id.* (quoting *Sampsell v. Imperial Paper & Color Corp.,* 313 U.S. 215, 61 S. Ct. 904 (1941)).

2  "We take into account, as well, the complementary principle that preferential treatment of a class

3  of creditors is in order only when clearly authorized by Congress. *Id.* at 655 (citing *Nathanson v.*

4  *NLRB,* 344 U.S. 25, 29, 73 S. Ct. 80 (1952).). Administrative expenses are narrowly construed in

5  chapter 9 cases. *In re Orange County,* 179 B.R. 195, 201 (Bankr. C.D. Cal. 1995). Because the

6  Bankruptcy Code does not expressly provide for the payment of Section 503(b)(1)(A) claims in

7  chapter 9 cases, the Court should not read Section 503(b)(1)(A) more broadly than the statute's

8  plain meaning. Congress did not clearly authorize a priority for post-petition claims against a

9  chapter 9 debtor when it authorized such claims against the estate. Congress could have done so

10  by, for example, stating in Section 902(1) that "estate" when used in the Bankruptcy Code

11  sections made applicable to chapter 9 means "the debtor," as Congress did with respect to

12  "property of the estate." Alternatively, Congress could have written Section 503(b)(1)(A) to

13  provide for administrative priority for "the actual, necessary costs and expenses of preserving the

14  debtor and the estate," but Congress limited that provision to claims against the estate. There

15  being no estate in chapter 9, Section 503(b)(1)(A) does not apply in chapter 9. Given the

16  constitutional concerns discussed in *Bekins* that led to Congress to enact Section 904

17  (substantially limiting the jurisdiction of the bankruptcy courts over a chapter 9 debtor's property

18  and revenues), the Court should not expand the reach of Section 503(b)(1)(A) unless doing so is

19  "clearly authorized by Congress (*Nathanson, supra*) and "the purpose of doing so is clear from

20  the statute" (*Howard Delivery Service, supra*). The Plan's treatment of claims arising under

21  Section 503(b) is consistent with the law, and no creditor has raised any objection to the

22  treatment under the Plan and the limited scope of administrative expense priority provided under

23  the Plan. Accordingly, the Plan satisfies the requirements of Section 943(b)(5).

24      Section 943(b)(6) requires that any regulatory or electoral approval necessary under

25  applicable non-bankruptcy law in order to carry out any provision of the plan has been obtained,

26  or such provision is expressly conditioned on such approval. The District does not need to obtain

27  any regulatory or electoral approval under applicable non-bankruptcy law in order to carry out

28  the provisions of the Plan. Thus, the Plan satisfies the requirements of Section 943(b)(6).

Debtor's Memorandum of Law in Support of Confirmation of Plan
for Adjustment of Debts Dated April 30, 2019     -35-     J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

Section 943(b)(7) requires that the court find that "the plan is in the best interests of creditors and is feasible." 11 U.S.C. § 943(b)(7). As described herein, the Plan is in the best interest of creditors because the District has made a reasonable effort to propose a Plan that is a better alternative for the District's creditors, collectively, than dismissal of the chapter 9 case. The Plan is feasible because the District's financial projections demonstrates the District's ability to make the payments required under the Plan and still uphold its mission to provide healthcare services to the District's residents.

The principal purpose of a chapter 9 debt restructuring is the continued provision of public services. *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 (Bankr. D. Colo. 1999). Unlike the other chapters of the Bankruptcy Code, Chapter 9 does not attempt to balance the rights of the debtor and its creditors, but rather attempts to first meet the special needs of a municipal debtor. *In re Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991). Chapter 9 is designed to assist municipalities in providing vital government services by "providing the debtor with an array of bankruptcy powers to enable it to achieve financial rehabilitation with very few, if any, corresponding limitations and duties of the type to which a Chapter 11 debtor is subject." *Id.* at 224.

In proposing a chapter 9 plan for the adjustment of debts, the "debtor must retain sufficient funds with which to operate and to make necessary improvements in and to maintain its facilities." *Collier* ¶ 943.03[7][a]. To hold otherwise would be to place creditor recoveries over the health, safety and welfare of the District's residents, which would be antithetical to the purposes of chapter 9. *Mount Carbon*, 242 B.R. at 41 (holding that a chapter 9 plan was not proposed in good faith and was not feasible because it provided for the satisfaction of debt over the provision of governmental services; stating that the legislative purpose underlying chapter 9 "is to allow an insolvent municipality to restructure its debts in order to continue to provide public services"); *In re Barnwell Cnty. Hosp.*, 459 B.R. 903, 907 (Bankr. D.S.C. 2011) (purpose of chapter 9 is to allow municipalities the opportunity to remain in existence through debt adjustment); *New Magma Irr. & Drainage Dist. v. Bd. of Supervisors (In re New Magma*

Debtor's Memorandum of Law in Support of Confirmation of Plan
for Adjustment of Debts Dated April 30, 2019          -36-          J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

1 *Irr. & Drainage Dist.)*, 193 B.R. 528, 532 (Bankr. D. Ariz. 1994) (ultimate purpose of chapter 9

2 is to beneficially affect the debtor's citizens).

3       Courts assessing plans of adjustment in chapter 9 have emphasized the unique need to

4 consider the general municipal welfare when addressing issues of plan confirmation. *Corcoran*,

5 233 B.R. at 454 (describing the area's economic woes and noting that "[t]he hospital is very

6 important to the community of Corcoran" and that it was "an essential element to the survival of

7 Corcoran as a community"); *Barnwell*, 471 B.R. at 869 ("[O]f particular importance to the Court

8 is that the Plan preserves the availability of healthcare services to citizens and patients in the

9 County"). An overarching goal of chapter 9, and this chapter 9 case in particular, is to relieve the

10 municipality's residents from the effects of further declining services caused by the enormity of

11 the claims pending against the District, by restructuring that debt. *Collier* ¶ 943.03[7][a].

12       Given the clear purposes of chapter 9, the best interests of creditors test of Section

13 943(b)(7) requires the Court to make a determination of whether or not the plan as proposed is

14 better than the alternatives. *In re Sanitary & Improvement Dist., No. 7*, 98 B.R. 970, 974 (Bankr.

15 D. Neb. 1989). As the Mount Carbon court stated:

16       "This is often easy to establish. Since creditors cannot propose a plan; cannot
      convert to Chapter 7; cannot have a trustee appointed; and cannot force sale of

17       municipal assets under state law, their only alternative to a debtor's plan is
      dismissal. Outside of bankruptcy, general unsecured creditors often have little

18       possibility of being repaid, especially where the municipality's debt burden is too
      high to be retired by taxes. Therefore, any possibility of payment under a Chapter

19       9 plan is often perceived by creditors as a better alternative."

20 *Mount Carbon*, 242 B.R. at 34. Because liquidation of a municipality is not contemplated under

21 chapter 9, and dismissal of the case is the only real alternative to confirmation of a plan, courts

22 require the municipal debtor to show that its plan of adjustment is a better alternative to the

23 creditors than dismissal of the case. *Cnty. of Orange v. Merrill Lynch & Co. (In re Cnty. of*

24 *Orange)*, 191 B.R. 1005, 1020 (Bankr. C.D. Cal. 1996); *Collier* ¶ 943.03[7].

25       Unlike the best interests test under chapter 11, where the plan proponent is obligated to

26 show that <u>each</u> objecting creditor will receive under the plan at least as much as the creditor

27 would receive in a chapter 7 liquidation, no such comparison is available in chapter 9 because

28 municipalities cannot be liquidated. Therefore, the best interests test in chapter 9 compares what

creditors as a group receive under the plan, compared to what they could achieve if the case were dismissed.

> "By their terms, the "best interests" tests in chapters 9 and 11 are different, and only in chapter 11 is particular consideration of the best interests of individual creditors specified. By its terms, the "best interests" test in chapter 9 is collective rather than individualized, and that interpretation is supported by the very context of chapter 9."

*B.A.P. Stockton Opinion*, 542 B.R. at 283. The B.A.P. added: "We conclude that the 'best interests' test in chapter 9 considers the collective interests of all concerned creditors in a municipal plan of adjustment rather than focusing on the claims of individual creditors." *Id.* at 286.

As liquidation is not an alternative, the only alternative to confirmation of the Plan is dismissal of the case altogether, leaving creditors to race to the state and federal courts. *In re Mount Carbon*, 242 B.R. at 34. The result would be chaos because the creditors, of which there are many hundreds, would be required to fend for themselves in a scramble to litigate their claims in the state and federal courts. As the Supreme Court held in the chapter 9 case of *Faitoute Iron & Steel Co. v. City of Asbury Park*, 316 U.S. 502, 510, 62 S. Ct. 1129, 1134 (1942), this "policy of every man for himself is destructive of the potential resources upon which rests the taxing power which in actual fact constitutes the security for unsecured obligations outstanding to a city." The race to the courthouse is not a viable alternative. "The experience of the two modern periods of municipal defaults, after the depressions of '73 and '93, shows that the right to enforce claims against the city through mandamus is the empty right to litigate." *Id.,* 316 U.S. at 510, 62 S. Ct. at 1133.

In the District's case, dismissal would result in the District being flooded with litigation from creditors with whom the District had achieved settlement agreements that are tied to confirmation of the Plan, and settlements with secured bondholders and other secured creditors. Massive litigation costs would burden the District, its creditors, and all parties in interest, although creditors with the financial resources to pursue litigation most quickly (and therefore win "the race to the courthouse") would benefit disproportionately. But even those creditors would likely find its ability to collect on a judgment stymied by the inability of the District to

1  pay in light of its secured debt. In short, dismissal of the chapter 9 case would result in chaos,

2  with few, if any, creditors successfully recovering anything even after costly litigation. The

3  District, its residents and its creditors cannot afford to be left in such a circumstance.

4         Confirmation of the Plan is in the best collective interests of the District's creditors. The

5  Plan represents the District's best effort to pay creditors while retaining adequate revenues to

6  meet the District's obligations under its Lease with AH Tulare and Evo, make critical repairs and

7  address the significant backlog of deferred maintenance at the District's hospital campus, comply

8  with California's seismic requirements, make limited capital expenditures and provide

9  community services based on a needs assessment, and build a small reserve in order to stabilize

10  its finances so that it can continue to provide healthcare services to the District's residents. These

11  facts demonstrate that the District has made a reasonable effort to propose a plan that is a better

12  alternative to its creditors than dismissal of the chapter 9 case.

13         Furthermore, all of the District's real property assets are either vital to the operation of

14  the District (*e.g.* the Hospital campus) or will be sold in order to fund payments to be made under

15  the Plan. The same is true for the District's equipment. Even if, hypothetically, a sale of public

16  use facilities like the Hospital complex would generate money, such sale would prevent the

17  District from providing healthcare services to the District's residents, particularly to the

18  District's poorest residents who may not be able to afford health care at private sector for-profit

19  facilities or have transportation to go to other healthcare facilities in Visalia or Hanford. The

20  District is entitled to make the political and governmental decisions to retain such public

21  facilities, as it is well accepted that a chapter 9 debtor cannot be compelled to liquidate assets.

22  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs (In re City of Desert Hot Springs)*, 339

23  F.3d 782, 789 (9th Cir. 2003) ("Chapter 9 makes no provision for conversion of the case to

24  another chapter or for an involuntary liquidation of any of the debtor's assets.") (quoting *In re*

25  *Richmond Unified Sch. Dist.*, 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991); *see also Newhouse v.*

26  *Corcoran Irr. Dist.*, 114 F.2d 690, 691 (9th Cir. 1940) (stating that the debtor's property "cannot

27  be disposed of as in the ordinary bankruptcy proceeding for the benefit of the debtor"); *Lorber v.*

28  *Vista Irr. Dist.*, 127 F.2d 628, 637 (9th Cir. 1942) (same).

Debtor's Memorandum of Law in Support of Confirmation of Plan    -39-    J:\Client\9703-001\PLEADINGS\WW-95 Chapter 9
for Adjustment of Debts Dated April 30, 2019    Plan\Confirmation Module\CLEAN.Confirmation
Brief.08919.jt.docx

Indeed, Section 904 prohibits the Court from interfering with, among other things, the property and revenues of the District or its use and enjoyment of income-producing property and, therefore, the lack of any such case law requiring a municipal debtor to sell assets is not surprising.  By expressly limiting the authority of the bankruptcy court to interfere with a municipality's assets, Section 904 protects the constitutionality of chapter 9 under the Tenth Amendment.

> "The bill here recommended for passage expressly avoids any restriction on the powers of the States or their arms of government in the exercise of their sovereign rights and duties. No interference with the fiscal or governmental affairs of a political subdivision is permitted. The taxing agency itself is the only instrumentality which can seek the benefits of the proposed legislation. No involuntary proceedings are allowable, and no control or jurisdiction over that property and those revenues of the petitioning agency necessary for essential governmental purposes is conferred by the bill …."

H.R. Rep. No. 95-595, at 264 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6222; *see also United States v. Bekins*, 304 U.S. 27, 51 (1938) (expressing approval of the foregoing statements of the Committee on of the Judiciary of the House of Representatives in upholding the constitutionality of Chapter X of the Bankruptcy Act under the Tenth Amendment to the United States Constitution).

Moreover, since *Bekins*, Congress further narrowed the power of bankruptcy courts to interfere with a municipal debtor's assets by, in 1975, removing from their discretion the determination of whether or not the assets are "necessary for essential governmental services." See H.R. Rep. No. 94-686, at 18 (1975), reprinted in 1976 U.S.C.C.A.N. 539, 556. The District has satisfied the best interests tests by showing that the Plan is better that dismissal, that asset sales are not a viable or legal option and that the Plan is fair and equitable in the non-bankruptcy sense because creditors are receiving all that they can reasonably expect in the circumstances.

A chapter 9 plan is feasible if it shows that the debtor can make the payments promised under the plan and maintain post-confirmation operations. *Collier* ¶ 943.03[7][b]. For the Court to find that the District's Plan is feasible, the District need not prove that success is guaranteed; rather, it must establish that the assumptions and projections underlying the Plan are reasonable and that, as a result the Plan is more likely than not to succeed. *Prime Healthcare Mgmt., Inc. v.*

*Valley Health Sys. (In re Valley Health Sys.)*, 429 B.R. 692, 711 (Bankr. C.D. Cal. 2010) (chapter 9 plan is feasible if "it offers a reasonable prospect of success and is workable"). To prove that the Plan is feasible, the District must show that the District will be able to both maintain services at the level it deems necessary to the continued viability of the District, and make the payments set forth in the Plan. *Mount Carbon*, 242 B.R. at 34-35; *Corcoran Hosp. Dist.*, 233 B.R. at 453-54 (finding that chapter 9 plan was feasible based on reliable testimony that the debtor would be able to make the payments provided under the plan and that the plan was based on reasonable projections of future income and expenses); *In re Connector 2000 Ass'n*, 447 B.R. 752, 765-66 (Bankr. D.S.C. 2011) (chapter 9 plan was feasible based on reasonable projections regarding debtor's ability to make payments under the plan).

Here, the District's financial projections attached as Exhibit A to the Disclosure Statement represents just the sort of balance that Congress intended the feasibility test to achieve. In preparing its financial projections, the District considered as many contingencies as possible in order to develop the most realistic revenue and expense projections it could. While predicting the future is obviously uncertain, the financial projections are reasonable and appropriate to show that the District will have the resources necessary to fund the Plan and carry out the District's mission of providing healthcare services to its residents. The District will continues to monitor closely the risk factors identified in the Disclosure Statement as well as those factors outside its control that impact the finances of the District and most all rural health care districts throughout the United States. The financial projections on which the Plan is predicated are realistic, and the District's Board is mindful of the District's ongoing challenging financial situation. At the same time, the financial projections show that the District is likely to be able to make the payments set forth in the Plan and still be able to continue to fulfill its mission to provide healthcare services to the District's residents. Thus, the Plan satisfies Section 943(b)(7).

///
///
///
///

IV.    CONCLUSION

The District has suffered significant financial difficulties and other problems for many years. The road leading to bankruptcy was tumultuous and filled with acrimony that sharply divided residents of the City of Tulare and surrounding communities. The District's road during the administration of this Chapter 9 case has been rocky, and the District has overcome significant obstacles and acrimonious litigation on its journey to financial rehabilitation. There is much to celebrate - the hospital has reopened and AH Tulare has made a long-term commitment and investment in providing the residents of the District with high quality healthcare services. Confirmation of the Plan will ensure that these efforts will not be for naught. For all of the foregoing reasons, the District respectfully requests that the Court determine that the Plan meets all of the requirements set forth in section 943(b) and confirm the Plan.

Dated: August **9**, 2019                    WANGER JONES HELSLEY PC

By: *Riley C. Walter*
Riley C. Walter
Attorneys for Tulare Local Healthcare
District